1 | Danielle R. Pena, Esq., SBN 286002
dpena@PHGLawGroup.com
2 | PHG Law Group
501 West Broadway, Suite 1480
3 | San Diego, CA 92101
Telephone: (619) 826-8060
4 | Facsimile:  (619) 826-8065

5 | James S. Terrell, Esq. SBN 170409
jim@talktoterrell.com
6 | 115411 Anacapa Road
Victorville, CA 92392
7 | Telephone: (760) 561-2699
Facsimile:  (760) 952-1085

8 |

9 | Sharon J. Brunner, Esq. SBN 229931
Sharon.j.brunner@gmailc.com
Law Office of Sharon J. Brunner
10 | 14393 Park Avenue, Suite 101
Victorville, CA 92392
11 | Telephone: (760) 243-9997
Facsimile:  (760) 843-8155

12 |

13 | Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCES ENYART, Individually, and as Successor in Interest to WILLIAM ENYART, GREGORY ENYART, as an Individual, and AMANDA KELLEY as GUARDIAN AD LITEM TO A.E., | Case No.  **5:23-cv-00540-RGK-KK** |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR:** |
| v. | **1. 4th AMENDMENT – EXCESSIVE FORCE** |
| COUNTY OF SAN BERNARDINO, AARON CONLEY, DEPUTY C. UMPHLETT, ROD SKAGGS, DEPUTY SNOW, DEPUTY SILVA, and DOES 1-10, inclusive, | **2. 4th AMENDMENT – UNLAWFUL ARREST** |
| Defendants. | **3. 14th AMENDMENT – INADEQUATE MEDICAL CARE** |
| | **4. 14th AMENDMENT – INADEQUATE POLICY & TRAINING** |
| | **5. 14th AMENDMENT – LOSS OF ASSOCIATION** |
| | **6. BANE ACT § 52.1** |
| | **7. NEGLIGENCE / CCP § 377.30** |
| | **8. WRONGFUL DEATH / CCP § 377.60** |

# I.

## **INTRODUCTION**

1.     William "Billy" Enyart was a typical 36-year-old man.  He loved sports, dirt bikes, his turtle Walter, and his daughter, A.E.  Billy lived with his parents, Greg and Fran Enyart. Since Greg was diagnosed with cancer years ago, Billy dedicated his life to being Greg's full-time caregiver because he was too afraid to leave his dad's side.

  

2.     On July 27, 2022 Billy's parents, and his two siblings, Amanda and Nick, confronted him with their concerns about his self-medicating to treat his severe anxiety and depression. Billy was diagnosed with severe depression and anxiety ten years prior. Until the last four years, Billy was prescribed Xanax to control his symptoms. However, when doctors began cracking down on opioid prescriptions, Billy started drinking daily to self-medicate.

3.     During the intervention, Billy started yelling at his family although he never became violent or aggressive. As Greg had done before in the past, he called the non-emergency police line and requested an officer talk with Billy about getting help. These efforts had been successful in the past. When the San Bernardino County Sheriff deputy approached the Enyart family house, the family was going to meet the deputy outside. Billy was calm and non-aggressive. He told his family that he would go with them outside to talk to the deputy and say "hi."

FIRST AMENDED COMPLAINT                    CASE NO. **5:23-CV-00540-RGK-KK**

4.      Defendant Deputy Conley approached the front of the house aggressively and instantly escalated the contact.  Without word or movement from Billy, Defendant Deputy Conley ordered Billy to turn out his pockets. In the process of turning out the left pocket, Defendant Deputy Conley grabbed Billy by the arms and threw him into a truck in the driveway.  Defendant Deputy Conley chicken-winged Billy and yelled vulgarities.  Billy's family was standing nearby and told Defendant Deputy Conley that Billy just had shoulder surgery two weeks ago and that he was not resisting arrest.  Nevertheless, Defendant Deputy Conley continued to be rough with Billy by repeatedly slamming him up against the truck. Without sufficient probable cause, Defendant Deputy Conley arrested Billy for resisting.

5.      During the arrest, which occurred in the family's front lawn, Billy's siblings, Amanda and Nick, both licensed nurses, repeatedly told Defendant Deputy Conley and his Supervisor, Defendant Sergeant Umphlett, that Billy was alcohol dependent and was going to be experiencing severe "life-threatening" withdrawals. They also informed Defendant Deputy Conley and Supervisor Umphlett that Billy was suffering from a mental health crisis.  They begged Defendant Deputy Conley and Supervisor Umphlett to take Billy to a hospital because he needed medical and mental health treatment. Fran and Greg mentioned to both Defendants that Billy had a history of bad alcohol withdrawals.  Nick told Supervisor Umphlett, "if this was my patient I would immediately request a 5150 evaluation."  Supervisor Umphlett told the family, "Anyone with any kind of substance in their system, goes to jail."  All of the Enyart family members expressed panicked concerns that Billy was going to experience severe alcohol withdrawals and required extensive medical treatment and monitoring.

6.      Again, the family urged their concerns to Defendant Deputy Conley and Supervisor Umphlett, this time asking for Billy to be evaluated by the EMTs that just arrived on scene.  Defendants refused to let the EMTs treat Billy and they

FIRST AMENDED COMPLAINT                    CASE NO. **5:23-CV-00540-RGK-KK**

refused to let Amanda and Nick, both licensed nurses, discuss Billy's medical needs with the EMTs.  The EMTs drove away at the direction of Defendant Deputy Conley and Defendant Umphlett.  Finally, after the Enyart family's repeated pleas, Supervisor Umphlett told the family that she had an alcoholic father growing up and knows High Desert Detention Facility has great alcohol and drug programs.

7.    Defendants transported Billy to High Desert Detention Facility.  Based on the limited jail medical records in the family's possession, it is clear Defendant Deputy Conley and Supervisor Umphlett failed to relay the material medical information to the jail intake staff regarding Billy's pending life-threatening withdrawals and current mental health crisis.  Make no mistake, there was a form that Defendants were required to fill out when booking Billy in jail, but Defendant Deputy Conley and Supervisor Umphlett answered "no" to all the field questions, including questions about Billy's medical and mental health needs.

8.    Nevertheless, terrified that Billy was going to die in jail, over the next five days Fran and Greg called the jail thirty-two times.  Each time, pleading to ensure Billy is ok and receiving appropriate withdrawal and mental health treatment.  Due to the level of calls placed by Billy's family, on July 30, 2022, Fran was told by Defendant Deputy Skaggs, "this is jail, not a hospital." Defendant Deputy Skaggs then hung up on Fran.

9.    Two days later, on August 1, 2022, at 1:15 p.m., Billy was found dead in his cell.  Based on information and belief, Billy died from Delirium Tremens, which is the most serious symptom of alcohol withdraw and leads to death if not properly treated.

10.    Based on the limited jail medical records in the family's possession, Billy was **never** flagged or treated for alcohol withdraws while in the custody and care of Defendant County of San Bernardino, despite the family's thirty-two phone calls begging for medical intervention.

/ / /

4

11.    Billy's foreseeable and predictable death leaves A.E. fatherless.  He also leaves behind his mother Fran, his father Greg, and his siblings, Amanda and Nicholas.

## II.

## JURISDICTION AND VENUE

12.    This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. section 1983.  The jurisdiction of this court is invoked pursuant to 28 U.S.C section 1331 and 1343.  State law claims are alleged as well, over which Plaintiffs invoke the Court's supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a).

13.    This case is instituted in the United States District Court for the Central District of California pursuant to 28 U.S.C. section 1391, as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices, work, and/or reside.  The incident giving rise to this lawsuit occurred in San Bernardino County custody.

14.    Pursuant to the California Government Code, Plaintiffs filed their tort claim with the County of San Diego based on the foregoing incident on August 5, 2022.  The claim was rejected on September 28, 2022.  Thus, the present complaint is timely, pursuant to California Government Code section 945.6.

## III.

## PARTIES

15.    Billy Enyart was a resident of San Bernardino County in the State of California and a citizen of the United States at all times relevant to this complaint. He died in-custody at West Valley Detention Center ("WVDC"), which is located in San Bernardino County.

/ / /

/ / /

/ / /

5

16.     Francis Enyart "Fran" is an individual residing in the County of San Bernardino, California, and was at all relevant times the natural mother of Billy. Fran sues in her individual capacity as the mother of Billy.  Fran seeks both survival and wrongful death damages under federal and state law.

17.     Gregory Enyart "Greg" is an individual residing in the County of San Bernardino, California, and was at all relevant times the natural father of Billy. Greg seeks both survival and wrongful death damages under federal and state law.

18.     A.E. is Billy's minor daughter. A.E. is a resident of San Bernardino County in the State of California and a citizen of the United States at all times relevant to this complaint.  A.E. brings this action in her individual capacity as the natural child of Billy and in a representative capacity as a successor-in-interest to Billy pursuant to California Code of Civil Procedure § 377.30 and 377.60.  A.E. seeks both survival and wrongful death damages under federal and state law. By and through this complaint, and pursuant to Federal Rule of Civil Procedure 17(c)(2), Billy's sister, Amanda Enyart Kelley, moves this Court to appoint her as A.E.'s *guardian ad litem*, for the sole purpose of pursuing this action.  An Application for a Guardian Ad Litem is submitted herewith.

19.     Defendant Aaron Conley was working for the San Bernardino Sheriff's Department on the morning of July 27, 2022, when he acted aggressively and unreasonably.  Defendant Aaron Conley was working under the color of law and within the course and scope of his employment when the alleged wrongful acts occurred.  Based on information and belief, Defendant Conley lived in the County of San Bernardino at all times mentioned herein and committed the culpable acts against Billy in the same county.

20.     Defendant Umphlett was Defendant Conley's supervisor.  She was directly in charge of Deputy Conley and was on scene in the aftermath of Defendant Conley's aggressive actions against Billy.  Billy's family told her explicitly that he needs mental health care and would be experiencing life-

FIRST AMENDED COMPLAINT          CASE NO. **5:23-CV-00540-RGK-KK**

1  threatening withdrawals.  Defendant Umphlett directed Defendant Conley to
2  unlawfully arrest Billy and to bypass 5150 and mental health clearance, putting
3  Billy straight to jail.  She did this despite direct knowledge from Billy's family that
4  Billy would suffer fatal withdrawals without proper treatment.  Defendant Umphlett
5  was working under the color of law and within the course and scope of her
6  employment when the alleged wrongful acts occurred.  Based on information and
7  belief, Defendant Umphlett lived in and worked for the San Bernardino County at
8  all times herein and committed culpable acts against Plaintiffs in the same county.

9    21.    Defendant Rod Skaggs was working at High Desert Detention Facility.
10 He received several warnings from the Enyart family regarding Billy's medical and
11 mental health condition.  Defendant Skaggs knew Billy was suffering from life-
12 threatening alcohol withdrawals and a mental health crisis but failed to relay that
13 critical information to the jail medical staff or include that information in Billy's
14 jail profile.  Based on information and belief, Defendant Skaggs lived in and
15 worked for the San Bernardino County at all times herein and committed culpable
16 acts against Plaintiffs in the same county.

17    22.    Defendant Deputy Snow was working at High Desert Detention
18 Facility.  She received several warnings from the Enyart family regarding Billy's
19 medical and mental health condition.  Defendant Snow knew Billy was suffering
20 from life-threatening alcohol withdrawals and a mental health crisis but failed to
21 relay that critical information to the jail medical staff or include that information in
22 Billy's jail profile.  Based on information and belief, Defendant Snow lived in and
23 worked for the San Bernardino County at all times herein and committed culpable
24 acts against Plaintiffs in the same county.

25    23.    Defendant Deputy Silva was working at High Desert Detention
26 Facility.  She received several warnings from the Enyart family regarding Billy's
27 medical and mental health condition.  Defendant Silva knew Billy was suffering
28 from life-threatening alcohol withdrawals and a mental health crisis but failed to

FIRST AMENDED COMPLAINT                    CASE NO. **5:23-CV-00540-RGK-KK**

relay that critical information to the jail medical staff or include that information in Billy's jail profile. Based on information and belief, Defendant Silva lived in and worked for the San Bernardino County at all times herein and committed culpable acts against Plaintiffs in the same county.

24. Defendant County of San Bernardino ("County") is, and at all times mentioned herein was, a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of San Bernardino County citizens. At all times mentioned herein, Defendant County was responsible for policing the public and for overseeing the operation, management, and supervision of the County jails such as West Valley Detention Center and High Desert Detention Center, as well as its Corrections Officers, Medical Staff, and inmates. The County is also responsible for developing, implementing, and amending jail policies, procedures, and training.

25. The names of the other individual Sheriff's Deputies and Medical Staff who are responsible for Plaintiffs' injuries are currently unknown to Plaintiffs. As such, these individuals are sued herein as DOES 1-10.

26. The true names and capacities whether individual, corporate, associate or otherwise, of defendants named herein as DOES 1-10 are unknown to Plaintiffs, who therefore sue said defendants by said fictitious names. Plaintiffs will amend this complaint to show said defendants' true names and capacities when the same have been ascertained. Plaintiffs are informed and believe and thereon allege that all defendants sued herein as DOES are in some manner responsible for the acts and injuries alleged herein.

27. At all times mentioned herein Defendants named herein as DOES 1-10 were employees and/or independent contractors of San Bernardino County and in doing the acts hereinafter described acted within the course and scope of their employment. The acts of all defendants and each of them were also done under the color and pretense of the statutes, ordinances, and regulations of the San Bernardino

8

County and the State of California.  In committing the acts and/or omissions alleged herein, all defendants acted under color of authority and/or under color of law. Plaintiffs sue all public employees named as Defendants in their individual capacities.

**IV.**

**FACTS RELEVANT TO ALL COUNTS**

28.    On July 27, 2022, around 2:45 p.m., Billy's family called the nonemergency police line asking for someone to come talk to Billy because Billy was suffering from a mental health crisis.  Billy's family had done this in the past and it resulted in helpful conversation between law enforcement and Billy regarding his life and medical needs.

29.    Billy was calm and collected by the time Defendant Deputy Conley arrived on scene.  Nicholas, Amanda, Fran, and Greg went outside to talk to Defendant Deputy Conley.  Billy also walked outside to the front lawn.  Defendant Deputy Conley asked which one of them was Billy.  When Billy identified himself, Deputy Conley grabbed him by the left arm and walked him over to Nicholas's truck.

30.    Defendant Deputy Conley ordered Billy to remove any items from his pockets.  When Billy began emptying the second pocket, Defendant Deputy Conley ordered Billy to get his hand out of his pocket and then grabbed Billy by the arms and slammed him into Nick's truck.

31.    The Enyart family watched in horror as Defendant Deputy Conley grabbed Billy's arm and shoved his right arm into his back and slamming Billy into the truck.  Billy had three surgeries in this very arm and Billy pleaded with Deputy Conley to ease up because he was hurting him.  At that same time, Amanda and Nick Enyart told Defendant Deputy Conley that Billy just had surgery. Greg told Defendant Conley that Billy had hardware in his arms.  Specifically, they told Defendant Deputy Conley that Billy had a mass taken out of his back under the left

shoulder blade two weeks prior to the incident.  Doctors said that it was a four-to-six-week recovery and directed Billy not to lift anything heavy.

32.    At that point, Defendant Deputy Conley called for more back up. Additional officers arrived, including Sergeant Umpheltt, and Billy was unlawfully arrested for resisting arrest.  Billy was then placed in the back of a police car.

33.    While Billy sat in the police car, Sergeant Umphlett interviewed Billy's family inside the house.  Nick, who is a licensed nurse, told Sergeant Umphlett that Billy is suffering from a mental health crisis and is a high-risk patient.  Nick advised Sergeant Umphlett that Billy will certainly experience "life-threatening" withdrawals due to his alcohol dependency.  Nick told Sergeant Umphlett, "If this was my patient, I would send an order for a 5150 hold." Sergeant Umphlett responded that Billy was going to jail.

34.    Fran Enyart also told Sergeant Umphlett that Billy drinks daily and that he is at risk of seizure or stroke.  Sergeant Umphlett said, "Anyone with any kind of substance in their system goes to jail."

35.    Sergeant Umphlett repeatedly told the Enyart family that Billy is not going to a withdrawal center, but he is going to jail.  Sergeant Umphlett told the Enyart family that High Desert Detention Center had an alcohol treatment program and Billy would receive proper withdraw treatment there.

36.    Defendants Conley and Umphlett transported Billy straight to jail. Defendants failed to obtain a medical and mental health clearance despite the Enyart family's serval warnings about Billy's mental health crisis and impending alcohol withdraws.

37.    San Bernardino jails require arresting officers to fill out a portion of the intake form entitled "Arresting Officer Questions."  The purpose of the form is to relay material information the arresting officer learned in the filed to the jail intake staff.  The questions relate to whether an inmate has injuries, mental health issues, and/or drug and alcohol issues.  Defendants Conley and Umphlett answered

FIRST AMENDED COMPLAINT        CASE NO. **5:23-CV-00540-RGK-KK**

"No" to every question and failed to explicitly relay the Enyart Family's concerns and medical warnings.

38.     From July 27, 2022, to July 31, 2022, Billy's family constantly called the jail repeatedly telling whoever answered that Billy could be in critical condition. Over the course of these days, the family called a total of thirty-two times, pleading with every person who answered the phone that Billy would be suffering from life-threatening withdrawals and is experiencing a mental health crisis.  Two of the reception deputies that received several of the Enyart Family's calls was Defendant Snow and Defendant Silva.

39.     Defendant Snow and Defendant Silva were told over and over again that Billy was severely alcohol dependent and would be experiencing life-threatening withdrawals.  Fran and Greg also told Defendant Snow and Defendant Silva that Billy was experiencing a mental health crisis.  Fran and Greg Enyart begged Defendant Snow and Defendant Silva to get Billy the medical care he needed.  Defendant Snow and Defendant Silva reassured the Enyart's family that Billy was "fine" despite knowing that he had been suffering from medical distress. Defendant Snow did inform the family that Billy said he was in pain.  Based on the limited jail medical records in the family's possession, Defendant Snow and Defendant Silva did not relay this critical medical information to the medical staff nor did they include mention of the Greg and Fran's warnings and concerns in Billy's jail profile.

40.     On July 30, 2022, Defendant Silva transferred the Enyart Family's calls to Defendant Deputy Skaggs, who told them that Billy was doing fine.  Billy's family told Deputy Skaggs that Billy was going to die if he did not receive proper medical and mental health care.  Again, Fran and Greg told Deputy Skaggs that Billy was severely alcohol dependent and would being going through severe, life-threatening withdrawals.  They also told Defendant Skaggs that they initially called the police because Billy's was having a mental health crisis.  Deputy Skaggs told

FIRST AMENDED COMPLAINT           CASE NO. **5:23-CV-00540-RGK-KK**

Billy's family, "This is a jail, not a hospital" and hung up on them.  Based on the limited jail medical records in the family's possession, Defendant Skaggs did not relay this critical medical information to the medical staff, nor did he include mention of the Enyart Family's warnings and concerns in Billy's jail profile.

41.    On July 31, 2022, the Enyart Family was told that Billy was transferred to West Valley Detention Center.  As it turns out, despite the constant reassurance from High Desert Detention Center ("HDDC") that Billy was fine, Billy was actually decompensating and experiencing severe delirium tremens ("DTs").  Over the course of Billy's detainment at HDDC, he slowly started to have vivid and constant auditory and visual hallucinations compounded with severe confusion and disorientation.  Not knowing how to treat Billy, HDDC transferred Billy to West Valley Detention Center.  Notably, no one from HDDC informed West Valley of the warnings they received from Billy's family.

42.    Billy's symptoms got worse and worse after he was transferred to West Valley.  Billy's symptoms all point to delirium tremens, the most serious symptom of alcohol withdrawal and can be fatal when untreated.

43.    Knowing that Billy was transferred to another jail, the Enyart Family called West Valley a total of ten times in two days.  Each time, Fran and Greg spoke to DOE jail staff and asked if Billy was ok.  Fran and Greg warned jail staff that Billy would be suffering from life-threatening alcohol withdraws and was experiencing a mental health crisis.  The Enyart's were assured Billy was fine and receiving appropriate treatment at West Valley in the reception area.

44.    Fran and Greg called West Valley at least four times on August 1, 2022.  At the times they called, Billy had already been found dead in his cell.  However, each time Fran and Greg called that day, they were told Billy was "fine" and receiving proper treatment.  At 11:45 p.m. that night, two detectives showed up at the Enyart Family house and told Fran and Greg that Billy died in custody earlier that day ay 1:15 p.m.

FIRST AMENDED COMPLAINT                CASE NO. **5:23-CV-00540-RGK-KK**

45.    Based on the limited jail medical records in the Enyart Family's possession, the thirty-two calls the family placed to High Desert and West Valley fell on deaf ears as there is no indication in Billy's medical records that his family warned jail staff about Billy suffering from life-threatening alcohol withdraws and a mental health crisis.  The repeated failures by Defendant Conley, Defendant Umphlett, Defendant Snow, Defendant Silva, and Defendant Skaggs, as well as the policy failures by San Bernardino County, directly caused Billy's premature and foreseeable death.

46.    A.E. will never get to share another adventure with her dad, or have his help on homework, or walk her down the aisle. She is currently in counseling and misses her dad daily. Fran and Greg will never be the same.  Their youngest child was taken from them despite moving heaven and earth to get Billy help. Aside from the love they had for Billy, Billy was Greg's primary caregiver after he was diagnosed with cancer.  Billy did everything for his father, from making him food, to picking up groceries, and taking him to the doctor. Since Billy's death, a hole has replaced their heart.

## **FIRST CAUSE OF ACTION**

### **42 U.S.C. Section 1983 – Fourth Amendment Excessive Force**

### **(By Successor in Interest Against Defendant Conley and DOES 1-10)**

47.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

48.    To prove an excessive force claim under the Fourth Amendment, a pretrial detainee must show that the officers' use of force was "objectively" unreasonable.  The detainee is not required to show that the "subjectively" aware that their use of force was unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).  "The following considerations may bear on the reasonableness (or unreasonableness) of the force used: 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort

13

made by the officer to temper or to limit the amount of force; the severity of the
security problem at issue; the threat reasonably perceived by the officer; and
whether the plaintiff was actively resisting.'" *Hyde v. City of Willcox*, 23 F.4th 863,
870 (9th Cir. 2022).

49.    Defendant Deputy Conley arrived at the Enyart Family home knowing
the family called the nonemergency line requesting a mental health evaluation.
There was no report of crime or injury.

50.    When Defendant Deputy Conley arrived, Billy walked out of the house
with his family right next to him.  According to several witnesses, Billy was calm
and compliant.  Given those circumstances, there was no reason to search Billy or
to reasonably conclude he was dangerous.

51.    Defendant Deputy Conley approached the Enyart Family in a hostile
and aggressive manner.  He immediately asked Billy to empty his pockets.  Billy
complied.  Billy put his right hand in the right pocket removing his phone and
pocketknife.  Billy placed the items on the truck as Defendant Deputy Conley
instructed.  Defendant Deputy Conley then asked Billy to empty the left pocket.  As
Billy followed Defendant Deputy Conley's instructions to empty out his left pocket,
Deputy Conley, without warning, violently grabbed Billy's right arm and pushed it
up into Billy's shoulder blade and then slammed Billy against the truck.  Billy cried
out in pain.  Billy's family yelled out that Billy just had surgery and had hardware
in his shoulders.  Defendant Deputy Conley kept throwing Billy against the truck
and jamming both arms into Billy's back, chicken-winging Billy.

52.    Defendant Deputy Conley called for backup even though Billy was not
fighting back or being physical in any way.  Defendant Deputy Conley said, "give
me your other arm or I will tase you."  Again, the Enyart Family told Defendant
Deputy Conley that Billy could not move his arm that way because of recent
shoulder surgery.

/ / /

14

53.     Billy gripped the truck bed with his left hand because he did not want his shoulder to be severely re-injured.  A minute later, unknown deputies arrived at the Enyart house.  They tackled Billy to the ground and handcuffed him.  Billy was then placed in the back of a police car.

54.     Based on the alleged facts above, there was no rhyme or reason to use force on Billy.  The initial call was not about Billy's supposed propensity for violence, but rather, because Billy was going through a mental health crisis.  The initial call was to the nonemergency line to get Billy help, not to get him arrested. When Defendant Deputy Conley arrived, Billy was calm and not posing a threat to anyone. He was surrounded by his loving family. Thus, Defendant Conley had no reasonable justification to use force on Billy and treat him like an armed suspect.

55.     A reasonable deputy in the same circumstances would have taken reasonable measures to take time to investigate and de-escalate the situation, if necessary.  Instead, Defendant Deputy Conley immediately escalated the situation and used unreasonable force on a calm, compliant, and mentally unstable citizen.

56.     Based on Defendant Deputy Conley's unreasonable conduct, Billy suffered from excruciating pain in front of his family.  He was repeatedly slammed into Nick's truck like a rag doll, each time causing more and more injury to Billy's shoulders.  Defendant Deputy Conley had no regard for the surgery Billy had on his shoulder just two weeks prior despite the warnings from Billy and his family.

57.     Based on these injuries, Billy's successor in interest is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate Billy for his injuries and for the violation of his Constitutional and civil rights.

58.     In addition to compensatory, economic, consequential, and special damages, Billy's successor in interest is entitled to punitive damages against Defendant Deputy Conley under 42 U.S.C. section 1983, in that his actions were done intentionally and with the intent to violate Plaintiff's rights, or was done with a reckless disregard or wanton disregard for Billy's constitutional rights.

15

## SECOND CAUSE OF ACTION

**42 U.S.C. Section 1983 – Unreasonable seizure of a person – Probable Cause Arrest**

**(By Successor in Interest Against Defendant Conley, Defendant Umphlett, and DOES 1-10)**

59.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

60.

61.    "A claim for unlawful arrest is cognizable under 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Lacey v. Maricopa County*, 693 F.3d 896, 918 (9th Cir. 2012).

62.    "Probable cause exists if the arresting officers had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that the [the arrestee] had committed or was committing a crime." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097-98 (9th Cir. 2013).

63.    Billy's family called the nonemergency line, not because Billy was in the act of committing a crime, but rather, Billy's parents were concerned about his mental health. Billy's parents reported that Billy was having a mental health crisis and needed help.  There was no report of a crime being committed or that an injury occurred.

64.    Based on no evidence of a crime or reasonable suspicion a crime was taking place, Deputy Conley grabbed Billy and used excessive force to detain Billy by throwing him against the truck and pinning him into place.  Billy was not free to move and stayed pinned against the truck until back-up deputies arrived and placed handcuffs on Billy.  At no time during this incident, did Billy try to resist or runaway.  Billy and his family repeatedly told Deputy Conley that his shoulders were injured and could not be chicken-winged high behind his back.

/ / /

16

FIRST AMENDED COMPLAINT          CASE NO. **5:23-CV-00540-RGK-KK**

65.     Deputy Conley roughly arrested Billy in front of his whole family. They all witnessed that Billy was compliant, was calm, was not a harm to others or himself, and yet Deputy Conley arrested him abruptly and harshly.  His family tried over and over to talk to Deputy Conley, to inform him of why they called the nonemergency line, but Deputy Conley did not listen to a word the family was saying.

66.     Billy was unlawfully charged with resisting arrest and was transported to High Desert Detention Facility.

67.     Sergeant Umphlett was the supervisor on scene and acting under the color of state law.  Sergeant Umphlett knew the circumstances of the Enyart's call to the nonemergency police line.  She also knew, based on her interview of the Enyart family, that Billy was not committing a crime and was not a danger to himself or others when Deputy Conley first detained Billy.  Furthermore, Sergeant Umphlett knew that Billy was calm and compliant when Deputy Conley chicken-winged him and threw him into Nick's truck repeatedly.  Despite this information, Sergeant Umphlett directed and/or acquiesced to and/or refused to stop Billy's arrest for PC69.

68.     In her capacity as Defendant Conley's supervisor, and based on her knowledge of the circumstances, Sergeant Umphlett knew Defendant Conley and DOES were unlawfully arresting Billy and that those actions deprived Billy of his constitutional right.

69.     Furthermore, in her capacity as Defendant Conley's supervisor, and based on her knowledge of the circumstances, Sergeant Umphlett engaged in the unconstitutional conduct showing a reckless or callous indifference to Billy's constitutional rights.

/ / /

/ / /

/ / /

17

70.    Based on the injuries alleged above, and ultimately Billy's untimely death, Billy's successor in interest is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate Billy for his injuries and loss of life, and for the violation of his Constitutional and civil rights.

71.    In addition to compensatory, economic, consequential, and special damages, Billy's successor in interest is entitled to punitive damages against Defendant Deputy Conley under 42 U.S.C. section 1983, in that his actions were done intentionally and with the intent to violate Plaintiff's rights, or was done with a reckless disregard or wanton disregard for Billy's constitutional rights.

### **THIRD CAUSE OF ACTION**

**42 U.S.C. Section 1983 – Inadequate Medical Care**

**(By Successor in Interest Against Deputy Conley, Sergeant Umphlett, Deputy Skaggs, Deputy Snow, Deputy Silva, and DOES 1-10)**

72.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

73.    The elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are:

a.    The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

b.    Those conditions put the plaintiff at substantial risk of suffering serious harm;

c.    The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and

/ / /

FIRST AMENDED COMPLAINT        CASE NO. **5:23-CV-00540-RGK-KK**

d.    By not taking such measures, the defendant caused the plaintiff's injuries.  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1072 (2016).

74.    Pursuant to the POST standards and Regulations that govern the conduct of law enforcement officers, "The arresting officer is responsible for informing custodial personnel and documenting any observable, known, or recognized signs of injury, illness, possible drug overdose, mental incapacitation, suicide risk, or whether that person requires medication."

75.    Specifically, Billy's sister, Amanda, and his brother, Nick, both licensed nurses, repeatedly told Defendant Deputy Conley and his Supervisor, Defendant Deputy Umphlett, that Billy was alcohol dependent and was going to be experiencing severe "life-threatening" withdrawals.  They also informed Defendant Deputy Conley and Supervisor Umphlett that Billy was suffering from a mental health crisis.  They begged Defendant Deputy Conley and Supervisor Umphlett to take Billy to a hospital because he needed medical and mental health treatment. Nick told Supervisor Umphlett, "if this was my patient, I would immediately request a 5150 evaluation."  Supervisor Umphlett told the Enyart Family, "Anyone with any kind of substance in their system, goes to jail."

76.    Billy's family continually told Deputy Conley and Sergeant Umphlett that Billy was a heavy drinker and was at high risk for "life-threatening" withdrawals, needed high blood pressure medication, and needed mental health assistance.

77.    Sergeant Umphlett told the Enyart Family that she would not take Billy to the hospital but that High Desert had a "great" alcohol and drug program. Sergeant Umphlett ensured the Enyart family that Billy would receive appropriate medical and mental health care at jail.

78.    Billy was transported to High Desert Detention Facility rather than to a hospital for medical and mental health clearance.

19

79.     Based on the limited jail medical records in the family's possession, it is clear Defendant Deputy Conley and Supervisor Umphlett failed to relay the material medical information to the jail intake staff regarding Billy's pending "life-threatening withdrawals" and current mental health crisis.  Make no mistake, there was a form filled out, but Defendant Deputy Conley and Supervisor Umphlett answered "no" to all the field questions, including questions about Billy's medical and mental health needs.  Meaning, Defendant Deputy Conley and Supervisor Umphlett intentionally failed to relay critical medical information to the jail in conscious disregard of Billy's life.

80.     Despite their repeated pleas to Defendant Conley and Umphlett, terrified that Billy was going to die in jail, over the next five days Billy's family called the jail thirty-two times.  Each time, pleading to ensure Billy is ok and receiving appropriate withdrawal and mental health treatment.

81.     The Enyart Family explicitly informed Defendant Snow, Defendant Silva, and Defendant Skaggs that Billy was going to die in jail from severe alcohol withdrawals.  Fran and Greg did everything in their power to get Billy the medical and mental health care he needed.  These critical warnings and requests for medical attention on behalf of Billy were not relayed to the medical staff, or inputted in Billy's jail profile, thereby intentionally denying Billy life-saving treatment.

82.     The National Commission on Correctional Health Care requires that every jail implement an alcohol withdrawal policy and train staff regarding the signs and symptoms associated with alcohol withdrawals.  Based on information a belief, and the Remedial Plan governing San Bernardino County jails, every Defendant was trained that Delirium Tremens (DT's) is a **medical emergency** and occurs because of severe alcohol withdrawal.  Symptoms include disorientation, memory disturbance, tactile and/or visual hallucinations, delusions including paranoia, increased pulse, blood pressure, temperature, sweating, and tremors. Every Defendant is also trained that untreated DT's will likely result in death.

20

83.     Once Billy was flagged as a daily drinker with a history of DT withdrawals, Billy should have been prescribed a medication regimen including Librium, Thiamine, and Zofran.  He also should have been housed in an area that could provide 24-hour medical monitoring and at least twice daily vital checks. The moment Billy displayed severed signs of DTs, Billy should have immediately been rushed to the Emergency Room.

84.     Based on the limited medical records, Billy did display severe signs of DT's for at least two or three days prior to his death however the medical staff was not notified that Billy was a daily drinker and would experience severe alcohol withdrawals. Rather, without knowing Billy's medical history, mental health staff assumed Billy was severely mental ill and potentially schizophrenic because Billy displayed severe confusion and effects of auditory and visual hallucinations. Had the Enyart family's warnings been relayed to the medical staff, any reasonable medical professional would have immediately began treatment for DT's and would have rushed Billy to the emergency Room.

85.     For example, on the morning of his death, Billy was sitting backwards on the toilet facing the wall and responding to internal stimuli. Billy kept repeating, "don't take that pillow, appetizer, to die."  The day prior, Billy was confused, paranoid, and delusional as he was talking to a non-existing identity and claiming he owned the facility.  Billy was continually looking under the bed and sink for unknown reasons. Severe confusion and hallucinations are the most commons symptoms associated with DT's.

86.     As such, based on the county's training protocol, each Defendant was aware that severe alcohol withdrawals are highly dangerous and can lead to death if not properly treated.  Accordingly, each Defendant knew that failing to relay this critical medical information to the jail medical staff would likely lead to Billy's death.

/ / /

FIRST AMENDED COMPLAINT          CASE NO. **5:23-CV-00540-RGK-KK**

87.    Furthermore, based on the county's training protocol, each Defendant was aware that material medical information relating to an arrestee or inmate must be timely conveyed to jail medical staff.

88.    The Enyart Family called the jail so frequently that on July 30, 2022, Fran Enyart was told by Defendant Skaggs, "this is jail, not a hospital."

89.    In total, Greg and Fran called the two detention centers a total of thirty-two times, trying to ensure that their beloved son gets the correct medical treatment.  They were given reassurance time-and-time again that Billy was "fine" and receiving appropriate medical treatment.

90.    However, medical records reveal that the medical staff had no idea that Billy had a drinking problem, despite the family's consistent and persistent attempts to tell someone that Billy was going to experience "life-threatening withdrawals." Accordingly, due to every Defendants' critical failure to relay material medical information, Billy was never administered withdrawal medications and was not medically monitored as indicated.

91.    All Defendants and DOES at HDDC and WVDC knew that the Enyart Family was trying to give information pertinent to proper medical care of Billy, and yet, no one did the due diligence of telling medical personnel about Billy's impending medical distress.

92.    Based on the injuries alleged above, and ultimately Billy's untimely death, Billy's successor in interest is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate Billy for his injuries and loss of life, and for the violation of his Constitutional and civil rights.

93.    In addition to compensatory, economic, consequential, and special damages, Billy's successor in interest is entitled to punitive damages against Defendant Deputy Conley under 42 U.S.C. section 1983, in that his actions were done intentionally and with the intent to violate Plaintiff's right, or was done with a reckless disregard or wanton disregard for Billy's constitutional rights.

22

## FOURTH CAUSE OF ACTION

### 42 U.S.C. Section 1983 – Inadequate Policy and Training

### (By Successor in Interest Against San Bernardino County)

94.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

95.    Defendants San Bernardino County, together with County DOE policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a)    Maintaining an inadequate policy and providing inadequate training regarding relaying material medical information privy to the arresting deputy to the jail intake staff.  During the jail intake screening process, arresting deputies are not properly trained to relay critical medical information to the jail intake staff.  Such a policy and adequate training would ensure that inmates receive proper and timely treatment and medication;

(b)    Maintaining an inadequate policy and providing inadequate training regarding receiving information from family members (or other third parties) that call the jail complaining of medical and mental healthcare concerns for a particular inmate.  San Bernardino County failed to maintain any policy that directs staff to verbally relay medical information from third parties to the medical staff.  In that same vein, San Bernardino County failed to maintain any policy that directs staff to document the medical and mental healthcare warnings that jail staff receives from third parties in an inmate's jail profile.  The importance of relaying critical medical information to the medical staff ensures the inmate will receive proper and timely treatment;

(c)    Maintaining an inadequate policy and providing inadequate training relating to which facility or jail a medically distressed inmate should

23

be transported to. Because Defendant Conley and Umphlett knew that Billy was in serious medical distress and would be suffering from "life-threatening" withdrawals, Defendants should have transported Billy to a hospital or a medical facility within the jail system that has 24-hour medical and mental health care; and

(d)     Failing to adequately discipline county deputies and medical staff for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct or ratifying their conduct.

96.     Taking no action since 2016, despite signing a Consent Decree which consisted of vast changes, including a "Plan" between the Prison Law Office and the County to fix the broken inadequate medical policies.

97.     The "Plan" which consisted of remedial charges in policy, procedure, and staff changes is "notice" that the County was aware of unsafe conditions in its jails were failing to treat inmates for serious medical conditions because their staff was not properly trained to relay critical medical information to the jail medical staff. As such, the failure to provide inadequate care is a longstanding custom.

98.     Based on information and belief, Defendant Conley, Defendant Umphlett, Defendant Snow, Defendant Silva, Defendant Skaggs, and DOES 1-10 acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant San Bernardino County, including an unconstitutional policy of not relaying critical medical information to the jail medical staff, as well as a policy of mishandling situations with individuals who suffer from intoxication or withdrawals, and severe life threatening crises.

99.     Prior to Billy's foreseeable death, San Bernardino County was put on notice, via other similar cases, that it needed to implement a policy, and train its employees, to relay critical medical information learned in the field to jail medical

24

staff.  For example, prior to Billy's death, Betty Lozano, Jacob Hoyo, Albert Snell, Joshua Pitts, David Liebrenz, and Angel Sapien all died in-custody because material medical information was not relayed to the jail medical staff.

100.   In the last three years, over 30 people have died in San Bernardino jails with 18 of these deaths, or 60 percent, being medically related, according to Sherriff's Department figures, which was stated in response to Betty Lozano's jail death.

101.   The failures referenced above, and the failure to implement adequate training, was a moving force in Billy's foreseeable death.

102.   By reason of the aforementioned acts and omissions, Billy died.  His pain and suffering and loss of life is a result of the callous indifference of all Defendants.

103.   All Defendants and DOES 1-10, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Billy, his family, and other individuals similarly situated.

104.   By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, San Bernardino County acted with intentional, reckless, and callous disregard for the life of Billy and for his and constitutional rights.  Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by San Bernardino County and DOES 1-10 were affirmatively linked to and were a significantly influential force behind Billy's death.

/ / /

/ / /

FIRST AMENDED COMPLAINT          CASE NO. **5:23-CV-00540-RGK-KK**

105.   Fran Enyart brings this claim as successor in interest to Billy and seeks survival and wrongful death damages under this claim individually, as does Greg and A.E.

106.   Plaintiffs seek damages, accounting for Billy's pain and suffering, loss of earning capacity, and loss of enjoyment of life.  Billy's family seeks damages relating to their loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support.  Plaintiff also seeks reasonable costs, funeral and burial expenses, and attorney's fees under 42 U.S.C. section 1988.

## FIFTH CAUSE OF ACTION

**42 U.S.C. Section 1983 – Due Process – Loss of Familial Association**

**(By Fran Enyart, Greg Enyart, and A.E. Against All Defendants and**

**DOES 1-10)**

107.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

108.   The Ninth Circuit recognizes that a parent and child have a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child.  *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).

109.   All Defendants' failures hereinabove described was so egregious and outrageous it would shock the contemporary conscience of any family trying to get help for their loved on that is being detained in jail.  What more could anyone else do?

110.   Each member of Billy's family told Deputy Conley and Sergeant Umphlett that Billy was going to experience "life-threatening" withdrawals and was suffering from a mental health crisis.  No matter what information they told Defendants, Defendants did not care—they were taking Billy to jail no matter his medical needs.  Then, once they arrived at High Desert, Defendant conley and

Supervisor Umphlett intentionally refused to relay critical medical information to the jail intake staff, ensuring Billy's death.

111. Similarly, Defendant Snow, Silva, and Skaggs, each knew that Billy was in the midst of severe "life-threatening" alcohol withdrawals. Fran and Greg Enyart told each Defendant that Billy was going to die from withdrawals if he did not get proper treatment. Each Defendant lied to Plaintiffs and told them Billy was fine despite knowing he was suffering from medical problems. Despite the life-threatening nature of Billy's medical needs, each Defendant deliberately failed to relay critical medical information to the jail medical personnel, which directly caused Billy's death.

112. All of the family's warnings and pleas for help were ignored. Billy remained secluded, unmonitored, and unmediated, despite displaying signs and symptoms associated with DT's such as severe confusion and hallucinations. As a result, Fran, Greg, and A.E., were deprived of their constitutional right to familial association, society, and companionship, without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

113. These facts equate to conduct that shocks the conscience. As such all Defendants and DOES 1-10 are liable for the damages associated with Plaintiffs' loss of relationship. A.E. will never get to share another adventure with her dad, or have his help on homework, or walk her down the aisle. She is currently in counseling and misses her dad daily. Fran and Greg will never be the same. Their youngest child was taken from them despite moving heaven and earth to get Billy help. Aside from the love they had for Billy, Billy was Greg's primary caregiver after he was diagnosed with cancer. Billy did everything for his father, from making him food, to picking up groceries, and taking him to the doctor. Since Billy's death, a hole has replaced their heart.

/ / /

/ / /

FIRST AMENDED COMPLAINT          CASE NO. **5:23-CV-00540-RGK-KK**

### SIXTH CAUSE OF ACTION

### BANE ACT (Civ. Code, §52.1)

### (By Successor in Interest Against All Defendants and DOES 1-10)

114.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

115.   The Bane Act provides a civil cause of action against anyone who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment … of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." (§ 52.1, subd. (a); see id., subd. (b).)  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.*, 149 Cal.App.4th 860, 883 (2007).

116.   "Where the Bane Act violation is based on allegations of an unlawful arrest where there was also excessive force in effectuating that arrest, a Bane Act claim can be stated.  See, e.g., *Stubblefield v. City of Novato*, 2016 U.S. Dist. LEXIS 5662, 2016 WL 192539, at *11 (N.D. Cal. Jan. 15, 2016) (discussing cases).

117.   Here, Defendant Conley coerced Billy by using excessive force to make an unlawful arrest and threatened Billy in the patrol unit during transport to jail.  According to Billy, Defendant Conley harassed him about something he did not do and intimidated Billy by declaring he was going to personally appear at Billy's arraignment to ensure he was properly punished.

118.   In the Ninth Circuit, as it relates to Bane Act claims relating to inadequate medical care in a correctional setting, controlling law states, with regard to coercive conduct, "at the pleading stage, the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct." *M.H. v. County of Alameda* (N.D. Cal. 2013) 90 F. Supp. 3d 889, 898 Courts have equated the

28

"[t]hreat, intimidation, or **coercion**" requirement to "intentional . . . conduct." *Id.* at 898. "That intent requirement is satisfied where the defendant allegedly acted with '[r]eckless disregard of the right at issue.'" *Cornell v. City and County of San Fransisco* (1ˢᵗ Dist. 2017) 17 Cal. App. 5th at 804.

119.   Here, all Defendants intentionally failed to relay critical medical information knowing Billy would die if not relayed.  This intentional conduct, knowing Billy would die without proper treatment, and failing to obtain that treatment, rises to the necessary level of reckless disregard.

120.   Based on Defendants' intentional failure to act as referenced above, San Bernardino County is vicariously liable.  See *Perreault v. Cty. of Westminister* (C.D. Cal. March 7, 2013) 2013 U.S. Dist. LEXIS 31780 at *7 (recognizing availability of *respondeat superior* liability for violations of Bane Act).

121.   Additionally, San Bernardino County is directly liable under the Bane Act because it intentionally chooses not to train or supervise its staff to relay critical information to jail medical staff, as detailed above.

122.   Under the provisions of California Civil Code section 52(b), Defendants are liable for reasonable attorney's fees and a civil penalty of $25,000.

123.   The conduct of Defendant Deputy Conley and Sergeant Umplett was malicious, wanton, oppressive, and accomplished with a conscious disregard for Billy's rights, justifying an award of exemplary and punitive damages as to Defendant Conley and Umphlett.

124.   Plaintiff A.E. brings this claim as successors-in-interest to Billy and seeks survival damages including emotional distress and loss of enjoyment of life under this claim.  Plaintiff A.E. also seek treble damages, attorney's fees, and costs under this claim.

125.   As a result of all Defendants' wrongful conduct, Billy's successor in interest is entitled to all applicable damages and attorney's fees according to proof and pursuant to Civil Code, section 52.1, as detailed above.

## SEVENTH CAUSE OF ACTION

### Negligence – Failure to Summon Care (CCP 377.30)

### (By Successor in Interest Against All Defendants and DOES)

126.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

127.   California Government Code section 845.6 creates an affirmative duty for jailers to furnish or obtain medical care for a prisoner in their custody when the jailer knows the inmate is in serious medical distress.

128.   Based on the allegations above, all Defendants knew Billy was suffering from severe medical and mental health distress, yet everyone failed to summon immediate medical care.

129.   Based on those failures, San Bernardino County is vicariously liable for its employees' negligent conduct which was performed within the course and scope of their employment.

130.   In doing the acts and/or omissions herein alleged, all Defendants failed to summon immediate medical care and therefore was negligent in their conduct. As a result thereof, Billy, through his successor in interest, is entitled to all applicable damages according to proof.

131.   Pursuant to Code of Civil Procedure section 377.34, Billy is also entitled to recover "damages for pain, suffering, or disfigurement if the action or proceeding was …filed on or after January 1, 2022, and before January 1, 2026." Accordingly, because this action was filed in April of 2022, Billy is entitled to recover for the pain, suffering, and disfigurement related to the days leading up to his death.

132.   As detailed above, Defendants' conduct amounts to oppression, fraud, or malice within the meaning of Civil Code Section 3294 et supra.  Accordingly, punitive damages should be assessed against Defendants for the purpose of punishment and for the sake of example.

## **EIGHTH CAUSE OF ACTION**

### **Wrongful Death (CCP 377.60)**

### **(By Fran Enyart, Greg Enyart, and A.E. Against All Defendants and DOES 1-10)**

133.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

134.   "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf: … (b)(1)… stepchildren, parents, or the legal guardians of the decedent."  Ca. CCP 377.60.

135.   All Defendants committed wrongful acts which proximately caused Billy' premature death.  As Defendants' employer, San Bernardino County, is vicariously liable for Defendants' conduct which was performed in the course and scope of the employment.

136.   These gross failures to act directly and proximately resulted in Billy's premature death.

137.   A.E. will never get to share another adventure with her dad, or have his help on homework, or walk her down the aisle. She is currently in counseling and misses her dad daily. Fran and Greg will never be the same.  Their youngest child was taken from them despite moving heaven and earth to get Billy help. Aside from the love they had for Billy, Billy was Greg's primary caregiver after he was diagnosed with cancer.  Billy did everything for his father, from making him food, to picking up groceries, and taking him to the doctor. Since Billy's death, a hole has replaced their heart.

138.   Accordingly, Defendants' wrongful acts caused Plaintiffs severe emotional damages, including the loss of love, support, guidance, society, and companionship.  Defendants are also responsible for Plaintiffs' further economic loss and non-economic damages according to proof at trial.

FIRST AMENDED COMPLAINT                    CASE NO. **5:23-CV-00540-RGK-KK**

# NINTH CAUSE OF ACTION

## Violation of Americans With Disabilities Act

**(By Successor in Interest Against Defendant Conley, Defendant Umphlett, and DOES 1-10)**

139.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

140.   At all relevant times, Defendants County of San Bernardino, Defendant Conley, Sergeant Umphlett and DOES 1-10 had an obligation under federal law to provide persons with disabilities with an equal opportunity to benefit from all of its programs, services and activities.

141.   Defendants failed to reasonably accommodate Billy's disabilities including his depression and his alcoholism.  Defendants failed to establish policies and procedures dealing with how to handle persons with disabilities and failed to establish proper training for officers and other employees on how to handle persons with disabilities.  Defendants acted with deliberate indifference to a strong likelihood that Billy's federal rights would be violated.

142.   By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of Billy.  The aforementioned acts and omissions also caused Billy's pain and suffering, loss of enjoyment of life, and death.  Accordingly, Defendants are liable to Plaintiffs for compensatory damages under 42 U.S.C. section 1983.

143.   Plaintiff A.E. brings this claim as successor in interest to Billy and seek Survival and wrongful death damages under this claim.  Plaintiff seeks damages, including for Billy's pain and suffering, loss of earning capacity, and loss of enjoyment of life.  Plaintiff also seeks reasonable costs, funeral and burial expenses, and attorney's fees under 42 U.S.C. section 1988.

32

FIRST AMENDED COMPLAINT                    CASE NO. **5:23-CV-00540-RGK-KK**

1
## **PRAYER FOR RELIEF**

2        WHEREFORE, Plaintiffs pray for the following relief:

3        1.      For compensatory, general, and special damages against each

4    Defendant, jointly and severally, in an amount according to proof;

5        2.      For punitive and exemplary damages against each individually named

6    Defendant in their individual capacity in an amount appropriate to punish

7    Defendants and deter others from engaging in similar misconduct;

8        3.      For costs and reasonable attorney's fees pursuant to 42 U.S.C. section

9    1988, the Bane Act, and as otherwise authorized by statute or law; and

10       4.      For such other relief, including injunctive and/or declaratory relief, as

11   the Court may deem proper.

12
## **REQUEST FOR JURY**

13       Plaintiffs hereby request a jury trial in this action.

14

15                                 Respectfully submitted,

16                                 **PHG Law Group**

17

18   Dated:  July 24, 2023          by:   _s/ Danielle R. Pena_

19                                 Danielle R. Pena, Esq.
                                   dpena@PHGLawGroup.com
20                                 Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT          CASE NO. **5:23-CV-00540-RGK-KK**