# EXHIBIIT 15

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCES ENYART, individually, and as successor in interest to WILLIAM ENYART, as an individual, and AMANDA KELLEY as GUARDIAN AD LITEM TO A.E., Plaintiffs, vs. COUNTY OF SAN BERNARDINO, AARON CONLEY, DEPUTY C. UMPHLETT, ROD SKAGGS, DEPUTY SNOW, DEPUTY SILVA, and DOES 1-10, inclusive, Defendants. | No. 5:23-CV-00540-RGK-SHK |

DEPOSITION OF APRIL SNOW

CONFIDENTIAL PORTIONS EXCERPTED

February 13, 2024

9:56 a.m.

14393 Park Avenue, Suite 101

Victorville, California

Reported By:
AMBER IBARRA

BY MR. J. TERRELL:

Q I'd like you to take a look at this form here.

A Yes.

Q And this is a form, and at the bottom right-hand corner, the date is 9/22 of '08, okay? And at the top it says it's the San Bernardino County Sheriffs Department Inmate Medication Form.

Have you ever seen this form at all before?

A Once, yes.

Q Okay. When did you see this?

A When I had a phone call when a parent or a relative wanted to make sure that our medical team was aware of medications that someone needed when they got arrested.

Q Okay.

A Medications, yes.

Q And did you give that person this form?

A I told them they could come get it. I don't remember if they came and got it or not.

Q Okay.

A Yeah.

Q And this form here has many different facilities and fax numbers to the jail, medical, and other things like that?

A Yes.

Q Okay. Well, this is what that form is for, isn't it?
A It is.
Q Okay. In fact, in that, it's asking for psychiatric medicine, family contact information, and inmate information.
A Yes.
Q Right?
A Uh-huh.
Q In fact, this sheet, in a way, is kind of different from what you just testified about not getting any information from the family member. This actually is asking for information, who the family member is and what medicine the inmate is on.
MS. SHIN: Objection. Misstates prior testimony.
Okay. Go ahead and answer.
THE WITNESS: This is for medication.
BY MR. J. TERRELL:
Q Correct.
A And this is not something that -- like I said, I only had it once on one phone call. So this is not something that we give out all the time or that we advise people that we have.
Q Okay. On that one time that you used that form,

how did that come to be? Do you recall?
A From a phone call.
Q The person called in and wanted to give information to you?
A Which I cannot take, yes.
Q Okay. And did you end up telling them how to fill out this form --
A No.
Q -- or what did you do?
A I told them we have the form. They can come fill it out, and then we'll put it in the mailbox for medical.
Q Okay. And that's the only time you've ever asked anybody about medicine or filling out the form?
A Right.
Q So you were aware that there was a form like this?
A For medication, yes.
Q For medication?
A Uh-huh.
Q Okay. So what you said before was is that you didn't take down the individual's information, but if they said that they were aware of medicine or prescription or the name of a psychiatrist or a treatment facility, then you would have -- referred them to fill

MS. SHIN: Okay.
BY MR. J. TERRELL:
Q Are there other things that when family members would call in for, that would be something that you've been trained to get ahold of a watch commander or advise someone on?
MS. SHIN: Objection --
BY MR. J. TERRELL:
Q Is there anything -- is there any factors that someone would call in, and you would call in a watch commander?
A No.
Q Okay. So if an individual called in and was talking about a patient that had had a mental health issue, you would simply advise them, There is medical facilities here; is that what you would tell them?
A If they were there, yes. I don't discuss medical.
Q Okay. Or if an individual had had a needed medicine, you would -- what would you tell them at that time? If they called in around July of 2022 and said that this individual needed medicine, what would you tell them?
A We have a medical team, and the inmate can advise that. We don't discuss anything like that with

families.
Q Okay. Did you ever give them the telephone number of the medical team inside the jail at all?
A No.
Q Okay. And you know that that's a Level I jail, right?
A Yes.
Q Okay. And the facility medicals are very -- very small in that particular facility, correct?
A Yes.
Q Okay. Do you know when you book -- when you book an individual in there to the jail, are there different criteria that you look for to see if they should be transferred to West Valley Detention Center?
MS. SHIN: Objection. Assumes facts.
Go ahead. You can answer.
THE WITNESS: That would be our medical team before they get booked in.
BY MR. J. TERRELL:
Q Okay. So the medical team screens them before they come over to you for fingerprinting and identification searches?
A I don't do fingerprinting.
Q Okay.
A But medical would screen them. Medical says,

do watch commanders.
Q Okay. Sergeants don't take phone calls and neither do watch commanders. So the only thing you can look for is a senior deputy or someone that you know that's there?
A Yes.
Q Do you try to put the phone call in -- if somebody is making persistent calls and asking, is that generally over health issues, or what are some of the facts that you can recall that you've transferred a call to someone else?
A I don't remember, actually. I mean, it could range anything from -- I don't know, like, whether they're getting out. When they're getting out of jail or why are they here? It could vary. I don't know. That's kind of a -- I don't know. Anything that I can't answer.
Q Okay. So in this particular case --
A Yeah.
Q -- if the mother was calling up and indicating that her son is going to go through alcohol withdrawals, is that something that you might refer over to the Deputy --
A No.
Q -- Skaggs? It's not?
A No.

Q Because that's medical?
A Well, yeah, it's medical. We have a medical team and he can discuss that with medical, so no.
Q Okay. But you wouldn't refer it to medical either, correct?
A No.
Q Okay. So if someone persistently called, is there things they have to ask for? Can they ask to speak to a deputy or a supervisor? Is that what they typically ask for?
MS. SHIN: Objection. Vague as to "persistent."
BY MR. J. TERRELL:
Q If they've called more than once, like you've described if they are persistent or several calls, is one of the reasons that you transfer it over is they're asking to speak to a supervisor or a deputy?
A Could be.
Q Okay. Can you think of some other reasons?
A No.
Q Okay. All right. Do you know what -- when you're working the shift, is there more than just one person answering the phone?
A Yes.
Q Okay. And how many other individuals are answering the phone?

--o0o--

I, APRIL SNOW, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made my corrections as appear noted, in ink, initialed by me; that my testimony contained herein, as corrected, is true and correct.

Executed this ____________ day of __________________, 2024, at __________________________, California.

______________________________

APRIL SNOW

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter was transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action, nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 15, 2024.

Amber Abarca

CSR No. 14034

Dismantling of transcript will void Reporter's certificate.

# EXHIBIIT 16

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FRANCES ENYART, individually, and as successor in interest to WILLIAM ENYART, as an individual, and AMANDA KELLEY as GUARDIAN AD LITEM TO A.E.,

Plaintiffs,

vs.

COUNTY OF SAN BERNARDINO, AARON CONLEY, DEPUTY C. UMPHLETT, ROD SKAGGS, DEPUTY SNOW, DEPUTY SILVA, and DOES 1-10, inclusive,

Defendants.

No. 5:23-CV-00540-RGK-SHK

DEPOSITION OF TROY SKAGGS

CONFIDENTIAL PORTIONS EXCERPTED

February 13, 2024

11:42 a.m.

14393 Park Avenue, Suite 101

Victorville, California

Reported By:
AMBER IBARRA

you receive that many calls from inmates' family members on your typical shift?

MS. SHIN: Objection. Vague as to time.

BY MR. J. TERRELL:

Q In and about July of 2022, did you receive quite a few calls or no calls or very few calls being forwarded to you --

A I don't recall.

Q Okay. You have no memory whatsoever?

Okay. If you had spoken to a family member that had talked to you about a medical condition, would you have made a note on that?

A No.

Q Okay. Would you have called medical if a family member had reported to you of a medical condition of a family member?

A No.

Q Okay. And why is that?

A Because that's something medical does.

Q Okay. Would you refer an inmate that talked to you about a particular health issue and refer them to medical in your facility at the High Desert Detention Center?

MS. SHIN: Objection. Assumes facts that he spoke to the inmate.

BY MR. J. TERRELL:
Q I'm asking if you had spoken to a family member around July of 2022 and they indicated a dire emergency or health condition, would you pass that information on to medical or would you have any way of letting medical know?
A I don't recall.
Q Okay. Has that ever -- have you ever had a circumstance where a family member or somebody on the phone with you tells you of a horrific health issue that the inmate might be going through?
MS. SHIN: Objection as to "horrific." Vague. Go ahead and answer if you can.
THE WITNESS: Can you repeat it?
BY MR. J. TERRELL:
Q Yeah. If an inmate's family member had been transferred to you, the call --
A Okay.
Q -- and they had told you of the situation that they're fearful of their son, their family member, whatever, of suffering a health issue, would you advise medical, or what would you do after receiving that information?
A No.
Q You wouldn't contact medical?

A No.
Q Okay. What would you do with that information?
A Nothing, because the inmate has already seen medical.
Q Okay. So if individuals receive this information, you believe medical has already taken care of it, correct?
A Yes.
Q Okay. And when I asked you earlier about sending somebody -- or a reason that somebody is sent to West Valley, is it because West Valley has better facilities to take care of medical needs than the High Desert Detention Center?
MS. SHIN: Objection. Misstates the testimony.
MR. J. TERRELL: No, I don't think it does, but --
BY MR. J. TERRELL:
Q Is the level of medical attention at West Valley superior to that of a Level I High Desert Detention Center?
MS. SHIN: Objection. Improper lay opinion. Improper expert opinion. He's not qualified to make that determination.
If you can answer.
THE WITNESS: No.

followed when inmates are being booked in and processed?

A I don't recall.

Q Okay.

MR. J. TERRELL: One second, please.

(Plaintiffs' Exhibit 111 was previously marked for identification.)

BY MR. J. TERRELL:

Q I've shown you what has been marked as Exhibit 111, and that's for the San Bernardino County Sheriff's Department Inmate Medication Form. And on the right-hand side down below the date is 9/22 of '08.

Have you ever seen this form before?

A Yes.

Q Okay. And can you tell me when you first saw that form?

A I don't recall.

(Whereupon the testimony from pages 38 to 40 have been marked confidential, excerpted and bound separately)

--o0o--

I, TROY SKAGGS, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made my corrections as appear noted, in ink, initialed by me; that my testimony contained herein, as corrected, is true and correct.

Executed this __________ day of ________________, 2024, at ______________________, California.

______________________________

TROY SKAGGS

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter was transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action, nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 15, 2024.

CSR No. 14034

Dismantling of transcript will void Reporter's certificate.

# EXHIBIIT 17

SOAP NOTE BY: Zhou Dujin MH- LIberty RN POSTED ON 7/30/2022 9:30:36 PM PDT

Type: MED VERIFICATION

**Subjective**

Inmate is a HDDC transfer. Per chart review on very limited information, inmate was booked in HDDC on 7/27/2022. Inmate was described as "alert, oriented to person, time, place and event, cooperative answers questions appropriately—". However, on the morning of 7/30 2022 record showed that "Patient is trying to get out of the segment during his tear time. Acting bizarre. Stating he is the owner of this facility. Trying to look around what is under the beds and sink. His cell mate said he is acting weird." Inmate was then transferred from HDDC to WVDC.

**Objective**

| BP: / | Temp: | Pulse: | Resp: | Wt: | Sa02: | BS: | Pain: |
|---|---|---|---|---|---|---|---|

This MHRN met inmate at cell side of intake cell, with attempt to do MH screening, Columbia-suicide severity rating scale analysis and housing. Inmate presents as hyperverbal, talking to non-existent identity in the cell non-stop with very disorganized thoughts. He looks around in the cell while he was talking to self, appears very paranoid and delusional. He told writer that there is a person who is under the concrete floor in the cell. Inmate denies hx of mental illness, denies taking any psychotropic medication, states, "I only take Tylenol or Ibuprofen for pain and medication for my hypertension". He denies hx of self-harm or suicide attempts, denies current suicidal and homicidal ideations, denies current auditory hallucination and yet he appears responding to internal stimuli as he talks to self all the time during assessment. He denies family hx of mental illness and suicide commitment, denies drug and alcohol abuse history and recent use.

**Assessment**

Awake, alert, disoriented to date, place, and situation
Appears paranoid and delusional
observed talking to self, seeing things not there.
Appears under influence of unknown substance although inmate denying recent use of drug and alcohol
Denies current and hx of SI/HI

**Plan**

MH screening completed
Columbia SSRS completed
House to SMIL, house alone
MHMD appointment scheduled for psycho eval
Clinical therapist appointment scheduled for MH eval

Zhou Dujin MH- LIberty RN POSTED ON 7/30/2022 8:42:27 PM PDT

Type: MED VERIFICATION

MHRN attempted to do MH screening and Columbia-suicide severity rating scale analysis, inmate presents as hyperverbal, talking to nonexisting identity in the cell non-stop with very disorganized thoughts, appears very paranoid and delusional. Inmate is housed SMIL, house alone. See progress note in TechCare.

Ferreria Samuel Correctional Nurse II POSTED ON 7/30/2022 1:40:14 PM PDT Type: NURSE

Pt was seen for COVID-19 vitals/assessment. Pt denies any covid symptoms.

Alert/oriented, speech clear and able to speak complete sentence. RR even and unlabored, non-diaphoretic, NAD noted at this time. Ambulated without difficulty.

See VS in EMAR

Educated Pt regarding hand hygiene, social distancing, and encourage adequate hydration.

Advised to RNSC if symptoms occur or any medical concerns.

SOAP NOTE BY: Martinez-Cordova Jerelyn RN II POSTED ON 7/30/2022 10:09:43 AM PDT Type: NURSE

**Subjective**

Seen as per custody's request.

Patient is trying to get out of the segment during his tear time. Acting bizarre. Stating he is the owner of this facility. That his last name is the same as his Mom's last name. Trying to look around what is under the beds and sink. His cell mate said he is acting weird.

Pt was assessed and vital signs taken per covid protocol.

Denies having any covid 19 s/sx.

**Objective**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BP: na/na | Temp: 96.2 | Pulse: 106 | Resp: 16 | Wt: na | Sa02: 99 | BS: na | Pain: 0 |

Pt is awake and alert, NAD, able to answer questions with redirection, conversing with eyes wide open and has a bizarre personality..

Ambulatory with steady gait.

Skin is warm and dry.

Respirations are even and unlabored.

**Assessment**

Poss SMI

**Plan**

Called MH Ivanez and Charge Nurse Herradura for transfer to WVDC.

Core and unit 7 were informed.

MHSC sched.

Pt instructed on proper mask wear, hand hygiene, rest, adequate nutrition and hydration, and to notify medical if any symptoms develop.

RN S/C PRN , PT verbalized understanding.

Ferreria Samuel Correctional Nurse II POSTED ON 7/29/2022 10:29:12 AM PDT

Type: NURSE

Pt was seen for COVID-19 vitals/assessment. Pt denies any covid symptoms.

Alert/oriented, speech clear and able to speak complete sentence. RR even and unlabored, non-diaphoretic, NAD noted at this time. Ambulated without difficulty.

See VS in EMAR

Educated Pt regarding hand hygiene, social distancing, and encourage adequate hydration.

Advised to RNSC if symptoms occur or any medical concerns.

Saunders Marie Grace Correctional Nurse II POSTED ON 7/28/2022 3:44:25 PM PDT

Type: NURSE

Seen pt at approx 0916 for PPD reattempt.Pt refused. Educated on risk & consequences. Chest xray scheduled. Refusal form scanned in file.

Saunders Marie Grace Correctional Nurse II POSTED ON 7/28/2022 1:20:11 PM PDT

Type: NURSE

Seen patient for COVID-19 vital signs.

Patient denies any signs & symptoms of COVID 19. No signs & symptoms observed.

Patient is alert & oriented

Calm & cooperative. Patient able to speak in full sentences.

Respirations are even & unlabored. No apparent distress noted at the time of assessment.

Patient is ambulatory with steady gait.

Vital signs documented in the EMAR.

Education provided on proper hand hygiene, mask compliance and social distancing & hydration as tolerated.

Education provided on signs and symptoms to report. Verbalized understanding.

Patient educated and advised RNSC PRN

Alvarado Angel RN POSTED ON 7/27/2022 5:52:30 PM PDT

Type: NURSE

Addendum to last note: Pt was handcuffed to the rear during intake process for safety, with stable vitals, PERRLA 3/3 and brisk. Pt signed consents handcuffed cuffed to the rear and uncooperative with custody. Educated to kiosk and process for medical evaluations, pt verbalized understanding

rnsc prn, pt verbalized understanding

Alvarado Angel RN POSTED ON 7/27/2022 5:49:31 PM PDT

Type: NURSE

Patient was seen in intake at High Desert Detention Center, States he has PTSD, anxiety and depression with no current treatment, HTN which he takes atenolol 50mg QD for (see initial screen note), and a resection or a superficial skin growth (pt is a poor historian at this time) noted a healed right posterior mid shoulder healed transversely located scar.

Patient is alert and oriented to person, time, place and event, cooperative, answers questions appropriately, denies suicidal ideations/homicidal ideations or withdrawing from drugs/meds/alcohol when asked. Patient ambulates with a steady, self-supported gait and makes good eye contact. Pt is hyperverbal and being unooperative with custody.

RN S/C PRN, patient Verbalized Understanding
Health Assessment done
Covid swab done
Covid screen done
Green band placed
Refused PPD placement CXR ordered
clinical therapy ordered for MH hx
BP checks for HTN
MDRC placed for medication order

Chau Fanny CMHS - MHRN POSTED ON 8/1/2022 11:36:59 AM PDT

Type: MH NURSE

Discharge inmate from MHRN cell check queue, add inmate to MHRN wellness check queue.

Chau Fanny CMHS - MHRN POSTED ON 8/1/2022 11:31:20 AM PDT

Type: MH NURSE

0918 Add inmate to MHRN cell check queue. Inmate seen for daily MHRN cell check. Inmate seen pacing in cell, talking to self, manic, disorganized, multiple welts noted to arms and legs, redness noted to sacrum area. Medical Charge RN notified, RN sick call scheduled, inmate added to list to be seen by Psychiatrist. Unable to assess for SI/HI/AH/VH at this time. Respirations even and unlabored, no acute signs of distress noted. Will continue to follow up while on mental health cell checks.

Tamayo Monica Clinical Supervisor - CMHS POSTED ON 8/1/2022 9:10:59 AM PDT

Type: MH CLINICIAN

Clinician met with patient for a MH Eval and treatment plan. See note in chart.

Tamayo Monica Clinical Supervisor - CMHS POSTED ON 8/1/2022 9:10:28 AM PDT

Type: MH CLINICIAN

Clinician met with patient for a MH Eval and treatment plan. See note in chart.

San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

8/1/2022 3:50:41 PM PDT

**Progress Notes- MH CELL CHECK ADMIT - ENYART, WILLIAM GREGORY (2207370848)**

Chau Fanny CMHS - MHRN POSTED ON 8/1/2022 11:31:20 AM PDT

Type: MH NURSE

0918 Add inmate to MHRN cell check queue. Inmate seen for daily MHRN cell check. Inmate seen pacing in cell, talking to self, manic, disorganized, multiple welts noted to arms and legs, redness noted to sacrum area. Medical Charge RN notified, RN sick call scheduled, inmate added to list to be seen by Psychiatrist. Unable to assess for SI/HI/AH/VH at this time. Respirations even and unlabored, no acute signs of distress noted. Will continue to follow up while on mental health cell checks.

Inmate is a HDDC transfer. Per chart review on very limited information, inmate was booked in HDDC on 7/27/2022. Inmate was described as "alert, oriented to person, time, place and event, cooperative answers questions appropriately—". However, on the morning of 7/30 2022 record showed that "Patient is trying to get out of the segment during his tear time. Acting bizarre. Stating he is the owner of this facility. Trying to look around what is under the beds and sink. His cell mate said he is acting weird." Inmate was then transferred from HDDC to WVDC. This MHRN met inmate at cell side of intake cell, with attempt to do MH screening, Columbia-suicide severity rating scale analysis and housing. inmate presents as hyperverbal, talking to non-existent identity in the cell non-stop with very disorganized thoughts. He looks around in the cell while he was talking to self, appears very paranoid and delusional. He told writer that there is a person who is under the concrete floor in the cell. Inmate denies hx of mental illness, denies taking any psychotropic medication, states, "I only take Tylenol or Ibuprofen for pain and medication for my hypertension". He denies hx of self-harm or suicide attempts, denies current suicidal and homicidal ideations, denies current auditory hallucination and yet he appears responding to internal stimuli as he talks to self all the time during assessment. He denies family hx of mental illness and suicide commitment, denies drug and alcohol abuse history and recent use.

☐ 10) Does the interviewer feel the inmate is a suicide risk and/or should be on suicide watch?

**GENERAL MENTAL HEALTH ASSESSMENTS - Select and document all that apply**

---

**Has the inmate:**

☐ 11) Received treatment for mental health issues?

**Receiving screen response:**

PTSD and anxiety depression - no current treatment

☑ 12) Had any psychiatric hospitalizations?

**When and where:**

Inmate denied

**Receiving screen response:**

☑ 13) Intentionally injured himself/herself (aside from suicide attempts)?

**What type of behavior when was it last done:**

Inmate denied

☑ 14) Had hallucinations (auditory, visual, or other)?

**Type and content of hallucinations, and when they were last experienced:**

Inmate observed talking to a nonexisting identity as he talking to self. Inmate states, "there is a person under the concrete floor in the cell"

☑ 15) Had delusional thought processes or psychosis?

**Describe abnormal thoughts and when they were last experienced:**

Inmate is curntly presenting as paranoid and delusional

☐ 16) Experienced a life-threatening traumatic event?

☑ 17) Used illegal drugs or abused prescription drugs?

**What drugs, how much, how often, route, and when last used:**

Inmate denied

**Receiving screen response:**

☐ 18) Abused alcohol or sedatives?

**Receiving screen response:**

☐ 19) Experienced significant alcohol or drug withdrawal?

**Receiving screen response:**

☐ 20) Been in inpatient or outpatient detoxification or had any hospitalizations related to substance abuse?

**GENERAL ASSESSMENTS - Select and document all that apply**

---

**21) Inmate Appearance:**

○ Clean/well groomed
◉ Mildly unkempt
○ Dirty/disheveled
○ Other

**22) Inmate behavior:**

San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

8/1/2022 3:50:41 PM PDT

## MH HOUSING ASSESSMENT (ADMIT/DISCHARGE) - Completed by: Zhou Dujin MH- LIberty RN on 7/30/2022 8:42:35 PM PDT

| | | | |
|---|---|---|---|
| **Patient:** ENYART, WILLIAM GREGORY | **#:** (2207370848) | **Lang:** | PICTURE NOT AVAILABLE |
| **DOB:** 11/16/1988 (Age=33) | **Sex:** M | **Race:** WHITE | |
| **Housing:** 34-4B-02-HA | **SSN#:** **HIDDEN** | **Court Date:** 8/3/2022 8:30:00 AM | |
| **Status:** ACTIVE | **Booking Date:** 7/27/2022 6:00:00 PM PDT | **Release:** | |

### HYGIENE

- ☐ Superior hygiene
- ☐ Good hygiene
- ☑ Moderate hygiene
- ☐ Poor hygiene
- ☐ Extremely poor, no sense of hygiene

### EATING & DRINKING

- ☐ Healthy eating and drinking patterns
- ☑ Intermittent eating or drinking patterns
- ☐ Poor eating or drinking patterns
- ☐ No eating or drinking, maintaining weight
- ☐ No eating or drinking, losing weight

### DESTRUCTIVE BEHAVIORS (Agitation, head banging, fecal smearing, property destruction)

- ☑ No destructive behaviors
- ☐ Minimal destructive behaviors
- ☐ Intermittent destructive behaviors
- ☐ Frequent destructive behaviors
- ☐ Extreme, considerably influenced by delusions or hallucinations

### SELF-INJURIOUS BEHAVIORS

- [x] None
- [ ] May engage in self-injurious behaviors without suicidal intent i.e. superficial scratches
- [ ] May engage in self-injurious behavior with/without suicidal intent possibly for secondary gain i.e. mild bleeding
- [ ] Self-injurious behaviors-without suicidal intent resulting in moderate physical damage requiring medical attention
- [ ] Severe self-injurious behaviors resulting in severe physical damage requiring medical hospitalization

## AGGRESSION/IMPULSE CONTROL

- [x] Calm, no display of hostility or aggression
- [ ] Minimal, display of verbal hostility
- [ ] Intermitten display of verbal hostility or physical aggression
- [ ] Constant verbal hostility and/or physically aggressive
- [ ] Displays severe assaultive behavior

## SOCIALIZATION

- [ ] Positive social behaviors
- [ ] Associates with others of similar status
- [x] Seeks isolation and segregation
- [ ] Isolated/segregated
- [ ] Incapable of leaving cell

## OBEDIENCE

- [ ] Follows/understands all rules
- [ ] Follows most rules
- [ ] Follows rules with intermittent guidance
- [ ] Follows most rules with constant guidance
- [x] Does not or is unable to follow directions: cannot be redirected

## MEDICATION

- [ ] No need for meds
- [ ] Compliant with meds, potential for manipulation of prescribed medications for secondary gain
- [ ] Minor to moderate medication non-adherence
- [ ] Significant medication, non-adherence
- [ ] Possible to serious need for involuntary medication; Difficulty with medication adherence

## SPEECH

- [ ] Proper/effective communication
- [ ] Fair communication
- [ ] Mild difficulty communicating
- [x] Inappropriate/illogical communication
- [ ] Serious communication impairment

**INSIGHT/JUDGEMENT**

- [ ] Hopeful/realistic, good coping skills
- [ ] Understands need for medications
- [ ] Intermittent insight/judgement
- [ ] Poor insight/judgement
- [x] Poor insight/judgement, severely disconnected with reality

**RECOMMENDED HOUSING**

- [ ] General population\GP or SMI-G
- [ ] SMI-R (5-6-7)
- [ ] SMI-S
- [ ] SMI-A\Suicide Watch
- [ ] ARMC

**CLASSIFICATION**

- [x] SMIA
- [ ] SMIS
- [ ] SMIR
- [ ] MH-G
- [ ] DISCHARGE

- [x] Complete Note

# EXHIBIT 18

San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

8/1/2022 3:50:40 PM PDT

## MENTAL HEALTH SCREENING - Completed by: Zhou Dujin MH- LIberty RN on 7/30/2022 9:21:27 PM PDT

| | | | |
|---|---|---|---|
| Patient: ENYART, WILLIAM GREGORY | #: (2207370848) | Lang: | PICTURE NOT AVAILABLE |
| DOB: 11/16/1988 (Age=33) | Sex: M | Race: WHITE | |
| Housing: 34-4B-02-HA | SSN#: **HIDDEN** | Court Date: 8/3/2022 8:30:00 AM | |
| Status: ACTIVE | Booking Date: 7/27/2022 6:00:00 PM PDT | Release: | |

☐ Patient Refused

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) | Height(in) |
|---|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 | 0 |
| Weight | BMI | MAP | | | | | | |

Current Allergies

No Known Drug Allergy

*************************************************************************************************************************************

**Screeners: All questions in this form must be addressed.For questions with a single checkbox, by leaving the checkbox unselected, you are documenting your conclusion that all parameters of the quesiton are false. By selecting the checkbox, you are acknowledging a positive response to the item and further documentation must be provided in the corresponding text box.**

*************************************************************************************************************************************

**SUICIDE RISK ASSESSMENT - Select and document all that apply**

**Does/Has the inmate: (Select all that apply)**

☐ 1) Currently feel depressed?

☐ 2) Currently have thoughts of self harm or suicide?

**Receiving screen response:**

☑ 3) Strongly considered or attempted suicide in the past?

**When and what method:**

Inmate denied

**Receiving screen response:**

☐ 4) Feel that he/she has nothing positive to look forward to?

☑ 5) Have any family history of attempted or committed suicide?

**List relatives:**

Inmate denied

☑ 6) Had any recent emotional losses?

**List recent losses:**

Inmate deined

☑ 7) Had any treatment for mental health issues or suicide risk during any previous incarceration?

**When and where was the inmate incarcerated and what were the risk:**

Not information in his chart, Inmate denied

☑ 8) Exhibit any disorientation to person, place, time, and/or situation?

**Record Deficit(s):**

Inmate disoriented to date, place and situation

---

**9) How does the inmate feel about the current situation?**

Inmate is a HDDC transfer. Per chart review on very limited information, inmate was booked in HDDC on 7/27/2022. Inmate was described as "alert, oriented to person, time, place and event, cooperative answers questions appropriately—". However, on the morning of 7/30 2022 record showed that "Patient is trying to get out of the segment during his tear time. Acting bizarre. Stating he is the owner of this facility. Trying to look around what is under the beds and sink. His cell mate said he is acting weird." Inmate was then transferred from HDDC to WVDC. This MHRN met inmate at cell side of intake cell, with attempt to do MH screening, Columbia-suicide severity rating scale analysis and housing. inmate presents as hyperverbal, talking to non-existent identity in the cell non-stop with very disorganized thoughts. He looks around in the cell while he was talking to self, appears very paranoid and delusional. He told writer that there is a person who is under the concrete floor in the cell. Inmate denies hx of mental illness, denies taking any psychotropic medication, states, "I only take Tylenol or Ibuprofen for pain and medication for my hypertension". He denies hx of self-harm or suicide attempts, denies current suicidal and homicidal ideations, denies current auditory hallucination and yet he appears responding to internal stimuli as he talks to self all the time during assessment. He denies family hx of mental illness and suicide commitment, denies drug and alcohol abuse history and recent use.

☐ 10) Does the interviewer feel the inmate is a suicide risk and/or should be on suicide watch?

## GENERAL MENTAL HEALTH ASSESSMENTS - Select and document all that apply

---

**Has the inmate:**

☐ 11) Received treatment for mental health issues?

**Receiving screen response:**

PTSD and anxiety depression - no current treatment

☑ 12) Had any psychiatric hospitalizations?

**When and where:**

Inmate denied

**Receiving screen response:**

☑ 13) Intentionally injured himself/herself (aside from suicide attempts)?

**What type of behavior when was it last done:**

Inmate denied

☑ 14) Had hallucinations (auditory, visual, or other)?

**Type and content of hallucinations, and when they were last experienced:**

Inmate observed talking to a nonexisting identity as he talking to self. Inmate states, "there is a person under the concrete floor in the cell"

☑ 15) Had delusional thought processes or psychosis?

**Describe abnormal thoughts and when they were last experienced:**

Inmate is curmtly presenting as paranoid and delusional

☐ 16) Experienced a life-threatening traumatic event?

☑ 17) Used illegal drugs or abused prescription drugs?

**What drugs, how much, how often, route, and when last used:**

Inmate denied

**Receiving screen response:**

☐ 18) Abused alcohol or sedatives?

**Receiving screen response:**

☐ 19) Experienced significant alcohol or drug withdrawal?

**Receiving screen response:**

☐ 20) Been in inpatient or outpatient detoxification or had any hospitalizations related to substance abuse?

**GENERAL ASSESSMENTS - Select and document all that apply**

---

**21) Inmate Appearance:**

○ Clean/well groomed
◉ Mildly unkempt
○ Dirty/disheveled
○ Other

**22) Inmate behavior:**

- ○ Cooperative
- ○ Depressed/sad
- ○ Hostile/angry
- ◉ Paranoid/psychotic
- ○ Other

---

**Does the inmate:**

- ☐ 23) Voice any anxiety?
- ☐ 24) Have a history of physical, sexual, or emotional abuse as a child or adult, in any setting including incarceration?

**Receiving screen response:**

- ☐ 25) Have any charges or convictions of a sex crime or violent crime?
- ☐ 26) Have a history of special education classes in school?
- ☐ 27) Have any form of serious developmental or learning disability, or does the interviewer believe in the inmate has such a disability?

**Receiving screen response:**

- ☑ 28) Have a history of a serious head injury or seizure?

**Describe injury or seizure history including age of onset an last event:**

Inmate denied

**DISPOSITION/TREATMENT PLAN - Select and document all that apply**

---

- ☑ Mental Health appointment needed

**Housing Assignment:**

- ○ General Population
- ○ Segregation/Confinement
- ◉ Psychiatric
- ○ Other

**Discharge Planning:**

- ☐ ARMC Behavioral Health
- ☐ Drug/Alcohol Treatment
- ☐ Outpatient Mental Health
- ☐ SSI/SSDI Assistance
- ☐ Other
- ☐ ARMC Emergency Room
- ☐ Housing Assistance
- ☐ Probation/Parole Contact
- ☐ Transportation
- ☐ Assess for Possible 5150
- ☐ Medical Follow-Up Care Instructions
- ☐ Resource Info Packet
- ☐ Veterans Referral

Discharge needs reviewed with inmate?

- ☑ Yes
- ☐ No

# EXHIBIIT 19

San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

8/1/2022 3:50:41 PM PDT

## MH HOUSING ASSESSMENT (ADMIT/DISCHARGE) - Completed by: Zhou Dujin MH- LIberty RN on 7/30/2022 8:42:35 PM PDT

| | | | | | | |
|---|---|---|---|---|---|---|
| **Patient:** | ENYART, WILLIAM GREGORY | **#:** | (2207370848) | **Lang:** | | PICTURE NOT AVAILABLE |
| **DOB:** | 11/16/1988 (Age=33) | **Sex:** | M | **Race:** | WHITE | |
| **Housing:** | 34-4B-02-HA | **SSN#:** | **HIDDEN** | **Court Date:** | 8/3/2022 8:30:00 AM | |
| **Status:** | ACTIVE | **Booking Date:** | 7/27/2022 6:00:00 PM PDT | **Release:** | | |

### HYGIENE

- [ ] Superior hygiene
- [ ] Good hygiene
- [x] Moderate hygiene
- [ ] Poor hygiene
- [ ] Extremely poor, no sense of hygiene

### EATING & DRINKING

- [ ] Healthy eating and drinking patterns
- [x] Intermittent eating or drinking patterns
- [ ] Poor eating or drinking patterns
- [ ] No eating or drinking, maintaining weight
- [ ] No eating or drinking, losing weight

### DESTRUCTIVE BEHAVIORS (Agitation, head banging, fecal smearing, property destruction)

- [x] No destructive behaviors
- [ ] Minimal destructive behaviors
- [ ] Intermittent destructive behaviors
- [ ] Frequent destructive behaviors
- [ ] Extreme, considerably influenced by delusions or hallucinations

### SELF-INJURIOUS BEHAVIORS

- [x] None
- [ ] May engage in self-injurious behaviors without suicidal intent i.e. superficial scratches
- [ ] May engage in self-injurious behavior with/without suicidal intent possibly for secondary gain i.e. mild bleeding
- [ ] Self-injurious behaviors-without suicidal intent resulting in moderate physical damage requiring medical attention
- [ ] Severe self-injurious behaviors resulting in severe physical damage requiring medical hospitalization

## AGGRESSION/IMPULSE CONTROL

- [x] Calm, no display of hostility or aggression
- [ ] Minimal, display of verbal hostility
- [ ] Intermitten display of verbal hostility or physical aggression
- [ ] Constant verbal hostility and/or physically aggressive
- [ ] Displays severe assaultive behavior

## SOCIALIZATION

- [ ] Positive social behaviors
- [ ] Associates with others of similar status
- [x] Seeks isolation and segregation
- [ ] Isolated/segregated
- [ ] Incapable of leaving cell

## OBEDIENCE

- [ ] Follows/understands all rules
- [ ] Follows most rules
- [ ] Follows rules with intermittent guidance
- [ ] Follows most rules with constant guidance
- [x] Does not or is unable to follow directions: cannot be redirected

## MEDICATION

- [ ] No need for meds
- [ ] Compliant with meds, potential for manipulation of prescribed medications for secondary gain
- [ ] Minor to moderate medication non-adherence
- [ ] Significant medication, non-adherence
- [ ] Possible to serious need for involuntary medication; Difficulty with medication adherence

## SPEECH

- [ ] Proper/effective communication
- [ ] Fair communication
- [ ] Mild difficulty communicating
- [x] Inappropriate/illogical communication
- [ ] Serious communication impairment

**INSIGHT/JUDGEMENT**

- [ ] Hopeful/realistic, good coping skills
- [ ] Understands need for medications
- [ ] Intermittent insight/judgement
- [ ] Poor insight/judgement
- [x] Poor insight/judgement, severely disconnected with reality

**RECOMMENDED HOUSING**

- [ ] General population\GP or SMI-G
- [ ] SMI-R (5-6-7)
- [ ] SMI-S
- [ ] SMI-A\Suicide Watch
- [ ] ARMC

**CLASSIFICATION**

- [x] SMIA
- [ ] SMIS
- [ ] SMIR
- [ ] MH-G
- [ ] DISCHARGE

- [x] Complete Note

# EXHIBIT 20



# Inmate Movement History

San Bernardino County Sheriff
Jail Information Management System

**2207370848**
**ENYART, WILLIAM GREGORY**
**WMA-M**
**OUT CUSTODY**

12/05/2023 16:33

Current Housing Facility: **45 - RELEASED*NO ALTER**

Discipline:

| Date | Fac | Block | Cell | Bunk | Class | Rating | Reason | Officer |
|---|---|---|---|---|---|---|---|---|
| 07/27/2022 18:00 | 37 | ZZZZ | | | GF | | ** COMPUTER GENERATED ** | not identified |
| 07/27/2022 20:25 | 37 | ZZZZ | | HR | GF | | 0XST/0VIO/NO GANG/GP7 | G MONTENEGRO |
| NOT PHONE ENROLLED/ REFUSED TO SIGN/GP7/ RECEPTION DATE 07-27-22 | | | | | | | | |
| 07/28/2022 05:09 | 37 | 7B | 08 | 27 | GF | GP7 | 0XST/0VIO/NO GANG/GP7 | G MONTENEGRO |
| NOT PHONE ENROLLED/ REFUSED TO SIGN/GP7/ RECEPTION DATE 07-27-22 | | | | | | | | |
| 07/30/2022 15:46 | 34 | XFR | | | GF | GP7 | FACILITY TRANSFER | T SKAGGS |
| NOT PHONE ENROLLED/ REFUSED TO SIGN/GP7/ RECEPTION DATE 07-27-22 | | | | | | | | |
| 07/30/2022 20:57 | 34 | 4B | 02 | HA | SMIL | GP7 | SMIL HA PER ST 728 | A ZAVALA |
| 08/04/2022 21:19 | 45 | | | | | | RELEASE | E MENDOZA |

# EXHIBIIT 23

Arete Health

# ADDICTION MEDICINE EXPERT REPORT

**February 20, 2024**

**Case:** Frances Enyart, Individually, and as Successor in interest to William Enyart, Gregory Enyart, as an individual, and Amanda Kelley as Guardian ad litem to A.E.

Plaintiffs,

v.

County of San Bernardino, Aaron Conley, Deputy Umphlett, Rod Skaggs, CSA Snow.

Defendants

**Case No.:** 5:23-cv-000540-RGK-KK

**Court:** United States District Court, Central District of California

**Attorneys:** Daniella R. Pena, Esq.
James S. Terrell, Esq.
Sharon Brunner, Esq.

**Preparer:** Mario San Bartolome, MD, MBA, MRO, FASAM
3017 Douglas Blvd, #300
Roseville, CA 95661
O: 562.394.2469
DrMario@AreteHealth.net

6) I have served as a medical director for a multi-state health plan with titles including Medical Director, Substance Use Disorders and Medical Director, Medical Policy.

7) I have served as medical director for "detox" units (withdrawal management) that were hospital-based (highest acuity), residential level of care ("rehabs"), and outpatient withdrawal management through medical clinics.

8) I was asked to review the records provided and offer an opinion on elements of the case involving:
   a. Cause of death
   b. Standard of care for individuals with alcohol use disorder experiencing withdrawal
   c. Pain and suffering experienced by individuals experiencing delirium tremens.

9) **Files reviewed**
   a. See appendix A

10) **Summary of Opinions:** The following are my opinions, with a reasonable degree of medical certainty, based on my experience and expertise as an addiction medicine specialist.

   a. Mr. William Enyart's cause of death was unmanaged alcohol withdrawal delirium ("Delirium Tremens").

   b. Failure to communicate vital health information from the time of Mr. William Enyart's arrest to the period of time while in custody, lead to incomplete access of important medical information that was a significant contributing factor in the resultant death of Mr. William Enyart. This information was known, but not communicated appropriately, by Aaron

Conley and Deputy Umphlett.

c. The failure to appropriately collect and communicate vital collateral health information from family and inter-facility health information between High Desert Detention Center and West Valley Detention Center were significant contributing factors to the resultant death of Mr. William Enyart. CSA Snow and Deputy Skaggs both spoke with the Enyart family who communicated key medical information that was never shared.

d. As a result of experiencing unmanaged delirium tremens, Mr. William Enyart suffered tremendous physical and psychological consequences before succumbing to the effects of delirium tremens.

e. Had Mr. William Enyart received the medical treatment he required to address delirium tremens, it is more likely than not, he would be alive today.

**11) Summary of Events**

a. On 07-27-22, Mr. William Enyart (the decedent), a 33-year-old male with a medical history of hypertension (high blood pressure) was arrested at his parent's home in the town of Apple Valley, California. The decedent was intoxicated with alcohol and was causing a disturbance with his family, who were concerned about his health as a consequence of his alcohol use.

b. Officer Conley was among the first officers responding to the disturbance call and after some discussion with the decedent and non-compliance with Officer Conley's orders, the decedent was handcuffed and arrested.

c. The decedent's family had communicated to Deputy Umphlett, their concern for the decedent's escalation of binge drinking alcohol and his

spacial ability, perception, or all of these abilities that is a change from the normal level and fluctuates in severity during the day.

b. Approximately 5 percent of patients who undergo alcohol withdrawal suffer from DTs. DT is defined by hallucinations, disorientation, tachycardia, hypertension, hyperthermia, agitation and sweating in the setting of acute reduction or abstinence from alcohol.

c. Risk factors for developing DTs include concurrent illness, older age, long duration of heavy and regular alcohol consumption, numerous prior episodes of withdrawal and prior complications of withdrawal.

d. Time Course of Alcohol Withdrawal

**Alcohol withdrawal syndrome progression**




i.

e. When managing alcohol withdrawal, the goal is to monitor closely (typically using validated alcohol withdrawal scales like CIWA-Ar[2]) and to use particular medications to avoid seizures and alcohol withdrawal delirium.

---

[2] CIWA-Ar, or Clinical Institute of Withdrawal Assessment-Alcohol, revised, is a validated tool commonly used in the assessment of alcohol withdrawal severity. It is a 10 item scale that scores up to 67 points. Higher severity withdrawal (>score of 15) is associated with danger of seizures, delirium, or both.

Unfortunately, William did not have the benefit of receiving these treatments. When death is the result of DTs, it is typically from hyperthermia or a cardiac arrhythmia. When treating DTs, the goal is to control the agitation, to keep the individual safe and to treat any underlying conditions, including metabolic problems that often occur with alcohol use.

f. Based on William's autopsy report and toxicology, he had signs of comorbid complications. The high acetone level detected is commonly associated with alcoholic ketoacidosis. Simultaneously, William's hypertension (high blood pressure) was not being treated with a medication while in custody. His usual medication was a beta blocker called atenolol. This medication lowers blood pressure and slows down the heart rate. With the few vital signs documented in his medical record one can see that he did have noted elevated blood pressure and tachycardia (rapid heart rate). Combining a possible underlying metabolic disorder and uncontrolled and untreated blood pressure in the setting of evolving DTs, it becomes clear that William required a much higher level of care at a hospital where his metabolic acidosis would certainly have been detected and stabilized as well as his cardiovascular effects along with appropriate management of DTs.

g. Had William's DTs been identified, he could have been transported to a hospital for appropriate medical management and would likely be alive today. Mortality from DTs in current time is approximately 5% due to our ability to identify and manage it quickly. In the early 20th century, when treatment was mostly absent, the mortality was 37%. William received 20th century treatment for his DTs.

h. William clearly suffered along his entire experience while engaged with the justice system. Starting from what was initially a non-violent confrontation to experiencing progressively worsening agitation, paranoid delusions, self-

alcohol issues, and Deputy Umphlett communicated the information she was given by the family in the field on the day of the arrest, William could have received more appropriate treatment. Had the Enyart's been appropriately guided on how to submit medical information, what form to fill, in order to communicate William's medical risks, William would have had a chance to receive more appropriate medical care. Instead, information from over a dozen phone calls from family were not passed along by CSA Snow and Deputy Skaggs.

13) In summary, Mr. William Enyart, a 33-year-old son and father with an alcohol use disorder began to experience the turmoil that persistent alcohol use causes for the individual and a family. Alcohol use disorder is a well-documented disorder that manifests as both a behavioral and physical disorder. Tolerance to alcohol leads to the adaptation of the nervous system that sets up a circumstance where the body rebels against the individual when not exposed to the alcohol—we call that alcohol withdrawal. Severe alcohol withdrawal can include delirium tremens, marked by hallucinations and perceptual problems that can lead to a fatality if left untreated. William's family, in their desperation from observing his health deteriorate from drinking, sought any help they could find. When William was appearing out of control they called law enforcement. They were assured that it would be beneficial to him and that he was not a candidate at the time for a psychiatric hold. The family communicated their concerns including characterizing William's drinking, his newest symptoms (talking to himself) and their fear that he would "seize" or have another complication from alcohol withdrawal. Not unlike a family telling a deputy their son has insulin dependent diabetes, he is on insulin and has been experiencing what seems to be complications of his insulin. Instead, the information around his alcohol use was not communicated on intake or anywhere else of medical/clinical importance to afford William safe medical management of what quite predictably would be impending alcohol withdrawal. The Enyart family called over a dozen times to the facilities where William was in custody to

desperately pass along their concerns and information about his medical risks including his alcohol use and high blood pressure. This information was neither collected, nor guidance given to the family to follow a procedure to communicate information. A clear lack of training starting from the deputies in the field as well as those interfacing with family about the risks of alcohol withdrawal appears to exist. The result was that an incomplete picture of William's health risks existed in his medical chart. When William began experiencing the classic signs of DTs at the time when one would expect (day 3-4 after stopping alcohol use), it was determined to be a purely psychiatric issue. Never mind that William had no history of a psychotic disorder or bipolar disorder. Because the information on his alcohol use was not available to the medical/clinical staff, it was not considered as the underlying disorder causing the symptoms and therefore went untreated. Had the information been communicated into his intake and medical chart, William could have been appropriately screened, monitored, treated with medically necessary medications and likely transported for life saving treatment. Had information from William's family been communicated to the medical team, like a diagnosis of leukemia, maybe William would be alive today. It is with reasonable medical certainty that William died of effects related to untreated delirium tremens. That the absence of information that did exist, from his medical chart created a circumstance that was a significant contributing factor in causing the death and suffering of William Enyart.

14) I reserve to right to change my opinions based on any new information.

"I declare under penalty of perjury pursuant to the laws of the United States and the State of California that the information contained in this report and its attachments are true and correct to the best of my knowledge, except as to information I have indicated was received from others. As to that information I declare that this report accurately represents the information provided to me. As more materials come forth in this case this report may be modified and/or supplemented to take into

account new information, such as the depositions of Conley, Umphlett, and relevant medical policies."

Mario San Bartolome

Mario San Bartolome, MD, MBA, MRO, FASAM
Diplomate American Board of Preventive Medicine
Diplomate, American Board of Family Medicine
Can Med Lic: A89818

# EXHIBIIT 24

## 11.500. OBSERVATION AND SPECIALTY CELL LOGS

The shift supervisor shall direct staff to document the reason for the delayed log entry in an interoffice memorandum. This memorandum shall include the reason for the delay, notifications made to supervisors, date, time, and location of the log. A copy of the memorandum shall be attached to the log and routed per Facility Specific Policy.

When circumstances necessitate a delay in a safety check and the log entry, staff shall make every reasonable effort to resume the safety checks and log entries as soon as practical.

Staff is encouraged to make additional safety checks and log entries whenever they are present in a monitored area throughout the course of their duties.

Routing Logs: Staff shall collect handwritten observation logs from the previous day at 0001 hours and route per facility policy. Specialty Cell Logs shall be collected as inmates are cleared for booking or housing. Original logs shall be placed in booking jackets and copies shall be routed per facility policy. (Refer to Title 15, Sections 1006 and 1027, and Facility Specific Policy.)
(Rev. 04/2017)

**521.00. SOBERING CELL:** Sobering cells shall be used to hold only those inmates who are a threat to their own safety or the safety of others due to their state of intoxication. Such inmates shall not be placed in the same cell with any other inmate except those who are sobering.
(Rev.12/2010)

**521.05. SOBERING CELL CHECKS:** Safety staff shall conduct random direct visual observation at least once every 30 minutes and note observations on the Specialty Cell Log (ASU#110709).
(Rev. 06/2017)

**521.08. INTOXICATION ASSESSEMENT:** If an arrestee is determined to be under the influence of drugs and/or alcohol during the intake health screening and appears to be a threat to his own safety or the safety of others, he shall be further evaluated by Health Services.

Arrestees may be placed in a sobering cell by safety staff. Health Services may also recommend an arrestee be placed in a sobering cell.

An initial medical evaluation shall be completed by a designated Health Services staff member upon placement in a sobering cell and at least every four hours thereafter. In no case shall an arrestee remain in a sobering cell longer than four hours without an evaluation by a Health Services staff member.
(See Health Services Nursing Operational Procedure Manual, Section 303.)

# EXHIBIIT 25

# Roger Clark

Police Procedures Consultant, Inc.
10207 Molino Road, Santee, CA 92071
(208) 351-2458, rclark9314@aol.com


February 20, 2024

Danielle R. Pena, Esq.
PHG Law Group
501 West Broadway, Suite 1480
San Diego, CA 92101

James S. Terrell, Esq.
115411 Anacapa Road
Victorville, CA 92392

Sharon J. Brunner Esq. SBN 229931
Law Office of Sharon J. Brunner
10 14393 Park Avenue, Suite 101
Victorville, CA 92392

***Regarding:*** ***Frances Enyart, Individually, and as Successor in Interest to William Enyart, Gregory Enyart, as an Individual, and Amanda Kelley as Guardian Ad Litem to A.E., vs. County of San Bernardino, Deputy Aaron Conley, et al., Case No.: 5:23-cv-00540-RGK-KK.***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the August 1, 2022 in-custody death of Mr. William Gregory Enyart (Mr. Enyart) while under the arrest, booking, aegis and care of the San Bernardino County Sheriff's Department (SBCSD). Pursuant to the requirements of Rule 26 of the Federal Rules of Civil Procedure, I have reviewed the reports, interviews, video and audio recordings, California Peace Officers Standards and Training (POST), custody standards, deposition transcripts and other material (as listed below) provided to me thus far regarding this case. I am informed that additional depositions are pending - including the depositions of Deputy R. Conley

A. Oh, no, no. I had to learn that they had something medical, but why would they transfer somebody from a -- why wouldn't he go to a hospital? That's what I don't understand. With everything we talked about that I've called and talked to a unit deputy named Skaggs and told him the severity of what Billy could be undergoing, that you transfer him to another jail. A hospital would have been appropriate. (Mrs. Enyart, Pages 102-103)

Q. Okay. Do you know which of these calls on Page 32 represents that conversation?

A. I want -- it was in the afternoon, and yes -- and yes, and when I spoke to her, I explained to her the severity of what Billy's condition could be at this point. She told me he was fine, and I told her I'm not satisfied with that. I want to speak to somebody who has eyes on him, and I was very persistent. She transferred me back to a unit deputy named Deputy Skaggs, and I told him the severity of Billy's problem. I told him I was afraid he would have a heart attack, stroke or seizure, and I said, "I haven't heard from him." I asked him, "Do they have the phones?" I said, "He has been set up. He has credit cards. I haven't heard from my son, and I am extremely worried." He told me it wasn't a hotel, and I said, "Well, it's not a hotel, but I'm afraid for his condition, and I do not want him dying in your facility," and that was the end of our call. He hung up on me.

Q. He actually hung up on you?

A. Yep, he did. (Mrs. Enyart, Page 124)

Subsequently, after just three days under the aegis of personnel at the West Valley Detention Center, on Monday, August 1, 2022, deputies responded to an unresponsive inmate, Mr. Enyart while he was housed, solo in a unit for mentally ill inmates and not a sobering cell.

State law regarding provisions for alcohol withdrawal inmates are codified in Title 24 and Title 15 - Minimum Jail Standards - and require that an inebriated inmate be housed in a sobering cell that meets specific requirements (listed below). In this matter, the Defendants violated Title 24 and Title 15 when they housed Mr. Enyart in quarters other than a sobering cell. In fact, Mr. Enyart's chronic alcohol dependence was totally absent in his arrest, booking medical records. Rather, he was simply identified as an inmate with a mental illness and was housed in an solo COVID reception unit, which did not meet Title 24 and 15 standards for his alcohol dependence and withdrawal risks.

**Title 24 § 1231.2.4 Sobering cell. A sobering cell shall:**

1. Contain a minimum of 20 square feet (1.9 m2) of floor area per inmate;
2. Be limited to eight inmates;
3. Be no smaller than 60 square feet (5.6 m2) and have a clear ceiling height of 8 feet (2438 mm) or more;
4. Contain a toilet, wash basin and drinking fountain as specified in Section 1231.3;
5. Have padded partitions located next to toilet fixture in such a manner that they provide support to the user;
6. Maximize visual supervision of inmates by staff;
7. Be padded on the floor as specified in Section 1231.3; and,
8. Have accessible a shower in the secure portion of the facility.

**Title 15 § 1056. Use of Sobering Cell.**

The sobering cell described in Title 24, Part 2, Section 1231.2.4, shall be used for the holding of inmates who are a threat to their own safety or the safety of others due to their state of intoxication and pursuant to written policies and procedures developed by the facility administrator. Such inmates shall be removed from the sobering cell as they are able to continue in the processing. In no case shall an inmate remain in a sobering cell over six hours without an evaluation by a medical staff person or an evaluation by custody staff, pursuant to written medical procedures in accordance with section 1213 of these regulations, to determine whether the prisoner has an urgent medical problem. At 12 hours from the time of placement, all inmates will receive an evaluation by responsible health care staff. Intermittent direct visual observation of inmates held in the sobering cell shall be conducted no less than every half hour. Such observation shall be documented.

**Title 15 § 1213. Detoxification Treatment.**

The responsible physician shall develop written medical policies on detoxification which shall include a statement as to whether detoxification will be provided within the facility or require transfer to a licensed medical facility. The facility detoxification protocol shall include procedures and

information. The subject had a history of hypertension and was taking atenolol. On July 29, 2022, he refused a blood pressure check. On the morning of July 30, 2022, at 10:09 AM, the patient was acting bizarre, stating that he was the owner of the facility, trying to look around at what was under his bed and sink. He was to be transferred to West Valley Detention Center. A note from July 30, 2022, at 9:30 pm indicates the following information. The patient was hyperverbal, talking to non-existent identity in the cell non-stop with very disorganized thoughts. He looked around the cell while he was talking to self, appeared very paranoid and delusional. He stated that there was a person underneath the concrete floor in the cell. He denied any history of mental illness or history of taking psychotropic medication. On July 31 , 2022, at 5:01 PM the patient refused to come to clinic for a sick call appointment. A medical note posted on August 1, 2022, at 11:31:20 AM, indicated that the subject was seen pacing in cell, talking to self, manic, disorganized, and had multiple welts on arms and legs and redness to sacrum area. The medical charge nurse was notified, and he was added to the list to be seen by a psychiatrist. On August 1, 2022, at approximately 1310 hours, Code Blue was called. A note indicated that the patient was found lying supine next to a cell with compressions being given by a deputy, and he was unresponsive with rigor mortis.

Review of the SBCSD Video Review report provides the following summary of the pertinent information for the autopsy report. Twenty video recordings for SBCSD High Desert Detention Center (HDDC) and the WVDC were reviewed. The video recordings covered the subject's movement during his incarceration at both facilities. All times were approximated based on the video recordings timestamp.

On 07/27/2022 at 17:20:08, the subject entered the male intake at HDDC. At 17:29:04 he was taken for a medical evaluation, and at 17:46:04 he was walked into the male intake. On 07/29/2022 at 17:05:46 he was escorted into the WVDC male intake.

On **07/30/2022** at 17:08:41 he was placed in cell 15 in male intake by himself.

- At 17:10:56 the video recording began with the subject in Cell 15 alone. At 18:40:56 he sat on the bench inside of Cell 15, appeared to talk to himself, made unknown

motions with both of his hands, and began putting his fingers up one at a time, consistent with counting.

- At 18:56:04 the video recording began with deputies moving him from Cell 15 to Cell 11 in male intake.
- At 18:56:23 the video recording began with the subject being placed in Cell 11 alone.
- At 19:00:35 he hit the intercom button.
- At 19:02:53 he removed his orange inmate shirt and appeared to be agitated.
- At 19:02:59 an unknown deputy conducted a safety check and stopped in front of his cell.
- At 19:04:30 he attempted to open the door with his right hand.
- At 19:04:42 he threw his shirt against the cell wall, caught the shirt, and threw it at the opposite wall. He waved both of his hands up and down and appeared agitated.
- At 19:06:05 he hit the cell wall near the door with the bottom of both of his fists approximately nine times.
- At 19:07:03 he punched the cell door with both of his fists.
- At 19:16:19 three unknown deputies walked by his cell and looked into the cell.
- At 19:19:22, he leaned over the intercom.
- At 19:36:27 an unknown deputy conducted a safety check at his cell.
- At 19:43:59 an unknown deputy walked to his cell and spoke to him from the outside of his cell.
- At 19:44:43 another deputy walked up to his cell while another unknown deputy spoke to the subject.
- At 19:50:04 an unknown medical staff member spoke to him from the outside of his cell.
- At 20:03:00 the video recording began with the subject being in Cell 11 alone.
- At 22:41:07 he stood by the cell's metal slider door and knocked on the door with the bottom of his right hand.
- At 22:41:41 he appeared to use his body weight to try and force the cell door open.
- At 22:42:47 he used his body weight to try to force open the door. An unknown light, consistent with a flashlight, was turned on outside of his cell.

- At 22:43:43 he punched the cell window with his right hand.
- At 22:43:52 he repeatedly hit the cell window with the bottom of his right fist.
- At 22:44:22 he wrapped his right hand with his SBCSD orange inmate shirt. At 22:45:57 he used his body weight to try to force open the cell slide door and used his left leg to hit the door.
- At 22:47:39 he used his right shoulder to push the cell door.
- At 22:56:44, 22:57:36, 22:57:55, 23:10:48, 23:11:02, 23:12:27, 23:15: 21, 23:15:33, 23:15:38. 23:22:27, 23:22:34. 23:22:40, and 23:22:44 he punched the cell window multiple times with his right hand.
- At 23:23:33 he looked at the ceiling in his cell and appeared to be speaking and continuously ran from one side of the cell to the other.
- At 23:28:06 he ran towards the cell door and push-kicked it with his left foot three times.
- At 23 :29:43 he ran from one end of the cell towards the cell window and punched it with his right hand.
- At 23:29:58 he climbed onto the toilet and the top portion of his body was out of the camera's view.
- At 23:31:12 and 23:31: 37 he push-kicked the cell door with his left foot multiple times.
- At 23:33:20 he punched the cell window with his right hand.
- At 23:33:26 he punched the cell window with both of his hands four times. At 23:34:35 he push-kicked the cell door with his left foot two times.
- At 23 :34:45 he removed his shoes and climbed onto the toilet.
- At 23:38:10, 23:39:44, 23:40:29, 23:42:27, and 23:42:58 he punched the cell window multiple times with his right hand.
- At 23:43:51 he threw an unknown object at the cell window.
- At 23:44:35 he punched the cell window with his right hand. At 23:45:07 he pushed kicked the cell door with his left foot five times.

- At 23 :46:27 he sprinted from one end of the cell towards the cell door and used his right shoulder to ram the cell door. He fell onto his back and held his right hand with his left hand. He stood up and then sat down on the cell floor.

On **07/31/2022** at 00:07:33 he used his right leg and hip to continuously push the cell door.

- At 00:08:03 he alternated between his left and right hip to continuously push the cell door. At 00:08:31 he used his back to push the cell door.
- At 00: 11: 13 he pushed-kicked the cell door with his left foot five times.
- At 00: 12:28 he used his right hip to continuously push the cell door.
- At 00:14:14 a light, consistent with a flashlight strobed into his cell, and he appeared to speak to an unknown person.
- At 00:15:00 he used his right hip to continuously push the cell door.
- At 00: 16: 10 he used his back to push the cell door.
- At 00: 16:49 he pushed his right shoulder to push the cell door.
- At 00:17:46 and 00:19:26 he used his right shoulder and hip to continuously push the cell door.
- At 00:23 :33 he was given a mustard color SBCSD inmate shirt and red pants by an unknown WVDC personnel. He changed his clothing.
- At 00:27:38 two unknown deputies removed him from Cell 11 and walked him through the south control corridor from his cell.
- At 00:30:24 two unknown deputies escorted him to Housing Unit Four, Segment G without incident.
- At 00:31 :09 the deputies placed him in Segment B, Cell Two, without incident.
- At 00:52:29 an unknown deputy conducted a safety check inside of Segment B. At 01:14:52 an unknown deputy entered Segment B and spoke to him at his cell. Multiple safety checks were performed.

Q. Okay. Were you told not to write people's names down?
A. No.
Q. Okay. So the Sheriff's department had no procedures or policies that were taught to you about writing down information?
A. Pertaining to?
Q. The inmates calling, the inmate's family calling?
A. No. (Snow, Pages 34-35)

Had Deputy Snow and/or Skaggs reported the multiple calls from Mr. Enyart's family members, which were pleas to get Mr. Enyart immediate medical care, Mr. Enyart may not have suffered the catastrophic, sudden, cardiac arrest.

**Detectives Bilboa and Rivas' Crime Report Excerpts:**

"SCENE: WEST VALLEY DETENTION CENTER. UNIT 48"

"On Monday, August 1, 2022, I processed the scene. I collected and documented all evidence found at the scene. The scene was documented using photographs and a Leica Disto Laser measuring device. I used my department-issued cellphone to take all photographs. All measurements taken with the Leica Disto Laser were approximate. All directions will be from the segment's bar door (Johnson door) which will be referred to as north."

"The San Bernardino County Sheriff's Department (SBCSD) was responsible for the West Valley Detention Center (VWDC). WVDC was a jail facility located at 9500 Etiwanda Ave, Rancho Cucamonga. The jail contained inmates who were sentenced, pre-sentenced, had medical disabilities, and mental health concerns. WVDC was separated by various units each responsible for a specific classification of inmate. The units were divided into six different segments. The segments were comprised of dorms containing up to 48 inmates or cells which hold up to two inmates in each cell, up to 32 inmates. Each unit is separated into eight segments labeled A through H. Segment G is the only way in and out of each unit. Segment G led into a circular sally port where the Johnson doors to each segment were located. Segment H was the recreation yard."

"The housing segments were labeled A through F. In the middle of the sally port there was a secured control booth, referred to as the bubble, comprised

> The Americans with Disabilities Act of 1990 (42 US Code 2101 et seq.) and the Rehabilitation Act of 1973, Section 504, were written to provide clear and comprehensive mandates for the elimination of discrimination against individuals with mental and physical impairments.
>
> "No qualified individual with a disability shall, on the basis of the disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by the public entity."

In law enforcement, the ADA is used as a guide for the development of agency specific policies. Law enforcement and custody agencies (and custody/police officers) are trained that the ADA applies to all law enforcement facilities (including prisons and/or local detention facilities). Not only must these facilities be accessible to the general public but accommodations must be made for arrestees and inmates with specified disabilities. Deputies and agencies are responsible for protecting arrested people with disabilities from exploitation by other prisoners.

**Additional Opinions Thus Far:**

1. The record supports the fact that Deputy Conley and Umphlett were informed both by verbal statements from the family, their own observations of Mr. Enyart's intoxication ("I believed he was intoxicated"), and subsequent telephone calls that hMr. Enyart, required medical evaluation(s) and monitoring for chronic alcohol dependence withdrawal and (at a minimum) housing in a sobering cell.

2. There is nothing in the record to justify Deputy Conley arresting and booking Mr. Enyart for a felony crime.

3. The arrest report and booking (intake) documents do not include Mr. Enyart's chronic alcohol dependence. That critical information was not included by Deputy Conley. Officers are taught at POST that deliberately false statements in police reports - including omissions - are forbidden by law and can even constitute criminal conduct. The omission(s) in Deputy Conley's arrest and booking reports regarding what actually prompted the call and Mr. Enyart's chronic alcohol

"Peace officers who have responsibility for arrested persons are liable for the safekeeping and standard of care of those persons.

"Failure to uphold the expected level of care under the provisions of state and federal laws or the **callous disregard** for an arrested person's safety will subject peace officers to:

- departmental discipline (including termination),
- state prosecution for violation of penal code statutes,
- federal prosecution for violation of federal civil rights law, and/or
- civil lawsuits which may include punitive damages levied directly against individual officers." (POST Learning Domain # 31: "Custody," Chapter 1, page 4.)

8. Both Deputy Troy Skaggs, and SCA April Snow have admitted in their respective depositions that they had *no obligation whatsoever* to convey the repeated telephone calls expressing knowledge of Mr. Enyart's chronic alcohol dependence (and the required medical accommodations) is *callous disregard* of the requirements cited under state and federal law and as taught by POST (and cited above).

   "***Callous Disregard***: Willful insensitivity to the well being, as well as the rights and privileges of others, that is so flagrant it rises to the level of negligence." (POST LD #31 - Custody, page G-1).

9. The documented actions of the defendants indicate an existing imbedded custom and practice within the SBCSD to ignore the required standards under state and federal law for the safety and protection of persons they arrest and keep in custody.

10. Despite their apparent departures from the required POST training regarding handing persons in need of State and Federal accommodations, the Defendants were returned to duty without apparent meaningful discipline and corrective retraining. Additionally, to my knowledge no new training has occurred and no new policies have been implemented since this incident.

own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.* There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed January 20, 2024, at Santee, CA.

Roger A. Clark

# EXHIBIIT 26

SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT

# INMATE MEDICATION INFORMATION FORM

This form may be completed online or you may print the form and complete it by hand

## INMATE INFORMATION

FULL LEGAL NAME OF INMATE: ____________

AKA(s): ____________ DOB: ____________

STREET ADDRESS: ____________ Booking #: ____________

CITY: ____________ STATE: ______ ZIP CODE: ____________

INMATE'S HOUSING FACILITY: ☐ WVDC ☐ GHRC ☐ CDC ☐ ADC

## FAMILY CONTACT INFORMATION

FAMILY CONTACT NAME: ____________ RELATIONSHIP: ____________

STREET ADDRESS: ____________ CITY: ____________ STATE: ______ ZIP CODE: ____________

DAYTIME TELEPHONE: ( ) - ____________ EVENING TELEPHONE: ( ) - ____________

CONTACT SIGNATURE: X ____________

## PSYCHIATRIST / TREATMENT FACILITY INFORMATION

PSYCHIATRIST/LAST TREATMENT FACILITY: ____________ DATE LAST TREATED: ____________

STREET ADDRESS: ____________ CITY: ____________ STATE: ______ ZIP CODE: ____________

TELEPHONE: ( ) - ____________ FAX: ( ) - ____________

## MEDICAL INFORMATION

DIAGNOSIS: ____________

DAYTIME MEDICATIONS: ____________

NIGHTTIME MEDICATIONS: ____________

PRIOR UNFAVORABLE MEDICATION EFFECTS (i.e., side effects, poor response or allergies): ____________

IS SUICIDE A CONCERN? ☐ NO ☐ YES IF YES, WHY? ____________

OTHER MEDICAL CONCERNS: ____________

MEDICAL DOCTOR'S NAME: ____________ OFFICE PHONE: ( ) - ____________

STREET ADDRESS: ____________ CITY: ____________ STATE: ______ ZIP CODE: ____________

**FAX TO BOTH NUMBERS WHEN BOTH MEDICAL AND MENTAL HEALTH CONDITIONS APPLY**

| Fax Numbers | WVDC | GHRC | CDC | ADC |
|---|---|---|---|---|
| Jail Medical | (909) 463-5180 | (909) 473-2643 | (909) 386-0939 | (760) 530-9374 |
| Jail Mental Health | (909) 463-5233 | (909) 463-5233 | (909) 463-5233 | (909) 463-5233 |

# EXHIBIIT 27

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FRANCES ENYART, individually, and as successor in interest to WILLIAM ENYART, as an individual, and AMANDA KELLEY as GUARDIAN AD LITEM to A.E.,

Plaintiffs,

vs.

COUNTY of SAN BERNARDINO, AARON CONLEY, DEPUTY C. UMPHLETT, ROD SKAGGS, DEPUTY SNOW, DEPUTY SILVA, and DOES 1-10, inclusive,

Defendants.

No. 5:23-CV-00540-RGK-SHK

DEPOSITION OF CARA MARTINEZ

CONFIDENTIAL PORTIONS EXCERPTED

February 20, 2024

10:16 a.m.

14393 Park Avenue, Suite 101

Victorville, California

Reported By:
AMBER IBARRA

Q Okay. Did you ever contact Officer Conley with any of the information you received from the family?
A I don't recall.
Q Okay. If they had said that Officer Conley was abusive and cruel, would you have contacted Officer Conley?
MR. RAMIREZ: Incomplete hypothetical. Calls for speculation.
But you can answer, if you know.
THE WITNESS: I don't think I can answer that.
BY MR. J. TERRELL:
Q Normally -- Officer Conley asked you to go over and investigate something for him, correct?
A That's correct.
Q All right. So you did that, right?
A Correct.
Q Did you pass on the information to Officer Conley of what you learned?
A I don't recall. Officer Conley might have already been gone. I don't remember.
Q Okay. And to your knowledge, how long did Officer Conley stay around, if you can remember as far as time goes?
A I don't remember.
Q Well, let me put it in context. It might be

asking, if you can recall the mother showing you the bottle of the Bananas, the strong alcohol?
A The 99 Bananas?
Q Uh-huh.
A Yes.
Q But as you sit here today, you don't recall this learning domain, correct?
A No.
Q Okay. All right.
MR. J. TERRELL: I think I'll leave the room for everybody now, and I don't think I'll have very many questions. Just give us a minute.
MR. RAMIREZ: Off the record.
(Recess taken.)
BY MR. J. TERRELL:
Q I have one more question, and that concerns the jail itself. When you arrive at the High Desert Detention Center, the information that you pass on to the nurses or the medical staff at the High Desert Detention Center, would that include information -- I know you're not the one that went there, right? But my question to you is would it be important for you to put down there if the individual was intoxicated or violent or using drugs or alcohol in excess?
MR. RAMIREZ: Incomplete hypothetical.

You can answer.

THE WITNESS: I believe those questions are what the nurses ask, but I'm not sure. I don't know how the jail policies or the medical policies work.

BY MR. J. TERRELL:

Q Okay. But as far as your actions taken on the day of July 27th, all the actions that you took were the reports and the information that you did that you put in your supplemental report is in compliance, as you understand it, with the policy of San Bernardino County Sheriff's Department?

A Yes.

Q Okay. I have no other questions.

MR. RAMIREZ: No questions for me.

MR. J. TERRELL: All right. Thank you very much. We're off the record.

MR. RAMIREZ: Do you want to do the stip?

MR. J. TERRELL: You do the stip.

MR. RAMIREZ: All right. Then I'll propose the following stipulation: The court reporter will be relieved of her custodial duties under the code upon completion of the transcript. The transcript will be forwarded to my office. We will maintain custody of the original and make it available upon reasonable request.

We will also make it available to the deputy

--o0o--

I, CARA MARTINEZ, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made my corrections as appear noted, in ink, initialed by me; that my testimony contained herein, as corrected, is true and correct.

Executed this ___________ day of _________________, 2024, at ________________________, California.

_____________________________

CARA MARTINEZ

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter was transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action, nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 22, 2024.

Amber Abana

CSR No. 14034

Dismantling of transcript will void Reporter's certificate.

# EXHIBIIT 28

San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

8/1/2022 3:50:28 PM PDT

## Sick Calls - ENYART, WILLIAM 2207370848

| Name | Scheduled Date | Reason | Completed Date |
|---|---|---|---|
| Medical Provider | 8/1/2022 | Code Blue | |
| X-Ray | 7/29/2022 | chest xray- refused PPD Cancelled by lhara on 8/1/2022 Reason: PPD READ 07/30/2022 - NEGATIVE / 0MM | 8/1/2022 |
| Clinical Therapist | 8/4/2022 | MH Eval: | 8/1/2022 |
| Clinical Therapist | 7/30/2022 | MH Eval: Poss SMI, pls evaluate | 8/1/2022 |
| Clinical Therapist | 7/27/2022 | MH Eval: MH hx no current treatment | 8/1/2022 |
| Mental Health Psychiatrist | 7/31/2022 | Psych Eval: Pt paranod and delusionl, AH+ VH+ | |
| Medical Chart Review | 7/31/2022 | Record check of BP values collected for 3 days following Hypertension noted at intake. | |
| Mental Health RN | 7/30/2022 | MH Screening: | 7/30/2022 |
| RN Sick Call | 7/30/2022 | add on: | 7/30/2022 |
| RN Sick Call | 7/28/2022 | reoffer PPD (refused in intake) | 7/28/2022 |
| Chronic Care | 8/26/2022 | Hypertension Cancelled by aalvarado on 7/28/2022 Reason: chronic care | 7/27/2022 |
| Medical Provider | 7/27/2022 | takes atenolol | |

# EXHIBIIT 29

San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

8/1/2022 3:50:39 PM PDT

**MENTAL HEALTH EVALUATION** - Completed by: Tamayo Monica Clinical Supervisor - CMHS on 8/1/2022 9:45:58 AM PDT

| | | |
|---|---|---|
| **Patient:** ENYART, WILLIAM GREGORY | **#:** (2207370848) | **Lang:** |
| **DOB:** 11/16/1988 (Age=33) | **Sex:** M | **Race:** WHITE |
| **Housing:** 34-4B-02-HA | **SSN#:** **HIDDEN** | **Court Date:** 8/3/2022 8:30:00 AM |
| **Status:** ACTIVE | **Booking Date:** 7/27/2022 6:00:00 PM PDT | **Release:** |



☐ Patient Refused

Chief Complaint/Presenting Problem:

Clinician met with patient at 0700 hours to complete a mental health evaluation. Patient was offered a more confidential setting to meet, however, due to patient's paranoid and delusional AH/VH, patient was seen at cell side. Clinician attempted to review limits of confidentiality and privacy. Patient was preoccupied with internal stimuli and did not verbalize his understanding of limits of confidentiality. Clinician attempted to assess patient for SI/HI/VH/AH but was unable due to patient preoccupied with internal stimuli. Patient presented with bizarre behavior sitting on the toilet facing the wall and responding sporadically to internal stimuli. Patient presented with disorganized speech and word salad saying "don't take that pillow, appetizer, to die." Per chart review, patient was scheduled a psychiatric evaluation on 7.31.22 to address paranoid ad delusional AH and VH. Per chart review EMARs, patient is currently not taking medication/s.

**Suicide/Violence Assessment:**

Current Suicidal Ideation and Behavior:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Past Suicidal Ideation/Attempts (dates and methods):

Patient was unable to answer due to patient responding to internal stimuli (AH).

Current Violent/Assaultive Ideas/Behavior:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Past Violent/Assaultive Behavior:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Past Psychiatric History and Treatment:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Medical History:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Allergies:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Abuse History:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Family Psychiatric History:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Legal History:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Developmental/Social History:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Substance Use History:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Strengths and Assets and/or Deficiences:

Patient was unable to answer due to patient responding to internal stimuli (AH).

## Mental Status Examination:

### Orientation:

- [ ] Unimpaired
- [ ] Person
- [ ] Place
- [ ] Time
- [ ] Situation

Comments/Other:

Patient was not oriented.

### Memory:

- [ ] Unimpaired
- [x] Immediate deficit
- [ ] Short term deficit
- [x] Long term deficit

Comments/Other:

### Appearance:

- [ ] Well groomed
- [ ] Mildly Unkempt
- [x] Disheveled

Comments/Other:

### Demeanor:

- [ ] Spontaneous
- [ ] Cooperative
- [x] Mistrustful
- [x] Preoccupied
- [ ] Demanding
- [ ] Hostile

Comments/Other:

Patient was unable to answer due to patient responding to internal stimuli (AH).

**Psychomotor Activity:**

- [ ] Normal
- [ ] Increased
- [x] Decreased

Comments/Other:

**Speech:**

- [ ] Appropriate
- [ ] Coherent
- [x] Incoherent
- [ ] Rapid
- [ ] Pressured
- [ ] Loud
- [ ] Soft
- [ ] Perseveration
- [x] Word Salad
- [ ] Mute

Comments/Other:

Patient was unable to answer due to patient responding to internal stimuli (AH).

**Mood:**

- [ ] Euthymic
- [ ] Depressed
- [x] Anxious
- [ ] Angry
- [ ] Irritable
- [ ] Elated

Comments/Other:

Patient was unable to answer due to patient responding to internal stimuli (AH).

**Affect:**

- [ ] Appropriate
- [ ] Flat
- [ ] Blunted
- [ ] Expansive
- [ ] Euphoric
- [ ] Anxious
- [x] Labile
- [ ] Irritable
- [ ] Angry

Comments/Other:

Patient was unable to answer due to patient responding to internal stimuli (AH).

**Thought Process:**

- [ ] Appropriate
- [ ] Goal directed
- [x] Tangential
- [ ] Circumstantial
- [x] Flight of Ideas
- [x] Loosening of Associations

Comments/Other:

**Thought Content:**

☐ Appropriate/No abnormalities noted

Comments/Other:

**Delusions:**

☐ Persecution ☐ Grandiose

Comments/Other:

Patient was responding to internal stimuli.

**Hallucinations:**

☑ Auditory ☑ Visual ☐ Command

Comments/Other:

☐ Obsessions ☐ Compulsions ☐ Phobias
☐ Hopelessness ☐ Worthlessness ☐ Loneliness
☐ Guilt ☐ Self Deprecation

Comments/Other:

**Insight:**

☐ Good ☐ Fair ☑ Poor

Comment:

**Judgment:**

☐ Good ☐ Fair ☑ Poor

Comment:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Suicidal Ideation:

☐ Yes
☑ No

Comment:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Suicide Plan:

- [ ] Yes
- [x] No

Comment:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Homicidal Ideation:

- [ ] Yes
- [x] No

Comment:

Patient was unable to answer due to patient responding to internal stimuli (AH).

Homicidal Plan:

- [ ] Yes
- [x] No

Comment:

Patient was unable to answer due to patient responding to internal stimuli (AH).

**Impression:**

Axis I:

F29 Unspecified Schizophrenia Spectrum and other Psychotic Disorder

Axis II:

Axis III:

Axis IV:

Axis V: GAF:

Discharge Needs:

**Select Flags:**

- [ ] Developmental Disability/Mental Retardation
- [ ] Other Psychiatric Disorders
- [ ] Delirium and Dementia and Amnestic and Other Cognitive Disorders
- [ ] Substance Related Disorders
- [x] Psychotic Disorders
- [ ] Mood Disorders
- [ ] Anxiety Disorders
- [ ] Adjustment Disorders
- [ ] Personality Disorders

Are you currently taking or have you been prescribed any medications?

- [ ] Yes
- [x] No

| Medication | Strength | Filling Pharmacy | Address | Phone Number | Frequency | Last Dose | Last Fill Date |
|---|---|---|---|---|---|---|---|

## Sick Call Completion

○ Complete Scheduled Sick Call

Available Sick Calls:

○ Create and Complete Sick Call

Sick Call Types:

○ This visit does not require a sick call

San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

8/1/2022 3:50:40 PM PDT

**MH INITIAL TREATMENT PLAN** - Completed by: Tamayo Monica Clinical Supervisor - CMHS on 8/1/2022 9:16:57 AM PDT

| | | | |
|---|---|---|---|
| **Patient:** ENYART, WILLIAM GREGORY | **#:** (2207370848) | **Lang:** | PICTURE NOT AVAILABLE |
| **DOB:** 11/16/1988 (Age=33) | **Sex:** M | **Race:** WHITE | |
| **Housing:** 34-4B-02-HA | **SSN#:** **HIDDEN** | **Court Date:** 8/3/2022 8:30:00 AM | |
| **Status:** ACTIVE | **Booking Date:** 7/27/2022 6:00:00 PM PDT | **Release:** | |

**DSM-5 Diagnosis:**

Current Conditions:

SMIA

Add Diagnosis Code Remove Selected

**Initial Assessment:**

Initial CMHS Intake Assessment

Open

**A CMHS Intake Assessment was completed by Mental Health Clinician. Based upon the CMHS Intake Assessment, the patient will receive treatment to address the following mental health symptoms:**

☐ DISORGANIZED THINKING

**Intervention: Medication evaluation, ongoing medication management and monitoring by Psychiatrist and Mental Health Clinician, psycho-educational therapy and/or groups that address illness management.**

**Goal: Improvement will be evidenced in a decrease in symptoms according to MHSE.**

☑ DELUSIONAL IDEATIONS/PARANOIA

**Intervention: Addressing paranoid ideations. Using reality testing techniques and practice during individual and**

group contacts.

Clinician will provide psycho-education on reality testing techniques to address AH and VH.

**Goal: Improvement will be evidenced in a decrease in symptoms according to MHSE.**

Patient will practice reality testing on a daily basis for the next 90 days.

☑ HALLUCINATIONS

**Intervention: Medication evaluation, management and re-evaluation by Psychiatrist. Patient offered psycho-education in areas of understanding of management of positive symptoms of psychosis through 1:1 psycho-education by Mental Health Clinician. Monitoring medication adherence.**

Clinician will provide psycho-education on managing positive symptoms of psychosis. Clinician will provide psycho-education on medication evaluation and the benefits of medications to address hallucinations.

**Goal: Improvement will be evidenced in a decrease in symptoms according to MHSE.**

Patient will be medication compliant to address hallucinations on a daily basis for the next 90 days.

☐ IMPAIRED CONCENTRATION/MEMORY PROBLEMS

**Re-direct attention back to subject matter, provide structure during individual sessions and groups. Provide education. Provide and encourage specific tasks focused on reducing attention distractions.**

**Goal: Improvement will be evidenced in a decrease in symptoms according to MHSE.**

☐ ABNORMAL RATE OF THINKING

**Intervention: Medication evaluation, management and re-evaluation by Psychiatrist. Patient offered psycho-education in areas of understanding of management of positive symptoms of psychosis through 1:1 pscyho-education by Mental Health Clinician. Monitoring medication adherence.**

**Goal: Improvement will be evidenced in a decrease in symptoms according to MHSE.**

☐ ACTIVITIES OF DAILY LIVING (ADL)

**Intervention: Provide psycho-education through groups and/or individual therapy sessions on how to maintain personal hygiene, medication compliance, nutrition as well as overcome obstacles related to ADL.**

Goal: Address problematic area within ADL. Create and maintain a Behavior Modification Plan that will assist in reducing obstacles that prevent ADL goals from being reached. Exhibit an increased knowledge of personal hygiene, nutrition medication compliance and over-all wellbeing.

☐ ANGER MANAGEMENT

Intervention: Provide psycho-education through groups and/or individual therapy sessions on Anger Management. Increase knowledge of healthy coping skills associated with outbursts of anger as well as healthy ways of communicating anger and frustration.

Goal: Be able to

1. Address issues underlying angry feelings.

2. Correct irrational thinking which leads to anger and interpersonal problems.

3. Identify extreme anger, reduce potential for violence.

4. Address areas of potential conflict upon return to community.

☐ ANXIETY

Intervention: Provide psycho-education through groups and/or individual therapy sessions on the anxiety. Increase knowledge of healthy coping skills associated with anxiety.

Goal: Decrease symptoms of anxiety and increase level of healthy coping skills to reduce symptoms.

☐ DEPRESSION

Intervention: Provide psycho-eduction through groups and/or individual therapy sessions focused on Depression. Create a list of healthy attitudes and activities that would help elevate mood.

Goal: Decrease depressive thoughts that produce feelings of depression. Increase level of healthy coping skills to reduce symptoms.

☐ DISRUPTIVE BEHAVIOR

Intervention: Inform patient of expectations regarding appropriate behavior and demonstrate limit setting. Provide specific examples in individual session that can be addressed by patient and Clinician.

Goal: Improvement will be evidenced in a decrease of disruptive behavior and increase of cooperation with staff.

☐ DOMESTIC VIOLENCE - Perpetrator

Intevention: Psycho-education identifying mental, physical and emotional abuse and escalating behaviors that lead to acting out.

Goal: To engage in appropriate counseling with the goal of ending coercive control and physical violence over domestic partner and/or family. To obtain a professional evaluation of motivation to change abusive behavior, and his understanding of the impact of his abusive behaviors.

☐ DOMESTIC VIOLENCE - Victim

Intervention: Psycho-education identifying mental, physical and emotional abuse. Teach about creating safety plan for self.

Goal: Increase victim safety and support victim in protecting self and children by validating their experiences, providing support, and offering information about resources and options.

☐ GRIEF AND LOSS

Intervention: Provide psycho-education through groups and/or individual therapy sessions on the stages of Grief and Loss. Increase knowledge of healthy coping skills associated with grief and decrease disassociated behaviors that cause mental stagnation.

Goal: Increased awareness of how unresolved grief issues have impacted life. Develop vocabulary to express loss. Reduce potential for substance abuse or other harmful behaviors relating as a result of grief. Developed coping techniques to address feelings resulting from grief.

☐ IMPAIRED SOCIAL SKILLS/COOPERATION

Intervention: Address concerns specific to patient's impaired socialization needs. Use Relationship/Solution Focused Therapy to assist patient in addressing impairment.

Goal: Improvement will be evidenced an ability to communicate needs and cooperate with others in a social setting such as groups or unit activities.

☐ LACK OF MOTIVATION/SOCIAL ISOLATION

**Intervention:** Provide activities that will stimulate increased motivation and socialization. Elicit specific interests and educate on the benefits of social interaction.

**Goal:** Patient will increase participation in treatment programming activities as evidenced by at least 80 percent overall engagement within the next 45 days.

☐ LIFE SKILLS

**Intervention:** Use of solution-focused therapy, identifying needs to maintaining a lifestyle that would reduce the likelihood of returning to custody.

**Goal:** Increase successful transition back into society with newfound self-esteem, direction and control. Decrease likelihood of recidivism through understanding of parole/probation expectations, medication managements and general care for mental health symptoms.

☐ MEDICATION NONCOMPLIANCE

**Intervention:** Medication evaluation, management and re-evaluation by Psychiatrist. Patient offered psycho-education in areas of understanding of management of positive symptoms of psychosis through 1:1 psycho-education by Forensic Mental Health Clinician.

**Goal:** Patient will demonstrate full compliance with psychiatric medication orders during the next 45 days.

☐ SUBSTANCE USE

**Intervention:** Provide psycho-education about the chronic, relapsing nature of substance abuse disorders. Develop a list of triggers to relapse. Develop strategies for identifying and coping with high-risk situations or the re-emergence of substance abuse behaviors. Teaching the patient how to capitalize on personal strengths and identifying a healthy support system, including mutual help groups, family support, and community support.

**Goal:** Increased understanding of triggers that lead to relapse. Decrease in addictive thinking patterns by listing distorted thought processes. Increase of social support by creating a recovery booklet with people, places and things focused on recovery.

☐ OTHER

Intervention:

Goal: