EXHIBIIT A

```
 1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION
 3                          - - -
                   HONORABLE R. GARY KLAUSNER
 4          UNITED STATES DISTRICT JUDGE PRESIDING
                            - - -
 5

 6     FRANCES ENYART, ET AL.,           )
                                         )
 7              PLAINTIFFS,              )
                                         )
 8     VS.                               )    CASE NO.:
                                         )    CV 23-00540-RGK
 9     COUNTY OF SAN BERNARDINO,         )
       ET AL.,                           )
10                                       )
                DEFENDANTS.              )
11     _____)

12

13

14          REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

15                  TUESDAY, MAY 21, 2024

16                 LOS ANGELES, CALIFORNIA

17

18

19

20

21

22

23              LAURA MILLER ELIAS, CSR 10019
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA 90012
25                 PH:  (213) 894-0374
```

```
 1
     APPEARANCES OF COUNSEL:
 2
     ON BEHALF OF PLAINTIFF:
 3
                 PHG LAW GROUP
 4               BY: DANIELLE PENA, ESQ.
                 501 WEST BROADWAY
 5               SUITE 1480
                 SAN DIEGO, CA 92101
 6
                 GRACE JUN, ESQ.
 7               501 WEST BROADWAY
                 SUITE 1480
 8               SAN DIEGO, CA 92101

 9               LAW OFFICES OF JOE McMULLEN
                 BY:  JOE McMULLEN, ESQ.
10               501 WEST BROADWAY
                 SUITE 1510
11               SAN DIEGO, CA 92101

12

13   ON BEHALF OF DEFENDANTS:

14
                 SAN BERNARDINO COUNTY COUNSEL
15               BY: JACOB RAMIREZ
                     ADAM MIEDERHOFF
16                   SEONHAE (KELLIE) SHIN
                 DEPUTY COUNTY COUNSEL
17
                 385 NORTH ARROWHEAD AVENUE
18               FOURTH FLOOR
                 SAN BERNARDINO, CA 92415
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
1
                                    INDEX
2

3      PROCEEDINGS                                        PAGE

4      OPENING STATEMENT

5        BY:  MR. McMULLEN                                 4
         BY:  MR. RAMIREZ                                  20
6
       WITNESSES FOR
7      THE PLAINTIFF:
                                  DIRECT    CROSS    REDIRECT    RECROSS
8      VENTERS, HOMER

9      BY:  MS. JUN           32                    85
       BY:  MR. MIEDERHOFF            68
10
       KELLEY, AMANDA
11
       BY:  MS. PENA          89
12

13              EXHIBITS         RECEIVED

14                 2A              39
                   2B              39
15                 2C              39

16                  7              44
                  120              48
17                 3B              99
                   3A             100
18

19

20

21

22

23

24

25
```

1    LOS ANGELES, CALIFORNIA; TUESDAY, MAY 21, 2024; 1:09 P.M.

2                          - - -

3           THE CLERK:  Calling Case No. CV 23-540.

4           Frances Enyart versus county of San Bernardino.

12:58PM 5   THE CLERK:  All rise.

6                    (Jury present.)

7           THE COURT:  The record will reflect that all of

8    jury members are in their perspective seats in the jury box.

9    We have finished with the pretrial instructions, and now

01:09PM 10   we're going to the opening statement.

11          Keep in mind what I said earlier this morning.

12    Opening statements, that's an opportunity for the attorneys

13    to tell you what they think the evidence says, uh, not to

14    argue the case or anything else but just to tell you -- give

01:09PM 15   you kind of a roadmap as to where they're gonna go with the

16    evidence, uh, but it's not evidence itself.  After they're

17    through, we'll get into the evidence itself.

18          Counsel?

19          MR. McMULLEN:  Thank you, Your Honor.

01:09PM 20   Good afternoon, ladies and gentlemen.  As I

21    mentioned a bit earlier, my name's Joe McMullen.  This is

22    Grace Jun and Dani Pena, and we represent the plaintiffs in

23    the civil case.  The plaintiffs here, we introduced some of

24    them, we didn't introduce all of the them.  One of the

01:10PM 25   plaintiffs also is the estate of William Enyart, and the

1    estate of William Enyart, the successor in interest is his

2    daughter, Abigail.

3           And what we're gonna do right now for a few

4    minutes, we're gonna have the opening statement.  And

01:10PM 5    Judge Klausner talked about it's a roadmap, and that's

6    exactly what it is.

7           One of things that we are going to present in this

8    case is not every piece of evidence that we've reviewed since

9    the death that occurred here in Summer of 2022, August 1st of

01:10PM 10    2022.  If we did that, this trial would go on for a few

11    weeks.  But what our commitment to you is we want to give you

12    everything you need to make a fair and just decision but

13    nothing extra.  We don't want to waste your time.  And we're

14    gonna -- if we do that -- our goal is to do that to make sure

01:11PM 15    you have this case before the end of this week so we can

16    bring that to you.

17           Now, you're going to hear quite a bit about some of

18    the causes of action in this case.  We've introduced some of

19    the defendants in this case.  A defendant in this case is

01:11PM 20    also San Bernardino County itself.  And the employees that

21    are the individual defendants, they're all together

22    represented by County counsel here for San Bernardino.

23           This case is -- as we said, it's a civil case.

24    This is not a criminal action.  And that means a few things.

01:11PM 25    One, you've heard the judge talk a little bit about

1    differences in the burden of proof when we were in voir dire,

2    and he'll give you more instructions about that.

3         What it also means is that when we talk about

4    justice, the only justice that we are seeking, the only

01:11PM 5    justice we can seek is money justice.  And in a way, that

6    feels a little dirty, but with a case like this, it's the

7    only thing that we can achieve.  This is not a case where

8    anyone's going to jail.  It's not a case about someone losing

9    their job.  The types for those types of accountability have

01:12PM 10   long since passed.

11        Now, the evidence in this case, you're gonna hear a

12   lot about what happened to William Enyart.  But before we --

13   I'll talk about that a little bit during this opening

14   statement, but before I do, you're also gonna hear evidence

01:12PM 15   about what it is that San Bernardino County employees are

16   supposed to do when they're safely taking someone into the

17   custody and care of the San Bernardino County jails and what

18   it is they're supposed to do to insure that the person gets

19   the medical care that they need.

01:12PM 20        Now, as you probably heard during the

21   introductions, this isn't a case about saying, well, this

22   medical person, this medical staff member, a nurse or a

23   doctor, did something wrong.  That's not what this is about.

24   What it's about is what are the steps, and you'll hear about

01:13PM 25   the steps that jail staff and patrol deputies are supposed to

1    take when they take someone into custody.

2         And one of the critical things that you'll hear

3    about during this trial, a rule that's required is that if

4    they receive information that is going to be critical for the

01:13PM 5    medical staff to have about determining whether someone might

6    be in danger once they get to the jail that they have to pass

7    that information on to medical staff.

8         And you'll learn that when they that, when they

9    follow rules in particular about when someone is intoxicated

01:13PM10    or an addict that people are taken care of and they -- and

11    when they serve the time or they get through the proceedings

12    in the jail, they go home safely to their family, and that's

13    a good thing here.  Those rules tell us that in particular,

14    when it comes to alcohol withdrawal that that is something

01:14PM15    that is particularly dangerous and something that is known to

16    staff, and they're trained on that.

17         Now, what precipitated this incident happened as I

18    said in the Summer of 2022, and it happened at the home of

19    the Enyarts, and you're gonna learn a bit about the Enyart

01:14PM20    family in this case.  The Enyart family, and we'll talk

21    about -- I'm gonna talk about mom and dad.  I'm gonna try to

22    use some shorthand because even though William was referred

23    to as Billy or Daddy, in this courtroom, I'm gonna call him

24    Mr. Enyart, and that's the rules of decorum in this court,

01:14PM25    and we're gonna follow that.

UNITED STATES DISTRICT COURT

1          There's a few Enyarts that are important in this

2     case, and so we'll talk about mom and dad.  That's Francis

3     Enyart and Gregory Enyart.  They raised their children, their

4     three children in the Victorville area.  And Victorville,

01:15PM 5     you'll be hearing a bit about that, too.  This area, Apple

6     Valley, Adelanto, these cities that are -- that are near each

7     other in the high desert.

8          For those of you who aren't familiar with that, if

9     I can get my directions right here, I think that if we go out

01:15PM 10    the 10 freeway about an hour till we get to Rancho Cucamonga,

11    and then we hit the 15 freeway and go another 45 miles, an

12    hour or so, up into the desert, that's where you're gonna

13    find this area.

14         And there we have -- the Enyart home is in a part

01:15PM 15    called Apple Valley.  Apple Valley Sheriff's Substation in

16    San Bernardino County is also where Deputy Conley was

17    assigned where is was a patrol deputy.  As a patrol deputy,

18    he'd been working there for the better part of a couple

19    decades.  He was familiar with the procedures of arresting

01:16PM 20    people and taking them to the closest detention facility

21    which is called the High Desert Detention Center.

22         That High Desert Detention Center, you're gonna

23    hear a bit about that, too.  It's what's called -- under

24    California law, it's called a Type 1 jail facility.  And what

01:16PM 25    that means is that it's really set up for short-term stays by

1    people for a few days.  It doesn't have the -- it's not built

2    out with the type of medical capability and healthcare

3    capability that other facilities that are more advanced do.

4         And so if someone has some type of vulnerability or

01:16PM 5    condition or risk factors that require more in depth

6    monitoring or care, Deputy Conley knows, and it's part of the

7    rules, that that person, if they don't make it through the

8    first what's called intake initial screening, then they will

9    be rejected from being -- from the intake at High Desert

01:17PM 10   Detention Center, and you have to drive down to a place

11   called West Valley Detention Center.  And that's in

12   Rancho Cucamonga about an hour down the hill down the 15.

13        Also in Apple Valley is the Enyart residence.

14   Raising their children in Victorville, the kids who were in

01:17PM 15   the house is you have the eldest who is Amanda Kelly, then

16   Amanda Enyart, and the middle child is William Enyart, and

17   then youngest brother, Nick Enyart.  They're all about five

18   or six years apart, give or take.

19        And as they grow, the family structure kind of

01:18PM 20   looks like this.  Ms. Kelley, Nicholas Enyart, they're both

21   nurses.  Mom, Frances Enyart, she's in real estate.  Dad,

22   Gregory Enyart, he's fully disabled, and his disability is

23   related to his need for oxygen and other types of assistance.

24        Now, William Enyart, he lives at home as an adult

01:18PM 25   as well.  And Mom's able to work because he stays home, and

1    he helps take care of Dad.  He and Dad are close.  They

2    shared of love of motor cross, motorcycles growin' up until

3    William Enyart had an injury where he broke his arms as a

4    freshman in high school and had to get hardware put in his

01:18PM 5    left arm.  They would do odd jobs and projects together, and

6    then as dad's disability expanded, it became necessary for

7    William to help in more ways.

8         Now, the other member of the family that we've

9    talked a bit about is Abigail.  And I'll call her by her

01:19PM 10   first name with the Court's permission.  And Abigail was born

11   in 2012, uh, joint custody, shared custody with Mr. Enyart

12   and Abigail's mother who lives in Nevada.  And she's the

13   sunshine of his life.  It's a close relationship, and they

14   spend time together.

01:19PM 15        And I'm gonna -- you're gonna learn a little bit

16   about that relationship, and it's not -- and you'll have -- I

17   anticipate you'll receive instructions later about sympathy.

18   This is not for sympathy, but it's important to understand

19   the value of Mr. Enyart's life and the value of that

01:19PM 20   relationship.

21        These are some photo -- a few photos of Mr. Enyart

22   and Abby.  And in the summer of 2022, Abby is about ten years

23   old, and Mr. Enyart has a surgery that summer.  And so Abby

24   goes home a little bit earlier than she usually would in the

01:20PM 25   summer back to her other home in Nevada with her mother.

1          And despite these positives and the brightness she

2     brought to him, Mr. Enyart had some other darkness in his

3     life, and the darkness was alcoholism.  Now, alcohol wasn't

4     allowed in the Enyart residence in Apple Valley.  No alcohol

01:20PM 5     in the home.  The family weren't drinkers, but William Enyart

6     was.  He did start to drink at a younger age after his

7     injuries, and he mostly kept it hidden from family.  The

8     siblings as you probably would imagine, they had some

9     indication, and they knew that he would drink a bit.

01:21PM 10          And over the decade before leading up to this

11     incident, they knew there was a problem, but it wasn't really

12     until we get close to the pandemic where it really started to

13     escalate.  And he's at home.  And in those periods of time,

14     other than some efforts to keep things together when Abby was

01:21PM 15     visiting, he was pretty much during the day reeking of

16     alcohol and coming off a bender the night before which would

17     be by himself usually in his bedroom.  And the family knew

18     that these things were happening.  They could tell that it

19     was going on.

01:21PM 20          And finally, when we get to the Summer of '22, they

21     say, you know, enough's enough.  He's -- he has been to

22     counseling.  He's acknowledged to Ms. Kelly, he's

23     acknowledged to Mom in different conversations where they've

24     talked to him about his problem, and he says yeah, I know I

01:22PM 25     have a problem.  I know I need to do this.  I'll go to

 1    counseling.  But he relapses.  It's something that he can't

 2    handle on his own.

 3         And so Ms. Kelley who's down in the Hollywood area,

 4    she comes up the week -- the last week of July in 2022.  The

01:22PM 5    family's planning for okay, when's the right time for this

 6    intervention?  We're gonna get together, and we're gonna --

 7    we're gonna confront him about it.  But he doesn't come out

 8    of his room, and when he does, he's clearly not in any shape

 9    for some sort of intervention or he doesn't feel it.

01:22PM10         Finally, because he had a surgery a few weeks

11    before, a surgery on his back where he had a mass removed on

12    the left side of his back, now, he's also getting Norco-types

13    of pain pills as a prescription for that period of time, and

14    he's drinking with that, too.  He leaves the room in the

01:23PM15    middle of the day on Wednesday, July 27th, and he's going to

16    refill his prescription.

17         And Ms. Kelley and Mom go into bedroom, and there

18    they see in his closet hidden in jacket pockets are bottles,

19    hard liquor bottles, 49-and-a-half percent.  That's a hundred

01:23PM20    proof.  20 percent or some 25 percent stronger than vodka.

21    They see empty bottles.  They see empty beer cans.

22         Now, it's not that shocking because they know.

23    They can hear at night him in the room.  They can hear him

24    sometimes talking to himself.  They know there's a problem.

01:23PM25    They take the bottles out, they stack them up on the kitchen

UNITED STATES DISTRICT COURT

1    counter, and then they wait for him to come home.

2            And he comes home in the early afternoon, and they

3    confront him.  And he's -- he -- he's first denying.  That's

4    not mine.  He's swaying a little bit.  He reeks.  He seems

01:23PM 5    intoxicated.  And he starts to get upset.  Why are you going

6    into my stuff?  He's yelling.  And he's not someone who's

7    been a violent person to the family in his drinking.  That's

8    not who he is.

9            But Mom says, you know, I'm gonna start to record

01:24PM10    you so you see what you look like, and he goes swatting phone

11    the phone out of her hand.  Dad says that's enough.  And he

12    calls the non-emergency line of the San Diego Sheriff's

13    Department, and he says our son's intoxicated.  He's out of

14    control.  I think he tried to hit my wife with the phone.

01:24PM15    You know, we need help.  He needs help.

16            So that's when Deputy Conley comes, and he

17    responds.  And Deputy Conley is -- he doesn't come in guns

18    a'blazing or anything like that.  He comes in to assess the

19    situation.  When he -- when he parks his patrol vehicle in

01:24PM20    the afternoon about -- this call came is about 3:30 p.m. so

21    it's about 3:45 p.m. on that Wednesday.

22            He sees William Enyart walk -- walking out of the

23    house.  And so he walks up to them, and he hasn't talked to

24    the family yet, but he say, you know, why don't you come over

01:25PM25    here.  Come over by my car so they can -- I can speak with

UNITED STATES DISTRICT COURT

1     you.  And William complies.  William Enyart complies.  He

2     goes over to the car.

3          But then, uh, Deputy Conley sees that he has a

4     pocketknife that's on his, uh -- strapped to his belt, and so

01:25PM 5     he goes to grab the pocketknife, and William sort of swats

6     his hand away.  You can't do that.  And Deputy Conley grabs

7     his right arm behind his back, and William has the other hand

8     against the truck, his brother's truck that's there, and he's

9     not complying.  He's resisting, and he's not putting his

01:25PM 10    other hand behind his back.  And he's saying stop.  Please

11    stop.  Please stop.  You're hurting me.  Please.

12         Deputies arrive.  William Enyart is arrested, and

13    he's put in the back of Deputy Conley's patrol vehicle.  And

14    then the deputies begin to interview the family members.  And

01:26PM 15    all of the family members that are there who are Nick has

16    come home from work so Nick Enyart, Amanda Kelley, and mom

17    and dad are there, and they're all saying son, he is daily

18    drinking.

19         He's intoxicated.  He has these alcohol issues.  We

01:26PM 20    need help.  We want him to go be 5150 which they understand

21    to mean that he'll be take in for some type of a hold where

22    he'd be monitored.  But it -- but he's not.  He's taken to

23    the jail.

24         And Deputy Conley. . . Deputy Conley writes a

01:26PM 25    report when he gets to the jail.  And the report that he

1    writes says that this is a person who's intoxicated, who is,

2    uh, slurring his speech, he reeks of alcohol, and he

3    recommends that he be charged with a felony, battery on a

4    police officer, because during this -- this kerfuffle

01:27PM 5    resisting, he says that his finger got bent back, and so he

6    wants him to be charged with a felony to become a felon.

7          And, uh, then he is asked by the Intake Triage

8    Nurse Angel Alvarado who has a form that says okay, what does

9    the arresting officer say about what observations he made?

01:27PM 10   And there's the eight standard questions.  And one of the

11   questions is is the person under the influence of drugs or

12   alcohol?  And Deputy Conley says no.  And that's what goes on

13   the form.  There won't be any driving down the hill to West

14   Valley Detention Center.  Let's get him booked in.

01:28PM 15         Now, it's close to 6 o'clock.  Deputy Conley, he

16   goes to the Apple Valley substation, and he finds that the

17   Enyart family is calling the substation to talk to Deputy

18   Conley so Deputy Conley calls them back.  And they say we're

19   worried about our son.  We're worried he's gonna start

01:28PM 20   seizing.  Have you checked his blood alcohol level?  No, but

21   he reeks of alcohol.

22         Well, we're worried about him.  We want make sure

23   nothing bad happens to him.  They're worried because they

24   know from their children about withdrawals and how dangerous

01:28PM 25   they can be.

UNITED STATES DISTRICT COURT

1          Over the course of the next four or five days, and

2     we have phone records of this, the Enyart family call the

3     jail over 30 times.  They're calling, and they're calling.

4     And when they get through, they say you have to watch our

01:28PM 5     son.  He's got a drinking problem.  There's something wrong

6     with him, and we want to make sure that he's okay.  And the

7     people that pick up the phone some of the times are Ms. Snow

8     who's here, and one of the calls gets transferred to

9     Deputy Skaggs on July 30th.

01:29PM 10          And at this point, William is not calling the

11     family back.  He is starting to have his own psychoses

12     because alcohol withdrawal is kicking in.  It's something

13     called delirium tremens.  But the medical staff think that

14     it's just a mental health, psychotic issue, and so they do

01:29PM 15     transfer him to West Valley, but when he gets transferred

16     down to West Valley, the intake paperwork says due to very

17     limited information, it appears he's suffering from

18     psychosis, and so they put him in a cell by himself.

19          They don't -- they don't initiate their alcohol

01:29PM 20     withdrawal protocols because they don't have reason to

21     believe there's an alcohol related issue cause they have no

22     documentation about the information that they're receiving

23     that is going into a black hole because the phone calls that

24     are coming in, here's what's going on with our son, that

01:30PM 25     information is provided to no one.

UNITED STATES DISTRICT COURT

1              The information that Deputy Conley received goes to

2       no one.  The information that Deputy Umphlett received when

3       she's there at the scene as well about all these issues with

4       his drinking and talking about it is provided to no one.

01:30PM 5              Finally, detectives come to the Enyart residence in

6       Apple Valley on August 1st, and they say -- and the Enyarts

7       are relieved.  Finally they're gonna listen to us.  We're so

8       worried about our son.  We haven't heard from him.  We want

9       you to know that he has these drinking problems.  They say to

01:30PM 10      them the same things that they've been saying on the phone

11      that they were telling Deputy Conley.  And the detectives

12      listened patiently.

13              THE COURT:  You've got about five minutes.

14              MR. McMULLEN:  Thank you, Your Honor.

01:31PM 15              And then they tell the family that William Enyart

16      is gone, that he died earlier that day.

17              Now, we asked -- we wanted to find out is this

18      something that passing this information on would have made a

19      difference or is it something -- was there anything wrong

01:31PM 20      with that?  And so we talked to three experts that you're

21      gonna hear from.

22              You're gonna hear from someone by the name of Dr.

23      Homer, and Dr. Homer is going to tell you that he is a

24      Correctional Healthcare Specialist.  And he absolutely says

01:31PM 25      it's critical at this hand-off stage to provide this type of

UNITED STATES DISTRICT COURT

1      information to medical staff.  Otherwise, they're in a

2      vacuum.  Well, you're gonna hear that Mr. Enyart didn't

3      tell -- they asked him, well, are you drinker?  He said no.

4      Nope, I don't do that.

01:32PM 5              And what you're gonna hear from the expert, Dr.

6      Homer Venters, is that that is common, and it is known that,

7      of course, people because it is a judgment disorder, they are

8      going to deny.  And you can't stop there, and you need to

9      have it in place to make sure that information gets passed

01:32PM10      along.

11              You're gonna hear from Mr. Roger Clark who is a

12      three-decade long L.A. County Sheriff who is a Lieutenant.

13      He's a known Jail Procedures and Correctional Expert.  And

14      he's gonna say there is an absolute obligation for law

01:32PM15      enforcement, and they're trained that when they receive

16      information that's critical that be provided to medical

17      staff, they have to share that.

18              This idea that HIPAA is not gonna let us share it

19      is something that is -- it's a red herring because HIPAA is

01:33PM20      for information going out, not from law enforcement doing

21      something with the information that they receive from family

22      members.

23              And then finally, most importantly, you're gonna

24      hear -- well, why would any of this have made a difference?

01:33PM25      And you're gonna hear from Dr. San Bartolome.  And he's a

1       physician who's an Addiction Specialist, and he can talk

2       particularly about delirium tremens.  And once you start

3       delirium tremens, can you survive it?  And he will say yes.

4       The earlier that you know, the better, and not wasting timing

01:33PM 5   on that is critically important.  And he will also tell you

6       it's a horrible death, and you'll hear some of the haunting

7       audio as he goes into the psychosis over the last few days of

8       his life.

9               Now, before I sit down, it's important to talk

01:33PM 10  about you also are gonna hear a bit about William Enyart, the

11      experiences, the moments, the value of his life, and we

12      understand that's something very difficult to quantify.  But

13      what's important here as well is accountability for the

14      deliberate indifference that caused the death.

01:34PM 15          There's no one sitting over there that wanted

16      Mr. Enyart to die.  Of course not.  But what you're gonna

17      hear and see here is that they didn't do the things they were

18      supposed to do because they were indifferent, and that's what

19      caused the death.

01:34PM 20          And at the end of this case, we'll come before you,

21      and we're going to tell you about what we believe the value,

22      not the price, but the value amount that's substantial in the

23      millions of dollars.  And I along with Ms. Jun and Ms. Pena

24      look forward to giving you all the evidence.

01:34PM 25          Thank you.


UNITED STATES DISTRICT COURT

1          THE COURT:  Thank you very much, Counsel.

2          Counsel?

3          MR. RAMIREZ:  Thank you, Your Honor.

4          Good afternoon, ladies and gentlemen.  My name is

01:35PM 5   Jacob Ramirez.  I'd like to talk to you about what this case

6    is really about.  It's about information that no one knew,

7    not even the Enyart family, and the one person who did know

8    concealed the truth.

9          Now, a big part of this case is going to focus on

01:35PM 10  what the family members told to Deputy Conley and what they

11   say they said to Deputy Umphlett, Ms. Snow and Deputy Skaggs.

12   We believe the evidence will also show the family did not

13   tell my clients what they say they told them.  For that

14   reason, credibility is gonna be an important thing for you to

01:35PM 15  consider.  Remember nothing that the attorneys say in this

16   case is evidence.

17         I'm simply here to guide you through the evidence

18   and help it make sense.  Because there are so many moving

19   pieces, I'm gonna walk you through a time line broken down

01:36PM 20  into five key chapters; the arrest, the use of force

21   investigation, booking, the stay at High Desert Detention

22   Center which is the first facility, the stay at West Valley

23   detention Center which is the second facility.

24         And in this case, the Enyarts have to prove that my

01:36PM 25  clients intentionally denied Mr. Enyart the access to needed

UNITED STATES DISTRICT COURT

1   medical care.  The evidence will show that simply didn't

2   happen.  The events of this case took place between July 27,

3   2022 and August 1st, 2022, a total of six days.

4         So let's talk about Deputy Conley's arrest of

01:37PM 5   Mr. Enyart.  You're going to hear of how it all started in

6   the home.  On July 27th, the family discovered empty

7   containers of alcohol in Mr. Enyart's room, and they an

8   intervention was necessary.  You'll hear how they had no

9   professional training in interventions and instead planned to

01:37PM10   call the police if the intervention went south.  And that's

11   exactly what happened.

12         You'll hear how Mr. Enyart was arrested when he

13   refused to remove a knife from his pocket and wouldn't put

14   one of his hands behind his back despite orders from Deputy

01:37PM15   Conley.  The evidence will show that no one here claims that

16   Deputy Conley did anything wrong by arresting Mr. Enyart.

17   And you won't hear any witnesses or experts testify that

18   Deputy Conley did anything wrong during the investigation --

19   or during the arrest.  The evidence will show that

01:37PM20   Mr. Enyart's father even gave Deputy Conley an A+ twice so

21   our focus is not on the arrest itself.

22         The focus in this case is gonna be on what Deputy

23   Conley knew about Mr. Enyart and his drinking habits, and

24   more importantly, what he didn't know.  You'll hear from

01:38PM25   Mr. Enyart's mother and Deputy Conley that because of how the

UNITED STATES DISTRICT COURT

1    arrest went down, Deputy Conley never got a chance to speak

2    with the Enyart family.  He was tasked with arresting and

3    booking Mr. Enyart pursuant to County procedures, and that's

4    what he did.

01:38PM 5         You'll hear about how Deputy Conley stayed with

6    Mr. Enyart at the scene until paramedics could assess him.

7    Even though the family believed Mr. Enyart had a drinking

8    problem, they never told Deputy Conley.  He never knew.

9         While speaking with paramedics on scene, Mr. Enyart

01:38PM 10   wouldn't tell the paramedics that he drank alcohol.

11   Paramedic Erwin Cuevas will tell you that nothing he saw or

12   heard during his evaluation of Mr. Enyart made him believe

13   that there was a risk of withdrawal.  When the paramedics

14   asked Mr. Enyart if he wanted to go to the hospital,

01:39PM 15   Mr. Enyart said no.  After getting checked by paramedics,

16   Deputy Conley left the arrest scene, and he didn't speak with

17   the Enyarts again.

18        Now onto the next chapter of this case, the

19   investigation of Mr. Enyart's arrest and the use of force by

01:39PM 20   Deputy Conley.  Deputy Conley had to use force to arrest

21   Mr. Enyart because as you've heard, Mr. McMullen told you

22   Mr. Enyart fought against the orders of Deputy Conley.

23        You're gonna hear that Deputy Umphlett arrived

24   after Deputy Conley as backup.  And you'll hear about the

01:39PM 25   roughly 15 to 20 minutes when she was involved with the

1     Enyart family and how she never personally spoke with

2     Mr. Enyart.  Now, her job was to investigate the arrest and

3     the use of force by Deputy Conley.  She didn't arrive or

4     leave with Deputy Conley.  Deputy Umphlett spoke with

01:40PM 5     Mr. Enyart's parents while in their home when the arrest had

6     just happened.

7              Fortunately, we will be able to show you what was

8     said that day because Deputy Umphlett followed county

9     procedures and activated her belt recorder.  She captured the

01:40PM10    interview with Mr. Enyart's parents.  You'll hear how

11    Deputy Umphlett tried to figure out what happened but was

12    faced with changing stories from Mr. Enyart's mom.  You'll

13    hear her waffle back and forth regarding her son's current

14    intoxication status, his past use of alcohol and drugs and

01:40PM15    his changes in his personality.

16             The Enyart family will tell you they also voiced

17    their fierce to another deputy, Karen Mammolito.  But Deputy

18    Mammolito isn't a defendant in this case.  They never sued

19    her even though she was given a little bit more information

01:40PM20    or detail than they told Deputy Umphlett.  You'll hear

21    Mr. Enyart's parents explain their son needed help because of

22    his ongoing alcohol issues.

23             What you will not hear on any of the recordings is

24    anyone telling Deputy Umphlett that Mr. Enyart might withdraw

01:41PM25    from alcohol.  You will not hear Mr. Enyart's mother telling

1    Deputy Umphlett that her son could die.  You will not hear

2    Deputy Umphlett say anything that sounds like she didn't care

3    if something bad happened to Mr. Enyart.

4         Deputy Umphlett will tell you she doesn't remember

01:41PM 5    getting a chance to speak with Deputy Conley about what the

6    family told her because he was gone when she finished her

7    investigation.  After her investigation at the Enyart home,

8    Deputy Umphlett never saw the Enyart family again.

9         Before we shift our focus to the third chapter of

01:41PM 10    this case, I wanna talk about what the Enyarts knew and what

11    they didn't know.  This is important because they hired

12    witnesses who rely heavily on the Enyart's account of their

13    son's alcohol use.

14         Again, the evidence will show that no one knew.

01:42PM 15    You're gonna hear testimony that the Enyart family didn't

16    know the degree of Mr. Enyart's struggle because he concealed

17    the truth.  Or at least that's their assumption.  And you'll

18    hear that's what their paid witnesses are also going to

19    assume.

01:42PM 20         Now, the family says they saw evidence he was

21    drinking.  They saw empty containers, and they saw him in

22    what they considered an altered state, but they didn't see

23    their son's lips touch alcohol.  Well, at least not more than

24    a beer or two.  And you'll hear, and the family will

01:42PM 25    acknowledge, they have no idea how much Mr. Enyart drank when

UNITED STATES DISTRICT COURT

1     he drank, how often he was drinking or what he drank each

2     time that he drank.

3            Even the Enyart's paid witnesses won't be able to

4     answer those questions.  One of those witnesses, Dr. San

01:43PM 5     Bartolome will admit he assumed that Mr. Enyart's drinking

6     history was accurately reported by the family.  That's not

7     his only assumption, and you'll hear about those as the case

8     progresses.  The Enyart's paid witnesses don't know either.

9            So let's turn our attention to the third chapter of

01:43PM 10    the booking.  The Enyart's witnesses will tell you that

11    Deputy Conley intentionally denied Mr. Enyart needed medical

12    care.  He did that by not reporting that Mr. Enyart smelled

13    of alcohol to the intake nurse, Nurse Alvarado, but you'll

14    hear Deputy Conley confirm his custom and practice is to

01:43PM 15    relay known alcohol related information if he gets a chance

16    to speak directly with the nurse.  Video will confirm that

17    Deputy Conley did get to speak directly with the Nurse

18    Alvarado.

19           What you'll hear from Intake Nurse Alvarado is that

01:44PM 20    he personally conducted his own independent evaluation of

21    Mr. Enyart at intake.  He will confirm that as a trained

22    medical professional, he had no reason to believe that

23    Mr. Enyart was intoxicated at the time of his booking.

24           Nurse Alvarado will testify he did not notice the

01:44PM 25    smell of alcohol on Mr. Enyart, and he took his vital signs

1    and confirmed there was no obvious need for additional

2    medical care.  He'll tell you that Mr. Enyart seemed calm and

3    cooperative when the deputies weren't around, and that he was

4    able to obtain a clear medical history from him which

01:44PM 5    typically only happens when an arrestee is not intoxicated.

6            Like the on-scene paramedics, Nurse Alvarado asked

7    Mr. Enyart if he had consumed any alcohol.  Mr. Enyart's

8    response?  No.  He asked Mr. Enyart if there was any chance

9    he could withdraw from alcohol.  Mr. Enyart's response?  No.

01:45PM10   You'll hear how Nurse Alvarado cleared Mr. Enyart for booking

11   because he had no reason to believe Mr. Enyart needed higher

12   care or additional follow-up.

13           This brings us to Chapter four of our story.  Up to

14   this point, everything that's happened has been on the same

01:45PM15   day, July 27th.  This chapter will take us through July 30th

16   while Mr. Enyart was at the first facility.

17           For most of his stay, MR. Enyart remained at the

18   first facility without complaints and without him making a

19   request for any medical care even though he could have done

01:45PM20   both.  He even called his family which was captured on audio

21   recording, and he had calmly explained the status of his most

22   recent court hearing.  Despite what we anticipate Ms. Enyart

23   will say from the stand, Mr. Enyart never sounded like he was

24   scared during that call.  And you'll hear it for yourself.

01:46PM25           What you won't hear during that call?  Anyone

UNITED STATES DISTRICT COURT

1    asking the son how he's feeling.  Not one time will you hear

2    family members mention their fears.  Not one time will you

3    hear family members ask him to be sure to get medical help.

4    The Enyart family will testify that they were worried sick,

01:46PM 5    terrified that their son was going to die in custody, and we

6    anticipate that they're gonna tell you that it was this fear

7    that drove them to call many times and tell anybody who would

8    listen that they were afraid for their son's life.

9            And that's where Ms. Snow and Deputy Skaggs come

01:46PM 10   into this case.  Again, Mrs. Enyart is going to tell you that

11   she tried to call multiple facilities multiple times between

12   July 28th and July 30th.  We don't dispute those calls were

13   made.  We dispute what was said during those calls.

14           You'll hear that Ms. Snow worked in the facility's

01:47PM 15   lobby.  She would answer phone calls from the public, and she

16   would take individuals who came into the facility and respond

17   to their concerns.  That isn't all she did, but we'll get

18   into that a little bit later as well.  Ms. Snow will testify

19   that she definitely did not receive a call from any one

01:47PM 20   family member reporting that their son was gonna withdraw

21   from alcohol.  That something is not typical, and she would

22   remember a call like that.

23           She'll also testify that she never got any calls

24   telling her that there was a family member who was going to

01:47PM 25   withdraw from alcohol or at risk for dying.  Again, these are

 1    things she would remember because they're not typical calls.

 2    If she had, she would have reported that to her core

 3    supervisor, but, again, that's not what happened in this

 4    case.

01:48PM 5        Mr. Enyart's father gave sworn testimony under

 6    penalty of perjury.  It's called a deposition, and you'll

 7    hear him tell you what was really said on those calls.  The

 8    family was asking questions.  They were asking about the

 9    status of their son.  They were asking if he was getting

01:48PM10   medical care.  They were worried.  They wanted answers.  They

11    wanted to know why he wasn't calling.  They were not giving

12    warnings.  They were trying to get information.

13        Deputy Skaggs was one of the multiple core

14    supervisors and was only on duty on the 30th.  You'll hear

01:48PM15   him say the same thing.  According to the Enyarts, he only

16    spoke with the family one time.  Now, he doesn't remember the

17    conversation, but it's this one conversation that they want

18    you to hold him responsible for being indifferent or

19    intentionally denying Mr. Enyart of medical care.

01:49PM20        Now, Mr. Enyart's father testified when we asked

21    him about this, and he said that Deputy Skaggs repeatedly

22    told them that he would look into how their son was doing.

23    There's nothing from Ms. Snow or Deputy Skaggs to relay

24    because they weren't being warned, and they couldn't give out

01:49PM25   the requested medical information to the family because of

1    HIPAA.  And HIPAA is a federal law that protects privacy

2    rights in medical records.

3          What you won't hear from Ms. Snow or Deputy Skaggs

4    is they didn't care about the family's concerns.  The

01:49PM 5    county's procedures for addressing inmate care were followed.

6    The evidence will also show the Enyarts never tried to

7    personally deliver what they believed was crucial medical

8    information in person.  They blame COVID policies, but you're

9    going to hear testimony from multiple county witnesses

01:50PM 10   confirming the county didn't have any policies prohibiting

11   them from coming down to any of the jails.

12         An audio recording of Mr. Nicholas Enyart will

13   confirm the real reason they didn't go see Mr. Enyart because

14   they believed Mr. Enyart needed to feel alone so he would get

01:50PM 15   help which brings us to final chapter in our time line,

16   Mr. Enyart's transfer to West Valley, the second facility.

17   You'll hear how and why Mr. Enyart was moved to second

18   facility on July 30th.

19         Everyone acknowledges that on July 30th, Mr. Enyart

01:50PM 20   started to act differently, enough that his cellmate at the

21   first facility noticed but so did medical personnel.  When

22   medical staff tried to talk with him, he refused to

23   cooperate.  In fact, you'll hear from another county witness,

24   and they'll take you through the medical records to show you

01:51PM 25   the care that was provided.

UNITED STATES DISTRICT COURT

            1          You'll see how staff documented Mr. Enyart's

            2     behaviors, and you'll hear how Mr. Enyart continued to deny

            3     consuming alcohol or using drugs.  The evidence will show

            4     that staff at the first facility recognized that Mr. Enyart

01:51PM 5     needed more care, but they didn't know exactly why.  Instead

            6     of ignoring that need, they decided to send Mr. Enyart to

            7     West Valley Detention Center because he'd have access to

            8     24-hour medical care and to mental healthcare.

            9          When Mr. Enyart got to the second facility, he was

01:51PM 10    immediately examined by mental health staff.  Again,

            11    Mr. Enyart told them he didn't drink alcohol or use drugs.

            12    We'll even let you hear it from Mr. Enyart's own mouth

            13    because he reported the same thing to a deputy who had his

            14    belt recorder activated.  He wasn't asked the question.  He

01:52PM 15    just voluntarily told them I don't drink.  I don't use drugs.

            16    I didn't do anything wrong.

            17          Despite multiple visits from mental health nurses

            18    and a physician's assistant, Mr. Enyart repeatedly refused

            19    care from July 31st to August 1st at the second facility.

01:52PM 20    And this is despite being warned that if he didn't get more

            21    care, his medical condition could get worse or he could die,

            22    but Mr. Enyart still said he didn't want more care.

            23          Despite those refusals, an appointment with the

            24    psychiatrist was set up for about 2:00 p.m. on August 1st.

01:52PM 25    Unfortunately, Mr. Enyart passed away in his cell at, uh --

1    before he could be seen.  He was found in his cell

2    unresponsive at about 1:09 p.m. and declared dead at about

3    1:39 p.m.

4         So there is no dispute in evidence that my clients

01:53PM 5    took steps to make sure Mr. Enyart got medical care.  He was

6    evaluated by a paramedic at the Enyart home, an intake nurse

7    at the first facility, medical clinicians at both facilities,

8    mental health nurses at the second facility, a physician's

9    assistant, and he was scheduled to see a psychiatrist all

01:53PM 10   within six days.  Unfortunately, as the evidence will also

11   show, Mr. Enyart repeatedly concealed the truth with each

12   medical provider.

13        And we believe, ladies and gentlemen, that the

14   evidence will be very clear that my clients did their job

01:53PM 15   properly with the information they had available to them.

16   Remember you're gonna get a jury instruction about the law.

17   You're going to be told that it's the plaintiff's burden to

18   prove their case by a preponderance of the evidence.  And as

19   my team and I guide you through the evidence, it's up to you

01:54PM 20   to decide whether they've carried that burden.

21        At the end of this case, I'll get one last chance

22   to speak with you about the evidence.  Until that time, I ask

23   that you wait until for all the evidence to be presented

24   before you make your decision.  I appreciate your time and

01:54PM 25   look forward to speaking with you again at the end of this

1    case.

2              THE COURT:  Okay, thanks you very much, Counsel.

3              Okay.  Ladies and gentlemen, we're now at the point

4    of what the case is all about, and that's hearing the

01:54PM 5    evidence, and we're gonna start presenting that at this time.

6              Counsel, do you want to call your first witness?

7              MS. JUN:  Yes, Your Honor.

8              Plaintiffs call Dr. Homer Venters.

9              THE COURT:  Okay.

01:55PM 10             THE CLERK:  Please raise your right hand.

11                      (Witness sworn.)

12             THE CLERK:  Thank you.  Please be seated.

13             For the record, please state your full name and

14   spell your last name.

01:55PM 15             THE WITNESS:  Homer Venters, V as in Victor

16   e-n-t-e-r-s as in Sam.

17             THE COURT:  Thank you, Counsel.

18                       DIRECT EXAMINATION

19   BY MS. JUN:

01:56PM 20   Q.   Good afternoon, Dr. Venters.  Let me begin by asking

21   some questions about your background.  What do you do?

22   A.   I'm a Doctor who works in Correctional Health.

23   Q.   And what does that mean, correctional health?

24   A.   That means providing healthcare in jails and prisons.

01:56PM 25   Q.   And what kind of work do you do within correctional

UNITED STATES DISTRICT COURT

1    health?

2    A.    When I started my career, I was directly working in one

3    jail system, the New York City jail system, and worked my way

4    up to be the head doctor there.  And then more recently, in

01:56PM 5    the last four or five years, I worked to either investigate

6    what's going on in jails and prisons with their healthcare or

7    I do a separate kind of work where I take a longer view and

8    am appointed by a federal judge to try and fix problems once

9    they've been found.

01:56PM 10   Q.    So let me go back to the first thing you said.  You said

11   you were a head doctor at New York City jails.  What do you

12   mean by head doctor?

13   A.    After my fellowship training, I worked in the New York

14   City jails which is a big system of at the time about 15

01:57PM 15   jails, and some of 'em were small, some of 'em were large.

16   And I started as the Deputy Medical Director and over about a

17   decade worked my way up to be Chief Medical Officer.  That's

18   overseeing all the physical health, mental health, substance

19   use care.

01:57PM 20   Q.    And in that capacity as the Chief Medical Officer at the

21   New York City jails, were you overseeing other medical

22   personnel?

23   A.    Yes.  We had, as I said, 12 to 15 jails depending on

24   year so I oversaw about -- directly or indirectly about 800

01:58PM 25   uh, doctors, nurse, mental health staff, um, in my final

UNITED STATES DISTRICT COURT

1    position.  That number was smaller when I started.

2    Q.    And you mentioned you were overseeing the medical care

3    at New York City jails, and you mentioned there were 15

4    facilities.  And give me an estimate as to the number of

01:58PM 5    patients coming into the jail.

6    A.    I believe that some years, we had -- it changed over the

7    years I was there, but we had approximately, I think, up to

8    100,000 annual admissions spread out over these 15 jails when

9    I started.  Those numbers kind of decreased.  But the average

01:58PM 10    daily population across all the jails might have been 12 or

11    15,000 when I started, and by the time I left, it was closer

12    to 8 or 9,000 people who are in these different jails at any

13    one time.

14    Q.    So the second thing you mentioned, um, in terms of what

01:58PM 15    you do, you -- you described it as an investigator.  You work

16    in some sort of investigative capacity.  Could you explain to

17    us what that means?

18    A.    Yeah, I don't mean to make that sound more interesting

19    than it is.  I work as a correctional health expert so I'm a

01:59PM 20    doctor, and instead of running or working in one place, uh,

21    I'm retained to go for this investigation half of things to

22    try and figure out what's going with healthcare in a jail or

23    a prison if there's a question.  So sometimes there's a

24    lawsuit.  Most of my work on that side now is either with the

01:59PM 25    U.S. Department of Justice or some State Attorney's General

         1   when they want to look into what's going on in a jail or

         2   prison.

         3   Q.   So you mentioned the U.S. Department of Justice.  Does

         4   the U.S. Department of Justice retain to you kind of review

01:59PM  5   how healthcare is being delivered in jails or prisons?

         6   A.   Yes.

         7   Q.   And you mentioned some other agencies.  What other

         8   government agencies will hire you to investigate the type of

         9   medical care being provided in a jail or prison?

02:00PM 10   A.   Sometimes a State Attorney General.  Um, so I'm not a

        11   lawyer, but I think that either the law enforcement

        12   organization of the state instead of the federal government,

        13   they may want to look into the adequacy of care or what's

        14   going on with healthcare in a jail.  Uh, and so that's a role

02:00PM 15   I've done a few different times and -- and doing now still.

        16   Q.   And which agencies -- which state agencies have hired

        17   you to conduct these like investigations and reviews of -- of

        18   medical care at jails?

        19   A.   The Illinois Attorney General, the New York Attorney

02:00PM 20   General although that case is kind of done, and then I'm

        21   still working with the Attorney General of the State of

        22   California.

        23   Q.   Now, there was one last area that you mentioned, and you

        24   said it was sometimes you are working with a court to oversee

02:01PM 25   medical care in a jail or prison.  Could you describe what

1    that means?

2    A.   Sure.  That's probably about two-thirds of what I do

3    now.  Basically, once people have kind of agreed that there

4    are problems in a jail or a prison, and there's a settlement,

02:01PM 5    and I'm not sure of the legal -- if that's the right legal

6    term, but a federal court may say -- may look for a person to

7    help implement or oversee a plan to improve healthcare.  And

8    so that person sometimes gets called a monitor.

9         And that's the role that I do spend most of my time

02:01PM 10   on now where a court or a judge will hire me or retain me as

11   a monitor.  And then my role as the monitor is over a few

12   years hopefully to work with the facility, go there a lot,

13   train the staff, work with them and assess them on kind of

14   fixing the things that everybody started off agreeing needed

02:02PM 15   fixing.

16   Q.   And so you said you were essentially retained by a court

17   or a judge.  Have you been retained by -- or have you been

18   appointed to be a monitor by any federal court in California?

19   A.   Uh, yes, although I sometimes get confused about federal

02:02PM 20   and state courts, but the -- the jail in Santa Barbara, I'm a

21   court appointed monitor there so I work with that jail to

22   make improvements and -- and measure compliance with

23   improvements in healthcare there.

24   Q.   Now, we're in the Central District of California.

02:02PM 25   That's the federal court we're sitting at today.  Is that an

UNITED STATES DISTRICT COURT

                1    appointment made by a judge in the Central District of

                2    California?

                3    A.    I am not sure.  I apologize.

                4    Q.    Okay.  Well, let me ask you about payment.  You

02:02PM   5    mentioned being retained as an expert by the United States

                6    Department of Justice, by the California Attorney General's

                7    Office, um, and even being appointed by different federal

                8    courts and judges.  Do you get paid for this work?

                9    A.    Yes.  The is -- the work I just described is my

02:03PM  10    full-time work now.

               11    Q.    And are you being paid today to come to court and

               12    testify to the jury about what happened in this case?

               13    A.    Yes.

               14    Q.    And how much do you get paid per hour for your time?

02:03PM  15    A.    $500 per how.

               16    Q.    Now, I want to redirect your attention to this case and

               17    to the death of William Enyart.  Did you come to certain

               18    opinions about this case?

               19          THE COURT:  Counsel?  If he's testifying as an

02:03PM  20    expert, he can't testify to what he thinks about this case.

               21    It has to be a hypothetical, and then you have to prove up

               22    that hypothetical unless he's a participating witness.  So

               23    experts have to testify as to a hypothetical, and then you

               24    have to prove up facts of the hypothetical.  Go ahead.

02:04PM  25          MS. JUN:  Thank you, Your Honor.


                            UNITED STATES DISTRICT COURT

```
 1                  I appreciate the clarification.

 2                  THE COURT:  Mm-hmm.

 3       BY MS. JUN:

 4       Q.   Dr. Venters, in reviewing this case, did you review any

 5       factual information about what happened to Mr. Enyart?

 6       A.   Yes.

 7       Q.   What kind of information did you review?

 8       A.   Medical records from his incarceration as well as other

 9       records that were transcripts of depositions and audio files

10       and video files that were associated with his case.  I don't

11       recall the full list.  I have it in my report where I list

12       the things that I reviewed to get there.  But those were the

13       big buckets of information that I can recall off the top of

14       my head.

15       Q.   Did you review any deposition transcripts of witnesses

16       in this case?

17       A.   Yes.  As I recall, there were depositions of both family

18       members and law enforcement.

19       Q.   So then let me ask you a little bit about the facts of

20       this case.  What's your understanding as to the reason law

21       enforcement officers came into contact with Mr. Enyart?

22       A.   Well, the information I reviewed indicated to me that

23       his, Mr. Enyart's, family called the police for help because

24       his drinking was out of control, and they were worried about

25       him, and they needed help with that.
```

UNITED STATES DISTRICT COURT

```
 1    Q.   Um, and of the material that you reviewed in this case,

 2    did you review audio recordings of the Enyart family's

 3    contact with San Bernardino County Sheriff's deputies?

 4    A.   Yes.

 5    Q.   And did you rely on those recordings in coming to

 6    concern conclusions in this case?

 7    A.   Yes.

 8         MS. JUN:  At this time, Your Honor, I would move

 9    into evidence Exhibits 2-A, 2-B and 2-C which are stipulated.

10         THE COURT:  2-A, B and C?

11         MS. JUN:  Yes, sir.

12         THE COURT:  They'll be received.

13         (Exhibits 2-A, 2-B and 2-C admitted.)

14         MS. JUN:  Thank you, Your Honor.  And with the

15    Court's permission, I would like to play these audio

16    recording for the jury.

17         THE COURT:  Yes.

18         MS. JUN:

19    Q.   Dr. Venters, we are now going to play what has been

20    marked as Exhibit 2-A.  After that, I'm going to stop it and

21    ask you some questions.

22         MS. JUN:  Give us just a minute.  We're having some

23    technical difficulties.  Thank you for bearing with us.

24         Okay.  We're going to try to play Exhibit 2-A.

25    It's a one-minute clip.
```

UNITED STATES DISTRICT COURT

```
          1                    (Audio played.)

          2    BY MS. JUN:

          3    Q.   Dr. Venters, do you recognize that audio recording?

          4    A.   Yes.

02:08PM    5    Q.   And what do you understand this audio recording to be?

          6    A.   To be one of Mr. Enyart's family member who was talking

          7    to a --

          8         THE COURT:  Counsel, again, the jury heard it.  He

          9    can't tell us what it said.  The jury has to tell us what was

02:08PM   10    said on it.

         11         MS. JUN:  Thank you, Your Honor.  I appreciate

         12    that.  Let me then move on to the second audio clip, and this

         13    is the audio recording that is marked as Exhibit 2-B.

         14                    (Audio played.)

02:08PM   15         MS. JUN:  And then the last clip that is marked as

         16    Exhibit 2-C.

         17         THE COURT:  2-C?

         18         MS. JUN:  2-C, Your Honor.

         19                    (Audio played.)

02:09PM   20    BY MS. JUN:

         21    Q.   Dr. Venters, as a correctional medical expert, what is

         22    the significance of this information that is being conveyed

         23    by the Enyart family?

         24    A.   The family's reporting that Mr. Enyart is a heavy

02:10PM   25    drinker, and that he's having problems with how much he's
```

 1    drinking, and there's some reference, I think, to maybe

 2    something else, some other substance, but they're reporting

 3    to the law enforcement officers they called that he drinks a

 4    lot.

02:10PM 5          And they're hearing back that the law enforcement

 6    officers it sounds like won't take -- don't want to do a 5150

 7    which I understand to be a mental health route because they

 8    are saying that's not something for people who are

 9    intoxicated.  So it's mostly just three clips of people

02:10PM10   talking about how heavily he's drinking and is intoxicated.

 11   Q.   Is that type of information about an individual under

 12   arrest being intoxicated something important to convey once

 13   that person is booked into jail?

 14   A.   Yes, and it's potentially life saving.

02:11PM15   Q.   Let me ask you, um, about intoxication generally.

 16   Are -- is -- is that a problem where people are being

 17   arrested who are intoxicated and coming into jails?

 18   A.   Yes, it's very common.

 19   Q.   Oh, and I'm sorry, Dr. Venters, before I go too much

02:11PM20   further, did you recognize the deputy who is on that audio

 21   recording?

 22          MR. MIEDERHOFF:  I object as speculation,

 23   Your Honor.  Lacks foundation.

 24          THE COURT:  Well, I don't know.

02:11PM25          Do you recognize the person?

UNITED STATES DISTRICT COURT

1          THE WITNESS:  I actually just recall it was one of

2     the deputies.

3          THE COURT:  Okay.  Next question.

4     BY MS. JUN:

02:11PM 5     Q.   So let me orient us properly.  When a person is

6     arrested, and they're transported to a jail for booking, what

7     happens in that process?  What is that process called, and

8     what happens during that process?

9     A.   Well, the initial step in jails is -- is generally

02:12PM 10    called a receiving screening which means that the person who

11    comes in the door of the jail, uh, is brought by law

12    enforcement, and somebody does a receiving screening which

13    means going through a list of questions about what health

14    problems they might have which might involve asking them

02:12PM 15    questions, taking their vital signs.

16          But usually, the beginning of that is also getting

17    information from the law enforcement officer.  What did you

18    see here?  Is there -- you know, was this person injured or

19    did anybody say anything that makes you worried about their

02:12PM 20    health?  So those are some of the basic steps in the

21    receiving screening.

22    Q.   Is the receiving screening process conducted by a

23    medical professional?

24    A.   Most often the -- that is the case.

02:12PM 25    Q.   And so you mentioned that the medical professional is

UNITED STATES DISTRICT COURT

```
 1   trying to get information from the arresting officer about

 2   the person who's being booked into jail?

 3   A.   That's a part of it, yes.

 4   Q.   So what -- what's the importance of this process?  Like

02:13PM 5   why -- why does the medical professional need to get this

 6   information?

 7   A.   Well, the law enforcement officers in the field or who

 8   transport somebody to a jail, they often will see or hear

 9   things.  Family members might tell them things.  They might

02:13PM10   see something.  A patient, for instance, could say on the way

11   to the jail I'm gonna kill myself or a family could say our

12   loved one has epilepsy or has diabetes.

13        When the person gets to the jail, they may not --

14   they often don't want to talk.  They may be intoxicated or

02:13PM15   for whatever reason, we may not be able to get all the

16   information from them they want.  And so often it's the case

17   that the law enforcement officers have seen or learned

18   something that really can be lifesaving if the health staff,

19   uh, know it.

02:13PM20   Q.   Now, let me, um, ask if you've reviewed the receiving

21   screening form for Mr. Enyart in this case.

22   A.   Yes.

23        MS. JUN:  And, Your Honor, I would now move into

24   evidence Exhibit 7 which is stipulated and is the receiving

02:14PM25   screening form for Mr. Enyart.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Exhibit 7.  It will be received.

2                    (Exhibit 7 admitted.)

3          MS. JUN:  And with the Court's permission, may I

4    publish it to the jury?

02:14PM 5          THE COURT:  Yes.

6    BY MS. JUN:

7    Q.   Dr. Venters, I am going to direct your attention to the

8    bottom portion of -- well, like the second half of this

9    document where it says arresting officer's questions.  Do you

02:14PM10   see that?

11   A.   Yes.

12   Q.   Okay.  And obviously, here it says the arresting officer

13   was Deputy Conley, and it has his information.  I want to

14   direct your attention to the series of questions here, and

02:14PM15   then there's a response that's clicked no.  What is the

16   significance of these questions?  Why are these questions

17   posed to the arresting officer?

18   A.   Well, these are questions that are designed to find out

19   for the health staff is this person safe to come into this

02:15PM20   jail?  Or as is often the case, did the officer learn

21   something or see something that should direct the patient in

22   a different direction?  And that different direction could

23   be, for instance, going to a hospital for medical clearance

24   or it could be that we're gonna start doing something in the

02:15PM25   jail differently than if we had a no to these questions.  So

UNITED STATES DISTRICT COURT

        1    they're -- they're designed to help the health staff know is

        2    this somebody we have to worry about or do something

        3    different with.

        4    Q.    So let me direct your attention then to one specific

02:15PM 5    question.  It's the third question down, and it says under

        6    the influence of drugs or alcohol.  Do you see that line?

        7    A.    Yes.

        8    Q.    And that the response from the arresting officer is no

        9    to this question.  Do you see that?

02:16PM 10   A.    I do see that.

        11   Q.    Is this the type of question that would prompt a

        12   different type of treatment for the person coming into a

        13   jail?

        14   A.    Yes.

02:16PM 15   Q.    And what would happen if this was -- if this question

        16   was answered with a yes?

        17   A.    At a minimum, it would prompt the staff to start doing,

        18   uh, a periodic check for alcohol withdrawal.  When people

        19   stop drinking all of a sudden, their bodies can have a very

02:16PM 20   strong, sometimes deadly response called alcohol withdrawal.

        21        And so when somebody has some indication that

        22   they're intoxicated, that they're using alcohol or other

        23   drugs, that is an indication for the staff to at a minimum

        24   doing some of these periodic checks to see is this person

02:16PM 25   going into withdrawal?  It always usually triggers some other

                          UNITED STATES DISTRICT COURT

1   things, but that's the first step of something that would be

2   different for somebody who has a yes instead of a no on this

3   question.

4   Q.   Before we go any further, could you just educate us a

02:17PM 5   little bit as to what is alcohol withdrawal?  You mentioned

6   it was deadly.  Why is it deadly?

7   A.   Well, it can be deadly.  Alcohol is a potent sedative as

8   most people know.  And so when you are a heavy drinker, when

9   you drink every day, two or more drinks a day, one of the

02:17PM 10   things that does is it's always introducing a sedative to

11   your body.  Your body responds by amping up all of these

12   stimulation pathways in your central nervous system.

13          And the details of that become very clear when you

14   take away the sedative.  When the alcohol goes away, your

02:17PM 15   body has spent weeks, months, maybe years building up all

16   these stimulation pathways.  And what that means is people go

17   into withdrawal when they stop drinking right away.

18   Sometimes that's mild.  It could be tremors, it could be

19   shakes.

02:18PM 20          But for people who are very heavy drinkers, and for

21   people who have been through this multiple times, alcohol

22   withdrawal can lead to something called delirium tremens or

23   DTs where you can have -- you're not just feeling agitated or

24   anxious, but your heart rate can go up, you can have waves of

02:18PM 25   psychosis where you're seeing things, seizures, your body

UNITED STATES DISTRICT COURT

1    temperature can skyrocket, and you can die.

2    Q.    So you mentioned that, um, the answer yes to the

3    question of was Mr. Enyart under the influence of alcohol or

4    other substances would have prompted an initiation of an

02:18PM 5    alcohol withdrawal protocol.  What does that mean?

6    A.    Well, in its simplest form, the basic step that we do to

7    assess, to figure out how bad the problem is, is every four

8    to eight hours, we'll do a check, and that check involves a

9    standard set of questions.  And so there's a standard tool we

02:19PM 10   use to check how bad the withdrawal is for alcohol.  There's

11   another tool we use for opiate withdrawal.

12        But these tools are really important, especially in

13   a jail because you check ten or fifteen things depending on

14   which tool you use, things like is the person agitated or

02:19PM 15   fidgety?  Are they sweating?  Have they been throwing up?

16   What's their pulse?  Things like that.

17        And then you come up with a score.  And that score

18   helps you track, okay, right now, they're up three out of,

19   you know, 70, but all of a sudden, they went from a 3 to a

02:19PM 20   15.  And then because jails don't have doctors all the time,

21   it gives you a pathway to say okay, I'm a nurse.  I -- my

22   protocol is they went from a 3 to a 15, I gotta -- I gotta

23   call this person or I gotta do something.  So that's the

24   utility of those tools.

02:19PM 25        They can also guide, oh, the person needs more

UNITED STATES DISTRICT COURT

```
        1    medicine.  They need to go to the ER.  Things like that.

        2    Q.   So you mention a tool.  Does that tool have a name?

        3    A.   Yes.  It's a horrible set of acronyms.  But for the

        4    alcohol withdrawal, we use something called a CIWA, C-I-W-A,

02:20PM 5    and it often is CIWA-AR to make it even more annoying.  But

        6    the CIWA or the CIWA-AR is the tool used for alcohol

        7    withdrawal.  And there's another one called the COWS,

        8    C-O-W-S, we use for opiate withdrawal.

        9    Q.   Now, are you aware if San Bernardino County jails have a

02:20PM10    protocol for monitoring alcohol withdrawal?

       11    A.   I believe they do.

       12         MS. JUN:  Okay.  Um, at this point, Your Honor, I

       13    would move into evidence Exhibit 120 which is the standard

       14    nursing protocol for alcohol withdrawal for the

02:20PM15    San Bernardino County jails.  It is a stipulated exhibit.

       16         THE COURT:  Exhibit what?

       17         MS. JUN:  120, Your Honor.

       18         THE COURT:  120.  Okay.

       19              (Exhibit 120 admitted.)

02:21PM20         MS. JUN:  With the Court's permission, may I

       21    publish it to the jury?

       22         THE COURT:  Yes.

       23    BY MS. JUN:

       24    Q.   Dr. Venters, let me ask you a couple of questions about

02:21PM25    this document.  When did you first receive this document?
```

1    A.    I think over the weekend.  I don't -- I put it on -- I

2    downloaded it onto my computer Monday in the airport, but I

3    think it was emailed -- there's a whole bunch of documents

4    emailed to me sometime Friday or Saturday.  I don't -- I

02:21PM 5    don't recall.

6    Q.    Now, you wrote an expert report in this case.  Is that

7    fair?

8    A.    Yes.

9    Q.    And are these types of protocols the types of things

02:21PM10    that you would ask to see before you write an expert report?

11    A.    Yes.

12    Q.    And in this case, did you, in fact, ask for copies of

13    these expert reports?

14    A.    That's my recollection.

02:21PM15    Q.    When was your expert report issued?

16    A.    I submitted it in late February.

17    Q.    Of this year?

18    A.    Yes.

19    Q.    So you wrote your expert report in February 2024.  Did

02:22PM20    you ask for these types of medical policies before that time

21    period?  Before that date?

22    A.    That's my recollection.

23    Q.    And are these the types of policies that you would want

24    to review before you issued an expert report?

02:22PM25    A.    Yes.

1    Q.   Now, you mentioned earlier that you just got these

2    documents I think you mentioned on Saturday?

3    A.   I don't actually recall when I got the email, but I

4    opened 'em up and put 'em on my computer Monday morning.

02:22PM 5    Q.   How many medical documents or policies did you receive?

6    A.   I don't know.  I think maybe a dozen.  I -- I haven't

7    opened 'em all up.  I downloaded them, but I haven't -- I

8    haven't looked through them.

9    Q.   Was it more than one?

02:22PM 10   A.   Yes.

11   Q.   More than ten?

12   A.   I think it might have been a dozen or so.  I don't -- I

13   don't actually know.

14   Q.   And just to be clear, were those the types of medical

02:23PM 15   services policies that you had been asking for before

16   February 2024?

17   A.   That's my recollection.

18   Q.   And when you asked for these policies before

19   February 2024, what were you told?

02:23PM 20   A.   I didn't have any communication with the defense that I

21   recall, but my recollection from our communication is they --

22   there weren't any policies.

23        MS. JUN:  Well, let's look at the policy that was

24   produced to you on Monday, just two days ago, uh, regarding

02:23PM 25   the standard nursing protocol or procedure for alcohol

UNITED STATES DISTRICT COURT

```
 1    withdrawal.  If -- Mr. McMullen, if we could kindly go to the
 2    -- actually, if we could scroll down to the bottom half of
 3    page 1 which is Exhibit 120-1.
 4    Q.   Dr. Venters, what is this on the document?  What does
02:24PM 5   this describe about alcohol withdrawal?
 6    A.   This looks like a -- a box or a table to introduce
 7    people to what you can expect when a person is withdrawing
 8    from alcohol.  This doesn't look like the actual protocol.
 9    It's just an introduction to say when people withdraw from
02:24PM10  alcohol, there are subjective and objective components that
11    you might see.
12         And the difference in my experience for
13    correctional health is subjective is often used as a term to
14    describe what people tell you like I feel like I have a
02:24PM15  headache.  An objective is things as a healthcare provider
16    you measure like their pulse is 102.
17    Q.   And then earlier, you have referenced a CIWA-AR.
18         MS. JUN:  Mr. McMullen, can we go to the next page?
19         And this is Exhibit 120-2.
02:25PM20        Dr. Venters, is this a CIWA-AR?
21    A.   Yes.
22    Q.   And you had mentioned that the CIWA-AR measures certain
23    things.  Could you describe that for us?  And please feel
24    free to guide us and zooming in on the relevant portions.
02:25PM25  A.   Well, they're kind of right there in front of us.  You
```

UNITED STATES DISTRICT COURT

          1    have these boxes, and each box has something else you're

          2    gonna check in or -- or measure.  And so nausea, vomiting is

          3    the first one at the top there.  And so each of these areas,

          4    these ten areas, has a score that goes from zero to 7, and

02:25PM   5    you go through this.  The nurse usually is the one who does

          6    it, and you'll do this every four to eight hours with a

          7    person, and you'll come up with a score.

          8           And the helpful part about this is if you, you

          9    know, train everybody the same way, then it standardizes

02:26PM  10    across your health system, and we use it all over the

         11    country, in hospitals and all sort of places.  We get these

         12    scores, and we can see, okay, look, you went from a 4 to a 6

         13    or a 6 to a 10, um, or you're coming back down.  So that's

         14    really crucial information for thinking about how severe the

02:26PM  15    withdrawal is.

         16    Q.   Now, you had mentioned that on Exhibit 7, if there had

         17    been a yes response to the question of being under the

         18    influence of drugs or alcohol, that would have prompted a

         19    different clinical response.  What kind of clinical response

02:26PM  20    would that have prompted?

         21    A.   Well, if you know somebody is under the influence of a

         22    substance, then you can expect -- unless they're gonna keep

         23    drinking or using drugs, and I don't say that to joke because

         24    there are prisons and jails where I've seen it happen, but

02:26PM  25    generally speaking, we expect when somebody comes to a jail

1    or prison, they're gonna stop.  They're gonna become

2    abstinent all of a sudden; right?  It's a forced withdrawal.

3           But we know with alcohol especially, it's the most

4    deadly type of withdrawal.  Three fourths of the withdrawal

02:27PM 5    deaths in jails are from alcohol so we know it's a really big

6    problem.  So then when we know somebody's a drinker of

7    alcohol, a consumer of alcohol, we start with this CIWA right

8    away.  Now, sometimes we stop it because their scores are

9    zero for three days in a row or we've a wrong or something,

02:27PM 10    but the first thing we have to do is start monitoring right

11    away.

12    Q.   And when you say start monitoring right away, is -- is

13    there like a -- a score that's tallied, um, like at regular

14    intervals for the person who says they're under the influence

02:27PM 15    of drugs or alcohol?

16    A.   Yes.  That's how each of these tools is designed so you

17    just end up with a number score.  So generally, with a

18    CIWA-AR, if your score adds up, and you can kinda see how you

19    get points if you look at that sheet, and if you're over 10,

02:28PM 20    then you're starting to have some symptoms that might be

21    moving from mild to moderate.  And then if you get up over 18

22    or 19, we're starting to think you may be in severe

23    withdrawal.  And so guiding how you handle, uh, the patient,

24    uh, how much health service you have in your jail cause not

02:28PM 25    all jails have the same amount of capacity can be driven by

        1    these numbers that help you with, uh, the monitoring of

        2    withdrawal.

        3    Q.    Now, how frequently would a person under the influence

        4    of alcohol be assessed under the CIWA-AR protocol?

02:28PM  5    A.    A minimum of every eight hours.  Uh, usually between

        6    every four and eight hours, and that would go on for probably

        7    72 hours or until you had multiple readings that were zero,

        8    you know.  But the thing with alcohol is people can have

        9    their worst withdrawals symptoms on Day 3 or 4 often.  And so

02:29PM 10    you wouldn't want to just stop it just because you stayed in

       11    a safe zone for, uh, let's say, two days.

       12    Q.    And you had mentioned that -- well, actually strike

       13    that.  Let me ask you a different question.  Uh, does the

       14    presentation of alcohol withdrawal change over time?

02:29PM 15    A.    Yes.  I think the best way for me to describe it is

       16    there are waves of symptoms that come and go, and as people

       17    experience withdrawal, each waver may be more serious than

       18    the last.

       19           So the reason I say wave is because somebody could

02:29PM 20    have an initial wave where their heart rate goes up a little

       21    bit, but a few hours later, they're feeling fine where

       22    they're just a little anxious.  But next wave could bring

       23    more serious symptoms like, uh, heart rate and blood pressure

       24    going up or a splitting headache or a seizure.

02:29PM 25           And these waves, not only do get worse, but they

                        UNITED STATES DISTRICT COURT

1    become increasingly difficult to control even with all the

2    medicines we know.  So it -- there is a -- in medicine, they

3    use the term -- we use this term, wax and wane, but you can

4    have these waves of symptoms getting worse and worse.

02:30PM 5              THE COURT:  Okay.

6              Ladies and gentlemen, it's 2:30.  We are breaking

7    for an afternoon break.  We're gone have you come back in

8    15 minutes at quarter to 3:00.  We'll take up at that time

9    and go to 4:00.  Remember the admonishment not to discuss the

02:30PM 10   case among yourselves or with anybody else or form or express

11   any opinions about the matter until it's submitted to you and

12   you retire to the jury room.  When you leave, you can leave

13   quietly because I've got to talk to the attorneys a little

14   bit, okay?

02:30PM 15             THE CLERK:  All rise.  Please follow me and leave

16   your notes on your chair.

17                         (Jury not present.)

18             THE COURT:  Okay.  The record will reflect that the

19   jurors have left the courtroom.

02:31PM 20            You can step down now.

21             Uh, you can have seats.  Ladies and gentlemen --

22   excuse me.

23             Counsel, I want to talk to you a little bit.  Not

24   criticizing anything, but I just wanted to make sure that

02:31PM 25   nobody's blind sided.  The testimony that was given went very

UNITED STATES DISTRICT COURT

1    deeply into narratives that really were not necessary for the

2    case, questions about when you were provided information and

3    when you got the information, not relevant, et cetera.

4         And I have no problem with that.  You put on the

02:31PM 5    bare bones of the case, and then you put on the icing on the

6    cake as much as you want as long as you're within time

7    limits.  It's testimony like this that would -- would make it

8    very doubtful that I'd ever give you an extension in time.

9         But that's okay.  You know what your time is.  You

02:32PM 10   use it the way you want.  And sometimes the case is much more

11   efficient if you can't put the frosting on the cake.  But I

12   just don't want anybody to be blind sided at the end of the

13   case thinking that, you know, I've got more time.

14        Uh, we will see you back then in 15 minutes.

02:32PM 15        THE CLERK:  All rise.  This court is in recess.

16                     (Recess taken.)

17        THE CLERK:  All rise.

18                     (Jury present.)

19        THE COURT:  Okay.  The record will reflect that all

02:46PM 20   members of the jury are in their respective seats in the jury

21   box, the witness is on the witness stand, and counsel, you

22   are in direct examination.  You may continue.

23        MS. JUN:  Thank you, Your Honor.

24        Dr. Venters, let's finish up on Exhibit 7.  If we

02:47PM 25   could look at Exhibit 7 one more time?  And particularly, if

UNITED STATES DISTRICT COURT

 1    can hone in on that question about whether Mr. Enyart was

 2    under the influence of drugs or alcohol.

 3    Q.   Did you review any evidence in this case that showed

 4    that Deputy Conley was aware that Mr. Enyart was under the

02:47PM 5    influence of alcohol?

 6    A.   Yes.

 7    Q.   What evidence did you review that showed that he was

 8    aware that Mr. Enyart was under the influence of alcohol?

 9    A.   As I recall, the interviews with the family, uh, they

02:47PM10    mentioned -- multiple family members mentioned they had

11    reported alcohol use.  And as I recall, the arrest report

12    also included some language about Mr. Enyart being under the

13    influence or smelling of alcohol, and I think that might have

14    been part of what Officer Conley told to one of Mr. Enyart's

02:48PM15    relatives when they talked on the phone, that he smelled of

16    alcohol.

17    Q.   So you referenced a conversation.  Was there a

18    conversation between the Enyart family and Deputy Conley?

19    A.   That's my -- my recollection is there was both

02:48PM20    communication between those two groups, and then also, there

21    was an arrest report that had some information about

22    intoxication.

23    Q.   So hypothetically, if an -- if deputies on the scene of

24    an arrest have information from the family that an individual

02:48PM25    is a chronic alcoholic, that he binge drinks, and that he has

1    issues such as seizures or there's concern about seizures

2    related to the drinking, and if that person appears

3    intoxicated meaning they smell of alcohol, um, what should an

4    arresting officer do when he arrives at the jail in his

02:49PM 5    providing information to a medical intake nurse?

6    A.   They should tell the medical staff about it.

7    Q.   And what precisely should they have told the medical

8    staff?

9    A.   I think that I don't -- I wouldn't put too much pressure

02:49PM10   on the custodial staff, the law enforcement.  This question

11   is pretty good.  Is the person under the influence of drugs

12   or alcohol?  If a -- if -- if they get a report from a family

13   member or they have their own personal observations that the

14   person's intoxicated, uh, then they should tell health staff.

02:49PM15   Health staff, it's their job to go dig into the details and

16   figure out how bad the withdrawal is.  But they just have to

17   take that information they've learned and give it to it's

18   usually the receiving nurse.

19   Q.   In this case, did you review any evidence indicating

02:49PM20   that there was a policy by the San Bernardino County

21   Sheriff's Department requiring arresting officers or deputies

22   to provide this information to intake nurses at the jail?

23   A.   I haven't seen any policy that's on that specific area.

24   Q.   Did you review any training records that indicated that

02:50PM25   deputies at the San Bernardino County Sheriff's Department

UNITED STATES DISTRICT COURT

1    receive training on conveying this information about alcohol

2    intoxication to an intake nurse at the jail?

3    A.   No.

4    Q.   Is that -- are these policies -- an affirmative policy

02:50PM 5    requiring this type of information about alcohol intoxication

6    to be conveyed by the arresting officer to the intake nurse,

7    is this type of policy something you have encountered before?

8    A.   Uh, yes.  It's kind of the other side of the coin of

9    these questions we're looking at.  Those questions don't just

02:50PM10    sit there out there by themselves.  We have to train the

11    people we're asking on what they're supposed to tell us, that

12    they should tell us when they see or hear things.  So yes,

13    it's important to train the nurses and the custodial staff.

14    Q.   So we talked about two things.  We've talked about,

02:51PM15    policies, and we talked about training.  So in your

16    experience, have you encountered correctional systems that

17    have both the policy requiring officers to convey information

18    about alcohol intoxication plus training given to those

19    arresting officers about communicating that information to

02:51PM20    intake nurses?  Have you seen that exist in tandem in other

21    correctional systems?

22    A.   Yes.  Although to be fair, we had that in New York City,

23    but most of the work I do, as I mentioned earlier, is places

24    that I've had problems, and so that's one of the first things

02:51PM25    I work with the facility to build.  So my experience is often

UNITED STATES DISTRICT COURT

1    that one part of this crucial hand-off of information might

2    be lacking, and we have to build the policy, build the

3    training and make sure that it works.

4    Q.   Now, let me then ask you about whether the --

02:52PM 5    hypothetically, if an arrestee's family is providing

6    information to the officers about intoxication and abuse of

7    alcohol, is that information alone sufficient to initiate the

8    alcohol withdrawal protocol, in other words, the CIWA

9    monitoring?

02:52PM 10   A.   Yes.  It doesn't mean that you're gonna give a certain

11   medicine, but this tool, the CIWA, it's a screening tool.  So

12   a screening tool is like we're gonna use it to try to find

13   every possible patient that has this problem.  We might

14   decide later they really don't have the problem or we might

02:52PM 15   draw back on what we're gonna do, but it's pretty common in

16   my experience that family members are gonna be the source of

17   information that can save somebody's life.

18   Q.   And, excuse me, is that the standard of care in

19   correctional health, in correctional medicine to make sure

02:53PM 20   that there are affirmative policies and training in place to

21   ensure that arresting officers transfer that information,

22   that critical information about alcohol intoxication to the

23   intake nurse?

24   A.   Yes.

02:53PM 25   Q.   And is it the standard of care for arresting officers

1    when they have that information to, in fact, convey it to a

2    medical intake nurse?

3    A.   Based on my experience, yes.

4    Q.   Let me go now to another area of inquiry.  In your

02:53PM 5    review of the evidence in this case, did you see any evidence

6    that the family of William Enyart was trying to give

7    information about his possible withdrawal from alcohol to

8    staff at the High Desert Detention Center?

9    A.   Yes.

02:54PM 10   Q.   And first, before I ask you any questions, let me orient

11   the jury.  Do you know what date William Enyart was accepted

12   and placed at the High Desert Detention Center?

13   A.   My recollection is the afternoon or early evening of the

14   27th of July in 2022.  He had arrived at his first facility,

02:54PM 15   the High Desert.

16   Q.   And did you review evidence in this case that showed

17   that the family of Mr. Enyart had then contacted High Desert

18   Detention Center after July 27th to try and speak to

19   personnel at High Desert?

02:54PM 20   A.   Yes.

21   Q.   And what type of evidence or information did you review

22   on this subject?

23   A.   I reviewed depositions of the family members who

24   reported calling 30 or so times to try and report these

02:55PM 25   concerns about alcohol, uh, and treatment, and I also recall

UNITED STATES DISTRICT COURT

1    reviewing some phone records, uh, of some sort.

2    Q.    And what did those phone records indicate to you?

3    A.    They just show lots of calls to the facility from family

4    members, and I believe they had how long the calls were so

02:55PM 5    some were very short, and some were longer.

6    Q.    And is that common for family members to call jails with

7    information about a loved one who's arrested?

8         MR. MIEDERHOFF:  Objection, calls for speculation.

9         THE COURT:  Sustained.

02:55PM 10   BY MS. JUN:

11   Q.    Is it the standard of care with -- for a correctional

12   medical facility to make sure that there is a system in place

13   to receive outside collateral information about an arrestee's

14   health and ensure that information is conveyed to medical

02:56PM 15   providers?

16   A.    Yes.

17   Q.    Tell me a little bit more about that.  What type of

18   policies need to be in place for a correctional healthcare

19   system?

02:56PM 20   A.    Part of the standard health training for correctional

21   staff is that when they learn health information about a

22   patient, a person who is detained or incarcerated, that they

23   get that information to the health service.

24        And so that is a big part of the training that's a

02:56PM 25   standard and essential training for correctional officers or

UNITED STATES DISTRICT COURT

1    correctional staff.  And that information can come from

2    outside family members.  It could come from other

3    correctional staff.  It actually often comes from, uh, other

4    inmates or detained people.

02:56PM 5            So without that as a strong foundation for

6    policies, much of -- for instance, suicide prevention

7    wouldn't happen behind bars because we rely on correctional

8    staff to get information they learn over to the health staff.

9    Q.   Now, when this type of information about alcohol

02:57PM 10   intoxication and the risk of withdrawal is conveyed by a

11   family member, what is the standard of care in terms of using

12   that information?  What is the expectation that will happen

13   with this critical information?

14   A.   That they get it to health staff.  And so health staff

02:57PM 15   depending on the facility, it could be the health

16   administrator, it could be the nurse, the charge nurse,

17   somebody on the health staff needs to then take on that

18   problem and think about clinically.  So it's simple, but it

19   has to be quick, especially with a problem like this.

02:57PM 20   Q.   And you just said the word they.  They need to convey it

21   to health staff.  Is it typical in correctional health or

22   just in correction systems in general for the people

23   receiving this information not to be medical staff?

24   A.   Yes.  Because when a family member has a loved one

02:58PM 25   behind bars, they pick up the phone, and they call the number

1     they can find, and that is almost always an administrator who

2     works for the Corrections or Sheriff's Department.  They

3     can't get to the health staff directly.

4             And so it's my experience, and it's the standard of

02:58PM 5     care based on my work and understanding, that when somebody

6     calls and says my loved one was suicidal, they have diabetes,

7     they have epilepsy, whoever gets that information takes it

8     over to the health staff, and then it's the health staff's

9     job and problem, to be frank, to figure it out.

02:58PM 10    Q.   In this case, was there any evidence that you reviewed

11    that indicated this critical information about alcohol

12    intoxication and withdrawal was being conveyed to the medical

13    staff at the High Desert Detention Center?

14    A.   No.

02:58PM 15    Q.   What did -- what evidence -- or strike that.  What did

16    you review as to what was occurring with this information?

17    In other words, once the Enyart family transmitted this

18    information to High Desert Detention Center, what happened

19    with this information?

02:59PM 20    A.   Based on my review of depositions of custodial staff, I

21    believe there were two, the -- their depositions about

22    fielding these calls had a pretty consistent response which

23    was that we don't do that.  We don't -- we don't transfer

24    information from us to health staff.  So I don't -- my

02:59PM 25    understanding is none of it got to health staff.

UNITED STATES DISTRICT COURT

1   Q.   Is that -- does that violate the standard of care in

2   correctional medicine?

3   A.   Yes.

4   Q.   Tell me a little bit more about that.  Why is that a

02:59PM 5   departure from the standard for what to do with information

6   in a correctional setting?

7   A.   Because the custodial staff, the law enforcement

8   officers, they learn frequently information about somebody's

9   health or health problems or health emergencies that we need

03:00PM 10   to know in correctional health to save their lives, to keep

11   them alive, to promote their health, all of those things.

12        And so it is one of the most well trod paths.  For

13   instance, often the leading source of referrals for mental

14   health, uh, in a jail are officers saying I'm worried about

03:00PM 15   this person.  Here, health staff, this is what I saw.  That

16   saves lives.  And so the ability and training for the

17   officers to do that is essential.

18   Q.   In your review of the evidence in this case, did you

19   encounter any policy requiring -- correctional staff or

03:00PM 20   security staff who get phone calls and information from

21   family members about an arrestee's health or medical

22   condition, did you seen any policy requiring that information

23   to be transmitted to medical staff within that jail?

24   A.   No.

03:01PM 25   Q.   Is that something you would expect to see from a jail or

UNITED STATES DISTRICT COURT

1   correctional facility like High Desert Detention Center?

2   A.   Yes.

3   Q.   And once that information -- let's just say

4   hypothetically, if that type of information was conveyed from

03:01PM 5   the health staff -- or, excuse me, from the security staff

6   for taking the phone call from the family members, if that

7   information was then conveyed to medical staff at the jail,

8   what would typically happen with that information?

9   A.   Well, if --

03:01PM 10       MR. MIEDERHOFF:   Object, it calls for speculation.

11       THE COURT:   Sustained.

12   BY MS. JUN:

13   Q.   Dr. Venters, did you see any reason given in this case

14   as to why this type of critical information was not being

03:02PM 15   transferred to medical personnel?

16   A.   The two depositions I reviewed, the custodial staff had

17   a very similar response to why they didn't share this

18   information, and it had to do with concerns about privacy or

19   HIPAA of the patient.

03:02PM 20   Q.   Have you encountered a correctional system where this

21   type of lifesaving information is not conveyed to medical

22   personnel due to HIPAA?

23   A.   I have encountered instances where this happened as an

24   individual error.   Somebody messed up or they didn't do what

03:02PM 25   they were supposed to do.   I've never encountered a system

UNITED STATES DISTRICT COURT

1    that said we're not gonna do this.

2    Q.    Yeah.  And you mentioned an individual error.  Why is it

3    an individual error to not transmit or convey this

4    information?

03:02PM 5    A.    Because that information could save somebody's life.

6    Q.    Hypothetically, if a mother of an arrestee called --

7    strike that.  Hypothetically -- if the mother and father of

8    an arrestee call a jail a combined 34 times to inform people

9    picking up the phone at that jail that their son is -- abuses

03:03PM 10    alcohol, is a chronic abuser of alcohol and is at risk of

11    seizures, heart attack or stroke because of that son's

12    alcohol dependency, hypothetically, with that information in

13    mind, what should have happened with that information

14    conveyed by the parents?

03:03PM 15    A.    It should have been given to the medical or health

16    staff.

17    Q.    With the same facts of that hypothetical in mind, is it

18    a failure if the Sheriff's Department does not have any

19    affirmative policy requiring that information to be given?

03:04PM 20    A.    Yes.

21    Q.    And given with the same facts of this hypothetical in

22    mind, would -- that failure to transfer this critical

23    lifesaving information to medical staff, could that lead to

24    death?

03:04PM 25    A.    Yes.

UNITED STATES DISTRICT COURT

```
 1    Q.   And did that lead to William Enyart's death in this

 2    case.

 3              MR. MIEDERHOFF:  Objection, lacks foundation.

 4              THE COURT:  Sustained.

 5              MS. JUN:  No further questions, Your Honor.

 6              THE COURT:  Thank you.

 7              Cross-examination.

 8              MR. MIEDERHOFF:  May I proceed, Your Honor?

 9              THE COURT:  Yes.

10                          CROSS-EXAMINATION

11    BY MR. MIEDERHOFF:

12    Q.   Good afternoon, Dr. Venters.  One of your basic, uh,

13    comments has been that the withdrawal protocols should have

14    been started at the time of booking for Mr. William Enyart;

15    is that right?

16    A.   Yes.

17    Q.   You reviewed the medical records in this case?

18    A.   Yes.

19    Q.   You reviewed the deposition transcripts?

20    A.   Yes.

21    Q.   You, uh, reviewed the audio recordings.

22    A.   Yes.

23    Q.   Those were all important items of information for you;

24    right?

25    A.   Yes.
```

1    Q.   We know that Mr. William Enyart was seen at the scene by

2    emergency medical services; right?

3    A.   Yes.

4    Q.   He was seen by a paramedic?

03:05PM 5    A.   Uh, that's my recollection.  I don't recall if it was a

6    medic or EMT or what the level of training was.

7    Q.   I want you to assume for a moment that it was a

8    paramedic.  That's a licensed healthcare provider; right?

9    A.   I'm not sure what you mean by that, but I'm familiar

03:06PM10    with a paramedic and what they do.

11    Q.   They have medical training; right?

12    A.   Yes.

13    Q.   They diagnose injuries.  Right?

14    A.   I'm not sure paramedics -- I don't know the state laws

03:06PM15    here, but paramedics don't routinely do a lot of diagnosis.

16    They'll say what they think the problem might be, and then a

17    doctor diagnoses it or a nurse practitioner comes up with an

18    actual diagnosis.

19    Q.   They'll make a determination as to whether or not the

03:06PM20    patient is transported to the hospital; correct?

21    A.   Yes.

22    Q.   In this case, the paramedic would have seen Mr. Enyart.

23    Right?

24    A.   Yes.

03:06PM25    Q.   He would have evaluated him?

UNITED STATES DISTRICT COURT

```
        1    A.    Yes.

        2    Q.    He would have asked him questions?

        3    A.    Yes.

        4    Q.    Mr. Enyart refused to answer questions regarding drugs

03:06PM 5    and alcohol; correct?

        6    A.    I don't recall.

        7    Q.    Mr. Enyart we know the paramedic -- strike that.  The

        8    paramedic did not decide to transport Mr. Enyart to the

        9    hospital; correct?

03:07PM10    A.    That's my recollection.

       11    Q.    Deputy Conley who was on-scene took custody of

       12    Mr. Enyart after that and transported him to the jail.  He

       13    talked about that; right?

       14    A.    Yes.

03:07PM15    Q.    There were multiple deputies on-scene; right?

       16    A.    That's my recollection.

       17    Q.    You read all their depositions; right?

       18    A.    I don't recall if I've reviewed everybody -- I don't

       19    know as I sit here today.

03:07PM20    Q.    Did you review Deputy Conley's deposition?

       21    A.    I believe so.

       22    Q.    Did you review Deputy Umphlett's deposition?

       23    A.    I believe so, yes.

       24    Q.    Did you review Deputy Mammolito's deposition?

03:08PM25    A.    I don't recall.  I believe it is one of the ones.  I
```

UNITED STATES DISTRICT COURT

1     just don't recall as I sit here today.

2     Q.   You reviewed those belt recordings; right?

3     A.   I'm not sure.  Do you mean the audio recordings?

4     Q.   Yeah, the audio recordings.  You reviewed those; right?

03:08PM 5   A.   Yes.

6     Q.   And we played come clips when you were being examined by

7     plaintiff's counsel?  Right?

8     A.   Yes.

9     Q.   And you weren't at the scene; correct?

03:08PM 10   A.   That is correct.

11     Q.   You heard all those belt recordings.  Like that was a

12     clip of the belt recording, but you heard the entire

13     recording; right?

14     A.   I -- there were -- as I recall, some of these recordings

03:08PM 15   started off with officers just talking to each other so I

16     think I probably skipped through those until it seemed like

17     they were interacting with a family member or Mr. Enyart or

18     something.

19     Q.   You received the entire recording; right?

03:09PM 20   A.   I -- I haven't -- I -- I don't know how to answer that.

21     I received recordings I received.  I don't know what they

22     represent.

23     Q.   You would expect to receive the entire recording; right?

24     A.   I'm not sure -- again, I'm not sure how to say what the

03:09PM 25   entire recording is, if it's when they get out of the car, if

UNITED STATES DISTRICT COURT

1    it's when they approach the person, but I'm not disputing it.

2    I just don't know how to characterize the length of the

3    recordings I got.

4    Q.   In the recordings that you reviewed, you never heard the

03:09PM 5    word alcohol dependency; right?

6    A.   I -- I don't recall hearing that.

7    Q.   You never heard the word delirium tremens; right?

8    A.   I don't recall hearing that.

9    Q.   You never heard anyone say that Mr. Enyart was at risk

03:09PM 10   for withdrawals; right?

11   A.   I do recall somebody mentioning that they were worried

12   he could have a seizure.

13   Q.   That's different from risk of withdrawals; right?

14   A.   Uh, well, one of the bad things that happens when you

03:10PM 15   stop drinking is you can have a seizure.  I'm not -- I'm not

16   sure if it is.

17   Q.   He talks about that.  One of the withdrawal symptoms is

18   a seizure; right?

19   A.   It could be.

03:10PM 20   Q.   Okay.  But on-scene, when the deputy was talking with

21   the family members, you never heard on the recording anyone

22   say that Mr. William Enyart was at risk for withdrawals;

23   correct?

24   A.   I don't recall hearing that phrasing.

03:10PM 25   Q.   No family member spoke with Deputy Conley on-scene;

UNITED STATES DISTRICT COURT

```
     1    isn't that correct?

     2    A.   That's my recollection.

     3    Q.   And you mentioned -- during your examination by

     4    plaintiff's counsel, you said family members are sometimes

03:10PM 5    going to be the source of information that will save

     6    somebody's life; right?

     7    A.   Yes.

     8    Q.   And you gave a deposition in this case; right?

     9    A.   Yes.

03:10PM10    Q.   And you told the truth in that deposition?

     11   A.   Yes.

     12   Q.   When you gave that deposition, you said families

     13   sometimes report incorrect information; right?

     14   A.   Also true.

03:11PM15    Q.   So Deputy Conley and Deputy Umphlett were assigned as

     16   patrol deputies for this incident?

     17   A.   I don't know what their assignments were, but I

     18   understand they responded to the scene.

     19   Q.   You don't have any information that they saw Mr. Enyart

03:11PM20    while he was in the facility aside from Deputy Conley booking

     21   him into the facility; right?

     22   A.   I don't believe so, no.

     23   Q.   So we have Deputy Umphlett on the scene; right, who

     24   talks with the family.  We have Deputy Conley also on the

03:11PM25    scene; right?
```

```
          1    A.   That's my understanding.

          2    Q.   And we have Deputy Conley who transports the individual

          3    to the High Desert Detention Center; right?

          4    A.   Yes, that's my understanding.

03:11PM   5    Q.   And Mr. Enyart's booked into the facility; correct?

          6    A.   Yes.

          7    Q.   And then there's no more contact between Deputy Umphlett

          8    and Deputy Conley and Mr. William Enyart; is that correct?

          9    A.   That's my understanding.

03:12PM  10    Q.   So that's on July 27th; right?

         11    A.   Yes, that's my understanding.

         12    Q.   So when Mr. William Enyart gets to the facility, he's

         13    seen by the nurse.  You talked about that, didn't you?

         14    A.   Yes.

03:12PM  15    Q.   He's seen by Nurse Alvarado?

         16    A.   I forgot the name, but yes, I recall that the nurse saw

         17    him.

         18    Q.   I think on direct you said that sometimes at some

         19    facilities, um, inmates who are arrested or arrestees are

03:12PM  20    seen by medical staff or not; right, depending on the

         21    facility?

         22    A.   My answer was about that I was speaking with reference

         23    to the CIWA, but yes, that could happen.  That it could be

         24    depending on when they come to a facility or how big it is,

03:12PM  25    uh, the first person to ask them health questions could be a
```

```
          1    custodial staff.

          2    Q.   We know in this instance he was seen by a registered

          3    nurse; right?

          4    A.   Yes.

03:12PM    5    Q.   So you talked about the first page of that form, the

          6    initial receiving screening; right?

          7    A.   Yes.

          8    Q.   You talked about how the fact that it was marked no for

          9    under influence of drugs or alcohol; right?

03:13PM   10    A.   Yes.

         11    Q.   I want you to assume for a moment that the deputy who's

         12    arresting the individual only knows that the individual

         13    smells of alcohol.  Would they still have to mark that

         14    they're under the influence of drugs or alcohol?

03:13PM   15    A.   Yes.  I don't think it's their job to try and figure

         16    that all out.  They just need to tell health staff.

         17    Q.   And then during that examination by the nurse, did you

         18    review video surveillance?

         19    A.   I believe I saw video clips of when Mr. Enyart came into

03:13PM   20    the facility.  And I think part of that included the -- some

         21    of the -- his initial moments in the jail.

         22    Q.   So did you see the part where Mr. Enyart went into a

         23    room with the registered nurse during the, uh, booking

         24    process?

03:13PM   25    A.   I believe so, yes.
```

1    Q.    So the nurse, just like before with the paramedic, the

2    nurse would have asked him questions; right?

3    A.    Yes.

4    Q.    The nurse took his vital signs?

03:14PM 5    A.    Yes.

6    Q.    The nurse asked him if he needed any prescription

7    medications and he said no; right?

8    A.    That's my recollection.

9    Q.    He, Mr. William Enyart denied that he had drank any

03:14PM 10    alcohol; right?

11    A.    Yes, that's my recollection.

12    Q.    He denied that he had a history of withdrawals; right?

13    A.    Yes, that's my recollection.

14    Q.    He denied that he had used any street drugs such as

03:14PM 15    heroin, coke, meth; right?

16    A.    Correct.

17    Q.    He denied that he had a history of drug withdrawals;

18    right?

19    A.    That's my recollection.

03:14PM 20    Q.    You talked about the deputies being responsible for

21    providing information; right?

22    A.    Yes.

23    Q.    And the medical staff is responsible for making a

24    determination of treatment; right?

03:15PM 25    A.    Yes.

1    Q.    You talked about the CIWA, I think was the acronym you

2    used.  That's the tool that you use for someone who they

3    believe is at risk for withdrawals; right?

4    A.    Yes.

03:15PM 5    Q.    So what are the symptoms or the -- I think you showed on

6    the screen, but what are some of the items that they'll look

7    for to rate an individual for the CIWA?

8    A.    The -- I don't have all the boxes memorized.  The

9    regular CIWA has 15 of those boxes and the CIWA-AR, the one

03:15PM10    we looked at has ten, but some of them are, uh, have to do

11    with irritability or restlessness or, um, if people have

12    perceptual disturbances.  If they're hearing things that

13    aren't there or seeing things that aren't there.  Sweating.

14    Those are some of the elements of the CIWA.

03:16PM15    Q.    You would agree that the smell of alcohol alone is not

16    enough to trigger the CIWA protocol?

17    A.    No, I would not.

18    Q.    We talked about those signs and symptoms that you rate

19    for the CIWA.  You can't say whether or not Mr. William

03:16PM20    Enyart would have had any of those at the time of his

21    booking; correct?

22    A.    Correct.

23    Q.    You don't have any info on the level of intoxication

24    that Mr. Enyart could have been at the time of his arrest;

03:16PM25    correct?

1      A.    Correct.

2      Q.    You don't know the last time Mr. Enyart had anything to

3      drink; correct?

4      A.    Other than the family did reference whether he was

03:16PM 5      drunk.  Those clips we heard, I think one referenced that he

6      was either intoxicated then or intoxicated from the night

7      before, but aside from that, I don't have any other

8      information.

9      Q.    So no information on what he actually drank and at what

03:17PM 10     time; right?

11     A.    Correct.

12     Q.    You mentioned that the CIWA protocols should be in place

13     for at least 72 hours?

14     A.    Well, there are more specific guidelines depending on if

03:17PM 15     you use which of these tools, the CIWA generally or the

16     CIWA-AR just for alcohol.

17            But as a general matter, when we start monitoring

18     somebody every four to eight hours, uh, we need to keep it

19     going for long enough that we feel either like the original

03:17PM 20     information was wrong, there's no substance withdrawal worry

21     or we're kind of through the phase where that withdrawal

22     could rear its ugly head.  So it depends a little bit on what

23     substance we're worried the person is withdrawing from.

24     Q.    You also talked about the fact that most of the people

03:17PM 25     who come into the jail are intoxicated with something; right?

1    A.    Yes.

2    Q.    Is another part of your earlier testimony was describing

3    the fact that the family reported that they gave information

4    to staff at the jail in the middle of this incarceration and

03:18PM 5    that information should have been transferred to medical

6    staff; right?

7    A.    Correct.

8    Q.    And that applies to Defendants Snow and Skaggs; right?

9    A.    That's my understanding, yes.

03:18PM 10    Q.    There's no recordings of those calls; correct?

11    A.    Not that I'm aware of.

12    Q.    The content of those calls is based on you reviewing the

13    deposition testimony of the parents; correct?

14    A.    Yes, I believe so.

03:18PM 15    Q.    You've never seen any documentation that was created at

16    the time of those calls that reflects what was said to those

17    deputies; is that correct?

18    A.    Uh, not that I recall.  I just want to qualify that as I

19    recall, the calls were also a topic of their depositions, the

03:18PM 20    officers' depositions when they said they don't -- their

21    practice is not to give health that information.  So that's a

22    second area besides the depositions of the family members

23    where the content of the calls I think was discussed.

24    Q.    They didn't remember -- excuse me.  Deputy Skaggs and

03:19PM 25    SCA Snow didn't have any recollection of those calls;

1    correct?

2    A.    I don't recall as I sit here today, uh, what they

3    recalled about the specific calls.

4    Q.    So the information that you relied on for the content of

03:19PM 5    those calls came from the family; right?

6    A.    I think that's fair, yes.

7    Q.    And there was one conversation with Skaggs that occurred

8    on July 30th; right?

9    A.    I would need to review something.  I don't recall the

03:19PM10    specific conversation.

11    Q.    I want you to assume for a moment that the family

12    members called, but never said anything about Mr. William

13    Enyart being at risk for withdrawals or that his life was at

14    risk.  Just that they were asking questions and they were

03:19PM15    concerned.  Would that change your opinions about

16    Deputy Skaggs and SCA Snow in terms of whether they met the

17    standard of care?

18            MS. JUN:   Objection.   Improper hypothetical.

19            THE COURT:   Overruled.

03:20PM20            THE WITNESS:   If they hadn't previously reported

21    those concerns to those deputies or subsequently, then I

22    would say I would agree with you.   If they had in half the

23    calls or a third of the calls or even one of the calls

24    reported that concern, then I would be harshly critical

03:20PM25    because that one -- even one passage of that information to

UNITED STATES DISTRICT COURT

1    the security staff is something that could save somebody's

2    life.

3    BY MR. MIEDERHOFF:

4    Q.    How many people work in that role where they receive

03:20PM 5    calls from family members at High Desert Detention Center?

6    A.    I don't know.

7    Q.    You'd be guessing; right?

8    A.    Yes.

9    Q.    Can you say it's more than just SCA Snow?

03:20PM 10   A.    I don't know.

11   Q.    Um, the calls that came in over the five days from the

12   family, we know that from the phone records; right?

13   A.    That's my understanding, yes.

14   Q.    Those phone records don't reveal what was said in those

03:21PM 15   calls; right?

16   A.    Correct.

17   Q.    Not all the calls were answered.  Some of them were just

18   calls that failed to go through; right?

19   A.    I don't -- I don't know.  I know some of the calls

03:21PM 20   seemed to be short and some of them were longer.  I don't

21   know what the source or what happened with the short calls.

22   Q.    Frances Enyart did not get Mrs. Snow's name right in her

23   deposition; isn't that correct?

24   A.    I'm sorry.  Could you repeat the question?

03:21PM 25   Q.    She didn't get her name right.  She thought it was

UNITED STATES DISTRICT COURT

1       someone else; right?

2       A.    Sorry.  You're saying in her deposition, she confused

3       her name or someone else's name?

4       Q.    Ms. Frances Enyart thought she spoke to someone else,

03:21PM 5       didn't she?

6       A.    Uh, that may be.  I don't recall.

7       Q.    She didn't get her title right; isn't that correct?

8       A.    I don't recall.

9       Q.    Ms. Enyart identified a person that had never worked

03:22PM 10      there before; isn't that true?

11      A.    Again, I don't recall.

12      Q.    During the time that the family made the calls, they

13      never came in to see Mr. Enyart at the jail; is that correct?

14      A.    I don't know.  I'm not disputing it.  I just didn't

03:22PM 15      know.

16      Q.    You don't know that?

17      A.    No.

18      Q.    Okay.  The family never came in to talk to anybody at

19      the jail; isn't that correct?

03:22PM 20      A.    I'm not disputing it.  Again, I just wasn't aware one

21      way or the other.

22      Q.    So once Mr. Enyart's at the High Desert Detention

23      Center, he's in that jail, we know initially he's seen by

24      Nurse Alvarado; right?

03:22PM 25      A.    That's my recollection, yes.

UNITED STATES DISTRICT COURT

1    Q.    And then he's also seen by other healthcare providers at

2    the jail?

3    A.    Yes.

4    Q.    So on July 27th, he's seen by Nurse Alvarado; right?

03:22PM 5    A.    That's my recollection.

6    Q.    Then on July 28th, he's seen by Nurse Sanders?

7    A.    I don't recall.  I have the time line in my report if

8    you want me to -- I just haven't memorized the clinical

9    encounters.

03:23PM10    Q.    Can you say that he was seen by a nurse on July 28th?

11    Do you remember that?

12    A.    I recall that he was seen by a nurse.  I don't recall

13    when it was.  I'm not disputing it.  I just haven't memorized

14    the individual encounters he had.

03:23PM15    Q.    You would agree he was seen by a nurse on July 29th as

16    well?  Nurse Ferrara does that refresh your memory?

17    A.    Again, I recall that he had encounters, multiple

18    encounters after his receiving screening.  I just don't

19    recall exactly who did them or what the date was.

03:23PM20    Q.    We know that Mr. Enyart denied, uh, using alcohol or

21    alcohol withdrawals in his initial intake; right?

22    A.    Yes.

23    Q.    We also know that in those subsequent visits with the

24    healthcare providers, he also denied to them that he had a

03:23PM25    history of alcohol and drug abuse; right?

1    A.    I don't recall if they asked that in all of the

2    subsequent encounters, but I certainly -- my recollection is

3    he didn't affirmatively report it in those subsequent

4    encounters.  I just don't know if he was being asked every

03:24PM 5    time he saw a health person.

6    Q.    You talked about the fact that you're being paid to be

7    here today?

8    A.    Yes.

9    Q.    At the time of your deposition, you had charged $6,000

03:24PM 10   for your testimony; is that right?

11   A.    Uh, for writing the report.

12   Q.    For your work on the case.

13   A.    Uh, yes.

14   Q.    Then you were paid for your deposition testimony; right?

03:24PM 15   A.    I think I was.  I don't recall if I was, but I certainly

16   submitted an invoice, yes.

17   Q.    And then you're gonna be paid for your testimony today;

18   right?

19   A.    Yes.

03:24PM 20   Q.    You talked about the fact that Mr. William Enyart's

21   family called him or called the facility multiple times;

22   right?

23   A.    Yes.

24   Q.    We also know that Mr. William Enyart called his family,

03:24PM 25   too, didn't he?

UNITED STATES DISTRICT COURT

```
        1    A.    Uh, yes, that's my understanding.

        2    Q.    And in those calls he never told them that there's any

        3    problem with his care; is that correct?

        4    A.    I don't -- I'm not disputing it.  I just don't recall

03:25PM 5    the contents of all his calls to his family.

        6    Q.    And he called them nine times, but they only answered

        7    once; is that correct?

        8    A.    Again, I don't know, but I'm not disputing it.

        9          MR. MIEDERHOFF:  No further questions, Your Honor.

03:25PM10          THE COURT:  Okay.  Redirect in that area.

       11                    REDIRECT EXAMINATION

       12    BY MS. JUN:

       13    Q.    Dr. Venters, you were asked on cross-examination the

       14    question of does the smell of alcohol alone require

03:25PM15    initiation of the CIWA-AR.  Do you recall that question?

       16    A.    Yes.

       17    Q.    What is your answer to that question?

       18    A.    It's that if we have a worry or a concern about somebody

       19    being intoxicated, uh, certainly, with alcohol because it's

03:26PM20    so deadly the withdrawal, we have to start monitoring right

       21    away.  The standards are clear.  It doesn't mean we have to

       22    keep it going.  It doesn't mean that it couldn't be a mistake

       23    or that the person has no signs of withdrawal.  Those are all

       24    great outcomes.

03:26PM25          But we want to screen meaning we want to look for
```

UNITED STATES DISTRICT COURT

1     all the possible cases as aggressively as possible because

2     the drug-related, substance-related deaths in jails have gone

3     up 400 percent in last 20 years.  And most of the withdrawal

4     deaths, three-quarters of them around the country are

03:26PM 5     alcohol.  So it's something we need to be very careful to

6     look for even if we content ourselves a day or two later, oh,

7     we were wrong.

8     Q.    So hypothetically, if Deputy Conley smelled alcohol on

9     Mr. Enyart and he had reported that information to the intake

03:26PM 10    nurse Angel Alvarado should the CIWA-AR have been initiated?

11    A.    Yes.

12    Q.    One other area of inquiry.  On cross-examination counsel

13    asked you about your review of the depositions of Ms. Snow

14    and Deputy Skaggs.  Do you recall that line of questioning?

03:27PM 15    A.    Yes.

16    Q.    And you mentioned something about there was a custom or

17    practice that both Ms. Snow and Deputy Skaggs had testified

18    to in their deposition.  Do you recall that?

19    A.    Yes.

03:27PM 20    Q.    What did they testify was their custom and practice?

21    A.    Well, they both said that they don't -- it wasn't their

22    role when they received health information from families to

23    tell the health staff about what they heard or were told.

24    Q.    And then finally, you were asked some questions, you

03:27PM 25    were asked quite a few questions about Mr. Enyart refusing to

UNITED STATES DISTRICT COURT

1    disclose that he abused alcohol.  Do you recall that line of

2    questioning?

3    A.   Yes.

4    Q.   And to be very fair and honest, Mr. Enyart did not

03:28PM 5    truthfully answer some of those intake questions regarding

6    his abuse of alcohol.  Is that fair?

7    A.   That's my understanding.

8    Q.   Does that stop medical professionals providing care --

9    in other words, let me rephrase that.

03:28PM10         Is the standard of care in the correctional health

11    setting that if an inmate fails to report subjective

12    information, then suddenly there's no obligation or

13    responsibility by that medical care system to provide alcohol

14    withdrawal or monitoring?

03:28PM15    A.   No.

16    Q.   What is the standard of care even if an inmate denies

17    use of alcohol?

18    A.   Well, our obligation is to use the information we have.

19    So a patient who responds no to all the suicide risk

03:28PM20    questions, but has a history of suicide attempt, we are

21    automatically gonna have them see mental health.  A person

22    with a history of withdrawal or there's some information

23    about alcohol use or other drug use, they routinely it's my

24    experience doing these intakes in jails, often people don't

03:29PM25    want to talk to us for a whole variety of reasons.

1          But when we have information about a withdrawal or

2     intoxication or suicidality or even diabetes or epilepsy, we

3     have to act on it because those are things that can and do

4     lead to deaths that are preventable in the first few days of

03:29PM 5     incarceration.

6     Q.   And you just mentioned if we have that information that

7     there's a serious medical condition, we have to act on it.

8     Does that mean medical professionals can rely on arresting

9     officers to provide information?

03:29PM10     A.   Well, we have to.   It doesn't mean that we're asking

11     them to make a diagnosis or say it means this or that or come

12     up with what's the significance.   We just need them to tell

13     us what their observations, what they heard, and then it's

14     our job to figure out is it relevant, is it serious, is it an

03:29PM15     emergency.   But that starts with them being trained and --

16     and affirmatively telling us oh, this person has this issue.

17     The family said he drinks a lot or he smells like alcohol.

18     Something like that.

19               MS. JUN:  Thank you.  No further questions.

03:30PM20               THE COURT:  Recross in that area?

21               MR. MIEDERHOFF:  No, Your Honor.

22               THE COURT:  You may step down.  Thank you for

23     coming in.  Your next witness.

24               MS. PENA:  Thank you, Your Honor.  Plaintiffs call

03:30PM25     Amanda Kelley to the stand.

UNITED STATES DISTRICT COURT

```
        1                THE CLERK:  Please raise your right hand.

        2                        (Witness sworn.)

        3                THE CLERK:  For the record please state your full

        4      name and spell your last name.

03:31PM 5                THE WITNESS:  Amanda Kelley, K-e-l-l-e-y.

        6                THE COURT:  Thank you.  Counsel, you may inquire.

        7                MS. PENA:  Thank you, Your Honor.

        8                        DIRECT EXAMINATION

        9      BY MS. PENA:

03:31PM10      Q.  Ms. Kelley, thank you for being here today and

       11      introducing yourself.  Can you tell us a little bit more

       12      about your relation to Mr. Enyart?

       13      A.  I'm his oldest sister.

       14      Q.  By how many years?

03:31PM15      A.  Five.  Five years.

       16      Q.  Before we get into the incident we've been talking about

       17      today, I want to ask you a little bit about Billy so we can

       18      get a better idea of who he is.  Can you tell us about him

       19      briefly?

03:31PM20                THE COURT:  Well, that's kind of an open-ended

       21      question.  Can you be a little bit more specific on your

       22      question?

       23      BY MS. PENA:

       24      Q.  What was Mr. Enyart like?

03:31PM25      A.  Um, may I refer to him as Billy?  Is that okay?
```

1                MS. PENA:  I think the Judge gave his permission.

2                THE COURT:  Why don't you just refer to him as your

3      brother.

4                THE WITNESS:  Okay.  Thank you, Your Honor.

03:32PM 5                My brother was, he was always the fun one in the

6      family.  He would always make us laugh and always had great

7      jokes.  He loved family.  Family was his number one thing in

8      life.  That's what he cherished a lot.  Loved holidays.  He

9      loved everyone being in the same room, and he loved being a

03:32PM 10     father.  It gave him a purpose in life.

11     BY MS. PENA:

12     Q.   Why don't you talk to us a little bit about his

13     relationship with his daughter Abigail.  What was that like

14     in the last years of his life?

03:32PM 15     A.   The times he spent with her, they would do many

16     different things together.  He taught her how to ride a bike.

17     He taught her how to swim.  He taught her the importance of

18     saving money.  He wanted her to learn how to be independent.

19     And, uh, he really enjoyed just spending quality time with

03:33PM 20     her playing board games, stuff like that.

21     Q.   Thank you.  Now, we told the jury earlier this morning

22     that your father is not here due to a medical condition.  Can

23     you tell us a little bit about the role that Billy played as

24     far as within the family and specifically concerning your

03:33PM 25     father?

1    A.    Uh, over the past few years, uh, my father's health

2    declined.  He has end-stage COPD and emphysema.  And he's

3    currently on oxygen on a full-time use.  So he's not able to

4    get around on day-to-day things like showering which my

03:33PM 5    brother would help make sure he was okay getting in and out

6    of the shower and getting his oxygen.  Making sure he had

7    enough oxygen when the delivery guys would come.  And he

8    would cook meals like barbecues.  My dad couldn't be around

9    smoke.  It would trigger exacerbation so he would cook

03:34PM 10   dinners.  Take him to appointments.  My father can't drive.

11   He's too afraid to drive because of his breathing and special

12   testing like blood labs, MRIs, stuff like that.

13   Q.    Since Billy's passing has the family had to find in-home

14   healthcare from other ways?

03:34PM 15   A.    Yes.  So, uh, we have had hired help through a home

16   health agency and between them and my brother Nick who is a

17   nurse and my mom.

18   Q.    And prior to his death, is it fair to say that Billy

19   fulfilled that role by himself?

03:34PM 20   A.    Yes, he did it full time.  He was -- he was considered

21   the point person for my dad while we were gone.  Should

22   anything occur, Billy would be the point person to alert the

23   family and say hey, dad's not doing good.  Maybe we should

24   all come back and see if he needs to go to the ER.

03:35PM 25   Q.    And he did that on a multitude of levels I'm sure.

```
         1    A.    He did.

         2    Q.    Okay.  I want to transition a little bit.  We know, um,

         3    that Billy has died at this point from alcohol withdrawal and

         4    so I want to talk a little bit about his alcohol abuse.

03:35PM  5          MR. RAMIREZ:  Objection.  Speculation, lacks

         6    foundation.

         7          THE COURT:  Sustained.

         8    BY MS. PENA:

         9    Q.    Let's talk about brother's alcohol abuse.  Okay?

03:35PM 10          At some point in his life, did he start struggling

        11    with alcohol abuse?

        12    A.    He did.  Uh, over the past year, I noticed, uh,

        13    significant changes in his behavior.  My brother kept it a

        14    secret.  He was more of a closet drunk.  He didn't show it in

03:36PM 15    front of his family because my dad he's been clean and sober

        16    with alcohol for over 30 years now.  And it's -- it's a big

        17    deal that we don't allow alcohol in the house period.  So my

        18    brother held it a lot.  He held it from us a lot visually.

        19          But every now and then, I'd catch him with a beer

03:36PM 20    or two.  But over the year, I noticed, uh, he was -- he would

        21    smell a lot like alcohol.  He would be swaying in the kitchen

        22    a lot and sometimes talking to himself even so it was -- it

        23    was concerning.

        24    Q.    And Ms. Kelley, can you explain to us how you would know

03:36PM 25    on the occasions that you saw this behavior, how would you
```

1    know that he was drunk or intoxicated?

2    A.    Well, the alcohol was -- the smell of it was very

3    prominent.  He -- he -- he reeked of booze.

4    Q.    And this was on a frequent basis.  And, again, you live

03:36PM 5    in L.A. I think it was said; is that correct?

6    A.    That is correct, yes.

7    Q.    Okay.  So on occasions that you did observe Mr. Enyart,

8    did you see other symptoms such as him swaying or talking to

9    himself?

03:37PM10    A.    Mainly the swaying.  Uh, he would mumble things to

11    himself.  Uh, sometimes he would sweat or -- or shake.

12    Sometimes had little tremors every now and then on occasion.

13    Q.    Did you ever have occasions to speak with your brother

14    about his alcohol abuse problem?

03:37PM15    A.    I did.  Um, about a month before the incident, we had a

16    long talk and I had told him, I said, you know, we're all

17    worried about you.  You know, your drinking is getting out of

18    hand and we love you very much.  And there's programs out

19    there.  There's detox centers.  You know, you want to go to

03:38PM20    the hospital, let's go.  We'll take you.

21        And at some point in the conversation, he said I

22    know I have a problem and he'll go when he's ready.  And we

23    were talking about switching providers so he could get the

24    right care he needed, but he -- he -- he did in fact know he

03:38PM25    had a problem.

UNITED STATES DISTRICT COURT

```
 1   Q.   This was recent?  Did you say this was a month before

 2   the incident approximately?

 3   A.   Yes.

 4   Q.   And to be clear, you said that he admitted that he had a

03:38PM 5   problem and was trying to seek help?

 6   A.   Yes.  He was talking to me about getting better doctors

 7   and switching providers.

 8   Q.   I want to discuss the day of the incident as far as his

 9   arrest.  Before the law enforcement was called on July 27th,

03:39PM10   2022, did the family try to take efforts to address Billy's

11   alcohol abuse problem?

12   A.   Yes.

13   Q.   Can you explain to us how the family tried to do that?

14   A.   We all came together as a family unit and we confronted

03:39PM15   Billy, my brother Billy about his alcoholism and he became

16   very defensive and verbally aggressive.  He got upset and --

17   and left the house that morning.

18   Q.   So the family tried to address the issues with him and

19   he got upset.

03:39PM20   A.   Yes, that's correct.

21   Q.   And when he got upset, was he -- was he doing more than

22   just yelling?  Did he get physical or violent in any way?

23   A.   Uh, verbally aggressive, um, he -- he was like puffing

24   out his chest, you know, just very stiff like he was, uh,

03:40PM25   very defensive about the confrontation.
```

UNITED STATES DISTRICT COURT

1    Q.   And you mentioned that he left for a while.  At some

2    point did he come back?

3    A.   Yes, he did.

4    Q.   And once he came back, what happened then?

03:40PM 5    A.   We had addressed it for a second time and the second

6    time, we showed him all the several bottles of between heavy

7    liquor and beer from his bedroom that my parents and I found.

8    Uh, then it escalated even more.  He became -- he started

9    screaming and yelling.  He was denying that those weren't

03:40PM 10   even his and we found them in his room.

11   Q.   At that point once he came back and you were having this

12   interaction, was Mr. Enyart acting belligerent or could you

13   smell alcohol on him at that point?

14   A.   Yes.  He -- he was not making any sense.  He was using a

03:41PM 15   lot of mixed words that just weren't formulating perfect

16   sentences and he was just -- just verbally violent and -- and

17   aggressive with his words.

18   Q.   And could you smell the alcohol on him?

19   A.   Yes, very much so.

03:41PM 20   Q.   At that point what happened next as far as the actions

21   your family took?

22   A.   From what I remember, I was in the hall with my mom and

23   my brother Billy, and I overheard my dad, uh, calling the

24   non-emergency number to the Sheriff's Department.

03:41PM 25   Q.   And how do you know that it was the non-emergency line?

UNITED STATES DISTRICT COURT

        1    A.    I overheard dispatch talking on the speakerphone to my

        2    dad and I remember him saying he's out of control.

        3    Q.    Do you remember anything else your dad might have said

        4    on the phone?

03:42PM 5    A.    No.

        6    Q.    After your father called the non-emergency line and said

        7    Billy was out of control, what happened next?

        8    A.    At that point an officer came to our house -- my

        9    parents' house and my brother walked out the front door and

03:42PM10    the rest of the family went out on the porch.  And my brother

       11    Billy went to meet Conley in the driveway, Officer Conley in

       12    the driveway.

       13    Q.    What happened after that once your brother met

       14    Officer Conley?

03:42PM15    A.    Officer Conley he said I want to talk to you.  They met

       16    with each other by my brother Nick's truck.  Officer Conley

       17    asked my brother to empty his pockets and my brother reached

       18    into his left pocket and pulled out his pocketknife and

       19    cigarette lighter and placed it on the bed of my brother

03:43PM20    Nick's truck.

       21          And then he went into his right hand, and I heard

       22    Officer Conley say get your hand out of your pocket.  And

       23    once my brother did that, I saw Officer Conley put a handcuff

       24    on my brother's right arm and put it behind his back.

03:43PM25    Q.    At the point where Officer Conley had one arm, one of

                        UNITED STATES DISTRICT COURT

1    Mr. Enyart's arms in the handcuff, what was Mr. Enyart doing

2    with his other hand?

3    A.   He began to grip on to my brother Nick's truck with his

4    left hand and he became frozen.   He -- he appeared very

03:43PM 5    scared and Officer Conley said you're not in trouble.   I just

6    want to talk and my brother was resisting.   He at some point

7    my brother Nick and I were in the driveway saying Billy, just

8    listen.   And, uh, this went on for a short period of time.

9    Q.   And when you say that your brother was resisting, are

03:44PM 10   you -- are you saying that in relation to him having his hand

11   on the truck or was he resisting in some other way?

12   A.   No, he was --

13            MR. RAMIREZ:   Objection, leading.

14            THE COURT:   Sustained.   Let her ask the question

03:44PM 15   again.

16   BY MS. PENA:

17   Q.   When the Judge sustains any objection, just let me reask

18   the question.

19   A.   Okay.

03:44PM 20   Q.   How was your brother resisting?

21   A.   He had his left hand on the bed of my brother Nick's

22   truck and he was gripping on and he wasn't letting go.

23   Q.   Did you observe your brother resist in any other way?

24   A.   No.

03:45PM 25   Q.   But it's fair to say that or was your brother, was he

UNITED STATES DISTRICT COURT

1    listening to the commands to put his hand behind his back?

2              MR. RAMIREZ:  Objection.  Calls for speculation.

3              THE COURT:  Sustained.

4              Did he appear to be listening?

03:45PM 5              THE WITNESS:  No.

6              MS. PENA:  Thank you, Your Honor.

7    Q.   At some point, you mentioned that it went on for a few

8    minutes.  At some point did other officers arrive?

9    A.   Yes, uh, about several.

03:45PM 10   Q.   And what happened?

11   A.   They arrested my brother and put him into a squad car.

12   Q.   At that point did you have occasion to provide a

13   statement to any deputies on scene?

14   A.   Yes, I did.

03:45PM 15   Q.   How many statements did you provide?

16   A.   Two.

17   Q.   And do you recall who those statements were provided to?

18   A.   To Deputy Mammolito and Deputy Umphlett.

19   Q.   And you are a plaintiff in this matter representing

03:46PM 20   Abigail; correct?

21   A.   Yes, that is correct.

22   Q.   And you've had the occasion to have your deposition

23   taken; correct?

24   A.   Yes.

03:46PM 25   Q.   Have you had an opportunity to review evidence in this

1        case?

2        A.    I'm sorry.  I don't understand the question.

3        Q.    Sure.  Let me rephrase it.  What I want to know is have

4        you heard any recorded statements that you've provided in

03:46PM 5   this case?

6        A.    To my knowledge only one.

7        Q.    Only one.  Let's talk about the recorded statement.

8        That was made to what deputy?

9        A.    Deputy Mammolito.

03:46PM 10  Q.    And when you provided that interview, were you with

11       someone else when you spoke to Deputy Mammolito?

12       A.    Yes, I was with my brother Nick.

13              MS. PENA:  At this point, Your Honor, I would like

14       to move into evidence Exhibit 3B.  It has been stipulated to

03:47PM 15  as admissible.

16              THE COURT:  I'm sorry, 3B?

17              MS. PENA:  Yes, Your Honor.

18              THE COURT:  It will be received.

19                  (Exhibit 3B admitted.)

03:47PM 20      MS. PENA:  Permission to publish, Your Honor.

21              THE COURT:  Yes.

22                  (Audio played.)

23       BY MS. PENA:

24       Q.    Who was that speaking on the recorded clip?

03:47PM 25  A.    That's Deputy Mammolito.


UNITED STATES DISTRICT COURT

```
 1    Q.   And who was the other male voice?

 2    A.   That's my brother Nick.

 3    Q.   Is your brother Nick in the courtroom?

 4    A.   Yes, he is.

 5    Q.   And you were standing next to him when that recorded

 6    clip, uh, when he gave that statement; correct?

 7              MR. RAMIREZ:  Objection, leading.

 8              THE COURT:  Sustained.  Why don't you reask the

 9    question.

10    BY MS. PENA:

11    Q.   Were you standing next to him when that statement was

12    provided?

13    A.   Yes, I was.

14              MS. PENA:  At this time I'd also like to move into

15    evidence Exhibit 3A.  The parties have also stipulated to

16    admissibility.

17              THE COURT:  3A?

18              MS. PENA:  Yes, Your Honor.

19              THE COURT:  It will be received.  You may publish.

20                   (Exhibit 3A admitted.)

21              MS. PENA:  Thank you, Your Honor.

22                      (Audio played.)

23    BY MS. PENA:

24    Q.   Was that your voice on the record, Ms. Kelley?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT

1    Q.   Is that the portion of the statement you provided to

2    Deputy Mammolito regarding your brother's alcohol abuse

3    problem?

4    A.   Yes.

03:51PM 5    Q.   Was it important for you to convey that your brother was

6    an alcoholic and that he might be detoxing?

7            MR. RAMIREZ:  Objection.  Misstates the evidence.

8            THE COURT:  Why don't you restate the question,

9    Counsel.

03:51PM 10   BY MS. PENA:

11   Q.   Did you tell Deputy Mammolito that your brother was an

12   alcoholic?

13   A.   Yes, I did.

14   Q.   And did Deputy Mammolito understand that he would be

03:51PM 15   going through detox?

16           MR. RAMIREZ:  Objection.  Calls for speculation.

17           THE COURT:  Sustained.

18   BY MS. PENA:

19   Q.   Did you hear on the recording that Deputy Mammolito

03:51PM 20   mentioned that the jail would allow him to detox?

21           THE COURT:  Counsel, it speaks for itself.  The

22   jury heard it.  She can't testify to what the audio said

23   because the jury heard it.  They have to interpret it.  She

24   can't interpret it for them.

03:51PM 25   BY MS. PENA:

UNITED STATES DISTRICT COURT

1    Q.   Based on the information that you told Deputy Mammolito

2    and the information that she told you, did you ask if he

3    would be -- if your brother would be taken to a medical

4    facility on a 72-hour hold?

03:52PM 5              MR. RAMIREZ:  Objection, the same --

6              THE COURT:  Overruled.  Did you ask that?

7              THE WITNESS:  No, I did not.  It was my

8    understanding that --

9              THE COURT:  You've answered the question.  Next

03:52PM 10   question.

11   BY MS. PENA:

12   Q.   What was your understanding?

13   A.   From what Mammolito told me, it was my understanding

14   that he would be able to detox and receive the medications he

03:52PM 15   needed to get help from alcoholism.

16   Q.   Based on the statement that you were told by

17   Deputy Mammolito, did you think that jail, that going into

18   custody and being booked in jail would be a suitable place

19   for your brother?

03:52PM 20   A.   Yes, because from what she told me that he was gonna be

21   able to receive medical care in the facility.

22   Q.   After you spoke with Deputy Mammolito, did you have an

23   occasion to speak to the paramedics on scene?

24   A.   I tried to.  When they arrived, I went out to the front

03:53PM 25   of the driveway and Mammolito approached me.  And I had asked

UNITED STATES DISTRICT COURT

1        her if I could speak to the fire department and paramedics

2        and she said no.  And I said well, will you please let them

3        know that he takes blood pressure medication and he has high

4        blood pressure.

03:53PM 5   Q.   Why was it important for you to speak to the paramedics?

6        A.   Because I wanted to relay them the history he's had with

7        drinking and the objective signs and symptoms that I was

8        noticing that were very severe and I was concerned.

9        Q.   After you attempted to speak to the paramedics, what

03:54PM 10  happened next?

11       A.   I went back inside my parents' house and I was in the

12       kitchen with my parents and my brother Nick and

13       Officer Umphlett.

14       Q.   What was happening at that time?

03:54PM 15  A.   They were having the conversation of my brother Billy's

16       drinking and how she could relate that she came from an

17       alcoholic family herself.  And my mom wanted Deputy Conley's

18       card so she left out front of my parents and came back inside

19       the house with a business card and a report number on it.

03:55PM 20  And my mom went into the conversation again how she's worried

21       about him.  She's afraid he's gonna seize, and I mentioned

22       how life-threatening it can be when someone goes through a

23       withdrawal from alcohol.

24       Q.   Ms. Kelley, this is very important.  Did you mention

03:55PM 25  alcohol withdrawals and the severity of those withdrawals to

UNITED STATES DISTRICT COURT

       1    Deputy Umphlett?

       2    A.   Yes, I did.

       3    Q.   How do you know that?

       4    A.   From my recollection with me speaking to her.

03:55PM 5    Q.   How do you know alcoholic withdrawals are life

       6    threatening?

       7    A.   Well, I'm a licensed vocational nurse and based on my

       8    education and experience --

       9              THE COURT:   That would be expert testimony,

03:56PM10    Counsel.

      11              MS. PENA:   Thank you, Your Honor.

      12    Q.   Based on what you knew, you conveyed that alcohol

      13    withdrawals was life threatening.  That's what you told

      14    Deputy Umphlett.

03:56PM15              MR. RAMIREZ:   Objection.  Again, expert testimony.

      16              THE COURT:   Overruled.  Is that what you told her?

      17              THE WITNESS:   Yes, that's correct.

      18    BY MS. PENA:

      19    Q.   After this conversation, the second statement you

03:56PM20    provide to the deputies on scene, did you have any further

      21    conversations with the deputies on scene at your parents'

      22    house?

      23    A.   No.

      24    Q.   After Billy was taken to jail, did you have -- excuse me

03:56PM25    Mr. Enyart, your brother, did you have the occasion to speak

                      UNITED STATES DISTRICT COURT

```
        1    to another deputy after that?

        2    A.   Yes.

        3    Q.   And who was that?

        4    A.   Officer Conley.

03:57PM 5    Q.   Can you tell us what you remember from that

        6    conversation?

        7    A.   My mom had put in a call to dispatch to have

        8    Deputy Conley return her call and in fact he did.  And when

        9    the call came through, my mom put the phone on speaker.  My

03:57PM10    brother Nick and I and my mother and father were in the

       11    kitchen.  And I recall myself asking Officer Conley if they

       12    did a blood alcohol test on him and he said no, he refused,

       13    but you could sure smell the alcohol on his breath.  And my

       14    dad said, you know, he's a good kid.  He just has an alcohol

03:57PM15    problem.

       16    Q.   Did your mom -- I'm sorry.  Did I cut you off?

       17    A.   No.

       18    Q.   Did you hear your mom say anything?

       19    A.   Yes, she said she was really worried about him.

03:57PM20              MR. RAMIREZ:  Hearsay.

       21              THE COURT:  Sustained.

       22    BY MS. PENA:

       23    Q.   Was there anything else from that conversation with

       24    Deputy Conley that you recall?

03:58PM25    A.   No.
```

106

1    Q.   From the call with Deputy Conley from your recollection,

2    was he informed that your brother had a bad drinking problem?

3              MR. RAMIREZ:   Objection.   Calls for speculation,

4    hearsay.

03:58PM 5              THE COURT:   Why don't you ask it a different way.

6    That's calling for a conclusion.   Why don't you ask the

7    question again.

8    BY MS. PENA:

9    Q.   Ms. Kelley, I just want to give you one more opportunity

03:58PM10    if you could tell us what, if anything, you recall from that

11   phone call as far as Mr. Conley being informed of your

12   brother's alcohol abuse?

13             THE COURT:   If you recall.

14             THE WITNESS:   I'm sorry.   Can you repeat the

03:59PM15   question again, please?

16             MS. PENA:   Sure.   I understand this is hard.

17   Q.   I just want you to tell us if you can recall anything

18   else that was told to Deputy Conley on that phone call?

19   A.   No.

03:59PM20             MS. PENA:   No further questions at this time,

21   Your Honor.

22             THE COURT:   Cross-examination.

23             MR. RAMIREZ:   Your Honor, I don't mind starting,

24   but we have one minute to 4:00.   Do you want me to get

03:59PM25   started any way?

```
 1              THE COURT:  Well, it's right at 4 o'clock so we'll
 2     break at this time.  Just a second.
 3              Okay.  Ladies and gentlemen, we're gonna break at
 4     this time until tomorrow.  Remember the admonishment not to
 5     discuss the case among yourselves or with anybody else or
 6     form or express any opinions about the matter until it's
 7     submitted to you and you retire to the jury room.
 8              If you go home tonight, I don't know if you're into
 9     sports or not, but watch the Dodger game or something like
10     that, but don't think about this case.  Wait until you get
11     back so we just concentrate on what comes out here in court.
12              I do want to tell you a little bit about tomorrow
13     because we've had problems with the last few jurors when I've
14     said be here at 8:30.  By the way, the reason we do it at
15     8:30 rather than 9:00 which a lot of courts do is because
16     they go from 9:00 to 4:30.  I've been told by jurors they'd
17     rather go from 8:30 to 4 o'clock because of the traffic and
18     all so that's what we do.  But we have to make sure that we
19     start right on time.
20              We've had a lot of problem with jurors because in
21     Los Angeles, you always run into traffic problems.  And we'll
22     have jurors call up and say well, I'll be 10 minutes late or
23     15 minutes.  If you're 10 minutes late, there's 30 people in
24     the courtroom so that's ten minutes times 30, you wasted
25     hours.  And everyone just gonna be sitting here waiting for
```

```
 1      you to come in.  And you're gonna feel funny when you come in

 2      because you're gonna feel like that person that comes on the

 3      plane late and everyone says just hurry up and get here.

 4              So what I'm gonna ask you to do is try to be here

 5      at 8:15 tomorrow.  Get a cup of coffee whatever.  That builds

 6      in a buffer in case you run into traffic or anything else

 7      cause we have to start right at 8:30.  Are you with me on

 8      that?  If you are, then go ahead and we'll release you at

 9      this time.  We'll see you back here tomorrow at 8:30.

10      Hopefully, at 8:15 but at least by 8:30.  And if you leave

11      quietly because I've got to talk to the attorneys just for a

12      second.

13              THE CLERK:  All rise.

14                      (Jury not present.)

15              THE COURT:  You can step down.

16              The record reflect the jurors have left the

17      courtroom.  Just wanted to give you an update if you're

18      interested in the time, the time that you have left.  The

19      plaintiff has used 86 minutes of the 300 minutes.  The

20      defendant used 21 minutes.  I'll let you do the mathematics.

21              Again, same thing for you, if you could be here by

22      8:15 so we won't have any problems getting started.  It's

23      even worse if the attorneys don't come in on time so be here

24      about 8:15.  Have a pleasant evening.  We'll see you back

25      tomorrow morning.
```

UNITED STATES DISTRICT COURT

1          THE CLERK:  All rise.

2          This court is adjourned.

3          (Proceedings were concluded at 4:03 p.m.)

4

5                    CERTIFICATE OF REPORTER

6

7    COUNTY OF LOS ANGELES      )

8                              )  SS.

9    STATE OF CALIFORNIA        )

10

11   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

12   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

14   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

15   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

16   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

17   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

18   OF MY STENOGRAPHIC NOTES.

19

20   DATE:  MAY 21, 2024

21

22       /s/  LAURA MILLER ELIAS

23   LAURA MILLER ELIAS, CSR 10019

24   FEDERAL OFFICIAL COURT REPORTER

25

**$**

**$500** [1] - 37:15
**$6,000** [1] - 84:9

**'**

**'22** [1] - 11:20
**'em** [5] - 33:15, 50:4, 50:7

**/**

**/s** [1] - 109:22

**1**

**1** [2] - 8:24, 51:3
**10** [5] - 8:10, 52:13, 53:19, 107:22, 107:23
**100** [1] - 3:17
**100,000** [1] - 34:8
**10019** [2] - 1:23, 109:23
**102** [1] - 51:16
**12** [2] - 33:23, 34:10
**120** [5] - 3:16, 48:13, 48:17, 48:18, 48:19
**120-1** [1] - 51:3
**120-2** [1] - 51:19
**1480** [2] - 2:5, 2:7
**15** [13] - 8:11, 9:12, 22:25, 33:14, 33:23, 34:3, 34:8, 47:20, 47:22, 55:8, 56:14, 77:9, 107:23
**15,000** [1] - 34:11
**1510** [1] - 2:10
**18** [1] - 53:21
**19** [1] - 53:22
**1:09** [2] - 4:1, 31:2
**1:39** [1] - 31:3
**1st** [5] - 5:9, 17:6, 21:3, 30:19, 30:24
**1ST** [1] - 1:24

**2**

**2-A** [5] - 39:9, 39:10, 39:13, 39:20, 39:24
**2-B** [3] - 39:9, 39:13, 40:13
**2-C** [5] - 39:9, 39:13, 40:16, 40:17, 40:18
**20** [4] - 3:5, 12:20, 22:25, 86:3
**2012** [1] - 10:11
**2022** [9] - 5:9, 5:10, 7:18, 10:22, 12:4,

21:3, 61:14, 94:10
**2024** [6] - 1:15, 4:1, 49:19, 50:16, 50:19, 109:20
**21** [4] - 1:15, 4:1, 108:20, 109:20
**213** [1] - 1:25
**23-00540-RGK** [1] - 1:8
**23-540** [1] - 4:3
**24-hour** [1] - 30:8
**25** [1] - 12:20
**27** [1] - 21:2
**27th** [8] - 12:15, 21:6, 26:15, 61:14, 61:18, 74:10, 83:4, 94:9
**28th** [3] - 27:12, 83:6, 83:10
**29th** [1] - 83:15
**2:00** [1] - 30:24
**2:30** [1] - 55:6
**2A** [1] - 3:14
**2B** [1] - 3:14
**2C** [1] - 3:15

**3**

**3** [3] - 47:19, 47:22, 54:9
**30** [5] - 16:3, 61:24, 92:16, 107:23, 107:24
**300** [1] - 109:19
**30th** [7] - 16:9, 26:15, 27:12, 28:14, 29:18, 29:19, 80:8
**31st** [1] - 30:19
**32** [1] - 3:9
**34** [1] - 67:8
**350** [1] - 1:24
**385** [1] - 2:17
**39** [3] - 3:14, 3:14, 3:15
**3:00** [1] - 55:8
**3:30** [1] - 13:20
**3:45** [1] - 13:21
**3A** [4] - 3:17, 100:15, 100:17, 100:20
**3B** [4] - 3:17, 99:14, 99:16, 99:19

**4**

**4** [5] - 3:5, 52:12, 54:9, 107:1, 107:17
**400** [1] - 86:3
**44** [1] - 3:16
**4455** [1] - 1:24
**45** [1] - 8:11
**48** [1] - 3:16

**49-and-a-half** [1] - 12:19
**4:00** [2] - 55:9, 106:24
**4:03** [1] - 109:3
**4:30** [1] - 107:16

**5**

**501** [3] - 2:4, 2:7, 2:10
**5150** [2] - 14:20, 41:6

**6**

**6** [3] - 15:15, 52:12, 52:13
**68** [1] - 3:9

**7**

**7** [8] - 3:16, 43:24, 44:1, 44:2, 52:4, 52:16, 56:24, 56:25
**70** [1] - 47:19
**72** [2] - 54:7, 78:13
**72-hour** [1] - 102:4

**8**

**8** [1] - 34:12
**800** [1] - 33:24
**85** [1] - 3:9
**86** [1] - 108:19
**89** [1] - 3:11
**894-0374** [1] - 1:25
**8:15** [4] - 108:5, 108:10, 108:22, 108:24
**8:30** [6] - 107:14, 107:15, 107:17, 108:7, 108:9, 108:10

**9**

**9,000** [1] - 34:12
**90012** [1] - 1:24
**92101** [3] - 2:5, 2:8, 2:11
**92415** [1] - 2:18
**99** [1] - 3:17
**9:00** [2] - 107:15, 107:16

**A**

**a'blazing** [1] - 13:18
**Abby** [4] - 10:22, 10:23, 11:14
**Abigail** [5] - 5:2, 10:9, 10:10, 90:13, 98:20
**Abigail's** [1] - 10:12

**ability** [1] - 65:16
**able** [8] - 9:25, 23:7, 25:3, 26:4, 43:15, 91:3, 102:14, 102:21
**absolute** [1] - 18:14
**absolutely** [1] - 17:24
**abstinent** [1] - 53:2
**abuse** [10] - 60:6, 83:25, 87:6, 92:4, 92:9, 92:11, 93:14, 94:11, 101:2, 106:12
**abused** [1] - 87:1
**abuser** [1] - 67:10
**abuses** [1] - 67:9
**accepted** [1] - 61:11
**access** [2] - 20:25, 30:7
**according** [1] - 28:15
**account** [1] - 24:12
**accountability** [2] - 6:9, 19:13
**accurately** [1] - 25:6
**achieve** [1] - 6:7
**acknowledge** [1] - 24:25
**acknowledged** [2] - 11:22, 11:23
**acknowledges** [1] - 29:19
**acronym** [1] - 77:1
**acronyms** [1] - 48:3
**act** [3] - 29:20, 88:3, 88:7
**acting** [1] - 95:12
**action** [2] - 5:18, 5:24
**actions** [1] - 95:20
**activated** [2] - 23:9, 30:14
**actual** [2] - 51:8, 69:18
**ADAM** [1] - 2:15
**addict** [1] - 7:10
**Addiction** [1] - 19:1
**additional** [2] - 26:1, 26:12
**address** [2] - 94:10, 94:18
**addressed** [1] - 95:5
**addressing** [1] - 29:5
**adds** [1] - 53:18
**Adelanto** [1] - 8:6
**adequacy** [1] - 35:13
**adjourned** [1] - 109:2
**administrator** [2] - 63:16, 64:1
**admissibility** [1] - 100:16
**admissible** [1] - 99:15
**admissions** [1] - 34:8
**admit** [1] - 25:5

**admitted** [6] - 39:13, 44:2, 48:19, 94:4, 99:19, 100:20
**admonishment** [2] - 55:9, 107:4
**adult** [1] - 9:24
**advanced** [1] - 9:3
**affirmatively** [2] - 84:3, 88:16
**afraid** [3] - 27:8, 91:11, 103:21
**afternoon** [8] - 4:20, 13:2, 13:20, 20:4, 32:20, 55:7, 61:13, 68:12
**age** [1] - 11:6
**agencies** [4] - 35:7, 35:8, 35:16
**agency** [1] - 91:16
**aggressive** [3] - 94:16, 94:23, 95:17
**aggressively** [1] - 86:1
**agitated** [2] - 46:23, 47:14
**ago** [1] - 50:24
**agree** [3] - 77:15, 80:22, 83:15
**agreed** [1] - 36:3
**agreeing** [1] - 36:14
**ahead** [2] - 37:24, 108:8
**AIDED** [1] - 109:16
**airport** [1] - 49:2
**AL** [2] - 1:6, 1:9
**alcohol** [118] - 7:14, 11:3, 11:4, 11:16, 14:19, 15:2, 15:12, 15:20, 15:21, 16:12, 16:19, 16:21, 21:7, 22:10, 23:14, 23:22, 23:25, 24:13, 24:23, 25:13, 25:15, 25:25, 26:7, 26:9, 27:21, 27:25, 30:3, 30:11, 45:6, 45:18, 45:20, 45:22, 46:5, 46:7, 46:14, 46:21, 47:3, 47:5, 47:10, 48:4, 48:6, 48:10, 48:14, 50:25, 51:5, 51:8, 51:10, 52:18, 53:3, 53:5, 53:7, 53:15, 54:4, 54:8, 54:14, 57:2, 57:5, 57:8, 57:11, 57:13, 57:16, 58:3, 58:12, 59:1, 59:5, 59:18, 60:7, 60:8, 60:22, 61:7, 61:25, 63:9, 64:11,

67:10, 67:12, 70:5,
72:5, 75:9, 75:13,
75:14, 76:10, 77:15,
78:16, 83:20, 83:21,
83:25, 85:14, 85:19,
86:5, 86:8, 87:1,
87:6, 87:13, 87:17,
87:23, 88:17, 92:3,
92:4, 92:9, 92:11,
92:16, 92:17, 92:21,
93:2, 93:14, 94:11,
95:13, 95:18, 101:2,
103:23, 103:25,
104:12, 105:12,
105:13, 105:14,
106:12
**alcoholic** [5] - 57:25,
101:6, 101:12,
103:17, 104:5
**alcoholism** [3] - 11:3,
94:15, 102:15
**alert** [1] - 91:22
**alive** [1] - 65:11
**allow** [2] - 92:17,
101:20
**allowed** [1] - 11:4
**almost** [1] - 64:1
**alone** [4] - 29:14, 60:7,
77:15, 85:14
**altered** [1] - 24:22
**Alvarado** [11] - 15:8,
25:13, 25:18, 25:19,
25:24, 26:6, 26:10,
74:15, 82:24, 83:4,
86:10
**AMANDA** [1] - 3:10
**Amanda** [5] - 9:15,
9:16, 14:16, 88:25,
89:5
**AMERICA** [1] - 1:1
**amount** [2] - 19:22,
53:25
**amping** [1] - 46:11
**AND** [4] - 109:11,
109:14, 109:16,
109:17
**Angel** [2] - 15:8, 86:10
**ANGELES** [4] - 1:16,
1:24, 4:1, 109:7
**Angeles** [1] - 107:21
**annoying** [1] - 48:5
**annual** [1] - 34:8
**answer** [8] - 25:4,
27:15, 47:2, 70:4,
71:20, 74:22, 85:17,
87:5
**answered** [4] - 45:16,
81:17, 85:6, 102:9
**answers** [1] - 28:10
**anticipate** [3] - 10:17,

26:22, 27:6
**anxious** [2] - 46:24,
54:22
**apart** [1] - 9:18
**apologize** [1] - 37:3
**appear** [1] - 98:4
**APPEARANCES** [1] -
2:1
**appeared** [1] - 97:4
**Apple** [6] - 8:5, 8:15,
9:13, 11:4, 15:16,
17:6
**apple** [1] - 8:15
**applies** [1] - 79:8
**appointed** [4] - 33:8,
36:18, 36:21, 37:7
**appointment** [2] -
30:23, 37:1
**appointments** [1] -
91:10
**appreciate** [3] - 31:24,
38:1, 40:11
**approach** [1] - 72:1
**approached** [1] -
102:25
**AR** [11] - 48:5, 48:6,
51:17, 51:20, 51:22,
53:18, 54:4, 77:9,
78:16, 85:15, 86:10
**area** [11] - 8:4, 8:5,
8:13, 12:3, 35:23,
58:23, 61:4, 79:22,
85:10, 86:12, 88:20
**areas** [2] - 52:3, 52:4
**argue** [1] - 4:14
**arm** [4] - 10:5, 14:7,
96:24, 96:25
**arms** [2] - 10:3, 97:1
**arrest** [16] - 20:20,
21:4, 21:19, 21:21,
22:1, 22:16, 22:19,
22:20, 23:2, 23:5,
41:12, 57:11, 57:21,
57:24, 77:24, 94:9
**arrested** [7] - 14:12,
21:12, 41:17, 42:6,
62:7, 74:19, 98:11
**arrestee** [3] - 26:5,
67:6, 67:8
**arrestee's** [3] - 60:5,
62:13, 65:21
**arrestees** [1] - 74:19
**arresting** [17] - 8:19,
15:9, 21:16, 22:2,
43:1, 44:9, 44:12,
44:17, 45:8, 58:4,
58:21, 59:6, 59:19,
60:21, 60:25, 75:12,
88:8
**arrive** [3] - 14:12,

23:3, 98:8
**arrived** [3] - 22:23,
61:14, 102:24
**arrives** [1] - 58:4
**ARROWHEAD** [1] -
2:17
**aside** [2] - 73:20, 78:7
**assess** [4] - 13:18,
22:6, 36:13, 47:7
**assessed** [1] - 54:4
**assigned** [2] - 8:17,
73:15
**assignments** [1] -
73:17
**assistance** [1] - 9:23
**assistant** [2] - 30:18,
31:9
**associated** [4] - 38:10
**assume** [4] - 24:19,
69:7, 75:11, 80:11
**assumed** [1] - 25:5
**assumption** [2] -
24:17, 25:7
**AT** [1] - 109:14
**attack** [1] - 67:11
**attempt** [1] - 87:20
**attempted** [1] - 103:9
**attention** [5] - 25:9,
37:16, 44:7, 44:14,
45:4
**Attorney** [5] - 35:10,
35:19, 35:21, 37:6
**Attorney's** [1] - 34:25
**attorneys** [5] - 4:12,
20:15, 55:13,
108:11, 108:23
**audio** [20] - 19:7,
26:20, 29:12, 38:9,
39:2, 39:15, 40:1,
40:3, 40:5, 40:12,
40:13, 40:14, 40:19,
41:20, 68:21, 71:3,
71:4, 99:22, 100:22,
101:22
**August** [5] - 5:9, 17:6,
21:3, 30:19, 30:24
**automatically** [1] -
87:21
**available** [1] - 31:15
**AVENUE** [1] - 2:17
**average** [1] - 34:9
**aware** [5] - 48:9, 57:4,
57:8, 79:11, 82:20

---

B

**background** [1] -
32:21
**backup** [1] - 22:24
**bad** [7] - 15:23, 24:3,

47:7, 47:10, 58:16,
72:14, 106:2
**Barbara** [1] - 36:20
**barbecues** [1] - 91:8
**bare** [1] - 56:5
**bars** [2] - 63:7, 63:25
**Bartolome** [2] - 18:25,
25:5
**based** [8] - 61:3, 64:5,
64:20, 79:12, 102:1,
102:16, 104:7,
104:12
**basic** [4] - 42:20, 47:6,
68:12
**basis** [1] - 93:4
**battery** [1] - 15:3
**bearing** [1] - 39:23
**became** [4] - 10:6,
94:15, 95:8, 97:4
**become** [4] - 15:6,
46:13, 53:1, 55:1
**bed** [2] - 96:19, 97:21
**bedroom** [3] - 11:17,
12:17, 95:7
**beer** [4] - 12:21,
24:24, 92:19, 95:7
**began** [1] - 97:3
**begin** [2] - 14:14,
32:20
**beginning** [1] - 42:16
**BEHALF** [2] - 2:2, 2:13
**behavior** [2] - 92:13,
92:25
**behaviors** [1] - 30:2
**behind** [7] - 14:7,
14:10, 21:14, 63:7,
63:25, 96:24, 98:1
**belligerent** [1] - 95:12
**belt** [6] - 14:4, 23:9,
30:14, 71:2, 71:11,
71:12
**bender** [1] - 11:16
**bent** [1] - 15:5
**Bernardino** [11] - 4:4,
5:20, 5:22, 6:15,
6:17, 8:16, 39:3,
48:9, 48:15, 58:20,
58:25
**BERNARDINO** [3] -
1:9, 2:14, 2:18
**best** [1] - 54:15
**better** [4] - 8:18, 19:4,
89:18, 94:6
**between** [8] - 21:2,
27:11, 54:5, 57:18,
57:20, 74:7, 91:16,
95:6
**big** [7] - 20:9, 33:14,
38:13, 53:5, 62:24,
74:24, 92:16

**bike** [1] - 90:16
**Billy** [14] - 7:23, 89:17,
89:25, 90:23, 91:18,
91:22, 92:3, 94:15,
95:23, 96:7, 96:11,
97:7, 104:24
**Billy's** [3] - 91:13,
94:10, 103:15
**binge** [1] - 57:25
**bit** [31] - 4:21, 5:17,
5:25, 6:13, 7:19, 8:5,
8:23, 10:9, 10:15,
10:24, 11:9, 13:4,
19:10, 23:19, 27:18,
38:19, 46:5, 54:21,
55:14, 55:23, 62:17,
65:4, 78:22, 89:11,
89:17, 89:21, 90:12,
90:23, 92:2, 92:4,
107:12
**black** [1] - 16:23
**blame** [1] - 29:8
**blind** [2] - 55:25,
56:12
**blood** [6] - 15:20,
54:23, 91:12, 103:3,
103:4, 105:12
**board** [1] - 90:20
**bodies** [1] - 45:19
**body** [4] - 46:11,
46:15, 46:25
**bones** [1] - 56:5
**booked** [5] - 15:14,
41:13, 43:2, 74:5,
102:18
**booking** [10] - 20:21,
22:3, 25:10, 25:23,
26:10, 42:6, 68:14,
73:20, 75:23, 77:21
**booze** [1] - 93:3
**born** [1] - 10:10
**bottles** [5] - 12:18,
12:19, 12:21, 12:25,
95:6
**bottom** [2] - 44:8, 51:2
**box** [4] - 41:8, 51:6,
52:1, 56:21
**boxes** [3] - 52:1, 77:8,
77:9
**break** [3] - 55:7,
107:2, 107:3
**breaking** [1] - 55:6
**breath** [1] - 105:13
**breathing** [1] - 91:11
**briefly** [1] - 89:19
**brightness** [1] - 11:1
**bring** [2] - 5:16, 54:22
**brings** [2] - 26:13,
29:15
**BROADWAY** [3] - 2:4,

112

2:7, 2:10
**broke** [1] - 10:3
**broken** [1] - 20:19
**brother** [39] - 9:17, 90:3, 90:5, 91:5, 91:16, 92:13, 92:18, 93:13, 94:15, 95:23, 96:9, 96:10, 96:13, 96:16, 96:17, 96:19, 96:23, 97:3, 97:6, 97:7, 97:9, 97:20, 97:21, 97:23, 97:25, 98:11, 99:12, 100:2, 100:3, 101:5, 101:11, 102:3, 102:19, 103:12, 103:15, 104:25, 105:10, 106:2
**brother's** [5] - 14:8, 92:9, 96:24, 101:2, 106:12
**brought** [2] - 11:2, 42:11
**buckets** [1] - 38:13
**buffer** [1] - 108:6
**build** [3] - 59:25, 60:2
**building** [1] - 46:15
**builds** [1] - 108:5
**built** [1] - 9:1
**bunch** [1] - 49:3
**burden** [3] - 6:1, 31:17, 31:20
**business** [1] - 103:19
**BY** [36] - 2:4, 2:9, 2:15, 3:5, 3:5, 3:9, 3:9, 3:11, 32:19, 38:3, 40:2, 40:20, 42:4, 44:6, 48:23, 62:10, 66:12, 68:11, 81:3, 85:12, 89:9, 89:23, 90:11, 92:8, 97:16, 99:23, 100:10, 100:23, 101:10, 101:18, 101:25, 102:11, 104:18, 105:22, 106:8, 109:16

---

# C

**CA** [4] - 2:5, 2:8, 2:11, 2:18
**cake** [2] - 56:6, 56:11
**California** [6] - 8:24, 35:22, 36:18, 36:24, 37:2, 37:6
**CALIFORNIA** [6] - 1:2, 1:16, 1:24, 4:1, 109:9, 109:12
**calm** [1] - 26:2

**calmly** [1] - 26:21
**cans** [1] - 12:21
**capability** [2] - 9:2, 9:3
**capacity** [3] - 33:20, 34:16, 53:25
**captured** [2] - 23:9, 26:20
**car** [4] - 13:25, 14:2, 71:25, 98:11
**card** [2] - 103:18, 103:19
**care** [42] - 6:17, 6:19, 7:10, 9:6, 10:1, 21:1, 24:2, 25:12, 26:2, 26:12, 26:19, 28:10, 28:19, 29:4, 29:5, 29:25, 30:5, 30:8, 30:19, 30:21, 30:22, 31:5, 33:19, 34:2, 35:9, 35:13, 35:18, 35:25, 60:18, 60:25, 62:11, 63:11, 64:5, 65:1, 80:17, 85:3, 87:8, 87:10, 87:13, 87:16, 93:24, 102:21
**career** [1] - 33:2
**careful** [1] - 86:5
**carried** [1] - 31:20
**Case** [1] - 4:3
**CASE** [1] - 1:8
**case** [72] - 4:14, 4:23, 5:8, 5:15, 5:18, 5:19, 5:23, 6:6, 6:7, 6:8, 6:11, 6:21, 7:20, 8:2, 19:20, 20:5, 20:9, 20:16, 20:24, 21:2, 21:22, 22:18, 23:18, 24:10, 25:7, 27:10, 28:4, 31:18, 31:21, 32:1, 32:4, 35:20, 37:12, 37:16, 37:18, 37:20, 38:4, 38:10, 38:16, 38:20, 39:1, 39:6, 42:24, 43:16, 43:21, 44:20, 49:6, 49:12, 55:10, 56:2, 56:5, 56:10, 56:13, 57:3, 58:19, 61:5, 61:16, 64:10, 65:18, 66:13, 68:2, 68:17, 69:22, 73:8, 84:12, 99:1, 99:5, 107:5, 107:10, 108:6
**cases** [1] - 86:1
**catch** [1] - 92:19
**caused** [2] - 19:14, 19:19
**causes** [1] - 5:18
**cell** [3] - 16:18, 30:25,

31:1
**cellmate** [1] - 29:20
**Center** [17] - 8:21, 8:22, 9:10, 9:11, 15:14, 20:22, 20:23, 30:7, 61:8, 61:12, 61:18, 64:13, 64:18, 66:1, 74:3, 81:5, 82:23
**centers** [1] - 93:19
**central** [1] - 46:12
**CENTRAL** [2] - 1:2, 109:12
**Central** [2] - 36:24, 37:1
**certain** [3] - 37:17, 51:22, 60:10
**certainly** [3] - 84:2, 84:15, 85:19
**CERTIFICATE** [1] - 109:5
**CERTIFY** [2] - 109:13, 109:17
**cetera** [1] - 56:3
**chair** [1] - 55:16
**chance** [5] - 22:1, 24:5, 25:15, 26:8, 31:21
**change** [2] - 54:14, 80:15
**changed** [1] - 34:6
**changes** [2] - 23:15, 92:13
**changing** [1] - 23:12
**Chapter** [1] - 26:13
**chapter** [5] - 22:18, 24:9, 25:9, 26:15, 29:15
**chapters** [1] - 20:20
**characterize** [1] - 72:2
**charge** [1] - 63:16
**charged** [3] - 15:3, 15:6, 84:9
**check** [6] - 45:18, 47:8, 47:10, 47:13, 52:2
**checked** [2] - 15:20, 22:15
**checks** [1] - 45:24
**cherished** [1] - 90:8
**chest** [1] - 94:24
**Chief** [2] - 33:17, 33:20
**child** [1] - 9:16
**children** [4] - 8:3, 8:4, 9:14, 15:24
**chronic** [2] - 57:25, 67:10
**cigarette** [1] - 96:19
**cities** [1] - 8:6

**City** [6] - 33:3, 33:11, 33:14, 33:21, 34:3, 59:22
**civil** [2] - 4:23, 5:23
**CIWA** [26] - 48:4, 48:5, 48:6, 51:17, 51:20, 51:22, 53:7, 53:18, 54:4, 60:8, 60:11, 74:23, 77:1, 77:7, 77:9, 77:14, 77:16, 77:19, 78:12, 78:15, 78:16, 85:15, 86:10
**CIWA-AR** [11] - 48:5, 48:6, 51:17, 51:20, 51:22, 53:18, 54:4, 77:9, 78:16, 85:15, 86:10
**claims** [1] - 21:15
**clarification** [1] - 38:1
**Clark** [1] - 18:11
**clean** [1] - 92:15
**clear** [6] - 26:4, 31:14, 46:13, 50:14, 85:21, 94:4
**clearance** [1] - 44:23
**cleared** [1] - 26:10
**clearly** [1] - 12:8
**CLERK** [11] - 4:3, 4:5, 32:10, 32:12, 55:15, 56:15, 56:17, 89:1, 89:3, 108:13, 109:1
**clicked** [1] - 44:15
**clients** [4] - 20:13, 20:25, 31:4, 31:14
**clinical** [3] - 52:19, 83:8
**clinically** [1] - 63:18
**clinicians** [1] - 31:7
**clip** [6] - 39:25, 40:12, 40:15, 71:12, 99:24, 100:6
**clips** [4] - 41:9, 71:6, 75:19, 78:5
**close** [4] - 10:1, 10:13, 11:12, 15:15
**closer** [1] - 34:11
**closest** [1] - 8:20
**closet** [2] - 12:18, 92:14
**coffee** [1] - 108:5
**coin** [1] - 59:8
**coke** [1] - 76:15
**collateral** [1] - 62:13
**combined** [1] - 67:8
**coming** [9] - 11:16, 16:24, 29:11, 34:5, 39:5, 41:17, 45:12, 52:13, 88:23
**commands** [1] - 98:1
**comments** [1] - 68:13

**commitment** [1] - 5:11
**common** [4] - 18:6, 41:18, 60:15, 62:6
**communicating** [1] - 59:19
**communication** [3] - 50:20, 50:21, 57:20
**complaints** [1] - 26:18
**compliance** [1] - 36:22
**complies** [1] - 14:1
**complying** [1] - 14:9
**components** [1] - 51:10
**computer** [2] - 49:2, 50:4
**COMPUTER** [1] - 109:16
**COMPUTER-AIDED** [1] - 109:16
**concealed** [3] - 20:8, 24:16, 31:11
**concentrate** [1] - 107:11
**concern** [4] - 39:6, 58:1, 80:24, 85:18
**concerned** [2] - 80:15, 103:8
**concerning** [2] - 90:24, 92:23
**concerns** [5] - 27:17, 29:4, 61:25, 66:18, 80:21
**concluded** [1] - 109:3
**conclusion** [1] - 106:6
**conclusions** [1] - 39:6
**condition** [5] - 9:5, 30:21, 65:22, 88:7, 90:22
**conduct** [1] - 35:17
**conducted** [2] - 25:20, 42:22
**confirm** [4] - 25:14, 25:16, 25:21, 29:13
**confirmed** [1] - 26:1
**confirming** [1] - 29:10
**confront** [2] - 12:7, 13:3
**confrontation** [1] - 94:25
**confronted** [1] - 94:14
**confused** [2] - 36:19, 82:2
**Conley** [63] - 8:16, 9:6, 13:16, 13:17, 14:3, 14:6, 14:24, 15:12, 15:15, 15:18, 17:1, 17:11, 20:10, 21:15, 21:16, 21:18, 21:20, 21:23, 21:25, 22:1,

22:5, 22:8, 22:16,
22:20, 22:22, 22:24,
23:3, 23:4, 24:5,
25:11, 25:14, 25:17,
44:13, 57:4, 57:14,
57:18, 70:11, 72:25,
73:15, 73:20, 73:24,
74:2, 74:8, 86:8,
96:11, 96:14, 96:15,
96:16, 96:22, 96:23,
96:25, 97:5, 105:4,
105:8, 105:11,
105:24, 106:1,
106:11, 106:18
**Conley's** [4] - 14:13,
21:4, 70:20, 103:17
**consider** [1] - 20:15
**considered** [2] -
24:22, 91:20
**consistent** [1] - 64:22
**consumed** [1] - 26:7
**consumer** [1] - 53:7
**consuming** [1] - 30:3
**contact** [3] - 38:21,
39:3, 74:7
**contacted** [1] - 61:17
**containers** [2] - 21:7,
24:21
**content** [4] - 79:12,
79:23, 80:4, 86:6
**contents** [1] - 85:5
**continue** [1] - 56:22
**continued** [1] - 30:2
**control** [5] - 13:14,
38:24, 55:1, 96:2,
96:7
**conversation** [12] -
28:17, 57:17, 57:18,
80:7, 80:10, 93:21,
103:15, 103:20,
104:19, 105:6,
105:23
**conversations** [2] -
11:23, 104:21
**convey** [6] - 41:12,
59:17, 61:1, 63:20,
67:3, 101:5
**conveyed** [10] - 40:22,
59:6, 62:14, 63:10,
64:12, 66:4, 66:7,
66:21, 67:14, 104:12
**conveying** [1] - 59:1
**cook** [2] - 91:8, 91:9
**cooperate** [1] - 29:23
**cooperative** [1] - 26:3
**COPD** [1] - 91:2
**copies** [1] - 49:12
**core** [2] - 28:2, 28:13
**correct** [36] - 69:20,
70:5, 70:9, 71:9,

71:10, 72:23, 73:1,
74:5, 74:8, 76:16,
77:21, 77:22, 77:25,
78:1, 78:3, 78:11,
79:7, 79:10, 79:13,
79:17, 80:1, 81:16,
81:23, 82:7, 82:13,
82:19, 85:3, 85:7,
93:5, 93:6, 94:20,
98:20, 98:21, 98:23,
100:6, 104:17
**CORRECT** [1] -
109:17
**correction** [1] - 63:22
**Correctional** [3] -
17:24, 18:13, 32:22
**correctional** [24] -
32:23, 32:25, 34:19,
40:21, 51:13, 59:16,
59:21, 60:19, 62:11,
62:18, 62:20, 62:25,
63:1, 63:3, 63:7,
63:21, 65:2, 65:6,
65:10, 65:19, 66:1,
66:20, 87:10
**Corrections** [1] - 64:2
**COUNSEL** [3] - 2:1,
2:14, 2:16
**Counsel** [5] - 20:1,
32:2, 32:17, 101:9,
104:10
**counsel** [13] - 4:18,
5:22, 20:2, 32:6,
37:19, 40:8, 55:23,
56:21, 71:7, 73:4,
86:12, 89:6, 101:21
**counseling** [2] -
11:22, 12:1
**counter** [1] - 13:1
**country** [2] - 52:11,
86:4
**COUNTY** [4] - 1:9,
2:14, 2:16, 109:7
**County** [12] - 5:20,
5:22, 6:15, 6:17,
8:16, 18:12, 22:3,
39:3, 48:9, 48:15,
58:20, 58:25
**county** [5] - 4:4, 23:8,
29:9, 29:10, 29:23
**county's** [1] - 29:5
**couple** [2] - 8:18,
48:24
**course** [3] - 16:1,
18:7, 19:16
**COURT** [61] - 1:1,
1:23, 4:7, 17:13,
20:1, 32:2, 32:9,
32:17, 37:19, 38:2,
39:10, 39:12, 39:17,

40:8, 40:17, 41:24,
42:3, 44:1, 44:5,
48:16, 48:18, 48:22,
55:5, 55:18, 56:19,
62:9, 66:11, 68:4,
68:6, 68:9, 80:19,
85:10, 88:20, 88:22,
89:6, 89:20, 90:2,
92:7, 97:14, 98:3,
99:16, 99:18, 99:21,
100:8, 100:17,
100:19, 101:8,
101:17, 101:21,
102:6, 102:9, 104:9,
104:16, 105:21,
106:5, 106:13,
106:22, 107:1,
108:15, 109:12,
109:24
**court** [13] - 7:24,
26:22, 35:24, 36:6,
36:10, 36:16, 36:18,
36:21, 36:25, 37:11,
56:15, 107:11, 109:2
**Court's** [4] - 10:10,
39:15, 44:3, 48:20
**courtroom** [5] - 7:23,
55:19, 100:3,
107:24, 108:17
**courts** [3] - 36:20,
37:8, 107:15
**COVID** [1] - 29:8
**COWS** [2] - 48:7, 48:8
**created** [1] - 79:15
**credibility** [1] - 20:14
**criminal** [1] - 5:24
**critical** [10] - 7:2, 7:4,
17:25, 18:16, 60:22,
63:13, 64:11, 66:14,
67:22, 80:24
**critically** [1] - 19:5
**criticizing** [1] - 55:24
**CROSS** [2] - 3:7,
68:10
**cross** [5] - 10:2, 68:7,
85:13, 86:12, 106:22
**cross-examination** [4]
- 68:7, 85:13, 86:12,
106:22
**CROSS-
EXAMINATION** [1] -
68:10
**crucial** [3] - 29:7,
52:14, 60:1
**CSR** [2] - 1:23, 109:23
**Cucamonga** [2] -
8:10, 9:12
**Cuevas** [2] - 12:11
**cup** [1] - 108:5
**current** [1] - 23:13

**custodial** [6] - 58:10,
59:13, 64:20, 65:7,
66:16, 75:1
**custody** [7] - 6:17,
7:1, 10:11, 27:5,
70:11, 102:18
**custom** [3] - 25:14,
86:16, 86:20
**cut** [1] - 105:16
**CV** [2] - 1:8, 4:3

---

# D

**Dad** [2] - 10:1
**dad** [12] - 7:21, 8:2,
9:21, 13:11, 14:17,
91:8, 91:21, 92:15,
95:23, 96:2, 96:3,
105:14
**dad's** [2] - 10:6, 91:23
**Daddy** [1] - 7:23
**daily** [2] - 14:17, 34:10
**danger** [1] - 7:6
**dangerous** [2] - 7:15,
15:24
**Dani** [1] - 4:22
**DANIELLE** [1] - 2:4
**darkness** [2] - 11:2,
11:3
**date** [3] - 49:21, 61:11,
83:19
**DATE** [1] - 109:20
**daughter** [2] - 5:2,
90:13
**day-to-day** [1] - 91:4
**days** [10] - 9:1, 16:1,
19:7, 21:3, 31:10,
50:24, 53:9, 54:11,
81:11, 88:4
**dead** [1] - 31:2
**deadly** [6] - 45:20,
46:6, 46:7, 53:4,
85:20
**deal** [1] - 92:17
**death** [8] - 5:9, 19:6,
19:14, 19:19, 37:17,
67:24, 68:1, 91:18
**deaths** [4] - 53:5,
86:2, 86:4, 88:4
**decade** [3] - 11:10,
18:12, 33:17
**decades** [1] - 8:19
**decide** [3] - 31:20,
60:14, 70:8
**decided** [1] - 30:6
**decision** [2] - 5:12,
31:24
**declared** [1] - 31:2
**declined** [1] - 91:2
**decorum** [1] - 7:24

**deceased** [1] - 34:9
**deeply** [1] - 56:1
**defendant** [3] - 5:19,
23:18, 108:20
**DEFENDANTS** [2] -
1:10, 2:13
**Defendants** [1] - 79:8
**defendants** [2] - 5:19,
5:21
**defense** [1] - 50:20
**defensive** [2] - 94:16,
94:25
**definitely** [1] - 27:19
**degree** [1] - 24:16
**deliberate** [1] - 19:14
**delirium** [5] - 16:13,
19:2, 19:3, 46:22,
72:7
**deliver** [1] - 29:7
**delivered** [1] - 35:5
**delivery** [1] - 91:7
**denied** [8] - 20:25,
25:11, 76:9, 76:12,
76:14, 76:17, 83:20,
83:24
**denies** [1] - 87:16
**deny** [2] - 18:8, 30:2
**denying** [3] - 13:3,
28:19, 95:9
**department** [1] - 103:1
**Department** [10] -
13:13, 34:25, 35:3,
35:4, 37:6, 58:21,
58:25, 64:2, 67:18,
95:24
**departure** [1] - 65:5
**dependency** [2] -
67:12, 72:5
**deposition** [16] - 28:6,
38:15, 68:19, 70:20,
70:22, 70:24, 73:8,
73:10, 73:12, 79:13,
81:23, 82:2, 84:9,
84:14, 86:18, 98:22
**depositions** [11] -
38:9, 38:17, 61:23,
64:20, 64:21, 66:16,
70:17, 79:19, 79:20,
79:22, 86:13
**depth** [1] - 9:5
**deputies** [17] - 6:25,
14:12, 14:14, 26:3,
39:3, 42:2, 57:23,
58:21, 58:25, 70:15,
73:16, 76:20, 79:17,
80:21, 98:13,
104:20, 104:21
**Deputy** [97] - 8:16,
9:6, 13:16, 13:17,
14:3, 14:6, 14:13,

14:24, 15:12, 15:15, 15:17, 15:18, 16:9, 17:1, 17:2, 17:11, 20:10, 20:11, 21:4, 21:14, 21:16, 21:18, 21:20, 21:22, 21:25, 22:1, 22:5, 22:8, 22:16, 22:20, 22:22, 22:23, 22:24, 23:3, 23:4, 23:8, 23:11, 23:17, 23:20, 23:24, 24:1, 24:2, 24:4, 24:5, 24:8, 25:11, 25:14, 25:17, 27:9, 28:21, 28:23, 29:3, 33:16, 44:13, 57:4, 57:18, 70:11, 70:20, 70:22, 70:24, 72:25, 73:15, 73:20, 73:23, 73:24, 74:2, 74:7, 74:8, 79:24, 80:16, 86:8, 86:14, 86:17, 98:18, 99:9, 99:11, 99:25, 101:2, 101:11, 101:14, 101:19, 102:1, 102:17, 102:22, 103:17, 104:1, 104:14, 105:8, 105:24, 106:1, 106:18

**DEPUTY** [1] - 2:16
**deputy** [10] - 8:17, 23:17, 28:13, 30:13, 41:20, 72:20, 75:11, 99:8, 105:1
**describe** [5] - 35:25, 51:5, 51:14, 51:23, 54:15
**described** [2] - 34:15, 37:9
**describing** [1] - 79:2
**desert** [2] - 8:7, 8:12
**Desert** [15] - 8:21, 8:22, 9:9, 20:21, 61:8, 61:12, 61:15, 61:17, 61:19, 64:13, 64:18, 66:1, 74:3, 81:5, 82:22
**designed** [3] - 44:18, 45:1, 53:16
**despite** [6] - 11:1, 21:14, 26:22, 30:17, 30:20, 30:23
**detail** [1] - 23:20
**details** [2] - 46:13, 58:15
**detained** [2] - 62:22, 63:4
**detectives** [2] - 17:5,

17:11
**detention** [2] - 8:20, 20:23
**Detention** [16] - 8:21, 8:22, 9:10, 9:11, 15:14, 20:21, 30:7, 61:8, 61:12, 61:18, 64:13, 64:18, 66:1, 74:3, 81:5, 82:22
**determination** [2] - 69:19, 76:24
**determining** [1] - 7:5
**detox** [4] - 93:19, 101:15, 101:20, 102:14
**detoxing** [1] - 101:6
**diabetes** [3] - 43:12, 64:6, 88:2
**diagnose** [1] - 69:13
**diagnoses** [1] - 69:17
**diagnosis** [2] - 69:15, 69:18, 88:11
**die** [5] - 19:16, 24:1, 27:5, 30:21, 47:1
**died** [2] - 17:16, 92:3
**DIEGO** [3] - 2:5, 2:8, 2:11
**Diego** [1] - 13:12
**difference** [3] - 17:19, 18:24, 51:12
**differences** [1] - 6:1
**different** [14] - 11:23, 34:12, 35:15, 37:7, 44:22, 45:3, 45:12, 46:2, 52:19, 54:13, 72:13, 90:16, 106:5
**differently** [1] - 29:20, 44:25
**difficult** [2] - 19:12, 55:1
**difficulties** [1] - 39:23
**dig** [1] - 58:15
**dinners** [1] - 91:10
**dire** [1] - 6:1
**direct** [6] - 44:7, 44:14, 44:21, 45:4, 56:22, 74:18
**DIRECT** [3] - 3:7, 32:18, 89:8
**direction** [2] - 44:22
**directions** [1] - 8:9
**directly** [5] - 25:16, 25:17, 33:2, 33:24, 64:3
**Director** [1] - 33:16
**dirty** [1] - 6:6
**disability** [2] - 9:22, 10:6
**disabled** [1] - 9:22
**disclose** [1] - 87:1

**discovered** [1] - 21:6
**discuss** [3] - 55:9, 94:8, 107:5
**discussed** [1] - 79:23
**disorder** [1] - 18:7
**dispatch** [2] - 96:1, 105:7
**dispute** [3] - 27:12, 27:13, 31:4
**disputing** [6] - 72:1, 82:14, 82:20, 83:13, 85:4, 85:8
**District** [2] - 36:24, 37:1
**DISTRICT** [5] - 1:1, 1:2, 1:4, 109:12
**disturbances** [1] - 77:12
**DIVISION** [1] - 1:2
**DO** [2] - 109:13, 109:16
**Doctor** [1] - 32:22
**doctor** [6] - 6:23, 33:4, 33:11, 33:12, 34:20, 69:17
**doctors** [3] - 33:25, 47:20, 94:6
**document** [4] - 44:9, 48:25, 51:4
**documentation** [2] - 16:22, 79:15
**documented** [1] - 30:1
**documents** [4] - 49:3, 50:2, 50:5
**Dodger** [1] - 107:9
**dollars** [1] - 19:23
**done** [3] - 26:19, 35:15, 35:20
**door** [2] - 42:11, 96:9
**doubtful** [1] - 56:8
**down** [16] - 9:10, 9:12, 12:3, 15:13, 16:16, 19:9, 20:19, 22:1, 29:11, 45:5, 51:2, 52:13, 55:20, 88:22, 108:15
**downloaded** [2] - 49:2, 50:7
**dozen** [2] - 50:6, 50:12
**Dr** [20] - 17:22, 17:23, 18:5, 18:25, 25:4, 32:8, 32:20, 38:4, 39:19, 40:3, 40:21, 41:19, 44:7, 48:24, 51:4, 51:20, 56:24, 66:13, 68:12, 85:13
**drank** [7] - 22:10, 24:25, 25:1, 25:2, 76:9, 78:9
**draw** [1] - 60:15

**drink** [6] - 11:6, 11:9, 30:11, 30:15, 46:9, 78:3
**drinker** [4] - 18:3, 40:25, 46:8, 53:6
**drinkers** [2] - 11:5, 46:20
**drinking** [23] - 12:14, 13:7, 14:18, 16:5, 17:4, 17:9, 21:23, 22:7, 24:21, 25:1, 25:5, 38:24, 41:1, 41:10, 45:19, 46:17, 52:23, 58:2, 72:15, 93:17, 103:7, 103:16, 106:2
**drinks** [4] - 41:3, 46:9, 57:25, 88:17
**drive** [3] - 9:10, 91:10, 91:11
**driven** [1] - 53:25
**driveway** [4] - 96:11, 96:12, 97:7, 102:25
**driving** [1] - 15:13
**drove** [1] - 27:7
**drug** [4] - 76:17, 83:25, 86:2, 87:23
**drug-related** [1] - 86:2
**drugs** [5] - 15:11, 23:14, 30:3, 30:11, 30:15, 45:6, 45:23, 52:18, 52:23, 53:15, 57:2, 58:11, 70:4, 75:9, 75:14, 76:14
**drunk** [3] - 78:5, 92:14, 93:1
**DTs** [1] - 46:23
**due** [3] - 16:16, 66:22, 90:22
**during** [16] - 6:13, 6:20, 7:3, 11:15, 15:4, 21:18, 21:19, 22:12, 26:24, 26:25, 27:13, 42:8, 73:3, 75:17, 75:23, 82:12
**duty** [1] - 28:14
**dying** [1] - 27:25

**E**

**early** [2] - 13:2, 61:13
**educate** [1] - 46:4
**education** [1] - 104:8
**efficient** [1] - 56:11
**efforts** [2] - 11:14, 94:10
**eight** [6] - 15:10, 47:8, 52:6, 54:5, 54:6, 78:18
**either** [6] - 25:8, 33:5,

34:24, 35:11, 78:6, 78:19
**eldest** [1] - 9:15
**elements** [1] - 77:14
**ELIAS** [4] - 1:23, 109:11, 109:22, 109:23
**email** [1] - 50:3
**emailed** [2] - 49:3, 49:4
**emergencies** [1] - 65:9
**emergency** [6] - 13:12, 69:2, 88:15, 95:24, 95:25, 96:6
**emphysema** [1] - 91:2
**employees** [2] - 5:20, 6:15
**empty** [5] - 12:21, 21:6, 24:21, 96:17
**EMT** [1] - 69:6
**encounter** [1] - 65:19
**encountered** [5] - 59:7, 59:16, 66:20, 66:23, 66:25
**encounters** [6] - 83:9, 83:14, 83:17, 83:18, 84:2, 84:4
**end** [7] - 5:15, 19:20, 31:21, 31:25, 53:17, 56:12, 91:2
**end-stage** [1] - 91:2
**ended** [1] - 89:20
**enforcement** [14] - 18:15, 18:20, 35:11, 38:18, 38:21, 41:3, 41:5, 42:12, 42:17, 43:7, 43:17, 58:10, 65:7, 94:9
**enjoyed** [1] - 90:19
**enough's** [1] - 11:21
**ensure** [2] - 60:21, 62:14
**ENTERS** [1] - 32:16
**entire** [4] - 71:12, 71:19, 71:23, 71:25
**ENYART** [1] - 1:6
**Enyart** [147] - 4:4, 4:25, 5:1, 6:12, 7:19, 7:20, 7:24, 8:3, 8:14, 9:13, 9:16, 9:17, 9:20, 9:21, 9:22, 9:24, 10:3, 10:11, 10:21, 10:23, 11:2, 11:4, 11:5, 13:22, 14:1, 14:12, 14:16, 15:17, 16:2, 17:5, 17:15, 18:2, 19:10, 19:16, 20:7, 20:25, 21:5, 21:12, 21:16,

115

21:23, 22:2, 22:3, 22:6, 22:7, 22:9, 22:12, 22:14, 22:15, 22:21, 22:22, 23:1, 23:2, 23:16, 23:24, 24:3, 24:7, 24:8, 24:15, 24:25, 25:11, 25:12, 25:21, 25:23, 25:25, 26:2, 26:7, 26:8, 26:10, 26:11, 26:16, 26:17, 26:22, 26:23, 27:4, 27:10, 28:19, 29:12, 29:13, 29:14, 29:17, 29:19, 30:2, 30:4, 30:6, 30:9, 30:11, 30:18, 30:22, 30:25, 31:5, 31:6, 31:11, 37:17, 38:5, 38:21, 39:2, 40:23, 40:24, 43:21, 43:25, 47:3, 57:1, 57:4, 57:8, 57:12, 57:18, 61:6, 61:11, 61:17, 64:17, 68:14, 69:1, 69:22, 70:4, 70:7, 70:8, 70:12, 71:17, 72:9, 72:22, 73:19, 74:8, 74:12, 75:19, 75:22, 76:9, 77:20, 77:24, 78:2, 80:13, 81:22, 82:4, 82:9, 82:13, 83:20, 84:24, 86:9, 86:25, 87:4, 89:12, 89:24, 93:7, 95:12, 97:1, 104:25

**Enyart's** [31] - 10:19, 21:7, 21:20, 21:25, 22:19, 23:5, 23:10, 23:12, 23:21, 23:25, 24:12, 24:16, 25:3, 25:5, 25:8, 25:10, 26:7, 26:9, 28:5, 28:20, 29:16, 30:1, 30:12, 38:23, 40:6, 57:14, 68:1, 74:5, 82:22, 84:20, 97:1
**Enyarts** [8] - 7:19, 8:1, 17:6, 20:24, 22:17, 24:10, 28:15, 29:6
**epilepsy** [3] - 43:12, 64:7, 88:2
**ER** [2] - 48:1, 91:24
**error** [3] - 66:24, 67:2, 67:3
**Erwin** [1] - 22:11
**escalate** [1] - 11:13
**escalated** [1] - 95:8
**especially** [3] - 47:12, 53:3, 63:19

**ESQ** [3] - 2:4, 2:6, 2:9
**essential** [2] - 62:25, 65:17
**essentially** [1] - 36:16
**estate** [3] - 4:25, 5:1, 9:21
**estimate** [1] - 34:4
**et** [1] - 56:3
**ET** [2] - 1:6, 1:9
**evaluated** [2] - 31:6, 69:25
**evaluation** [1] - 22:12, 25:20
**evening** [2] - 61:13, 108:24
**events** [1] - 21:2
**evidence** [43] - 4:13, 4:16, 4:17, 5:8, 6:11, 6:14, 19:24, 20:12, 20:16, 20:17, 21:1, 21:15, 21:19, 24:14, 24:20, 29:6, 30:3, 31:4, 31:10, 31:14, 31:18, 31:19, 31:22, 31:23, 32:5, 39:9, 43:24, 48:13, 57:3, 57:7, 58:19, 61:5, 61:16, 61:21, 64:10, 64:15, 65:18, 98:25, 99:14, 100:15, 101:7
**exacerbation** [1] - 91:9
**exactly** [4] - 5:6, 21:11, 30:5, 83:19
**examination** [7] - 56:22, 68:7, 73:3, 75:17, 85:13, 86:12, 106:22
**EXAMINATION** [4] - 32:18, 68:10, 85:11, 89:8
**examined** [2] - 30:10, 71:6
**excuse** [5] - 55:22, 60:18, 66:5, 79:24, 104:24
**Exhibit** [18] - 39:20, 39:24, 40:13, 40:16, 43:24, 44:1, 44:2, 48:13, 48:19, 51:3, 51:19, 52:16, 56:24, 56:25, 99:14, 99:19, 100:15, 100:20
**exhibit** [2] - 48:15, 48:16
**EXHIBITS** [1] - 3:13
**Exhibits** [2] - 39:9, 39:13
**exist** [1] - 59:20
**expanded** [1] - 10:6

**expect** [5] - 51:7, 52:22, 52:25, 65:25, 71:23
**expectation** [1] - 63:12
**experience** [9] - 51:12, 54:17, 59:16, 59:25, 60:16, 61:3, 64:4, 87:24, 104:8
**experiences** [1] - 19:11
**expert** [13] - 18:5, 34:19, 37:5, 37:20, 40:21, 49:6, 49:10, 49:13, 49:15, 49:19, 49:24, 104:9, 104:15
**Expert** [1] - 18:13
**experts** [3] - 17:20, 21:17, 37:23
**explain** [4] - 23:21, 34:16, 92:24, 94:13
**explained** [1] - 26:21
**express** [2] - 55:10, 107:6
**extension** [1] - 56:8
**extra** [1] - 5:13

**F**

**faced** [1] - 23:12
**facilities** [5] - 9:3, 27:11, 31:7, 34:4, 74:19
**facility** [32] - 8:20, 8:24, 20:22, 20:23, 26:16, 26:18, 27:16, 29:16, 29:18, 29:21, 30:4, 30:9, 30:19, 31:7, 31:8, 36:12, 59:25, 61:14, 62:3, 62:12, 63:15, 66:1, 73:20, 73:21, 74:5, 74:12, 74:21, 74:24, 75:20, 84:21, 102:4, 102:21
**facility's** [1] - 27:14
**fact** [10] - 29:23, 49:12, 61:1, 75:8, 78:24, 79:3, 84:6, 84:20, 93:24, 105:8
**factors** [1] - 9:5
**facts** [4] - 37:24, 38:19, 67:17, 67:21
**factual** [1] - 38:5
**failed** [1] - 81:18
**fails** [1] - 87:11
**failure** [2] - 67:18, 67:22
**fair** [8] - 5:12, 49:7, 59:22, 80:6, 87:4,

87:6, 91:18, 97:25
**familiar** [3] - 8:8, 8:19, 69:9
**families** [2] - 73:12, 86:22
**family** [96] - 7:12, 7:20, 9:19, 10:8, 11:5, 11:7, 11:17, 13:7, 13:24, 14:14, 14:15, 15:17, 16:2, 16:11, 17:15, 18:21, 20:7, 20:10, 20:12, 21:6, 22:2, 22:7, 23:1, 23:16, 24:6, 24:8, 24:15, 24:20, 24:24, 25:6, 26:20, 27:2, 27:3, 27:4, 27:20, 27:24, 28:8, 28:16, 28:25, 38:17, 38:23, 40:6, 40:23, 43:9, 43:11, 57:9, 57:10, 57:18, 57:24, 58:12, 60:5, 60:16, 61:6, 61:17, 61:23, 62:3, 62:6, 63:2, 63:11, 63:24, 64:17, 65:21, 66:6, 71:17, 72:21, 72:25, 73:4, 73:24, 78:4, 79:3, 79:22, 80:5, 80:11, 81:5, 81:12, 82:12, 82:18, 84:21, 84:24, 85:5, 88:17, 90:6, 90:7, 90:24, 91:13, 91:23, 92:15, 94:10, 94:13, 94:14, 94:18, 95:21, 96:10, 103:17
**family's** [4] - 12:5, 29:4, 39:2, 40:24
**far** [4] - 90:24, 94:8, 95:20, 106:11
**father** [10] - 21:20, 28:5, 28:20, 67:7, 90:10, 90:22, 90:25, 91:10, 96:6, 105:10
**father's** [1] - 91:1
**fear** [1] - 27:6
**fears** [1] - 27:2
**February** [4] - 49:16, 49:19, 50:16, 50:19
**FEDERAL** [1] - 1:23, 109:24
**federal** [8] - 29:1, 33:8, 35:12, 36:6, 36:18, 36:19, 36:25, 37:7
**fellowship** [1] - 33:13
**felon** [1] - 15:6
**felony** [2] - 15:3, 15:6
**Ferrara** [1] - 83:16

**few** [16] - 5:3, 5:10, 5:24, 8:1, 9:1, 10:21, 12:10, 19:7, 35:15, 36:11, 54:21, 86:25, 88:4, 91:1, 98:7, 107:13
**fidgety** [1] - 47:15
**field** [1] - 43:7
**fielding** [1] - 64:22
**fierce** [1] - 23:17
**fifteen** [1] - 47:13
**figure** [7] - 23:11, 34:22, 47:7, 58:16, 64:9, 75:15, 88:14
**files** [2] - 38:9, 38:10
**final** [2] - 29:15, 33:25
**finally** [6] - 11:20, 12:10, 17:5, 17:7, 18:23, 86:24
**fine** [1] - 54:21
**finger** [1] - 15:5
**finish** [1] - 56:24
**finished** [2] - 4:9, 24:6
**fire** [1] - 103:1
**first** [21] - 9:8, 10:10, 13:3, 20:22, 26:16, 26:18, 29:21, 30:4, 31:7, 32:6, 33:10, 46:1, 48:25, 52:3, 53:10, 59:24, 61:10, 61:14, 74:25, 75:5, 88:4
**five** [8] - 9:17, 16:1, 17:13, 20:20, 33:5, 81:11, 89:15
**fix** [1] - 33:8
**fixing** [2] - 36:14, 36:15
**FLOOR** [1] - 2:18
**focus** [4] - 20:9, 21:21, 21:22, 24:9
**follow** [4] - 7:9, 7:25, 26:12, 55:15
**follow-up** [1] - 26:12
**followed** [2] - 23:8, 29:5
**FOR** [3] - 3:6, 109:11, 109:12
**force** [4] - 20:20, 22:19, 22:20, 23:3
**forced** [1] - 53:2
**FOREGOING** [1] - 109:14
**forgot** [1] - 74:16
**form** [8] - 15:8, 15:13, 43:21, 43:25, 47:6, 55:10, 75:5, 107:6
**FORM** [1] - 109:16
**formulating** [1] - 95:15

**forth** [1] - 23:13
**FORTH** [1] - 109:15
**fortunately** [1] - 23:7
**forward** [2] - 19:24, 31:25
**fought** [1] - 22:22
**foundation** [4] - 41:23, 63:5, 68:3, 92:6
**four** [7] - 16:1, 26:13, 33:5, 47:7, 52:6, 54:6, 78:18
**FOURTH** [1] - 2:18
**fourths** [1] - 53:4
**Frances** [4] - 4:4, 9:21, 81:22, 82:4
**FRANCES** [1] - 1:6
**Francis** [1] - 8:2
**frank** [1] - 64:9
**free** [1] - 51:24
**freeway** [2] - 8:10, 8:11
**frequent** [1] - 93:4
**frequently** [2] - 54:3, 65:8
**freshman** [1] - 10:4
**Friday** [1] - 49:4
**front** [5] - 51:25, 92:15, 96:9, 102:24, 103:18
**frosting** [1] - 56:11
**frozen** [1] - 97:4
**fulfilled** [1] - 91:19
**full** [6] - 32:13, 37:10, 38:11, 89:3, 91:3, 91:20
**full-time** [2] - 37:10, 91:3
**fully** [1] - 9:22
**fun** [1] - 90:5
**funny** [1] - 108:1
**FURTHER** [1] - 109:17

## G

**game** [1] - 107:9
**games** [1] - 90:20
**GARY** [1] - 1:3
**general** [2] - 63:22, 78:17
**General** [5] - 34:25, 35:10, 35:19, 35:20, 35:21
**General's** [1] - 37:6
**generally** [5] - 41:15, 42:9, 52:25, 53:17, 78:15
**gentlemen** [7] - 4:20, 20:4, 31:13, 32:3, 55:6, 55:21, 107:3

**given** [7] - 23:19, 55:25, 59:18, 66:13, 67:15, 67:19, 67:21
**goal** [1] - 5:14
**gonna** [61] - 4:15, 5:3, 5:4, 5:14, 6:11, 6:14, 7:19, 7:21, 7:23, 7:25, 8:12, 8:22, 10:15, 12:6, 12:7, 13:9, 15:19, 17:7, 17:21, 17:22, 18:2, 18:5, 18:11, 18:14, 18:18, 18:23, 18:25, 19:10, 19:16, 20:14, 20:19, 21:22, 22:23, 24:15, 27:6, 27:20, 31:16, 32:5, 43:11, 44:24, 52:2, 52:22, 53:1, 60:10, 60:12, 60:15, 60:16, 67:1, 84:17, 87:21, 102:20, 103:21, 107:3, 107:25, 108:1, 108:2, 108:4
**gotta** [3] - 47:22, 47:23
**government** [2] - 35:8, 35:12
**grab** [1] - 14:5
**grabs** [1] - 14:6
**Grace** [1] - 4:22
**GRACE** [1] - 2:6
**great** [2] - 85:24, 90:6
**Gregory** [2] - 8:3, 9:22
**grip** [1] - 97:3
**gripping** [1] - 97:22
**GROUP** [1] - 2:3
**groups** [1] - 57:20
**grow** [1] - 9:19
**growin'** [1] - 10:2
**guessing** [1] - 81:7
**guide** [4] - 20:17, 31:19, 47:25, 51:24
**guidelines** [1] - 78:14
**guiding** [1] - 53:23
**guns** [1] - 13:17
**guys** [1] - 91:7

## H

**habits** [1] - 21:23
**half** [4] - 34:21, 44:8, 51:2, 80:22
**hall** [1] - 95:22
**hand** [16] - 13:11, 14:6, 14:7, 14:10, 17:25, 32:10, 60:1, 89:1, 93:18, 96:21, 96:22, 97:2, 97:4, 97:10, 97:21, 98:1

**hand-off** [2] - 17:25, 60:1
**handcuff** [2] - 96:23, 97:1
**handle** [2] - 12:2, 53:23
**hands** [1] - 21:14
**hard** [2] - 12:19, 106:16
**hardware** [1] - 10:4
**harshly** [1] - 80:24
**haunting** [1] - 19:6
**head** [5] - 33:4, 33:11, 33:12, 38:14, 78:22
**headache** [2] - 51:15, 54:24
**health** [58] - 16:14, 30:10, 30:17, 31:8, 32:23, 33:1, 33:18, 33:25, 34:19, 41:7, 42:13, 42:20, 43:18, 44:19, 45:1, 51:13, 52:10, 53:24, 58:14, 58:15, 60:19, 62:14, 62:20, 62:21, 62:23, 63:8, 63:14, 63:15, 63:17, 63:21, 64:3, 64:8, 64:24, 64:25, 65:9, 65:10, 65:11, 65:14, 65:15, 65:21, 66:5, 67:15, 74:25, 75:16, 79:21, 84:5, 86:22, 86:23, 87:10, 87:21, 91:1, 91:16
**Health** [1] - 32:22
**Healthcare** [1] - 17:24
**healthcare** [15] - 9:2, 30:8, 32:24, 33:6, 34:22, 35:5, 35:14, 36:7, 36:23, 51:15, 62:18, 69:8, 83:1, 83:24, 91:14
**hear** [56] - 5:17, 6:11, 6:14, 6:24, 7:2, 8:23, 12:23, 17:21, 17:22, 18:2, 18:5, 18:11, 18:24, 18:25, 19:6, 19:10, 19:17, 21:5, 21:8, 21:12, 21:17, 21:24, 22:5, 22:23, 22:24, 23:10, 23:13, 23:20, 23:23, 23:25, 24:1, 24:15, 24:18, 24:24, 25:7, 25:14, 25:19, 26:10, 26:24, 26:25, 27:1, 27:3, 27:14, 28:7, 28:14, 29:3, 29:9, 29:17, 29:23, 30:2, 30:12, 43:8, 59:12, 101:19,

105:18
**heard** [19] - 5:25, 6:20, 17:8, 22:12, 22:21, 40:8, 71:11, 71:12, 72:4, 72:7, 72:9, 72:21, 78:5, 86:23, 88:13, 96:21, 99:4, 101:22, 101:23
**hearing** [8] - 8:5, 26:22, 32:4, 41:5, 72:6, 72:8, 72:24, 77:12
**hearsay** [2] - 105:20, 106:4
**heart** [4] - 46:24, 54:20, 54:23, 67:11
**heavily** [2] - 24:12, 41:10
**heavy** [4] - 40:24, 46:8, 46:20, 95:6
**held** [2] - 92:18
**help** [17] - 10:7, 13:15, 14:20, 20:18, 23:21, 27:3, 29:15, 36:7, 38:23, 38:25, 45:1, 54:1, 91:5, 91:15, 94:5, 102:15
**helpful** [1] - 52:8
**helps** [2] - 10:1, 47:18
**HEREBY** [1] - 109:13
**HEREINBEFORE** [1] - 109:14
**heroin** [1] - 76:15
**herring** [1] - 18:19
**herself** [1] - 103:17
**hidden** [2] - 11:7, 12:18
**high** [3] - 8:7, 10:4, 103:3
**High** [15] - 8:21, 8:22, 9:9, 20:21, 61:8, 61:12, 61:15, 61:17, 61:19, 64:13, 64:18, 66:1, 74:3, 81:5, 82:22
**higher** [1] - 26:11
**hill** [2] - 9:12, 15:13
**himself** [7] - 11:17, 12:24, 16:18, 91:19, 92:22, 93:9, 93:11
**HIPAA** [6] - 18:18, 18:19, 29:1, 66:19, 66:22
**hire** [2] - 35:8, 36:10
**hired** [3] - 24:11, 35:16, 91:15
**history** [8] - 25:6, 26:4, 76:12, 76:17, 83:25, 87:20, 87:22, 103:6

**hit** [2] - 8:11, 13:14
**hmm** [1] - 38:2
**hold** [3] - 14:21, 28:18, 102:4
**hole** [1] - 16:23
**holidays** [1] - 90:8
**Hollywood** [1] - 12:3
**home** [19] - 7:12, 7:18, 8:14, 9:24, 9:25, 10:24, 10:25, 11:5, 11:13, 13:1, 13:2, 14:16, 21:6, 23:5, 24:7, 31:6, 91:13, 91:15, 107:8
**HOMER** [1] - 3:8
**Homer** [2] - 17:23, 18:6
**homer** [3] - 17:23, 32:8, 32:15
**hone** [1] - 57:1
**honest** [1] - 87:4
**Honor** [30] - 4:19, 17:14, 20:3, 32:7, 37:25, 39:8, 39:14, 40:11, 40:18, 41:23, 42:23, 48:12, 48:17, 56:23, 68:5, 68:8, 85:9, 88:21, 88:24, 89:7, 90:4, 98:6, 99:13, 99:17, 99:20, 100:18, 100:21, 104:11, 106:21, 106:23
**HONORABLE** [1] - 1:3
**hopefully** [2] - 36:12, 108:10
**horrible** [2] - 19:6, 48:3
**hospital** [5] - 22:14, 44:23, 69:20, 70:9, 93:20
**hospitals** [1] - 52:11
**hour** [4] - 8:10, 8:12, 9:12, 37:14
**hours** [9] - 47:8, 52:6, 54:5, 54:6, 54:7, 54:21, 78:13, 78:18, 107:25
**house** [9] - 9:15, 13:23, 92:17, 94:17, 96:8, 96:9, 103:11, 103:19, 104:22
**hundred** [1] - 12:19
**hurry** [1] - 108:3
**hurting** [1] - 14:11
**hypothetical** [7] - 37:21, 37:22, 37:23, 37:24, 67:17, 67:21, 80:18
**hypothetically** [7] -

57:23, 60:5, 66:4,
67:6, 67:7, 67:12,
86:8

## I

**icing** [1] - 56:5
**idea** [3] - 18:18, 24:25,
89:18
**identified** [1] - 82:9
**ignoring** [1] - 30:6
**Illinois** [1] - 35:19
**imagine** [1] - 11:8
**immediately** [1] -
30:10
**implement** [1] - 36:7
**importance** [2] - 43:4,
90:17
**important** [14] - 8:1,
10:18, 19:5, 19:9,
19:13, 20:14, 24:11,
41:12, 47:12, 59:13,
68:23, 101:5, 103:5,
103:24
**importantly** [2] -
18:23, 21:24
**improper** [1] - 80:18
**improve** [1] - 36:7
**improvements** [2] -
36:22, 36:23
**IN** [1] - 109:11
**in-home** [1] - 91:13
**incarcerated** [1] -
62:22
**incarceration** [3] -
38:8, 79:4, 88:5
**incident** [7] - 7:17,
11:11, 73:16, 89:16,
93:15, 94:2, 94:8
**included** [2] - 57:12,
75:20
**incorrect** [1] - 73:13
**increasingly** [1] - 55:1
**independent** [2] -
25:20, 90:18
**INDEX** [1] - 3:1
**indicate** [1] - 62:2
**indicated** [3] - 38:22,
58:24, 64:11
**indicating** [1] - 58:19
**indication** [3] - 11:9,
45:21, 45:23
**indifference** [1] -
19:14
**indifferent** [2] - 19:18,
28:18
**indirectly** [1] - 33:24
**individual** [11] - 5:21,
41:11, 57:24, 66:24,
67:2, 67:3, 74:2,

75:12, 77:7, 83:14
**individuals** [1] - 27:16
**influence** [14] - 15:11,
45:6, 47:3, 52:18,
52:21, 53:14, 54:3,
57:2, 57:5, 57:8,
57:13, 58:11, 75:9,
75:14
**info** [1] - 77:23
**inform** [1] - 67:8
**information** [109] -
7:4, 7:7, 16:17,
16:22, 16:25, 17:1,
17:2, 17:18, 18:1,
18:9, 18:16, 18:20,
18:21, 20:6, 23:19,
25:15, 28:12, 28:25,
29:8, 31:15, 38:5,
38:7, 38:13, 38:22,
40:22, 41:11, 42:17,
43:1, 43:6, 43:16,
44:13, 52:14, 56:2,
56:3, 57:21, 57:24,
58:5, 58:17, 58:22,
59:1, 59:5, 59:17,
59:19, 60:1, 60:6,
60:7, 60:17, 60:21,
60:22, 61:1, 61:7,
61:21, 62:7, 62:13,
62:14, 62:21, 62:23,
63:1, 63:8, 63:9,
63:12, 63:13, 63:23,
64:7, 64:11, 64:16,
64:18, 64:19, 64:24,
65:5, 65:8, 65:20,
65:22, 66:3, 66:4,
66:7, 66:8, 66:14,
66:18, 66:21, 67:4,
67:5, 67:12, 67:13,
67:19, 67:23, 68:23,
73:5, 73:13, 73:19,
76:21, 78:8, 78:9,
78:20, 79:3, 79:5,
79:21, 80:4, 80:25,
86:9, 86:22, 87:12,
87:18, 87:22, 88:1,
88:6, 88:9, 102:1,
102:2
**informed** [2] - 106:2,
106:11
**initial** [6] - 9:8, 42:9,
54:20, 75:6, 75:21,
83:21
**initiate** [2] - 16:19,
60:7
**initiated** [1] - 86:10
**initiation** [2] - 47:4,
85:15
**injured** [1] - 42:18
**injuries** [2] - 11:7,

69:13
**injury** [1] - 10:3
**inmate** [3] - 29:5,
87:11, 87:16
**inmates** [2] - 63:4,
74:19
**inquire** [1] - 89:6
**inquiry** [2] - 61:4,
86:12
**inside** [2] - 103:11,
103:18
**instance** [5] - 43:10,
44:23, 63:6, 65:13,
75:2
**instances** [1] - 66:23
**instead** [5] - 21:9,
30:5, 34:20, 35:12,
46:2
**instruction** [1] - 31:16
**instructions** [3] - 4:9,
6:2, 10:17
**insure** [1] - 6:18
**Intake** [2] - 15:7, 25:19
**intake** [16] - 9:8, 9:9,
16:16, 25:13, 25:21,
31:6, 58:5, 58:22,
59:2, 59:6, 59:20,
60:23, 61:2, 83:21,
86:9, 87:5
**intakes** [1] - 87:24
**intentionally** [3] -
20:25, 25:11, 28:19
**interacting** [1] - 71:17
**interaction** [1] - 95:12
**interest** [1] - 5:1
**interested** [1] - 108:18
**interesting** [1] - 34:18
**interpret** [2] - 101:23,
101:24
**intervals** [1] - 53:14
**intervention** [4] -
12:6, 12:9, 21:8,
21:10
**interventions** [1] -
21:9
**interview** [3] - 14:14,
23:10, 99:10
**interviews** [1] - 57:9
**intoxicated** [20] - 7:9,
13:5, 13:13, 14:19,
15:1, 25:23, 26:5,
41:9, 41:10, 41:12,
41:17, 43:14, 45:22,
58:3, 58:14, 78:6,
78:25, 85:19, 93:1
**intoxication** [12] -
23:14, 41:15, 57:22,
59:2, 59:5, 59:18,
60:6, 60:22, 63:10,
64:12, 77:23, 88:2

**introduce** [2] - 4:24,
51:6
**introduced** [2] - 4:23,
5:18
**introducing** [2] -
46:10, 89:11
**introduction** [1] - 51:9
**introductions** [1] -
6:21
**investigate** [3] - 23:2,
33:5, 35:8
**investigation** [6] -
20:21, 21:18, 22:19,
24:7, 34:21
**investigations** [1] -
35:17
**investigative** [1] -
34:16
**investigator** [1] -
34:15
**invoice** [1] - 84:16
**involve** [1] - 42:14
**involved** [1] - 22:25
**involves** [1] - 47:8
**irritability** [1] - 77:11
**IS** [1] - 109:17
**issue** [3] - 16:14,
16:21, 88:16
**issued** [2] - 49:15,
49:24
**issues** [5] - 14:19,
17:3, 23:22, 58:1,
94:18
**items** [2] - 68:23, 77:6
**itself** [5] - 4:16, 4:17,
5:20, 21:21, 101:21

## J

**jacket** [1] - 12:18
**JACOB** [1] - 2:15
**Jacob** [1] - 20:5
**Jail** [1] - 18:13
**jail** [53] - 6:8, 6:25, 7:6,
7:12, 8:24, 14:23,
14:25, 16:3, 33:3,
34:5, 34:22, 35:1,
35:9, 35:14, 35:25,
36:4, 36:20, 36:21,
41:13, 42:6, 42:11,
43:2, 43:8, 43:11,
43:13, 44:20, 44:25,
45:13, 47:13, 52:25,
53:24, 58:4, 58:22,
59:2, 65:14, 65:23,
65:25, 66:7, 67:8,
67:9, 70:12, 75:21,
78:25, 79:4, 82:13,
82:19, 82:23, 83:2,
101:20, 102:17,

102:18, 104:24
**jails** [26] - 6:17, 29:11,
32:24, 33:6, 33:11,
33:14, 33:15, 33:21,
33:23, 34:3, 34:8,
34:10, 34:12, 35:5,
35:18, 41:17, 42:9,
47:20, 48:9, 48:15,
52:24, 53:5, 53:25,
62:6, 86:2, 87:24
**job** [7] - 6:9, 23:2,
31:14, 58:15, 64:9,
75:15, 88:14
**jobs** [1] - 10:5
**Joe** [1] - 4:21
**JOE** [2] - 2:9, 2:9
**joint** [1] - 10:11
**joke** [1] - 52:23
**jokes** [1] - 90:7
**JUDGE** [1] - 1:4
**Judge** [3] - 5:5, 90:1,
97:17
**judge** [5] - 5:25, 33:8,
36:10, 36:17, 37:1
**judges** [1] - 37:8
**judgment** [1] - 18:7
**July** [21] - 12:4, 12:15,
16:9, 21:2, 21:6,
26:15, 27:12, 29:18,
29:19, 30:19, 61:14,
61:18, 74:10, 80:8,
83:4, 83:6, 83:10,
83:15, 94:9
**JUN** [33] - 2:6, 3:9,
32:7, 32:19, 37:25,
38:3, 39:8, 39:11,
39:14, 39:18, 39:22,
40:2, 40:11, 40:15,
40:18, 40:20, 42:4,
42:23, 44:3, 44:6,
48:12, 48:17, 48:20,
48:23, 50:23, 51:18,
56:23, 62:10, 66:12,
68:5, 80:18, 85:12,
88:19
**Jun** [1] - 4:22
**jun** [1] - 19:23
**jurors** [6] - 55:19,
107:13, 107:16,
107:20, 107:22,
108:16
**jury** [21] - 4:6, 4:8,
31:16, 37:12, 39:16,
40:8, 40:9, 44:4,
48:21, 55:12, 55:17,
56:18, 56:20, 61:11,
90:21, 101:22,
101:23, 107:7,
108:14
**justice** [4] - 6:4, 6:5

**Justice** [4] - 34:25, 35:3, 35:4, 37:6

## K

**K-e-l-l-e-y** [1] - 89:5
**Karen** [1] - 23:17
**keep** [6] - 4:11, 11:14, 52:22, 65:10, 78:18, 85:22
**Kelley** [11] - 9:20, 12:3, 12:17, 14:16, 88:25, 89:5, 89:10, 92:24, 100:24, 103:24, 106:9
**KELLEY** [1] - 3:10
**KELLIE** [1] - 2:16
**Kelly** [2] - 9:15, 11:22
**kept** [2] - 11:7, 92:13
**kerfuffle** [1] - 15:4
**key** [1] - 20:20
**kicking** [1] - 16:12
**kid** [1] - 105:14
**kids** [1] - 9:14
**kill** [1] - 43:11
**kind** [15] - 4:15, 9:19, 32:25, 33:7, 34:9, 35:4, 35:20, 36:3, 36:13, 38:7, 51:25, 52:19, 59:8, 78:21, 89:20
**kinda** [1] - 53:18
**kindly** [1] - 51:1
**kitchen** [4] - 12:25, 92:21, 103:12, 105:11
**KLAUSNER** [1] - 1:3
**Klausner** [1] - 5:5
**knife** [1] - 21:13
**knowledge** [1] - 99:6
**known** [4] - 7:15, 18:6, 18:13, 25:15
**knows** [2] - 9:6, 75:12

## L

**L.A** [2] - 18:12, 93:5
**labs** [1] - 91:12
**lacking** [1] - 60:2
**lacks** [3] - 41:23, 68:3, 92:5
**ladies** [7] - 4:20, 20:4, 31:13, 32:3, 55:6, 55:21, 107:3
**language** [1] - 57:12
**large** [1] - 33:15
**last** [13] - 12:4, 19:7, 31:21, 32:14, 33:5, 35:23, 40:15, 54:18, 78:2, 86:3, 89:4,

90:14, 107:13
**late** [4] - 49:16, 107:22, 107:23, 108:3
**laugh** [1] - 90:6
**LAURA** [4] - 1:23, 109:11, 109:22, 109:23
**law** [17] - 8:24, 18:14, 18:20, 29:1, 31:16, 35:11, 38:18, 38:20, 41:3, 41:5, 42:11, 42:17, 43:7, 43:17, 58:10, 65:7, 94:9
**LAW** [2] - 2:3, 2:9
**laws** [1] - 69:14
**lawsuit** [1] - 34:24
**lawyer** [1] - 35:11
**lead** [4] - 46:22, 67:23, 68:1, 88:4
**leading** [4] - 11:10, 65:13, 97:13, 100:7
**learn** [8] - 7:8, 7:19, 10:15, 44:20, 62:21, 63:8, 65:8, 90:18
**learned** [2] - 43:17, 58:17
**least** [4] - 24:17, 24:23, 78:13, 108:10
**leave** [5] - 23:4, 55:12, 55:15, 108:10
**leaves** [1] - 12:14
**left** [13] - 10:5, 12:12, 22:16, 34:11, 55:19, 94:17, 95:1, 96:18, 97:4, 97:21, 103:18, 108:16, 108:18
**legal** [2] - 36:5
**length** [1] - 72:2
**letting** [1] - 97:22
**level** [3] - 15:20, 69:6, 77:23
**levels** [1] - 91:25
**licensed** [2] - 69:8, 104:7
**Lieutenant** [1] - 18:12
**life** [19] - 10:13, 10:19, 11:3, 19:8, 19:11, 27:8, 41:14, 60:17, 67:5, 73:6, 80:13, 81:2, 90:8, 90:10, 90:14, 92:10, 103:22, 104:5, 104:13
**life-threatening** [1] - 103:22
**lifesaving** [3] - 43:18, 66:21, 67:23
**lighter** [1] - 96:19
**limited** [1] - 16:17

**limits** [1] - 56:7
**line** [9] - 13:12, 20:19, 29:15, 45:6, 83:7, 86:14, 87:1, 95:25, 96:6
**lips** [1] - 24:23
**liquor** [2] - 12:19, 95:7
**list** [3] - 38:11, 42:13
**listen** [3] - 17:7, 27:8, 97:8
**listened** [1] - 17:12
**listening** [2] - 98:1, 98:4
**live** [1] - 93:4
**lives** [4] - 9:24, 10:12, 65:10, 65:16
**lobby** [1] - 27:15
**look** [15] - 13:10, 19:24, 28:22, 31:25, 35:1, 35:13, 36:6, 50:23, 51:8, 52:12, 53:19, 56:25, 77:6, 85:25, 86:6
**looked** [2] - 50:8, 77:10
**looking** [1] - 59:9
**looks** [2] - 9:20, 51:6
**Los** [1] - 107:21
**LOS** [4] - 1:16, 1:24, 4:1, 109:7
**losing** [1] - 6:8
**love** [2] - 10:2, 93:18
**loved** [8] - 43:12, 62:7, 63:24, 64:6, 90:7, 90:8, 90:9

## M

**male** [1] - 100:1
**Mammolito** [15] - 23:17, 23:18, 98:18, 99:9, 99:11, 99:25, 101:2, 101:11, 101:14, 101:19, 102:1, 102:13, 102:17, 102:22, 102:25
**Mammolito's** [1] - 70:24
**mark** [1] - 75:13
**marked** [4] - 39:20, 40:13, 40:15, 75:8
**mass** [1] - 12:11
**material** [1] - 39:1
**mathematics** [1] - 108:20
**matter** [4] - 55:11, 78:17, 98:19, 107:6
**MAY** [3] - 1:15, 4:1, 109:20

**mcMullen** [1] - 22:21
**McMullen** [8] - 2:9, 2:9, 3:5, 4:19, 4:21, 17:14, 51:1, 51:18
**meals** [1] - 91:8
**mean** [12] - 14:21, 32:23, 33:12, 34:18, 47:5, 60:10, 69:9, 71:3, 85:21, 85:22, 88:8, 88:10
**meaning** [2] - 58:3, 85:25
**means** [10] - 5:24, 6:3, 8:25, 32:24, 34:17, 36:1, 42:10, 42:13, 46:16, 88:11
**MEANS** [1] - 109:16
**measure** [3] - 36:22, 51:16, 52:2
**measures** [1] - 51:22
**medic** [1] - 69:6
**medical** [71] - 6:19, 6:22, 7:5, 7:7, 9:2, 16:13, 18:1, 18:16, 21:1, 25:11, 25:22, 26:2, 26:4, 26:19, 27:3, 28:10, 28:19, 28:25, 29:2, 29:7, 29:21, 29:22, 29:24, 30:8, 30:21, 31:5, 31:7, 31:12, 33:21, 34:2, 35:9, 35:18, 35:25, 38:8, 40:21, 42:23, 42:25, 43:5, 44:23, 49:20, 50:5, 50:14, 58:5, 58:6, 58:7, 61:2, 62:12, 62:14, 63:23, 64:12, 65:21, 65:23, 66:7, 66:15, 66:21, 67:15, 67:23, 68:17, 69:2, 69:11, 74:20, 76:23, 79:5, 87:8, 87:13, 88:7, 88:8, 90:22, 102:3, 102:21
**Medical** [3] - 33:16, 33:17, 33:20
**medication** [1] - 103:3
**medications** [2] - 76:7, 102:14
**medicine** [5] - 48:1, 55:2, 60:11, 60:19, 65:2
**medicines** [1] - 55:2
**meet** [1] - 96:11
**member** [10] - 6:22, 10:8, 27:20, 27:24, 40:6, 58:13, 63:11, 63:24, 71:17, 72:25
**members** [23] - 4:8,

14:14, 14:15, 18:22, 20:10, 27:2, 27:3, 38:18, 43:9, 56:20, 57:10, 60:16, 61:23, 62:4, 62:6, 63:2, 65:21, 66:6, 72:21, 73:4, 79:22, 80:12, 81:5
**memorized** [3] - 77:8, 83:8, 83:13
**memory** [1] - 83:16
**mental** [10] - 16:14, 30:8, 30:10, 30:17, 31:8, 33:18, 33:25, 41:7, 65:13, 87:21
**mention** [3] - 27:2, 48:2, 103:24
**mentioned** [28] - 4:21, 34:2, 34:3, 34:14, 35:3, 35:7, 35:23, 37:5, 42:25, 46:5, 47:2, 50:1, 50:2, 51:22, 52:16, 54:12, 57:10, 59:23, 67:2, 73:3, 78:12, 86:16, 88:6, 95:1, 98:7, 101:20, 103:21
**mentioning** [1] - 72:11
**messed** [1] - 66:24
**met** [3] - 80:16, 96:13, 96:15
**meth** [1] - 76:15
**middle** [3] - 9:16, 12:15, 79:4
**MIEDERHOFF** [11] - 2:15, 3:9, 41:22, 62:8, 66:10, 68:3, 68:8, 68:11, 81:3, 85:9, 88:21
**might** [17] - 7:5, 23:24, 34:10, 42:14, 43:9, 50:12, 51:11, 53:20, 57:13, 60:1, 60:13, 60:14, 69:16, 96:3, 101:6
**mild** [2] - 46:18, 53:21
**miles** [1] - 8:11
**MILLER** [3] - 1:23, 109:22, 109:23
**millions** [1] - 19:23
**mind** [5] - 4:11, 67:13, 67:17, 67:22, 106:23
**mine** [1] - 13:4
**minimum** [3] - 45:17, 45:23, 54:5
**minute** [3] - 39:22, 39:25, 106:24
**minutes** [13] - 5:4, 17:13, 22:25, 55:8, 56:14, 98:8, 107:22,

107:23, 107:24, 108:19, 108:20
**misstates** [1] - 101:7
**mistake** [1] - 85:22
**mixed** [1] - 95:15
**moderate** [1] - 53:21
**mom** [13] - 7:21, 8:2, 9:21, 14:16, 23:12, 91:17, 95:22, 103:17, 103:20, 105:7, 105:9, 105:16, 105:18
**Mom** [3] - 11:23, 12:17, 13:9
**Mom's** [1] - 9:25
**moment** [3] - 69:7, 75:11, 80:11
**moments** [2] - 19:11, 75:21
**Monday** [3] - 49:2, 50:4, 50:24
**money** [2] - 6:5, 90:18
**monitor** [5] - 36:8, 36:11, 36:18, 36:21
**monitored** [1] - 14:22
**monitoring** [9] - 9:6, 48:10, 53:10, 53:12, 54:1, 60:9, 78:17, 85:20, 87:14
**month** [2] - 93:15, 94:1
**months** [1] - 46:15
**morning** [5] - 4:11, 50:4, 90:21, 94:17, 108:25
**most** [12] - 18:23, 26:17, 26:21, 34:24, 36:9, 42:24, 46:8, 53:3, 59:23, 65:12, 78:24, 86:3
**mostly** [2] - 11:7, 41:9
**mother** [7] - 10:12, 10:25, 21:25, 23:25, 67:6, 67:7, 105:10
**motor** [1] - 10:2
**motorcycles** [1] - 10:2
**mouth** [1] - 30:12
**move** [6] - 39:8, 40:12, 43:23, 48:13, 99:14, 100:14
**moved** [1] - 29:17
**moving** [2] - 20:18, 53:21
**MR** [27] - 3:5, 3:5, 3:9, 4:19, 17:14, 20:3, 26:17, 41:22, 62:8, 66:10, 68:3, 68:8, 68:11, 81:3, 85:9, 88:21, 92:5, 97:13, 98:2, 100:7, 101:7,

101:16, 102:5, 104:15, 105:20, 106:3, 106:23
**MRIs** [1] - 91:12
**MS** [61] - 3:9, 3:11, 32:7, 32:19, 37:25, 38:3, 39:8, 39:11, 39:14, 39:18, 39:22, 40:2, 40:11, 40:15, 40:18, 40:20, 42:4, 43:23, 44:3, 44:6, 48:12, 48:17, 48:20, 48:23, 50:23, 51:18, 56:23, 62:10, 66:12, 68:5, 80:18, 85:12, 88:19, 88:24, 89:7, 89:9, 89:23, 90:1, 90:11, 92:8, 97:16, 98:6, 99:13, 99:17, 99:20, 99:23, 100:10, 100:14, 100:18, 100:21, 100:23, 101:10, 101:18, 101:25, 102:11, 104:11, 104:18, 105:22, 106:8, 106:16, 106:20
**multiple** [11] - 27:11, 28:13, 29:9, 30:17, 46:21, 54:7, 57:10, 70:15, 83:17, 84:21
**multitude** [1] - 91:25
**mumble** [1] - 93:10
**MY** [1] - 109:18

## N

**name** [13] - 10:10, 17:22, 20:4, 32:13, 32:14, 48:2, 74:16, 81:22, 81:25, 82:3, 89:4
**name's** [1] - 4:21
**narratives** [1] - 56:1
**nausea** [1] - 52:2
**near** [1] - 8:6
**necessary** [3] - 10:6, 21:8, 56:1
**need** [19] - 5:12, 6:19, 9:23, 11:25, 13:15, 14:20, 18:8, 26:1, 30:6, 43:5, 48:1, 62:18, 63:20, 65:9, 75:16, 78:18, 80:9, 86:5, 88:12
**needed** [11] - 20:25, 23:21, 25:11, 26:11, 29:14, 30:5, 36:14, 38:25, 76:6, 93:24,

102:15
**needs** [4] - 13:15, 47:25, 63:17, 91:24
**nervous** [1] - 46:12
**Nevada** [2] - 10:12, 10:25
**never** [20] - 22:1, 22:8, 23:1, 23:18, 24:8, 26:23, 27:23, 29:6, 66:25, 72:4, 72:7, 72:9, 72:21, 79:15, 80:12, 82:9, 82:13, 82:18, 85:2
**New** [7] - 33:3, 33:11, 33:13, 33:21, 34:3, 35:19, 59:22
**next** [12] - 16:1, 22:18, 42:3, 51:18, 54:22, 88:23, 95:20, 96:7, 100:5, 100:11, 102:9, 103:10
**Nicholas** [2] - 9:20, 29:12
**Nick** [10] - 9:17, 14:15, 14:16, 91:16, 97:7, 99:12, 100:2, 100:3, 103:12, 105:10
**Nick's** [4] - 96:16, 96:20, 97:3, 97:21
**night** [3] - 11:16, 12:23, 78:6
**nine** [1] - 85:6
**NO** [1] - 1:8
**nobody's** [1] - 55:25
**non** [4] - 13:12, 95:24, 95:25, 96:6
**non-emergency** [4] - 13:12, 95:24, 95:25, 96:6
**none** [1] - 64:25
**Norco** [1] - 12:12
**Norco-types** [1] - 12:12
**NORTH** [1] - 2:17
**notes** [1] - 55:16
**NOTES** [1] - 109:18
**nothing** [5] - 5:13, 15:23, 20:15, 22:11, 28:23
**notice** [1] - 25:24
**noticed** [3] - 29:21, 92:12, 92:20
**noticing** [1] - 103:8
**number** [7] - 34:1, 34:4, 53:17, 63:25, 90:7, 95:24, 103:19
**numbers** [2] - 34:9, 54:1
**Nurse** [10] - 15:8, 25:13, 25:17, 25:19,

26:6, 26:10, 74:15, 82:24, 83:4, 83:6
**nurse** [33] - 6:22, 25:13, 25:16, 25:24, 31:6, 33:25, 47:21, 52:5, 58:5, 58:18, 59:2, 59:6, 60:23, 61:2, 63:16, 69:17, 74:13, 74:16, 75:3, 75:17, 75:23, 76:1, 76:2, 76:4, 76:6, 83:10, 83:12, 83:15, 83:16, 86:10, 91:17, 104:7
**nurses** [6] - 9:21, 30:17, 31:8, 58:22, 59:13, 59:20
**nursing** [2] - 48:14, 50:25

## O

**o'clock** [3] - 15:15, 107:1, 107:17
**object** [2] - 41:22, 66:10
**objection** [13] - 62:8, 68:3, 80:18, 92:5, 97:13, 97:17, 98:2, 100:7, 101:7, 101:16, 102:5, 104:15, 106:3
**objective** [3] - 51:10, 51:15, 103:7
**obligation** [3] - 18:14, 87:12, 87:18
**observations** [3] - 15:9, 58:13, 88:13
**observe** [2] - 93:7, 97:23
**obtain** [1] - 26:4
**obvious** [1] - 26:1
**obviously** [1] - 44:12
**occasion** [5] - 93:12, 98:12, 98:22, 102:23, 104:25
**occasions** [3] - 92:25, 93:7, 93:13
**occur** [1] - 91:22
**occurred** [2] - 5:9, 80:7
**occurring** [1] - 64:16
**odd** [1] - 10:5
**OF** [14] - 1:1, 1:2, 1:9, 1:14, 2:1, 2:2, 2:9, 2:13, 109:5, 109:7, 109:9, 109:12, 109:16, 109:18
**Office** [1] - 37:7
**Officer** [13] - 33:17,

33:20, 57:14, 96:11, 96:14, 96:16, 96:22, 96:23, 96:25, 97:5, 103:13, 105:4, 105:11
**officer** [12] - 15:4, 15:9, 42:17, 43:1, 44:12, 44:17, 44:20, 45:8, 58:4, 59:6, 96:8, 96:15
**officer's** [1] - 44:9
**officers** [18] - 38:21, 41:3, 41:6, 43:7, 43:17, 58:21, 59:17, 59:19, 60:6, 60:21, 60:25, 62:25, 65:8, 65:14, 65:17, 71:15, 88:9, 98:8
**officers'** [1] - 79:20
**OFFICES** [1] - 2:9
**OFFICIAL** [3] - 1:23, 109:11, 109:24
**often** [13] - 25:1, 42:24, 43:8, 43:14, 43:16, 44:20, 48:5, 51:13, 54:9, 59:25, 63:3, 65:13, 87:24
**old** [1] - 10:23
**oldest** [1] - 89:13
**ON** [2] - 2:2, 2:13
**on-scene** [5] - 26:6, 70:11, 70:15, 72:20, 72:25
**once** [13] - 7:6, 19:2, 33:8, 36:3, 41:12, 64:17, 66:3, 82:22, 85:7, 95:4, 95:11, 96:13, 96:23
**one** [65] - 4:24, 5:7, 5:25, 7:2, 15:10, 16:8, 16:25, 17:2, 17:4, 19:15, 20:6, 20:7, 21:14, 21:15, 24:14, 25:4, 27:1, 27:2, 27:19, 28:13, 28:16, 28:17, 31:21, 33:2, 34:13, 34:20, 35:23, 39:25, 40:6, 42:1, 43:12, 45:4, 46:9, 48:7, 50:9, 52:3, 52:5, 56:25, 57:14, 59:24, 60:1, 62:7, 63:24, 64:6, 65:12, 68:12, 70:25, 72:14, 72:17, 77:9, 78:5, 80:7, 80:23, 80:25, 82:20, 86:12, 90:5, 90:7, 96:25, 99:6, 99:7, 106:9, 106:24

120

one-minute [1] - 39:25
ones [1] - 70:25
ongoing [1] - 23:22
open [1] - 89:20
open-ended [1] - 89:20
opened [2] - 50:4, 50:7
opening [4] - 4:10, 4:12, 5:4, 6:13
OPENING [1] - 3:4
opiate [2] - 47:11, 48:8
opinions [4] - 37:18, 55:11, 80:15, 107:6
opportunity [3] - 4:12, 98:25, 106:9
orders [2] - 21:14, 22:22
organization [1] - 35:12
orient [2] - 42:5, 61:10
original [1] - 78:19
otherwise [1] - 18:1
ourselves [1] - 86:6
outcomes [1] - 85:24
outside [2] - 62:13, 63:2
overheard [2] - 95:23, 96:1
overruled [3] - 80:19, 102:6, 104:16
oversaw [1] - 33:24
oversee [2] - 35:24, 36:7
overseeing [3] - 33:18, 33:21, 34:2
own [5] - 12:2, 16:11, 25:20, 30:12, 58:13
oxygen [4] - 9:23, 91:3, 91:6, 91:7

P

p.m [6] - 13:20, 13:21, 30:24, 31:2, 31:3, 109:3
P.M [1] - 4:1
PAGE [1] - 3:3
page [3] - 51:3, 51:18, 75:5
paid [9] - 24:18, 25:3, 25:8, 37:8, 37:11, 37:14, 84:6, 84:14, 84:17
pain [1] - 12:13
pandemic [1] - 11:12
paperwork [1] - 16:16
paramedic [9] - 22:11, 31:6, 69:4, 69:8,

69:10, 69:22, 70:7, 70:8, 76:1
paramedics [12] - 22:6, 22:9, 22:10, 22:13, 22:15, 26:6, 69:14, 69:15, 102:23, 103:1, 103:5, 103:9
parents [8] - 23:5, 23:10, 23:21, 67:14, 79:13, 95:7, 103:12, 103:18
parents' [3] - 96:9, 103:11, 104:21
parks [1] - 13:19
part [13] - 8:14, 8:18, 9:6, 20:9, 43:3, 52:8, 57:14, 60:1, 62:20, 62:24, 75:20, 75:22, 79:2
PARTIAL [1] - 1:14
participating [1] - 37:22
particular [2] - 7:9, 7:13
particularly [3] - 7:15, 19:2, 56:25
parties [1] - 100:15
pass [1] - 7:6
passage [1] - 80:25
passed [3] - 6:10, 18:9, 30:25
passing [2] - 17:18, 91:13
past [3] - 23:14, 91:1, 92:12
paths [1] - 65:12
pathway [1] - 47:21
pathways [2] - 46:12, 46:16
patient [8] - 43:10, 44:21, 53:23, 60:13, 62:22, 66:19, 69:20, 87:19
patiently [1] - 17:12
patients [1] - 34:5
patrol [6] - 6:25, 8:17, 13:19, 14:13, 73:16
payment [1] - 37:4
Pena [2] - 4:22, 19:23
PENA [30] - 2:4, 3:11, 88:24, 89:7, 89:9, 89:23, 90:1, 90:11, 92:8, 97:16, 98:6, 99:13, 99:17, 99:20, 99:23, 100:10, 100:14, 100:18, 100:21, 100:23, 101:10, 101:18, 101:25, 102:11,

104:11, 104:18, 105:22, 106:8, 106:16, 106:20
penalty [1] - 28:6
people [29] - 7:10, 8:20, 9:1, 16:7, 18:7, 34:12, 36:3, 41:8, 41:9, 41:16, 45:18, 46:8, 46:16, 46:20, 46:21, 51:7, 51:9, 51:14, 54:8, 54:16, 59:11, 63:4, 63:22, 67:8, 77:11, 78:24, 81:4, 87:24, 107:23
per [2] - 37:14, 37:15
percent [2] - 12:19, 12:20, 86:3
perceptual [1] - 77:12
perfect [1] - 95:15
period [4] - 12:13, 49:21, 92:17, 97:8
periodic [2] - 45:18, 45:24
periods [1] - 11:13
perjury [1] - 28:6
permission [6] - 10:10, 39:15, 44:3, 48:20, 90:1, 99:20
person [42] - 6:18, 6:22, 9:7, 13:7, 15:1, 15:11, 20:7, 29:8, 36:6, 36:8, 41:13, 41:25, 42:5, 42:10, 42:18, 43:2, 43:13, 44:19, 45:12, 45:24, 47:14, 47:23, 47:25, 51:7, 52:7, 53:14, 54:3, 58:2, 58:11, 62:22, 65:15, 72:1, 74:25, 78:23, 82:9, 84:5, 85:23, 87:21, 88:16, 91:21, 91:22, 108:2
person's [1] - 58:14
personal [1] - 58:13
personality [1] - 23:15
personally [3] - 23:1, 25:20, 29:7
personnel [5] - 29:21, 33:22, 61:19, 66:15, 66:22
perspective [1] - 4:8
PH [1] - 1:25
phase [1] - 78:21
PHG [1] - 2:3
phone [21] - 13:10, 13:11, 13:14, 16:2, 16:7, 16:23, 17:10, 27:15, 57:15, 62:1, 62:2, 63:25, 65:20,

66:6, 67:9, 81:12, 81:14, 96:4, 105:9, 106:11, 106:18
photo [1] - 10:21
photos [1] - 10:21
phrasing [1] - 72:24
physical [2] - 33:18, 94:22
physician [1] - 19:1
physician's [2] - 30:18, 31:8
pick [2] - 16:7, 63:25
picking [1] - 67:9
piece [1] - 5:8
pieces [1] - 20:19
pills [1] - 12:13
place [9] - 9:10, 18:9, 21:2, 34:20, 60:20, 62:12, 62:18, 78:12, 102:18
PLACE [1] - 109:14
placed [2] - 61:12, 96:19
places [2] - 52:11, 59:23
PLAINTIFF [2] - 2:2, 3:7
plaintiff [2] - 98:19, 108:19
plaintiff's [3] - 31:17, 71:7, 73:4
plaintiffs [5] - 4:22, 4:23, 4:25, 32:8, 88:24
PLAINTIFFS [1] - 1:7
plan [1] - 36:7
plane [1] - 108:3
planned [1] - 21:9
planning [1] - 12:5
play [3] - 39:15, 39:19, 39:24
played [7] - 40:1, 40:14, 40:19, 71:6, 90:23, 99:22, 100:22
playing [1] - 90:20
pleasant [1] - 108:24
plus [1] - 59:18
pocket [3] - 21:13, 96:18, 96:22
pocketknife [3] - 14:4, 14:5, 96:18
pockets [2] - 12:18, 96:17
point [20] - 16:10, 26:14, 32:3, 48:12, 91:21, 91:22, 92:3, 92:10, 93:21, 95:2, 95:11, 95:13, 95:20, 96:8, 96:25, 97:6, 98:7, 98:8, 98:12,

99:13
points [1] - 53:19
police [3] - 15:4, 21:10, 38:23
policies [13] - 29:8, 29:10, 49:20, 49:23, 50:5, 50:15, 50:18, 50:22, 59:4, 59:15, 60:20, 62:18, 63:6
policy [10] - 50:23, 58:20, 58:23, 59:4, 59:7, 59:17, 60:2, 65:19, 65:22, 67:19
population [1] - 34:10
porch [1] - 96:10
portion [2] - 44:8, 101:1
portions [1] - 51:24
posed [1] - 44:17
position [1] - 34:1
positives [1] - 11:1
possible [4] - 60:13, 61:7, 86:1
potent [1] - 46:7
potentially [1] - 41:14
practice [4] - 25:14, 79:21, 86:17, 86:20
practitioner [1] - 69:17
precipitated [1] - 7:17
precisely [1] - 58:7
preponderance [1] - 31:18
prescription [3] - 12:13, 12:16, 76:6
present [5] - 4:6, 5:7, 55:17, 56:18, 108:14
presentation [1] - 54:14
presented [1] - 31:23
presenting [1] - 32:5
PRESIDING [1] - 1:4
pressure [4] - 54:23, 58:9, 103:3, 103:4
pretrial [1] - 4:9
pretty [4] - 11:15, 58:11, 60:15, 64:22
preventable [1] - 88:4
prevention [1] - 63:6
previously [1] - 80:20
price [1] - 19:22
prison [6] - 34:23, 35:2, 35:9, 35:25, 36:4, 53:1
prisons [4] - 32:24, 33:6, 35:5, 52:24
privacy [2] - 29:1, 66:18
problem [26] - 11:11, 11:24, 11:25, 12:24,

16:5, 22:8, 41:16,
47:7, 53:6, 56:4,
60:13, 60:14, 63:18,
63:19, 64:9, 69:16,
85:3, 93:14, 93:22,
93:25, 94:5, 94:11,
101:3, 105:15,
106:2, 107:20
**problems** [10] - 17:9,
33:8, 36:4, 40:25,
42:14, 59:24, 65:9,
107:13, 107:21,
108:22
**procedure** [1] - 50:25
**procedures** [4] - 8:19,
22:3, 23:9, 29:5
**Procedures** [1] -
18:13
**proceed** [1] - 68:8
**PROCEEDINGS** [3] -
1:14, 3:3, 109:14
**proceedings** [2] -
7:11, 109:3
**process** [6] - 42:7,
42:8, 42:22, 43:4,
75:24
**produced** [1] - 50:24
**professional** [5] -
21:9, 25:22, 42:23,
42:25, 43:5
**professionals** [2] -
87:8, 88:8
**programs** [1] - 93:18
**progresses** [1] - 25:8
**prohibiting** [1] - 29:10
**projects** [1] - 10:5
**prominent** [1] - 93:3
**promote** [1] - 65:11
**prompt** [2] - 45:11,
45:17
**prompted** [3] - 47:4,
52:18, 52:20
**proof** [2] - 6:1, 12:20
**properly** [2] - 31:15,
42:5
**protects** [1] - 29:1
**protocol** [9] - 47:5,
47:22, 48:10, 48:14,
50:25, 51:8, 54:4,
60:8, 77:16
**protocols** [4] - 16:20,
49:9, 68:13, 78:12
**prove** [4] - 20:24,
31:18, 37:21, 37:24
**provide** [7] - 17:25,
58:22, 87:13, 88:9,
98:12, 98:15, 104:20
**provided** [11] - 16:25,
17:4, 18:16, 29:25,
35:9, 56:2, 98:17,

99:4, 99:10, 100:12,
101:1
**provider** [3] - 31:12,
51:15, 69:8
**providers** [5] - 62:15,
83:1, 83:24, 93:23,
94:7
**providing** [5] - 32:24,
58:5, 60:5, 76:21,
87:8
**psychiatrist** [2] -
30:24, 31:9
**psychoses** [1] - 16:11
**psychosis** [3] - 16:18,
19:7, 46:25
**psychotic** [1] - 16:14
**public** [1] - 27:15
**publish** [4] - 44:4,
48:21, 99:20, 100:19
**puffing** [1] - 94:23
**pulled** [1] - 96:18
**pulse** [2] - 47:16,
51:16
**purpose** [1] - 90:10
**pursuant** [1] - 22:3
**put** [16] - 10:4, 14:13,
16:18, 21:13, 49:1,
50:4, 56:4, 56:5,
56:11, 58:9, 96:23,
96:24, 98:1, 98:11,
105:7, 105:9
**putting** [1] - 14:9

## Q

**qualify** [1] - 79:18
**quality** [1] - 90:19
**quantify** [1] - 19:12
**quarter** [1] - 55:8
**quarters** [1] - 86:4
**questioning** [2] -
86:14, 87:2
**questions** [33] - 15:10,
15:11, 25:4, 28:8,
32:21, 39:21, 42:13,
42:15, 44:9, 44:14,
44:16, 44:18, 44:25,
47:9, 48:24, 56:2,
59:9, 61:10, 68:5,
70:2, 70:4, 74:25,
76:2, 80:14, 85:9,
86:24, 86:25, 87:5,
87:20, 88:19, 106:20
**quick** [1] - 63:19
**quietly** [2] - 55:13,
108:11
**quite** [2] - 5:17, 86:25

## R

**raise** [2] - 32:10, 89:1
**raised** [1] - 8:3
**raising** [1] - 9:14
**Ramirez** [1] - 20:5
**RAMIREZ** [14] - 2:15,
3:5, 20:3, 92:5,
97:13, 98:2, 100:7,
101:7, 101:16,
102:5, 104:15,
105:20, 106:3,
106:23
**Rancho** [2] - 8:10,
9:12
**rate** [5] - 46:24, 54:20,
54:23, 77:7, 77:18
**rather** [2] - 107:15,
107:17
**reached** [1] - 96:17
**read** [1] - 70:17
**readings** [1] - 54:7
**ready** [1] - 93:22
**real** [2] - 9:21, 29:13
**really** [13] - 8:25,
11:11, 11:12, 20:6,
28:7, 43:18, 47:12,
52:14, 53:5, 56:1,
60:14, 90:19, 105:19
**rear** [1] - 78:22
**reask** [2] - 97:17,
100:8
**reason** [10] - 16:20,
20:14, 25:22, 26:11,
29:13, 38:20, 43:15,
54:19, 66:13, 107:14
**reasons** [1] - 87:25
**recalled** [1] - 80:3
**receive** [13] - 7:4,
10:17, 18:15, 18:21,
27:19, 48:25, 50:5,
59:1, 62:13, 71:23,
81:4, 102:14, 102:21
**RECEIVED** [1] - 3:13
**received** [10] - 17:1,
17:2, 39:12, 44:1,
71:19, 71:21, 86:22,
99:18, 100:19
**receiving** [11] - 16:22,
42:10, 42:12, 42:21,
42:22, 43:20, 43:24,
58:18, 63:23, 75:6,
83:18
**recent** [2] - 26:22,
94:1
**recently** [1] - 33:4
**recess** [1] - 56:15
**Recess** [1] - 56:16
**recognize** [3] - 40:3,
41:20, 41:25

**recognized** [1] - 30:4
**recollection** [20] -
49:14, 49:22, 50:17,
50:21, 57:19, 61:13,
69:5, 70:10, 70:16,
73:2, 76:8, 76:11,
76:13, 76:19, 79:25,
82:25, 83:5, 84:2,
104:4, 106:1
**recommends** [1] -
15:3
**record** [8] - 4:7, 13:9,
32:13, 55:18, 56:19,
89:3, 100:24, 108:16
**recorded** [4] - 99:4,
99:7, 99:24, 100:5
**recorder** [2] - 23:9,
30:14
**recording** [14] - 26:21,
29:12, 39:16, 40:3,
40:5, 40:13, 41:21,
71:12, 71:13, 71:19,
71:23, 71:25, 72:21,
101:19
**recordings** [13] -
23:23, 39:2, 39:5,
68:21, 71:2, 71:3,
71:4, 71:11, 71:14,
71:21, 72:3, 72:4,
79:10
**records** [11] - 16:2,
29:2, 29:24, 38:8,
38:9, 58:24, 62:1,
62:2, 68:17, 81:12,
81:14
**recross** [1] - 88:20
**RECROSS** [1] - 3:7
**red** [1] - 18:19
**redirect** [2] - 37:16,
85:10
**REDIRECT** [2] - 3:7,
85:11
**REDUCED** [1] -
109:15
**reeked** [1] - 93:3
**reeking** [1] - 11:15
**reeks** [3] - 13:4, 15:2,
15:21
**refer** [2] - 89:25, 90:2
**reference** [3] - 41:1,
74:22, 78:4
**referenced** [3] - 51:17,
57:17, 78:5
**referrals** [1] - 65:13
**referred** [1] - 7:22
**refill** [1] - 12:16
**reflect** [4] - 4:7, 55:18,
56:19, 108:16
**reflects** [1] - 79:16
**refresh** [1] - 83:16

**refusals** [1] - 30:23
**refused** [5] - 21:13,
29:22, 30:18, 70:4,
105:12
**refusing** [1] - 86:25
**regarding** [5] - 23:13,
50:24, 70:4, 87:5,
101:2
**registered** [2] - 75:2,
75:23
**regular** [2] - 53:13,
77:9
**rejected** [1] - 9:9
**relapses** [1] - 12:1
**relate** [1] - 103:16
**related** [6] - 9:23,
16:21, 25:15, 58:2,
86:2
**relation** [2] - 89:12,
97:10
**relationship** [4] -
10:13, 10:16, 10:20,
90:13
**relatives** [1] - 57:15
**relay** [3] - 25:15,
28:23, 103:6
**release** [1] - 108:8
**relevant** [3] - 51:24,
56:3, 88:14
**relied** [1] - 80:4
**relieved** [1] - 17:7
**rely** [4] - 24:12, 39:5,
63:7, 88:8
**remained** [1] - 26:17
**remember** [14] -
20:15, 24:4, 27:22,
28:1, 28:16, 31:16,
55:9, 79:24, 83:11,
95:22, 96:2, 96:3,
105:5, 107:4
**remove** [1] - 21:13
**removed** [1] - 12:11
**repeat** [2] - 81:24,
106:14
**repeatedly** [3] - 28:21,
30:18, 31:11
**rephrase** [2] - 87:9,
99:3
**report** [18] - 14:25,
38:11, 49:6, 49:10,
49:15, 49:19, 49:24,
57:11, 57:21, 58:12,
61:24, 73:13, 83:7,
84:3, 84:11, 87:11,
103:19
**REPORTED** [1] -
109:13
**reported** [9] - 25:6,
28:2, 30:13, 57:11,
61:24, 79:3, 80:20,

80:24, 86:9
**REPORTER** [4] - 1:23, 109:5, 109:11, 109:24
**REPORTER'S** [1] - 1:14
**reporting** [4] - 25:12, 27:20, 40:24, 41:2
**reports** [1] - 49:13
**represent** [2] - 4:22, 71:22
**represented** [1] - 5:22
**representing** [1] - 98:19
**request** [1] - 26:19
**requested** [1] - 28:25
**require** [2] - 9:5, 85:14
**required** [1] - 7:3
**requiring** [6] - 58:21, 59:5, 59:17, 65:19, 65:22, 67:19
**residence** [3] - 9:13, 11:4, 17:5
**resist** [1] - 97:23
**resisting** [6] - 14:9, 15:5, 97:6, 97:9, 97:11, 97:20
**respective** [1] - 56:20
**respond** [1] - 27:16
**responded** [1] - 73:18
**responds** [3] - 13:17, 46:11, 87:19
**response** [10] - 26:8, 26:9, 44:15, 45:8, 45:20, 52:17, 52:19, 64:22, 66:17
**responsibility** [1] - 87:13
**responsible** [3] - 28:18, 76:20, 76:23
**rest** [1] - 96:10
**restate** [1] - 101:8
**restlessness** [1] - 77:11
**retain** [2] - 35:4, 36:10
**retained** [4] - 34:21, 36:16, 36:17, 37:5
**retire** [2] - 55:12, 107:7
**return** [1] - 105:8
**reveal** [1] - 81:14
**review** [23] - 35:4, 38:4, 38:7, 38:15, 39:2, 49:24, 57:3, 57:7, 58:19, 58:24, 61:5, 61:16, 61:21, 64:16, 64:20, 65:18, 70:20, 70:22, 70:24, 75:18, 80:9, 86:13, 98:25

**reviewed** [15] - 5:8, 38:12, 38:22, 39:1, 43:20, 61:23, 64:10, 66:16, 68:17, 68:19, 68:21, 70:18, 71:2, 71:4, 72:4
**reviewing** [3] - 38:4, 62:1, 79:12
**reviews** [1] - 35:17
**ride** [1] - 90:16
**rights** [1] - 29:2
**rise** [6] - 4:5, 55:15, 56:15, 56:17, 108:13, 109:1
**risk** [12] - 9:5, 22:13, 27:25, 63:10, 67:10, 72:9, 72:13, 72:22, 77:3, 80:13, 80:14, 87:19
**roadmap** [2] - 4:15, 5:5
**Roger** [1] - 18:11
**role** [7] - 35:14, 36:9, 36:11, 81:4, 86:22, 90:23, 91:19
**ROOM** [1] - 1:24
**room** [9] - 12:8, 12:14, 12:23, 21:7, 55:12, 75:23, 90:9, 95:10, 107:7
**roughly** [1] - 22:25
**route** [1] - 41:7
**routinely** [2] - 69:15, 87:23
**row** [1] - 53:9
**rule** [1] - 7:3
**rules** [4] - 7:9, 7:13, 7:24, 9:7
**run** [2] - 107:21, 108:6
**running** [1] - 34:20

---

**S**

**safe** [2] - 44:19, 54:11
**safely** [2] - 6:16, 7:12
**Sam** [1] - 32:16
**SAME** [1] - 109:15
**San** [14] - 4:4, 5:20, 5:22, 6:15, 6:17, 8:16, 13:12, 18:25, 25:4, 39:3, 48:9, 48:15, 58:20, 58:25
**SAN** [6] - 1:9, 2:5, 2:8, 2:11, 2:14, 2:18
**Sanders** [1] - 83:6
**Santa** [1] - 36:20
**Saturday** [2] - 49:4, 50:2
**save** [5] - 60:17, 65:10, 67:5, 73:5,

81:1
**saves** [1] - 65:16
**saving** [2] - 41:14, 90:18
**saw** [12] - 22:11, 24:8, 24:20, 24:21, 65:15, 73:19, 74:16, 75:19, 84:5, 92:25, 96:23
**SCA** [3] - 79:25, 80:16, 81:9
**scared** [2] - 26:24, 97:5
**scene** [19] - 17:3, 22:6, 22:9, 22:16, 26:6, 57:23, 69:1, 70:11, 70:15, 71:9, 72:20, 72:25, 73:18, 73:23, 73:25, 98:13, 102:23, 104:20, 104:21
**scheduled** [1] - 31:9
**school** [1] - 10:4
**score** [7] - 47:17, 52:4, 52:7, 53:13, 53:17, 53:18
**scores** [2] - 52:12, 53:8
**screaming** [1] - 95:9
**screen** [2] - 77:6, 85:25
**screening** [11] - 9:8, 42:10, 42:12, 42:21, 42:22, 43:21, 43:25, 60:11, 60:12, 75:6, 83:18
**scroll** [1] - 51:2
**seated** [1] - 32:12
**seats** [3] - 4:8, 55:21, 56:20
**second** [15] - 20:23, 29:16, 29:17, 30:9, 30:19, 31:8, 34:14, 40:12, 44:8, 79:22, 95:5, 104:19, 107:2, 108:12
**secret** [1] - 92:14
**security** [3] - 65:20, 66:5, 81:1
**sedative** [3] - 46:7, 46:10, 46:14
**see** [34] - 12:18, 12:21, 13:10, 19:17, 24:22, 29:13, 30:1, 31:9, 42:18, 43:8, 43:10, 44:10, 44:21, 45:6, 45:9, 45:10, 45:24, 49:10, 51:11, 52:12, 53:18, 56:14, 59:12, 61:5, 65:25, 66:13, 75:22, 82:13, 87:21,

91:24, 93:8, 108:9, 108:24
**seeing** [2] - 46:25, 77:13
**seek** [2] - 6:5, 94:5
**seeking** [1] - 6:4
**sees** [2] - 13:22, 14:3
**seize** [1] - 103:21
**seizing** [1] - 15:20
**seizure** [4] - 54:24, 72:12, 72:15, 72:18
**seizures** [2] - 46:25, 58:1, 67:11
**send** [1] - 30:6
**sense** [2] - 20:18, 95:14
**sentences** [1] - 95:16
**SEONHAE** [1] - 2:16
**separate** [1] - 33:7
**series** [1] - 44:14
**serious** [4] - 54:17, 54:23, 88:7, 88:14
**serve** [1] - 7:11
**service** [2] - 53:24, 62:23
**services** [2] - 50:15, 69:2
**SET** [1] - 109:14
**set** [4] - 8:25, 30:24, 47:9, 48:3
**setting** [2] - 65:6, 87:11
**settlement** [1] - 36:4
**several** [2] - 95:6, 98:9
**severe** [3] - 52:14, 53:22, 103:8
**severity** [1] - 103:25
**shake** [1] - 93:11
**shakes** [1] - 46:19
**shape** [1] - 12:8
**share** [3] - 18:17, 18:18, 66:17
**shared** [2] - 10:2, 10:11
**sheet** [1] - 53:19
**Sheriff** [1] - 18:12
**Sheriff's** [8] - 8:15, 13:12, 39:3, 58:21, 58:25, 64:2, 67:18, 95:24
**shift** [1] - 24:9
**SHIN** [1] - 2:16
**shocking** [1] - 12:22
**short** [5] - 8:25, 62:5, 81:20, 81:21, 97:8
**short-term** [1] - 8:25
**shorthand** [1] - 7:22
**show** [12] - 20:12, 21:1, 21:15, 21:19, 23:7, 24:14, 29:6,

29:24, 30:3, 31:11, 62:3, 92:14
**showed** [5] - 57:3, 57:7, 61:16, 77:5, 95:6
**shower** [1] - 91:6
**showering** [1] - 91:4
**siblings** [1] - 11:8
**sick** [1] - 27:4
**side** [3] - 12:12, 34:24, 59:8
**sided** [2] - 55:25, 56:12
**significance** [3] - 40:22, 44:16, 88:12
**significant** [1] - 92:13
**signs** [6] - 25:25, 42:15, 76:4, 77:18, 85:23, 103:7
**similar** [1] - 66:17
**simple** [1] - 63:18
**simplest** [1] - 47:6
**simply** [2] - 20:17, 21:1
**sister** [1] - 89:13
**sit** [5] - 19:9, 59:10, 70:19, 71:1, 80:2
**sitting** [3] - 19:15, 36:25, 107:25
**situation** [1] - 13:19
**six** [3] - 9:18, 21:3, 31:10
**Skaggs** [13] - 16:9, 20:11, 27:9, 28:13, 28:21, 28:23, 29:3, 79:8, 79:24, 80:7, 80:16, 86:14, 86:17
**skipped** [1] - 71:16
**skyrocket** [1] - 47:1
**slurring** [1] - 15:2
**small** [1] - 33:15
**smaller** [1] - 34:1
**smell** [9] - 25:25, 58:3, 77:15, 85:14, 92:21, 93:2, 95:13, 95:18, 105:13
**smelled** [3] - 25:12, 57:15, 86:8
**smelling** [1] - 57:13
**smells** [2] - 75:13, 88:17
**smoke** [1] - 91:9
**snow** [7] - 27:9, 27:14, 27:18, 28:23, 29:3, 86:13, 86:17
**Snow** [6] - 16:7, 20:11, 79:8, 79:25, 80:16, 81:9
**snow's** [1] - 81:22
**sober** [1] - 92:15

**someone** [14] - 6:8, 6:16, 7:1, 7:5, 7:9, 9:4, 13:6, 17:22, 77:2, 82:1, 82:3, 82:4, 99:11, 103:22

**sometime** [1] - 49:4

**sometimes** [16] - 12:24, 34:23, 35:10, 35:24, 36:8, 36:19, 45:20, 46:18, 53:8, 56:10, 73:4, 73:13, 74:18, 92:22, 93:11, 93:12

**son** [13] - 14:17, 15:19, 16:5, 16:24, 17:8, 23:21, 24:1, 27:1, 27:5, 27:20, 28:9, 28:22, 67:9

**son's** [6] - 13:13, 23:13, 24:13, 24:23, 27:8, 67:11

**sorry** [7] - 41:19, 81:24, 82:2, 99:2, 99:16, 105:16, 106:14

**sort** [5] - 12:9, 14:5, 34:16, 52:11, 62:1

**sound** [1] - 34:18

**sounded** [1] - 26:23

**sounds** [2] - 24:2, 41:6

**source** [4] - 60:16, 65:13, 73:5, 81:21

**south** [1] - 21:10

**speaker** [1] - 105:9

**speakerphone** [1] - 96:1

**speaking** [6] - 22:9, 31:25, 52:25, 74:22, 99:24, 104:4

**speaks** [1] - 101:21

**special** [1] - 91:11

**Specialist** [2] - 17:24, 19:1

**specific** [6] - 45:4, 58:23, 78:14, 80:3, 80:10, 89:21

**specifically** [1] - 90:24

**speculation** [7] - 41:22, 62:8, 66:10, 92:5, 98:2, 101:16, 106:3

**speech** [1] - 15:2

**spell** [2] - 32:14, 89:4

**spend** [2] - 10:14, 36:9

**spending** [1] - 90:19

**spent** [2] - 46:15, 90:15

**splitting** [1] - 54:24

**sports** [1] - 107:9

**spread** [1] - 34:8

**squad** [1] - 98:11

**SS** [1] - 109:8

**stack** [1] - 12:25

**staff** [61] - 6:22, 6:25, 7:5, 7:7, 7:16, 16:13, 18:1, 18:17, 29:22, 30:1, 30:4, 30:10, 33:25, 36:13, 43:18, 44:19, 45:1, 45:17, 45:23, 58:6, 58:8, 58:10, 58:14, 58:15, 59:13, 61:8, 62:21, 63:1, 63:3, 63:8, 63:14, 63:17, 63:21, 63:23, 64:3, 64:8, 64:13, 64:20, 64:24, 64:25, 65:7, 65:15, 65:19, 65:20, 65:23, 66:5, 66:7, 66:16, 67:16, 67:23, 74:20, 75:1, 75:16, 76:23, 79:4, 79:6, 81:1, 86:23

**staff's** [1] - 64:8

**stage** [2] - 17:25, 91:2

**stand** [3] - 26:23, 56:21, 88:25

**standard** [17] - 15:10, 47:9, 48:13, 50:25, 60:18, 60:25, 62:11, 62:20, 62:25, 63:11, 64:4, 65:1, 65:5, 80:17, 87:10, 87:16

**standardizes** [1] - 52:9

**standards** [1] - 85:21

**standing** [2] - 100:5, 100:11

**start** [15] - 11:6, 13:9, 15:19, 19:2, 32:5, 44:24, 45:17, 53:7, 53:10, 53:12, 78:17, 85:20, 92:10, 107:19, 108:7

**started** [14] - 11:12, 21:5, 29:20, 33:2, 33:16, 34:1, 34:9, 34:11, 36:14, 68:14, 71:15, 95:8, 106:25, 108:22

**starting** [4] - 16:11, 53:20, 53:22, 106:23

**starts** [2] - 13:5, 88:15

**state** [7] - 24:22, 32:13, 35:12, 35:16, 36:20, 69:14, 89:3

**State** [3] - 34:25, 35:10, 35:21

**STATE** [1] - 109:9

**STATEMENT** [1] - 3:4

**statement** [10] - 4:10, 5:4, 6:14, 98:13, 99:7, 100:6, 100:11, 101:1, 102:16, 104:19

**statements** [4] - 4:12, 98:15, 98:17, 99:4

**STATES** [4] - 1:1, 1:1, 1:4, 109:12

**States** [1] - 37:5

**status** [3] - 23:14, 26:21, 28:9

**stay** [3] - 20:21, 20:22, 26:17

**stayed** [2] - 22:5, 54:10

**stays** [2] - 8:25, 9:25

**STENOGRAPHIC** [1] - 109:18

**STENOGRAPHICALLY** [1] - 109:13

**step** [6] - 42:9, 46:1, 47:6, 55:20, 88:22, 108:15

**steps** [4] - 6:24, 6:25, 31:5, 42:20

**stiff** [1] - 94:24

**still** [4] - 30:22, 35:15, 35:21, 75:13

**stimulation** [2] - 46:12, 46:16

**stipulated** [5] - 39:9, 43:24, 48:15, 99:14, 100:15

**stop** [12] - 14:10, 14:11, 18:8, 39:20, 45:19, 46:17, 53:1, 53:8, 54:10, 72:15, 87:8

**stories** [1] - 23:12

**story** [1] - 26:13

**strapped** [1] - 14:4

**street** [1] - 76:14

**STREET** [1] - 1:24

**strike** [4] - 54:12, 64:15, 67:7, 70:7

**stroke** [1] - 67:11

**strong** [2] - 45:20, 63:5

**stronger** [1] - 12:20

**structure** [1] - 9:19

**struggle** [1] - 24:16

**struggling** [1] - 92:10

**stuff** [3] - 13:6, 90:20, 91:12

**subject** [1] - 61:22

**subjective** [3] - 51:10, 51:13, 87:11

**submitted** [4] - 49:16, 55:11, 84:16, 107:7

**subsequent** [3] - 83:23, 84:2, 84:3

**subsequently** [1] - 80:21

**substance** [6] - 33:18, 41:2, 52:22, 78:20, 78:23, 86:2

**substance-related** [1] - 86:2

**substances** [1] - 47:4

**substantial** [1] - 19:22

**Substation** [1] - 8:15

**substation** [2] - 15:16, 15:17

**successor** [1] - 5:1

**sudden** [3] - 45:19, 47:19, 53:2

**suddenly** [1] - 87:12

**sued** [1] - 23:18

**suffering** [1] - 16:17

**sufficient** [1] - 60:7

**suicidal** [1] - 64:6

**suicidality** [1] - 88:2

**suicide** [3] - 63:6, 87:19, 87:20

**suitable** [1] - 102:18

**SUITE** [3] - 2:5, 2:7, 2:10

**summer** [3] - 10:22, 10:23, 10:25

**Summer** [3] - 5:9, 7:18, 11:20

**sunshine** [1] - 10:13

**supervisor** [1] - 28:3

**supervisors** [1] - 28:14

**supposed** [6] - 6:16, 6:18, 6:25, 19:18, 59:11, 66:25

**surgery** [3] - 10:23, 12:10, 12:11

**surveillance** [1] - 75:18

**survive** [1] - 19:3

**sustained** [9] - 62:9, 66:11, 68:4, 92:7, 97:14, 98:3, 100:8, 101:17, 105:21

**sustains** [1] - 97:17

**swats** [1] - 14:5

**swatting** [1] - 13:10

**swaying** [4] - 13:4, 92:21, 93:8, 93:10

**sweat** [1] - 93:11

**sweating** [2] - 47:15, 77:13

**swim** [1] - 90:17

**switching** [2] - 93:23,

94:7

**sworn** [3] - 28:5, 32:11, 89:2

**sympathy** [2] - 10:17, 10:18

**symptoms** [10] - 53:20, 54:9, 54:16, 54:23, 55:4, 72:17, 77:5, 77:18, 93:8, 103:7

**system** [10] - 33:3, 33:14, 46:12, 52:10, 62:12, 62:19, 66:20, 66:25, 87:13

**systems** [3] - 59:16, 59:21, 63:22

**T**

**table** [1] - 51:6

**talks** [2] - 72:17, 73:24

**tallied** [1] - 53:13

**tandem** [1] - 59:20

**tasked** [1] - 22:2

**taught** [3] - 90:16, 90:17

**team** [1] - 31:19

**technical** [1] - 39:23

**temperature** [4] - 47:1, 50:11, 52:4, 77:10, 107:24

**ten** [6] - 10:22, 47:13, 50:11, 52:4, 77:10, 107:24

**term** [5] - 8:25, 36:6, 51:13, 55:3

**terms** [3] - 34:14, 63:11, 80:16

**terrified** [1] - 27:5

**test** [1] - 105:12

**testified** [2] - 28:20, 86:17

**testify** [10] - 21:17, 25:24, 27:4, 27:18, 27:23, 37:12, 37:20, 37:23, 86:20, 101:22

**testifying** [1] - 37:19

**testimony** [12] - 24:15, 28:5, 29:9, 55:25, 56:7, 79:2, 79:13, 84:10, 84:14, 84:17, 104:9, 104:15

**testing** [1] - 91:12

**THAT** [3] - 109:13, 109:15, 109:17

**THE** [83] - 3:7, 4:3, 4:5, 4:7, 17:13, 20:1, 32:2, 32:9, 32:10, 32:12, 32:15, 32:17, 37:19, 38:2, 39:10, 39:12, 39:17, 40:8, 40:17, 41:24, 42:1,

42:3, 44:1, 44:5, 48:16, 48:18, 48:22, 55:5, 55:15, 55:18, 56:15, 56:17, 56:19, 62:9, 66:11, 68:4, 68:6, 68:9, 80:19, 80:20, 85:10, 88:20, 88:22, 89:1, 89:3, 89:5, 89:6, 89:20, 90:2, 90:4, 92:7, 97:14, 98:3, 98:5, 99:16, 99:18, 99:21, 100:8, 100:17, 100:19, 101:8, 101:17, 101:21, 102:6, 102:7, 102:9, 104:9, 104:16, 104:17, 105:21, 106:5, 106:13, 106:14, 106:22, 107:1, 108:13, 108:15, 109:1, 109:11, 109:12, 109:13, 109:14, 109:15

**themselves** [1] - 59:10

**THEREAFTER** [1] - 109:15

**they've** [5] - 11:23, 17:10, 31:20, 33:9, 58:17

**thinking** [2] - 52:14, 56:13

**thinks** [1] - 37:20

**third** [4] - 24:9, 25:9, 45:5, 80:23

**thirds** [1] - 36:2

**THIS** [1] - 109:17

**threatening** [3] - 103:22, 104:6, 104:13

**three** [8] - 8:4, 17:20, 18:12, 41:9, 47:18, 53:4, 53:9, 86:4

**three-decade** [1] - 18:12

**three-quarters** [1] - 86:4

**throwing** [1] - 47:15

**TIME** [1] - 109:14

**timing** [1] - 19:4

**title** [1] - 82:7

**TO** [1] - 109:15

**today** [9] - 36:25, 37:11, 70:19, 71:1, 80:2, 84:7, 84:17, 89:10, 89:17

**together** [7] - 5:21, 10:5, 10:14, 11:14, 12:6, 90:16, 94:14

**tomorrow** [5] - 107:4, 107:12, 108:5, 108:9, 108:25

**tonight** [1] - 107:8

**took** [6] - 21:2, 25:25, 31:5, 70:11, 76:4, 95:21

**tool** [10] - 47:9, 47:11, 47:14, 48:2, 48:6, 60:11, 60:12, 77:2

**tools** [4] - 47:12, 47:24, 53:16, 78:15

**top** [2] - 38:13, 52:3

**topic** [1] - 79:19

**total** [1] - 21:3

**touch** [1] - 24:23

**track** [1] - 47:18

**traffic** [3] - 107:17, 107:21, 108:6

**train** [4] - 36:13, 52:9, 59:10, 59:13

**trained** [4] - 7:16, 18:15, 25:21, 88:15

**training** [14] - 21:9, 33:13, 58:24, 59:1, 59:15, 59:18, 60:3, 60:20, 62:20, 62:24, 62:25, 65:16, 69:6, 69:11

**TRANSCRIPT** [1] - 1:14

**TRANSCRIPTION** [2] - 109:16, 109:17

**transcripts** [3] - 38:9, 38:15, 68:19

**transfer** [5] - 16:15, 29:16, 60:21, 64:23, 67:22

**transferred** [4] - 16:8, 16:15, 66:15, 79:5

**transition** [1] - 92:2

**transmit** [1] - 67:3

**transmitted** [2] - 64:17, 65:23

**transport** [2] - 43:8, 70:8

**transported** [3] - 42:6, 69:20, 70:12

**transports** [1] - 74:2

**treatment** [3] - 45:12, 61:25, 76:24

**tremens** [5] - 16:13, 19:2, 19:3, 46:22, 72:7

**tremors** [2] - 46:18, 93:12

**Triage** [1] - 15:7

**trial** [2] - 5:10, 7:3

**tried** [8] - 13:14, 23:11, 27:11, 29:6, 29:22, 94:13, 94:18, 102:24

**trigger** [2] - 77:16, 91:9

**triggers** [1] - 45:25

**trod** [1] - 65:12

**trouble** [1] - 97:5

**truck** [7] - 14:8, 96:16, 96:20, 97:3, 97:11, 97:22

**TRUE** [1] - 109:17

**true** [2] - 73:14, 82:10

**truth** [4] - 20:8, 24:17, 31:11, 73:10

**truthfully** [1] - 87:5

**try** [10] - 7:21, 33:8, 34:22, 39:24, 60:12, 61:18, 61:24, 75:15, 94:10, 108:4

**trying** [4] - 28:12, 43:1, 61:6, 94:5

**TUESDAY** [2] - 1:15, 4:1

**turn** [1] - 25:9

**twice** [1] - 21:20

**two** [12] - 24:24, 36:2, 46:9, 50:24, 54:11, 57:20, 59:14, 64:21, 66:16, 86:6, 92:20, 98:16

**two-thirds** [1] - 36:2

**Type** [1] - 8:24

**type** [17] - 9:2, 9:4, 14:21, 17:25, 35:8, 41:11, 45:11, 45:12, 53:4, 59:5, 59:7, 61:21, 62:17, 63:9, 66:4, 66:14, 66:21

**types** [9] - 6:9, 9:23, 12:12, 49:9, 49:20, 49:23, 50:14

**TYPEWRITTEN** [1] - 109:15

**typical** [3] - 27:21, 28:1, 63:21

**typically** [2] - 26:5, 66:8

**U**

**U.S** [3] - 34:25, 35:3, 35:4

**ugly** [1] - 78:22

**Umphlett** [19] - 17:2, 20:11, 22:23, 23:4, 23:8, 23:11, 23:20, 23:24, 24:1, 24:2, 24:4, 24:8, 73:15, 73:23, 74:7, 98:18, 103:13, 104:1, 104:14

**Umphlett's** [1] - 70:22

**under** [18] - 8:23, 15:11, 28:5, 41:11, 45:5, 47:3, 52:17, 52:21, 53:14, 54:3, 54:4, 57:2, 57:4, 57:8, 57:12, 58:11, 75:9, 75:14

**unfortunately** [2] - 30:25, 31:10

**unit** [1] - 94:14

**UNITED** [4] - 1:1, 1:1, 1:4, 109:11

**United** [1] - 37:5

**unless** [2] - 37:22, 52:22

**unresponsive** [1] - 31:2

**up** [41] - 8:12, 8:25, 10:2, 11:10, 12:4, 12:25, 13:23, 16:7, 26:12, 26:13, 30:24, 31:19, 33:4, 33:17, 34:7, 37:21, 37:24, 46:11, 46:15, 46:24, 47:15, 47:17, 47:18, 50:4, 50:7, 52:7, 53:17, 53:18, 53:21, 54:20, 54:24, 55:8, 56:24, 63:25, 66:24, 67:9, 69:17, 86:3, 88:12, 107:22, 108:3

**update** [1] - 108:17

**upset** [4] - 13:5, 94:16, 94:19, 94:21

**utility** [1] - 47:24

**V**

**vacuum** [1] - 18:2

**Valley** [14] - 8:6, 8:15, 9:11, 9:13, 11:4, 15:14, 15:16, 16:15, 16:16, 17:6, 20:22, 29:16, 30:7

**value** [5] - 10:19, 19:11, 19:21, 19:22

**variety** [1] - 87:25

**vehicle** [2] - 13:19, 14:13

**venters** [1] - 32:20

**VENTERS** [1] - 3:8

**Venters** [16] - 18:6, 32:8, 32:15, 38:4, 39:19, 40:3, 40:21, 41:19, 44:7, 48:24, 51:4, 51:20, 56:24, 66:13, 68:12, 85:13

**verbally** [3] - 94:16,

104:14

**Umphlett's** [1] - 70:22

94:23, 95:16

**versus** [1] - 4:4

**Victor** [1] - 32:15

**Victorville** [3] - 8:4, 9:14

**video** [4] - 25:16, 38:10, 75:18, 75:19

**view** [1] - 33:7

**violate** [1] - 65:1

**violent** [3] - 13:7, 94:22, 95:16

**visiting** [1] - 11:15

**visits** [2] - 30:17, 83:23

**visually** [1] - 92:18

**vital** [3] - 25:25, 42:15, 76:4

**vocational** [1] - 104:7

**vodka** [1] - 12:20

**voice** [2] - 100:1, 100:24

**voiced** [1] - 23:16

**voir** [1] - 6:1

**voluntarily** [1] - 30:15

**vomiting** [1] - 52:2

**VS** [1] - 1:8

**vulnerability** [1] - 9:4

**W**

**waffle** [1] - 23:13

**wait** [3] - 13:1, 31:23, 107:10

**waiting** [1] - 107:25

**walk** [2] - 13:22, 20:19

**walked** [1] - 96:9

**walking** [1] - 13:22

**walks** [1] - 13:23

**wane** [1] - 55:3

**wanna** [1] - 24:10

**wants** [1] - 15:6

**warned** [2] - 28:24, 30:20

**warnings** [1] - 28:12

**WAS** [1] - 109:15

**waste** [1] - 5:13

**wasted** [1] - 107:24

**wasting** [1] - 19:4

**watch** [2] - 16:4, 107:9

**wave** [3] - 54:19, 54:20, 54:22

**waver** [1] - 54:17

**waves** [4] - 46:24, 54:16, 54:25, 55:4

**wax** [1] - 55:3

**ways** [2] - 10:7, 91:14

**Wednesday** [2] - 12:15, 13:21

**week** [3] - 5:15, 12:4

**weekend** [1] - 49:1
**weeks** [3] - 5:11, 12:10, 46:15
**WEST** [4] - 1:24, 2:4, 2:7, 2:10
**West** [7] - 9:11, 15:13, 16:15, 16:16, 20:22, 29:16, 30:7
**WESTERN** [1] - 1:2
**whole** [2] - 49:3, 87:25
**wife** [1] - 13:14
**william** [1] - 74:8
**William** [31] - 4:25, 5:1, 6:12, 7:22, 9:16, 9:24, 10:3, 10:7, 11:5, 13:22, 14:1, 14:5, 14:7, 14:12, 16:10, 17:15, 19:10, 37:17, 61:6, 61:11, 68:1, 68:14, 69:1, 72:22, 74:12, 76:9, 77:19, 80:12, 84:20, 84:24
**withdraw** [5] - 23:24, 26:9, 27:20, 27:25, 51:9
**withdrawal** [45] - 7:14, 16:12, 16:20, 22:13, 45:18, 45:20, 45:25, 46:5, 46:17, 46:22, 47:5, 47:10, 47:11, 48:4, 48:7, 48:8, 48:10, 48:14, 51:1, 51:5, 52:15, 53:2, 53:4, 53:23, 54:2, 54:14, 54:17, 58:16, 60:8, 61:7, 63:10, 64:12, 68:13, 72:17, 78:20, 78:21, 85:20, 85:23, 86:3, 87:14, 87:22, 88:1, 92:3, 103:23
**withdrawals** [14] - 15:24, 54:9, 72:10, 72:13, 72:22, 76:12, 76:17, 77:3, 80:13, 83:21, 103:25, 104:5, 104:13
**withdrawing** [2] - 51:7, 78:23
**WITNESS** [9] - 32:15, 42:1, 80:20, 89:5, 90:4, 98:5, 102:7, 104:17, 106:14
**witness** [8] - 29:23, 32:6, 32:11, 37:22, 56:21, 88:23, 89:2
**witnesses** [9] - 21:17, 24:12, 24:18, 25:3, 25:4, 25:8, 25:10, 29:9, 38:15
**WITNESSES** [1] - 3:6
**word** [3] - 63:20, 72:5, 72:7
**words** [5] - 60:8, 64:17, 87:9, 95:15, 95:17
**works** [3] - 32:22, 60:3, 64:2
**worried** [15] - 15:19, 15:22, 15:23, 17:8, 27:4, 28:10, 38:24, 42:19, 65:14, 72:11, 78:23, 93:17, 103:20, 105:19
**worry** [3] - 45:2, 78:20, 85:18
**worse** [5] - 30:21, 54:25, 55:4, 108:23
**worst** [1] - 54:9
**write** [1] - 49:10
**writes** [2] - 14:24, 15:1
**writing** [1] - 84:11
**wrote** [2] - 49:6, 49:19

**Y**

**year** [4] - 33:24, 49:17, 92:12, 92:20
**years** [13] - 9:18, 10:22, 33:5, 34:6, 34:7, 36:12, 46:15, 86:3, 89:14, 89:15, 90:14, 91:1, 92:16
**yelling** [3] - 13:6, 94:22, 95:9
**York** [7] - 33:3, 33:11, 33:13, 33:21, 34:3, 35:19, 59:22
**younger** [1] - 11:6
**youngest** [1] - 9:17
**yourself** [2] - 26:24, 89:11
**yourselves** [2] - 55:10, 107:5

**Z**

**zero** [3] - 52:4, 53:9, 54:7
**zone** [1] - 54:11
**zooming** [1] - 51:24