# EXHIBIIT D

1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
2                  CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
3                           - - -
                  HONORABLE R. GARY KLAUSNER
4          UNITED STATES DISTRICT JUDGE PRESIDING
                            - - -
5

6     FRANCES ENYART, ET AL.,              )
                                           )
7              PLAINTIFFS,                  )
                                           )
8     VS.                                   )    CASE NO.:
                                           )    CV 23-00540-RGK
9     COUNTY OF SAN BERNARDINO,            )
      ET AL.,                              )
10                                          )
               DEFENDANTS.                  )
11    _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 WEDNESDAY, MAY 22, 2024

16                 LOS ANGELES, CALIFORNIA

17

18

19

20

21

22

23            LAURA MILLER ELIAS, CSR 10019
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA 90012
25                 PH:  (213) 894-0374


                  UNITED STATES DISTRICT COURT

```
 1
     APPEARANCES OF COUNSEL:
 2
     ON BEHALF OF PLAINTIFF:
 3
                 PHG LAW GROUP
 4               BY: DANIELLE PENA, ESQ.
                 501 WEST BROADWAY
 5               SUITE 1480
                 SAN DIEGO, CA 92101
 6
                 GRACE JUN, ESQ.
 7               501 WEST BROADWAY
                 SUITE 1480
 8               SAN DIEGO, CA 92101

 9               LAW OFFICES OF JOE McMULLEN
                 BY:  JOE McMULLEN, ESQ.
10               501 WEST BROADWAY
                 SUITE 1510
11               SAN DIEGO, CA 92101

12

13   ON BEHALF OF DEFENDANTS:

14
                 SAN BERNARDINO COUNTY COUNSEL
15               BY: JACOB RAMIREZ
                     ADAM MIEDERHOFF
16                   SEONHAE (KELLIE) SHIN
                 DEPUTY COUNTY COUNSEL
17
                 385 NORTH ARROWHEAD AVENUE
18               FOURTH FLOOR
                 SAN BERNARDINO, CA 92415
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1
                              INDEX
 2   WITNESSES FOR
     THE PLAINTIFF:
 3                          DIRECT    CROSS    REDIRECT    RECROSS
     KELLEY, AMANDA
 4   BY:  MS. PENA                                26
     BY:  MR. RAMIREZ                  6                       29
 5
     CLARK, ROGER
 6   BY:  MS. JUN          31                     55
     BY:  MR. MIEDERHOFF              46                       57
 7
     CONLEY, RONALD
 8   BY:  MR. McMULLEN      59                     108
     BY:  MR. RAMIREZ                 97
 9
     UMPHLETT, CARA
10   BY:  MR. McMULLEN     111                     139
     BY:  MR. RAMIREZ                118
11
     SAN BARTOLOME, MARIO
12   BY:  MS. JUN          141                     172
     BY:  MR. MIEDERHOFF             163
13
     SNOW, APRIL
14   BY:  MR. McMULLEN     174
     BY:  MR. RAMIREZ                180
15
     SKAGGS, TROY
16   BY:  MR. McMULLEN     183                     188
     BY:  MR. RAMIREZ                187
17
     ENYART, FRANCES
18   BY:  MS. JUN          189
     BY:  MR. RAMIREZ                217
19
           EXHIBITS     RECEIVED        EXHIBIT     RECEIVED
20           102            7              12          150
             103            9              15          150
21           104            9              52          155
               3           10              53          155
22            99           65              55          155
              6D           84              42          185
23             2          125              97          193
                                           62          214
24

25
```

UNITED STATES DISTRICT COURT

```
 1        LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 22, 2024; 8:32 A.M.

 2                              - - -

 3             THE CLERK:  Calling Calendar Item No. 1.

 4             Case No. CV 23-540.

08:26AM 5      Frances Enyart versus County of San Bernardino.

 6               (Appearances as heretofore stated.)

 7             THE COURT:  The jury is not present.

 8             We had a call I wanted to bring up.  Juror No. 1

 9      indicated yesterday that he couldn't be in Thursday morning

08:32AM10     because he had to sign papers and has business to do on the

11      outside.  I said he's obligated to be here, and so that's not

12      an excuse.  You know, the Court doesn't run on -- on the

13      convenience of some business somewhere or another.  So he

14      just called this morning and said since I'm not gonna be in

08:33AM15     tomorrow, I'm not gonna bother coming in today.

16             I've ordered him in, but I'm going to excuse him as

17      member of the jury.  We have eight.  We will have seven when

18      he's gone.  All we need is six.  I'm gonna excuse him, and I

19      wanted to let you know that.

08:33AM20            MS. PENA:  Just for clarification, is it Juror No.

21      3?

22             THE COURT:  Juror No. 1.  Did you hear most of what

23      I said.

24             MS. PENA:  We heard a little bit, something about

08:33AM25     we're going to excuse Juror No. 1.
```

```
 1              THE COURT:  We're going to be excusing Juror No. 1.
 2              I wonder why the Mik stopped.  And I explained why
 3      he's not coming in, and he can talk about.  But as long as
 4      there's no objection, at 8:30, we're gonna bring the jury in
08:34AM 5      and get going.  We'll be in recess until the jury gets in.
 6              THE CLERK:  All rise.  This court is in recess.
 7                     (Recess taken.)
 8              THE CLERK:  All rise.
 9                     (Jury present.)
08:40AM10              THE COURT:  Okay.  The record will reflect that all
11      the members of the jury are in their respective seats in the
12      jury box.  Hopefully, you didn't think about this case last
13      night.  Did anybody watch the Dodger game yesterday?  So how
14      am I gonna find out the score if none of you watched it?
08:41AM15      Nobody?  Okay.
16              All the jurors are in their respective seats of the
17      juror box except for Juror No. 1.  We've run into a problem
18      this morning.  Juror No. 1 will not be with us this morning
19      and may not be with us for the rest of the trial.  So we're
08:41AM20      gonna be proceeding without him.
21              Uh, any questions that you have?  If not?  You're
22      ready to get started?  You ready to get back into the
23      testimony?  Okay, I'm with you.
24              Do you want to put your witness back on the stand?
08:41AM25              MS. PENA:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT

1              THE COURT:  Thank you very much.  Restate your name

2    again, and remember you're still under oath.  And if you

3    could restate your name again?

4              THE WITNESS:  Amanda Kelley.

08:42AM 5              THE COURT:  Okay.

6              And this is cross-examination, Counsel.

7              MR. RAMIREZ:  Yes, Your Honor.  Thank you.

8                        CROSS-EXAMINATION

9    BY MR. RAMIREZ:

08:42AM 10   Q.   Good morning, Ms. Kelley.

11   A.   Good morning.

12   Q.   I'm gonna go back a little in time back to before

13   deputies at arrived at your house.  You say you were having

14   an intervention with your brother; correct?

08:42AM 15   A.   Yes, that's correct.

16   Q.   And you didn't have any formal trainings in alcohol

17   interventions; correct?

18   A.   I'm sorry, I don't understand the question.

19   Q.   You didn't have any formal training with how to conduct

08:42AM 20   an intervention for an individual with alcoholism, did you?

21   A.   I'm sorry, I'm a little confused.  I'm not understanding

22   what you're asking me.

23              THE COURT:  Why don't you just state it again.

24              MR. RAMIREZ:  Okay.

08:42AM 25              THE COURT:  And listen carefully to what he's

1    asking.

2    BY MR. RAMIREZ:

3    Q.   Isn't it true, Ms. Kelley, you did not have any formal

4    training in how to conduct an intervention for an individual

08:42AM 5    with alcoholism?

6             THE COURT:  Have you had any formal training in

7    that area?

8             THE WITNESS:  Uh, no.

9             THE COURT:  Okay.

08:43AM 10   BY MR. RAMIREZ:

11   Q.   And you're not aware of anyone in your family having

12   that type of training, are you.

13   A.   In specifics?  Not to my knowledge.

14   Q.   So in the process of the intervention, you personally

08:43AM 15   took cell phone video of what was occurring; correct?

16   A.   I remember I did take a video.

17            MR. RAMIREZ:  Your Honor, I'd like to identify for

18   the record as Exhibit 102.

19            THE COURT:  Okay.

08:43AM 20            MR. RAMIREZ:  A phone video and move it into

21   evidence.  It's stipulated evidence.

22            THE COURT:  Again, is it Exhibit 102?

23            MR. RAMIREZ:  Correct.

24            THE COURT:  It may be received.

08:43AM 25                     (Exhibit 102 admitted.)

```
 1                    MR. RAMIREZ:  May we publish it to the jury?

 2                    THE COURT:  Yes.  And counsel, both sides agree

 3          that since it's an exhibit in this matter, this audio, the

 4          reporter doesn't have to take it down because it's an

08:43AM  5  exhibit.

 6                    MR. RAMIREZ:  That's correct.

 7                    MS. JUN:  Yes, Your Honor.

 8                    THE COURT:  Okay.  Thank you.

 9                         (Video played.)

08:45AM 10  BY MR. RAMIREZ:

11          Q.   That's a video that you took; correct?

12          A.   Yes, I did.

13          Q.   You wanted to document the way he was acting that day?

14          A.   Well, I saw what was going on, and I felt the need to

08:45AM 15  take a video.

16          Q.   And that's the way that you would typically see your

17          brother acting after, um, you'd seen him having alcohol or

18          after you'd experienced him having alcohol.

19          A.   Not to that degree.  There were times where he wasn't

08:45AM 20  behaving that way.

21                    MR. RAMIREZ:  Your Honor, for the record, I'd like

22          to identify Exhibit 103 for the record?

23                    THE COURT:  Okay.

24                    MR. RAMIREZ:  And we'd like to move it into

08:46AM 25  evidence as a stipulated exhibit.
```

1                    THE COURT:  103.  It'll be received.

2                    The last was 102?

3                    MR. RAMIREZ:  Correct.

4                    THE COURT:  And this is 103.

08:46AM 5            MR. RAMIREZ:  Correct.

6                    THE COURT:  Okay.

7                         (Exhibit 103 admitted.)

8                    MR. RAMIREZ:  May we publish it to the jury?

9                    THE COURT:  Yes, you may.

08:46AM 10                    (Video played.)

11   BY MR. RAMIREZ:

12   Q.   All right.  Again, this is another video you took the

13   same day; correct?

14   A.   Yes, it is.

08:46AM 15   Q.   The same intervention?

16   A.   Yes.

17                    MR. RAMIREZ:  At this time, I'd like to identify

18   for the record Exhibit 104 and move it into evidence as a

19   stipulated exhibit?

08:46AM 20                   THE COURT:  It may be received and may be

21   published.

22                         (Exhibit 104 admitted.)

23                    MR. RAMIREZ:  Thank you, Your Honor.

24                         (Video played.)

08:47AM 25   BY MR. RAMIREZ:

                 1    Q.   During this video, do you recall that was being captured

                 2    while your mother was speaking to dispatch?

                 3    A.   No, I was just videotaping.  There was no specific thing

                 4    that I was looking at at the time.

    08:47AM       5    Q.   And your brother, Nick Enyart, wasn't at the home at the

                 6    time you're taking this video; correct?

                 7    A.   I don't remember if he was or if he wasn't.

                 8    Q.   All right.  At some point, deputies do arrive at your

                 9    parents house; correct?

    08:48AM      10    A.   Yes.

                11    Q.   All right.  And then you testified that you had an

                12    opportunity to speak with Deputy Mammolito?

                13    A.   Yes, I did.

                14    Q.   You were still outside when you spoke with her; correct?

    08:48AM      15    A.   Yes, I was.

                16         MR. RAMIREZ:  At this time, Your Honor, I would

                17    like to designate for the record Exhibit 3, the entirety of

                18    the exhibit.

                19         THE COURT:  Okay.

    08:48AM      20         MR. RAMIREZ:  And move the entirety of the exhibit

                21    into evidence as stipulated?

                22         THE COURT:  Yes.

                23              (Exhibit 3 admitted.)

                24         MR. RAMIREZ:  May we publish it?

    08:48AM      25         THE COURT:  Yes.


                            UNITED STATES DISTRICT COURT

```
 1              MR. RAMIREZ:  And we're just gonna play a portion
 2    of it starting about the 7-minute, 39 mark.
 3              THE COURT:  Okay.
 4                      (Audio played.)
08:50AM 5   BY MR. RAMIREZ:
 6    Q.   You recognize the voice of that other individual
 7    speaking to you at that time?
 8    A.   I believe that's the voice of Officer Mammolito.
 9    Q.   All right.  So there was -- there were actually three
08:50AM10  different voices that we heard in there.  The first one would
11    be Deputy Mammolito that you spoke with; correct?
12    A.   That is correct.
13    Q.   And then the other voice is yours; correct?
14    A.   Yes.
08:50AM15  Q.   And then we just heard another voice.  Do you recall
16    that to be Deputy Umphlett?
17    A.   Yes, the voice sounds very familiar.  Sounds like her
18    voice.
19    Q.   All right.  And you recall at the time Deputy Umphlett
08:51AM20  trying to speak saying she was gonna go speak with your
21    parents; correct?
22    A.   Yes.
23              MR. RAMIREZ:  Why don't you go to the 12-minute
24    mark, please.  And this is still from Exhibit 3, Your Honor.
08:51AM25             Go ahead and play.
```

```
  1                         (Audio played.)

  2     BY MR. RAMIREZ:

  3     Q.    You were telling deputies that you believe -- you were

  4     telling Deputy Mammolito that you believed Deputy Conley did

08:51AM 5     a great job with your brother; correct?

  6     A.    Yes, I did.

  7     Q.    Now, when you were speaking with Deputy Mammolito, you

  8     were also expressing your concern about your brother's

  9     medical conditions; correct?

08:52AM10    A.    Yes.

  11    Q.    In fact, you were telling her that you believed that

  12    your brother had a problem with alcohol; right?

  13    A.    Yes.  I did.

  14    Q.    So much so that you believed he would die if he didn't

08:52AM15    get help; correct?

  16    A.    Well, with the education that I have and understanding I

  17    have --

  18              THE COURT:  That's not the question.  The question

  19    is whether or not you said this.

08:52AM20              THE WITNESS:  Oh, okay.  I'm sorry, Your Honor.

  21              THE COURT:  That's okay.

  22              THE WITNESS:  I apologize.  Yes.  I -- from -- from

  23    history and from knowing him for all his life, yes.

  24    BY MR. RAMIREZ:

08:52AM25    Q.    And you wanted him to get treatment even if he wouldn't
```

UNITED STATES DISTRICT COURT

```
  1   agree to get treatment; right?

  2   A.   I would hope he would get treatment.

  3   Q.   That's why you asked the deputies to take your brother

  4   5150; correct?

08:53AM 5   A.   Yes.

  6   Q.   You wanted the deputies to force him into a facility;

  7   correct?

  8   A.   I wanted him to get help.

  9   Q.   In fact, you thought that when the deputies showed up,

08:53AM10   they would just take your brother to a hospital; right?

 11   A.   Well, from my understanding of what I was told by

 12   officer Mammolito, it was explained to me that he was gonna

 13   get help for medications and be able to detox.  So I was okay

 14   with it at the time.

08:53AM15   Q.   You personally tried multiple ways to try to get your

 16   brother help before July 27th; right?

 17   A.   Yes.

 18   Q.   You tried to help him get to see doctors; right?

 19   A.   Yes.

08:53AM20   Q.   You tried to help him see counselors; right?

 21   A.   Yes.

 22   Q.   You tried to help him get other forms of treatment;

 23   right?

 24   A.   Yes.

08:54AM25   Q.   He refused every single one of those efforts, didn't he.
```

1    A.    No.  He was actually seeing a counselor.  I don't know

2    how often, but he was going to appointments for counseling.

3    Q.    You believed that he was in need of an intervention on

4    the 27th; right?

08:54AM 5    A.    Yes.

6    Q.    So you didn't think he was really getting the help that

7    he needed with the counselor that he was seeing, did you.

8    A.    I don't know.

9    Q.    All right.  So yesterday, there was some discussion with

08:54AM 10   the jury about conversations that you had with

11   Deputy Umphlett, and I want to just make sure I understand

12   the time line.  You spoke with Deputy Mammolito outside;

13   correct?

14   A.    Yes, I did.

08:54AM 15   Q.    And after you finished that conversation, that's when

16   you tried to go speak with the paramedics; correct?

17   A.    I'm sorry.  Can you repeat the question again?

18   Q.    After you finished giving your statement to

19   Deputy Mammolito, that's when you tried to go speak to the

08:55AM 20   paramedics; correct?

21   A.    Well, I went back inside my parents' house, and I

22   noticed the fire department had showed up.  And I went back

23   out to the front part of my parents, and that's when

24   Mammolito and I met in the driveway, and I had asked to speak

08:55AM 25   to them.

UNITED STATES DISTRICT COURT

```
 1    Q.   And that's when you were told to go back, that you

 2    couldn't speak with the paramedics at that time; right?

 3    A.   Yes.

 4    Q.   So you went back inside to be with your family; correct?

08:55AM 5   A.   I went back inside, and I met my parents and my brother,

 6    Nick, and Officer Umphlett in the kitchen.  They were

 7    finishing up speaking about what they saw.

 8    Q.   They were giving their statement to Deputy Umphlett;

 9    correct?

08:55AM10   A.   It was a tail end of a conversation.  I don't know

11    exactly all of it that they said.  I just remember what I

12    heard.

13    Q.   At that time, that's when you spoke with

14    Deputy Umphlett; correct?

08:56AM15   A.   No.

16    Q.   So your -- so you testimony is after she finished the

17    interview with the family, there was -- you had a subsequent

18    conversation with Deputy Umphlett?

19    A.   That is correct.  She went back out to get a business

08:56AM20   card for my mom, and she came back inside with the business

21    card and the report number on the back.  And that's when my

22    mother and I had an additional conversation with her.

23    Q.   And this was outside the house again.

24    A.   No.  It was inside.

08:56AM25   Q.   So Deputy Umphlett went outside your house, you went
```

```
 1   outside your house, and then you all went back inside.

 2   A.   I'm sorry, I'm not understanding the question.

 3   Q.   You went outside to speak to the paramedics, and then

 4   you came back in with your family; correct?

 5   A.   Yes.

 6   Q.   Deputy Umphlett went back outside to get a business

 7   card, and then she came back inside; correct?

 8   A.   I'm -- I'm sorry, I'm not following you.  It's very

 9   confusing what you're asking me.  I'm -- I'm sorry.  I'm

10   having a hard time following the question.

11   Q.   I'm trying to figure out the time line of events here.

12   You've told the jury that you had -- you went inside, and you

13   were in there with your family and Deputy Umphlett for a few

14   minutes at the tail end of a conversation; correct?

15   A.   Yes.

16   Q.   And then you said Deputy Umphlett went outside to get a

17   business card; correct?

18   A.   Yes.

19   Q.   You didn't follow her outside, did you?

20   A.   No.

21   Q.   All right.  She came back inside with the business card;

22   correct?

23   A.   Yes.

24   Q.   And that's when you had another conversation with her;

25   correct?
```

1    A.    More personalized, one-on-one with my mother and I, yes.

2    Q.    And you haven't heard any audio recordings of that

3    conversation, have you.

4    A.    No.

08:57AM 5    Q.    All right.  So when you spoke with Deputy Mammolito, you

6    told -- you didn't tell her your brother -- that you believed

7    your brother was gonna have life threatening alcohol

8    withdrawals, did you.

9    A.    Uh, I -- I said I was worried about him, and I didn't

08:58AM 10    want him to, you know. . . I -- I didn't want to be crying at

11    his funeral.

12    Q.    You did -- you said you were worried about your brother,

13    but you did not use the words that you believed your brother

14    would suffer life threatening withdrawal from alcohol, did

08:58AM 15    you.

16    A.    I don't remember.

17    Q.    And you didn't tell Deputy Mammolito you believed your

18    brother would suffer from delirium tremens or DTs, did you.

19    A.    I remember asking her if they were gonna -- I assumed

08:59AM 20    that they were gonna put him under a 72-hour hold, and she

21    said no.  And I remember her saying that it's good for him to

22    be where he's at because he'll be able to detox and get the

23    right medication he needs.

24          MR. RAMIREZ:  I'm gonna move to strike the response

08:59AM 25    as nonresponsive, Your Honor.


UNITED STATES DISTRICT COURT

1              THE COURT:  Why don't you state the question again.

2     BY MR. RAMIREZ:

3     Q.    You did not tell Deputy Mammolito that you believed your

4     brother was going to suffer from delirium tremens, also known

08:59AM 5     as DTs, did you.

6     A.    I don't recall if I said that.

7     Q.    And you told the jury yesterday that you had a

8     conversation with Deputy Mammolito where she told you you

9     couldn't spoke to the paramedics -- speak to the paramedics;

09:00AM 10    correct?

11    A.    Yes, I did.

12    Q.    And you asked her to relay information to them, didn't

13    you.

14    A.    I did.

09:00AM 15    Q.    You're a nurse, aren't you?

16    A.    Yes.

17    Q.    You understand the importance of giving an accurate and

18    complete medical history, don't you.

19    A.    Yes.

09:00AM 20    Q.    And the message that you asked Deputy Mammolito to relay

21    to the paramedics is that your brother had hypertension, and

22    that he required medication; correct?

23    A.    Yes.

24    Q.    You didn't say anything to her about relaying the fact

09:00AM 25    that you believed your brother was a chronic alcoholic, did

UNITED STATES DISTRICT COURT

1     you.

2     A.   I did relay that to -- I did relay that to her in the

3     original information I gave her.

4     Q.   You didn't tell her to report that to the paramedic like

09:00AM 5   you said about the other medical history, did you.

6     A.   Well, I. . . I thought giving my statement was enough

7     information that it was gonna be given to the right people so

8     he could get the right help.

9     Q.   Now, you said you didn't get a chance to speak to

09:01AM 10   paramedics; correct?

11    A.   No.  Uh, unfortunately, I wasn't allowed to.

12    Q.   But if your father testified at his deposition that you

13    and your brother got an opportunity to speak to the

14    paramedics about this information, he'd be incorrect then;

09:01AM 15   correct?

16    A.   I don't -- I don't recall.

17    Q.   You didn't ask Deputy Mammolito to relay the fact that

18    you believed your brother would suffer from life threatening

19    alcohol withdrawals, did you.

09:01AM 20   A.   In specifics?  No.  I gave her other information that he

21    was, in fact, a heavy alcoholic, and he needed help.

22    Q.   But you didn't know how much he would drink at any given

23    time, did you.

24    A.   Well, based on the alcohol bottles that we found and how

09:02AM 25   he was behaving and acting belligerent and not making any

            1    sense, he was talking to himself, I -- I was very concerned.

            2              MR. RAMIREZ:  Move to strike as nonresponsive.

            3              THE COURT:  Be stricken.

            4              State the question again.

09:02AM  5    BY MR. RAMIREZ:

            6    Q.   You did not know how much your brother would drink at

            7    any given time, did you.

            8    A.   The times that I did see him, he would drink a couple

            9    beers; however, he hid it from the entire family.

09:02AM 10    Q.   And when he would drink other than the couple beers, you

           11    had no idea what he was drinking; correct?

           12    A.   I did.

           13    Q.   And there were days that he would go without drinking;

           14    correct?

09:02AM 15    A.   It's possible.

           16    Q.   Because you didn't live with your parents at their home

           17    in High Desert, did you.

           18    A.   No.

           19    Q.   You didn't see your brother every day, did you.

09:03AM 20    A.   No, not every day.

           21    Q.   You -- you didn't speak to him every day, did you.

           22    A.   Not every day, but we would -- we would talk.

           23    Q.   When you spoke with Deputy Umphlett in this private

           24    conversation, the one-on-one with you, your mother and

09:03AM 25    Deputy Umphlett, did you use the words my brother will suffer

                         UNITED STATES DISTRICT COURT

1    from life threatening alcohol withdrawal?

2    A.    To Officer Umphlett?  Yes, I did.

3    Q.    Those exact words.

4    A.    Yes.

09:03AM 5    Q.    You also testified that you had a chance to speak with

6    Deputy Conley on a telephone conversation later; correct?

7    A.    Yes, I did.

8    Q.    That was the very first time you had an opportunity to

9    speak with him; correct?

09:03AM 10    A.    Yes.

11    Q.    You didn't speak to him when he was at the property.

12    True?

13    A.    No.

14    Q.    Is that true?

09:04AM 15         THE COURT:  Yeah, he asked you in the negative so

16    is it true that you didn't speak to him or. . .

17         THE WITNESS:  It's true I did not speak to him.

18         MR. RAMIREZ:  Thank you, Your Honor.

19    Q.    So when you had the conversation with Deputy Conley, you

09:04AM 20    told the jury the family asked about whether or not your

21    brother had a blood alcohol test done; right?

22    A.    Yes.

23    Q.    And you said that Deputy Conley mentioned that he could

24    smell alcohol on him, but that your brother refused the

09:04AM 25    alcohol test; correct?

```
 1    A.   Yes.

 2    Q.   And then your attorney asked if you remember any other

 3    part of the conversation.  You remember that part of the

 4    testimony?

 5    A.   Yes.

 6    Q.   And you said you didn't remember anything else; correct?

 7    A.   Well, I remember my dad saying that he's a good kid.  He

 8    just has a bad alcohol problem.

 9    Q.   You didn't tell Deputy Conley that you believed your

10    brother was gonna suffer from a life threatening alcohol

11    withdrawal, did you.

12    A.   No.

13    Q.   You didn't report to him anything about your brother's

14    history of alcohol use, did you.

15    A.   No.

16    Q.   All right.  So yesterday, we had an opportunity to talk

17    a little bit about your niece, A.E.  That would be your

18    brother's daughter; correct?

19    A.   Yes.

20    Q.   All right.  And you said that they had a very good

21    relationship; correct?

22    A.   Yes.

23    Q.   Now, she didn't live in California for the majority of

24    the time, did she.

25    A.   No, she did not.
```

UNITED STATES DISTRICT COURT

1    Q.    She lived in Nevada for at least nine months out of the

2    year; correct?

3    A.    Approximately.

4    Q.    And there are times that maybe it was even more than

09:05AM 5    that; correct?

6    A.    It would vary from time to time.

7    Q.    Typically, if she came, she would visit over the summer

8    and maybe on Spring Break or something like that?

9    A.    Maybe sometimes a little more.  It -- it depended on the

09:05AM10    communication amongst my brother, Billy, and her mother.

11    Q.    And you also testified that your brother was kind of

12    tasked with being your father's caretaker; correct?

13    A.    Yes.

14    Q.    He was kind of responsible for the day-to-day and making

09:06AM15    sure that your dad was okay?

16    A.    Yes.

17    Q.    And your family trusted somebody that you all believed

18    had a chronic alcohol problem with taking care of your father

19    on a day-to-day basis?

09:06AM20    A.    Well, it didn't become chronic, and he wasn't severe

21    until about a year before the incident.

22    Q.    So your family -- for about a year, your family trusted

23    who you believed to be a chronic alcoholic for about a year

24    with the health of your father.

09:06AM25    A.    Yeah.

1    Q.   You believed he was in good enough condition to be able

2    to take care of your father still?

3    A.   Well, he did minimal things.  And he loved his father,

4    and he wouldn't do anything to harm him in any manner so

09:07AM 5    there was no reason why he couldn't take care of his father.

6    Q.   One of the things that you reported to Deputy Mammolito

7    was that you believed your brother was a danger to himself

8    and to others; correct?

9    A.   Yes.

09:07AM 10   Q.   You used that language for the purpose of trying to

11   trigger the 5150, didn't you.

12   A.   Based on what I saw him behaving that day, I felt he

13   was.

14   Q.   You didn't believe he was actually a danger to your

09:08AM 15   parents, did you?

16   A.   I'm sorry, I don't understand the question.

17   Q.   You didn't ever see your brother hit either of your

18   parents, did you?

19   A.   No.

09:08AM 20   Q.   You never saw him use any sort of violence with your

21   parents, did you.

22   A.   No.

23   Q.   You didn't believe your brother would be violent with

24   your parents; correct?

09:08AM 25   A.   Violent as in physically violent or -- I'm sorry, I'm --

1    I'm trying to understand your question.

2    Q.   Sure.  You didn't believe that your brother would have

3    any sort of physical violence with your parents, did you.

4    A.   Physical violence?  No.

09:08AM 5    Q.   You didn't believe your parents were in any physical

6    danger because of your brother, did you.

7    A.   I'm sorry, I'm -- I'm having a hard time.  I'm -- I'm

8    just -- this is a lot for me.  I -- I didn't feel he was

9    gonna be physically.  He was very verbally aggressive, and

09:09AM 10   his body movements were aggressive so I did feel that there

11   was a potential that he could become a danger to himself.

12   Q.   You didn't feel like he was -- that your physical health

13   was ever in danger because of your brother, did you.

14   A.   At the time, no.

09:09AM 15   Q.   At anytime before July 27th, you did not believe your

16   brother was a risk of danger to you, did you.

17   A.   A danger to me in what way?  I'm -- I'm not

18   understanding.

19   Q.   Ms. Kelley, isn't it true that before July 27th, 2022,

09:10AM 20   you did not form any belief that your brother would

21   physically hurt you in any way, did you.

22   A.   I'm sorry, I -- I don't know how to answer that.

23           THE COURT:  Well, were you ever in fear of your

24   brother?  It's a simple yes or no.

09:10AM 25           THE WITNESS:  In fear that he was gonna hurt me

UNITED STATES DISTRICT COURT

```
 1    personally?  No.

 2    BY MR. RAMIREZ:

 3    Q.   Were you ever -- did you ever believe your brother would

 4    physically hurt your brother, Nick Enyart?

 5    A.   No.

 6    Q.   So you didn't actually believe that your brother was a

 7    danger to anybody other than himself; correct?

 8    A.   Well, there's a possibility that anything could happen.

 9    At the time, I didn't feel he was a danger to me personally.

10    Q.   And as a nurse, you understood what it was to ask

11    somebody to be taken 5150, didn't you.

12    A.   Yes.

13              MR. RAMIREZ:  No further questions, Your Honor.

14              THE COURT:  Redirect.

15              MS. PENA:  Thank you, Your Honor.

16                         REDIRECT EXAMINATION

17    BY MS. PENA:

18    Q.   Good morning, Ms. Kelley.  Did you see a binder of

19    exhibits up there?

20              THE COURT:  What exhibit?

21              MS. PENA:  Exhibit 82.  Thank you.

22    Q.   Ms. Kelley, you were deposed in this case; correct?

23    A.   Yes.

24    Q.   The date of your deposition, was that January 18th,

25    2024?
```

09:10AM 5
09:11AM 10
09:11AM 15
09:11AM 20
09:12AM 25

         1    A.   I believe so.

         2    Q.   Do you have Exhibit 82 in front of you?

         3    A.   Yes.

         4    Q.   Is that your deposition?

09:12AM  5    A.   Yes.

         6    Q.   I want to take you back to a line of questioning where

         7    Mr. Ramirez was asking you if you remember or, in fact, told

         8    Deputy Umphlett the -- the words of withdrawal or DTs or

         9    delirium tremens.  And I want you to look back at your

09:12AM 10    deposition on page 125 at lines 11 through 15.  Ms. Kelley,

        11    I'd like you to read that to yourself.  Don't read it out

        12    loud.  And when you finished reading that, look back up at

        13    me, please.

        14    A.   Okay.

09:13AM 15    Q.   Does that refresh your recollection that you testified

        16    in your deposition that you told Deputy Umphlett --

        17         THE COURT:  Without reading it again.  This is just

        18    to refresh your memory so we're not asking you what the

        19    document says.

09:13AM 20         MS. PENA:  Why don't you close it.

        21         THE COURT:  Why don't you close it up.  Because the

        22    only question is that after looking at the document, does it

        23    refresh your memory.

        24         MS. PENA:  Thank you, Your Honor.

09:13AM 25    Q.   Does it refresh your memory that you testified in your

                            UNITED STATES DISTRICT COURT

1    deposition that you told Deputy Umphlett that your brother

2    would be having or experiencing DTs?

3    A.   Yes.

4    Q.   I wanna take you back to another line of questioning by

09:13AM 5    Mr. Ramirez.  And he asked you if you told Deputy Mammolito

6    that you thought Billy would die if he continued abuse

7    alcohol.  Do you recall that line of questioning?

8    A.   Yes.

9    Q.   And you said that if he continued, you did believe that

09:14AM 10   that might happen; correct?

11   A.   Yes.

12   Q.   And is that why the family was taking efforts to stop

13   Billy from drinking?  Excuse me, your brother?

14   A.   Yes, it was.

09:14AM 15   Q.   And from your experience in your own family, did the

16   family think that your brother could stop drinking like your

17   father who's been sober for 30 years?

18   A.   Yes.  My -- my father's living proof that it can be

19   possible.

09:14AM 20   Q.   I want to ask you one last question.  Mr. Ramirez asked

21   you about the information that you relayed to

22   Deputy Mammolito.  From the information that you recall

23   relaying to her, was it clear in your mind that you had

24   expressed information that your brother was going to be

09:15AM 25   experiencing detox from alcohol withdrawal?

UNITED STATES DISTRICT COURT

```
          1   A.   Yes.

          2             MS. PENA:  Thank you, Ms. Kelley.

          3             No further questions.

          4             THE COURT:  Thank you, Counsel.

09:15AM   5             Redirect in that area?

          6             MR. RAMIREZ:  Yes.

          7             THE COURT:  Or recross in that area, I'm sorry.

          8                       RECROSS-EXAMINATION

          9   BY MR. RAMIREZ:

09:15AM  10   Q.   Ms. Kelley, you just were asked a few questions about

         11   your deposition testimony; correct?

         12   A.   Yes.

         13   Q.   You remember giving deposition testimony?

         14   A.   Yes.

09:15AM  15   Q.   You remember being under oath to tell the truth in that

         16   deposition testimony?

         17   A.   Yes.

         18   Q.   You did tell the truth when you gave that deposition

         19   testimony; right?

09:15AM  20   A.   Yes.

         21   Q.   And you were asked about the time you spoke with

         22   Deputy Umphlett; right?

         23   A.   Yes.

         24             MR. RAMIREZ:  Your Honor, I'd like to take the time

09:16AM  25   to read from her deposition, page 116, lines 3 through 6.
```

UNITED STATES DISTRICT COURT

|     |     |
| --- | --- |
| 1 | MS. PENA:  One moment, Your Honor. |
| 2 | THE COURT:  Sure. |
| 3 | MS. PENA:  It's improper impeachment, Your Honor. |
| 4 | THE COURT:  Just a second.  3 through 6? |
| 09:16AM 5 | MR. RAMIREZ:  Correct, Your Honor. |
| 6 | THE COURT:  On -- on 116? |
| 7 | MR. RAMIREZ:  Correct. |
| 8 | THE COURT:  You may read that. |
| 9 | MR. RAMIREZ: |
| 09:16AM 10 | "Q.  Did you then speak to Deputy Umphlett, the |
| 11 | shorter one? |
| 12 | "A.  As a group; my mother, my father, my brother, |
| 13 | Nick, and I." |
| 14 | No further questions, Your Honor. |
| 09:17AM 15 | THE COURT:  You may step down. |
| 16 | Thank you very much. |
| 17 | THE WITNESS:  Thank you, Your Honor. |
| 18 | THE COURT:  Next witness? |
| 19 | MS. JUN:  Your Honor, the plaintiffs call Police |
| 09:17AM 20 | Practices Expert Roger Clark. |
| 21 | THE COURT:  Okay. |
| 22 | THE CLERK:  Please raise your right hand, sir. |
| 23 | (Witness sworn.) |
| 24 | THE CLERK:  Thank you.  Please be seated. |
| 09:18AM 25 | Please adjust the microphone so you're speaking |

UNITED STATES DISTRICT COURT

1    into it at all times.

2            For the record, please state your full name last

3    name.

4            THE WITNESS:  Roger Alma Clark, C-l-a-r-k.

09:18AM 5         THE COURT:  Thank you.

6            You may inquire, Counsel.

7            MS. JUN:  Thank you, Your Honor.

8                    DIRECT EXAMINATION

9    BY MS. JUN:

09:18AM 10   Q.   Good morning, Mr. Clark.  Let me begin with some

11   questions about your background.  What do you currently do?

12   A.   I'm a Police Procedures Consultant.

13   Q.   And as a police procedures consultant, do you testify in

14   court?

09:18AM 15   A.   Yes.

16   Q.   And have you been qualified as an expert to testify in

17   court?

18   A.   Yes.

19   Q.   How many times have you testified in court as a police

09:19AM 20   procedures expert?

21   A.   I've tested in court and trials about 600 times.

22   Q.   And before you were a police procedures expert, what did

23   you do?

24   A.   I'm a retired L.A. County Sheriff.

09:19AM 25   Q.   And when you were working at the Los Angeles County

UNITED STATES DISTRICT COURT

```
 1    Sheriff's Department, did you ever work in any type of jail

 2    setting?

 3    A.   I did.

 4    Q.   Tell me a little bit about that.

 5    A.   Sure.  As, uh -- when I came on the department in 1965,

 6    typical to Sheriffs departments, you go to custody.  I was in

 7    custody for two years as a Deputy Rank.  And when then I was

 8    promoted to Lieutenant, I went back into the Central Jail so

 9    I was a Watch Commander and Training and Logistics Lieutenant

10    for two years.

11          Then when I was transferred to a station, stations

12    in the Sheriff's Department in L.A. are portals for the main

13    jail system or for the county jail system.  So every station

14    facility has a jail, and I had responsibility over the jail

15    for four years as the Lieutenant.

16    Q.   Now, you mentioned something.  You mentioned the Central

17    Jail.  Are you talking about the Los Angeles County Central

18    Jail?

19    A.   I am.

20    Q.   So you said you were the watch commander for that jail.

21    Did I hear you correctly?

22    A.   You did.

23    Q.   And when were you the watch commander for the Los

24    Angeles County Central Jail?

25    A.   So that information from '78 to '80, and that was my
```

UNITED STATES DISTRICT COURT

```
       1    first assignment as a lieutenant, two years in that

       2    assignment.

       3    Q.   I want to ask you some questions about training that

       4    police officers have to receive in order to become police

09:20AM 5    officers in the State of California.  Well, do police

       6    officers have to get some sort of training to be law

       7    enforcement here in California?

       8    A.   Yes.  It's required under the California Penal Code.

       9    Q.   What is that training called?

09:20AM10    A.   So it's a -- the oversight of the training is from the

      11    California Department of Justice called POST, Peace Officers

      12    Standards and Training.  There are certifications.  The basic

      13    certification which empowers the successful candidate with

      14    police powers is called Post Basic.  And it's 42 specific

09:21AM15    skills that have to be certified on an individual basis.

      16    It's typically at the Academy.  It includes scenario role

      17    play, includes field vetting to make sure that the training

      18    sticks.

      19    Q.   Now, you mentioned the person who's trying to become a

09:21AM20    police officer in California has to be certified in 42

      21    separate categories.  Does one of those categories relate to

      22    intoxication or withdrawal?

      23    A.   Yes.

      24    Q.   What is taught in POST to police officers about

09:21AM25    intoxication and withdrawal?
```

UNITED STATES DISTRICT COURT

1    A.    So there's an extensive learning.  It's called Learning

2    Domain No. 34, and it covers the duties of an officer as a

3    first responder because officers are usually the first,

4    paramedic second.  Then it goes through first aid.  And then

09:22AM 5    it goes through poisoning.  And the piece you're asking me

6    about covers alcohol poisoning which is a common source of

7    poisoning and treatment and response.  The last chapter is

8    how to deliver a baby in the field.

9    Q.    When you say alcohol poisoning, is that the same thing

09:22AM 10   as alcohol intoxication?

11   A.    Yes.

12   Q.    And is this Learning Domain 34 a subject matter that

13   every police officer in the State of California has to be

14   certified in?

09:22AM 15   A.    Yes.

16   Q.    So, uh, any -- and let me just ask you, is a Sheriff's

17   deputy a police officer under the laws of this state?

18   A.    Yes.  So post-certification is required for both deputy

19   sheriffs, all sheriffs throughout the state and police

09:23AM 20   officers throughout the state.

21   Q.    Mr. Clark, what is taught to police officers about

22   gathering information as it relates to alcohol intoxication?

23   A.    Well, it's a common event in the police experience or

24   what we do.  So the symptoms are taught, and the typical

09:23AM 25   symptom is intoxication.  But in addition to that, if there's

         1    an addiction or dependency that the poisoning -- or either

         2    from overuse of the alcohol, and that's alcohol poisoning,

         3    and that has to be treated.  That's common with the

         4    youngsters and so forth.

09:24AM  5             And then the withdrawal which is a very significant

         6    hazard, the officers are trained to recognize both.  And they

         7    must inquire and must settle that it's not just over drinking

         8    on that one event and if there's history that has to be

         9    tended to as a medical need.

09:24AM 10    Q.   You said that police officers have a duty to inquire

        11    about the history of alcohol use.  What do you mean by that?

        12    A.   Well, it's taught in a number of the learning domains.

        13    One is when you take someone into custody, the obligation of

        14    taking that person into custody, for example, you must know

09:24AM 15    certain things.

        16             And then you're taught about state requirements for

        17    interviewing and attending to anybody in your custody that

        18    you're booking into the system.  That requires when you take

        19    someone into custody or you're dealing with somebody who's

09:25AM 20    intoxicated, methods to deal with it.

        21             And if there's an indication of alcohol poisoning

        22    is a detox situation because withdrawal can be significant.

        23    It can be life threatening in the training.

        24    Q.   Police officers including sheriff's deputies in the

09:25AM 25    State of California, are they trained that they have to write

                        UNITED STATES DISTRICT COURT

1    in their reports any information about alcohol intoxication?

2    A.   Yes.  So that's part of -- that's a learning skill on

3    report writing, and that the details of the -- are to be

4    included even if it's not connected specifically to the crime

09:25AM 5    being arrested, that all details.  And the phrases, if you're

6    not sure, put it in anyway so there's a complete report.  And

7    that the justice system depends on a thorough, truthful

8    report.

9    Q.   And Mr. Clark, let me ask you, um, in your experience,

09:26AM 10   are there situations when multiple police officers are

11   responding to a scene, and lots of police officers are

12   talking to lots of different people?  Is that a common

13   scenario in your experience?

14   A.   It is.

09:26AM 15   Q.   So if -- is there usually one main police officer who's

16   considered like the -- the arresting officer or the lead

17   officer?

18   A.   Yes.  So the basic training is the fact -- there has to

19   be an assigned officer to deal with the problem.  So if

09:26AM 20   there's call for service or crime in progress, the dispatch

21   always identifies one handling unit.  That officer is

22   responsible for -- he or she is gonna write the report and to

23   have all of the facts because that's also the booking

24   officer, typically.  And so the responding officers with that

09:27AM 25   call are called responding officers or support officers,

```
         1    assisting officers.  They have an obligation as to if they

         2    gather information, they must pass it over to the arresting

         3    officer or the handling officer so that the report can be

         4    complete, and the proper activity can occur.

09:27AM  5    Q.   So let me just touch upon that.  You said responding

         6    officers who are not the main arresting officers.  They still

         7    have an obligation to write down everything they see or hear

         8    at the scene?

         9    A.   They have an obligation to see that it's written down.

09:27AM 10    An example would be if someone -- they get information that a

        11    person's epilepsy, for example, they would see this is

        12    significant, and the handling officer has to know that.  And

        13    it would be tended to according to what's necessary for a

        14    suspect or subject being handled that has epilepsy.  Same

09:28AM 15    with alcoholism or any disease or cognitive issue including

        16    mental illness.

        17    Q.   So let's stick with the alcohol abuse example.  So would

        18    the responding officers who get information about the

        19    arrestee's abuse of alcohol have an obligation to make sure

09:28AM 20    that information gets to the arresting officer, the main

        21    person who's gonna book that person into jail?

        22    A.   Yes.

        23    Q.   Now, are all officers trained on the need as responding

        24    officers to convey that information to the arresting officer

09:28AM 25    for booking at jail?
```

1    A.    Yes.  And it's in the training response to calls, to the

2    tactical crimes in progress, et cetera.

3    Q.    Now, I want to ask you about your role in this case in

4    particular.  You've reviewed some of the evidence in this

09:29AM 5    case.  Is that fair?

6    A.    Yes.

7    Q.    Can you describe some of the evidence that you've

8    reviewed in this case?

9    A.    Uh, yes.  There were reports written on the time he was

09:29AM 10    arrested, the arrest report itself, the reports that occurred

11    while he was in custody, uh, including his booking material

12    or booking documents.

13           Um, there were five depositions when I wrote my

14    report.  In the federal cases, you have to write an opinion

09:29AM 15    report.  It's part of the process.  And I reviewed those.

16           I reviewed again the state requirements for

17    custodies.  It's a minimum jail standard.  It's Title 15 and

18    Title 24.  And then I reviewed also some --

19           I'm a member of the American Corrections

09:30AM 20    Association, and they -- the federal government uses them for

21    certification of prisons.  Um, those types of things.  There

22    were photographs as well.  There were no videos.

23    Q.    Mr. Clark, I want you to assume the following facts are

24    true.  I want you to assume that there are two responding

09:30AM 25    officers at the scene of a family home.  They are the

1    responding officers, not the arresting officers.  Those two

2    responding officers speak to the members of the family, and

3    those family member tell those two responding officers that

4    their brother has a history of alcohol abuse, is a heavy

09:30AM  5    drinker, is often under the influence and may suffer some

6    adverse health consequences because of that, for example,

7    have a seizure, and they use the word seizure.  Do those two

8    responding officers have an obligation under California law

9    to transfer that information over to the arresting officer?

09:31AM 10    A.    Yes.

11    Q.    Are those two responding officers -- assuming all those

12    facts are still true, do -- those two responding officers,

13    are they trained to transfer that information over to the

14    arresting officer?

09:31AM 15    A.    Yes.

16    Q.    And do those two responding officers assuming the same

17    facts are true have an obligation to thoroughly document and

18    report everything the family members have said to them about

19    the arrestee's health and medical condition?

09:31AM 20    A.    Yes.

21    Q.    I want you to assume some additional facts.  I want you

22    to assume that one of the responding officers has a

23    conversation with the mother and the sister of the arrestee.

24    And I want you to further assume that this officer,

09:31AM 25    responding officer, has finished her interviews, and she's

1    turned off her belt recording.  Assume further that during

2    that conversation, the sister says to the responding officer,

3    I'm worried my brother's going to suffer from delirium

4    tremens.

09:32AM 5        Even though that responding officer has turned off

6    her audio recording, assuming all these facts are true, does

7    that responding officer still have an obligation to write

8    down that information that the sister gave in the report?

9    A.   Their obligation -- or that officer's obligation would

09:32AM 10   be to make sure it's recorded in terms of noted in both the

11   booking process as well as the report itself so if it -- and

12   typically, they would write that in their book for their own

13   personal notes.

14   Q.   So I think I -- just to clarify, I think I heard you say

09:32AM 15   that the responding officer in this scenario, assuming all

16   these facts are true, would have two obligations.  Number

17   one, that responding officer should have turned her audio

18   recording back on so that she could have captured this

19   critical information from the family?

09:33AM 20   A.   Well, that would be typical, to document the incident.

21   But the issue here as I heard in the hypothetical is that it

22   must be, uh, positively known to that officer, that I've

23   given that information to the arresting officer, and it will

24   go into the report.  And the expectation would be based on

09:33AM 25   this information that that will be a major factor in his

```
          1    processing and in custody.

          2    Q.    And actually, before I go there, may I ask did you

          3    review any phone records in this case?

          4    A.    Did I review the what?

09:33AM   5    Q.    Any phone records.

          6    A.    Telephone records?

          7    Q.    Yes, sir.

          8    A.    Well, there -- the phone records of the calls of the

          9    concerned family into the facility and to the deputy, yes.

09:34AM  10    Q.    And when you say concerned family members, do you recall

         11    reviewing the deposition transcript of the mother, Francis

         12    Enyart?

         13    A.    Yes.

         14          MR. MIEDERHOFF:  Pardon me.  I'm gonna object to

09:34AM  15    this as cumulative, Your Honor.

         16          THE COURT:  Overruled.

         17          THE WITNESS:  One of the five deposition

         18    transcripts --

         19          THE COURT:  Question, Counsel.

09:34AM  20          MS. JUN:  Yes, sir, thank you.

         21          Thank you, Your Honor.

         22    Q.    Mr. Clark, I want you to assume the following facts are

         23    true.  I want you to assume that the mother of an arrestee --

         24    the mother and father of an arrestee have called a jail where

09:34AM  25    their son is being held a total of 34 times.  I want you to
```

UNITED STATES DISTRICT COURT

1    further assume that during the course of some of those 34

2    conversations, the mother and father told the person

3    answering the phone at the jail facility I'm really worried

4    about my son.  I'm worried he might have seizures.  He drinks

09:35AM 5    a lot.  He abuses alcohol.  I want you to further assume that

6    the person answering that phone call is not a law enforcement

7    officer.  In other words, that person is not sworn staff.

8           With those facts in mind, and assuming those facts

9    are true, what obligation does that nonsworn person who is

09:35AM10    answering the phone have to do with that information?

11   A.   Well, to, uh, document it, one.  To, uh, make sure --

12   what you just described is a very significant concern so it

13   would be routed to a doctor for medical evaluation because if

14   that individual is gonna be -- per the Title 15 requirement,

09:35AM15    that individual with that information would have to go into a

16   sobering cell under the direction of the doctor and certain

17   procedures because the sobering cell would document whether

18   he's getting better or worse and whatever the result is of

19   that evaluation medically.  So it makes no difference whether

09:36AM20    she's talking to a sworn person or not, as an employee or

21   assigned staff at the jail, that's in the Title 15 and 24

22   requirement.

23   Q.   So you --

24   A.   Then -- then, uh --

09:36AM25   Q.   Could I just stop you for one minute, Mr. Clark?  You

UNITED STATES DISTRICT COURT

1    are mentioning Title 15 and Title 24.   Could you tell us what

2    that's referring to?

3    A.   Yes.  So Title 15 is the requirement for procedure.   It

4    includes how persons are booked into a facility and the

09:36AM 5    necessity for interviews and documenting where it's

6    appropriate for them to be housed.   And it includes --

7              This goes into two places.   One is the criminal

8    history or the criminal experience of that subject.   You

9    would not put a youngster into a housing area where there's

09:37AM 10   known gangster with experience and felony charges.   So

11   that's -- that's one piece.   And then the other is the

12   medical need.   And there's a strict level of question and

13   answers on medications, mental condition, diseases or chronic

14   illness, high blood pressure, diabetes, that type of thing.

09:37AM 15   Those two pieces must be done thoroughly for the appropriate

16   housing.

17              Okay.   Title 24 is about the physical plant of the

18   jails.  That have requirements.   There has to be certain

19   space, there has to water, there has to be a toilet.   But

09:38AM 20   there's also a section of Title 24 about sobering cells

21   because they have to constructed and postured for medical

22   evaluation.   So that's what I meant by 15 and 24.

23   Q.   Thank you so much, Mr. Clark.   I want you to assume that

24   we're still talking about the nonsworn person receiving the

09:38AM 25   phone calls from the mother and father of the arrestee.

1    We're still assuming those facts are true.  Even if that

2    person is not a sworn officer, does that person receiving the

3    phone call still have an obligation under Title 15 and

4    Title 24 to document that information and relay it?

09:38AM 5    A.   Document, then relay it and see to it, tend to that

6    information regardless of whether it's a sworn officer status

7    or not.

8    Q.   Now, I want you to assume that these further sets of

9    facts are true.  I want you to assume that the mother of an

09:39AM 10   arrestee has called the jail where her son is being held, and

11   she has asked to speak to a deputy who has eyes on her son.

12   I want you to further assume that she gets transferred to

13   that deputy in the housing unit, and he answers her phone

14   call.

09:39AM 15        Assume additionally that the mother in that phone

16   call to that deputy tells that deputy I'm really worried

17   about my son.  He uses alcohol.  He can have a seizure, a

18   stroke or a heart attack.

19        Assuming all those facts are true, what does that

09:39AM 20   deputy need to do with that information received from the

21   mother regarding the arrestee?

22   A.   Well, he has to pay attention to it.  And the reason for

23   it is that a brief encounter by the deputy that results in

24   the arrest is significantly less in depth of understanding

09:40AM 25   and experience of the family.

UNITED STATES DISTRICT COURT

1          And so a mother, for example, or member of the

2     family has a history of understanding of the condition, then

3     that has to be taken seriously and would be routed to -- the

4     obligation is if the deputies, not a doctor, of course, but

09:40AM 5     the deputy would make sure that this information went to the

6     medical side, and that there was a -- per that information,

7     it was resolved.

8     Q.   Mr. Clark, you talked about your experience at the

9     Central Jail, the Los Angeles County Central Jail.  In your

09:40AM10     experience, do jails like the Los Angeles County Jail have

11     policies in place to ensure that when their employees at the

12     jail, whether sworn staff, nonsworn staff, if they receive

13     information about the medical condition of an arrestee or a

14     detainee, are there policies to ensure that information gets

09:41AM15     relayed to medical personnel?

16     A.   Yes.

17     Q.   And in -- according to your knowledge and experience, is

18     that consistent with the standard expected of correctional

19     facilities and detention facilities, to have such an

09:41AM20     affirmative policy in place?

21     A.   That was my experience personally, uh, because as a

22     Lieutenant and Watch Commander, I did get those calls.  And,

23     uh --

24          THE COURT:  You've also answered her question.

09:41AM25     You're getting into narratives here that are not being

```
 1   requested.

 2              MS. JUN:  Thank you, Your Honor.

 3              And with that, I have no further questions.

 4              Thank you, Mr. Clark.

09:41AM 5      THE COURT:  Cross-examination?

 6                        CROSS-EXAMINATION

 7   BY MR. MIEDERHOFF:

 8   Q.   Good morning, Mr. Clark.  It's early in the day, excuse

 9   me.  It's nice to see you again.  You came here to testify on

09:42AM10  behalf of the plaintiffs; right?

11   A.   Yes.

12   Q.   As their expert witness?

13   A.   Yes.

14   Q.   And you've been doing -- your sole income since 2000 has

09:42AM15  been as an expert witness; isn't that right?

16   A.   Yes.  No, it's the sole.  I have a retirement.  Excuse

17   me.

18   Q.   Okay.  Outside of your retirement, your sole income is

19   through working as an expert witness; isn't that right?

09:43AM20  A.   Yes.

21   Q.   You've ended your work as a police officer more than

22   31 years ago?

23   A.   Yes.

24   Q.   You've been retained in over 2500 cases as an expert

09:43AM25  witness?
```

```
 1    A.    Yes.

 2    Q.    The majority of those cases involve aspects of force?

 3    A.    Yes.

 4    Q.    You get about 50 new cases per year?

09:43AM 5    A.    Yes.

 6    Q.    90 percent of your cases are on behalf of the

 7    plaintiffs.

 8    A.    When they go to trial or testimony, yes.

 9    Q.    As part of providing your opinions in this case --

09:43AM10          Excuse me, thank you.

11          As part of providing your opinions in this case,

12    you accept what the plaintiffs say as true; isn't that

13    correct?

14    A.    No.  In my report, I said that's the jury's issue, and I

09:43AM15    try to be neutral on the report.

16    Q.    You try to be neutral whenever you can?

17    A.    That's the, uh, heartbeat of my report, yes.

18    Q.    Okay.  Let's talk about Deputy Conley.  At the scene,

19    the family did not talk directly with Deputy Conley; isn't

09:44AM20    that correct?

21    A.    Yes.

22    Q.    Uh, this individual was booked into the jail at about

23    3:45 p.m.?

24    A.    Yes.

09:44AM25    Q.    Uh, the family says that they -- and you've reviewed
```

```
        1    their deposition transcripts; right?

        2    A.   Yes.

        3    Q.   And the family says that they had a phone call with

        4    Deputy Conley later that day at about 6:00 p.m.?

09:44AM  5    A.   Yes.

        6    Q.   Deputy Conley doesn't remember this phone call; right?

        7    A.   I can't speak for Deputy Conley.

        8    Q.   You reviewed his deposition transcript; right?

        9    A.   In the record, that's what he said.

09:44AM 10    Q.   That's what he said in his deposition?

       11    A.   His deposition.  You're correct.

       12    Q.   So he didn't talk to anyone on-scene.  He wouldn't have

       13    had any information about alcohol withdrawals at the time he

       14    booked the inmate into the jail at 3:45; isn't that correct?

09:44AM 15    A.   No.

       16    Q.   Who told -- well, strike that.  The recordings, you

       17    listened to those?

       18    A.   Yes.

       19    Q.   Those were important to your opinions?

09:45AM 20    A.   Yes, to make my report.

       21    Q.   The -- the audio recordings.

       22    A.   Yes.

       23    Q.   Those were important to your opinions?

       24    A.   They were important to the report and my effort to

09:45AM 25    understand the situation.
```

UNITED STATES DISTRICT COURT

1    Q.   So they're important to your opinions; right?

2    A.   Well, they flavored the opinions.  Yes.

3    Q.   Those audio recordings are belt recordings; right?

4    A.   Yes.

09:45AM 5    Q.   So the deputy's on scene, and they activate their audio

6    recorder on their hip?

7    A.   Yes.

8    Q.   Okay.  And then they capture stuff that's said while on

9    scene; right?

09:45AM10    A.   While the recording is on.  Yes.

11    Q.   Yes.  The recorder has to be activated for it to capture

12    information; right?

13    A.   Of course.

14    Q.   Okay.  So when that's activated, they're capturing

09:46AM15    information from different people who are talking.

16    A.   Yes.

17    Q.   Okay.  And you reviewed the recording of

18    Deputy Umphlett?

19    A.   I don't recall as I sit here.  I think so.

09:46AM20    Q.   Well, do you -- do you remember reviewing it or not?

21    A.   I don't recall as I sit here hearing it exactly, that

22    one.

23    Q.   Okay.  Did you review any recordings of -- belt

24    recordings on scene?

09:46AM25    A.   Yes.

1    Q.    Okay.  How many did you review?

2    A.    Um, let me. . . just a minute.  I only listed in my

3    report deputy interviews and inmate interviews so, um, I'd

4    have to go into the original part of the -- my, uh, file in

09:47AM 5    order to be able to recount which video -- which audio I

6    listened to.

7    Q.    Do you have that file right in front of you right now?

8    A.    No, I don't.  I brought my report.  I brought my

9    deposition.

09:47AM 10    Q.    So for today, we don't know if you reviewed any audio

11    recordings; right?

12    A.    We don't know exactly which one was -- and my -- my

13    expectation is there'd be testimony to the jury, no.

14    Q.    For today, we don't know if you reviewed any audio belt

09:47AM 15    recordings; correct?

16    A.    I reviewed belt recordings, but I do not -- I cannot

17    testify with certainty which ones.

18    Q.    So you don't know which ones you reviewed; right?

19    A.    As I said, you are correct.

09:47AM 20    Q.    And you don't how many you reviewed.

21    A.    Only what was said at the scene.

22    Q.    Okay.  So you don't how many recordings you reviewed;

23    right?

24    A.    I don't know how many Counsel.  You're correct.

09:47AM 25    Q.    You talked about post-training for deputies on different

          1    various subjects; right?

          2    A.    Yes.

          3    Q.    For a deputy to be certified as a peace officer in

          4    California, they have to complete that post-training;

09:48AM   5    correct?

          6    A.    Yes.

          7    Q.    Successfully?

          8    A.    Of course.

          9    Q.    And you don't have any information that Deputy Umphlett

09:48AM  10    did not complete that post-training successfully; correct?

         11    A.    No.

         12    Q.    Is that a correct statement?

         13    A.    You are correct.  I have no information.

         14    Q.    And you have no information that Deputy Conley did not

09:48AM  15    complete that post-training; correct?

         16    A.    I need to amend that.  Simply because they're an active

         17    police officer is per se that they did successfully complete.

         18    Otherwise, they would not be law enforcement officers.

         19    Q.    Right.  And that applies to Deputy Umphlett?

09:48AM  20    A.    It applies to every single deputy rank or deputy in that

         21    department.

         22    Q.    So all the deputies that were on scene that day would

         23    have been post-certified; correct?

         24    A.    Correct.

09:49AM  25    Q.    And they would have received the training you talked

                              UNITED STATES DISTRICT COURT

1    about; correct?

2    A.    Yes.

3    Q.    You talked about phone calls that came in later.  You

4    talked about that presumably, Snow and Skaggs would have

09:49AM 5    received; is that right?

6    A.    Yes.

7    Q.    We don't have recordings of those phone calls; correct?

8    A.    Correct.

9    Q.    The representation of what was said come from the

09:49AM 10    family; correct?

11    A.    Yes.

12    Q.    And you -- you have to rely on that in forming your

13    opinions; correct?

14    A.    That there was contact, yes.  Taking that as true, yes.

09:49AM 15    Q.    At what they said was true; right?  You have to -- you

16    have to rely on that for your opinions; correct?

17    A.    For some of the opinions, you are correct.

18    Q.    We don't have any notations by anyone of what was said

19    in those phone calls; right?

09:50AM 20    A.    Correct.

21    Q.    So the family didn't make any notes of any kind;

22    correct?

23    A.    Nothing that was presented to me.

24    Q.    And we talked about the fact that there were 30

09:50AM 25    something phone calls made by the family?

          1    A.    That's offered in the, uh, record.

          2    Q.    Not all of those calls were answered; right?

          3    A.    Um, some were not as I understand it.

          4    Q.    You don't know how many people work in the role where

09:50AM   5    they receive phone calls from the outside at HDDC; is that

          6    correct?

          7    A.    Would you please repeat that?

          8    Q.    Yeah.  You don't know how many people work in the role

          9    of receiving phone calls every day at High Desert Detention

09:50AM  10    Center; correct?

         11    A.    Correct.

         12    Q.    The family said they called to report additional

         13    information about their son being at risk of withdrawals;

         14    right?

09:51AM  15    A.    My understanding of the record and the testimony is they

         16    called because they wanted High Desert to be aware of their

         17    concerns of his medical condition.  Those are my words, but

         18    that was always my understanding of the record.

         19    Q.    And they -- they did not communicate directly with

09:51AM  20    medical staff; right?

         21    A.    Uh, I know for sure that they talked to sworn staff, but

         22    I don't recall any conversations with medical staff.

         23    Q.    The family never came in to see Mr. Enyart; correct?

         24    A.    That they what?

09:51AM  25    Q.    The family never came to see Mr. Enyart at High Desert

1    Detention Center; correct?

2    A.   I don't, uh -- there's nothing in the record that they

3    made a personal visit with him.  It was COVID.  They did not

4    have a personal visit with him at High Desert.

09:51AM 5    Q.   The family did not come into High Desert Detention

6    Center to talk with any of the staff; correct?

7    A.   I think you're correct.

8    Q.   Mr. Enyart called home multiple times; right?

9    A.   I can't speak for him or the record.  They -- at -- at

09:52AM 10   my -- my viewing of the record is they never heard from him,

11   that he never made contact with them.

12   Q.   So you never heard a recording of a phone call from

13   Mr. Enyart to his family.

14   A.   I did not.

09:52AM 15          THE COURT:  And when you say Mr. Enyart, are you

16   talking about the decedent?

17          MR. MIEDERHOFF:  Mr. William Enyart, yes,

18   Your Honor.

19          THE COURT:  Okay.  We have to make that

09:52AM 20   clarification because there's several Mr. Enyarts.

21          MR. MIEDERHOFF:  Good point.

22   Q.   You never heard an audio recording of a phone call from

23   Mr. William Enyart to his family; correct?

24   A.   I did not.

09:52AM 25          MR. MIEDERHOFF:  No further questions, Your Honor.

UNITED STATES DISTRICT COURT

1            THE COURT:  Counsel?

2            MS. JUN:  Briefly, Your Honor.

3            THE COURT:  Sure.  Redirect.

4                     REDIRECT EXAMINATION

09:53AM 5   BY MS. JUN:

6   Q.   Mr. Clark, on cross-examination, you were asked by

7   counsel whether Conley had any information about Mr. William

8   Enyart's state of intoxication that he could convey to the

9   staff at High Desert Detention Facility.  Do you recall those

09:53AM 10  lines of questions?

11  A.   Yes.

12  Q.   Did Mr. Conley -- oh, excuse me.  Did Deputy Conley have

13  information that he should have conveyed to the intake staff

14  at High Desert Detention Center?

09:53AM 15  A.   Yes.

16  Q.   What was that information?

17  A.   That was a phone call subsequent when they family called

18  and asked for him to call back, this is from the record, and

19  he did, and they conveyed that to him.

09:53AM 20  Q.   When Deputy Conley had a subsequent conversation with

21  the family after the arrest, did he have an obligation to

22  contact someone at the jail to say, hey, I had a phone

23  conversation with the family, and this is what they said?

24  A.   Yes.

09:53AM 25  Q.   Now, I want to direction your attention to the line of

                     UNITED STATES DISTRICT COURT

1    cross-examination about questioning about there were no notes

2    about the phone calls that the family had made to High Desert

3    Detention Center.  Do you recall that line of questioning?

4    A.   I do.

09:54AM 5    Q.   And counsel had asked, uh, that family, the family

6    members had not made any notes about these phone calls.  Do

7    you recall that?

8    A.   That's what I took the statement and the question.

9    Q.   Now, in your review of the records in this case, there

09:54AM 10   were actually no reports written by any of the employees of

11   the jail facility about these calls.  Is that accurate?

12   A.   You are correct.

13   Q.   And do -- did those jail employees at the facility have

14   an obligation to actually document the contents of that call?

09:54AM 15   A.   Yes.

16   Q.   And finally, um, counsel had asked you about your

17   experience, um, working in a jail, and he said you had worked

18   31 years ago.  31 years ago, were Title 15 and Title 24 still

19   operative?

09:54AM 20   A.   The equivalents were, yes.

21   Q.   And did -- all of the rules and standards that you

22   talked about, does that still apply to jails?

23   A.   It does.

24        MS. JUN:  Thank you.  No further questions.

09:55AM 25        THE COURT:  Okay.

UNITED STATES DISTRICT COURT

1           Recross-examination.

2                   RECROSS-EXAMINATION

3   BY MR. MIEDERHOFF:

4   Q.    Um, Mr. Clark, you just mentioned that the persons at

09:55AM 5   the facility were responsible for documenting any phone calls

6   that came in?

7   A.    The phone calls and the information in particular about

8   this medical need, yes.

9   Q.    You don't know how many phone calls a jail gets every

09:55AM 10  day, do you.

11  A.    No, I have not seen their phone log.

12  Q.    If someone called just to say that they were curious

13  about their family member who is an inmate, you're saying you

14  expect that to be documented?

09:55AM 15  A.    On a curiosity. . . a curiosity with where he's housed,

16  what's the status, those would not necessarily be documented,

17  but a notice of medical condition would absolutely be noted.

18  Q.    So if someone called and notified of a specific medical

19  condition, you would expect that to be documented.

09:56AM 20  A.    Well, it is -- it's documented in certain ways.

21  Typically, I took your question as information; what's the

22  court date, where he's going, is he gonna be moved, that type

23  of thing.  That's not what my testimony here.  My testimony

24  is about --

09:56AM 25          MR. MIEDERHOFF:  I move to strike as nonresponsive,

```
  1     Your Honor.

  2            THE COURT:  Sustained.

  3            Why don't you reask the question.

  4     BY MR. MIEDERHOFF:

09:56AM 5   Q.   It's your opinion that if someone calls and reports a

  6     medical condition of a family member, that should be

  7     documented; right?

  8     A.   Yes.

  9     Q.   You did not review any notations of anyone calling to

09:57AM10   report a medical condition; correct?

 11     A.   Correct.

 12            MR. MIEDERHOFF:  No further questions, Your Honor.

 13            THE COURT:  You may step down.

 14            Thank you very much for coming in, sir.

09:57AM15           Next witness.

 16            MR. McMULLEN:  Your Honor, the plaintiffs call

 17     Deputy Roger Conley.

 18            THE COURT:  Okay.

 19            MR. McMULLEN:  And as I feared, that was Mr. Roger

09:57AM20   Clark that just left.  And I apologize, it's Mr. Ronald

 21     Conley.

 22            THE COURT:  Okay.  Thank you, Counsel.

 23            THE CLERK:  Please raise your right hand.

 24                   (Witness sworn.)

09:58AM25           THE CLERK:  Thank you.  Please be seated.
```

```
 1              Please adjust the microphone so you're speaking

 2      into it at all times.

 3              For the record, please state your full name and

 4      spell your last name.

09:58AM 5       THE WITNESS:  Ronald Conley, C-o-n-l-e-y.

 6              THE COURT:  Okay.  Thank you, Counsel.

 7              You may inquire.

 8              MR. McMULLEN:  Thank you, Your Honor.

 9                        DIRECT EXAMINATION

09:58AM10   BY MR. McMULLEN:

11      Q.  Good morning, Deputy Conley.

12      A.  Good morning, sir.

13      Q.  Deputy Conley, you've been here in the courtroom

14      throughout the trial so far?

09:58AM15   A.  I have.

16      Q.  And you were here during my opening statement?

17      A.  Yes, sir.

18      Q.  Uh, as well as the witness testimony that we've heard so

19      far?

09:58AM20   A.  Yes, sir.

21      Q.  All right.  So if it's okay with you, we'll just kind of

22      jump right in.

23      A.  Yes, sir.

24      Q.  First, we just heard a little bit about POST, the Peace

09:59AM25   Officers Standards and Training.  Is that something that
```

UNITED STATES DISTRICT COURT

```
  1    you're certified in?

  2    A.    Yes, sir, I am.

  3    Q.    When did you first get the POST basic certification?

  4    A.    June of 2005 is when I graduated.

09:59AM 5    Q.    Graduated from the --

  6    A.    San Bernardino County Sheriff Academy.

  7    Q.    And you have been a Deputy Sheriff since your

  8    graduation?

  9    A.    Yes, sir, I have.

09:59AM10    Q.    2005?

 11    A.    Yes, sir.

 12    Q.    At the time of the incident here -- and does it fit with

 13    your memory?  We're talking about July of 2022?

 14    A.    Yes, sir.

09:59AM15    Q.    You were assigned at that time to the Apple Valley

 16    Sheriff Substation?

 17    A.    I was.

 18    Q.    And Apple Valley is sometimes called the Apple Valley

 19    Police which is actually, that police role is fulfilled by

09:59AM20    the San Bernardino Sheriff's Department.

 21    A.    If it contracts the station through the Sheriff's

 22    Department, yes.

 23    Q.    So those aren't separate police officers -- uh, I've

 24    heard you referred to as Officer Conley as well.  Is that

10:00AM25    also an appropriate title?
```

UNITED STATES DISTRICT COURT

1    A.    Well, I'm -- I'm actually a Deputy Sheriff, but the City

2    pays the Sheriff's Department for police protection.

3           THE COURT:  Counsel, we're gonna break at this

4    time.   It's 10 o'clock, and so it's time of the morning

10:00AM 5    recess.   We're gonna break at this time.

6           Ladies and gentlemen, remember the admonishment not

7    to discuss the case among yourselves or with anyone else or

8    form or express any opinions about the matter until it's

9    submitted to you and you retire the jury room.   We'll break

10:00AM10    for 15 minutes.   We'll see you back at that time.   We'll be

11    in recess.

12           THE CLERK:  This court is in recess.

13                     (Recess taken.)

14           THE CLERK:  All rise.

10:14AM15                     (Jury present.)

16           THE CLERK:  Please be seated and come to order.

17           THE COURT:  I'd like to reflect that all the

18    members of the jury are in the respective seats in the jury

19    box, witness is on the witness stand, and remember you're

10:18AM20    still under oath.

21           Counsel, you may inquire.

22    BY MR. McMULLEN:

23    Q.    Deputy Conley, so in July of 2022, you were saying

24    you're assigned to the Apple Valley Sheriff Substation?

10:18AM25    A.    Uh, yes, sir, I was.

```
 1    Q.   And in that same time, and I'm not asking for your
 2    address, but what city did you live in?
 3    A.   Apple Valley.
 4    Q.   How long have you lived there?
10:18AM 5    A.   Off and on for 40 years.
 6    Q.   Uh, how long is your commute from where you live in
 7    Apple Valley to the substation?
 8    A.   15 minutes.
 9    Q.   And as long as we're talking about commutes, how long
10:19AM 10   does it get -- how long does it take to get from Apple Valley
11    say the substation to the High Desert Detention Center?
12    A.   It's roughly a 30-minute drive.
13    Q.   And then have you had occasion to -- well, in fact, back
14    in 2005, you were -- were you -- do I remember correctly?
10:19AM 15   You were assigned for a little bit to the West Valley
16    Detention Center in Rancho Cucamonga?
17    A.   Yes, sir, I was.
18    Q.   Have you made that drive between the High Desert
19    Detention Center and the West Valley Detention Center before?
10:19AM 20   A.   No.  The High Valley Detention Center wasn't a jail
21    facility when I was assigned patrol.
22    Q.   And not back when you were assigned patrol, but at any
23    point, have you driven from the Adelanto area down to the
24    West Valley Detention Center?
10:19AM 25   A.   That I have done, yes.
```

UNITED STATES DISTRICT COURT

1    Q.    About how long did that take without traffic?

2    A.    45 minutes.

3    Q.    And then with traffic?

4    A.    Maybe an hour, hour and 15?

10:20AM 5    Q.    So let's go to July 27th, 2022.  Uh, we've heard some

6    about how you were dispatched to the Enyart residence.

7    A.    Yes, sir.

8    Q.    What did you understand that the call was about when

9    you're headed there?

10:20AM 10    A.    It was some sort of family disturbance.

11    Q.    And you get this dispatch call at 3:29 p.m.  Does that

12    fit with your memory?

13    A.    Yes, sir.

14    Q.    And you arrived about 3:42 p.m.?

10:20AM 15    A.    Yes, sir.

16    Q.    Um, what do you see when you get there?

17    A.    I saw a subject exit the front door with the family

18    pointing at him as he was indicating to me that he was the

19    involved party.

10:20AM 20    Q.    And -- and that is -- do you have any additional

21    information on the call aside from it's just a disturbance?

22    It sounds like you knew that there was some subject of that

23    disturbance?

24    A.    I don't recall the specifics of the initial call.

10:21AM 25    Q.    But you understand when you're lookin' out there that

UNITED STATES DISTRICT COURT

1    this is the person you're supposed to make contact with?

2    A.   Yes, sir.

3    Q.   Are you planning to arrest him at that point?

4    A.   No, sir.

10:21AM 5    Q.   What was your plan?

6    A.   Just to have a conversation with him, figure out what

7    the problem was, isolate him from the rest of the family as

8    it was a disturbance, try to get his side of the story.

9    Q.   Now, the San Bernardino Sheriff's Department patrol

10:21AM 10   vehicle, you arrived in a patrol vehicle; right?

11   A.   Yes, sir, a marked vehicle.

12   Q.   Is that a Ford explorer?

13   A.   Yes, sir.

14   Q.   And on those ones, there isn't any -- is there a dash

10:21AM 15   cam or anything like that?

16   A.   No.  No, sir.

17   Q.   And then on your person, there's no body worn camera

18   that -- that you're wearin'.

19   A.   Not at this time, no sir.

10:21AM 20   Q.   But you do have -- we've heard a little bit about belt

21   recorders?

22   A.   Yes, sir.

23   Q.   What I'd like to do is play for you Exhibit 99.  It's an

24   audio recording of your belt recording.  Okay?

10:22AM 25   A.   Yes, sir.

1          MR. McMULLEN:  And this is stipulated.

2          Your Honor, may I publish?

3          THE COURT:  And you're introducing, first of all,

4     99?  Exhibit 99?

10:22AM 5          MR. McMULLEN:  Yes, Your Honor, request to

6     introduce.

7          THE COURT:  It may be received.

8               (Exhibit 99 admitted.)

9          THE COURT:  And you may publish.

10:22AM10          MR. McMULLEN:  Thank you, Your Honor.  I'm gonna

11     play the entirety of this, it is a 2-minute, 13-second clip,

12     but I may stop with a few questions along the way.

13          THE COURT:  Sure.

14               (Audio played.)

10:23AM15          MR. McMULLEN:  Okay, um, I know that's pretty --

16     that's pretty quiet.  Were you able to hear that all right?

17     That's as much volume as we can get under this speaker, but I

18     might be able to put the mic up against it.

19          THE COURT:  Why don't you try the mic.  I think the

10:23AM20     jury's had a hard time hearing it, too.

21          MR. McMULLEN:  I am, too.  We'll start over.  I

22     have two mics here.  We'll put one right up against it.  All

23     right.  So this is playing from the beginning again.

24               (Exhibit 99, audio played.)

10:24AM25          MR. McMULLEN:  Is that better or worse?

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Can the jury hear it?  No.

 2     BY MR. McMULLEN:

 3     Q.   Are you able to hear that, sir?

 4     A.   A little bit yeah.

10:24AM 5   Q.   It's a somewhat faint recording on your belt.

 6     A.   It is.

 7     Q.   It was a windy day out there that day.

 8     A.   Yes.

 9     Q.   You've had an opportunity during the course of this

10:24AM10   litigation to hear some of that recording as well; right?

11     A.   I have, sir.

12     Q.   All right.  And that -- that first part that we heard,

13     the first 38 seconds, that's the approach as you're walkin'

14     up to the house?

10:24AM15   A.   Yes, sir.

16     Q.   All right.  And there's a point at which -- do you hear

17     yourself ask do you have any -- do you have weapons on you?

18     A.   Yes, sir.

19     Q.   Okay.  And, um, why do you ask that?

10:25AM20   A.   It's a typical question I ask for safety reasons.

21     Q.   Nothing wrong with asking that; right?

22     A.   No.  It's just for my safety.

23     Q.   And then does it fit with your memory and what you hear

24     there that he at that point responds by pulling out and

10:25AM25   showing you a pocketknife that was clipped to his waistband?
```

UNITED STATES DISTRICT COURT

1  A.   Yeah, I had to reach for it to pull it -- to pull it

2  out.  And he slapped my hand away, and then he pulled the

3  knife out.  He didn't open it, but he had it in his hand.

4  Q.   So it's closed at that point?

10:25AM 5  A.   It was closed, yes.

6  Q.   All right.  And you're reaching for it?

7  A.   Yeah, I was gonna hold onto it until we were done with

8  our conversation.

9  Q.   Is he taking it off his -- his belt clip when you

10:25AM 10  reached for it or you're just tryin' to take it off his belt

11  clip?

12  A.   It was on the outside pocket, and he had cargo shorts

13  on.

14  Q.   But my question is did he -- did he pull it off of his

10:25AM 15  waist pocket, and then you tried to grab it out of his hand

16  or did you just try to grab it from his waistband?

17  A.   I tried to grab it from his pocket.

18  Q.   Okay.  Was there anything wrong with somebody havin' a

19  pocketknife on their pocket?

10:26AM 20  A.   Not necessarily, but out of just an abundance of

21  caution, when I'm on a disturbance like that, a family

22  disturbance, I like to try and get ahold of whatever weapon

23  may be on them just until we're done havin' our conversation,

24  and then I can return it.

10:26AM 25  Q.   You understand that this is -- you're responding to this

UNITED STATES DISTRICT COURT

1     person's residence, their home where they live; right?

2     A.    Yes, sir.

3     Q.    And so it's your understanding that you can just grab

4     for a closed pocketknife out of person's pocket on a man's

10:26AM 5     own property?

6     A.    For safety reasons, I -- I usually take knifes off

7     people, yes.

8     Q.    Okay.  So, uh, what we hear on -- did you hear on the

9     recording that you say you put that down, and he says I just

10:27AM 10     put it down?

11            MR. RAMIREZ:  Objection.

12            Best evidence is the recording.

13            THE COURT:  What's the best evidence?

14            MR. RAMIREZ:  The recording itself.

10:27AM 15            THE COURT:  They can't hear it.

16            So you have to testify what you heard on it.

17            THE WITNESS:  Can you ask that question one more,

18     sir?

19     BY MR. McMULLEN:

10:27AM 20     Q.    Do you hear on that recording you saying put that down

21     and him saying I just put it down?

22     A.    He had an object in his left hand.

23     Q.    There's some discussion of a, what, black, unknown

24     object?

10:27AM 25     A.    Yes.


UNITED STATES DISTRICT COURT

1    Q.   What was that?

2    A.   I don't recall what it turned out to be.

3    Q.   It wasn't a weapon of any sort right?

4    A.   It wasn't a weapon, no.

10:27AM 5    Q.   Okay.  And -- but what I'm talkin' about is with the

6    pocketknife, he does set that down on the pickup truck that's

7    right there, Nick's pickup truck.

8    A.   I don't recall if he set it down or if I was able to get

9    it out of his hand.

10:27AM 10         MR. McMULLEN:  Let's continue on listening for a

11   moment.

12              (Exhibit 99, audio played.)

13         MR. McMULLEN:  I'm gonna try to go back on the

14   overhead.  I think I can hear it a little bit better up here,

10:27AM 15   but I think the jurors may not.  So we've got our max volume

16   here.  All right.  So playing from second 38.

17                   (Audio played.)

18   BY MR. McMULLEN:

19   Q.   Okay.  So at this point, I hear you say put your other

10:28AM 20   hand behind your back.  Right?

21   A.   Yes, I was referring to his left hand.

22   Q.   Where is his right hand?

23   A.   I had had it -- I put it by behind his back.

24   Q.   Okay.  And you have it in a control hold?

10:29AM 25   A.   We call it a wrist lock.

UNITED STATES DISTRICT COURT

```
 1    Q.    Okay.  And a wrist lock is a type of pain compliance

 2    technique that you're taught.

 3    A.    It is.  Yes.

 4    Q.    And by pain compliance, with a wrist lock twisted behind

 5    your back, you can, uh, fluctuate the amount of pressure

 6    you're putting on the wrist to modulate the amount of pain

 7    you're inflicting in order to gain compliance.

 8          MR. RAMIREZ:  Objection.  Relevance, Your Honor.

 9          THE COURT:  Sustained

10    BY MR. McMULLEN:

11    Q.    At this point, why have you put his hands behind his

12    back?

13    A.    To control his actions.

14    Q.    What actions are those?

15    A.    The fact that he had slapped my hand away when I tried

16    to grab the knife from his pocket.

17    Q.    Okay.  Um, and at that point, are you arresting him?

18    A.    Not at all.

19    Q.    Why not?

20    A.    At that point, I was just going to detain him due to his

21    actions.

22    Q.    Okay.  And what -- and the actions are the -- the

23    slapping away.

24    A.    Correct.

25          MR. McMULLEN:  We're going to play 104.
```

UNITED STATES DISTRICT COURT

```
 1                         (Audio played.)

 2    BY MR. McMULLEN:

 3    Q.   That's the end of the recording at that point.  Right?

 4    A.   Yes, sir.

10:31AM 5    Q.   Okay.  And at -- at this point, he has his left hand on

 6    the truck.  Right?

 7    A.   Yes, sir.

 8    Q.   And you have his hand behind his back.

 9    A.   I do.

10:31AM10    Q.   And it's still in that wrist lock.

11    A.   Yes.

12    Q.   And during that period of time, do you know -- can you

13    see the scarring on the back of his left arm?

14    A.   No.

10:31AM15         MR. RAMIREZ:  Objection, relevance.

16         THE COURT:  Sustained.

17    BY MR. McMULLEN:

18    Q.   Do you know that he has hardware in his arm from an

19    accident?

10:31AM20         MR. RAMIREZ:  Objection, relevance.

21         THE COURT:  Sustained.

22    BY MR. McMULLEN:

23    Q.   So this, uh, continues even after the recording stops.

24    A.   Yes, it does.

10:32AM25    Q.   And you believe that the recording stopped because, uh,
```

UNITED STATES DISTRICT COURT

1    when you're reaching for your pepper spray, maybe you hit the

2    belt recorder?

3            MR. RAMIREZ:  Objection, relevance.

4            THE COURT:  Okay, I don't know where you're going.

10:32AM 5    Sustained.  That's not part of the charges in front of the

6    jury, Counsel.  Go ahead.

7    BY MR. McMULLEN:

8    Q.   Okay.  So now, the deputies arrive.  Other deputies

9    arrive?

10:32AM 10   A.   Yes, sir.  They did.

11   Q.   And you, uh -- you have him in this position for about

12   four-and-a-half minutes.

13   A.   Correct.

14   Q.   And then other deputies help you put his hands behind

10:32AM 15   his back.

16   A.   Yes.

17   Q.   And you put him in your, uh, patrol vehicle.

18   A.   Yeah, I put him in the back seat of my patrol vehicle.

19   Q.   All right.  Now, were you injured during this encounter?

10:32AM 20   A.   I was.

21   Q.   How were you injured?

22   A.   My thumb had been bent backwards.

23   Q.   And when did that happen?

24   A.   Trying to control him up against the truck.

10:33AM 25   Q.   Okay.  You wrote a report in this case eventually;

UNITED STATES DISTRICT COURT

```
            1    right?

            2    A.    I did.

            3    Q.    Okay.  And you're trained in your report to write things

            4    in a chronological order.

10:33AM     5    A.    Yes, sir.

            6    Q.    Now, in your report, you write about him bending your

            7    thumb?

            8    A.    Yes, sir.

            9    Q.    And so you write about him bending your thumb before,

10:33AM    10    uh -- well during the struggle when you're trying to get him

           11    to put his other hand behind his back.

           12            MR. RAMIREZ:  Objection, relevance.

           13            THE COURT:  Again sustained.

           14    BY MR. McMULLEN:

10:33AM    15    Q.    Now, uh. . . you. . . at that point, you place him under

           16    arrest.

           17    A.    Yes.

           18    Q.    And what are you planning to charge him with at that

           19    point?

10:33AM    20    A.    Assaulting a peace officer with injury.

           21    Q.    And so, uh, did you get any -- do you end up gettin' any

           22    medical attention for the thumb injury?

           23    A.    No, I did not.

           24    Q.    Um, and, did -- of course, if -- if you're planning to

10:34AM    25    do that, do you document any photos of yourself at the scene?
```

UNITED STATES DISTRICT COURT

```
 1              MR. RAMIREZ:  Relevance.

 2              THE COURT:  It probably isn't, but overruled.

 3      You're gonna ask him this.  Did you document anything on your

 4      injuries?

 5              THE WITNESS:  I don't remember if photographs were

 6      taken or not.

 7              THE COURT:  Okay.

 8      BY MR. McMULLEN:

 9      Q.   Okay.  All right.  So. . . at that point, you're not

10      happy about Mr. Enyart not listening to you.

11      A.   I wouldn't say I was not happy.

12      Q.   Well, your thumb's sore.  And the thumb injury is really

13      from when he's spinning around, and you're tryin' to hold

14      onto him; right?

15      A.   Yes.

16      Q.   That's what you testified in your deposition.

17      A.   Yes.

18      Q.   Okay.  Because he's got one hand up here and the other

19      behind his back, right, but he's trying to move around like

20      that?

21      A.   He was.  Yes.

22      Q.   And you're trying to control him.

23      A.   Yeah, I was trying to control his movement.

24      Q.   Okay.  And your thumb was sore after that.

25      A.   Yes.
```

 1    Q.    Okay.  So now, when you have him arrested, in addition

 2    to your thumb being sore, you notice this guy is slurring his

 3    words.

 4    A.    Yes.

10:35AM 5    Q.    And you smell alcohol on his breath.

 6    A.    I did.

 7    Q.    And we heard him in there.  He's whining I didn't do

 8    anything.  Please stop.

 9    A.    Yes.

10:35AM10    Q.    And he's sweaty.

11    A.    He was.

12    Q.    He's got tattoos.

13          MR. RAMIREZ:  Objection, relevance.

14          THE COURT:  Sustained.

10:36AM15    BY MR. McMULLEN:

16    Q.    He's got long hair.

17    A.    I don't recall his physical appearance, sir.

18    Q.    He's got sort of ear art.

19    A.    I -- I don't recall.

10:36AM20    Q.    And you decide this guy's goin' to jail.

21    A.    Yes.

22    Q.    And you drive him from the Enyart residence to the High

23    Desert Detention Center.

24    A.    I did.

10:36AM25    Q.    How -- how long is that drive?

```
 1   A.   30, 35 minutes.

 2   Q.   Now, you don't leave right away, though, when you put

 3   him in the car, do you?

 4   A.   No, sir.

 5   Q.   And you tell other deputies to take witness statements.

 6   A.   I don't know if I instructed them to do it or they just

 7   did it on their own.

 8   Q.   Well, you -- you gave a deposition in this case.  Do you

 9   remember that?

10   A.   I do.

11   Q.   That was earlier this year?

12   A.   Yes.

13   Q.   And you were under oath during that?

14   A.   Yes.

15   Q.   Okay.  We have that deposition here.  Does it fit with

16   your memory that said that you told other deputies to take

17   witness statements?

18   A.   It's very possible, yes.

19   Q.   Would you like to see that in your deposition?

20   A.   No, I -- I believe you.

21   Q.   Okay.  Um, now, you expected them -- as you testified

22   before, you expected them to find out all the important

23   information and pass it on to you.

24   A.   Yes.

25   Q.   Because you were the point person of this call.
```

UNITED STATES DISTRICT COURT

```
 1   A.   I was.

 2   Q.   And, uh, we've heard that discussed, lead officer?

 3   A.   Yes.

 4   Q.   Or arresting officer?

 5   A.   Yeah, I was -- I was initially the backing officer, but

 6   because I arrived first, I took as the case agent.

 7   Q.   When you were driving there, when you first got the

 8   call, you're thinking, oh, maybe I'm just going there as

 9   backup.

10   A.   Yes.

11   Q.   But you got there first.

12   A.   I did.

13   Q.   And from then on from the point you got there, for the

14   rest of this case, you are the lead officer and the arresting

15   officer.

16   A.   I am.

17   Q.   Now, those witness statements are gathered.  You're at

18   the scene while they're being gathered.

19   A.   Yes, sir.

20   Q.   And if the witness interviews would have revealed

21   Mr. Enyart was a chronic alcoholic that drinks every day, you

22   expected that to be passed on to you so that you could tell

23   that to the jail.

24   A.   I would.

25   Q.   Now, there were -- there were paramedics that were
```

1    called out; right?

2    A.   Yes, sir, I summoned for paramedics.

3    Q.   And that's because Mr. Enyart in the back of your car

4    was complaining about his back.

10:38AM 5    A.   Yes.  He had told me that he had recent surgery or had a

6    back problem so we summoned medical aid to check on him.

7    Q.   Did you see the scar that was on his left -- under his

8    left scapula?

9    A.   I don't recall seeing it.

10:38AM10    Q.   And when he's sittin' in the back of your car, uh, still

11    in handcuffs; right?

12    A.   Yes, sir.

13    Q.   It's -- it's 96 degrees out at that time?

14         MR. RAMIREZ:  Objection, calls for speculation.

10:39AM15         THE COURT:  Overruled.  Do you know -- do you know

16    what the temperature was at the time?

17         THE WITNESS:  I do not, but the back seat of our

18    patrol vehicles do have their own separate air conditioning.

19    BY MR. McMULLEN:

10:39AM20    Q.   Is the door closed or open in your -- in your vehicle?

21    A.   It was closed until the paramedics arrived.  Then the

22    door was open.

23    Q.   And so he's seat belted in the car in the back?

24    A.   He wasn't seat belted at this time.

10:39AM25    Q.   When -- when you put him in the car with the other

```
         1    deputies, you wrote in your report that you put -- that you

         2    seat belted him in there.

         3    A.    Prior to transport, yes.

         4    Q.    Okay.  So he's sitting in the back, and he has his hands

10:39AM  5    behind his back in handcuffs.

         6    A.    Yes.

         7    Q.    Now, when the paramedics come to check him out about his

         8    back, those are firefighter paramedics from Apple Valley?

         9    A.    They are, sir.

10:39AM 10    Q.    All right.  And they -- you -- uh, you walked with them

        11    over to the car.

        12    A.    Yes.

        13    Q.    So you could open the car door?

        14    A.    Yes.

10:40AM 15    Q.    And they check him right there in the car.

        16    A.    They do.

        17    Q.    They don't pull him out.

        18    A.    I don't remember him getting out, no.

        19    Q.    You don't take the handcuffs off.

10:40AM 20    A.    No.

        21    Q.    And they're there for a few minutes.

        22    A.    Yes.

        23    Q.    They're looking at his back.  Right?

        24    A.    I believe that was the main complaint, yes.

10:40AM 25    Q.    And then when the paramedics leave, you shut the door
```

UNITED STATES DISTRICT COURT

1      again?

2      A.    Yes.

3      Q.    So the air conditioner could be on?

4      A.    Mm-hmm.   Yes, sir.

10:40AM 5    Q.    And you stay there at the scene for longer.

6      A.    I don't think I stayed very much longer.

7      Q.    You don't leave with the paramedics.

8      A.    No.

9      Q.    So now we're headed to the High Desert Detention Center,

10:40AM10    and you said it was about a half hour?

11     A.    About half hour, 35 minutes.

12     Q.    How many times have you brought someone to be booked and

13     arrested at the High Desert Detention Center?

14     A.    A hundred, 150 times.

10:41AM15    Q.    And you're familiar with the steps that you have to take

16     in the booking process as the arresting officer.

17     A.    I do.

18     Q.    Um, what's the first step?

19     A.    First step from arriving at the facility?

10:41AM20    Q.    Yes, sir.

21     A.    They enter the search and uncuff area where jail staff

22     searches them thoroughly and un-handcuffs them.

23     Q.    And there is a -- are you familiar with somethin' called

24     an initial receiving screening?

10:41AM25    A.    I've heard of it.  I don't think I've ever -- I know

UNITED STATES DISTRICT COURT

1    about it, I don't think I've actually seen it.  It's done by

2    nursing staff.

3    Q.   You understand as an arresting officer that there is a

4    screening that's done by a nurse.

10:41AM 5    A.   Correct.

6    Q.   That's the first step.

7    A.   After they get searched and uncuffed, yes, they get

8    brought to the nurse.

9    Q.   You gotta take the cuffs off.

10:42AM 10   A.   Yes.

11   Q.   Make sure that there's not something that was missed in

12   an earlier search.

13   A.   Correct.

14   Q.   And then we have the screening by the nurse.

10:42AM 15   A.   Yes, sir.

16   Q.   And if an arrested person is accepted by the High Desert

17   Detention Center at that point, then it's not your

18   responsibility anymore.

19   A.   Well, I stay with them until they complete the booking

10:42AM 20   process meaning I give the booking officer my paperwork with

21   the charges, the personal information on the arrestee.  They

22   get brought out.  They sign that they acknowledge their

23   charges, how to make their phone calls, and then at that

24   point, I'm relieved.

10:42AM 25   Q.   Okay.  And in that initial screening by the nurse,

1    there's some circumstances where they my reject the person

2    from being booked in.

3    A.    That is correct.

4    Q.    And if they don't -- if they reject the person, that

10:42AM 5    they don't accept responsibility for the person, that person

6    stays your responsibility.

7    A.    Correct.

8    Q.    Until you find someone else to take over.

9    A.    Well, no.  If the jail nurse rejects the booking for

10:43AM 10    medical reasons, I have to take that person to a local

11    hospital and get them cleared to book by a doctor, and then I

12    can bring them back for booking.

13    Q.    Okay.  So there is a circumstance where that's called a

14    jail medical clearance, pre-clearance that's required?

10:43AM 15    A.    Yeah, we call it a jail check.

16    Q.    So if they say no, then that means you gotta go

17    somewhere else and deal with it more.

18    A.    Yes.

19    Q.    In the -- this first area where the search happens, um,

10:43AM 20    that is an area where you can get some work done, too; right?

21    A.    Yes.

22    Q.    You can work on a laptop there.

23    A.    Yes.

24    Q.    And what sort of work would you be doin' on a laptop

10:44AM 25    there?

UNITED STATES DISTRICT COURT

1    A.    Completing the booking application.

2    Q.    Okay.

3    A.    And the probable cause declaration.

4    Q.    What -- what are those?

10:44AM 5    A.    The booking application is, again, personal information

6    on the arrestee, the charges and then the probable cause

7    declaration because it was a felony on the events of the

8    incident that occurred.

9    Q.    Okay.  And then what about a -- a -- as the arresting

10:44AM10    officer, what about your crime report?  Are you able to work

11    on that there, too?

12    A.    I can, but typically, I dictate that.  And I usually do

13    that back at the station or on my way back to the station

14    from the jail.

10:44AM15         MR. McMULLEN:  So we have a visual of this.  What

16    I'd like to do is put up Exhibit 6.  Exhibit 6.  Uh, we'll

17    call is 6-D, and these are video excerpts that the county has

18    prepared of the High Desert Detention Center that day.

19         THE WITNESS:  Okay.

10:45AM20         MR. McMULLEN:  Okay?  And I'm going to -- they're

21    excerpts are 27 minutes long.  I'm not gonna play that.  I'm

22    gonna go to minute 1.20.  If I can pull that up?

23         Oh, I'm sorry, Your Honor.  Your honor, at this

24    time, I would move into evidence Exhibit 6-D which is the

10:45AM25    excerpts the county's prepared, and there's a stipulation to

          1    admissibility.

          2              THE COURT:  Exhibit 6-D?

          3              MR. McMULLEN:  Yes, Your Honor.

          4              THE COURT:  It'll be received.

10:45AM   5                   (Exhibit 6-D admitted.)

          6              THE COURT:  And it may be published.

          7              MR. McMULLEN:  Thank you, Your Honor.  So I'm

          8    playing it at time stamp one -- well, the minute 1.23 on this

          9    recording.

10:45AM  10              THE COURT:  Okay.

         11                   (Video played.)

         12              MR. McMULLEN:  Let me just pause it there for a

         13    moment.

         14    Q.   Is that you in the foreground of this video?

10:45AM  15    A.   It is, sir.

         16    Q.   All right.  And Deputy Conley, this door that we see to

         17    the right, that's the door to outside.

         18    A.   Yeah.  This is the door coming from the intake yard into

         19    the search and uncuff area.

10:46AM  20    Q.   That's where you first walk in with someone.

         21    A.   Yes, sir.

         22    Q.   And in this instance, Mr. Enyart is behind you with two

         23    deputies on either side of him?

         24    A.   He is.

10:46AM  25    Q.   Okay.  And you -- you are walking toward a countertop

```
 1   kind of like the one that we can see on the left?

 2   A.   Yes.

 3   Q.   It continues around in an L-shape on this pony wall

 4   that's in the very bottom left on the screen?

10:46AM 5   A.   It is, yeah.  Right behind that wall is a stainless

 6   steel shelf, if you will.

 7   Q.   And that's where there's -- on -- on the -- on the steel

 8   shelf is where there's some laptops you can work on.

 9   A.   It would be my computer out of my patrol vehicle.

10:46AM10   Q.   Okay.

11   A.   Which could -- yes, could be turned into a laptop, yes.

12   Q.   The probable cause declaration, that is the

13   declaration -- why do you need a probable cause declaration?

14   A.   Because charging him with a felony, he's not gonna be

10:47AM15   released as if I arrested someone for a simple misdemeanor.

16   So the probable cause goes to the custodial officer to

17   determine if he's gonna stay in custody or if he's gonna make

18   bail.

19   Q.   You know what Penal Code Section 148 is; right?

10:47AM20   A.   Correct.

21   Q.   That's resisting a police officer?

22   A.   Yes.

23   Q.   That's a misdemeanor; right?

24   A.   Yes, it is.

10:47AM25   Q.   Now, the -- the probable cause statement that you're
```

 1    preparing, you're saying you want him prosecuted for a

 2    felony.

 3    A.   Because there was injury.

 4    Q.   And the -- as you're preparing that. . .

10:47AM 5        MR. McMULLEN:  Let's go over for a moment to the

 6    one photo that you have in support of this case is -- I'd

 7    like to show you Exhibit -- or you can look at it up there in

 8    the binder.  Is the binder up there?

 9             THE WITNESS:  No, sir.

10:48AM 10            THE COURT:  What exhibit?

11             MR. McMULLEN:  Exhibit 46 from plaintiff's.

12             THE WITNESS:  You said 46?

13    BY MR. McMULLEN:

14    Q.   Yes, sir.

10:48AM 15    A.   Okay.

16    Q.   That's the photo that was taken of you at the scene in

17    support of this probable cause declaration and submission

18    you're planning for the district attorney about the felony?

19    A.   Yes.

10:48AM 20            MR. McMULLEN:  Your Honor, permission to admit and

21    publish?  This is stipulated.

22             MR. RAMIREZ:  I'll just object to relevance at this

23    point.

24             THE COURT:  Sustained.  It's not relevant.  We've

10:48AM 25    been wasting a whole lot of time on nothing to do with this

1    case up to this point.  The question is was there medical

2    needs that were given to the officers, did they do what they

3    should be doing with the medical needs, and was there any

4    damages on it?  So yes, it is irrelevant.  Sustained

10:49AM 5    BY MR. McMULLEN:

6    Q.   Deputy Conley, was the health and well-being in the

7    present and the future of importance to you with respect to

8    Mr. Enyart?  His health and well-being.

9    A.   Yeah, and it wasn't anything personal.

10:49AM 10   Q.   And you know that a felony can mean that someone is

11   gonna go to prison; right?

12   A.   Potentially.

13   Q.   And you know that someone, if they have a felony, it can

14   affect their job prospects, their ability to vote.  They're a

10:49AM 15   felon for life.

16           MR. RAMIREZ:  Objection, relevance.

17           THE COURT:  Sustained.

18   BY MR. McMULLEN:

19   Q.   Deputy Conley, why did you want Mr. Enyart to be a

10:49AM 20   felon?

21           MR. RAMIREZ:  Objection, relevance.

22           THE COURT:  Sustained.

23   BY MR. McMULLEN:

24   Q.   So let's talk about -- and you did prepare -- you

10:50AM 25   dictated and prepared a report; right?

1    A.    I did, sir.

2    Q.    And we can also talk about here at the scene, you're

3    preparing your probable cause declaration as well.  Right?

4    A.    At the scene or here in the jail?

10:50AM 5    Q.    Uh, here in the jail.

6    A.    I'm, yeah, preparing the booking paperwork.

7    Q.    Uh, and the probable cause statement.

8    A.    Yes.

9    Q.    And you document that Mr. Enyart was slurring his words

10:50AM 10   at the scene.

11   A.    At the initial scene, yes.

12   Q.    And you could smell alcohol coming from his breath.

13   A.    Yes.

14   Q.    And he was sweating heavily.

10:50AM 15   A.    Yes.

16   Q.    And that you believed that he was intoxicated.

17   A.    Yes.

18   Q.    Now, this initial receiving or screening that the nurse

19   does, you have some -- in general, you would have some

10:51AM 20   participation with that; right?

21   A.    Typically, yes.

22   Q.    At this time in July of 2022, uh, that is something that

23   the nurse would generally fill out on a computer.

24   A.    Yes.  In the nurse's office, yes.

10:51AM 25   Q.    And there are seven questions, and you've seen during

UNITED STATES DISTRICT COURT

1    this trial, and we've heard some about these questions on

2    this form about what the arresting officer is aware of.

3    A.    Yes.

4    Q.    And those questions are on a wall, uh, or on a form on a

10:51AM 5    wall in the -- in the nurse's office.

6    A.    Yes, sir, they are.

7    Q.    And those questions, they're the same questions every

8    time you bring someone there to be booked.

9    A.    Yes, sir, they are.

10:51AM10    Q.    Something that you've grown some familiarity with.

11    A.    Yes.

12    Q.    And sometimes the nurse might ask you each one of those

13    questions individually.

14    A.    Sometimes, depending on the nurse, yes.

10:52AM15    Q.    But sometimes, you might just say, uh, yes to 1 and 3.

16    A.    Yes.

17    Q.    Or you might just say no to all of 'em.

18    A.    Yes.

19          MR. McMULLEN:  Now, the initial receiving screening

10:52AM20    in this case has already been admitted into evidence, and

21    we've seen it earlier in this trial.  I'd like to pull it up

22    on the screen at this point.  It's Exhibit 7.

23          Your Honor, may I publish?

24          THE COURT:  Yes.  That's already been received,

10:52AM25    hasn't it?

UNITED STATES DISTRICT COURT

```
 1              MR. McMULLEN:  It has, Your Honor.

 2              THE COURT:  Yes.

 3    BY MR. McMULLEN:

 4    Q.   You see Exhibit 7 up on your screen?

10:52AM 5    A.   I do, sir.

 6    Q.   Now, let's look at a few parts of it.  First of all, the

 7    middle here, it says badge number.  That's your badge number?

 8    A.   Uh, my employee number.

 9    Q.   Employee number?

10:52AM10    A.   Yeah.  For the Sheriff's Department, we don't

11    necessarily use badge numbers.  We would refer to our

12    employee number.

13    Q.   That employee number, that's not -- that's -- that's

14    unique to you.

10:53AM15    A.   That is specifically unique to -- to me as a person,

16    yes.

17    Q.   And then arresting officer, it says Connley, but there's

18    an extra "n" in there.  It's misspelled?

19    A.   It is misspelled.

10:53AM20    Q.   And this is -- your understanding like we talked about

21    with this form, it's something that the nurse inputs.

22    A.   Yes.

23    Q.   Now, below, we've seen, and we've talked about some of

24    the questions on here.  Right?

10:53AM25    A.   Yes.
```

1    Q.   And we've talked in particular about this question

2    regarding is the arresting officer aware of any of the

3    following, and then under the influence of drugs or alcohol?

4    A.   Yes, sir.

10:53AM 5    Q.   All right.  Why did you tell the nurse no on that

6    question?

7    A.   I wasn't in the nurse's medical office when these --

8    when this form was filled out.

9    Q.   Okay.  Well, that is not my question.  My question is

10:54AM10    why at any point did you tell the nurse no with respect to

11    the question about whether he's under the influence of

12    alcohol?

13    A.   I don't know.

14         THE COURT:  Did you ever tell the nurse no, that he

10:54AM15    was not under the influence.

16         THE WITNESS:  No.  There was a video that I saw

17    after my deposition where I actually had --

18         THE COURT:  No, I'm just talking about at the -- at

19    the time you booked him in.  Did you ever tell the nurse that

10:54AM20    he was not under the influence?

21         THE WITNESS:  Prior to him going to the medical

22    office, I did talk with the nurse.

23         THE COURT:  Okay.  And you talked about whether or

24    not he was or was not under the influence?

10:54AM25         THE DEFENDANT:  Yes.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay.  Go ahead, Counsel.

 2    BY MR. McMULLEN:

 3    Q.   And at that point when you had that discussion with the

 4    nurse, why did you tell the nurse no?

 5    A.   The -- based on the video that I saw where me and him

 6    are just havin' a conversation before he goes to the female

 7    side to get his medical exam, his initial screening, um, that

 8    would have been the time that I would have told 'em about his

 9    shoulder injury, what happened at the scene, and that I

10    smelled alcohol on his breath.

11    Q.   Sir, my question's a little different.  My question is,

12    and what I want to understand is when the nurse is asking you

13    the answers to these questions that every time -- every time

14    that there's a requirement that the arresting officer provide

15    those answers; right?

16    A.   Yes.

17    Q.   Okay.  And so in response to the why -- are you aware if

18    he's under the influence of alcohol, why did you tell the

19    nurse no?

20              MR. RAMIREZ:  Asked and answered, misstates prior

21    testimony.

22              THE COURT:  Overruled.

23              THE WITNESS:  Again, I did tell the nurse the

24    issues that we had, and I was not in the office when this was

25    filled out on this computer.  I was still on the intake side.
```

1          MR. McMULLEN:  I can move to strike as

2    nonresponsive, but I won't do that.  I'm just gonna --

3          THE COURT:  Well, let me ask this question.  Did

4    you tell the nurse he was under the influence?

10:56AM 5          THE WITNESS:  Yes.

6          THE COURT:  You told the nurse that you thought he

7    was under the influence of alcohol.

8          THE WITNESS:  That I smelled alcohol on his breath,

9    yes, along with the shoulder injury or the back injury.

10:56AM 10   BY MR. McMULLEN:

11   Q.   This form doesn't say ask about shoulder injuries or

12   back injuries; right?

13   A.   This does not, no.  Well, it does say illness at the

14   first question.

10:56AM 15         THE COURT:  Wasted a lot of time.  The only -- the

16   only question to you is did you ever tell the nurse that you

17   thought he was under the influence of alcohol?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.  Next question.

10:56AM 20   BY MR. McMULLEN:

21   Q.   And so is it your position that the nurse changed your

22   answer and put no?

23         THE COURT:  Well, that would be speculation,

24   Counsel.

10:56AM 25   BY MR. McMULLEN:

UNITED STATES DISTRICT COURT

 1    Q.   What you're saying -- is that Nurse, and we see on this

 2   document, Alvarado?  Do you know who Nurse Alvarado is?

 3   A.   I do know of -- who he is, yes.

 4   Q.   And what you're saying is that Nurse Alvarado got it

10:57AM 5   wrong.

 6   A.   Somehow it got marked no.  I don't know if it was a

 7   mistake, it is an oversight, but it should have been marked

 8   yes.

 9   Q.   It should have been marked yes; correct?

10:57AM10   A.   Yes.

11   Q.   And he should have been told yes; correct?

12   A.   Yes.

13   Q.   Deputy Conley, you never gave any medical staff at the

14   jail any information related to Mr. Enyart's alcohol use.

10:57AM15   Did you.

16   A.   No.  I did not have that information.

17   Q.   You didn't provide anything that you had observed at the

18   scene regarding his alcohol use?

19        MR. RAMIREZ:  Objection, misstates prior testimony.

10:57AM20        THE COURT:  Overruled.

21        THE WITNESS:  I did tell the nurse that I -- I

22   smelled the alcohol on his breath.

23   BY MR. McMULLEN:

24   Q.   You didn't tell the nurse anything that you learned from

10:58AM25   witness interviews that were conducted by the other deputies

UNITED STATES DISTRICT COURT

1      at the scene?

2      A.   I didn't have that information when I booked him in.

3      Q.   Did you get that information after at some point from

4      the deputies?

10:58AM 5    A.   No, I did not.

6      Q.   So your expectation that you told them, okay, I want you

7      to do witness interviews, and you talked a little bit earlier

8      that you expected them to tell you the results of those

9      interviews; right?

10:58AM 10   A.   Correct.

11      Q.   And what you're saying is that they, also, didn't do

12      their job like Nurse Alvarado who checked no.

13      A.   No, there was no additional crime at the scene.  So that

14      therefore, I took him to the jail on my own.

10:58AM 15   Q.   So nothing that was learned from the family members

16      about his alcohol abuse and his issues related to alcohol was

17      communicated by you to the nursing staff at the jail at the

18      time of booking; right?

19      A.   No.

10:58AM 20   Q.   And it wasn't communicated at any point by you to the

21      jail even after you booked him.

22      A.   No.

23      Q.   That's probably a bad question.  Did you communicate

24      that information to the jail at any point?

10:59AM 25   A.   No, sir, I did not.

               1    Q.   And when you left, you went back to the Apple Valley

               2    Substation; right?

               3    A.   Yes, sir.

               4    Q.   And you learned that the family had called the station

    10:59AM    5    asking for you to call them back.

               6    A.   I don't recall that phone call.

               7    Q.   There is a phone record that indicates, and you've seen

               8    in this discovery, that there is a 12-minute phone call --

               9         THE COURT:   Counsel, why don't you ask as a

    10:59AM   10    question rather than a statement.

              11         MR. McMULLEN:   Yes, sir.

              12    Q.   Um, did -- did -- so what you're saying is that you

              13    don't -- you don't have a recollection of the family -- of

              14    you being on the phone with the family for 12 minutes.

    10:59AM   15    A.   I do not.

              16    Q.   And the family if they had told you at that point that

              17    there was a drinking problem that he had, and there's worries

              18    that he is gonna have seizures at the jail, is that part of

              19    your memory?

    11:00AM   20    A.   I don't recall any part of it.

              21    Q.   You don't recall any part of that 10 to 12-minute

              22    conversation.

              23    A.   I do not.  No.

              24    Q.   And you certainly didn't communicate that information to

    11:00AM   25    the jail.

1    A.   I don't recall the conversation so no, nothing would

2    have been passed on.

3    Q.   If you would have learned that information, even though

4    booking is done, you as the arresting officer would have had

11:00AM 5    an obligation to give that to the jail.

6    A.   I would have, yes.

7    Q.   But you got him booked into the High Desert Detention

8    Center?

9    A.   Yes, sir, I did.

11:00AM 10    Q.   And then you left.

11    A.   I did.

12    Q.   Not your problem anymore.

13    A.   He was booked into the jail.  Yeah, I was relieved.

14    Q.   Sir, do you think that you should have done anything

11:00AM 15    differently?

16    A.   No.

17         MR. McMULLEN:  Thank you, Deputy Conley.

18         No further questions, Your Honor.

19         THE COURT:  Okay.  Cross-examination.

11:00AM 20         MR. RAMIREZ:  Thank you, Your Honor.

21                   CROSS-EXAMINATION

22    BY MR. RAMIREZ:

23    Q.   Good afternoon, Deputy Conley.

24    A.   Afternoon, sir.

11:01AM 25    Q.   Deputy, you've told us, uh, about how you arrived at the

UNITED STATES DISTRICT COURT

```
 1    Enyart home; correct?
 2    A.   I did.
 3    Q.   And can you tell the jury what was the purpose of your
 4    response to the -- the call that day?
11:01AM 5    A.   To determine what caused the disturbance and if there
 6    was a crime committed.
 7    Q.   All right.  Eventually, did you -- there's been
 8    testimony, but did you arrest Mr. Enyart?
 9    A.   I did.
11:02AM10   Q.   Did you have the opportunity at the scene to speak with
11    any of the Enyart family?
12    A.   No, I did not.
13    Q.   Did you get to speak with any of the other deputies who
14    arrived?
11:02AM15   A.   No.
16    Q.   How many other deputies arrived on scene that day?
17    A.   Five or six?
18    Q.   Were they all San Bernardino County deputies?
19    A.   Yes, there were.
11:02AM20   Q.   Were there any officers from other stations?
21    A.   There was.  There was a Hesperia deputy.
22    Q.   And do you know the name of that deputy?
23    A.   I don't know his name.  He was fresh off the training.
24    Q.   And in terms of completing the arrest, what was your
11:02AM25   role?
```

UNITED STATES DISTRICT COURT

```
 1   A.   To take him to the booking facility to be booked.

 2   Q.   Before you took him to the facility, did you take any

 3   other steps?

 4   A.   I called for paramedics to come check on him.

11:02AM 5   Q.   Why?

 6   A.   Because he was complaining that he had severe back pain.

 7   Q.   Did you ever tell you that he had any potential chance

 8   of withdrawing from alcohol?

 9   A.   No, he did not.

11:03AM10   Q.   Did he ever tell you that he had a history of alcohol

11   abuse?

12   A.   No, he did not.

13   Q.   When you say you smelled alcohol on his breath, was that

14   something that you could smell from a far distance?  Did you

11:03AM15   have to be close?  Do you remember?

16   A.   It was pretty close him.  When him and I were within

17   inches of each other for almost five minutes, that's where I

18   could smell it.

19   Q.   When you told counsel in response to his questions about

11:03AM20   Mr. Enyart sweating, was he sweating before the altercation?

21   A.   I don't remember if he was or not.

22   Q.   When did you first notice the slurring of the words?

23   A.   When I, um, was trying to detain him up against the

24   truck.

11:03AM25   Q.   Now, did he continually slur his words the entire time
```

UNITED STATES DISTRICT COURT

1    you were with him through booking?

2    A.    No, he did not.

3    Q.    Can you explain how it changed?

4    A.    By the time we had arrived at the jail facility, 30,

11:04AM 5    35 minutes later, his -- his speech had become a little --

6    was more clear.  Um, he was less argumentative, more willin'

7    to follow along with the instructions being given to him.

8    Q.    And you -- I think there was some testimony about your

9    opportunity to have Mr. Enyart examined by paramedics; is

11:04AM 10    that correct?

11    A.    Yes.

12    Q.    What was done during that examination if you know?

13    A.    They checked his blood pressure, um, and asked him some

14    basic medical questions, but I -- I was within earshot, but I

11:04AM 15    wasn't listening to the exact questions that they were

16    asking.

17    Q.    Do you -- did you know the paramedics who showed up?

18    A.    I did.

19    Q.    How did you know them?

11:04AM 20    A.    I have worked Apple Valley for several years, and it's

21    the same crews.

22    Q.    Uh, do you know the paramedic by name?

23    A.    I do.

24    Q.    What was his name?

11:04AM 25    A.    Uh, Mr. Cuevas.

```
 1    Q.   Did you have an opportunity to speak with him at all

 2    about Mr. Enyart?

 3    A.   No, I did not.

 4    Q.   Did -- at any point, did Mr. Cuevas tell you that he

 5    believed Mr. Enyart should be monitored for alcohol use?

 6    A.   No, he did not.

 7    Q.   So we've talked a little bit about the transport to --

 8    of Mr. Enyart up to High Desert Detention Center.  Can you

 9    tell me why you selected High Desert Detention Center?

10    A.   That is the primary booking facility for the Desert

11    region.

12    Q.   Is that something that you get a choice of where you

13    take these people?

14    A.   No.  For us, that's about -- that's our main booking

15    facility.

16    Q.   When you got to the detention center, what did you do?

17    A.   Brought Mr. Enyart into the search and uncuff area.

18    Q.   Did you personally bring him inside?

19    A.   The intake deputies brought him inside.

20    Q.   How -- how did the intake deputies get involved?

21    A.   Because he was combative at the scene, a request is made

22    for the jail facility to be standing by when I arrived.

23    Q.   So can you explain what happened -- in terms of you show

24    up at the facility and stop your vehicle, what happens?

25    A.   The jail staff comes outside to relieve me of bringing
```

1    him as a lot of times, the arrestee is unhappy with the

2    arresting officer.  So take me out of the equation.  Fresh

3    people get to -- fresh deputies get to deal with him, take

4    him out of the car.  Less likely to result in the use of

11:06AM 5    force.  Calms everybody down.  Um, Mr. Enyart was brought

6    into search and uncuff where he was un-handcuffed and

7    searched.

8    Q.   Who did the uncuffing and searching?

9    A.   The jail intake deputies.

11:06AM 10   Q.   What was your role once you arrived at High Desert?

11   A.   To get him booked.

12   Q.   What does that mean?

13   A.   So when he goes to search and uncuff, sees the nurse,

14   the nurse approves that he's medically cleared for booking.

11:07AM 15   I provide my booking information to the booking officer.  And

16   then once he's -- the paperwork is completed, I'm relieved,

17   and I can leave.

18   Q.   So when we're talking about booking, is that the

19   procedure for getting him signed into the jail?

11:07AM 20   A.   Yes.  I complete my booking application and the probable

21   cause declaration.  I give it to the -- the booking officer

22   who processes it.  They -- they prepare some documents for

23   the arrestee, again, telling them what they're being formally

24   charged with and how to make their phone calls and their

11:07AM 25   rights.  Once the inmate signs -- the arrestee signs it, I am

```
           1    free to go.

           2    Q.   What goes on the booking application?

           3    A.   The arrestee's personal information, the case number

           4    and, uh, the charges that I have charged them with.

11:07AM    5    Q.   All right.

           6              MR. RAMIREZ:  And I'm just gonna show for the

           7    record again what's been identified as 6, I believe it's, D.

           8              THE COURT:  Yes.

           9              MR. RAMIREZ:  We're gonna publish it.

11:08AM   10              Your Honor, can I publish it to the jury?

          11              THE COURT:  Yes.

          12              MR. RAMIREZ:  If you could go to the 8.27 mark?

          13              THE CLERK:  This is 6-D, Counsel?

          14              MR. RAMIREZ:  Yes.

11:09AM   15              All right.  You can start playing.

          16                        (Video played.)

          17              MR. RAMIREZ:  All right.  Let's stop it right

          18    there.

          19    Q.   You can see yourself in this video; correct?

11:09AM   20    A.   Yes.  I'm in the bottom left corner.

          21    Q.   All right.  Do you know what you're doing at that time?

          22    A.   Finishing my booking paperwork.

          23    Q.   Okay.  Do you know who the individual is who is with

          24    Mr. Enyart in this video?

11:09AM   25    A.   I do not.
```

UNITED STATES DISTRICT COURT

```
 1    Q.   Do you see Mr. Enyart in the video?

 2    A.   I do.

 3    Q.   Which one is he?

 4    A.   He's the one with the jail deputy back -- back behind

 5    him.  He's in the upper left corner.

 6    Q.   If you could turn around, there's a screen behind you,

 7    and you can -- could you point to him?

 8    A.   He'd be back over here next to the intake deputy.

 9              MR. RAMIREZ:  Thank you.

10              And we'll go ahead and play it.

11                        (Video played.)

12              MR. RAMIREZ:  Stop it right there.

13    Q.   Do you know where that is leading him, where he's going

14    through that doorway?

15    A.   Through that doorway leads to the individual holding

16    cells.  This hallway that you see here is usually as you go

17    through those double doors, the door to the right, this is a

18    hallway that leads over to the female intake side of the

19    jail.

20    Q.   And why would we go to female intake side?

21    A.   If the -- if there's no females being booked, and

22    there's already someone being seen by nursing staff on the

23    male side, they'll typically go over to the female side and

24    use the nursing office on that side to complete just to speed

25    the process up.
```

11:09AM (line 5)
11:09AM (line 10)
11:10AM (line 15)
11:10AM (line 20)
11:10AM (line 25)

105

1           MR. RAMIREZ:  You can go ahead and push play.

2                       (Video played.)

3           MR. RAMIREZ:  Stop it right there.

4      Q.   Do you see yourself in this frame?

11:10AM 5   A.   Yeah, I'm outside the entrance of the doorway.

6      Q.   And do you know who it is that's standing next to you?

7      A.   That appears to be Nurse Alvarado.

8      Q.   All right.  And so you said earlier on your

9      cross-examination, you remember after deposition, you got an

11:11AM10    opportunity to watch a video?

11     A.   I did.

12     Q.   And is this the video that you got an opportunity to

13     watch?

14     A.   Yeah.  The is the video I was referring to, yes.

11:11AM15    Q.   What -- after seeing this video, how did that refresh

16     your memory about your encounter at the booking facility?

17     A.   When I have a face-to-face with nursing staff, um, that

18     is the time that I explain all the problems that we've had,

19     if any.  Uh, and the fact that Mr. Enyart had complained, uh,

11:11AM20    about his shoulder back injury, I woulda passed on that

21     information and the fact that I smelled alcohol at the

22     initial time of the contact.

23     Q.   Once you pass on that information, is there anything

24     else that you personally do with respect to conveying medical

11:11AM25    information?

UNITED STATES DISTRICT COURT

 1  A.    No.  Once I pass it off to medical, I'm -- I'm --

 2  usually not.

 3  Q.    Do you know what medical staff does once they get that

 4  information?

11:11AM 5  A.    I do not.

 6  Q.    All right.  All right.  So how long did you stay at High

 7  Desert Detention Center that day with Mr. Enyart?

 8  A.    Well over a half hour?  Maybe 45 minutes?

 9  Q.    How long do you typically stay at a facility like that?

11:12AM10  A.    About that time.

 11  Q.    And -- and what's -- what are the reasons that you stay

 12  through the entire process of the booking including the

 13  medical exam?

 14  A.    Say that one more time.

11:12AM15  Q.    Yeah.  What are the reasons that you stay at the

 16  facility through the entire booking process including the

 17  medical exam?

 18  A.    In case there's any further follow-up questions that

 19  they may have for me.

11:12AM20  Q.    So how far were you from the nurse's room where

 21  Mr. Enyart went while you were doing your paperwork at search

 22  and uncuff?

 23  A.    60, 70 feet.

 24  Q.    Did anybody -- any nursing staff come out to ask you any

11:13AM25  questions?

           1    A.    No, they did not.

           2    Q.    Did any jail custody staff come out to ask you any

           3    questions?

           4    A.    No, they did not.

11:13AM    5    Q.    Okay.  At some point, did you take -- uh, you were you

           6    made aware that Mr. Enyart completed his medical booking

           7    evaluation?

           8    A.    I did.

           9    Q.    Once he completed the medical evaluation, what happened

11:13AM   10    next?

          11    A.    He was placed into a holding cell while I gave the

          12    booking paperwork to the booking officer.

          13    Q.    After you gave your booking papers to the booking

          14    officer, what happened next?

11:13AM   15    A.    She processed the paperwork, the arrestee came out and

          16    signed, and I was relieved, and I could leave.

          17    Q.    Now, there's some questions that were posed to you about

          18    a subsequent telephone call with the Enyart family.  You

          19    recall that testimony?

11:13AM   20    A.    I do.

          21    Q.    Now, is it your testimony that that call never happened

          22    or you just don't remember it?

          23    A.    I don't remember it at all.

          24    Q.    Is that a conversation that you would typically recall

11:14AM   25    if it had happened?

1    A.    Yes.  Yes.

2    Q.    And why is that?

3    A.    Because this is the first time in my entire time as a

4    law enforcement officer that someone actually died after I

11:14AM 5    had arrested them.  That would have stood out in my mind.

6            MR. RAMIREZ:  No further questions, Your Honor.

7            THE COURT:  Okay.  Redirect.

8            MR. McMULLEN:  Thank you, Your Honor.

9                    REDIRECT EXAMINATION

11:14AM10   BY MR. McMULLEN:

11    Q.    Deputy Conley, um, on that examination just now with

12    your counsel, you mentioned again this idea that when you

13    spoke to the nurse at the detention center -- at High Desert

14    Detention Center that you told the nurse that you smelled

11:14AM15    alcohol on his breath.

16    A.    Yes.

17    Q.    Now, you believed that Mr. Enyart was intoxicated.

18    A.    Yes.

19    Q.    And did you tell the nurse that you believed that he's

11:15AM20    intoxicated?

21    A.    I told him either that yeah, I smelled alcohol on his

22    breath or yeah, he'd been drinking or was intoxicated, yes.

23    Q.    There's a lot of "ors" in there.  What I want to know

24    specifically, did you tell him that you believed that

11:15AM25    Mr. Enyart was intoxicated?

1    A.   I don't remember the exact wording.

2         THE COURT:  Well, let me help out a little bit.

3    There's a difference between smelling alcohol on somebody's

4    breath and somebody being intoxicated.  Do you agree to that?

11:15AM 5         THE WITNESS:  I do agree to that, yes.

6         THE COURT:  Okay.  That's what he's asking.  Did

7    you just say you smelled it on his breath or did you say he's

8    intoxicated?

9         THE WITNESS:  I don't remember which one it was,

11:15AM10   sir.

11        THE COURT:  Go ahead, Counsel.

12   BY MR. McMULLEN:

13   Q.   Did you tell him he was slurring his words?

14   A.   I don't recall exact -- exactly what I told him.

11:15AM15   Q.   You wrote in a report that he was slurring his words?

16   A.   Yes.

17   Q.   You wrote in a report that he you could smell alcohol on

18   his breath?

19   A.   Yes, sir.

11:16AM20   Q.   You wrote in a report that you believed that he was

21   intoxicated.

22   A.   Yes, sir.

23   Q.   And do you believe that you told those things to -- to

24   the jail nurse?

11:16AM25   A.   I don't know exactly what was relayed back to the nurse.

```
 1              THE COURT:  Well, did you tell the nurse that
 2     specifically?
 3              THE WITNESS:  I can't say for sure.
 4              THE COURT:  Okay.
11:16AM 5    BY MR. McMULLEN:
 6     Q.   So maybe you didn't tell the nurse that he was
 7     intoxicated.
 8     A.   I might not have.
 9     Q.   Maybe you didn't tell the nurse that he was slurrin' his
11:16AM10   words.
11     A.   Might not have.
12     Q.   Maybe you didn't tell the nurse that he's under the
13     influence of alcohol.
14     A.   Correct.
11:16AM15             MR. McMULLEN:  Thank you.
16              No further questions, Your Honor.
17              THE COURT:  Redirect?  Or any recross?
18              MR. RAMIREZ:  No, Your Honor.
19              THE COURT:  Okay, you may step down.  Thank you.
11:16AM20             THE WITNESS:  Thank you, sir.
21              THE COURT:  Mm-hmm.
22              Next witness.
23              MR. McMULLEN:  Your Honor, at this time, the
24     plaintiffs call Deputy Cara Umphlett, also Cara Martinez.
11:17AM25             THE COURT:  Okay.  Thank you, Counsel.
```

1          THE CLERK:  Please raise your right hand.

2                    (Witness sworn.)

3          THE CLERK:  Thank you.  Please be seated.

4          Please adjust the microphone so that you're

11:17AM 5   speaking into it at all times.

6          For the record, please state your full name and

7   spell your last name.

8          THE WITNESS:  It's Cara Umphlett, U-m-p-h-l-e-t-t.

9          THE COURT:  Okay.  You may inquire, Counsel.

11:17AM 10         MR. McMULLEN:  Thank you, Your Honor.

11                    DIRECT EXAMINATION

12   BY MR. McMULLEN:

13   Q.   Good morning, Deputy Umphlett.

14   A.   Good morning, sir.

11:18AM 15   Q.   At the time of your deposition, I think that you were

16   addressed as Deputy Martinez.  It's okay if I address you as

17   Deputy Umphlett?

18   A.   Yes.  That's fine.

19   Q.   And that's the name that was on the reports and the

11:18AM 20   documents in this case?

21   A.   Yes.

22   Q.   Thank you.  Uh, you also have been here throughout the

23   trial?

24   A.   Yes, sir.

11:18AM 25   Q.   And, uh, status, occupation-wise, maybe status is the

UNITED STATES DISTRICT COURT

1    wrong word, you're a deputy with the San Bernardino Sheriff's

2    Department?

3    A.    Yes, sir.

4    Q.    At the time of the incident that we're here to discuss,

11:18AM 5    were you also assigned to the Apple Valley Substation?

6    A.    I was.

7    Q.    And how long have you been a deputy in July of 2022?

8    A.    Approximately four or five years.

9    Q.    And the -- the testimony that you heard from Mr. Clark

11:18AM 10   this morning where we talked about the POST standards, Peace

11   Officers Standards and Training, you're certified in that as

12   well?

13   A.    Yes.

14   Q.    And you've maintained that certification?

11:19AM 15   A.    Yes.

16   Q.    Officer Conley -- Deputy Conley. . . well, let's go to

17   the scene first.  You go to the scene -- some of the things

18   that we've talked about, the interaction with Mr. Enyart,

19   you're not there for any of that; right?

11:19AM 20   A.    Correct.

21   Q.    And when I say any of that, I'm talking about everything

22   before he's handcuffed in the back of Deputy Conley's Ford

23   Explorer.

24   A.    Uh, correct.  I wasn't there for that altercation that

11:19AM 25   took place.

1    Q.   And there was something that went out on the radio that

2    deputies should respond, and you responded.

3    A.   Yes.

4    Q.   And you heard some of the audio that was played, uh,

11:19AM 5    where your voice shows up in the end of an interview that

6    Deputy Mammolito was conducting of Ms. Kelley and her brother

7    Nick, Nicholas.

8    A.   I heard that, yes.

9    Q.   And is that -- is that -- does that -- is that your

11:20AM 10   first memory or first arrival on the scene?

11   A.   Uh, I recall arriving on the scene as deputies were, uh,

12   placing Mr. Enyart, um, into the patrol vehicle.

13   Q.   And -- and you speak with Deputy Conley.

14   A.   I don't remember.  I believe I did, yes.

11:20AM 15   Q.   Deputy Conley tells you to go over and investigate

16   something for him.

17   A.   It may have been Deputy Conley, but there were several

18   other deputies there.

19   Q.   You recall giving a deposition in this case; right?

11:20AM 20   A.   I do.

21   Q.   And you probably have it up there.  Does it -- does it

22   fit with your memory that when you were asked that Officer

23   Conley asked you to go over and investigate something for

24   him, correct, and your answer was that's correct?

11:21AM 25   A.   I don't have anything on me, but I believe you.

UNITED STATES DISTRICT COURT

1    Q.   Okay.  I don't want you to believe me, but hearing that,

2    does that refresh your memory about that?  Or we can get the

3    documents.

4    A.   Yes.

11:21AM 5   Q.   Okay.  So you believe it's Deputy Conley who was the one

6    that directed you to do some investigation.

7    A.   Yes.

8    Q.   You understood that to be witness interviews.

9    A.   Yes.

11:21AM 10   Q.   And the witness interviews that you did you, if you go

11    and knock on the door of the residence, inside are the mother

12    and father of the person that's been arrested.

13    A.   Yes.

14    Q.   And during that interview, um, you learned -- well,

11:21AM 15   we've heard some of that, haven't we, during this, uh --

16    during this trial.

17    A.   Yes.

18    Q.   We heard three clips that are in evidence; Exhibit 2-A,

19    B and C, some snippets of that interview; right?

11:22AM 20   A.   That's correct.

21    Q.   And hearing that, that's your voice on the interview.

22    A.   Yes.

23    Q.   And you -- one of the things you learned from the mother

24    is that Mr. Enyart has been drinking hard stuff,

11:22AM 25   49-and-a-half percent liquor.

UNITED STATES DISTRICT COURT

1   A.   Yes.

2   Q.   And you learn that he's been talking to himself, and

3   that alcohol seems to be burning out his brain according to

4   her.

11:22AM 5   A.   I believe that's what she said, yes.

6   Q.   And you -- and that she believes he might still be under

7   the influence even from last night because she could hear him

8   crying and talking to himself in his room late.

9   A.   Yes.

11:22AM 10   Q.   And, um, that was something that -- that was important

11   to you.  Those were important issues.

12   A.   Uh, yes.

13   Q.   And you were trying to be there for -- for Mrs. Enyart

14   and Mr. Enyart at that time.

11:23AM 15   A.   Yes.

16   Q.   You talked about how alcoholism has touched your family.

17   A.   Yes, I showed empathy.

18   Q.   And the custom and practice that you had at that point

19   would be in learning that information, you would provide that

11:23AM 20   to the arresting officer.

21   A.   If it was stated whether it would be life and death.

22   Q.   I'm sorry?

23   A.   Can you repeat the question?

24   Q.   Yeah.  If -- if you received information that this is

11:23AM 25   someone who was abusing alcohol and might be intoxicated at

1    that time, that's something that would be information so that

2    your custom and practice would be to provide that to the

3    arresting officer.

4    A.   In custom and practice, yes.

11:23AM 5    Q.   Did you do that here?

6    A.   No.

7    Q.   Why not?

8    A.   By the time I was done interviewing, uh, the mother and

9    father, I believe Deputy Conley had already left the scene.

11:23AM 10   Q.   So did you take steps at that point then to make sure

11   that you could get that information to Deputy Conley?

12   A.   No.

13   Q.   When -- when deputies want to communicate, but they're

14   not in the same physical location, is there any tools that

11:24AM 15   deputies have in order to communicate important information?

16   A.   We have our cell phones or we can also send messages to

17   each other on our, we call them, MDCs, but they're kind of

18   like little laptops in our units.

19   Q.   Did you use that to communicate this information to

11:24AM 20   anyone?

21   A.   No.

22   Q.   Did you -- now, you wrote a report in this case; right?

23   A.   I did.

24   Q.   Did you say anything in the report about that

11:24AM 25   information of the alcohol abuse and intoxication that was

UNITED STATES DISTRICT COURT

            1    reported to you about Mr. Enyart by his mother and father?

            2    A.   No.

            3    Q.   Why not?

            4    A.   My role for the report was to investigate the use of

11:24AM     5    force that happened, um, as I was directed by my sergeant to

            6    only put the pertinent information regarding the use of force

            7    and what I was investigating.

            8    Q.   Okay.  So in that document, you're saying that's the use

            9    of force report so you didn't want to put it in there.

11:25AM    10    Right?

           11    A.   It wasn't pertinent to the use of force that took place,

           12    no.

           13    Q.   But did you -- did you -- you can do a different

           14    supplement report, right, if you have pertinent information

11:25AM    15    about an issue that's important?

           16    A.   If it's regarding what I'm investigating, yes.

           17    Q.   If during the course of your investigation, you learn

           18    information about someone's alcohol abuse and the current

           19    state of intoxication, is that something that even though

11:25AM    20    that wasn't your intent in doing the interview, you learn

           21    that, you're supposed to share it or document it; right?

           22    A.   You can share it, yes.  You don't necessarily have to

           23    document it.

           24    Q.   And you didn't share it here.

11:25AM    25    A.   No.

1    Q.   And you didn't document it here.

2    A.   No.

3              MR. McMULLEN:  Thank you, Deputy Umphlett.

4              I have no further questions, Your Honor.

11:25AM 5              THE COURT:  Cross-examination.

6              MR. RAMIREZ:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. RAMIREZ:

9    Q.   Good morning, Deputy Umphlett.

11:26AM 10    A.   Good morning, sir.

11    Q.   Can you tell the jury how it was that you came to arrive

12    at the Enyart home?

13    A.   I was at the Apple Valley Police Station, um, going into

14    to do my traffic reports for the day, and I heard broadcasts

11:26AM 15    over our radio, um, that a deputy had an uncooperative -- I

16    believe it was an uncooperative subject.

17              Um, normal practice when we have a deputy with an

18    uncooperative subject, we tend to respond as many units cause

19    we don't know what the level of uncooperativeness there is.

11:26AM 20    So I left the Apple Valley substation, entered my unit and

21    looked up where the call was and started driving to that

22    location.

23    Q.   When you arrived, uh, you were not -- were you the first

24    officer on the scene?

11:27AM 25    A.   No.

UNITED STATES DISTRICT COURT

1    Q.   And so I think you told the jury took that you took on

2    more of an investigative role.

3    A.   That's correct.

4    Q.   It's your understanding that there was a use of force at

11:27AM 5   the scene?

6    A.   Yes.

7    Q.   And what is -- what goes into, um, an investigation for

8    use of force?

9    A.   Typically, with a use of force investigation, um, we try

11:27AM 10  to have other deputies help out so there isn't the risk of

11   any bias.  We won't have the deputy involved in the use of

12   force carry out that investigation with the witnesses.

13        Um, so typically, we'll assign other deputies to

14   talk to witnesses who only saw the use of force.  You don't

11:27AM 15  want to get third-hand information from someone who heard

16   from someone else what had happened.  You only want to talk

17   to the witnesses and the input the information from that

18   witness that physically saw what took place.

19   Q.   How did you determine who to speak to?

11:28AM 20  A.   I entered the home.  Um, I asked who had been

21   interviewed.  I -- I think at one point, um, I asked the

22   brother and sister if they had talked to anyone, and they had

23   said that the other female deputy had gotten their statement

24   already.

11:28AM 25  Q.   Do you remember having any conversations, um, with, uh

1    -- well, let's strike that, back up.  You were here for the

2    testimony of Amanda Kelley; correct?

3    A.    That's correct.

4    Q.    Did you recognize her from that day?

11:28AM 5    A.    I'll be -- I'll be honest.  I -- I didn't recognize her,

6    but I believe she is who she says she is.

7    Q.    Do you remember having a conversation specifically with

8    her and her mother at their home?

9    A.    Not just the two of them, no.

11:28AM 10   Q.    Is it that you did not have that conversation or you

11   just don't remember it happening?

12   A.    I just don't remember it happening.

13   Q.    All right.  Can you tell the jury what you do to help

14   document your investigation and the steps you're taking in

11:29AM 15   the investigation?

16   A.    In general or just for the use of force.

17   Q.    Well, let's start with just in general.

18   A.    So typically, um, if I know I'm going to be interviewing

19   a witness or anyone with any kind of information regarding

11:29AM 20   what I'm investigating, we have, uh, belt recorders, um, on

21   our person cause this was before we had body cams.  Um, I'll

22   activate that recorder.  It's usually just a push of a

23   button.

24           I'll then go -- I have a notepad, a pen.  I

11:29AM 25   introduce myself.  Hi, I'm Deputy Umphlett.  Um, and then I

UNITED STATES DISTRICT COURT

```
 1   begin to ask questions, you know, what did you see, tell me
 2   what took place.  Um, I always try to let them know if I know
 3   anything about the call because then typically, if they
 4   don't -- if they know I don't know anything, that's sometimes
 5   a better way to try to get them to be more -- give more
 6   explanation and detail.  That way, they know you're getting
 7   the full story.
 8            THE COURT:  Okay.  Ladies and gentlemen, it is
 9   11:30 so we're gonna break at this time for lunch.  Remember
10   the admonishment not to discuss the case among yourselves or
11   with anybody else or form or express any opinions about the
12   matter until it's submitted to you in its entirety in the
13   juror room.  Have a pleasant lunch, and we'll see you back
14   here and start right at 1 o'clock.  Okay?  And if you leave
15   quietly because I've got to talk to the attorneys.
16            THE CLERK:  All rise.
17                 (Jury not present.)
18            THE COURT:  You may step down, also.
19            THE WITNESS:  Thank you, Your Honor.
20            THE COURT:  Okay.  The record will reflect that the
21   jurors have left the courtroom.
22            Counselors, I just want to let you know the timing
23   on it.  Today the plaintiff has used 97 minutes, and the
24   defense has used 66 minutes which is up to right now a total
25   of 183 minutes for the plaintiff and 87 minutes for the
```

UNITED STATES DISTRICT COURT

1    defendant which means you have -- plaintiff has 117 minutes

2    so it's about two hours left, and the defense has about

3    three-and-a-half hours left.  So I just wanted to keep you

4    updated on what's going on.

11:31AM 5          We're gonna have to have a hearing at this time,

6    also.  Please clear the courtroom.

7               THE CLERK:  Okay.

8               (Following proceedings held under seal.)

9               THE COURT:  We'll be in recess.

11:38AM 10          THE CLERK:  All rise.

11                        (Lunch recess.)

12               THE COURT:  Okay.  The record will reflect that all

13   the members of the jury are in their respective seats in the

14   jury box.  The witness is on the witness stand.  Remember

01:02PM 15   that you're under oath.

16               Counsel.

17                    CROSS-EXAMINATION (CONTINUED)

18   BY MR. RAMIREZ:

19   Q.   Deputy Umphlett, can you tell us what steps do you take

01:02PM 20   to record your interviews, if any?

21   A.   Typically, we have our audio recorder which just looks

22   like a little recording device.  Some of them are different,

23   but mine was a Puma at that point.  There's two buttons on

24   the Puma, and then there's the two volume buttons.  I had

01:03PM 25   mine situated just to the left of my -- I had mine situated

UNITED STATES DISTRICT COURT

1    just to the left, um, on my belt on my left side.  So

2    typically I would get in the habit of pushing the button I

3    knew would record.

4          Um, because sometimes it's technology, it's

01:03PM 5    technical equipment, the buttons can stick and stuff.  So I

6    set mine to have a red light when it is recording.  That way

7    I can double-check, look down and I know for certain that

8    it's on because I set it up so that my red light would let me

9    know it was on.

01:03PM10    Q.   When do you typically -- when are you trained to use

11    your belt recorder?

12    A.   We shall use our belt recorder for any preplanned event.

13    For example, if we're going to interview, um, my assignment

14    was traffic so on a traffic stop, anything that we know we're

01:04PM15    going to come in contact with either a witness or a suspect.

16    Q.   Is that for every time you're gonna have a discussion or

17    encounter with somebody in the field?

18    A.   Typically, if it's a preplanned, if we know that we're

19    going to pertinent information, we do activate our recorder.

01:04PM20    Q.   What if there's a scenario where you weren't planning on

21    encountering somebody, but they come up to you to start

22    speaking.  How does that work?

23    A.   Typically, with my past practice, um, I would

24    acknowledge like, okay, I understand you want to continue

01:04PM25    talking.  Then at that point, I would reach down push my

UNITED STATES DISTRICT COURT

1    audio recorder and then ask them to repeat what was said.

2    Okay.  Well, now I'm recording this for both of us just to

3    insure all the information is correct, can we continue now

4    that my recorder is on.

01:04PM 5    Q.   And why -- why do you do it that way?

6    A.   So that we have an accurate record of things that are

7    said to us, um, pertaining to cases, pertaining to arrests

8    should anything go to court.  A lot of criminal cases tend to

9    go to the criminal courts so the audio will get booked in as

01:05PM 10   evidence and then it's also used in those following cases.

11   Q.   On July 27th you had an opportunity to speak with the

12   Enyart family?

13   A.   I did.

14   Q.   Do you remember what was communicated to you during that

01:06PM 15   interview that you had with them?

16   A.   The family was rightfully emotional and distraught over

17   what had taken place, um, during -- they had a planned

18   intervention with Mr. Enyart.  During my interview with the

19   mother and the father, both portrayed they were worried about

01:06PM 20   their son's, um, alcohol use, that he drinks.  They think he

21   may use Norcos.  They weren't sure he if was using Norcos or

22   not.  He talks to himself.  Um, when I had advised -- they

23   wanted me to take him 51-50.  I explained unfortunately, if

24   subjects are under the influence of any kind of alcohol or

01:06PM 25   drugs and if they're belligerent, we can't typically take

UNITED STATES DISTRICT COURT

1    them 51-50.

2              THE COURT REPORTER:  I'm sorry.  Could you slow

3    down a little bit?

4              THE WITNESS:  Oh, yeah, I'm sorry.  I explained

01:07PM 5    that typically if our subject is under the influence of

6    alcohol or drugs, the hospitals won't typically take them for

7    mental care.  At that point the family told me they weren't

8    sure he was under the influence of alcohol.  He may not be

9    drunk today, but that it could be left over from the night

01:07PM 10   prior, but that they could not be certain.

11             MR. RAMIREZ:  I'm going to identify for the record

12   Exhibit 2, the full recording that's been identified and

13   stipulated to admissibility.

14             THE COURT:  Okay.  So you're introducing it?

01:07PM 15             MR. RAMIREZ:  Yes.

16             THE COURT:  It may be received and you may publish.

17                  (Exhibit 2 admitted.)

18             MR. RAMIREZ:  What I'm gonna do is I'm gonna start

19   playing this.  We'll listen to a portion.  Then as we have

01:08PM 20   questions, we'll go through that.

21                  (Audio played.)

22   BY MR. RAMIREZ:

23   Q.   Do you recognize who was speaking to you in this first

24   portion of the audio?

01:08PM 25   A.   Yes.

```
 1    Q.   Who was that?

 2    A.   Frances Enyart.  She's the mother of William Enyart.

 3    Q.   And you recall that -- what do you recall about her

 4    telling you with respect to her fears for her son?

01:08PM 5    A.   She was afraid that he was lost in the Norco that she

 6    believed he may or may not be abusing and that he was lost in

 7    the alcohol that he continued to consume.

 8    Q.   Did she say anything to you about her concerns for his

 9    mental health?

01:09PM10    A.   Yes.

11    Q.   What did she say about that?

12    A.   Uh, she advised she wanted him primarily to go for 51-50

13    which is a 72-hour hold in a mental facility or a hospital

14    that I think has regulations to hold 51-50 patients.

01:09PM15              MR. RAMIREZ:  You can continue playing.

16                        (Audio played.)

17              MR. RAMIREZ:  Stop right there.

18    Q.   There was another voice that we heard on the recording

19    at that moment.  Did you hear that?

01:10PM20    A.   I didn't.  I heard myself say declined a seat.  I

21    couldn't make out the voice that was saying it.

22              MR. RAMIREZ:  Thank you.  Go ahead.

23                        (Audio played.)

24    BY MR. RAMIREZ:

01:11PM25    Q.   Do you recall Ms. Enyart saying any information to you
```

1    about the alcohol she said her son was drinking?

2    A.    Yes.

3    Q.    What do you recall about that?

4    A.    She told me she had found, um, bottles that she believed

01:11PM 5    were I think 44 percent.  It ended up being the 99, um, the

6    little 99 shots that you can get.  It's like 99 bananas, 99

7    cinnamon.  It's a bunch of different flavors.  They're

8    smaller, kind of shot-sized, uh, shots of liquor you can get

9    at the gas station.

01:12PM 10    Q.    Were you ever able to determine from her when Mr. Enyart

11    consumed that alcohol?

12    A.    No.

13    Q.    Were you able to figure out from anybody that day how

14    frequently he was drinking?

01:12PM 15    A.    No.

16    Q.    Were you able to figure out from anybody at the Enyart

17    home that day the quantity of the alcohol he was consuming?

18    A.    No.  It was all based off what they believed he may or

19    may not be consuming.

01:12PM 20          MR. RAMIREZ:  Go ahead.  Keep playing.

21                (Audio played.)

22    BY MR. RAMIREZ:

23    Q.    Before we get on to the next portion of the recording,

24    as you're listening to Ms. Enyart, did you formulate any

01:13PM 25    opinions as to what the family actually knew about his

         1    alcohol use?

         2    A.    As per if they had any facts to his alcohol use?

         3    Q.    Yes.

         4    A.    No.  Everything they told me was what they believed may

01:13PM  5    or may not be true when it comes to his alcohol use.

         6    Q.    Did you ever formulate any opinions as to whether they

         7    had just figured this out themselves or whether they had

         8    known a long time or something of that nature?

         9    A.    No.

01:14PM 10           MR. RAMIREZ:  Go ahead.

        11                     (Audio played.)

        12    BY MR. RAMIREZ:

        13    Q.    Now, we have a male voice in the recording.  Do you

        14    recognize whose voice that is?

01:14PM 15    A.    I believe that was the brother.

        16    Q.    Was the father present during this discussion as well?

        17    A.    Yes.

        18    Q.    Was Mr. Enyart's sister present during this part of the

        19    discussion?

01:14PM 20    A.    Yes.

        21           MR. RAMIREZ:  Continue playing.

        22                     (Audio played.)

        23    BY MR. RAMIREZ:

        24    Q.    You asked did you guys see this, too.  Who were you

01:15PM 25    talking to?

1    A.   At that point I was talking to who I later found out to

2    be the brother and sister of Mr. William Enyart.  I had asked

3    them if they had seen what had taken place between

4    Deputy Conley and their brother.

01:15PM 5    Q.   And what was their response?

6    A.   That they had already spoken with Deputy Mammolito and

7    gave her their statements.

8    Q.   Did you have an opportunity to speak with either of them

9    beyond what was conducted in the group interview that you

01:15PM 10   were conducting?

11   A.   No.

12              MR. RAMIREZ:  Continue.

13                       (Audio played.)

14   BY MR. RAMIREZ:

01:17PM 15   Q.   In terms of your investigation as we're hearing what's

16   being said on the recording, is this part of the use of force

17   investigation that you conducted?

18   A.   This interview?

19   Q.   Yes.

01:17PM 20   A.   Yes.

21   Q.   And what was the purpose of collecting this information

22   at this point?

23   A.   So I could, uh, gather information from the witnesses

24   who actually saw the use of force happen so I could properly

01:17PM 25   document the use of force into a use of force report.

UNITED STATES DISTRICT COURT

1    Q.   Is that why you continued to ask what they were seeing?

2    A.   Yes.

3              MR. RAMIREZ:   Continue.

4                        (Audio played.)

01:18PM 5    BY MR. RAMIREZ:

6    Q.   So as we're listening to this recording again,

7    Ms. Enyart's bringing back up what she's not sure about in

8    terms of her son's need for a 51-50; right?

9    A.   That's correct.

01:19PM 10   Q.   And what was your understanding of the criteria for

11   taking an individual 51-50?

12   A.   To take someone 51-50 because it is essentially locking

13   them for up 72 hours, we are taught certain questions to ask

14   and certain things to look for.  Whether they're a danger to

01:19PM 15   themselves or others, for example.  If they're actively

16   trying to commit suicide, jumping into the streets.  If they

17   don't know what year it is.  They're so disoriented without

18   showing signs or symptoms, objective signs or symptoms of

19   drug or alcohol use.  If they cannot care for themselves in

01:19PM 20   any kind of capacity.  For example, if they haven't bathed

21   and they don't see a reason to bathe or they're not eating or

22   anything like that, we're trained to make those observations

23   ourselves and not go based off of third party, um, per se

24   because at that point, then anyone can 51-50 and lock someone

01:20PM 25   up for 72 hours.

         1    Q.   So what if, what if -- are the 51-50 procedures are set

         2    up to hold somebody against their will?

         3    A.   I wouldn't say against their will.  It would be more of

         4    this person cannot -- they're deemed incapable of caring for

01:20PM  5    themselves or they're deemed a danger to themselves.  For

         6    instance attempting suicide.  That's essentially why they

         7    would be held there.

         8    Q.   What if you smelled alcohol on somebody?  Is that enough

         9    to 51-50 them?

01:21PM 10    A.   No.

        11    Q.   What if you were told that somebody drinks alcohol

        12    regularly?  Is that enough to 51-50 them?

        13    A.   No.

        14              MR. RAMIREZ:  All right.

01:21PM 15                   (Audio played.)

        16    BY MR. RAMIREZ:

        17    Q.   We have a new voice that's coming into the recording.

        18    Do you recognize that person's voice?

        19    A.   Yes.

01:22PM 20    Q.   Who is that?

        21    A.   That is William Enyart's father.

        22    Q.   And when you're speaking to these individuals, where

        23    were you?

        24    A.   I was inside the house.

01:22PM 25    Q.   Do you know what part of the house?

1    A.   I believe I was in the living room, but I think it was

2    one of those layouts where the living room, it's either like

3    a front, um, like entertainment room or living room, and then

4    the kitchen is almost an open plan so that I could see into

01:22PM 5    the kitchen.

6    Q.   Where were the family members in relation to you as you

7    were interviewing them?

8    A.   Uh, I believe the brother and sister were in the kitchen

9    by the counter and then Ms. Enyart was speaking with me off

01:23PM 10   to the side.  And I don't remember if the dad was in the

11   adjoining other living room or if he was at the kitchen

12   counter.

13            MR. RAMIREZ:  Go ahead and continue.

14                    (Audio played.)

01:24PM 15   BY MR. RAMIREZ:

16   Q.   I notice they keep using the words your deputy.  Have

17   you used that phrase before my deputy?

18   A.   Yes.

19   Q.   Why do you use that phrase?

01:24PM 20   A.   It's just a term of endearment.  When you're in law

21   enforcement, you tend to form a camaraderie with your

22   partners.  You know you rely on these people to essentially

23   insure that you get home at the end of the day, you know.  We

24   never what kind of call we're gonna get.  So often times if I

01:24PM 25   don't refer to them as my partners, you know, I'll call my

1    deputies or anything like that.  It was just a term of

2    endearment.

3    Q.   What was your rank at the time?

4    A.   I was a Deputy Sheriff.

01:24PM 5    Q.   Did you ever tell anybody you were a sergeant?

6    A.   No.

7    Q.   Did you ever tell anybody you were a lieutenant?

8    A.   No.

9         MR. RAMIREZ:  All right.  Go ahead and continue.

01:25PM 10        (Audio played.)

11    BY MR. RAMIREZ:

12    Q.   So when Mr. Greg Enyart, the father, was communicating

13    to you, what information are you taking in as a deputy and

14    documenting?

01:26PM 15    A.   I'm documenting what he said he saw.  You know, he heard

16    Deputy Conley giving clear commands, clear and concise cause

17    he could hear them from the driveway.  Um, I documented, you

18    know, that he said that Deputy Conley was professional.  He,

19    you know, took care.  He was calm.

01:26PM 20         We document those kind of things especially for use

21    of force reports, um, it's important to try to show the

22    demeanor of both sides.  Did the defendants get whiled up and

23    be aggressive because we were the aggressors or were we the

24    calm ones trying to just keep a situation from getting worse.

01:26PM 25    Q.   To this point have you formulated any opinions that

UNITED STATES DISTRICT COURT

```
    1    Mr. Enyart was at risk for withdrawal from alcohol?

    2    A.    No.

    3    Q.    Why not?  The family talked about his use of alcohol or

    4    drugs or things of that nature.  Why haven't you formulated

01:27PM 5    that thought in your head?

    6    A.    Someone who drinks a lot, um, isn't always at risk of

    7    withdrawal.  To be at risk of withdrawing from any kind of

    8    alcohol, you have to be able to prove that that person is a

    9    very, very heavy drinker.  Typically, if they do go a little

01:27PM10    bit without any kind of alcohol, that you'll start to see I

   11    think what they call tremors and they're little shakes.

   12            I had often arrested many intoxicated people.  My

   13    job was traffic.  I was DUI car a little bit and we did a lot

   14    of DUI, driving under the influence, uh, over time,

01:27PM15    procedures and stuff.  And a lot of those although they were

   16    intoxicated and they were visibly drunk, they had all the

   17    signs and symptoms, they were -- they weren't at risk

   18    necessarily to be withdrawal.

   19            Just because someone is intoxicated or drinks more

01:28PM20    often than someone else might, it won't put them at that

   21    risk.  It depends on the person's alcohol tolerance level, it

   22    depends on what they're drinking, how often they drink.

   23    There's many things and factors that go into what can lead to

   24    that.

01:28PM25    Q.    Those were all things you were thinking of while you
```

         1    were conducting your use of force investigation?

         2    A.   What do you mean?

         3    Q.   Were those all factors or things that you were

         4    considering and weighing while you were doing your use of

01:28PM  5    force of investigation to determine what's important for you

         6    to even think about or document?

         7    A.   Yes.  I didn't hear any key words that would have

         8    triggered the thought of withdrawal and like I said, I've

         9    made so many arrests with intoxicated people that is

01:29PM 10    something that would of set off warning alarms, warning

        11    bells.

        12    Q.   What kind of words would you have been looking for that

        13    would have triggered you to be maybe looking into something

        14    more?

01:29PM 15    A.   If they would have said, um, even described how he -- if

        16    they would have told me, you know, he doesn't drink every

        17    day, but if he doesn't drink, he tends to shake if he doesn't

        18    drink or we're scared that he drinks so much, he might go

        19    into withdrawals.  They didn't use DTs.  They didn't give me

01:29PM 20    any reason to think they were anything other than just

        21    concerned for his well-being.

        22            MR. RAMIREZ:  Go ahead and continue.

        23                      (Audio played.)

        24    BY MR. RAMIREZ:

01:31PM 25    Q.   As you're hearing Ms. Enyart, Mr. Enyart's mother

                      UNITED STATES DISTRICT COURT

           1    communicate to you about what she knows about Mr. Enyart's

           2    alcohol or his intoxication levels, are you formulating any

           3    opinions as to what she actually knows about her son's use of

           4    alcohol?

01:31PM    5    A.   Just that she -- she didn't have any basis or facts.

           6    She didn't know how much he drank, when he drank.  She didn't

           7    even know if he was currently drunk.  She -- I mainly just

           8    thought she was just a mother who was just worried about her

           9    son and just wanted to do anything she could to get him any

01:31PM   10    help.

          11                 MR. RAMIREZ:  Okay.

          12                      (Audio played.)

          13    BY MR. RAMIREZ:

          14    Q.   I'm going to ask you, Deputy why bring up a restraining

01:32PM   15    order?

          16    A.   Because of how emotional and frantic the mother was, um,

          17    you know, she had explained how during their intervention, he

          18    smacked the phone out of her hand.  Um, the call was

          19    involving a combative son who was getting combative with his

01:33PM   20    family.  They had expressed how they didn't know what else to

          21    do with him.  They didn't, you know, they couldn't keep

          22    putting up with it.

          23                 So normally in situations like that when I have a

          24    family who is expressing their concerns about their safety or

01:33PM   25    about the unpredictability of someone who lives in the home,

1    I bring up a restraining order just to kinda make sure I

2    cover the bases so that they know they have other options.

3    That way if we do have to get called back out to the house,

4    if they have a restraining order, we can do a little more to

01:33PM 5    try to get him out.

6            Instead of showing up because he has another

7    episode where he's starting to get violent, but he lives

8    there, he doesn't give us cause to arrest him cause he's in

9    his own house, then we have to leave and leave that family

01:34PM 10   with that combative subject.

11   Q.    And what was Mr. Greg Enyart's response when you brought

12   up the restraining order?

13   A.    I believe it was, uh, he had stated that that was

14   something he had talked about and had been wanting to do or

01:34PM 15   had been wanting to evict him.

16           MR. RAMIREZ:   Continue.

17                   (Audio played.)

18   BY MR. RAMIREZ:

19   Q.    In terms of asking to go speak with him and speak with

01:36PM 20   Mr. Enyart, why would you tell the family you didn't think it

21   was a good idea to go and try speak with Mr. Enyart directly?

22   A.    From my experience, um, when there's a lot of emotions

23   like that, emotions are high, um, he had already resisted my

24   deputy, the mother upset, the father upset.   In those kind of

01:36PM 25   situations, although the intention may be to try to calm or

UNITED STATES DISTRICT COURT

         1    try to help, what ends up happening is at some point

         2    something gets sparks and then it just kinda drives

         3    everything right back up and it escalates the situation

         4    again.

01:36PM  5                          (Audio played.)

         6    BY MR. RAMIREZ:

         7    Q.   When you heard Mr. Enyart's brother say he has to feel

         8    alone in this process, what was your response or thought

         9    process when you heard that?

01:37PM 10    A.   My thought process was they were so at their wits end

        11    with having to deal with a family member who gets combative

        12    and, you know, drinks and constantly breaks the house rules,

        13    that they were just at a point where all they could think of

        14    now was to just let him be alone and let him feel alone.

01:37PM 15                MR. RAMIREZ:  Go ahead.

        16                          (Audio played.)

        17    BY MR. RAMIREZ:

        18    Q.   After you concluded this and you said you were gonna go

        19    get them a report number, did you go get the report number?

01:37PM 20    A.   I believe I would have, yes.

        21    Q.   And then what did you do after that?

        22    A.   I went back inside, I gave them the report number, I

        23    thanked them again, and then I left.

        24    Q.   Did you have any further discussion with them after

01:38PM 25    giving them the report number?

1  A.   Not to my knowledge, no.

2  Q.   And if you had, would you have as part of your custom

3  and practice recorded that with your belt recorder?

4  A.   Yes.  A lot of times like I stated earlier, we'll get,

01:38PM 5  um, what people call spontaneous statements.  Often times,

6  it's been my practice when that happens, I activate my belt

7  recorder and I ask them to repeat that again so I can have a

8  record of it.

9  Q.   Did anybody on July 27th tell you they believed that

01:38PM 10 Mr. Enyart would suffer from life-threatening alcohol

11 withdrawal?

12 A.   No.

13 Q.   Did anybody on July 27th from the Enyart family tell you

14 that they believed that Mr. Enyart would suffer from delirium

01:38PM 15 tremens?

16 A.   No.

17        MR. RAMIREZ:  No further questions, Your Honor.

18        THE COURT:  All right.  Redirect.

19        MR. McMULLEN:  Yes, Your Honor.

01:39PM 20              REDIRECT EXAMINATION

21 BY MR. McMULLEN:

22 Q.   Deputy Umphlett, when you went back into the house and

23 provided the business card, you didn't turn your recorder on

24 before that; right?

01:39PM 25 A.   No.

1   Q.   Were you silent during that time?  Did you walk in

2   silently and not say anything?

3   A.   No.

4   Q.   You spoke with them.

01:39PM 5   A.   I walked in, I gave them the report number, I thanked

6   them and I left.

7   Q.   What did they say to you?  Were they silent?

8   A.   I don't recall.  I think they may have thanked me, but

9   it was a very quick exchange.

01:39PM 10   Q.   You remember the words that were said?

11   A.   Not verbatim, no.

12   Q.   You gave an opinion about when there's a risk of

13   withdrawal.  Do you have any medical training?

14   A.   No.

01:39PM 15           MR. McMULLEN:  No further questions, Your Honor.

16           THE COURT:  Any recross?

17           MR. RAMIREZ:  No, Your Honor.

18           THE COURT:  You may step down.

19           THE WITNESS:  Thank you, Your Honor.

01:40PM 20           THE COURT:  Next witness.

21           MS. JUN:  Plaintiffs call Dr. Mario San Bartolome.

22           THE CLERK:  Please raise your right hand.

23                   (Witness sworn.)

24           THE CLERK:  Thank you.  Please be seated.

01:41PM 25           Please adjust the microphone so you're speaking

UNITED STATES DISTRICT COURT

1    into it at all times.  Please state your full name and spell

2    your last name.

3           THE WITNESS:  Mario San Bartolome.  Last name is

4    S-a-n like Nancy space B like Boy a-r-t-o-l-o-m-e.

01:41PM 5           THE COURT:  Thank you.  You may inquire, Counsel.

6           MS. JUN:  Thank you, Your Honor.

7                     DIRECT EXAMINATION

8    BY MS. JUN:

9    Q.   Dr. San Bartolome, what do you do?

01:41PM 10   A.   I'm an addiction medicine physician and family

11   physician.

12   Q.   And what does that mean that you're addiction medicine

13   physician?

14   A.   So I'm board certified as a specialist treating patients

01:41PM 15   that have addiction and related disorders.  And I hold the

16   board certification both in addiction medicine as well as

17   family medicine.

18   Q.   Have you treated patients who are going through alcohol

19   withdrawal?

01:41PM 20   A.   Yes, extensively.

21   Q.   Have you treated patients who suffer from substance use

22   disorders?

23   A.   Yes, extensively as well.

24   Q.   And what are substance use disorders?

01:42PM 25   A.   Substance use disorders are a class of disorders that

1    typically will be linked to some sort of a chemical that

2    causes changes in the body that are predictable and might

3    involve compulsive behaviors and doing things despite

4    negative consequences.

01:42PM 5    Q.   Have you ever treated patients who are suffering from

6    delirium tremens?

7    A.   Yes, I have.

8    Q.   And what is delirium tremens?

9    A.   Delirium tremens can be thought of as the most severe

01:42PM 10   form of alcohol withdrawal.  It's the sometimes fatal

11   consequence of an untreated withdrawal that usually is the

12   hallmark of it is that it includes things like

13   hallucinations, disorientation, kind of a decoupling of

14   reality.  In addition to what would maybe normally be seen in

01:42PM 15   regular alcohol withdrawal which most people are hearing

16   about tremors and sweats and nausea and things like that.

17   Q.   Let me ask you a question about alcohol withdrawal.  Are

18   registered nurses able to diagnose whether a person is going

19   through alcohol withdrawal?

01:43PM 20   A.   No, a nurse would maybe be able to point out some of the

21   factors that are being observed, uh, the symptoms and the

22   signs, but an actual medical diagnosis would need to come

23   from a physician.

24   Q.   And to your knowledge are law enforcement officers in

01:43PM 25   the state of California allowed to diagnose whether someone

UNITED STATES DISTRICT COURT

1    is at risk of alcohol withdrawal?

2    A.    At risk of alcohol withdrawal?

3    Q.    Actually, going through alcohol withdrawal.

4    A.    Well, so again, if it's a diagnosis, I would say no.

01:43PM 5    Q.    Now, let me -- and then let me go back to the delirium

6    tremens issue.  Are there risk factors for developing

7    delirium tremens?

8    A.    Yes.  Typically, we see delirium tremens in people that

9    have high consumption levels of alcohol.  There's some

01:44PM 10   association with older age.  Also, if you've had an episode

11   of delirium tremens or seizures and basically severe

12   withdrawal, uh, that it increases the likelihood of you

13   having delirium tremens as well.  One other factor could be

14   underlying medical conditions that could complicate an

01:44PM 15   average withdrawal.

16   Q.    Now, you reviewed the evidence in this case.  Is that

17   fair?

18   A.    Yes.

19   Q.    What kind of evidence did you review regarding the death

01:44PM 20   of William Enyart?

21   A.    I reviewed reports from the coroner, the pathologist.  I

22   reviewed video footage, audio footage and also progress notes

23   from staff at the detention center.  I've reviewed policies

24   and procedures that were recently brought to my attention.

01:44PM 25   And also I would say some -- well, I think that's pretty --

1    pretty inclusive of all the things.

2            MS. JUN:  So now I want to ask you some questions

3    about the facts of this case.  And I am now going to move

4    into evidence Exhibit 12.

01:45PM 5            THE COURT:  Counsel, again, be careful on an expert

6    witness, it's hypotheticals not the facts of this case.  An

7    expert can only testify to hypotheticals, and then you have

8    to prove the hypotheticals up.

9            MS. JUN:  Thank you, Your Honor, for reminding me.

01:45PM 10            THE COURT:  Go ahead.

11            MS. JUN:  Thank you, Your Honor.

12    Q.   Dr. San Bartolome, let me ask you this.  I want you to

13    assume that the following facts are true.  A person has a

14    history chronic alcohol abuse, No. 1.

01:45PM 15            His mother has reported hearing him talk to himself

16    and has also reported that he smells of alcohol.

17            No. 3, there's documented evidence that this

18    individual is starting -- when he is being monitored is

19    starting to respond to internal stimuli.

01:46PM 20            No. 4, this person documented as having or speaking

21    in word salad.

22            No. 5, this person is having auditory

23    hallucinations.

24            No. 6, this person is having visual hallucinations.

01:46PM 25            No. 7, that this person thinks there are people

UNITED STATES DISTRICT COURT

1    under the concrete floor of his cell.

2         And No. 8, this person does not have a history of

3    any psychiatric disorder or bipolar disorder.

4         Assuming all these facts are true, is it more

01:47PM 5    likely than not this person is suffering from delirium

6    tremens?

7    A.   Yes.

8    Q.   I want to ask you another hypothetical and I'm going to

9    ask that you assume these following facts are true.  I want

01:47PM10   you to assume that a person is arrested on July 27th, 2022.

11   This arrested person while in custody begins to exhibit

12   bizarre behavior on July 30, 2022.  The third fact is his

13   behavior worsens the next two days.  And then number four, he

14   dies on August 1st, 2022.

01:47PM15        So I want to you assume these facts are true and

16   the previous facts I had given you are all true.

17        Assuming this entire body of facts are true, is it

18   more likely than not that this person died of untreated

19   delirium tremens?

01:48PM20   A.   Yes, it is.

21   Q.   Now, I want to talk a little bit about the facts of this

22   case.  You had mentioned before that a person is at a higher

23   risk of delirium tremens if they have a history of chronic

24   alcohol abuse.  Is that a fair recap of your testimony?

01:48PM25   A.   Yeah, chronic alcohol use and in large quantities.

1    Q.   Is there evidence in this case that Mr. Enyart had a

2    history of chronic alcohol abuse?

3         THE COURT:  Again, Counsel, you can't testify as

4    the attorney that's asking the questions.  He can't testify

01:48PM 5    what happened at the scene cause he wasn't there.  He's an

6    expert.  You can pose any hypothetical you want, and then

7    with other witnesses, you have to prove up that hypothetical.

8    Go ahead.

9    By MS. JUN:

01:48PM10   Q.   Dr. San Bartolome --

11        THE COURT:  He could assume the facts you want him

12   to testify about, but it has to be an assumption that has to

13   be proven up later.

14        MS. JUN:  Thank you, Your Honor.  I appreciate it.

01:49PM15   Q.   You had mentioned earlier that you reviewed the

16   pathologist report in this case.

17   A.   Yes, I have.

18   Q.   I want you to assume the following facts are true with

19   respect to the pathologist report or a pathologist report.  I

01:49PM20   want you to assume that the pathologist or the coroner has

21   reviewed this report and has viewed the decedent's liver.  I

22   want you to further assume that the liver is showing signs

23   of, excuse me, I'm going to try and pronounce this correctly.

24   That the liver is showing signs of diffuse macro steatosis.

01:49PM25        Is it more likely than not that this person whose

```
 1    liver is showing diffuse macro steatosis is suffering from

 2    liver damage due to alcohol abuse?

 3    A.   It is.

 4    Q.   Now, I want you to assume some other facts are true and

 5    I will give you the following information.  Assume that an

 6    individual has a history of abusing alcohol.  Further assume

 7    that a subsequent autopsy shows that his liver has suffered

 8    extensive damage.  Further assume that there are toxicology

 9    results indicating that he had a high acetone levels.  And

10    then finally assume that his mother and father have reported

11    that he abuses alcohol and may be at risk of complications to

12    that such as seizures.

13         Based on this type of information is it more likely

14    than not that the person is going to suffer from delirium

15    tremens?

16    A.   Yeah, it would be consistent with having a significant

17    alcohol use disorder and likely if there's liver changes that

18    kind of speaks to the quantities so it would make the risk

19    higher to develop delirium tremens.

20    Q.   Is there a timeline for the development of delirium

21    tremens?

22    A.   Yes.  The timeline is actually quite important because

23    delirium tremens doesn't typically just start, you know, in

24    the very beginning.  Usually around 48 hours or so, the risk

25    begins and it peaks somewhere around the fourth day and can
```

01:50PM (line 5)
01:50PM (line 10)
01:51PM (line 15)
01:51PM (line 20)
01:51PM (line 25)

1    last if it's untreated for a long time if the person doesn't

2    die.  So the timeline is quite important because typically, a

3    mild withdrawal happens within hours of just somebody not

4    drinking.

01:52PM 5          And what I mean by the timeline, I mean after the

6    last drink so that's when the clock starts that last drink.

7    And so for delirium tremens, it's delayed in comparison to

8    mild withdrawal.

9    Q.   Now, I want you to assume these following facts are

01:52PM 10   true.  Assume that this person has a history of chronic

11   alcohol abuse.  Assume that his mother expresses concern

12   about the possibility of complications related to alcohol

13   abuse such as seizures or heart attack.

14          And then further assume that on July 30th, 2022,

01:52PM 15   the mom calls the jail and she speaks to a deputy and she

16   tells that deputy that her son drinks a lot and might have a

17   seizure or suffer some effect of withdrawal.  Now, I want you

18   to further assume that this deputy actually tells the medical

19   provider.  The deputy tells a nurse.

01:53PM 20          Assuming all those facts are true, is it more

21   likely than not that this would have prompted a transfer to

22   the emergency room department?

23   A.   Yes, I believe it would have because the type of

24   symptoms that were already manifesting around hallucinations

01:53PM 25   and the disorientation would be grossly out of what would be

UNITED STATES DISTRICT COURT

1    considered mild withdrawal.

2    Q.   I think you said earlier that you had reviewed the

3    medical records in this case.  Is that fair?

4    A.   Yes.

01:53PM 5    Q.   You reviewed the medical records for William Enyart?

6    A.   Yes.

7    Q.   You were able to see some of the observations documents

8    about Mr. Enyart's behavior?

9    A.   Yes, I was.

01:53PM 10   Q.   And did you rely on those medical records in coming to

11   some of your conclusions in this case?

12   A.   Yes, I did.

13          MS. JUN:  Your Honor, move into evidence Exhibit 12

14   and 15 both stipulated.

01:54PM 15          THE COURT:  Are those the medical records?

16          MS. JUN:  Yes.

17          MR. MIEDERHOFF:  I'm sorry.  I'm not sure what

18   we're referring to.  Can I look at that real quick?

19          MS. JUN:  Yes.

01:54PM 20          And to answer Your Honor's question, yes, those are

21   medical records, Your Honor.

22          THE COURT:  Okay.

23          MR. MIEDERHOFF:  Thank you.  Forgive me time to

24   look at that.

01:54PM 25          THE COURT:  No objection?

UNITED STATES DISTRICT COURT

1          MR. MIEDERHOFF:  No objection.

2          THE COURT:  Be received.

3              (Exhibits 12 and 15 admitted.)

4          MS. JUN:  Your Honor, may I publish to the jury?

01:54PM 5          THE COURT:  Yes.

6          MS. JUN:  Thank you, Your Honor.

7     Q.   Dr. San Bartolome, can you see what is marked and

8     admitted as Exhibit 12?

9     A.   Yes.

01:55PM 10    Q.   What are these documents -- excuse me.  What are these

11    notes in front of you?

12    A.   These are medical provider notes that were, uh, looks

13    like it's describing a code blue.

14          MS. JUN:  And if Mr. McMullen would be so kind to

01:55PM 15    take us to Exhibit 12 at page 4.  I'm sorry.  Exhibit 12 at

16    page 5.

17    Q.   And Dr. San Bartolome, if I could direct your attention

18    to the middle part of Exhibit 12 at page 5, and I'm referring

19    to the entry that says patient is trying to get out of the

01:56PM 20    segment during his tier time.  Do you see that portion that

21    I'm referring to?

22    A.   I do.

23    Q.   And is it your understanding that this is observations

24    that medical staff at a jail are documents regarding

01:56PM 25    Mr. Enyart?

1    A.   It is.

2    Q.   Do you know which jail he is in at this time?

3    A.   I believe this is the 30th so it would be subsequent

4    one, something with a west in it.  Maybe I'm not remembering.

01:56PM 5    Q.   So this would be -- let me just direct your attention.

6    It says here that, um, stating he is the owner of this

7    facility.  That his last name is same as his mom's name.

8    Trying to look what is around under the beds and sink.  His

9    cellmate said he is acting weird.  Is this information that

01:57PM 10   indicates the beginning of delirium tremens?

11   A.   Yes.  It certainly points to that, that's the bizarre

12   behavior, uh, looks like there's some delusion that's

13   happening and, again, a decoupling of what reality is and,

14   uh, the idea of owning the facility would be that.  And also

01:57PM 15   looking for, you know, looking for people, those are kind of

16   beginning signs also of paranoia, another type of delusion.

17   Q.   And it says later on that Mr. Enyart is conversing with

18   eyes wide open and has a bizarre personality.  Do you see

19   that?

01:57PM 20   A.   Yes.

21        MS. JUN:  And then I want to direct your attention

22   to page 4 of the exhibit.  If Mr. McMullen could be so kind

23   as to take us to page 4 of Exhibit 12.

24   Q.   I think you just said that at some point Mr. Enyart was

01:57PM 25   transferred to a second facility?

1   A.   That's right.

2   Q.   Why was Mr. Enyart transferred to a second facility

3   based on your review of the medical records?

4   A.   Based on my review, I believe that those behaviors were

01:58PM 5   concerning and that he needed to go to a facility that had

6   some capacity to do more medical and psychiatric monitoring.

7   Q.   And I'm going to direct your attention to the top --

8   excuse me, the top half of Exhibit 12 page 4.  And it says

9   here inmate is an HDDC transfer per chart review on very

01:58PM 10   limited information.  Inmate was booked on HDDC on 7-27.

11        Do you see where I'm reading?

12   A.   I do.

13   Q.   And then there's a subsequent objective note.  Do you

14   see where I'm pointing to?

01:58PM 15   A.   Yes.

16   Q.   What does that mean when it's an objective note?

17   A.   So the objective is basically the structure of a note.

18   In medicine we use it.  We typically call the whole thing a

19   SOAP, subjective, objective, assessment and plan.  And the

01:59PM 20   objective is what you observe.

21   Q.   So would this note indicate then that the nurse who is

22   observing Mr. Enyart is noting these observations of him?

23   A.   Yes.

24   Q.   And to be clear these are -- this is a nurse at the

01:59PM 25   second facility the West Valley Detention Center?

UNITED STATES DISTRICT COURT

1    A.    Yes, that's what it appears to be.

2    Q.    And is there anything in this note that indicates to you

3    that Mr. Enyart's delirium tremens is worsening?

4    A.    Well, so there's a description of being hyper verbal, of

01:59PM 5    also talking to non-existent entities, it sounds like there's

6    more disorganization that's happening in his thought process

7    and so I believe that all of this is really just a

8    continuation of what is already starting.  I would say even a

9    couple of days before when he was just beginning to refuse

01:59PM 10    some of the care that typically he was accepting.  So this

11    appears to be a continuation and a worsening of his symptoms.

12    Q.    At this point should Mr. Enyart have been transferred to

13    a higher level of care to an emergency room department?

14    A.    I believe that if at this point, it was known in the

02:00PM 15    diagnosis, you know, we call something a differential

16    diagnosis.  We have a list of things that are possibilities.

17    If alcohol were part of that, that could explain the

18    psychotic behavior which is all those delusions and

19    hallucinations.  Then yes, because that means that the

02:00PM 20    individual needs immediate medical attention.  If it was

21    coming from a different source, then, again, they might not.

22    But if it's known that alcohol was involved in this, then

23    yes.

24    Q.    So if it was known to the medical providers at this

02:00PM 25    point that alcohol was involved in the manifestation of these

1  symptoms, is it your understanding that Mr. Enyart should

2  have been transferred to an emergency room department at this

3  point?

4  A.   Yes, he should have been transferred immediately.

02:01PM 5        THE COURT:  Let me just make sure the jury

6  understands.  The hospital is not a party to this case so

7  what the hospital did is not a concern of yours.  What's a

8  concern of yours is the parties to the case and what they

9  did.

02:01PM 10        Go ahead, Counsel.

11        MS. JUN:  Thank you, Your Honor.

12  Q.   Just to be clear Dr. San Bartolome, in your review of

13  the medical records in this case, Mr. Enyart was never

14  transferred to an emergency room hospital.  Is that fair?

02:01PM 15  A.   That's correct.

16  Q.   Now, let me ask you as part of your review of the

17  evidence in this case and in coming to your opinions, did you

18  listen to audio records of Mr. Enyart?

19  A.   Yes.

02:01PM 20  Q.   And can you describe where these audio recordings were

21  captured?

22  A.   They were captured when he was in his cell and, um, they

23  were recorded and basically it supports the type of

24  delusional type of behavior that we see that was documented

02:02PM 25  by the medical staff as observed only a little more specific.

UNITED STATES DISTRICT COURT

```
 1      Where he was talking about his daughter or he was in panic.

 2      It was clearly there's some fear that something was gonna

 3      happen to him and he was fearing very specific individuals.

 4      Q.   Did you rely on these audio recordings in coming to your

02:02PM 5      opinion that Mr. Enyart was suffering from delirium tremens?

 6      A.   Yes, I did.

 7               MS. JUN:  Your Honor, I would now move into

 8      evidence Exhibits 52, 53 and 55 which have been stipulated

 9      to.

02:02PM10               THE COURT:  52, 53 and 55.

11               MS. JUN:  Yes, sir.

12               MR. MIEDERHOFF:  Can I just look at that those for

13      one minute?

14               THE COURT:  Okay.

02:03PM15               MS. JUN:  These are audio recordings.

16               MR. MIEDERHOFF:  No objection.

17               THE COURT:  Okay.

18                    (Exhibits 52, 53 and 55 admitted.)

19               MS. JUN:  Your Honor, may I publish to the jury?

02:03PM20               THE COURT:  Yes.

21               MS. JUN:  Let's start with Exhibit 52.

22                         (Audio played.)

23               THE COURT:  Can you stop it, please?  Thank you.

24      Counsel, this is far more prejudicial than it is probative.

02:05PM25      This is after he's in the hospital.  It has nothing to do
```

         1    with the allegations in this case.  It's completely

         2    irrelevant and is very prejudicial.  No need to put the jury

         3    through that.

         4         MS. JUN:  Your Honor, if I may respond, this is

02:05PM  5    actually recordings of Mr. Enyart in the jail cell.

         6         THE COURT:  What day?  I don't know what day this

         7    is.  Do you have anyone to testify?

         8         MS. JUN:  Yes, Dr. San Bartolome said --

         9         THE COURT:  Well, he can't testify.  Were you there

02:05PM 10    at the jail cell?

        11         THE WITNESS:  No, sir.

        12         THE COURT:  Do you know when this was taken?  Other

        13    than what was presented, you weren't there personally, were

        14    you?

02:05PM 15         THE WITNESS:  No, I wasn't.

        16         THE COURT:  You have to have somebody lay the

        17    foundation.  He can't do it.

        18         MR. McMULLEN:  Your Honor, they're stipulated --

        19         THE COURT:  Counsel, we can't have three attorneys

02:06PM 20    talking.  Go ahead.

        21         MS. JUN:  Your Honor they are stipulated as

        22    admissible.

        23         THE COURT:  I don't care if they're stipulated.

        24    Counsel, it's prejudicial.  I've got to protect the jury and

02:06PM 25    make sure that they get relevant information and not


                         UNITED STATES DISTRICT COURT

           1    prejudicial information.  And this has gone way too far.

           2    It's been going on for some time, but it's gone way too far

           3    on it.  If you want to bring somebody in to testify that this

           4    was something that the officers that you're charging knew

02:06PM    5    about it, the department knew about it, bring that person in,

           6    but this person can't testify to that.

           7              MS. JUN:  Thank you, Your Honor.  I appreciate

           8    that.

           9              THE COURT:  He can testify to his reaction what he

02:06PM   10    saw, but he can't testify when it happened.  Okay, go ahead.

          11              MS. JUN:  Thank you, Your Honor.

          12              Dr. San Bartolome, let's go back to some medical

          13    records of Mr. Enyart.  I would now like to show you

          14    Exhibit 15 which has been admitted into evidence.

02:06PM   15              Mr. McMullen, if it can be published to the jury?

          16              THE COURT:  I'm sorry?

          17              MS. JUN:  Exhibit 15 which is admitted.

          18              THE COURT:  Yes, it can be produced, yes.

          19    BY MS. JUN:

02:07PM   20    Q.   Dr. San Bartolome, what is Exhibit 15?

          21    A.   This appears to be a mental health evaluation by a

          22    clinical supervisor that was completed on August 1st, 2022 at

          23    9:45 a.m.

          24              THE COURT:  August?

02:07PM   25              THE WITNESS:  August 1st.

1          THE COURT:  Okay, thank you.

2          MS. JUN:  I want to continue on this medical

3    record.  If we could go to the bottom half of the medical

4    record, Mr. McMullen.  I'm sorry.

02:07PM 5    Q.   Do you see here where it says patient was unable to

6    answer due to patient responding to internal stimuli.  Do you

7    see that notation?

8    A.   I do.

9    Q.   What does that mean?

02:07PM 10   A.   So responding to internal stimuli is what we observe

11   when somebody is for example talking to themselves or

12   feeling, um, paranoid about something that's inside of them

13   that is not consistent with the reality outside of them.  We

14   call that internal stimuli.

02:08PM 15          MS. JUN:  And Mr. McMullen, if we could kindly go

16   to the next page of Exhibit 15.

17   Q.   And do you see that in response to a series of

18   questions, it simply says patient was unable to answer due to

19   patient responding to internal stimuli?

02:08PM 20   A.   Yes.

21          MS. JUN:  And then could we go back to the first

22   page?

23   Q.   There's a note towards the top of the page.  Can you

24   explain what this note is?

02:08PM 25   A.   Sure.  So this is the, um, more the narrative component

UNITED STATES DISTRICT COURT

1    of this note.  And the nurse was going through the process of

2    explaining that Mr. Enyart was offered a more secure location

3    or a confidential location, but that his paranoia, the

4    delusions he was experiencing and basically all the internal

02:09PM 5    stimuli observations that they had were essentially getting

6    in the way.

7    Q.   It says on this note, patient presented with

8    disorganized speech and word salad saying quote, "Don't take

9    that pillow, appetizer, to die," end quote.

02:09PM 10    Does that have any significance to your opinion

11    Mr. Enyart was suffering from delirium tremens?

12    A.   Yes, it does.  So word salad just really means that

13    somebody is using words that don't necessarily fit.  That's

14    why they call it a salad because it's all mixed up.  And

02:09PM 15    those are also part of that disassociation and disorientation

16    that we see with delirium tremens and they're also

17    characteristics of psychotic disorders.

18    Q.   Could you tell me what time did this clinician make

19    these observations of Mr. Enyart?

02:10PM 20    A.   Based on the note, it states that the clinician first

21    met at 7:00 in the morning, and then it looks like the time

22    stamp of the note is for 9:45 a.m.

23    THE COURT:  The date?

24    THE WITNESS:  On August 1st.

02:10PM 25    BY MS. JUN:

1    Q.    I want you to assume that the following facts are true.

2          On August 1st, 2022 at approximately 9:45 a.m., a

3    patient is seen who is engaging in disorganized speech and

4    word salad.  Who is preoccupied with internal stimuli and who

02:10PM 5    is unable to verbalize his understanding of the limits of

6    confidentiality.

7          I want you to further assume that this patient is

8    presented with bizarre behavior sitting on the toilet facing

9    the wall and responding sporadically to internal stimuli.

02:11PM10          MR. MIEDERHOFF:  Your Honor, make an objection.

11   Relevance and cumulative.

12          THE COURT:  Sustained.

13   BY MS. JUN:

14   Q.    Dr. San Bartolome, you testified earlier that you had

02:11PM15   reviewed the coroner's report in this case; is that correct?

16   A.    That's fair.

17   Q.    Did the coroner note that Mr. Enyart had injuries to his

18   body?

19   A.    Yes, he did.

02:11PM20   Q.    And based on your review of the coroner's report, did

21   you have an understanding of where those injuries were?

22   A.    Yes, they were outlined in the report.

23   Q.    Could you give us a description of those injuries?

24          MR. MIEDERHOFF:  Objection.  Relevance, cumulative.

02:11PM25          THE COURT:  I don't know if it is or not.

UNITED STATES DISTRICT COURT

1          Go ahead.

2          THE WITNESS:  There was a very detailed description

3     of contusions which are bruises on the shins and the upper

4     extremities.  There were abrasions which are scrapes on the

02:11PM 5     head, one side of the head.  There were evidence of red areas

6     on the back, lower back area, and descriptions as well of

7     areas that were discolored.  And so there just appeared to be

8     lots of essentially what would be from trauma.  Those are

9     caused from trauma, those bruises.  It's internal bleeding

02:12PM 10    that happens at the surface.

11         THE COURT:  And would that have an effect on the

12    opinions you've rendered today, those injuries?

13         THE WITNESS:  They did peripherally in that so when

14    somebody's disorganized and not able to take care of

02:12PM 15    themselves, they're psychotic.  In the recordings we heard,

16    we heard him hitting things.  He was essentially

17    self-injuring and that is the kind of behavior you do when

18    you are psychotic.

19         THE COURT:  That would be consistent.

02:12PM 20         THE WITNESS:  Yes, sir.

21         THE COURT:  Go ahead, Counsel.

22    BY MS. JUN:

23    Q.   Did the pathologist find any other injuries to

24    Mr. Enyart.  You mentioned blunt force trauma.  Did he have

02:13PM 25    any injuries to his head?

UNITED STATES DISTRICT COURT

1    A.    He did.

2              MR. MIEDERHOFF:  Hearsay, Your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes, there was a notation of

02:13PM 5    something called a subarachnoid hemorrhage and what that is

6    is essentially a bleeding in the part of the brain where it's

7    between the covers, the part that covers the brain so it's a

8    very unique area.

9              And generally, it exists usually for two main

02:13PM 10   reasons.  Either one where somebody has a reason to have an

11   internal bleed like an aneurysm, something ruptures or from

12   blunt trauma of some sort that causes that bleeding.  It was

13   described as focal, a focal subarachnoid hemorrhage which

14   just means if not around the whole brain, it's around one

02:13PM 15   specific area.

16   BY MS. JUN:

17   Q.    And to your knowledge and experience, are subarachnoid

18   hemorrhages caused by blunt force trauma?

19   A.    That is one of the main causes, yes.

02:13PM 20   Q.    And did you notice any other fractures -- did the

21   pathologist note any other fractures to Mr. Enyart's body?

22   A.    Yes, there was a listing of a seventh, right posterior

23   seventh rib fracture.  Typically, the ribs, uh, number 7 to

24   10 on the way down, those are the ones that typically can be

02:14PM 25   injured.

 1            THE COURT:  We're wasting a lot of time.  There are

 2    evidence of other injuries to the body.

 3            THE WITNESS:  Yes, sir.  Specifically, a rib

 4    fracture.

02:14PM 5            THE COURT:  And the reason that's significant in

 6    your opinion is that's consistent with somebody who either

 7    ran into walls or fell down or something like that?

 8            THE WITNESS:  Yes, sir.

 9            THE COURT:  Let's go on, Counsel.

02:14PM 10            MS. JUN:  Your Honor, I have no further questions.

 11    Thank you.

 12            THE COURT:  Okay, cross-examination.

 13                        CROSS-EXAMINATION

 14    MR. MIEDERHOFF:

02:15PM 15    Q.   Good afternoon, Doctor.

 16    A.   Good afternoon.

 17    Q.   You mentioned different levels of withdrawals; right?

 18    A.   Yes.

 19    Q.   You talked about three different levels.  There are

02:15PM 20    mild, I think it's moderate and the delirium tremens.  Mild,

 21    major and delirium tremens.  Did I get that right?

 22    A.   Yes.

 23    Q.   Mr. William Enyart was not a patient that you treated so

 24    you don't know what he drank daily; correct?

02:15PM 25    A.   Correct.

1    Q.    You relied on the information from the family to

2    understand how much Mr. William Enyart drank; correct?

3    A.    The family and the pathology report that outlined his

4    liver as well as the presence of acetone.

02:16PM 5    Q.    You looked at the pathology report and you looked at the

6    liver.  And there was a question to you about what his liver

7    looked like; right?

8    A.    Yes.

9    Q.    And that was damage to his liver?

02:16PM 10   A.    Specifically, it's called steatosis which is fatty

11   deposition to the liver.

12   Q.    That indicates damage to his liver from drinking?

13   A.    So typically for a 33 year old, that's the first stage

14   going towards cirrhosis.

02:16PM 15   Q.    Does that indicate that the person drinks heavily?

16   A.    Well, it typically would be that somebody drinks a

17   significant amount that's not clearing and therefore injuring

18   the liver which is the detoxing part of the body.

19   Q.    Did you say it indicates they drink a significant

02:16PM 20   amount?

21   A.    Yes.

22   Q.    What are some of the health risks associated with

23   someone who drinks a significant amount?

24   A.    Well, it's progressive as well.  Some of the early

02:17PM 25   stages can be everything as minor as reflux, and then it

```
         1    works its way to bleeding disorders when the liver's not

         2    working well which can manifest as bruising when you don't

         3    typically expect bruising.  It can cause what are called

         4    esophageal varices which are kind of like the same thing what

02:17PM  5    hemorrhoids are, but they're in the esophagus which can cause

         6    lots of bleeding as well.  And it can cause gastric lining

         7    problems.  Typically, there's almost no organ spared to be

         8    honest with you with alcohol.

         9    Q.    Right.  It affects the entire body?

02:17PM 10    A.    Yeah, at different stages.

        11    Q.    We already talked about it causes liver damage; right?

        12    A.    It sure can.

        13    Q.    Heart disease?

        14    A.    It can.

02:17PM 15    Q.    Brain and nervous system problems?

        16    A.    Yes.

        17    Q.    Anemia?

        18    A.    Yes.

        19    Q.    Cancer?

02:18PM 20    A.    Some cancers, yes.

        21    Q.    Uh, increased risk of infection?

        22    A.    Yeah, that's more linked to the behavior, but not so

        23    much to the alcohol, but maybe a little bit of immune

        24    suppression in late stages.

02:18PM 25    Q.    So in terms of what -- we know from the damage to his
```

UNITED STATES DISTRICT COURT

```
 1   liver that he drank a significant amount.  You testified

 2   about that; right?

 3   A.   Yes.

 4   Q.   In terms of what he actually drank on a daily basis that

02:18PM 5   information came from the family; right?

 6   A.   Yes, I believe so.

 7   Q.   Their best understanding of what he drank?

 8   A.   Yes.

 9   Q.   I think if I represented to you that Mr. William Enyart

02:18PM10   sister testified that he hid it from the family would that be

11   consistent with most alcoholics?

12   A.   I don't know about most, but it is very common because

13   there's a lot of shame usually associated with alcoholism

14   that people do hide their problem.  And so whether it's

02:18PM15   hiding it physically or, you know, not being around or

16   basically timing when they drink and this is more of a

17   binge-type of thing, those things are consistent.

18   Q.   You gave a deposition in this case; right?

19   A.   Yes, I did.

02:19PM20   Q.   You gave testimony under oath?

21   A.   Yes.

22   Q.   You talked about that the family never saw him drinking;

23   right?

24   A.   I didn't see documentation that discussed much of that.

02:19PM25   In fact, you know, that it was a little bit of a question you
```

1    know in terms of where he was drinking.  But that I believed

2    the whole family was under the impression that yes, he was

3    drinking.

4    Q.   My question was a little different.  The family never

02:19PM 5    saw him drinking; right?

6            THE COURT:  If you know.

7            THE WITNESS:  I don't know if -- you use the word

8    ever.  I don't know that to be the case so I'll probably just

9    say I don't remember that.

02:19PM 10   MR. MIEDERHOFF:

11   Q.   They found bottles of alcohol though; right?

12   A.   I believe there was even the name of a specific one so

13   to that degree, yes.

14   Q.   The alcohol you described it as he was heavy drinker of

02:20PM 15   concentrated versions of alcohol based on those bottles;

16   right?

17   A.   If we believe that that's the main thing that he drank,

18   yes.

19   Q.   We don't know how much he had to drink on the day he was

02:20PM 20   arrested because he declined a breath alcohol test; right?

21   A.   That's right.

22   Q.   When you evaluate someone for the risk of alcohol

23   withdrawals, it matters to know how much they drink each day

24   and how heavily concentrated the alcohol is; right?

02:20PM 25   A.   No, not for treatment.  For treatment that's clinical so

UNITED STATES DISTRICT COURT

```
 1    it's based off what you're seeing.  You said alcohol

 2    withdrawal.

 3    Q.   The risk of alcohol withdrawal.

 4    A.   For the risk yes, that would be an important part.

 5    Q.   So you would want to know how much the person drinks and

 6    how frequently they drink; right?

 7    A.   Yes, that's an important part of the history.

 8    Q.   Because going back to the mild, major and delirium

 9    tremens in terms of the level of withdrawals that you

10    mentioned earlier, how much does someone have to drink --

11    well, let me strike that.  Let me start over.

12         If a gentleman is 33 years old, he weighs

13    182 pounds and he's 5 foot 11, how much does that someone

14    have to drink to be to the point where they'll develop

15    delirium tremens as opposed to a major or mild withdrawal?

16    A.   So I don't believe there's any sort of a calculator for

17    that because there's a phenomenon called tolerance.  And that

18    means when you first start drinking, you might drink one

19    alcoholic beverage and get an effect, but after constant

20    drinking, now maybe you need 12 of those and then it goes up

21    and up.  That tolerance is the body's adaptation and there's

22    no linear correlation that I know of in science and addiction

23    medicine that draws a direct correlation to make that

24    conclusion with delirium tremens.

25         Because delirium tremens doesn't happen in
```

02:20PM (line 5)
02:21PM (line 10)
02:21PM (line 15)
02:21PM (line 20)
02:22PM (line 25)

1    everybody so, you know, I couldn't answer that question.

2    Q.   You wouldn't know if someone's gonna have a minor, major

3    or delirium tremens withdrawal just based on them telling you

4    how much they have to drink on a daily basis?

02:22PM  5    A.   No.

6    Q.   Now, you talked about a minor withdraw someone could

7    have that, could be a couple hours; right?

8    A.   For some people.

9    Q.   Major withdrawal a little bit more?

02:22PM 10    A.   No, it could still happen within a few hours.  It's just

11    a matter of the manifestation.  So it could be the difference

12    between a tremor and maybe the beginnings of what we call

13    alcoholic hallucination.

14    Q.   You talked about delirium tremens being about 48 hours;

02:22PM 15    right?

16    A.   Well, the risk of -- it's actually in a graph that I

17    included in my report.  And if you look at the graph, it

18    starts around 48 hours and it goes up into days.

19    Q.   You talked about -- let me start over.  Strike that.

02:23PM 20         If a person's intoxicated, but not dependent, they

21    would not suffer from withdrawal; is that correct?

22    A.   No.

23    Q.   Is that a correct statement?

24    A.   That is not a correct statement.

02:23PM 25    Q.   It's a data point if someone's intoxicated; right?

UNITED STATES DISTRICT COURT

1    A.    Somebody can be intoxicated, even heavily intoxicated --

2              MR. MIEDERHOFF:  I'm gonna have to stop you.

3    Motion to strike as non-responsive.

4              THE COURT:  Why don't you state the question again,

02:23PM 5    Counsel.

6    MR. MIEDERHOFF:

7    Q.    If someone's intoxicated, that's a data point; correct?

8    A.    Yes.

9    Q.    And if someone is intoxicated, but not dependent on

02:23PM 10   alcohol, they're not gonna have delirium tremens; right?

11   A.    Yeah, if they're not dependent, it's not typical.

12   Q.    If someone is drinking to such a degree -- strike that.

13              Would 10 to 11 drinks a day cause someone to have

14   delirium tremens as opposed to minor or major withdrawals?

02:24PM 15   A.    Again, it depends on their level of tolerance.  So ten

16   drinks for one individual might not affect them all that much

17   so it depends.  That's why the risk factors that are

18   generally experienced are more clinical.  They're not -- you

19   can't correlate a number of beers or glasses of wine.

02:24PM 20   Q.    When you say clinical, you mean like evaluated by

21   doctors?

22   A.    No, I mean that the kind of signs that you see.  So for

23   example, somebody that's had severe withdrawals, then that

24   predisposes them to having worsening withdrawals.  We call

02:24PM 25   that the kindling effect.  That's what I mean by clinical.

```
     1    Q.    For Mr. William Enyart, if he had gotten treatment for

     2    the withdrawals, he still would have had consequences; right?

     3    A.    Yes.

     4    Q.    What would those consequences have been?

02:24PM 5    A.    They would be related to the timing for when he sought

     6    or was able to get tertiary care type of treatment.  So

     7    there's a standard treatment for it.  It involves the

     8    medication called benzodiazepines.  And in some cases

     9    depending if you catch it a little bit too late, it's like a

02:25PM10    train that's going.

    11          If you don't catch it early, you're gonna have to

    12    use massive amount of resources to stop it.  So some people

    13    might have to be paralyzed, put in the ICU and put on

    14    medication.  But if it's earlier on, then you wouldn't need

02:25PM15    to do that.  So it just put depends on when you catch it.

    16    Q.    40 percent of individual who don't get treatment and

    17    they have delirium tremens, they pass away; right?

    18    A.    So these days -- I'm sorry.  Can you repeat the

    19    question?

02:25PM20    Q.    Yes.  40 percent of individuals with delirium tremens

    21    who do not receive treatment pass away; correct?

    22    A.    Yes, yes.

    23    Q.    Five percent of individuals with delirium tremens who

    24    receive treatment still pass away; right?

02:25PM25    A.    Correct.
```

1          MR. MIEDERHOFF:  No further questions.

2          THE COURT:  Redirect.

3          MS. JUN:  Very briefly, Your Honor.

4          THE COURT:  Sure.

02:26PM 5                    REDIRECT EXAMINATION

6     BY MS. JUN:

7     Q.   Dr. San Bartolome, you were asked on cross-examination a

8     question by counsel and I don't think you got to finish your

9     answer.  It was about intoxication and withdrawal.  Whether

02:26PM 10    one can be intoxicated and still withdraw from substance.

11          Do you remember that question?

12    A.   Yes, I do.

13    Q.   Could you explain that?  I think you started explaining

14    your response.  Could you continue, please?

02:26PM 15    A.   So an individual can be intoxicated with alcohol and if

16    you were to measure their blood alcohol level, it can even be

17    quite high.  It can be a point one, you know, much above the

18    level legal limit for driving let's say.  But they will be

19    manifesting withdrawal at that moment.  They can be having

02:27PM 20    shakes, agitation, nausea, vomiting, all of the things that

21    would start at that lower level and still be intoxicated.

22    Q.   And I want to go back to a line of questioning that

23    counsel had posed on cross-examination.  You had said DTs are

24    like a train.  You have to start early and get in front of

02:27PM 25    the train.  Do you recall that line of questioning?

UNITED STATES DISTRICT COURT

1    A.    Yes.

2    Q.    What do you mean by that?  So is the timing really

3    important, the timing of treatment?

4    A.    The timing of treatment is really the most important

02:27PM 5    thing of all.  You can consider anybody with an alcohol use

6    disorder, as soon as they stop drinking, the last drink that

7    they took, again, the clock is ticking at that point.  There

8    are variables in between that in terms of how you assess

9    somebody, but you can be guaranteed that if they're heavy

02:27PM10    drinkers, there will be a consequence.

11          In the case of alcohol withdrawal treatment, if you

12    don't do it early, what you're left with is a very

13    complicated, sometimes fatal-type of situation.  So that's

14    why timing is so important.

02:28PM15    Q.    Would that also mean the timing of the information of a

16    person's abuse of alcohol, the timing of that information

17    that someone is a heavy drinker, is the timing of that

18    information being passed on to medical personnel, is it

19    critical to effectively treat delirium tremens?

02:28PM20    A.    I believe it's critical in that it allows you to not be

21    crippled by not considering it in your differential

22    diagnosis.  You wouldn't automatically pull it out of your

23    hat just because somebody had nausea.

24          If you add that information to it, then now it

02:28PM25    becomes a potential plausible thing that now you have to say

UNITED STATES DISTRICT COURT

         1    to yourself what's the likelihood this person can be hurt by

         2    it, therefore, I must act versus something I might be able to

         3    wait for.  They're gonna be okay either way.  So timing is of

         4    the essence to have that knowledge.

02:28PM  5              MS. JUN:  Thank you, Dr. San Bartolome.

         6              No further questions, Your Honor.

         7              THE COURT:  Any redirect?

         8              MR. MIEDERHOFF:  No, Your Honor.

         9              THE COURT:  You may step down.  Thank you very much

02:29PM 10    for coming in.  Next witness.

        11              MR. McMULLEN:  Your Honor, at this time plaintiffs

        12    call April Snow.

        13              THE CLERK:  Please raise your right hand.

        14                        (Witness sworn.)

02:29PM 15              THE CLERK:  Thank you.

        16              Please adjust the microphone so you're speaking

        17    into at all times.  Please state your full name and spell

        18    your last name.

        19              THE WITNESS:  April Snow S-n-o-w.

02:30PM 20              THE COURT:  Thank you.  You may inquire.

        21              MR. McMULLEN:  Thank you, Your Honor.

        22                        DIRECT EXAMINATION

        23    BY MR. McMULLEN:

        24    Q.   Good afternoon, Ms. Snow.

02:30PM 25    A.   Hi.

1    Q.   Ms. Snow, back in July of 2022, you were working at the

2    High Desert Detention Center?

3    A.   Yes.

4    Q.   And your role was a Sheriff's Custody Assistant?

02:30PM 5    A.   Yes.

6    Q.   And in that role you would field phone calls from

7    members of the public?

8    A.   Yes.

9    Q.   You've provided some testimony in this case in the past;

02:30PM 10   right?

11   A.   Yes.

12   Q.   You don't remember any calls from the family of

13   Mr. Enyart?

14   A.   I didn't take any calls.

02:30PM 15          THE COURT:  Let me interrupt.  It is 2:30.  It's

16   time for our afternoon break.  We'll see you back in

17   15 minutes.  Ladies and gentlemen, remember the admonishment

18   not to discuss the case among yourselves or with anyone else

19   or form or express any opinions about the matter until it's

10:00AM 20   submitted to you and you retire to the jury room.  See you in

21   15 minutes.  If you leave quietly because I've got to talk

22   with the attorneys.

23                    (Jury not present.)

24          THE COURT:  For the record the jurors have left the

02:31PM 25   court.  Two things I want to talk to you about.  One is and

1    we didn't mention it before.  I should have.  When we have

2    multiple attorneys on a case, it's one attorney per witness.

3            So if one person is handling the witness, another

4    attorney should not make objections or anything else.  When I

02:31PM 5    said just one attorney, it's one attorney per witness.  If

6    she's handling the witness, she'll also handle the objections

7    on it.  I did not mention that before, but that's the policy

8    here.

9            Second thing is that I've mentioned it a couple of

02:32PM 10   times.  I'm worried you may run out of time so keep that in

11   mind.  There are things that are really relevant.  There are

12   things not as relevant.  It's okay to get into that, but it's

13   cutting into your time.  I don't want to be in a position

14   where at the end of the case, they have an hour left and they

02:32PM 15   can ask questions and you can't cross-examine the witnesses

16   so just be careful of that.

17            MR. McMULLEN:  First of all, I absolutely

18   apologize.

19            THE COURT:  No problem, Counsel.  I never mentioned

02:32PM 20   it before.  I should have.

21            MR. McMULLEN:  My practice in federal court is

22   always been one attorney.  The reason I did interject the

23   piece of information I wanted to make sure the Court had is

24   with respect to the stipulation as to the authenticity of

02:32PM 25   that audio exhibit.  That audio exhibit has its own time

1    stamp that we understood from the stipulation was

2    authenticated.  It's July 31st at 3:55:09 a.m.

3              THE COURT:  That was stipulated to.

4              MR. McMULLEN:  For that reason we don't have a

02:33PM 5    witness prepared to call to authenticate it.

6              THE COURT:  If something like that comes up and

7    you're not the attorney handling it, just say can I have a

8    second and you can talk to each other and tell her what the

9    objection is.

02:33PM 10             MR. McMULLEN:  What we would like to do then

11   instead of taking any time, if we could prepare tonight I

12   suppose it would be a screenshot of the name of that file

13   that will have the time stamp on it.  Because we understood

14   the stipulation or we can just read what that is.

02:33PM 15             THE COURT:  Either that or there's a stipulation

16   you can enter that stipulation it's taken at a certain time

17   and certain place.

18             MR. McMULLEN:  We'll work it out.

19             THE COURT:  If it's stipulated to, that should not

02:34PM 20   be a problem.

21             MR. McMULLEN:  Thank you, Your Honor.

22             THE COURT:  Okay, thank you.

23                       (Recess taken.)

24             THE COURT:  Okay.  The record reflect that all the

02:47PM 25   members of the jury are in their respective seats in the jury

          1    box.  The witness is on the witness stand.  Remember you're

          2    still under oath.

          3         Counsel, you may inquire.

          4         MR. McMULLEN:  Thank you, Your Honor.

02:47PM   5    Q.   Welcome back, Ms. Snow.

          6    A.   Thank you.

          7    Q.   Right before the break, I thought I heard you say that

          8    you know that you never received a phone call from the Enyart

          9    family.  Was that your testimony?

02:47PM  10    A.   I don't remember.

         11    Q.   Okay.  And you've testified about this case before;

         12    right, earlier this year?

         13    A.   Yes.

         14    Q.   There was some discussion about phone records in this

02:47PM  15    case?

         16    A.   I don't remember that.

         17    Q.   You've heard that during the trial as you've been here?

         18    A.   Yes.

         19    Q.   And before you were asked even if you were shown phone

02:48PM  20    records in this case, you didn't believe you would be able to

         21    know one way or another whether you received the calls from

         22    family.

         23    A.   I wasn't shown any phone records.

         24    Q.   The question was before when you testified you were

02:48PM  25    asked, if you were shown phone records, do you think you'd be

                          UNITED STATES DISTRICT COURT

1     able to tell us one way or another whether you received calls

2     from the family?  And you said no, I don't think that would

3     help me.  I'm not going to remember.  Does that fit with your

4     memory?

02:48PM 5     A.   No.

6     Q.   So at this point you don't know one way or another

7     whether you received calls from the Enyart family.

8     A.   No.

9     Q.   That's probably not a great question.  Do you remember

02:48PM 10    one way or another whether you did?

11    A.   I don't remember, no.

12    Q.   Now, if you had received a call from a family member of

13    an inmate reporting that a person at the jail abused alcohol

14    and that the family member had a concern that they would have

02:49PM 15    seizures or a stroke or a heart attack related to that

16    alcohol abuse, what did you understand you would be required

17    to do with that type of information in your role at the jail?

18    A.   I would pass it to my core.

19    Q.   To who?

02:49PM 20    A.   My core.  A deputy.

21    Q.   So you understood that it would be required at that

22    point for you a nonsworn personnel to tell your deputy.

23    A.   It's not required, but I would do it.

24    Q.   What I want to understand is what you understood the

02:49PM 25    requirement to be.  For that type of information if you were

UNITED STATES DISTRICT COURT

```
 1    to receive that type of information from a family member when

 2    you fielded a phone call, what did you understand you would

 3    be required to do?

 4    A.   It's not required.

02:49PM 5    Q.   Would you be required to do anything with that

 6    information?

 7    A.   No, but I would report it.

 8    Q.   Would you be -- I'm asking about what you understood you

 9    were required --

02:49PM10         THE COURT:  We're asking about what the policy is.

11         MR. McMULLEN:  The rule.

12         THE COURT:  The rules.

13    BY MR. McMULLEN:

14    Q.   Was there a rule that said you had to write it down?

02:50PM15    A.   No.

16    Q.   Was there a rule that said you had to share it with

17    anybody?

18    A.   No.

19         MR. McMULLEN:  No further questions, Your Honor.

02:50PM20         THE COURT:  Thank you.  Counsel.

21                   CROSS-EXAMINATION

22    BY MR. RAMIREZ:

23    Q.   Good afternoon, Ms. Snow.

24    A.   Afternoon.

02:50PM25    Q.   Can you tell the jury what your title was as of July 20,
```

1    2022?

2    A.    Sheriff Custody Assistant.

3    Q.    What's a Sheriff Custody Assistant?

4    A.    I don't want to say like a secretary, but we do a lot of

02:50PM 5    filings, answering phone calls, making visits, um, taking

6    visits from attorneys.  We book inmates in.  A lot of

7    paperwork.  Lots of phone calls.

8    Q.    What about handling members of the public who come into

9    the jails?

02:51PM 10   A.    We handle members as well.

11   Q.    What about dealing with attorneys?

12   A.    We handle attorney visits as well.

13   Q.    Anything else that you handle as an SCA, a Sheriff's

14   Custody Assistant?

02:51PM 15   A.    Um, whoever comes in our door like attorneys, we have

16   family members, um, we have psychologists.  It's a very long

17   list of people that come through our doors.  We answer phone

18   calls from families.  We take visits.  We answer phone calls

19   from employees, from attorneys.  So, you know, we have a lot

02:51PM 20   of duties.

21   Q.    As of July 2022, was there any policy at High Desert

22   Detention Center that made it so that family members could

23   not come down to the facility?

24   A.    Not at all.

02:52PM 25   Q.    Now, I know you testified that you don't remember having

UNITED STATES DISTRICT COURT

                1    a conversation with the Enyarts; right?

                2    A.    Correct.

                3    Q.    Do you remember receiving a call from anyone that had

                4    multiple calls about the same inmate reporting that that

02:52PM    5    inmate might be at risk for alcohol withdrawal?

                6    A.    No.

                7    Q.    Are you saying you don't remember it or that didn't

                8    happen?

                9    A.    It didn't happen.

02:52PM  10    Q.    How can you be so sure?

              11    A.    I would have remembered.  Multiple calls I would have

              12    remembered.

              13    Q.    That's something that happens frequently?

              14    A.    No.

02:52PM  15    Q.    Did you ever receive a call from anyone saying that they

              16    believed that their son was at risk for dying?

              17    A.    No.

              18    Q.    Did you ever receive a call from anyone saying their son

              19    was at risk for a heart attack?

02:52PM  20    A.    No.

              21    Q.    Did you ever receive a call from anyone saying their son

              22    was at risk for having seizures?

              23    A.    No.

              24    Q.    If you had received calls like that, what would you have

02:53PM  25    done?


                              UNITED STATES DISTRICT COURT

```
 1    A.   I would pass it on to my core.

 2             MR. RAMIREZ:  Thank you.  No further questions,

 3    Your Honor.

 4             THE COURT:  Redirect?

02:53PM 5        MR. McMULLEN:  No redirect, Your Honor.

 6             THE COURT:  You may step down.  Thank you very

 7    much.  Next witness.

 8             MR. McMULLEN:  Your Honor, at this time the

 9    plaintiffs call former deputy Troy Skaggs.

02:53PM10        THE COURT:  Okay.  Thank you.

11             THE CLERK:  Please raise your right hand.

12                   (Witness sworn.)

13             THE CLERK:  For the record please state your full

14    name and spell your last name.

02:53PM15        THE WITNESS:  Troy Skaggs S-k-a-g-g-s.

16             THE COURT:  Thank you.  You may inquire.

17                   DIRECT EXAMINATION

18    BY MR. McMULLEN:

19    Q.   Sir, should I call you Mr. Skaggs or Deputy Skaggs?

02:54PM20    What's your preference?

21    A.   Mr. Skaggs.

22    Q.   I don't want to be disrespectful.  Mr. Skaggs, I'm gonna

23    ask you some of the same questions that I asked Ms. Snow just

24    now.  Were you in here in the courtroom?

02:54PM25    A.   Yes.
```

1    Q.   Do you recall receiving any phone calls from the family

2    of Mr. Enyart during this period of time in July of 2022?

3    A.   No, I don't.

4    Q.   And is it possible that you did?

02:54PM 5    A.   No, I would have remembered that.

6    Q.   What would you have remembered?

7    A.   If they were talking about their son, you know, what

8    they were talking about on the phone what Ms. Snow said.

9    Q.   And if you had received the information that we were

02:54PM 10    talking about, the information with respect to someone

11    abusing alcohol and being at risk of a seizure, stroke or

12    heart attack, concerns that a family member had about that

13    because of someone's alcohol abuse, what did you understand

14    you were required to do with that information?

02:55PM 15    A.   Well, I'm not required to, but I would pass that on.

16    Q.   So that's something that you would feel a personal

17    obligation to pass on?

18    A.   Yes.

19    Q.   But you understood that there was no rule at the jail

02:55PM 20    that would require you to pass that information to anyone.

21    A.   That's correct.

22    Q.   There was no rule that you document it in any way?

23    A.   No.

24    Q.   So you could just leave with that information so no one

02:55PM 25    else would know about it?

UNITED STATES DISTRICT COURT

1    A.   Yes, I could.

2    Q.   And you have received some training at the High Desert

3    Detention Center with respect to alcohol abuse; right?

4    A.   No.

02:55PM 5    Q.   There's some policies that relate to alcohol abuse;

6    correct?

7    A.   No.

8    Q.   You're familiar with there is High Desert Detention

9    Center Facility Policy Manual; correct?

02:56PM 10    A.   Yes.

11           MR. McMULLEN:  And what I'd like to do at this time

12    is put up on the screen for you, uh, stipulated exhibit.

13    It's Exhibit 42 which is the policy manual.  And Your Honor,

14    I'd like to move that into evidence.

02:56PM 15           THE COURT:  Be received.

16           MR. RAMIREZ:  Your Honor, may I just look at it?

17           THE COURT:  Yes, sure.

18           MR. RAMIREZ:  No objection, Your Honor.

19                (Exhibit 42 admitted.)

02:56PM 20    BY MR. McMULLEN:

21    Q.   Sir, can you see that up on the screen?

22    A.   Yes.

23    Q.   And that's the High Desert Detention Center Facility

24    Policy Manual?

02:56PM 25    A.   Yes.

UNITED STATES DISTRICT COURT

```
        1    Q.   And as a correctional deputy that works there, these are

        2    the policies that apply to you?

        3    A.   Yes.

        4    Q.   I'm gonna turn to page 41 of this document.  And as part

02:57PM 5    of the policies there, do you see the first sentence of this

        6    that indicates inmates who abuse alcohol can be at

        7    significant risk for serious health complications and death.

        8         Is that something that you were trained on, sir?

        9    A.   No.

02:57PM10    Q.   So you did not receiving training.  Did you have any

       11    obligation to understand what's in the policy manual for the

       12    High Desert Detention Center?

       13    A.   No.

       14    Q.   So this policy manual, operations manual for the

02:57PM15    deputies working at the detention center, it's your testimony

       16    that didn't apply to you.

       17    A.   When something came up and we had to refer to policy, we

       18    would go to this to look up policy.

       19    Q.   But no one ever told you that you had to familiarize

02:58PM20    yourself with the policies in advance?

       21    A.   No.

       22    Q.   There was no training on it?

       23    A.   No.

       24    Q.   San Bernardino County did not require you to familiarize

02:58PM25    yourself with the policies at the jail.
```

         1    A.    That's correct.

         2          MR. McMULLEN:  No further questions, Your Honor.

         3          THE COURT:  Okay.  Counsel, cross.

         4                     CROSS-EXAMINATION

02:58PM  5    BY MR. RAMIREZ:

         6    Q.    Good afternoon, Deputy Skaggs.

         7    A.    Hello.

         8    Q.    You were just asked some questions about policies and

         9    procedures for High Desert Detention Center; correct?

02:58PM 10    A.    Yes.

        11    Q.    Sir, what was your title as of July 2022?

        12    A.    Core rover deputy.

        13    Q.    What is a core rover deputy?

        14    A.    I work on the bridge which is also like the lobby, the

02:58PM 15    entrance of the jail.  I'm kinda like the right-hand man for

        16    the sergeants.  We do the scheduling, we do the rosters for

        17    the deputies and SCAs are gonna work for the day.  We're kind

        18    of the middleman between what goes on in front with the

        19    sergeants.  We handle -- when official visits come in, we

02:59PM 20    walk them back.  We handle the visiting lobby also.  We take

        21    care of like when regular visits are going on security and

        22    safety in that area.

        23    Q.    If you could slow down just a little bit.

        24    A.    Okay.

02:59PM 25    Q.    You're moving really fast.

 1    A.   All right.

 2    Q.   Appreciate it, though.

 3         And then in terms of your responsibilities as a

 4    core rover deputy, were you responsible for directly

02:59PM 5    interacting with inmates?

 6    A.   As the core deputy?

 7    Q.   Correct.

 8    A.   No.

 9    Q.   Were you responsible for booking inmates?

02:59PM10    A.   No.

11    Q.   So in terms of the policies that you looked at, do you

12    know if those have to do with core rover deputies?

13    A.   Booking inmates?

14    Q.   No, the policy that counsel just showed you talking

02:59PM15    about alcoholism, does that have anything to do with your job

16    as a core rover deputy?

17    A.   No.

18    Q.   Did you have any personal contact with Mr. William

19    Enyart at any time while he was at High Desert?

03:00PM20    A.   No, sir.

21         MR. RAMIREZ:  No further questions.

22         THE COURT:  Redirect?

23                     REDIRECT EXAMINATION

24    BY MR. McMULLEN:

03:00PM25    Q.   Mr. Skaggs, how long did you work at High Desert

1       Detention Center?

2       A.    Approximately eight, nine years.

3              MR. McMULLEN:  Thank you, sir.

4              Your Honor, no further questions.

03:00PM 5      THE COURT:  Any recross?

6              MR. RAMIREZ:  No.

7              THE COURT:  You may step down.

8              Okay.  Next witness.

9              MS. JUN:  Your Honor, plaintiffs call Mrs. Frances

03:00PM 10     Enyart.

11             THE COURT:  Okay.

12             THE CLERK:  Ma'am, please raise your right hand.

13                    (Witness sworn.)

14             THE CLERK:  Please adjust microphone so you're

03:01PM 15     speaking into it at all times.  For the record please state

16     your full name and spell your last name.

17             THE WITNESS:  Frances Enyart E-n-y-a-r-t.

18             THE COURT:  Thank you.  Counsel, you may inquire.

19             MS. JUN:  Thank you.

03:01PM 20                    DIRECT EXAMINATION

21     BY MS. JUN:

22     Q.    Ms. Enyart, do you have any children?

23     A.    Yes.

24     Q.    In fact, one of your -- actually, two of your children

03:02PM 25     are in the courtroom today; right?

```
 1    A.   Yes.

 2    Q.   And could you describe which of your children are in the

 3    courtroom?

 4    A.   My youngest son Nicholas in the purple shirt and my

 5    daughter Amanda sitting next to him.

 6    Q.   Is Amanda your eldest child?

 7    A.   Yes, she is.

 8    Q.   And then you had a middle child; correct?

 9    A.   I did.

10    Q.   And what was your middle child's name?

11    A.   William.

12    Q.   And William is not here today.

13    A.   No.

14    Q.   Now, are you married?

15    A.   Yes.

16    Q.   And how long have you been married?

17    A.   41 years.

18    Q.   I'm sorry, 41 years?

19    A.   41 years.

20    Q.   And what is your husband's name?

21    A.   Gregory.

22    Q.   Is that Gregory Enyart?

23    A.   Correct, yes.

24    Q.   Is Mr. Greg Enyart the father of Amanda, William and

25    Nick Enyart?
```

```
 1    A.   Yes.

 2    Q.   I want to direct your attention to the date of July 27,

 3    2022.  Do you have that date in mind?

 4    A.   Yes.

03:03PM 5    Q.   Now, something happened to your son William on that day;

 6    right?

 7    A.   Yes.

 8    Q.   What happened that day?

 9    A.   He was arrested.

03:03PM10    Q.   Now, I'm not going to ask any questions about the arrest

11    and I don't want to ask any questions about what was said.

12    Just generally did you have a conversation with a

13    Deputy Umphlett at some point?

14    A.   Yes, I did.

03:03PM15    Q.   Did you tell Deputy Umphlett anything related to

16    Mr. William Enyart's alcohol abuse?

17    A.   Yes, I did.

18    Q.   And then at some point, did you have a conversation with

19    Deputy Conley?

03:03PM20    A.   Yes, I did.

21    Q.   I want you to tell me about that.  When did you have a

22    conversation with Deputy Conley?

23    A.   It was that afternoon.  Actually, it was more like

24    dinner time around 6 o'clock or thereafter.  And I made a

03:04PM25    call to the nonemergency number because I wanted to see how
```

UNITED STATES DISTRICT COURT

        1    my son was doing and just after 6 o'clock, I received a call

        2    back.  And it was Deputy Conley calling on an unavailable

        3    number and I asked him how my son was doing.  I told him we

        4    were worried about his health.  We had him -- he was put on

03:04PM  5    speakerphone so all of us could hear.

        6    Q.   Let me stop you there.  Who was there during that phone

        7    call?

        8    A.   My daughter Amanda, my son Nicholas -- I'm sorry.  Not

        9    my son Nicholas.  My husband Gregory and myself.

03:05PM 10    Q.   And you were just saying that you were saying something

       11    to Deputy Conley about your son William Enyart?

       12    A.   Yes.

       13    Q.   What did you say?

       14    A.   I told him I was really worried about him.  We asked if

03:05PM 15    he agreed to a blood alcohol test and he said no.  He said

       16    that we should file for a move out order while he was

       17    incarcerated.  And my husband said to him that he's really a

       18    good kid.  He just has a really bad alcohol problem.

       19    Q.   Did you express any concern about the impact of alcohol

03:05PM 20    on your son William's health in that phone conversation with

       21    Deputy Conley?

       22    A.   No, I did not.

       23    Q.   Did anyone else in that phone conversation express

       24    concerns about impact of alcohol on your son's health?

03:06PM 25    A.   Not at that time.

UNITED STATES DISTRICT COURT

1    Q.   Did Deputy Conley indicate if he knew that your son

2    William Enyart was under the influence of alcohol?

3    A.   He said he smelled alcohol on his breath all the way to

4    the detention center.

03:06PM 5    Q.   Now, at some point you actually obtained the phone

6    records, the Verizon cell phone records for your cell phone

7    number.  Is that fair?

8    A.   Yes.

9         MS. JUN:  Your Honor, at this time I would move

03:06PM 10   into evidence Exhibit 97, a stipulated exhibit which are the

11   phone records for Gregory and Frances Enyart.

12        THE COURT:  97 will be received.

13            (Exhibit 97 admitted.)

14        MS. JUN:  Your Honor, may we publish to the jury?

03:06PM 15   THE COURT:  Yes.

16        MS. JUN:  Thank you.

17   Q.   Mrs. Enyart, do you see the phone records in front of

18   you?

19   A.   Yes, I do.

03:07PM 20   Q.   Okay.  And that first page so what has been marked as

21   Exhibit 97-1, whose phone number is on the top of that page?

22   It says Gregory Enyart and then a phone number.  Whose phone

23   number is that?

24   A.   That's my husband's number.

03:07PM 25   Q.   Now, I'm gonna have you go to the next page which is

UNITED STATES DISTRICT COURT

```
 1    97-2.  Do you see that page, Ms. Enyart?

 2    A.   I do.

 3    Q.   That's a different phone number; right?  By the way that

 4    phone record is for a different phone number?

03:07PM 5    A.   Yes.

 6    Q.   And whose phone number is that?

 7    A.   That is the nonemergency line for the police department.

 8    Q.   Oh, you know, what, Mrs. Enyart, are the phone records

 9    we see on Exhibit 97-2 is that for your cell phone?

03:07PM10    A.   Yes, it is.

11    Q.   Okay.  And you mentioned there was a phone call to a

12    nonemergency line that you see on this record?

13    A.   Yes.

14    Q.   And I want to direct your attention to July 27th at

03:08PM15    5:55 p.m.  Do you see that?

16    A.   I do.

17    Q.   What's that?

18    A.   That's the phone number to the nonemergency line for the

19    Sheriff's Department.

03:08PM20    Q.   Is that number you had called asking to speak to

21    Deputy Conley?

22    A.   Yes.

23    Q.   And then you mentioned that Deputy Conley called you

24    back?

03:08PM25    A.   Yes.  The operator told me to wait and look for an
```

UNITED STATES DISTRICT COURT

          1    unavailable phone number because the number won't come up.

          2    And yes, that's the call I received next at 6:10 p.m.

          3    Q.    And that phone call says here lasted about 12 minutes?

          4    A.    Yes.

03:08PM   5    Q.    So you spoke to -- you, your daughter Amanda and your

          6    husband, Greg Enyart, all three of spoke to Deputy Conley

          7    during that phone call?

          8    A.    Yes, we did.

          9    Q.    Now, I'm going to go back to the first page of

03:09PM  10    Exhibit 97, 97-1.  I heard you say earlier this is a phone

         11    number for your husband, Greg Enyart?

         12    A.    Yes.

         13    Q.    To your knowledge did your husband make phone calls to

         14    High Desert Detention Center?

03:09PM  15    A.    Yes, he did.

         16    Q.    To your knowledge did your husband make phone calls to

         17    the West Valley Detention Center?

         18    A.    Yes, he did.

         19    Q.    When did your husband make phone calls to High Desert

03:09PM  20    Detention Center?  Which dates are we looking at?

         21    A.    July 27th.

         22          MS. JUN:  Ms. Enyart, give me one minute.  We're

         23    gonna pull up the right page.  Mr. McMullen is gonna pull up

         24    Exhibit 97-1.  If you could look at the screen in front of

03:09PM  25    you to make sure that is there.

1    Q.   Let me just ask you this.  How many total phone calls

2    did your husband make to High Desert Detention Center?

3    A.   Eight.

4    Q.   Why was your husband calling High Desert Detention

03:10PM  5    Center?

6    A.   He was calling to see how our son was doing.

7    Q.   Did he speak to anyone at High Desert Detention Center?

8    A.   I don't know who he spoke to, but he did have a

9    conversation a couple of times.

03:10PM 10    Q.   And were you present for these conversations?

11    A.   No.

12    Q.   Did your husband also call West Valley Detention Center?

13    A.   Yes, did he.

14    Q.   First, let me start with this.  How many times did he

03:10PM 15    call West Valley Detention Center?

16    A.   Six times.

17    Q.   It looks like you're counting.  Are you starting with a

18    specific date that's on Exhibit 97 page 1?

19    A.   Yes, I am.

03:11PM 20    Q.   Which date and time?

21    A.   On July 31st at 6:52 p.m.

22    Q.   And that's the time when your husband started calling

23    West Valley Detention Center?

24    A.   Yes.

03:11PM 25    Q.   And why was your husband calling West Valley Detention

UNITED STATES DISTRICT COURT

1       Center?

2       A.    Because we found out the morning of July 31st that our

3       son was transferred to West Valley Detention Center.

4       Q.    And before that are the phone numbers unredacted on this

03:11PM 5       record are those displaying phone calls made from your

6       husband's cell phone to High Desert Detention Center?

7       A.    Can you ask that again?

8       Q.    Sure.  How about do you see that line July 31st at

9       6:52 p.m. and I'm looking at Exhibit 97 page 1.  Do you see

03:11PM10      that line?

11      A.    Yes.

12      Q.    Okay.  There's some unredacted entries above that line.

13      Do you see that?

14      A.    Yes.

03:11PM15      Q.    And what are those unredacted entries above the

16      6:52 p.m. call?

17      A.    6:35, July 31st that was High Desert Detention Center

18      and July 31st at 3:34 p.m. to High Desert Detention Center.

19      Q.    What about those calls on July 30th that we see are

03:12PM20      unredacted?  Are those phone calls your husband made to High

21      Desert Detention Center?

22      A.    Yes.

23      Q.    All right.  Let me go now to your phone records and I am

24      going to direct your attention to Exhibit 97 at page 3.

03:12PM25      Mrs. Enyart, did you make any phone calls to High Desert

UNITED STATES DISTRICT COURT

1    Detention Center?

2    A.    Yes, I did.

3    Q.    What is the first date you made a phone call to High

4    Desert Detention Center?

03:12PM 5    A.    It was July 29th at 1:53 p.m.

6    Q.    Now, before I ask any further questions why were you

7    calling High Desert Detention Center?

8    A.    Because to my understanding and the conversation with

9    Conley that's where our son was taken.

03:13PM 10    Q.    So why was it important that you call someone at that

11    jail though?

12    A.    Because I wanted to make sure they knew what condition

13    he could facing with his alcoholism.

14    Q.    You know what, Mrs. Enyart, let ask you one question.

03:13PM 15    Are you familiar with alcohol withdrawal?

16    A.    I am.

17    Q.    And are you familiar with the symptoms of alcohol

18    withdrawal?

19    A.    Yes, I am.

03:13PM 20    Q.    And why are you familiar with alcohol withdrawal?

21    A.    I'm familiar with the alcohol withdrawal because I had a

22    father who was an alcoholic.  As a teenager I went to Alanon

23    meetings.  And my husband had a problem with alcohol and he

24    is now 33 years sober.  And I know the dangers from the

03:14PM 25    meetings I went to and all the stories that I heard.  And

UNITED STATES DISTRICT COURT

1    also, too my two children are both nurses and we've discussed

2    the dangers of the alcohol and what the effects could be on

3    my son William.

4    Q.   So what is your understanding of the dangers of alcohol

03:14PM 5    withdrawal?

6              MR. RAMIREZ:  Objection.  Calls for expert --

7              THE COURT:  Sustained.

8    BY MS. JUN:

9    Q.   Let me go back then to this phone record that shows the

03:14PM10   July 29th phone call that you made to High Desert Detention

11   Center.  And I'm going to direct your attention to July 29th

12   at 1:53 p.m. on page 3 of Exhibit 97.  Do you see that entry?

13   A.   I do.

14   Q.   It says it was for five minutes.  Do you see that?

03:14PM15   A.   Yes.

16   Q.   Do you know who you spoke to during that phone call?

17   A.   Yes, I do.

18   Q.   Who did you speak to?

19   A.   I spoke to Ms. Snow.

03:15PM20   Q.   And what did you say to Ms. Snow?

21   A.   I explained that I was William's mother and we haven't

22   heard from our son.  And I was extremely worried about what

23   could happen because he was an alcoholic.  I was afraid he

24   could have a seizure, I was afraid he could have a heart

03:15PM25   attack or maybe even a stroke.  And I told her I was just

1    worried sick because we've made -- opened up phone cards.  We

2    haven't heard from our son.

3         And she told me that she remembered that he was

4    complaining of pain, that they would give him something for

03:15PM 5    it.  And that made me feel like I had a connection.  Maybe

6    somebody had eyes on my son.

7    Q.   Why do you remember the name of Ms. Snow?

8    A.   Because of Christmas snow.  I have ways, objects I

9    remember names with.

03:16PM 10   Q.   I want to direct your attention then to some subsequent

11   calls.  And I see a call on July 26th at 2:26 p.m.  Do you

12   see that?  It's an incoming call for three minutes.

13   A.   I do.

14   Q.   What was that call?

03:16PM 15   A.   I don't know exactly who I spoke to.  It was a very

16   short call.  A lot of times I would call and I wouldn't get

17   anybody and would decide to make -- leave a message and

18   usually I just hung up if I didn't get an answer.

19   Q.   On July 29th, 2022 in the afternoon, did your son

03:16PM 20   William Enyart attempt to call your cell phone?

21   A.   Yes.

22   Q.   Could this entry reflect William's phone call to you?

23        MR. RAMIREZ:  Objection.  Calls for speculation.

24        THE COURT:  Sustained.

03:16PM 25   BY MS. JUN:

```
 1    Q.   Did you have any other phone conversations with Ms. Snow

 2    at High Desert Detention Center?

 3    A.   Yes, I did.

 4    Q.   Before I get to those, did you make other attempts to

03:17PM 5    call High Desert Detention Center?

 6    A.   Many.

 7    Q.   Is it fair to say that some of the times you called High

 8    Desert, you did not speak to someone?

 9    A.   Correct.

03:17PM10    Q.   But you do recall speaking to Ms. Snow at High Desert

11    Detention Center?

12    A.   Yes, I do.

13    Q.   When was the next time you had a phone conversation with

14    Ms. Snow at High Desert Detention Center?

03:17PM15    A.   On Saturday, July 30th.

16    Q.   And is that entry for 9:41?

17    A.   Yes.

18    Q.   It shows that conversation was for seven minutes.

19         Do you see that?

03:17PM20    A.   Yes, I do.

21    Q.   And what were telling Ms. Snow again?

22    A.   I told Ms. Snow that we still haven't heard from our

23    son.  That we actually got a 60-second phone call the day

24    before and it an automated call that said this call will end

03:17PM25    in 60 seconds.  And I heard my son's voice for the last time
```

UNITED STATES DISTRICT COURT

```
 1    and he was terrified.  And he said that they were trying to

 2    charge him with some charge he didn't understand, and then

 3    the call ended and that was the last time I heard from him.

 4              THE COURT:  That's what you told her?

 5              THE WITNESS:  Pardon me?

 6              THE COURT:  She's asking you about the

 7    conversation.

 8              THE WITNESS:  Yes, I told her we have a 60-second

 9    phone call and the phone called ended.  And I haven't heard

10    from him since and I was really extremely worried for his

11    health because at this time I knew what the possibilities

12    could be.

13              THE COURT:  Okay.  Next question.

14    BY MS. JUN:

15    Q.   Ms. Enyart, did you have another phone call with

16    Ms. Snow that same day?

17    A.   No.

18    Q.   I want to direct your attention to an entry that says

19    July 30, 12:23 p.m.  And it's on that same page, Exhibit 97

20    page 4.  Do you see where I'm talking about says July 30,

21    12:23 p.m.?

22    A.   Yes.

23    Q.   Is that a phone call to High Desert Detention Center?

24    A.   Yes.

25    Q.   And that was a phone call that lasted for seven minutes?
```

03:18PM (line 5)
03:18PM (line 10)
03:18PM (line 15)
03:19PM (line 20)
03:19PM (line 25)

1    A.   Yes.

2    Q.   And you spoke to someone at High Desert Detention Center

3    that day?

4    A.   Yes.

03:19PM 5    Q.   What did you tell that person that you spoke to?

6    A.   I told Ms. Snow that I was afraid that my son could have

7    seizure or he could have a stroke or a heart attack because

8    he's a daily drinker and we hadn't heard from him.  I just

9    thought that he would be in distress and she told me he was

03:19PM 10   fine.

11        THE COURT:  This was Ms. Snow again?

12        THE WITNESS:  Yes.

13        THE COURT:  Go ahead.  Next question.

14   BY MS. JUN:

03:19PM 15   Q.   And how do you remember that you were speaking to

16   Ms. Snow on this date?

17   A.   Because I recognized her voice and she said hello,

18   Mrs. Enyart.  I told her I still haven't heard from my son

19   William and she assured me that he was fine.

03:20PM 20   Q.   Was there something about her voice that caused you to

21   remember and recognize it?

22   A.   Yes.

23   Q.   What was that?

24   A.   Familiarity from the day before and the other calls I

03:20PM 25   had made.

UNITED STATES DISTRICT COURT

1    Q.    Now, later that day did you have another phone call that

2    you made to High Desert Detention Center?

3    A.    Yes.

4    Q.    And was that a call that you made at approximately

03:20PM 5    1:22 p.m.?

6    A.    Yes.

7    Q.    When you first called -- I'm sorry.  That phone call

8    looks like it was lasting about 16 minutes?

9    A.    Yes.

03:20PM 10    Q.    Tell me who you spoke to when you first called that

11    number on July 30th at 1:22 p.m.?

12    A.    I spoke to somebody named A. Silva.

13    Q.    What did you tell this person named A. Silva?

14    A.    I told her that I was really concerned for my son's

03:20PM 15    health and I told her he could have a seizure or a stroke or

16    a heart attack and that he was a daily drinker.  And I wasn't

17    satisfied with everybody -- they kept telling me he was fine.

18    So I finally told her that I need to speak to somebody who

19    has eyes on my son.  And she told me to hold on a minute and

03:21PM 20    she would transfer me to somebody who was in the unit.

21    Q.    Let me stop you there.  So you spoke to someone named

22    A. Silva first and you gave the information.  Then you were

23    transferred over to someone who had eyes on Billy?

24    A.    Yes.

03:21PM 25    Q.    Okay.  Who were you transferred to?

UNITED STATES DISTRICT COURT

1    A.   A Deputy Skaggs.

2    Q.   And how do you remember the name Deputy Skaggs?

3    A.   I have my -- because of the group Boz Scaggs.  I mean I

4    have my way of remembering names cause I have a lot of names

03:21PM 5    I have to remember.  So that is how I remember Skaggs.

6    Q.   And Boz Scaggs is a music group?

7    A.   Yes.

8    Q.   So what, if anything, did you tell Deputy Skaggs?

9    A.   I told Deputy Skaggs that my son was a daily drinker.  I

03:22PM 10   was afraid he would be in a very bad condition.  That he

11   could have a seizure.  That he could have a heart attack or

12   he could have a stroke.  And I told him I haven't heard from

13   my son in days.  That we've set up phone cards.  And I asked

14   him where were the phones in the unit or the facility and he

03:22PM 15   told me this wasn't a hotel, and then he hung up the phone

16   after that conversation.

17   Q.   Did you speak to anyone else at High Desert Detention

18   Center that day?

19   A.   No.

03:22PM 20   Q.   Did you make any attempts to contact West Valley

21   Detention Center?

22   A.   I didn't know he was there until the next morning.

23   Q.   Okay.  Is the next morning July 31st?

24   A.   Yes.

03:23PM 25   Q.   So once you found out that your son William had been

```
 1    transferred to West Valley Detention Center, did you try and

 2    make phone calls there, too?

 3    A.   Yes.

 4    Q.   Did you speak to anyone at West Valley Detention Center?

 5    A.   The first time I called, I didn't get an answer.  It

 6    went to voicemail.  The second time I called at 2:33 right

 7    after, I just hit redial, I spoke to somebody in the

 8    reception area.

 9    Q.   What did you tell this person in the reception area?

10    A.   I told them that my son was probably in really poor

11    medical condition.  That he was a daily drinker and that he

12    could have a seizure or he could have a heart attack or a

13    stroke.  And I told her that I haven't heard from him.  It's

14    been days and I had just found out that morning he was

15    transferred the night before.  And she told me that sometimes

16    the pin number can change for a card that they're given and

17    so she was gonna go and check and make sure that he had the

18    correct pin number, and then we hung up the phone call.

19    Q.   And it looks like on this phone record Exhibit 97 page 5

20    July 31st at 2:54 p.m., you made another phone call that

21    lasted about 16 minutes.

22    A.   I did.

23    Q.   Who did you call?

24    A.   West Valley Detention Center.

25    Q.   Did you have a conversation with someone at West Valley
```

03:23PM (line 5)
03:23PM (line 10)
03:23PM (line 15)
03:24PM (line 20)
03:24PM (line 25)

1    Detention Center?

2    A.   I did.

3    Q.   And just generally, what was the substance of that

4    conversation?

03:24PM 5    A.   I basically went through and told them my son's daily

6    drinking problem, that he was an alcoholic and that he could

7    be in really serious medical condition because I hadn't heard

8    from him for days and that I'm really concerned.  He's not

9    calling.  And she told me I could send, uh, it's called a

03:25PM 10   voice mail.  It's called a jail voice mail and I even

11   attempted to do that, but I never heard back from my son.

12   Q.   Now, I want to direct your attention to page 6 of

13   Exhibit 97.  And it looks like we're still on the date of

14   July 31st.  Did you make any other attempts to contact West

03:25PM 15   Valley Detention Center?

16   A.   Yes.

17   Q.   And let's just talk about July 31st.  How many times did

18   you call West Valley Detention Center on July 31st?

19        And Ms. Enyart, let me shortcut this a little bit.

03:26PM 20   How many total calls did you personally make to High Desert

21   Detention Center and West Valley Detention Center regarding

22   your son William Enyart?

23   A.   I made 21 calls all together.

24   Q.   Tell me one more time, how many calls did your husband

03:26PM 25   Greg make to High Desert Detention Center and West Valley

UNITED STATES DISTRICT COURT

```
 1   Detention Center regarding your son William Enyart?

 2   A.   13.

 3   Q.   And in total how many phone calls did the two of you

 4   make to these jail facilities to inquire about your son?

 5   A.   34.

 6   Q.   Generally speaking what was the response you received

 7   when you made these phone calls, these almost 34 phone calls

 8   to these jail facilities regarding your son?

 9   A.   Other than Ms. Snow telling me that she remembers him

10   being in pain, that everybody else told me he was fine, every

11   single phone call.

12   Q.   Now, I need to ask you this.  When did your son William

13   Enyart pass away?

14   A.   August 1st.

15   Q.   Do you know what time he passed away?

16   A.   1:39 p.m.

17   Q.   And before you learned that information, before you

18   learned that William had passed away on August 1st at

19   1:39 p.m., had you or your husband made attempts to contact

20   West Valley Detention Center?

21   A.   Yes.

22   Q.   And I want to direct your attention back to page 1 of

23   Exhibit 97.  And just to be clear, we're talking about the

24   date of August 1st, you had mentioned earlier that these were

25   your husband Greg Enyart's phone records.
```

1    A.    Yes.

2    Q.    Okay.  So give us just a minute.  I'm going to try and

3    enlarge this.  Ms. Enyart, I see a series of phone calls at

4    August 1st beginning at 9:29 p.m.  Do you see that?

03:28PM 5    A.    Yes.

6    Q.    Were these calls to West Valley Detention Center?

7    A.    Yes, they were.

8    Q.    Were you present when your husband was calling West

9    Valley Detention Center on this date and time?

03:28PM 10   A.    Yes.

11   Q.    Now, by this date and time, William had passed away; is

12   that right?

13          MR. RAMIREZ:  Objection, leading.

14          THE COURT:  Overruled.

03:28PM 15   BY MS. JUN:

16   Q.    Let me ask you one more thing.  Where did your son

17   William pass away?

18   A.    At West Valley Detention Center.

19   Q.    When you called West Valley Detention Center on

03:28PM 20   August 1st at 9:29 p.m., 9:30 p.m., 9:49 p.m., 10:06 p.m.,

21   had anyone told you that your son had passed away?

22   A.    No.

23   Q.    What, if anything --

24          THE COURT:  What was your objection earlier?  You

03:29PM 25   made an objection.

```
        1              MR. RAMIREZ:  I did make an objection.

        2              THE COURT:  For what?

        3              MR. RAMIREZ:  Leading at the time.

        4              THE COURT:  That's overruled.

03:29PM  5   BY MS. JUN:

        6    Q.   What, if anything, did the West Valley Detention Center

        7    personnel say to you about your son?

        8              MR. RAMIREZ:  Object as hearsay.

        9              THE COURT:  Well, sustained.

03:29PM 10   BY MS. JUN:

       11    Q.   Ms. Enyart, at some point did you have after these phone

       12    calls to West Valley Detention Center and after these phone

       13    calls to High Desert Detention Center, did you have any phone

       14    conversations or excuse me.  Strike that.

03:29PM 15         Did you have any considerations with any other

       16    police official at the San Bernardino County Sheriff's

       17    Department?

       18              MR. RAMIREZ:  Objection, relevance, Your Honor.

       19              THE COURT:  Sustained.

03:30PM 20   BY MS. JUN:

       21    Q.   Mrs. Enyart, I want to ask about your son and whether he

       22    had a child?

       23    A.   Yes.

       24              THE COURT:  Sorry.  Didn't hear the question.

03:30PM 25   BY MS. JUN:
```

```
        1    Q.   Did Mr. William Enyart have a child?

        2    A.   Yes.

        3    Q.   And what is his child's name?

        4    A.   Abigail Enyart.

03:30PM  5    Q.   How old is Abigail?

        6    A.   11.

        7    Q.   I want to ask you a few questions about your son William

        8    and your granddaughter Abigail.  Do you have that in mind?

        9    A.   Yes.

03:30PM 10    Q.   Okay.  Did William have -- did your son William Enyart

       11    have a relationship with Abigail?

       12    A.   Yes.

       13    Q.   Was there a custody schedule in place?

       14    A.   Yes.

03:30PM 15    Q.   Tell me a little bit about that.  How did William

       16    establish a relationship with Abigail?

       17    A.   He had Abigail come every other week before she started

       18    school, before she started kindergarten.  Then she came every

       19    Christmas and Thanksgiving and Easter.  And they would

03:31PM 20    alternate Christmas and Thanksgiving.  And then she would

       21    basically spend the summers with us at our home with my son.

       22    Q.   Did your son William have to go through a process in

       23    order to get these visitation rights with Abigail?

       24    A.   Yes.

03:31PM 25    Q.   And describe that for us.
```

UNITED STATES DISTRICT COURT

1           MR. RAMIREZ:  Objection, relevance.

2           THE COURT:  Sustained.

3           THE WITNESS:  He wanted --

4           THE COURT:  It's tough being a witness.  If I say

03:31PM 5   overruled, you answer it.  If I say sustained, don't answer

6   it.

7   BY MS. JUN:

8   Q.   Ms. Enyart, I want to ask you some questions about the

9   time that William, your son, would spend with his daughter

03:32PM 10  Abigail.  You mentioned there was visitation schedule.

11          Do you remember that?

12  A.   Yes.

13  Q.   Where would William go in order to pick up Abby?

14  A.   We would drive to Bishop, California.

03:32PM 15  Q.   And how long was that drive to Bishop, California?

16  A.   Three-and-a-half hours one way.

17  Q.   Did you make those drives with William to go pick up

18  Abby?

19  A.   Yes, most of the time.

03:32PM 20  Q.   And so it's a three hour drive each way.  Was William

21  concerned about Abby being in the car for that time period?

22  A.   Yes.

23  Q.   So did he do anything to try to make sure that process

24  was more comfortable?

03:32PM 25  A.   Yes.

1    Q.   Tell me about that.

2    A.   He would go the night before and buy waters and snacks

3    and all the things that Abby liked and, um, the cooler would

4    be packed ready to go.  Then the next morning we would get

03:33PM 5    up, he would make sure she had her coloring books in her tray

6    in the car and the iPad, of course and her squishies and

7    pillows and jackets.  He really loved being a father.

8            THE COURT:  Next question, Counsel.

9    BY MS. JUN:

03:33PM 10   Q.   Would William discuss his relationship with Abby with

11   you?  In other words, were there things that he looked

12   forward to doing with Abby?  Would you have these

13   conversations on the car rides to go pick up Abby?

14   A.   Yes.  Actually, he would always bring her a gift.  It

03:33PM 15   might be new squishie or it would be a new game.  He would

16   put a new game on his phone for her.  She liked to play the

17   golf game on the long trips.  They had a lot of fun.  They

18   would sing.  One of the songs we sang all together was

19   Wildfire, the horse song.  We just had a great time with the

03:34PM 20   travels even though it was long.

21           THE COURT:  Next question.  You're getting into a

22   narrative, Counsel.

23   BY MS. JUN:

24   Q.   Ms. Enyart, during one of these custody visitations and

03:34PM 25   pick up, did you take a video of your son with his daughter

UNITED STATES DISTRICT COURT

          1    Abigail?

          2    A.   Yes.

          3            MS. JUN:  Your Honor, I would now move into

          4    evidence Exhibit 62, a stipulated exhibit.

03:34PM   5            THE COURT:  Received.

          6                    (Exhibit 62 admitted.)

          7            MS. JUN:  May I publish to the jury?

          8            THE COURT:  Yes.

          9                    (Video played.)

03:35PM  10    BY MS. JUN:

         11    Q.   Ms. Enyart, do you know when you took this video in

         12    relation to your son's death?

         13    A.   It was June 2022.

         14    Q.   Was that the last time that your granddaughter saw her

03:35PM  15    father?

         16    A.   Yes.

         17    Q.   Now, I want to direct your attention -- oh, actually,

         18    let me ask you something else.  Tell us a little bit about

         19    the things that William loved to do with Abby when they were

03:35PM  20    together and spending time together?  What activities did

         21    they enjoy?

         22    A.   They enjoyed going to the beach, uh, body boarding,

         23    going on the pier, flying kites.  They enjoyed taking care of

         24    Billy's turtle Walter.  Firework shows.  Loved going to the

03:36PM  25    movies.  He loved to take her to the trampoline park.


                        UNITED STATES DISTRICT COURT

         1    Q.   Did your son William play any games with Abby, any fun

         2    games that they would do together?

         3    A.   Oh, yeah, there's one where you guess what somebody's

         4    trying to say when you have the plastic thing in your mouth

03:36PM  5    and you can't close your mouth.  It was pretty funny.

         6         MS. JUN:  What I will do now is move into evidence

         7    Exhibit 60 which is a video of Abigail with her father

         8    William Enyart and it is a stipulated exhibit.

         9         MR. RAMIREZ:  Objection, Your Honor.  Cumulative.

03:36PM 10         THE COURT:  Sustained.

        11    BY MS. JUN:

        12    Q.   Ms. Enyart, you mentioned the activities they loved to

        13    do together.  Did William express a desire to guide Abigail

        14    and counsel her and lead her?

03:37PM 15    A.   Yes, he wanted her to be independent.  He wanted her to

        16    be safe.  He always told her Abby not to talk to strangers.

        17    He said he never wanted to lose her.  And she said daddy, how

        18    can I make friends if I don't talk to strangers?  It was the

        19    cutest thing.  And he taught her how to count money because

03:37PM 20    she was struggling in math.

        21         THE COURT:  Okay.  And Counsel, keep it as a

        22    question and answer not narrative.

        23    BY MS. JUN:

        24    Q.   Did your son William Enyart have any participation in

03:37PM 25    Abigail's schooling or education?


                        UNITED STATES DISTRICT COURT

 1    A.   Yes, he did.

 2    Q.   Tell me a little bit about that.

 3    A.    He had her report cards -- he was on the emergency list

 4    at school and he had her report cards mailed to the house as

03:38PM 5    he would have to sign them and send them back.  And he

 6    actually had parent conferences with the teachers over the

 7    phone.

 8    Q.   Where was Abby's school?

 9    A.    In Nevada.

03:38PM 10    Q.   And did your son teach his daughter Abby any new skills

 11    or tricks or things to learn?

 12    A.    Yes.  He taught her how to swim.  He taught her how to

 13    ride a bike.  He was showing her how to change the oil in his

 14    car.  He was hands on with her on everything they did

03:38PM 15    together.  He taught her to get off the road when there was a

 16    car coming by if she was riding her bike, he would make her

 17    pull over in the neighbor's driveway.

 18         THE COURT:  Counsel, let me cut you off.  Question

 19    after question has been a narrative.  We could go on the next

03:38PM 20    three months talking about narratives of everything that

 21    happened.  It should be a question and answer.  Narratives

 22    are improper question where you just want someone to go into

 23    a narrative as to what might have happened.  You're running

 24    out of time and I hope you realize that.

03:39PM 25         MS. JUN:  Thank you, Your Honor.  I appreciate the

1    admonishment.  Mrs. Enyart, I have no further questions.

2              THE COURT:  You can keep going.  I just wanted to

3    let you know you're running out of time and you're doing it

4    all by narratives where someone can go on for ages on some

03:39PM 5    topic.  If you want to ask other questions, that's up to you.

6              MS. JUN:  I have no further questions.

7              THE COURT:  Okay.  Cross-examination.

8              MR. RAMIREZ:  Thank you, Your Honor.

9                         CROSS-EXAMINATION

03:39PM 10   BY MR. RAMIREZ:

11   Q.   Ms. Enyart, how old was your son at the time he was

12   arrested?

13   A.   33.

14   Q.   And at the time he was arrested, he hadn't had a steady

03:39PM 15   job for more than a year; correct?

16   A.   He worked as handyman when he could.

17   Q.   Right.  So there were maybe an occasional odd job that

18   he would take, but he didn't have steady employment for more

19   than a year before his arrest; correct?

03:40PM 20   A.   His job was to take care of his dad.

21   Q.   Okay.  When I'm saying employment, I'm talking about

22   earning money.  So is it your testimony he earned money

23   taking care of his dad?

24   A.   We didn't make him pay any rent, but we didn't pay him

03:40PM 25   to take care of his dad.  It was something that he chose to

                    UNITED STATES DISTRICT COURT

1    do and wanted to do.

2    Q.   So other than staying home and taking care of his

3    father, he did not have steady paying income from any source

4    for at least a year before his arrest; correct?

03:40PM 5    A.   Handyman work is like a self-employment.  He took jobs,

6    odd jobs when he could.

7    Q.   And he didn't continue in those jobs for more than a

8    week or two at a time; correct?

9    A.   Correct.

03:41PM 10   Q.   So when I'm talking about steady employment, I'm talking

11   more than three to four months at a time working for

12   employment.  With that understanding of definition of steady

13   employment, is it true that your son did not have steady

14   employment for at least a year before his arrest?

03:41PM 15   A.   W-2 income, employment he didn't have.  He didn't work

16   steadily.  He worked as a handyman and the other part-time he

17   took care of his dad.

18   Q.   When he did do work as a handyman, he couldn't go on

19   site under the influence, could he?

03:41PM 20   A.   My son's -- no, of course not.

21   Q.   So within the year that before his arrest, there were

22   days that he wasn't drinking; correct?

23   A.   During the daytime hours.  I would say during the

24   daytime hours we saw Billy.  It was at the nighttime when he

03:42PM 25   started drinking.

UNITED STATES DISTRICT COURT

1    Q.   Okay.  So my question is a little bit different from

2    that.  Is it true then that while your son was doing jobs

3    in -- as a handyman, he was not consuming alcohol?

4          MS. JUN:  Objection.  Calls for speculation.

03:42PM 5          THE COURT:  If you know.  You may not know.  If you

6    know.

7          THE WITNESS:  I don't know.

8          THE COURT:  Okay.

9    BY MR. RAMIREZ:

03:42PM 10   Q.   Is it fair to say that you personally never saw your son

11   engage in the act of drinking alcohol?

12   A.   I never let -- I never saw him drink in front of me, but

13   the evidence was outside in the trash can.  I never saw him

14   physically drink in front of me because he knew it wasn't

03:43PM 15   allowed in our home.  We don't have alcohol in our home.

16   Q.   All right.  So that is a yes, you never personally saw

17   him drink the alcohol?

18   A.   No.

19   Q.   Just to be clear -- my question is a double negative.

03:43PM 20   Did you ever see your son William Enyart drink any form of

21   alcohol?

22   A.   I didn't see him put alcohol, but I don't know that he

23   didn't put alcohol in his ice tea that he drank every day in

24   the daytime.  I don't know.

03:43PM 25         MR. RAMIREZ:  Your Honor, I'd just like to move

UNITED STATES DISTRICT COURT

1    strike everything after I didn't see him drink alcohol.

2              THE COURT:  Sustained.  It will be stricken.

3              MR. RAMIREZ:  Would the Court instruct the jury?

4              THE COURT:  Next question, Counsel.

03:44PM 5    BY MR. RAMIREZ:

6    Q.   Part of the reason you didn't see him drinking was

7    because your home had a rule that no alcohol was allowed;

8    right?

9    A.   Yes.

03:44PM 10   Q.   That's because of your family's past history with

11   alcohol?

12   A.   Yes.

13   Q.   And then there's testimony that there was a video that

14   was played where your son was picking up his daughter in the

03:44PM 15   exchange with Ms. A.E.'s mother; correct?

16   A.   Yes.

17   Q.   And that was the summer of 2022?

18   A.   Yes.

19   Q.   A.E. stayed with your family from June to July of 2022?

03:44PM 20   A.   Yes.

21   Q.   She was there over her birthday; correct?

22   A.   Yes.

23   Q.   What day is her birthday?

24   A.   July 6, 2012.

03:44PM 25   Q.   So she was there at least past her birthday; right?

UNITED STATES DISTRICT COURT

1    A.   Yes.

2    Q.   You don't know when she was went back to Nevada, do you?

3    A.   I don't remember.

4    Q.   During the time that she was visiting, you didn't see

03:45PM 5    your son consume any alcohol; right?

6    A.   No.

7    Q.   Is it true that you didn't see -- let me see if I can

8    ask this the right way.  Did you see your son consume any

9    alcohol when your granddaughter was present?

03:45PM 10    A.   No.

11    Q.   Do you know one way or the other, if he consumed any

12    alcohol whether during the day or night when your

13    granddaughter was visiting?

14              THE COURT:  If you know.

03:45PM 15              THE WITNESS:  I don't know.

16              THE COURT:  Okay.

17    BY MR. RAMIREZ:

18    Q.   So is it fair to say that finding the empty bottles in

19    his room July 27th is what really prompted your family to

03:45PM 20    start engaging in the intervention?

21    A.   No.

22    Q.   You planned the intervention before that.

23    A.   No.

24    Q.   So you planned the intervention as a family, but had

03:46PM 25    nothing to do with finding the alcohol bottles?

UNITED STATES DISTRICT COURT

1    A.    That was a conclusion of finding the alcohol bottles and

2    it wasn't really an intervention.  It was all of us getting

3    together as a family.  It wasn't planned.

4    Q.    So your testimony is that you weren't having an

03:46PM 5    intervention for your son; correct?

6    A.    We weren't planning to confront him on the alcohol.  It

7    just happened that way because my daughter was up here and we

8    found the empty containers.  We didn't plan an intervention.

9    It just came together and it happened.

03:47PM 10    Q.    All right.  So essentially you find the empty alcohol

11    containers and family realizes we need to talk to Mr. Enyart

12    about this?

13    A.    Yes.

14    Q.    And your daughter didn't go into his room to look for

03:47PM 15    the alcohol, did she?

16    A.    I don't remember.

17    Q.    You went in at least to look for something in his room;

18    correct?

19    A.    I don't know if it was the both of us or just me, but I

03:47PM 20    know we both discovered the alcohol bottles.

21    Q.    When you found the alcohol, he was not in the home at

22    that time; correct?

23    A.    Correct.

24    Q.    And you decided that you needed to take all the alcohol

03:47PM 25    bottles that were empty and put them on the kitchen table;

            1   correct?

            2   A.   As well as beer cans and things we found, yes.

            3   Q.   You have no idea when he consumed any of those drinks?

            4        THE COURT:   I'm sorry.  Didn't hear.  When he

03:48PM   5   consumed them?

            6        MR. RAMIREZ:   When.

            7        THE WITNESS:   No, because it was -- no.

            8   BY MR. RAMIREZ:

            9   Q.   So for all you know those could have been in his room

03:48PM  10   for a month and already been consumed; correct?

           11   A.   No.

           12   Q.   So you know when he drank those specific bottles or

           13   drinks?

           14   A.   No, no.

03:48PM  15   Q.   So is it fair to say as you're talking to the jury, you

           16   have no idea when he consumed the specific drinks that you

           17   found in his room?

           18   A.   Over a period of a few months possibly.  I don't have

           19   the exact number.  No, I don't have the exact amount or date.

03:48PM  20   Q.   That's because you never saw him drink any of that

           21   alcohol; correct?

           22   A.   My son drank alone and at night so I never -- I didn't

           23   see him drink or it would have been addressed.

           24   Q.   You have no idea how much he was drinking when he was

03:49PM  25   drinking, do you?

```
         1   A.   No.

         2   Q.   And you have no idea what he was drinking when he was

         3   drinking, do you?

         4   A.   No.

03:49PM  5   Q.   You don't know if he drank every single day, do you?

         6   A.   He drank every single night not day.

         7   Q.   But not when his daughter was visiting; correct?

         8   A.   A.m. or p.m.?

         9   Q.   Both.

03:49PM 10   A.   I don't understand the question.

        11   Q.   My question to you is when your granddaughter was

        12   visiting, isn't it true that even at night your son

        13   Mr. Enyart was not drinking alcohol?

        14   A.   Was not?  I don't understand the question.

03:50PM 15   Q.   You said you've never seen him drink during the day;

        16   correct?

        17   A.   Correct.

        18   Q.   And I'm focusing specifically when your granddaughter

        19   was visiting in the summer in 2022; right?  That's my time

03:50PM 20   period.  Okay?  You didn't see him drink at all during the

        21   day; right?

        22   A.   Correct.

        23   Q.   And you don't believe he was drinking in the evenings

        24   either while she was visiting; correct?

03:50PM 25   A.   I do believe he drank in the evenings.
```

UNITED STATES DISTRICT COURT

           1    Q.   Even while your granddaughter was present.

           2    A.   She was asleep.

           3    Q.   And you never thought to confront him while your

           4    granddaughter was present?

03:50PM    5    A.   Absolutely not.

           6    Q.   All right.  You remember giving deposition testimony in

           7    this case?

           8    A.   Yes.

           9    Q.   During this deposition testimony, you understood you

03:51PM   10    were under oath to tell the truth; correct?

          11    A.   Yes.

          12    Q.   You did tell the truth; right?

          13    A.   As far as I know, yes.

          14              MR. RAMIREZ:  At this time, Your Honor, I'd like to

03:52PM   15    read from Ms. Enyart's deposition page 35 lines 18

          16    through 23.

          17              MS. JUN:  Your Honor, if I may have a moment?

          18              No objection, Your Honor.

          19              THE COURT:  Okay.  You may read it, Counsel.

03:52PM   20              MR. RAMIREZ:  Thank you.

          21              "Q.  Did he drink every single night while A.E.

          22    was over?

          23              "A.  No, not always.

          24              "Q.  Did he drink any of the nights that A.E. was

03:52PM   25    visiting in the summer of 2022?


                           UNITED STATES DISTRICT COURT

1           "A.  I don't know."

2           THE COURT:  Next question.

3    BY MR. RAMIREZ:

4    Q.   And it's true that if you had a suspicion that he was

03:53PM 5    drinking while A.E. was over, you would have confronted him

6    on that; right?

7    A.   I didn't see any danger to confront him when his

8    daughter was there.

9           MR. RAMIREZ:  Move to strike as nonresponsive,

03:53PM10   Your Honor.

11          THE COURT:  It will be stricken.  Listen carefully

12   to the question.  Ask the question again.

13   BY MR. RAMIREZ:

14   Q.   If you believed that your son was drinking while your

03:53PM15   granddaughter was visiting, you would have confronted him on

16   that, wouldn't you have?

17   A.   Sure, yes.

18   Q.   And isn't it true that you didn't confront him one time

19   that summer before his arrest about a suspicion he was

03:53PM20   drinking alcohol?

21   A.   Can you repeat the question?

22   Q.   You did not confront your son Mr. William Enyart one

23   time during the summer about your suspicion he was drinking

24   alcohol until the day of the arrest?

03:54PM25   A.   Yes.

1    Q.   When you confronted your son about the drinking, he

2    denied that the alcohol was his; right?

3    A.   Yes.

4    Q.   And he denied that he had any problems; right?

03:54PM 5    A.   Denial, yes.

6    Q.   He denied that he needed help; correct?

7    A.   Depending on which day it was really.

8    Q.   Right now I'm focusing on July 27th, 2022.

9    A.   He denied the empty containers were his, yes.

03:55PM 10   Q.   When you were confronting him about that, he tried to

11   grab your phone from you; right?

12   A.   Yes.

13   Q.   He was using profanity with you in the home; correct?

14   A.   I don't remember.

03:55PM 15   Q.   Ultimately, your husband called the police on a

16   nonemergency line; right?

17   A.   Yes.

18   Q.   And you were present when he was speaking with the

19   dispatcher; correct?

03:55PM 20   A.   Yes.

21   Q.   And he told the dispatcher that your son hit you with

22   the phone; correct?

23   A.   Yes.

24   Q.   And you were present while he was -- when he said that;

03:55PM 25   right?

UNITED STATES DISTRICT COURT

1    A.   Yes.

2    Q.   You didn't try to correct him, did you?

3    A.   There was a lot going on.

4         MR. RAMIREZ:  Move to strike as nonresponsive.

03:55PM 5         THE COURT:  Sustained.  It will be stricken.

6         Did you try to correct him?

7         THE WITNESS:  I don't recall.

8    BY MR. RAMIREZ:

9    Q.   So eventually Deputy Conley arrived on scene and

03:56PM 10   arrested your son; correct?

11   A.   Yes.

12   Q.   And you never spoke with Deputy Conley while he was at

13   your house.  True?

14   A.   No.

03:56PM 15   Q.   Did you speak with Deputy Conley while --

16        THE COURT:  Why don't you ask that question again.

17   It was kind of in the negative again.

18        MR. RAMIREZ:  It's a bad habit, Your Honor.  I

19   apologize.

03:56PM 20   Q.   Did you speak with Deputy Conley while he was at your

21   house?

22   A.   No.

23   Q.   And then you did give a statement to Deputy Umphlett.

24   True?

03:56PM 25   A.   Yes.

```
          1   Q.   And during your statement with Deputy Umphlett, you

          2   never told her you believed your son was going to withdraw

          3   from alcohol, did you?

          4   A.   My daughter and I had a conversation with her about

03:57PM   5   danger of alcohol withdrawals and we did.

          6   Q.   So you personally told Deputy Umphlett that you believed

          7   that your son could withdraw from alcohol?

          8   A.   My daughter talked about withdrawals.  I expressed my

          9   concerns that he could have a seizure.

03:57PM  10   Q.   So I want to distinguish between what your daughter said

         11   and what you said.  Is it fair to say that what you told

         12   Deputy Umphlett was that you believed there was a chance your

         13   son could have a seizure?

         14   A.   That's correct.

03:57PM  15   Q.   And you didn't say I believe my son could withdraw from

         16   alcohol?

         17   A.   Not those words.

         18   Q.   In fact as of the date of the arrest, you didn't

         19   actually think he was intoxicated, did you?

03:57PM  20   A.   I felt he was still under the influence from the night

         21   before.

         22   Q.   But you didn't actually believe he was intoxicated?

         23   A.   I think it was at that time 24 hours around the clock.

         24   Q.   So you did believe he was intoxicated?

03:58PM  25   A.   From the night before.  I think you can still be
```

UNITED STATES DISTRICT COURT

1    intoxicated from the night before.

2              MR. RAMIREZ:  All right, Your Honor.  I'd like to

3    read from the witness deposition on page 42 lines 9

4    through 11.

03:58PM 5              MS. JUN:  Just a moment, Your Honor.

6              THE COURT:  Uh-huh.

7              MS. JUN:  No objection.

8              THE COURT:  You may read it.

9              MR. RAMIREZ:  Thank you.

03:59PM 10              "Q.  Did anybody -- do you have the belief he was

11    drunk at the moment you were confronting him?

12              "A.  I don't believe he was."

13    Q.    In fact isn't it true, Ms. Enyart that you have no idea

14    if he was drunk on July 27th, do you?

03:59PM 15    A.    I don't -- I couldn't tell you.  I'm not a medical

16    expert.  He could have been from the night before.

17    Q.    I understand you're talking about what could have,

18    there's possibility, you're not an expert, but you don't

19    personally believe he was intoxicated at that time?

04:00PM 20    A.    Not at the time.

21              THE COURT:  Counsel, it's 4 o'clock.  We're going

22    to be breaking at this time.  Remember the admonition, ladies

23    and gentlemen not to discuss the case among yourselves or

24    with anyone else or form or express any opinions about the

04:00PM 25    matter until it's submitted to you and you retire to the jury

          1    room.

          2              Have a pleasant evening today or tonight.  We'll

          3    see you back here tomorrow morning.  What time are you gonna

          4    come in?  Who's gonna say 8:15?  Start right at 8:30.  Try to

04:00PM   5    be here at 8:15.  Thank you very much.  You're excused at

          6    this time.

          7                        (Jury not present.)

          8              THE COURT:  The jurors have left the courtroom.

          9    You may step down.  Just to keep you updated on the time, the

04:01PM  10    plaintiff has 30 minutes left and the defendant has

         11    143 minutes left.  That goes towards cross-examination on the

         12    defense case, too so be very judicious with using of the

         13    time.  30 minutes for the plaintiff.  143 for the defendant.

         14    We'll see you back here tomorrow morning at 8:30.  See you

04:01PM  15    then.

         16              THE CLERK:  All rise.

         17              This court is adjourned.

         18              (Proceedings were completed at 4:01 p.m.)

         19

         20

         21

         22

         23

         24

         25

1

2                          CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES        )

5                                 )  SS.

6    STATE OF CALIFORNIA          )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  MAY 23, 2024

19

20      /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

233

'

**'78** [1] - 32:25
**'80** [1] - 32:25
**'em** [2] - 89:17, 92:8

---

/

**/s** [1] - 232:20

---

1

**1** [13] - 4:3, 4:8, 4:22, 4:25, 5:1, 5:17, 5:18, 89:15, 121:14, 144:14, 196:18, 197:9, 208:22
**1.20** [1] - 83:22
**1.23** [1] - 84:8
**10** [5] - 3:21, 61:4, 96:21, 162:24, 170:13
**10019** [2] - 1:23, 232:21
**102** [5] - 3:20, 7:18, 7:22, 7:25, 9:2
**103** [5] - 3:20, 8:22, 9:1, 9:4, 9:7
**104** [4] - 3:21, 9:18, 9:22, 70:25
**108** [1] - 3:8
**10:06** [1] - 209:20
**11** [5] - 27:10, 168:13, 170:13, 211:6, 230:4
**111** [1] - 3:10
**116** [2] - 29:25, 30:6
**117** [1] - 122:1
**118** [1] - 3:10
**11:30** [1] - 121:9
**12** [13] - 3:20, 96:14, 144:4, 149:13, 150:3, 150:8, 150:15, 150:18, 151:23, 152:8, 168:20, 195:3
**12-minute** [3] - 11:23, 96:8, 96:21
**125** [2] - 3:23, 27:10
**12:23** [2] - 202:19, 202:21
**13** [1] - 208:2
**13-second** [1] - 65:11
**139** [1] - 3:10
**141** [1] - 3:12
**143** [2] - 231:11, 231:13
**148** [1] - 85:19
**1480** [2] - 2:5, 2:7
**15** [21] - 3:20, 27:10, 38:17, 42:14, 42:21,

**43**:1, 43:3, 43:22, 44:3, 56:18, 61:10, 62:8, 63:4, 149:14, 150:3, 157:14, 157:17, 157:20, 158:16, 175:17, 175:21
**150** [3] - 3:20, 3:20, 80:14
**1510** [1] - 2:10
**155** [3] - 3:21, 3:21, 3:22
**16** [2] - 204:8, 206:21
**163** [1] - 3:12
**172** [1] - 3:12
**174** [1] - 3:14
**18** [1] - 225:15
**180** [1] - 3:14
**182** [1] - 168:13
**183** [2] - 3:16, 121:25
**185** [1] - 3:22
**187** [1] - 3:16
**188** [1] - 3:16
**189** [1] - 3:18
**18th** [1] - 26:24
**193** [1] - 3:23
**1965** [1] - 32:5
**1:22** [2] - 204:5, 204:11
**1:39** [2] - 208:16, 208:19
**1:53** [2] - 198:5, 199:12
**1st** [10] - 145:14, 157:22, 157:25, 159:24, 160:2, 208:14, 208:18, 208:24, 209:4, 209:20
**1ST** [1] - 1:24

---

2

**2** [3] - 3:23, 125:12, 125:17
**2-A** [1] - 114:18
**2-minute** [1] - 65:11
**20** [1] - 180:25
**2000** [1] - 46:14
**2005** [3] - 60:4, 60:10, 62:14
**2012** [1] - 220:24
**2022** [25] - 25:19, 60:13, 61:23, 63:5, 88:22, 112:7, 145:10, 145:12, 145:14, 148:14, 157:22, 160:2, 175:1, 181:1, 181:21, 184:2,

**187**:11, 191:3, 200:19, 214:13, 220:17, 220:19, 224:19, 225:25, 227:8
**2024** [4] - 1:15, 4:1, 26:25, 232:18
**21** [1] - 207:23
**213** [1] - 1:25
**214** [1] - 3:23
**217** [1] - 3:18
**22** [2] - 1:15, 4:1
**23** [2] - 225:16, 232:18
**23-00540-RGK** [1] - 1:8
**23-540** [1] - 4:4
**24** [9] - 38:18, 42:21, 43:1, 43:17, 43:20, 43:22, 44:4, 56:18, 229:23
**2500** [1] - 46:24
**26** [1] - 3:4
**26th** [1] - 200:11
**27** [2] - 83:21, 191:2
**27th** [14] - 13:16, 14:4, 25:15, 25:19, 63:5, 124:11, 139:9, 139:13, 145:10, 194:14, 195:21, 221:19, 227:8, 230:14
**29** [1] - 3:4
**29th** [4] - 198:5, 199:10, 199:11, 200:19
**2:26** [1] - 200:11
**2:30** [1] - 175:15
**2:33** [1] - 206:6
**2:54** [1] - 206:20

---

3

**3** [11] - 3:21, 4:21, 10:17, 10:23, 11:24, 29:25, 30:4, 89:15, 144:17, 197:24, 199:12
**30** [9] - 28:17, 52:24, 76:1, 100:4, 145:12, 202:19, 202:20, 231:10, 231:13
**30-minute** [1] - 62:12
**30th** [5] - 148:14, 151:3, 197:19, 201:15, 204:11
**31** [4] - 3:6, 46:22, 56:18
**31st** [11] - 177:2, 196:21, 197:2, 197:8, 197:17,

**197**:18, 205:23, 206:20, 207:14, 207:17, 207:18
**33** [4] - 164:13, 168:12, 198:24, 217:13
**34** [6] - 34:2, 34:12, 41:25, 42:1, 208:5, 208:7
**35** [4] - 76:1, 80:11, 100:5, 225:15
**350** [1] - 1:24
**38** [2] - 66:13, 69:16
**385** [1] - 2:17
**39** [1] - 11:2
**3:29** [1] - 63:11
**3:34** [1] - 197:18
**3:42** [1] - 63:14
**3:45** [2] - 47:23, 48:14
**3:55:09** [1] - 177:2

---

4

**4** [7] - 144:20, 150:15, 151:22, 151:23, 152:8, 202:20, 230:21
**40** [3] - 62:5, 171:16, 171:20
**41** [4] - 186:4, 190:17, 190:18, 190:19
**42** [6] - 3:22, 33:14, 33:20, 185:13, 185:19, 230:3
**44** [1] - 127:5
**4455** [1] - 1:24
**45** [2] - 63:2, 106:8
**46** [3] - 3:6, 86:11, 86:12
**48** [3] - 147:24, 169:14, 169:18
**49-and-a-half** [1] - 114:25
**4:01** [1] - 231:18

---

5

**5** [5] - 144:22, 150:16, 150:18, 168:13, 206:19
**50** [1] - 47:4
**501** [3] - 2:4, 2:7, 2:10
**51-50** [11] - 124:23, 125:1, 126:12, 126:14, 130:8, 130:11, 130:12, 130:24, 131:1, 131:9, 131:12
**5150** [3] - 13:4, 24:11, 26:11

**52** [5] - 3:21, 155:8, 155:10, 155:18, 155:21
**53** [4] - 3:21, 155:8, 155:10, 155:18
**55** [5] - 3:6, 3:22, 155:8, 155:10, 155:18
**57** [1] - 3:6
**59** [1] - 3:8
**5:55** [1] - 194:15

---

6

**6** [11] - 3:4, 29:25, 30:4, 83:16, 103:7, 144:24, 191:24, 192:1, 207:12, 220:24
**6-D** [5] - 83:17, 83:24, 84:2, 84:5, 103:13
**60** [3] - 106:23, 201:25, 215:7
**60-second** [2] - 201:23, 202:8
**600** [1] - 31:21
**62** [3] - 3:23, 214:4, 214:6
**65** [1] - 3:22
**66** [1] - 121:24
**6:00** [1] - 48:4
**6:10** [1] - 195:2
**6:35** [1] - 197:17
**6:52** [3] - 196:21, 197:9, 197:16
**6D** [1] - 3:22

---

7

**7** [5] - 3:20, 89:22, 90:4, 144:25, 162:23
**7-27** [1] - 152:10
**7-minute** [1] - 11:2
**70** [1] - 106:23
**72** [2] - 130:13, 130:25
**72-hour** [2] - 17:20, 126:13
**7:00** [1] - 159:21

---

8

**8** [1] - 145:2
**8.27** [1] - 103:12
**82** [2] - 26:21, 27:2
**84** [1] - 3:22
**87** [1] - 121:25
**894-0374** [1] - 1:25
**8:15** [2] - 231:4, 231:5
**8:30** [3] - 5:4, 231:4, 231:14

**8:32** [1] - 4:1

## 9

**9** [3] - 3:20, 3:21, 230:3
**90** [1] - 47:6
**90012** [1] - 1:24
**92101** [3] - 2:5, 2:8, 2:11
**92415** [1] - 2:18
**96** [1] - 78:13
**97** [15] - 3:8, 3:23, 121:23, 193:10, 193:12, 193:13, 195:10, 196:18, 197:9, 197:24, 199:12, 202:19, 206:19, 207:13, 208:23
**97-1** [3] - 193:21, 195:10, 195:24
**97-2** [2] - 194:1, 194:9
**99** [11] - 3:22, 64:23, 65:4, 65:8, 65:24, 69:12, 127:5, 127:6
**9:29** [2] - 209:4, 209:20
**9:30** [1] - 209:20
**9:41** [1] - 201:16
**9:45** [3] - 157:23, 159:22, 160:2
**9:49** [1] - 209:20

## A

**a-r-t-o-l-o-m-e** [1] - 141:4
**A.E** [5] - 22:17, 220:19, 225:21, 225:24, 226:5
**A.E.'s** [1] - 220:15
**a.m** [5] - 157:23, 159:22, 160:2, 177:2, 224:8
**A.M** [1] - 4:1
**Abby** [11] - 212:13, 212:18, 212:21, 213:3, 213:10, 213:12, 213:13, 214:19, 215:1, 215:16, 216:10
**Abby's** [1] - 216:8
**Abigail** [11] - 211:4, 211:5, 211:8, 211:11, 211:16, 211:17, 211:23, 212:10, 214:1, 215:7, 215:13
**Abigail's** [1] - 215:25

**ability** [1] - 87:14
**able** [21] - 13:13, 17:22, 24:1, 50:5, 65:16, 65:18, 66:3, 69:8, 83:10, 127:10, 127:13, 127:16, 134:8, 142:18, 142:20, 149:7, 161:14, 171:6, 174:2, 178:20, 179:1
**abrasions** [1] - 161:4
**absolutely** [3] - 57:17, 176:17, 225:5
**abundance** [1] - 67:20
**abuse** [21] - 28:6, 37:17, 37:19, 39:4, 95:16, 99:11, 116:25, 117:18, 144:14, 145:24, 146:2, 147:2, 148:11, 148:13, 173:16, 179:16, 184:13, 185:3, 185:5, 186:6, 191:16
**abused** [1] - 179:13
**abuses** [2] - 42:5, 147:11
**abusing** [4] - 115:25, 126:6, 147:6, 184:11
**Academy** [2] - 33:16, 60:6
**accept** [2] - 47:12, 82:5
**accepted** [1] - 81:16
**accepting** [1] - 153:10
**accident** [1] - 71:19
**according** [3] - 37:13, 45:17, 115:3
**accurate** [3] - 18:17, 56:11, 124:6
**acetone** [2] - 147:9, 164:4
**acknowledge** [2] - 81:22, 123:24
**act** [2] - 174:2, 219:11
**acting** [4] - 8:13, 8:17, 19:25, 151:9
**actions** [4] - 70:13, 70:14, 70:21, 70:22
**activate** [4] - 49:5, 120:22, 123:19, 139:6
**activated** [2] - 49:11, 49:14
**active** [1] - 51:16
**actively** [1] - 130:15
**activities** [2] - 214:20, 215:12
**activity** [1] - 37:4
**actual** [1] - 142:22

**ADAM** [1] - 2:15
**adaptation** [1] - 168:21
**add** [1] - 173:24
**addiction** [6] - 35:1, 141:10, 141:12, 141:15, 141:16, 168:22
**addition** [3] - 34:25, 75:1, 142:14
**additional** [5] - 15:22, 39:21, 53:12, 63:20, 95:13
**additionally** [1] - 44:15
**address** [2] - 62:2, 111:16
**addressed** [2] - 111:16, 223:23
**Adelanto** [1] - 62:23
**adjoining** [1] - 132:11
**adjourned** [1] - 231:17
**adjust** [6] - 30:25, 59:1, 111:4, 140:25, 174:16, 189:14
**admissibility** [2] - 84:1, 125:13
**admissible** [1] - 156:22
**admit** [1] - 86:20
**admitted** [16] - 7:25, 9:7, 9:22, 10:23, 65:8, 84:5, 89:20, 125:17, 150:3, 150:8, 155:18, 157:14, 157:17, 185:19, 193:13, 214:6
**admonishment** [4] - 61:6, 121:10, 175:17, 217:1
**admonition** [1] - 230:22
**advance** [1] - 186:20
**adverse** [1] - 39:6
**advised** [2] - 124:22, 126:12
**affect** [2] - 87:14, 170:16
**affects** [1] - 165:9
**afraid** [5] - 126:5, 199:23, 199:24, 203:6, 205:10
**afternoon** [11] - 97:23, 97:24, 163:15, 163:16, 174:24, 175:16, 180:23, 180:24, 187:6, 191:23, 200:19
**age** [1] - 143:10

**agent** [1] - 77:6
**ages** [1] - 217:4
**aggressive** [3] - 25:9, 25:10, 133:23
**aggressors** [1] - 133:23
**agitation** [1] - 172:20
**ago** [3] - 46:22, 56:18
**agree** [4] - 8:2, 13:1, 109:4, 109:5
**agreed** [2] - 192:15
**ahead** [21] - 11:25, 72:6, 92:1, 104:10, 105:1, 109:11, 126:22, 127:20, 128:10, 132:13, 133:9, 135:22, 138:15, 144:10, 146:8, 154:10, 156:20, 157:10, 161:1, 161:21, 203:13
**ahold** [1] - 67:22
**aid** [2] - 34:4, 78:6
**AIDED** [1] - 232:13
**air** [2] - 78:18, 80:3
**AL** [2] - 1:6, 1:9
**Alanon** [1] - 198:22
**alarms** [1] - 135:10
**alcohol** [174] - 6:16, 8:17, 8:18, 12:12, 17:7, 17:14, 19:19, 19:24, 21:1, 21:21, 21:24, 21:25, 22:8, 22:10, 22:14, 23:18, 28:7, 28:25, 34:6, 34:9, 34:10, 34:22, 35:2, 35:11, 35:21, 36:1, 37:17, 37:19, 39:4, 42:5, 44:17, 48:13, 75:5, 88:12, 91:3, 91:12, 92:10, 92:18, 93:7, 93:8, 93:17, 94:14, 94:18, 94:22, 95:16, 99:8, 99:10, 99:13, 101:5, 105:21, 108:15, 108:21, 109:3, 109:17, 110:13, 115:3, 115:25, 116:25, 117:18, 124:20, 124:24, 125:6, 125:8, 126:7, 127:1, 127:11, 127:17, 128:1, 128:2, 128:5, 130:19, 131:8, 131:11, 134:1, 134:3, 134:8, 134:10, 134:21,
**alcoholic** [9] - 18:25, 19:21, 23:23, 77:21, 168:19, 169:13, 198:22, 199:23, 207:6
**alcoholics** [1] - 166:11
**alcoholism** [7] - 6:20, 7:5, 37:15, 115:16, 166:13, 188:15, 198:13
**allegations** [1] - 156:1
**allowed** [4] - 19:11, 142:25, 219:15, 220:7

**136:2, 136:4, 139:10, 141:18, 142:10, 142:15, 142:17, 142:19, 143:1, 143:2, 143:3, 143:9, 144:14, 144:16, 145:24, 145:25, 146:2, 147:2, 147:6, 147:11, 147:17, 148:11, 148:12, 153:17, 153:22, 153:25, 165:8, 165:23, 167:11, 167:14, 167:15, 167:20, 167:22, 167:24, 168:1, 168:3, 170:10, 172:15, 172:16, 173:5, 173:11, 173:16, 179:13, 179:16, 182:5, 184:11, 184:13, 185:3, 185:5, 186:6, 191:16, 192:15, 192:18, 192:19, 192:24, 193:2, 193:3, 198:15, 198:17, 198:20, 198:21, 198:23, 199:2, 199:4, 219:3, 219:11, 219:15, 219:17, 219:21, 219:22, 219:23, 220:1, 220:7, 220:11, 221:5, 221:9, 221:12, 221:25, 222:1, 222:6, 222:10, 222:15, 222:20, 222:21, 222:24, 223:21, 224:13, 226:20, 226:24, 227:2, 229:3, 229:5, 229:7, 229:16**

**allows** [1] - 173:20
**Alma** [1] - 31:4
**almost** [4] - 99:17, 132:4, 165:7, 208:7
**alone** [4] - 138:8, 138:14, 223:22
**altercation** [2] - 99:20, 112:24
**alternate** [1] - 211:20
**Alvarado** [5] - 94:2, 94:4, 95:12, 105:7
**AMANDA** [1] - 3:3
**Amanda** [7] - 6:4, 120:2, 190:5, 190:6, 190:24, 192:8, 195:5
**amend** [1] - 51:16
**AMERICA** [1] - 1:1
**American** [1] - 38:19
**amount** [8] - 70:5, 70:6, 164:17, 164:20, 164:23, 166:1, 171:12, 223:19
**AND** [4] - 232:8, 232:11, 232:13, 232:14
**anemia** [1] - 165:17
**aneurysm** [1] - 162:11
**ANGELES** [4] - 1:16, 1:24, 4:1, 232:4
**Angeles** [5] - 31:25, 32:17, 32:24, 45:9, 45:10
**answer** [16] - 25:22, 93:22, 113:24, 149:20, 158:6, 158:18, 169:1, 172:9, 181:17, 181:18, 200:18, 206:5, 212:5, 215:22, 216:21
**answered** [3] - 45:24, 53:2, 92:20
**answering** [4] - 42:3, 42:6, 42:10, 181:5
**answers** [4] - 43:13, 44:13, 92:13, 92:15
**anytime** [1] - 25:15
**anyway** [1] - 36:6
**apologize** [4] - 12:22, 58:20, 176:18, 228:19
**appearance** [1] - 75:17
**APPEARANCES** [1] - 2:1
**appearances** [1] - 4:6
**appeared** [1] - 161:7
**appetizer** [1] - 159:9
**Apple** [13] - 60:15,

60:18, 61:24, 62:3, 62:7, 62:10, 79:8, 96:1, 100:20, 112:5, 118:13, 118:20
**application** [4] - 83:1, 83:5, 102:20, 103:2
**applies** [2] - 51:19, 51:20
**apply** [3] - 56:22, 186:2, 186:16
**appointments** [1] - 14:2
**appreciate** [4] - 146:14, 157:7, 188:2, 216:25
**approach** [1] - 66:13
**appropriate** [3] - 43:6, 43:15, 60:25
**approves** [1] - 102:14
**April** [2] - 174:12, 174:19
**APRIL** [1] - 3:13
**area** [16] - 7:7, 29:5, 29:7, 43:9, 62:23, 80:21, 82:19, 82:20, 84:19, 101:17, 161:6, 162:8, 162:15, 187:22, 206:8, 206:9
**areas** [2] - 161:5, 161:7
**argumentative** [1] - 100:6
**arm** [2] - 71:13, 71:18
**arrest** [16] - 38:10, 44:24, 55:21, 64:3, 73:16, 98:8, 98:24, 137:8, 191:10, 217:19, 218:4, 218:14, 218:21, 226:19, 226:24, 229:18
**arrested** [16] - 36:5, 38:10, 75:1, 80:13, 81:16, 85:15, 108:5, 114:12, 134:12, 145:10, 145:11, 167:20, 191:9, 217:12, 217:14, 228:10
**arrestee** [13] - 39:23, 41:23, 41:24, 43:25, 44:10, 44:21, 45:13, 81:21, 83:6, 102:1, 102:23, 102:25, 107:15
**arrestee's** [3] - 37:19, 39:19, 103:3
**arresting** [23] - 36:16, 37:2, 37:6, 37:20,

37:24, 39:1, 39:9, 39:14, 40:23, 70:17, 77:4, 77:14, 80:16, 81:3, 83:9, 89:2, 90:17, 91:2, 92:14, 97:4, 102:2, 115:20, 116:3
**arrests** [2] - 124:7, 135:9
**arrival** [1] - 113:10
**arrive** [4] - 10:8, 72:8, 72:9, 118:11
**arrived** [13] - 6:13, 63:14, 64:10, 77:6, 78:21, 97:25, 98:14, 98:16, 100:4, 101:22, 102:10, 118:23, 228:9
**arriving** [2] - 80:19, 113:11
**ARROWHEAD** [1] - 2:17
**art** [1] - 75:18
**aside** [1] - 63:21
**asleep** [1] - 225:2
**aspects** [1] - 47:2
**assaulting** [1] - 73:20
**assess** [1] - 173:8
**assessment** [1] - 152:19
**assign** [1] - 119:13
**assigned** [8] - 36:19, 42:21, 60:15, 61:24, 62:15, 62:21, 62:22, 112:5
**assignment** [3] - 33:1, 33:2, 123:13
**Assistant** [4] - 175:4, 181:2, 181:3, 181:14
**assisting** [1] - 37:1
**associated** [2] - 164:22, 166:13
**Association** [1] - 38:20
**association** [1] - 143:10
**assume** [35] - 38:23, 38:24, 39:21, 39:22, 39:24, 40:1, 41:22, 41:23, 42:1, 42:5, 43:23, 44:8, 44:9, 44:12, 44:15, 144:13, 145:9, 145:10, 145:15, 146:11, 146:18, 146:20, 146:22, 147:4, 147:5, 147:6, 147:8, 147:10, 148:9, 148:10, 148:11, 148:14,

148:18, 160:1, 160:7
**assumed** [1] - 17:19
**assuming** [10] - 39:11, 39:16, 40:6, 40:15, 42:8, 44:1, 44:19, 145:4, 145:17, 148:20
**assumption** [1] - 146:12
**assured** [1] - 203:19
**AT** [1] - 232:11
**attack** [10] - 44:18, 148:13, 179:15, 182:19, 184:12, 199:25, 203:7, 204:16, 205:11, 206:12
**attempt** [1] - 200:20
**attempted** [1] - 207:11
**attempting** [1] - 131:6
**attempts** [4] - 201:4, 205:20, 207:14, 208:19
**attending** [1] - 35:17
**attention** [18] - 44:22, 55:25, 73:22, 143:24, 150:17, 151:5, 151:21, 152:7, 153:20, 191:2, 194:14, 197:24, 199:11, 200:10, 202:18, 207:12, 208:22, 214:17
**attorney** [10] - 22:2, 86:18, 146:4, 176:2, 176:4, 176:5, 176:22, 177:7, 181:12
**attorneys** [8] - 121:15, 156:19, 175:22, 176:2, 181:6, 181:11, 181:15, 181:19
**audio** [29] - 8:3, 17:2, 40:6, 40:17, 48:21, 49:3, 49:5, 50:5, 50:10, 50:14, 54:22, 64:24, 65:24, 69:12, 113:4, 122:21, 124:1, 124:9, 125:24, 126:16, 127:21, 128:22, 143:22, 154:18, 154:20, 155:4, 155:15, 176:25
**Audio** [19] - 11:4, 12:1, 65:14, 69:17, 71:1, 125:21, 126:23, 128:11,

129:13, 130:4, 131:15, 132:14, 133:10, 135:23, 136:12, 137:17, 138:5, 138:16, 155:22
**auditory** [1] - 144:22
**august** [2] - 157:25, 208:14
**August** [9] - 145:14, 157:22, 157:24, 159:24, 160:2, 208:18, 208:24, 209:4, 209:20
**authenticate** [1] - 177:5
**authenticated** [1] - 177:2
**authenticity** [1] - 176:24
**automated** [1] - 201:24
**automatically** [1] - 173:22
**autopsy** [1] - 147:7
**AVENUE** [1] - 2:17
**average** [6] - 7:11, 53:16, 89:2, 91:2, 92:17, 107:6

---

**B**

**baby** [1] - 34:8
**background** [1] - 31:11
**backing** [1] - 77:5
**backup** [1] - 77:9
**backwards** [1] - 72:22
**bad** [5] - 22:8, 95:23, 192:18, 205:10, 228:18
**badge** [3] - 90:7, 90:11
**bail** [1] - 85:18
**bananas** [1] - 127:6
**Bartolome** [14] - 140:21, 141:3, 141:9, 144:12, 146:10, 150:7, 150:17, 154:12, 156:8, 157:12, 157:20, 160:14, 172:7, 174:5
**BARTOLOME** [1] - 3:11
**based** [14] - 19:24, 24:12, 40:24, 92:5, 127:18, 130:23, 147:13, 152:3,

152:4, 159:20, 160:20, 167:15, 168:1, 169:3
**bases** [1] - 137:2
**basic** [4] - 33:12, 36:18, 60:3, 100:14
**Basic** [1] - 33:14
**basis** [5] - 23:19, 33:15, 136:5, 166:4, 169:4
**bathe** [1] - 130:21
**bathed** [1] - 130:20
**beach** [1] - 214:22
**become** [5] - 23:20, 25:11, 33:4, 33:19, 100:5
**becomes** [1] - 173:25
**beds** [1] - 151:8
**beer** [1] - 223:2
**beers** [3] - 20:9, 20:10, 170:19
**begin** [2] - 31:10, 121:1
**beginning** [6] - 65:23, 147:24, 151:10, 151:16, 153:9, 209:4
**beginnings** [1] - 169:12
**begins** [2] - 145:11, 147:25
**behalf** [2] - 46:10, 47:6
**BEHALF** [2] - 2:2, 2:13
**behaving** [3] - 8:20, 19:25, 24:12
**behavior** [9] - 145:12, 145:13, 149:8, 151:12, 153:18, 154:24, 160:8, 161:17, 165:22
**behaviors** [2] - 142:3, 152:4
**behind** [13] - 69:20, 69:23, 70:4, 70:11, 71:8, 72:14, 73:11, 74:19, 79:5, 84:22, 85:5, 104:4, 104:6
**belief** [2] - 25:20, 230:10
**believes** [1] - 115:6
**belligerent** [2] - 19:25, 124:25
**bells** [1] - 135:11
**below** [1] - 90:23
**belt** [17] - 40:1, 49:3, 49:23, 50:14, 50:16, 64:20, 64:24, 66:5, 67:9, 67:10, 72:2, 120:20, 123:1, 123:11, 123:12,

139:3, 139:6
**belted** [3] - 78:23, 78:24, 79:2
**bending** [2] - 73:6, 73:9
**bent** [1] - 72:22
**benzodiazepines** [1] - 171:8
**Bernardino** [8] - 4:5, 60:6, 60:20, 64:9, 98:18, 112:1, 186:24, 210:16
**BERNARDINO** [3] - 1:9, 2:14, 2:18
**best** [3] - 68:12, 68:13, 166:7
**better** [4] - 42:18, 65:25, 69:14, 121:5
**between** [8] - 62:18, 109:3, 129:3, 162:7, 169:12, 173:8, 187:18, 229:10
**beverage** [1] - 168:19
**beyond** [1] - 129:9
**bias** [1] - 119:11
**bike** [2] - 216:13, 216:16
**Billy** [5] - 23:10, 28:6, 28:13, 204:23, 218:24
**Billy's** [1] - 214:24
**binder** [3] - 26:18, 86:8
**binge** [1] - 166:17
**binge-type** [1] - 166:17
**bipolar** [1] - 145:3
**birthday** [3] - 220:21, 220:23, 220:25
**Bishop** [2] - 212:14, 212:15
**bit** [25] - 4:24, 22:17, 32:4, 59:24, 62:15, 64:20, 66:4, 69:14, 95:7, 101:7, 109:2, 125:3, 134:10, 134:13, 145:21, 165:23, 166:25, 169:9, 171:9, 187:23, 207:19, 211:15, 214:18, 216:2, 219:1
**bizarre** [4] - 145:12, 151:11, 151:18, 160:8
**black** [1] - 68:23
**bleed** [1] - 162:11
**bleeding** [5] - 161:9, 162:6, 162:12, 165:1, 165:6

**blood** [5] - 21:21, 43:14, 100:13, 172:16, 192:15
**blue** [1] - 150:13
**blunt** [3] - 161:24, 162:12, 162:18
**board** [2] - 141:14, 141:16
**boarding** [1] - 214:22
**body** [11] - 25:10, 64:17, 120:21, 142:2, 145:17, 160:18, 162:21, 163:2, 164:18, 165:9, 214:22
**body's** [1] - 168:21
**book** [4] - 37:21, 40:12, 82:11, 181:6
**booked** [16] - 43:4, 47:22, 48:14, 80:12, 82:2, 89:8, 91:19, 95:2, 95:21, 97:7, 97:13, 99:1, 102:11, 104:21, 124:9, 152:10
**booking** [38] - 35:18, 36:23, 37:25, 38:11, 38:12, 40:11, 80:16, 81:19, 81:20, 82:9, 82:12, 83:1, 83:5, 88:6, 95:18, 97:4, 99:1, 100:1, 101:10, 101:14, 102:14, 102:15, 102:18, 102:20, 102:21, 103:2, 103:22, 105:16, 106:12, 106:16, 107:6, 107:12, 107:13, 188:9, 188:13
**books** [1] - 213:5
**bother** [1] - 4:15
**bottles** [10] - 19:24, 127:4, 167:11, 167:15, 221:18, 221:25, 222:1, 222:20, 222:25, 223:12
**bottom** [3] - 85:4, 103:20, 158:3
**box** [5] - 5:12, 5:17, 61:19, 122:14, 178:1
**Boy** [1] - 141:4
**Boz** [2] - 205:3, 205:6
**brain** [5] - 115:3, 162:6, 162:7, 162:14, 165:15
**Break** [1] - 23:8
**break** [6] - 61:3, 61:5, 61:9, 121:9, 175:16,

178:7
**breaking** [1] - 230:22
**breaks** [1] - 138:12
**breath** [13] - 75:5, 88:12, 92:10, 93:8, 94:22, 99:13, 108:15, 108:22, 109:4, 109:7, 109:18, 167:20, 193:3
**bridge** [1] - 187:14
**brief** [1] - 44:23
**briefly** [2] - 55:2, 172:3
**bring** [10] - 4:8, 5:4, 82:12, 89:8, 101:18, 136:14, 137:1, 157:3, 157:5, 213:14
**bringing** [2] - 101:25, 130:7
**broadcasts** [1] - 118:14
**BROADWAY** [3] - 2:4, 2:7, 2:10
**brother** [52] - 6:14, 8:17, 10:5, 12:5, 12:12, 13:3, 13:10, 13:16, 15:5, 17:6, 17:7, 17:12, 17:13, 17:18, 18:4, 18:21, 18:25, 19:13, 19:18, 20:6, 20:19, 20:25, 21:21, 21:24, 22:10, 23:10, 23:11, 24:7, 24:17, 24:23, 25:2, 25:6, 25:13, 25:16, 25:20, 25:24, 26:3, 26:4, 26:6, 28:1, 28:13, 28:16, 28:24, 30:12, 39:4, 113:6, 119:22, 128:15, 129:2, 129:4, 132:8, 138:7
**brother's** [4] - 12:8, 22:13, 22:18, 40:3
**brought** [10] - 50:8, 80:12, 81:8, 81:22, 101:17, 101:19, 102:5, 137:11, 143:24
**bruises** [2] - 161:3, 161:9
**bruising** [2] - 165:2, 165:3
**bunch** [1] - 127:7
**burning** [1] - 115:3
**business** [8] - 4:10, 4:13, 15:19, 15:20, 16:6, 16:17, 16:21, 139:23

**button** [1] - 120:23, 123:2
**buttons** [3] - 122:23, 122:24, 123:5
**buy** [1] - 213:2
**BY** [122] - 2:4, 2:9, 2:15, 3:4, 3:4, 3:6, 3:6, 3:8, 3:8, 3:10, 3:10, 3:12, 3:12, 3:14, 3:14, 3:16, 3:18, 3:18, 6:9, 7:2, 7:10, 8:10, 9:11, 9:25, 11:5, 12:2, 12:24, 18:2, 20:5, 26:2, 26:17, 29:9, 31:9, 46:7, 55:5, 57:3, 58:4, 59:10, 61:22, 66:2, 68:19, 69:18, 70:10, 71:2, 71:17, 71:22, 72:7, 73:14, 74:8, 75:15, 78:19, 86:13, 87:5, 87:18, 87:23, 90:3, 92:2, 93:10, 93:20, 93:25, 94:23, 97:22, 108:10, 109:12, 110:5, 111:12, 118:8, 122:18, 125:22, 126:24, 127:22, 128:12, 128:23, 129:14, 130:5, 131:16, 132:15, 133:11, 135:24, 136:13, 137:18, 138:6, 138:17, 139:21, 141:8, 157:19, 159:25, 160:13, 161:22, 162:16, 172:6, 174:23, 180:13, 180:22, 185:20, 187:5, 188:24, 189:21, 199:8, 200:25, 202:14, 203:14, 209:15, 210:5, 210:10, 210:20, 210:25, 212:7, 213:9, 213:23, 214:10, 215:11, 215:23, 217:10, 219:9, 220:5, 221:17, 223:8, 226:3, 226:13, 228:8, 232:13

**C**

**C-l-a-r-k** [1] - 31:4
**C-o-n-l-e-y** [1] - 59:5
**CA** [4] - 2:5, 2:8, 2:11,

2:18

**calculator** [1] - 168:16
**Calendar** [1] - 4:3
**CALIFORNIA** [6] - 1:2, 1:16, 1:24, 4:1, 232:6, 232:9
**California** [13] - 22:23, 33:5, 33:7, 33:8, 33:11, 33:20, 34:13, 35:25, 39:8, 51:4, 142:25, 212:14, 212:15
**calm** [3] - 133:19, 133:24, 137:25
**calms** [1] - 102:5
**cam** [1] - 64:15
**camaraderie** [1] - 132:21
**camera** [1] - 64:17
**cams** [1] - 120:21
**cancer** [1] - 165:19
**cancers** [1] - 165:20
**candidate** [1] - 33:13
**cannot** [3] - 50:16, 130:19, 131:4
**cans** [1] - 223:2
**capacity** [2] - 130:20, 152:6
**capture** [2] - 49:8, 49:11
**captured** [4] - 10:1, 40:18, 154:21, 154:22
**capturing** [1] - 49:14
**car** [15] - 76:3, 78:3, 78:10, 78:23, 78:25, 79:11, 79:13, 79:15, 102:4, 134:13, 212:21, 213:6, 213:13, 216:14, 216:16
**CARA** [1] - 3:9
**Cara** [3] - 110:24, 111:8
**card** [7] - 15:20, 15:21, 16:7, 16:17, 16:21, 139:23, 206:16
**cards** [4] - 200:1, 205:13, 216:3, 216:4
**care** [18] - 23:18, 24:2, 24:5, 125:7, 130:19, 133:19, 153:10, 153:13, 156:23, 161:14, 171:6, 187:21, 214:23, 217:20, 217:23, 217:25, 218:2, 218:17
**careful** [2] - 144:5,

176:16

**carefully** [2] - 6:25, 226:11
**caretaker** [1] - 23:12
**cargo** [1] - 67:12
**caring** [1] - 131:4
**carry** [1] - 119:12
**case** [51] - 4:4, 5:12, 26:22, 38:3, 38:5, 38:8, 41:3, 47:9, 47:11, 56:9, 61:7, 72:25, 76:8, 77:6, 77:14, 86:6, 87:1, 89:20, 103:3, 106:18, 111:20, 113:19, 116:22, 121:10, 143:16, 144:3, 144:6, 145:22, 146:1, 146:16, 149:3, 149:11, 154:6, 154:8, 154:13, 154:17, 156:1, 160:15, 166:18, 167:8, 173:11, 175:9, 175:18, 176:2, 176:14, 178:11, 178:15, 178:20, 225:7, 230:23, 231:12
**CASE** [1] - 1:8
**cases** [9] - 38:14, 46:24, 47:2, 47:4, 47:6, 124:7, 124:8, 124:10, 171:8
**catch** [3] - 171:9, 171:11, 171:15
**categories** [2] - 33:21
**caused** [4] - 98:5, 161:9, 162:18, 203:20
**causes** [4] - 142:2, 162:12, 162:19, 165:11
**caution** [1] - 67:21
**cell** [14] - 7:15, 42:16, 42:17, 107:11, 116:16, 145:1, 154:22, 156:5, 156:10, 193:6, 194:9, 197:6, 200:20
**cellmate** [1] - 151:9
**cells** [2] - 43:20, 104:16
**center** [5] - 101:16, 108:13, 143:23, 186:15, 193:4
**Center** [76] - 53:10, 54:1, 54:6, 55:14, 56:3, 62:11, 62:16,

62:19, 62:20, 62:24, 75:23, 80:9, 80:13, 81:17, 83:18, 97:8, 101:8, 101:9, 106:7, 108:14, 152:25, 175:2, 181:22, 185:3, 185:9, 185:23, 186:12, 187:9, 189:1, 195:14, 195:17, 195:20, 196:2, 196:5, 196:7, 196:12, 196:15, 196:23, 197:1, 197:3, 197:6, 197:17, 197:18, 197:21, 198:1, 198:4, 198:7, 199:11, 201:2, 201:5, 201:11, 201:14, 202:23, 203:2, 204:2, 205:18, 205:21, 206:1, 206:4, 206:24, 207:1, 207:15, 207:18, 207:21, 207:25, 208:1, 208:20, 209:6, 209:9, 209:18, 209:19, 210:6, 210:12, 210:13
**Central** [6] - 32:8, 32:16, 32:17, 32:24, 45:9
**CENTRAL** [2] - 1:2, 232:9
**certain** [10] - 35:15, 42:16, 43:18, 57:20, 123:7, 125:10, 130:13, 130:14, 177:16, 177:17
**certainly** [2] - 96:24, 151:11
**certainty** [1] - 50:17
**CERTIFICATE** [1] - 232:2
**certification** [6] - 33:13, 34:18, 38:21, 60:3, 112:14, 141:16
**certifications** [1] - 33:12
**certified** [8] - 33:15, 33:20, 34:14, 51:3, 51:23, 60:1, 112:11, 141:14
**CERTIFY** [2] - 232:10, 232:14
**cetera** [1] - 38:2
**chance** [4] - 19:9,

21:5, 99:7, 229:12
**change** [2] - 206:16, 216:13
**changed** [2] - 93:21, 100:3
**changes** [2] - 142:2, 147:17
**chapter** [1] - 34:7
**characteristics** [1] - 159:17
**charge** [3] - 73:18, 202:2
**charged** [2] - 102:24, 103:4
**charges** [6] - 43:10, 72:5, 81:21, 81:23, 83:6, 103:4
**charging** [2] - 85:14, 157:4
**chart** [1] - 152:9
**check** [7] - 78:6, 79:7, 79:15, 82:15, 99:4, 123:7, 206:17
**checked** [2] - 95:12, 100:13
**chemical** [1] - 142:1
**child** [4] - 190:6, 190:8, 210:22, 211:1
**child's** [2] - 190:10, 211:3
**children** [4] - 189:22, 189:24, 190:2, 199:1
**choice** [1] - 101:12
**chose** [1] - 217:25
**Christmas** [3] - 200:8, 211:19, 211:20
**chronic** [11] - 18:25, 23:18, 23:20, 23:23, 43:13, 77:21, 144:14, 145:23, 145:25, 146:2, 148:10
**chronological** [1] - 73:4
**cinnamon** [1] - 127:7
**circumstance** [1] - 82:13
**circumstances** [1] - 82:1
**cirrhosis** [1] - 164:14
**City** [1] - 61:1
**city** [1] - 62:2
**clarification** [2] - 4:20, 54:20
**clarify** [1] - 40:14
**Clark** [16] - 30:20, 31:4, 31:10, 34:21, 36:9, 38:23, 41:22, 42:25, 43:23, 45:8, 46:4, 46:8, 55:6,

57:4, 58:20, 112:9
**CLARK** [1] - 3:5
**class** [1] - 141:25
**clear** [9] - 28:23, 100:6, 122:6, 133:16, 152:24, 154:12, 208:23, 219:19
**clearance** [2] - 82:14
**cleared** [2] - 82:11, 102:14
**clearing** [1] - 164:17
**clearly** [1] - 155:2
**CLERK** [25] - 4:3, 5:6, 5:8, 30:22, 30:24, 58:23, 58:25, 61:12, 61:14, 61:16, 103:13, 111:1, 111:3, 121:16, 122:7, 122:10, 140:22, 140:24, 174:13, 174:15, 183:11, 183:13, 189:12, 189:14, 231:16
**clinical** [5] - 157:22, 167:25, 170:18, 170:20, 170:25
**clinician** [2] - 159:18, 159:20
**clip** [3] - 65:11, 67:9, 67:11
**clipped** [1] - 66:25
**clips** [1] - 114:18
**clock** [3] - 148:6, 173:7, 229:23
**close** [5] - 27:20, 27:21, 99:15, 99:16, 215:5
**closed** [5] - 67:4, 67:5, 68:4, 78:20, 78:21
**code** [1] - 150:13
**Code** [2] - 33:8, 85:19
**cognitive** [1] - 37:15
**collecting** [1] - 129:21
**coloring** [1] - 213:5
**combative** [5] - 101:21, 136:19, 137:10, 138:11
**comfortable** [1] - 212:24
**coming** [12] - 4:15, 5:3, 58:14, 84:18, 88:12, 131:17, 149:10, 153:21, 154:17, 155:4, 174:10, 216:16
**Commander** [2] - 32:9, 45:22
**commander** [2] -

32:20, 32:23

**commands** [1] - 133:16

**commit** [1] - 130:16

**committed** [1] - 98:6

**common** [5] - 34:6, 34:23, 35:3, 36:12, 166:12

**communicate** [7] - 53:19, 95:23, 96:24, 116:13, 116:15, 116:19, 136:1

**communicated** [3] - 95:17, 95:20, 124:14

**communicating** [1] - 133:12

**communication** [1] - 23:10

**commute** [1] - 62:6

**commutes** [1] - 62:9

**comparison** [1] - 148:7

**complained** [1] - 105:19

**complaining** [3] - 78:4, 99:6, 200:4

**complaint** [1] - 79:24

**complete** [10] - 18:18, 36:6, 37:4, 51:4, 51:10, 51:15, 51:17, 81:19, 102:20, 104:24

**completed** [5] - 102:16, 107:6, 107:9, 157:22, 231:18

**completely** [1] - 156:1

**completing** [2] - 83:1, 98:24

**compliance** [3] - 70:1, 70:4, 70:7

**complicate** [1] - 143:14

**complicated** [1] - 173:13

**complications** [3] - 147:11, 148:12, 186:7

**component** [1] - 158:25

**compulsive** [1] - 142:3

**computer** [3] - 85:9, 88:23, 92:25

**COMPUTER** [1] - 232:13

**COMPUTER-AIDED** [1] - 232:13

**concentrated** [2] - 167:15, 167:24

**concern** [7] - 12:8, 42:12, 148:11, 154:7, 154:8, 179:14, 192:19

**concerned** [7] - 20:1, 41:9, 41:10, 135:21, 204:14, 207:8, 212:21

**concerning** [1] - 152:5

**concerns** [6] - 53:17, 126:8, 136:24, 184:12, 192:24, 229:9

**concise** [1] - 133:16

**concluded** [1] - 138:18

**conclusion** [2] - 168:24, 222:1

**conclusions** [1] - 149:11

**concrete** [1] - 145:1

**condition** [14] - 24:1, 39:19, 43:13, 45:2, 45:13, 53:17, 57:17, 57:19, 58:6, 58:10, 198:12, 205:10, 206:11, 207:7

**conditioner** [1] - 80:3

**conditioning** [1] - 78:18

**conditions** [2] - 12:9, 143:14

**conduct** [2] - 6:19, 7:4

**conducted** [3] - 94:25, 129:9, 129:17

**conducting** [3] - 113:6, 129:10, 135:1

**conferences** [1] - 216:6

**confidential** [1] - 159:3

**confidentiality** [1] - 160:6

**confront** [5] - 222:6, 225:3, 226:7, 226:18, 226:22

**confronted** [3] - 226:5, 226:15, 227:1

**confronting** [2] - 227:10, 230:11

**confused** [1] - 6:21

**confusing** [1] - 16:9

**Conley** [55] - 12:4, 21:6, 21:19, 21:23, 22:9, 47:18, 47:19, 48:4, 48:6, 48:7, 51:14, 55:7, 55:12, 55:20, 58:17, 58:21, 59:5, 59:11, 59:13, 60:24, 61:23, 84:16,

87:6, 87:19, 94:13, 97:17, 97:23, 108:11, 112:16, 113:13, 113:15, 113:17, 113:23, 114:5, 116:9, 116:11, 129:4, 133:16, 133:18, 191:19, 191:22, 192:2, 192:11, 192:21, 193:1, 194:21, 194:23, 195:6, 198:9, 228:9, 228:12, 228:15, 228:20

**CONLEY** [1] - 3:7

**Conley's** [1] - 112:22

**connected** [1] - 36:4

**connection** [1] - 200:5

**Connley** [1] - 90:17

**consequence** [2] - 142:11, 173:10

**consequences** [4] - 39:6, 142:4, 171:2, 171:4

**consider** [1] - 173:5

**considerations** [1] - 210:15

**considered** [2] - 36:16, 149:1

**considering** [2] - 135:4, 173:21

**consistent** [7] - 45:18, 147:16, 158:13, 161:19, 163:6, 166:11, 166:17

**constant** [1] - 168:19

**constantly** [1] - 138:12

**constructed** [1] - 43:21

**Consultant** [1] - 31:12

**consultant** [1] - 31:13

**consume** [3] - 126:7, 221:5, 221:8

**consumed** [6] - 127:11, 221:11, 223:3, 223:5, 223:10, 223:16

**consuming** [3] - 127:17, 127:19, 219:3

**consumption** [1] - 143:9

**contact** [10] - 52:14, 54:11, 55:22, 64:1, 105:22, 123:15, 188:18, 205:20, 207:14, 208:19

**containers** [3] - 222:8,

222:11, 227:9

**contents** [1] - 56:14

**continually** [1] - 99:25

**continuation** [2] - 153:8, 153:11

**continue** [14] - 69:10, 123:24, 124:3, 126:15, 128:21, 129:12, 130:3, 132:13, 133:9, 135:22, 137:16, 158:2, 172:14, 218:7

**CONTINUED** [1] - 122:17

**continued** [4] - 28:6, 28:9, 126:7, 130:1

**continues** [2] - 71:23, 85:3

**contracts** [1] - 60:21

**control** [5] - 69:24, 70:13, 72:24, 74:22, 74:23

**contusions** [1] - 161:3

**convenience** [1] - 4:13

**conversation** [40] - 14:15, 15:10, 15:18, 15:22, 16:14, 16:24, 17:3, 18:8, 20:24, 21:6, 21:19, 22:3, 39:23, 40:2, 55:20, 55:23, 64:6, 67:8, 67:23, 92:6, 96:22, 97:1, 107:24, 120:7, 120:10, 182:1, 191:12, 191:18, 191:22, 192:20, 192:23, 196:9, 198:8, 201:13, 201:18, 202:7, 205:16, 206:25, 207:4, 229:4

**conversations** [8] - 14:10, 42:2, 53:22, 119:25, 196:10, 201:1, 210:14, 213:13

**conversing** [1] - 151:17

**convey** [2] - 37:24, 55:8

**conveyed** [2] - 55:13, 55:19

**conveying** [1] - 105:24

**cooler** [1] - 213:3

**core** [9] - 179:18, 179:20, 183:1, 187:12, 187:13, 188:4, 188:6,

188:12, 188:16

**corner** [2] - 103:20, 104:5

**coroner** [3] - 143:21, 146:20, 160:17

**coroner's** [2] - 160:15, 160:20

**CORRECT** [1] - 232:14

**correct** [167] - 6:14, 6:15, 6:17, 7:15, 7:23, 8:6, 8:11, 9:3, 9:5, 9:13, 10:6, 10:9, 10:14, 11:11, 11:12, 11:13, 11:21, 12:5, 12:9, 12:15, 13:4, 13:7, 14:13, 14:16, 14:20, 15:4, 15:9, 15:14, 15:19, 16:4, 16:7, 16:14, 16:17, 16:22, 16:25, 18:10, 18:22, 19:10, 19:15, 20:11, 20:14, 21:6, 21:9, 21:25, 22:6, 22:18, 22:21, 23:2, 23:5, 23:12, 24:8, 24:24, 26:7, 26:22, 28:10, 29:11, 30:5, 30:7, 47:13, 47:20, 48:11, 48:14, 50:15, 50:19, 50:24, 51:5, 51:10, 51:12, 51:13, 51:15, 51:23, 51:24, 52:1, 52:7, 52:8, 52:10, 52:13, 52:16, 52:17, 52:20, 52:22, 53:6, 53:10, 53:11, 53:23, 54:1, 54:6, 54:7, 54:23, 56:12, 58:10, 58:11, 70:24, 72:13, 81:5, 81:13, 82:3, 82:7, 85:20, 94:9, 94:11, 95:10, 98:1, 100:10, 103:19, 110:14, 112:20, 112:24, 113:24, 114:20, 119:3, 120:2, 120:3, 124:3, 130:9, 154:15, 160:15, 163:24, 163:25, 164:2, 169:21, 169:23, 169:24, 170:7, 171:21, 171:25, 182:2, 184:21, 185:6, 185:9, 187:1, 187:9, 188:7, 190:8, 190:23, 201:9, 206:18, 217:15,

217:19, 218:4, 218:8, 218:9, 218:22, 220:15, 220:21, 222:5, 222:18, 222:22, 222:23, 223:1, 223:10, 223:21, 224:7, 224:16, 224:17, 224:22, 224:24, 225:10, 227:6, 227:13, 227:19, 227:22, 228:2, 228:6, 228:10, 229:14

**correctional** [2] - 45:18, 186:1

**Corrections** [1] - 38:19

**correctly** [3] - 32:21, 62:14, 146:23

**correlate** [1] - 170:19

**correlation** [2] - 168:22, 168:23

**COUNSEL** [3] - 2:1, 2:14, 2:16

**Counsel** [26] - 6:6, 29:4, 31:6, 41:19, 50:24, 58:22, 59:6, 72:6, 92:1, 93:24, 103:13, 109:11, 110:25, 111:9, 141:5, 146:3, 154:10, 161:21, 163:9, 170:5, 176:19, 213:8, 213:22, 215:21, 220:4, 225:19

**counsel** [25] - 8:2, 55:1, 55:7, 56:5, 56:16, 61:3, 61:21, 96:9, 99:19, 108:12, 122:16, 144:5, 155:24, 156:19, 156:24, 172:8, 172:23, 178:3, 180:20, 187:3, 188:14, 189:18, 215:14, 216:18, 230:21

**counseling** [1] - 14:2

**counselor** [2] - 14:1, 14:7

**counselors** [2] - 13:20, 121:22

**count** [1] - 215:19

**counter** [2] - 132:9, 132:12

**countertop** [1] - 84:25

**counting** [1] - 196:17

**County** [11] - 4:5,

31:24, 31:25, 32:17, 32:24, 45:9, 45:10, 60:6, 98:18, 186:24, 210:16

**COUNTY** [4] - 1:9, 2:14, 2:16, 232:4

**county** [2] - 32:13, 83:17

**county's** [1] - 83:25

**couple** [6] - 20:8, 20:10, 153:9, 169:7, 176:9, 196:9

**course** [9] - 42:1, 45:4, 49:13, 51:8, 66:9, 73:24, 117:17, 213:6, 218:20

**Court** [3] - 4:12, 176:23, 220:3

**COURT** [243] - 1:1, 1:23, 4:7, 4:22, 5:1, 5:10, 6:1, 6:5, 6:23, 6:25, 7:6, 7:9, 7:19, 7:22, 7:24, 8:2, 8:8, 8:23, 9:1, 9:4, 9:6, 9:9, 9:20, 10:19, 10:22, 10:25, 11:3, 12:18, 12:21, 18:1, 20:3, 21:15, 25:23, 26:14, 26:20, 27:17, 27:21, 29:4, 29:7, 30:2, 30:4, 30:6, 30:8, 30:15, 30:18, 30:21, 31:5, 41:16, 41:19, 45:24, 46:5, 54:15, 54:19, 55:1, 55:3, 56:25, 58:2, 58:13, 58:18, 58:22, 59:6, 61:3, 61:17, 65:3, 65:7, 65:9, 65:13, 65:19, 66:1, 68:13, 68:15, 70:9, 71:16, 71:21, 72:4, 73:13, 74:2, 74:7, 75:14, 78:15, 84:2, 84:4, 84:6, 84:10, 86:10, 86:24, 87:17, 87:22, 89:24, 90:2, 91:14, 91:18, 91:23, 92:1, 92:22, 93:3, 93:6, 93:15, 93:19, 93:23, 94:20, 96:9, 97:19, 103:8, 103:11, 108:7, 109:2, 109:6, 109:11, 110:1, 110:4, 110:17, 110:19, 110:21, 110:25, 111:9, 118:5, 121:8, 121:18, 121:20,

122:9, 122:12, 125:2, 125:14, 125:16, 139:18, 140:16, 140:18, 140:20, 141:5, 144:5, 144:10, 146:3, 146:11, 149:15, 149:22, 149:25, 150:2, 150:5, 154:5, 155:10, 155:14, 155:17, 155:20, 155:23, 156:6, 156:9, 156:12, 156:16, 156:19, 156:23, 157:9, 157:16, 157:18, 157:24, 158:1, 159:23, 160:12, 160:25, 161:11, 161:19, 161:21, 162:3, 163:1, 163:5, 163:9, 163:12, 167:6, 170:4, 172:2, 172:4, 174:7, 174:9, 174:20, 175:15, 175:24, 176:19, 177:3, 177:6, 177:15, 177:19, 177:22, 177:24, 180:10, 180:12, 180:20, 183:4, 183:6, 183:10, 183:16, 185:15, 185:17, 187:3, 188:22, 189:5, 189:7, 189:11, 189:18, 193:12, 193:15, 199:7, 200:24, 202:4, 202:6, 202:13, 203:11, 203:13, 209:14, 209:24, 210:2, 210:4, 210:9, 210:19, 210:24, 212:2, 212:4, 213:8, 213:21, 214:5, 214:8, 215:10, 215:21, 216:18, 217:2, 217:7, 219:5, 219:8, 220:2, 220:4, 221:14, 221:16, 223:4, 225:19, 226:2, 226:11, 228:5, 228:16, 230:6, 230:8, 230:21, 231:8, 232:9, 232:22

**court** [11] - 5:6, 31:14, 31:17, 31:19, 31:21, 57:22, 61:12, 124:8,

175:25, 176:21, 231:17

**courtroom** [7] - 59:13, 121:21, 122:6, 183:24, 189:25, 190:3, 231:8

**courts** [1] - 124:9

**cover** [1] - 137:2

**covers** [4] - 34:2, 34:6, 162:7

**COVID** [1] - 54:3

**crews** [1] - 100:21

**crime** [5] - 36:4, 36:20, 83:10, 95:13, 98:6

**crimes** [1] - 38:2

**criminal** [4] - 43:7, 43:8, 124:8, 124:9

**crippled** [1] - 173:21

**criteria** [1] - 130:10

**critical** [3] - 40:19, 173:19, 173:20

**CROSS** [10] - 3:3, 6:8, 46:6, 97:21, 118:7, 122:17, 163:13, 180:21, 187:4, 217:9

**cross** [14] - 6:6, 46:5, 55:6, 56:1, 97:19, 105:9, 118:5, 163:12, 172:7, 172:23, 176:15, 187:3, 217:7, 231:11

**cross-examination** [12] - 6:6, 46:5, 55:6, 56:1, 97:19, 105:9, 118:5, 163:12, 172:7, 172:23, 217:7, 231:11

**CROSS-EXAMINATION** [9] - 6:8, 46:6, 97:21, 118:7, 122:17, 163:13, 180:21, 187:4, 217:9

**cross-examine** [1] - 176:15

**crying** [2] - 17:10, 115:8

**CSR** [2] - 1:23, 232:21

**Cucamonga** [1] - 62:16

**Cuevas** [2] - 100:25, 101:4

**cuffs** [1] - 81:9

**cumulative** [4] - 41:15, 160:11, 160:24, 215:9

**curiosity** [2] - 57:15

**curious** [1] - 57:12

**current** [1] - 117:18

**custodial** [1] - 85:16

**custodies** [1] - 38:17

**custody** [13] - 32:6, 32:7, 35:13, 35:14, 35:17, 35:19, 38:11, 41:1, 85:17, 107:2, 145:11, 211:13, 213:24

**Custody** [4] - 175:4, 181:2, 181:3, 181:14

**custom** [4] - 115:18, 116:2, 116:4, 139:2

**cut** [1] - 216:18

**cutest** [1] - 215:19

**cutting** [1] - 176:13

**CV** [2] - 1:8, 4:4

---

## D

**dad** [7] - 22:7, 23:15, 132:10, 217:20, 217:23, 217:25, 218:17

**daddy** [1] - 215:17

**daily** [8] - 163:24, 166:4, 169:4, 203:8, 204:16, 205:9, 206:11, 207:5

**damage** [6] - 147:2, 147:8, 164:9, 164:12, 165:11, 165:25

**damages** [1] - 87:4

**danger** [13] - 24:7, 24:14, 25:6, 25:11, 25:13, 25:16, 25:17, 26:7, 26:9, 130:14, 131:5, 226:7, 229:5

**dangers** [3] - 198:24, 199:2, 199:4

**DANIELLE** [1] - 2:4

**dash** [1] - 64:14

**data** [2] - 169:25, 170:7

**date** [15] - 26:24, 57:22, 159:23, 191:2, 191:3, 196:18, 196:20, 198:3, 203:16, 207:13, 208:24, 209:9, 209:11, 223:19, 229:18

**DATE** [1] - 232:18

**dates** [1] - 195:20

**daughter** [16] - 22:18, 155:1, 190:5, 192:8, 195:5, 212:9, 213:25, 216:10, 220:14, 222:7, 222:14, 224:7,

226:8, 229:4, 229:8, 229:10

**day-to-day** [2] - 23:14, 23:19

**days** [9] - 20:13, 145:13, 153:9, 169:18, 171:18, 205:13, 206:14, 207:8, 218:22

**daytime** [3] - 218:23, 218:24, 219:24

**deal** [5] - 35:20, 36:19, 82:17, 102:3, 138:11

**dealing** [2] - 35:19, 181:11

**death** [4] - 115:21, 143:19, 186:7, 214:12

**decedent** [1] - 54:16

**decedent's** [1] - 146:21

**decide** [2] - 75:20, 200:17

**decided** [1] - 222:24

**declaration** [8] - 83:3, 83:7, 85:12, 85:13, 86:17, 88:3, 102:21

**declined** [2] - 126:20, 167:20

**decoupling** [2] - 142:13, 151:13

**deemed** [2] - 131:4, 131:5

**DEFENDANT** [1] - 91:25

**defendant** [3] - 122:1, 231:10, 231:13

**defendants** [1] - 133:22

**DEFENDANTS** [2] - 1:10, 2:13

**defense** [3] - 121:24, 122:2, 231:12

**definition** [1] - 218:12

**degree** [3] - 8:19, 167:13, 170:12

**degrees** [1] - 78:13

**delayed** [1] - 148:7

**delirium** [40] - 17:18, 18:4, 27:9, 40:3, 139:14, 142:6, 142:8, 142:9, 143:5, 143:7, 143:8, 143:11, 143:13, 145:5, 145:19, 145:23, 147:14, 147:19, 147:20, 147:23, 148:7, 151:10, 153:3, 155:5, 159:11,

159:16, 163:20, 163:21, 168:8, 168:15, 168:24, 168:25, 169:3, 169:14, 170:10, 170:14, 171:17, 171:20, 171:23, 173:19

**deliver** [1] - 34:8

**delusion** [2] - 151:12, 151:16

**delusional** [1] - 154:24

**delusions** [2] - 153:18, 159:4

**demeanor** [1] - 133:22

**denial** [1] - 227:5

**denied** [4] - 227:2, 227:4, 227:6, 227:9

**department** [8] - 14:22, 32:5, 51:21, 148:22, 153:13, 154:2, 157:5, 194:7

**Department** [11] - 32:1, 32:12, 33:11, 60:20, 60:22, 61:2, 64:9, 90:10, 112:2, 194:19, 210:17

**departments** [1] - 32:6

**depended** [1] - 23:9

**dependency** [1] - 35:1

**dependent** [3] - 169:20, 170:9, 170:11

**deposed** [1] - 26:22

**deposition** [32] - 19:12, 26:24, 27:4, 27:10, 27:16, 28:1, 29:11, 29:13, 29:16, 29:18, 29:25, 41:11, 41:17, 48:1, 48:8, 48:10, 48:11, 50:9, 74:16, 76:8, 76:15, 76:19, 91:17, 105:9, 111:15, 113:19, 164:11, 166:18, 225:6, 225:9, 225:15, 230:3

**depositions** [1] - 38:13

**depth** [1] - 44:24

**deputies** [37] - 6:13, 10:8, 12:3, 13:3, 13:6, 13:9, 35:24, 45:4, 50:25, 51:22, 72:8, 72:14, 76:5, 76:16, 79:1, 84:23, 94:25, 95:4, 98:13, 98:16, 98:18, 101:19, 101:20,

102:3, 102:9, 113:2, 113:11, 113:18, 116:13, 116:15, 119:10, 119:13, 133:1, 186:15, 187:17, 188:12

**DEPUTY** [1] - 2:16

**Deputy** [110] - 10:12, 11:11, 11:16, 11:19, 12:4, 12:7, 14:11, 14:12, 14:19, 15:8, 15:14, 15:18, 15:25, 16:6, 16:13, 16:16, 17:5, 17:17, 18:3, 18:8, 18:20, 19:17, 20:23, 20:25, 21:6, 21:19, 21:23, 22:9, 24:6, 27:8, 27:16, 28:1, 28:5, 28:22, 29:22, 30:10, 32:7, 47:18, 47:19, 48:4, 48:6, 48:7, 49:18, 51:9, 51:14, 51:19, 55:12, 55:20, 58:17, 59:11, 60:7, 61:1, 61:23, 84:16, 87:6, 87:19, 94:13, 97:17, 97:23, 108:11, 110:24, 111:13, 111:16, 111:17, 112:16, 112:22, 113:6, 113:13, 113:15, 113:17, 114:5, 116:9, 116:11, 118:3, 118:9, 120:25, 122:19, 129:4, 129:6, 133:4, 133:16, 133:18, 136:14, 139:22, 183:19, 187:6, 191:13, 191:15, 191:19, 191:22, 192:2, 192:11, 192:21, 193:1, 194:21, 194:23, 195:6, 205:1, 205:2, 205:8, 205:9, 228:9, 228:12, 228:15, 228:20, 228:23, 229:1, 229:6, 229:12

**deputy** [43] - 34:17, 34:18, 41:9, 44:11, 44:13, 44:16, 44:20, 44:23, 45:5, 50:3, 51:3, 51:20, 59:13, 97:25, 98:21, 98:22, 104:4, 104:8, 112:1, 112:7, 118:15, 118:17, 119:11, 119:23, 132:16,

132:17, 133:13, 137:24, 148:15, 148:16, 148:18, 148:19, 179:20, 179:22, 183:9, 186:1, 187:12, 187:13, 188:4, 188:6, 188:16

**deputy's** [1] - 49:5

**describe** [4] - 38:7, 154:20, 190:2, 211:25

**described** [4] - 42:12, 135:15, 162:13, 167:14

**describing** [1] - 150:13

**description** [3] - 153:4, 160:23, 161:2

**descriptions** [1] - 161:6

**Desert** [57] - 20:17, 53:9, 53:16, 53:25, 54:4, 54:5, 55:9, 55:14, 56:2, 62:11, 62:18, 75:23, 80:9, 80:13, 81:16, 83:18, 97:7, 101:8, 101:9, 101:10, 102:10, 106:7, 108:13, 175:2, 181:21, 185:2, 185:8, 185:23, 186:12, 187:9, 188:19, 188:25, 195:14, 195:19, 196:2, 196:4, 196:7, 197:6, 197:17, 197:18, 197:21, 197:25, 198:4, 199:10, 201:2, 201:5, 201:8, 201:10, 201:14, 202:23, 203:2, 204:2, 205:17, 207:20, 207:25, 210:13

**designate** [1] - 10:17

**desire** [1] - 215:13

**despite** [1] - 142:3

**detail** [1] - 121:6

**detailed** [1] - 161:2

**details** [2] - 36:3, 36:5

**detain** [2] - 70:20, 99:23

**detainee** [1] - 45:14

**Detention** [77] - 53:9, 54:1, 54:5, 55:9, 55:14, 56:3, 62:11, 62:16, 62:19, 62:20,

62:24, 75:23, 80:9, 80:13, 81:17, 83:18, 97:7, 101:8, 101:9, 106:7, 108:14, 152:25, 175:2, 181:22, 185:3, 185:8, 185:23, 186:12, 187:9, 189:1, 195:14, 195:17, 195:20, 196:2, 196:4, 196:7, 196:12, 196:15, 196:23, 196:25, 197:3, 197:6, 197:17, 197:18, 197:21, 198:1, 198:4, 198:7, 199:10, 201:2, 201:5, 201:11, 201:14, 202:23, 203:2, 204:2, 205:17, 205:21, 206:1, 206:4, 206:24, 207:1, 207:15, 207:18, 207:21, 207:25, 208:1, 208:20, 209:6, 209:9, 209:18, 209:19, 210:6, 210:12, 210:13

**detention** [6] - 45:19, 101:16, 108:13, 143:23, 186:15, 193:4

**determine** [5] - 85:17, 98:5, 119:19, 127:10, 135:5

**detox** [4] - 13:13, 17:22, 28:25, 35:22

**detoxing** [1] - 164:18

**develop** [2] - 147:19, 168:14

**developing** [1] - 143:6

**development** [1] - 147:20

**device** [1] - 122:22

**diabetes** [1] - 43:14

**diagnose** [2] - 142:18, 142:25

**diagnosis** [5] - 142:22, 143:4, 153:15, 153:16, 173:22

**dictate** [1] - 83:12

**dictated** [1] - 87:25

**die** [4] - 12:14, 28:6, 148:2, 159:9

**died** [2] - 108:4, 145:18

**DIEGO** [3] - 2:5, 2:8, 2:11

**dies** [1] - 145:14

**difference** [3] - 42:19, 109:3, 169:11

**different** [16] - 11:10, 36:12, 49:15, 50:25, 92:11, 117:13, 122:22, 127:7, 153:21, 163:17, 163:19, 165:10, 167:4, 194:3, 194:4, 219:1

**differential** [2] - 153:15, 173:21

**differently** [1] - 97:15

**diffuse** [2] - 146:24, 147:1

**dinner** [1] - 191:24

**DIRECT** [8] - 3:3, 31:8, 59:9, 111:11, 141:7, 174:22, 183:17, 189:20

**direct** [14] - 150:17, 151:5, 151:21, 152:7, 168:23, 191:2, 194:14, 197:24, 199:11, 200:10, 202:18, 207:12, 208:22, 214:17

**directed** [2] - 114:6, 117:5

**direction** [2] - 42:16, 55:25

**directly** [4] - 47:19, 53:19, 137:21, 188:4

**disassociation** [1] - 159:15

**discolored** [1] - 161:7

**discovered** [1] - 222:20

**discovery** [1] - 96:8

**discuss** [6] - 61:7, 112:4, 121:10, 175:18, 213:10, 230:23

**discussed** [3] - 77:2, 166:24, 199:1

**discussion** [8] - 14:9, 68:23, 92:3, 123:16, 128:16, 128:19, 138:24, 178:14

**disease** [2] - 37:15, 165:13

**diseases** [1] - 43:13

**disorder** [4] - 145:3, 147:17, 173:6

**disorders** [7] - 141:15, 141:22, 141:24,

141:25, 159:17, 165:1

**disorganization** [1] - 153:6

**disorganized** [3] - 159:8, 160:3, 161:14

**disorientation** [3] - 142:13, 148:25, 159:15

**disoriented** [1] - 130:17

**dispatch** [3] - 10:2, 36:20, 63:11

**dispatched** [1] - 63:6

**dispatcher** [2] - 227:19, 227:21

**displaying** [1] - 197:5

**disrespectful** [1] - 183:22

**distance** [1] - 99:14

**distinguish** [1] - 229:10

**distraught** [1] - 124:16

**distress** [1] - 203:9

**DISTRICT** [5] - 1:1, 1:2, 1:4, 232:9

**district** [1] - 86:18

**disturbance** [7] - 63:10, 63:21, 63:23, 64:8, 67:21, 67:22, 98:5

**DIVISION** [1] - 1:2

**DO** [2] - 232:10, 232:13

**doctor** [4] - 42:13, 42:16, 45:4, 82:11

**Doctor** [1] - 163:15

**doctors** [2] - 13:18, 170:21

**document** [24] - 8:13, 27:19, 27:22, 39:17, 40:20, 42:11, 42:17, 44:4, 44:5, 56:14, 73:25, 74:3, 88:9, 94:2, 117:8, 117:21, 117:23, 118:1, 120:14, 129:25, 133:20, 135:6, 184:22, 186:4

**documentation** [1] - 166:24

**documented** [9] - 57:14, 57:16, 57:19, 57:20, 58:7, 133:17, 144:17, 144:20, 154:24

**documenting** [4] - 43:5, 57:5, 133:14, 133:15

**documents** [7] - 38:12, 102:22, 111:20, 114:3, 149:7, 150:10, 150:24

**Dodger** [1] - 5:13

**doin'** [1] - 82:24

**Domain** [2] - 34:2, 34:12

**domains** [1] - 35:12

**done** [13] - 21:21, 43:15, 62:25, 67:7, 67:23, 81:1, 81:4, 82:20, 97:4, 97:14, 100:12, 116:8, 182:25

**door** [11] - 63:17, 78:20, 78:22, 79:13, 79:25, 84:16, 84:17, 84:18, 104:17, 114:11, 181:15

**doors** [2] - 104:17, 181:17

**doorway** [3] - 104:14, 104:15, 105:5

**double** [2] - 104:17, 123:7, 219:19

**double-check** [1] - 123:7

**down** [29] - 8:4, 30:15, 37:7, 37:9, 40:8, 58:13, 62:23, 68:9, 68:10, 68:20, 68:21, 69:6, 69:8, 102:5, 110:19, 121:18, 123:7, 123:25, 125:3, 140:18, 162:24, 163:7, 174:9, 180:14, 181:23, 183:6, 187:23, 189:7, 231:9

**drank** [14] - 136:6, 163:24, 164:2, 166:1, 166:4, 166:7, 167:17, 219:23, 223:12, 223:22, 224:5, 224:6, 224:25

**draws** [1] - 168:23

**drink** [31] - 19:22, 20:6, 20:8, 20:10, 134:22, 135:16, 135:17, 135:18, 148:6, 164:19,

166:16, 167:19, 167:23, 168:6, 168:10, 168:14, 168:18, 169:4, 173:6, 219:12, 219:14, 219:17, 219:20, 220:1, 223:20, 223:23, 224:15, 224:20, 225:21, 225:24

**drinker** [8] - 39:5, 134:9, 167:14, 173:17, 203:8, 204:16, 205:9, 206:11

**drinkers** [1] - 173:10

**drinking** [37] - 20:11, 20:13, 28:13, 28:16, 35:7, 96:17, 108:22, 114:24, 127:1, 127:14, 134:22, 148:4, 164:12, 166:22, 167:1, 167:3, 167:5, 168:18, 168:20, 170:12, 173:6, 207:6, 218:22, 218:25, 219:11, 220:6, 223:24, 223:25, 224:2, 224:3, 224:13, 224:23, 226:5, 226:14, 226:20, 226:23, 227:1

**drinks** [18] - 42:4, 77:21, 124:20, 131:11, 134:6, 134:19, 135:18, 138:12, 148:16, 164:15, 164:16, 164:23, 168:5, 170:13, 170:16, 223:3, 223:13, 223:16

**drive** [7] - 62:12, 62:18, 75:22, 75:25, 212:14, 212:15, 212:20

**driven** [1] - 62:23

**drives** [2] - 138:2, 212:17

**driveway** [3] - 14:24, 133:17, 216:17

**driving** [4] - 77:7, 118:21, 134:14, 172:18

**drug** [1] - 130:19

**drugs** [4] - 91:3, 124:25, 125:6, 134:4

**drunk** [5] - 125:9,

134:16, 136:7, 230:11, 230:14

**DTs** [6] - 17:18, 18:5, 27:8, 28:2, 135:19, 172:23

**due** [4] - 70:20, 147:2, 158:6, 158:18

**DUI** [2] - 134:13, 134:14

**during** [38] - 10:1, 40:1, 42:1, 59:16, 66:9, 71:12, 72:19, 73:10, 76:13, 88:25, 100:12, 114:14, 114:15, 114:16, 117:17, 124:14, 124:17, 124:18, 128:16, 128:18, 136:17, 140:1, 150:20, 178:17, 184:2, 192:6, 195:7, 199:16, 213:24, 218:23, 221:4, 221:12, 224:15, 224:20, 225:9, 226:23, 229:1

**duties** [2] - 34:2, 181:20

**duty** [1] - 35:10

**dying** [1] - 182:16

───────

# E

**E-n-y-a-r-t** [1] - 189:17

**ear** [1] - 75:18

**early** [5] - 46:8, 164:24, 171:11, 172:24, 173:12

**earned** [1] - 217:22

**earning** [1] - 217:22

**earshot** [1] - 100:14

**Easter** [1] - 211:19

**eating** [1] - 130:21

**education** [2] - 12:16, 215:25

**effect** [4] - 148:17, 161:11, 168:19, 170:25

**effectively** [1] - 173:19

**effects** [1] - 199:2

**effort** [1] - 48:24

**efforts** [2] - 13:25, 28:12

**eight** [3] - 4:17, 189:2, 196:3

**either** [12] - 24:17, 35:1, 84:23, 108:21, 123:15, 129:8, 132:2, 162:10, 163:6, 174:3,

177:15, 224:24
**eldest** [1] - 190:6
**ELIAS** [4] - 1:23, 232:8, 232:20, 232:21
**emergency** [5] - 148:22, 153:13, 154:2, 154:14, 216:3
**emotional** [2] - 124:16, 136:16
**emotions** [2] - 137:22, 137:23
**empathy** [1] - 115:17
**employee** [5] - 42:20, 90:8, 90:9, 90:12, 90:13
**employees** [4] - 45:11, 56:10, 56:13, 181:19
**employment** [8] - 217:18, 217:21, 218:5, 218:10, 218:12, 218:13, 218:14, 218:15
**empowers** [1] - 33:13
**empty** [5] - 221:18, 222:8, 222:10, 222:25, 227:9
**encounter** [4] - 44:23, 72:19, 105:16, 123:17
**encountering** [1] - 123:21
**end** [10] - 15:10, 16:14, 71:3, 73:21, 113:5, 132:23, 138:10, 159:9, 176:14, 201:24
**endearment** [2] - 132:20, 133:2
**ended** [4] - 46:21, 127:5, 202:3, 202:9
**ends** [1] - 138:1
**enforcement** [6] - 33:7, 42:6, 51:18, 108:4, 132:21, 142:24
**engage** [1] - 219:11
**engaging** [2] - 160:3, 221:20
**enjoy** [1] - 214:21
**enjoyed** [2] - 214:22, 214:23
**enlarge** [1] - 209:3
**ensure** [2] - 45:11, 45:14
**enter** [2] - 80:21, 177:16
**entered** [2] - 118:20, 119:20
**entertainment** [1] -

132:3
**entire** [7] - 20:9, 99:25, 106:12, 106:16, 108:3, 145:17, 165:9
**entirety** [4] - 10:17, 10:20, 65:11, 121:12
**entities** [1] - 153:5
**entrance** [2] - 105:5, 187:15
**entries** [2] - 197:12, 197:15
**entry** [5] - 150:19, 199:12, 200:22, 201:16, 202:18
**ENYART** [2] - 1:6, 3:17
**Enyart** [137] - 4:5, 10:5, 26:4, 41:12, 53:23, 53:25, 54:8, 54:13, 54:15, 54:17, 54:23, 63:6, 74:10, 75:22, 77:21, 78:3, 84:22, 87:8, 87:19, 88:9, 98:1, 98:8, 98:11, 99:20, 100:9, 101:2, 101:5, 101:8, 101:17, 102:5, 103:24, 104:1, 105:19, 106:7, 106:21, 107:6, 107:18, 108:17, 108:25, 112:18, 113:12, 114:24, 115:13, 115:14, 117:1, 118:12, 124:12, 124:18, 126:2, 126:25, 127:10, 127:16, 127:24, 129:2, 132:9, 133:12, 134:1, 135:25, 137:20, 137:21, 139:10, 139:13, 139:14, 143:20, 146:1, 149:5, 150:25, 151:17, 151:24, 152:2, 152:22, 153:12, 154:1, 154:13, 154:18, 155:5, 156:5, 157:13, 159:2, 159:11, 159:19, 160:17, 161:24, 163:23, 164:2, 166:9, 171:1, 175:13, 178:8, 179:7, 184:2, 188:19, 189:10, 189:17, 189:22,

190:22, 190:24, 190:25, 192:11, 193:2, 193:11, 193:17, 193:22, 194:1, 194:8, 195:6, 195:11, 195:22, 197:25, 198:14, 200:20, 202:15, 203:18, 207:19, 207:22, 208:1, 208:13, 209:3, 210:11, 210:21, 211:1, 211:4, 211:10, 212:8, 213:24, 214:11, 215:8, 215:12, 215:24, 217:1, 217:11, 219:20, 222:11, 224:13, 226:22, 230:13
**Enyart's** [15] - 55:8, 94:14, 128:18, 130:7, 131:21, 135:25, 136:1, 137:11, 138:7, 149:8, 153:3, 162:21, 191:16, 208:25, 225:15
**Enyarts** [2] - 54:20, 182:1
**epilepsy** [2] - 37:11, 37:14
**episode** [2] - 137:7, 143:10
**equation** [1] - 102:2
**equipment** [1] - 123:5
**equivalents** [1] - 56:20
**escalates** [1] - 138:3
**esophageal** [1] - 165:4
**esophagus** [1] - 165:5
**especially** [1] - 133:20
**ESQ** [3] - 2:4, 2:6, 2:9
**essence** [1] - 174:4
**essentially** [8] - 130:12, 131:6, 132:22, 159:5, 161:8, 161:16, 162:6, 222:10
**establish** [1] - 211:16
**et** [1] - 38:2
**ET** [2] - 1:6, 1:9
**evaluate** [1] - 167:22
**evaluated** [1] - 170:20
**evaluation** [6] - 42:13, 42:19, 43:22, 107:7, 107:9, 157:21
**evening** [1] - 231:2
**evenings** [2] - 224:23,

224:25
**event** [3] - 34:23, 35:8, 123:12
**events** [2] - 16:11, 83:7
**eventually** [3] - 72:25, 98:7, 228:9
**evict** [1] - 137:15
**evidence** [29] - 7:21, 8:25, 9:18, 10:21, 38:4, 38:7, 68:12, 68:13, 83:24, 89:20, 114:18, 124:10, 143:16, 143:19, 144:4, 144:17, 146:1, 149:13, 154:17, 155:8, 157:14, 161:5, 163:2, 185:14, 193:10, 214:4, 215:6, 219:13
**exact** [6] - 21:3, 100:15, 109:1, 109:14, 223:19
**exactly** [6] - 15:11, 49:21, 50:12, 109:14, 109:25, 200:15
**exam** [3] - 92:7, 106:13, 106:17
**examination** [15] - 6:6, 46:5, 55:6, 56:1, 57:1, 97:19, 100:12, 105:9, 108:11, 118:5, 163:12, 172:7, 172:23, 217:7, 231:11
**EXAMINATION** [24] - 6:8, 26:16, 29:8, 31:8, 46:6, 55:4, 57:2, 59:9, 97:21, 108:9, 111:11, 118:7, 122:17, 139:20, 141:7, 163:13, 172:5, 174:22, 180:21, 183:17, 187:4, 188:23, 189:20, 217:9
**examine** [1] - 176:15
**examined** [1] - 100:9
**example** [11] - 35:14, 37:10, 37:11, 37:17, 39:6, 45:1, 123:13, 130:15, 130:20, 158:11, 170:23
**except** [1] - 5:17
**excerpts** [3] - 83:17, 83:21, 83:25
**exchange** [2] - 140:9,

220:15
**excuse** [13] - 4:12, 4:16, 4:18, 4:25, 28:13, 46:8, 46:16, 47:10, 55:12, 146:23, 150:10, 152:8, 210:14
**excused** [1] - 231:5
**excusing** [1] - 5:1
**EXHIBIT** [1] - 3:19
**Exhibit** [61] - 7:18, 7:22, 7:25, 8:22, 9:7, 9:18, 9:22, 10:17, 10:23, 11:24, 26:21, 27:2, 64:23, 65:4, 65:8, 65:24, 69:12, 83:16, 83:24, 84:2, 84:5, 86:7, 86:11, 89:22, 90:4, 114:18, 125:12, 125:17, 144:4, 149:13, 150:8, 150:15, 150:18, 151:23, 152:8, 155:21, 157:14, 157:17, 157:20, 158:16, 185:13, 185:19, 193:10, 193:13, 193:21, 194:9, 195:10, 195:24, 196:18, 197:9, 197:24, 199:12, 202:19, 206:19, 207:13, 208:23, 214:4, 214:6, 215:7
**exhibit** [6] - 8:3, 8:5, 8:25, 9:19, 10:18, 10:20, 26:20, 86:10, 145:11, 151:22, 176:25, 185:12, 193:10, 214:4, 215:8
**exhibits** [1] - 26:19
**Exhibits** [3] - 150:3, 155:8, 155:18
**EXHIBITS** [1] - 3:19
**existent** [1] - 153:5
**exists** [1] - 162:9
**exit** [1] - 63:17
**expect** [3] - 57:14, 57:19, 165:3
**expectation** [3] - 40:24, 50:13, 95:6
**expected** [5] - 45:18, 76:21, 76:22, 77:22, 95:8
**experience** [14] - 28:15, 34:23, 36:9, 36:13, 43:8, 43:10, 44:25, 45:8, 45:10, 45:17, 45:21, 56:17,

137:22, 162:17
**experienced** [2] - 8:18, 170:18
**experiencing** [3] - 28:2, 28:25, 159:4
**Expert** [1] - 30:20
**expert** [13] - 31:16, 31:20, 31:22, 46:12, 46:15, 46:19, 46:24, 144:5, 144:7, 146:6, 199:6, 230:16, 230:18
**explain** [6] - 100:3, 101:23, 105:18, 153:17, 158:24, 172:13
**explained** [6] - 5:2, 13:12, 124:23, 125:4, 136:17, 199:21
**explaining** [2] - 159:2, 172:13
**explanation** [1] - 121:6
**explorer** [1] - 64:12
**Explorer** [1] - 112:23
**express** [7] - 61:8, 121:11, 175:19, 192:19, 192:23, 215:13, 230:24
**expressed** [2] - 28:24, 136:20, 229:8
**expresses** [1] - 148:11
**expressing** [2] - 12:8, 136:24
**extensive** [2] - 34:1, 147:8
**extensively** [2] - 141:20, 141:23
**extra** [1] - 90:18
**extremely** [2] - 199:22, 202:10
**extremities** [1] - 161:4
**eyes** [5] - 44:11, 151:18, 200:6, 204:19, 204:23

## F

**face** [2] - 105:17
**face-to-face** [1] - 105:17
**facilities** [4] - 45:19, 208:4, 208:8
**facility** [29] - 13:6, 32:14, 41:9, 42:3, 43:4, 56:11, 56:13, 57:5, 62:21, 80:19, 99:1, 99:2, 100:4, 101:10, 101:15,

101:22, 101:24, 105:16, 106:9, 106:16, 126:13, 151:7, 151:14, 151:25, 152:2, 152:5, 152:25, 181:23, 205:14
**Facility** [3] - 55:9, 185:9, 185:23
**facing** [2] - 160:8, 198:13
**fact** [17] - 12:11, 13:9, 18:24, 19:17, 19:21, 27:7, 36:18, 52:24, 62:13, 70:15, 105:19, 105:21, 145:12, 166:25, 189:24, 229:18, 230:13
**factor** [2] - 40:25, 143:13
**factors** [5] - 134:23, 135:3, 142:21, 143:6, 170:17
**facts** [30] - 36:23, 38:23, 39:12, 39:17, 39:21, 40:6, 40:16, 41:22, 42:8, 44:1, 44:9, 44:19, 128:2, 136:5, 144:3, 144:6, 144:13, 145:4, 145:9, 145:15, 145:16, 145:17, 145:21, 146:11, 146:18, 147:4, 148:9, 148:20, 160:1
**faint** [1] - 66:5
**fair** [12] - 38:5, 143:17, 145:24, 149:3, 154:14, 160:16, 193:7, 201:7, 219:10, 221:18, 223:15, 229:11
**familiar** [8] - 11:17, 80:15, 80:23, 185:8, 198:15, 198:17, 198:20, 198:21
**familiarity** [2] - 89:10, 203:24
**familiarize** [2] - 186:19, 186:24
**families** [1] - 181:18
**family** [92] - 7:11, 15:4, 15:17, 16:4, 16:13, 20:9, 21:20, 23:17, 23:22, 28:12, 28:15, 28:16, 38:25, 39:2, 39:3, 39:18, 40:19, 41:9, 41:10, 44:25, 45:2, 47:19,

47:25, 48:3, 52:10, 52:21, 52:25, 53:12, 53:23, 53:25, 54:5, 54:13, 54:23, 55:17, 55:21, 55:23, 56:2, 56:5, 57:13, 58:6, 63:10, 63:17, 64:7, 67:21, 95:15, 96:4, 96:13, 96:14, 96:16, 98:11, 107:18, 115:16, 124:12, 124:16, 125:7, 127:25, 132:6, 134:3, 136:20, 136:24, 137:9, 137:20, 138:11, 139:13, 141:10, 141:17, 164:1, 164:3, 166:5, 166:10, 166:22, 167:2, 167:4, 175:12, 178:9, 178:22, 179:2, 179:7, 179:12, 179:14, 180:1, 181:16, 181:22, 184:1, 184:12, 220:19, 221:19, 221:24, 222:3, 222:11
**family's** [1] - 220:10
**far** [8] - 59:14, 59:19, 99:14, 106:20, 155:24, 157:1, 157:2, 225:13
**fast** [1] - 187:25
**fatal** [2] - 142:10, 173:13
**fatal-type** [1] - 173:13
**father** [26] - 19:12, 23:18, 23:24, 24:2, 24:3, 24:5, 28:17, 30:12, 41:24, 42:2, 43:25, 114:12, 116:9, 117:1, 124:19, 128:16, 131:21, 133:12, 137:24, 147:10, 190:24, 198:22, 213:7, 214:15, 215:7, 218:3
**father's** [2] - 23:12, 28:18
**fatty** [1] - 164:10
**fear** [3] - 25:23, 25:25, 155:2
**feared** [1] - 58:19
**fearing** [1] - 155:3
**fears** [1] - 126:4
**federal** [3] - 38:14,

38:20, 176:21
**FEDERAL** [2] - 1:23, 232:22
**feet** [1] - 106:23
**fell** [1] - 163:7
**felon** [2] - 87:15, 87:20
**felony** [7] - 43:10, 83:7, 85:14, 86:2, 86:18, 87:10, 87:13
**felt** [3] - 8:14, 24:12, 229:20
**female** [4] - 92:6, 104:18, 104:20, 104:23, 119:23
**females** [1] - 104:21
**few** [4] - 16:13, 29:10, 65:12, 79:21, 90:6, 169:10, 211:7, 223:18
**field** [4] - 33:17, 34:8, 123:17, 175:6
**fielded** [1] - 180:2
**figure** [4] - 16:11, 64:6, 127:13, 127:16
**figured** [1] - 128:7
**file** [4] - 50:4, 50:7, 177:12, 192:16
**filings** [1] - 181:5
**fill** [1] - 88:23
**filled** [2] - 91:8, 92:25
**finally** [3] - 56:16, 147:10, 204:18
**fine** [5] - 111:18, 203:10, 203:19, 204:17, 208:10
**finish** [1] - 172:8
**finished** [5] - 14:15, 14:18, 15:16, 27:12, 39:25
**finishing** [2] - 15:7, 103:22
**fire** [1] - 14:22
**firefighter** [1] - 79:8
**firework** [1] - 214:24
**first** [42] - 11:10, 21:8, 33:1, 34:3, 34:4, 59:24, 60:3, 65:3, 66:12, 66:13, 77:6, 77:7, 77:11, 80:18, 80:19, 81:6, 82:19, 84:20, 90:6, 93:14, 99:22, 108:3, 112:17, 113:10, 118:23, 125:23, 158:21, 159:20, 164:13, 168:18, 176:17, 186:5, 193:20, 195:9, 196:14, 198:3,

204:7, 204:10, 204:22, 206:5
**fit** [7] - 60:12, 63:12, 66:23, 76:15, 113:22, 159:13, 179:3
**five** [7] - 38:13, 41:17, 98:17, 99:17, 112:8, 171:23, 199:14
**flavored** [1] - 49:2
**flavors** [1] - 127:7
**floor** [1] - 145:1
**FLOOR** [1] - 2:18
**fluctuate** [1] - 70:5
**flying** [1] - 214:23
**focal** [2] - 162:13
**focusing** [2] - 224:18, 227:8
**follow** [3] - 16:19, 100:7, 106:18
**follow-up** [1] - 106:18
**following** [13] - 16:8, 16:10, 38:23, 41:22, 91:3, 122:8, 124:10, 144:13, 145:9, 146:18, 147:5, 148:9, 160:1
**foot** [1] - 168:13
**footage** [1] - 143:22
**FOR** [3] - 3:2, 232:8, 232:9
**force** [22] - 13:6, 47:2, 102:5, 117:5, 117:6, 117:9, 117:11, 119:4, 119:8, 119:9, 119:12, 119:14, 120:16, 129:16, 129:24, 129:25, 133:21, 135:1, 135:5, 161:24, 162:18
**Ford** [2] - 64:12, 112:22
**FOREGOING** [1] - 232:11
**foreground** [1] - 84:14
**forgive** [1] - 149:23
**FORM** [1] - 232:13
**form** [13] - 25:20, 61:8, 89:2, 89:4, 90:21, 91:8, 93:11, 121:11, 132:21, 142:10, 175:19, 219:20, 230:24
**formal** [4] - 6:16, 6:19, 7:3, 7:6
**formally** [1] - 102:23
**former** [1] - 183:9
**forming** [1] - 52:12
**forms** [1] - 13:22

formulate [2] - 127:24, 128:6
formulated [2] - 133:25, 134:4
formulating [1] - 136:2
forth [1] - 35:4
FORTH [1] - 232:12
forward [1] - 213:12
foundation [1] - 156:17
four [5] - 32:15, 72:12, 112:8, 145:13, 218:11
four-and-a-half [1] - 72:12
fourth [1] - 147:25
FOURTH [1] - 2:18
fracture [2] - 162:23, 163:4
fractures [2] - 162:20, 162:21
frame [1] - 105:4
FRANCES [2] - 1:6, 3:17
Frances [5] - 4:5, 126:2, 189:9, 189:17, 193:11
Francis [1] - 41:11
frantic [1] - 136:16
free [1] - 103:1
frequently [3] - 127:14, 168:6, 182:13
fresh [3] - 98:23, 102:2, 102:3
friends [1] - 215:18
front [13] - 14:23, 27:2, 50:7, 63:17, 72:5, 132:3, 150:11, 172:24, 187:18, 193:17, 195:24, 219:12, 219:14
fulfilled [1] - 60:19
full [9] - 31:2, 59:3, 111:6, 121:7, 125:12, 141:1, 174:17, 183:13, 189:16
fun [2] - 213:17, 215:1
funeral [1] - 17:11
funny [1] - 215:5
FURTHER [1] - 232:14
future [1] - 87:7

## G

gain [1] - 70:7
game [4] - 5:13, 213:15, 213:16,
213:17
games [2] - 215:1, 215:2
gangster [1] - 43:10
GARY [1] - 1:3
gas [1] - 127:9
gastric [1] - 165:6
gather [2] - 37:2, 129:23
gathered [2] - 77:17, 77:18
gathering [1] - 34:22
general [3] - 88:19, 120:16, 120:17
generally [6] - 88:23, 162:9, 170:18, 191:12, 207:3, 208:6
gentleman [1] - 168:12
gentlemen [4] - 61:6, 121:8, 175:17, 230:23
gettin' [1] - 73:21
gift [1] - 213:14
given [8] - 19:7, 19:22, 20:7, 40:23, 87:2, 100:7, 145:16, 206:16
glasses [1] - 170:19
goin' [1] - 75:20
golf [1] - 213:17
gonna [61] - 4:14, 4:15, 4:18, 5:4, 5:14, 5:20, 6:12, 11:1, 11:20, 13:12, 17:7, 17:19, 17:20, 17:24, 19:7, 22:10, 25:9, 25:25, 36:22, 37:21, 41:14, 42:14, 57:22, 61:3, 61:5, 65:10, 67:7, 69:13, 74:3, 83:21, 83:22, 85:14, 85:17, 87:11, 93:2, 96:18, 103:6, 103:9, 121:9, 122:5, 123:16, 125:18, 132:24, 138:18, 155:2, 169:2, 170:2, 170:10, 171:11, 174:3, 183:22, 186:4, 187:17, 193:25, 195:23, 206:17, 231:3, 231:4
gotta [2] - 81:9, 82:16
government [1] - 38:20
grab [6] - 67:15, 67:16, 67:17, 68:3, 70:16, 227:11
GRACE [1] - 2:6

graduated [2] - 60:4, 60:5
graduation [1] - 60:8
granddaughter [9] - 211:8, 214:14, 221:9, 221:13, 224:11, 224:18, 225:1, 225:4, 226:15
graph [2] - 169:16, 169:17
great [3] - 12:5, 179:9, 213:19
Greg [7] - 133:12, 137:11, 190:24, 195:6, 195:11, 207:25, 208:25
Gregory [5] - 190:21, 190:22, 192:9, 193:11, 193:22
grossly [1] - 148:25
group [4] - 30:12, 129:9, 205:3, 205:6
GROUP [1] - 2:3
grown [1] - 89:10
guaranteed [1] - 173:9
guess [1] - 215:3
guide [1] - 215:13
guy [1] - 75:2
guys [1] - 128:24

## H

habit [2] - 123:2, 228:18
hair [1] - 75:16
half [8] - 72:12, 80:10, 80:11, 106:8, 122:3, 152:8, 158:3, 212:16
hallmark [1] - 142:12
hallucination [1] - 169:13
hallucinations [5] - 142:13, 144:23, 144:24, 148:24, 153:19
hallway [2] - 104:16, 104:18
hand [23] - 30:22, 58:23, 67:2, 67:3, 67:15, 68:22, 69:9, 69:20, 69:21, 69:22, 70:15, 71:5, 71:8, 73:11, 74:18, 111:1, 119:15, 136:18, 140:22, 174:13, 183:11, 187:15, 189:12
handcuffed [2] - 102:6, 112:22
handcuffs [4] - 78:11,

79:5, 79:19, 80:22
handle [6] - 176:6, 181:10, 181:12, 181:13, 187:19, 187:20
handled [1] - 37:14
handling [7] - 36:21, 37:3, 37:12, 176:3, 176:6, 177:7, 181:8
hands [4] - 70:11, 72:14, 79:4, 216:14
handyman [5] - 217:16, 218:5, 218:16, 218:18, 219:3
happy [2] - 74:10, 74:11
hard [4] - 16:10, 25:7, 65:20, 114:24
hardware [1] - 71:18
harm [1] - 24:4
hat [1] - 173:23
havin' [3] - 67:18, 67:23, 92:6
hazard [1] - 35:6
HDDC [3] - 53:5, 152:9, 152:10
head [4] - 134:5, 161:5, 161:25
headed [2] - 63:9, 80:9
health [15] - 23:24, 25:12, 39:6, 39:19, 87:6, 87:8, 126:9, 157:21, 164:22, 186:7, 192:4, 192:20, 192:24, 202:11, 204:15
hear [22] - 4:22, 32:21, 37:7, 65:16, 66:1, 66:3, 66:10, 66:16, 66:23, 68:8, 68:15, 68:20, 69:14, 69:19, 115:7, 126:19, 133:17, 135:7, 192:5, 210:24, 223:4
heard [51] - 4:24, 11:10, 11:15, 15:12, 17:2, 40:14, 40:21, 54:10, 54:12, 54:22, 59:18, 59:24, 60:24, 63:5, 64:20, 66:12, 68:16, 75:7, 77:2, 80:25, 89:1, 112:9, 113:4, 113:8, 114:15, 114:18, 118:14, 119:15, 126:18, 126:20, 133:15, 138:7, 138:9, 161:15,

161:16, 178:7, 178:17, 195:10, 198:25, 199:22, 200:2, 201:22, 201:25, 202:3, 202:9, 203:8, 203:18, 205:12, 206:13, 207:7, 207:11
hearing [9] - 49:21, 65:20, 114:1, 114:21, 122:5, 129:15, 135:25, 142:15, 144:15
hearsay [2] - 162:2, 210:8
heart [11] - 44:18, 148:13, 165:13, 179:15, 182:19, 184:12, 199:24, 203:7, 204:16, 205:11, 206:12
heartbeat [1] - 47:17
heavily [4] - 88:14, 164:15, 167:24, 170:1
heavy [6] - 19:21, 39:4, 134:9, 167:14, 173:9, 173:17
held [4] - 41:25, 44:10, 122:8, 131:7
hello [2] - 187:7, 203:17
help [18] - 12:15, 13:8, 13:13, 13:16, 13:18, 13:20, 13:22, 14:6, 19:8, 19:21, 72:14, 109:2, 119:10, 120:13, 136:10, 138:1, 179:3, 227:6
hemorrhage [2] - 162:5, 162:13
hemorrhages [1] - 162:18
hemorrhoids [1] - 165:5
HEREBY [1] - 232:10
HEREINBEFORE [1] - 232:11
heretofore [1] - 4:6
Hesperia [1] - 98:21
hi [2] - 120:25, 174:25
hid [2] - 20:9, 166:10
hide [1] - 166:14
hiding [1] - 166:15
High [57] - 20:17, 53:9, 53:16, 53:25, 54:4, 54:5, 55:9, 55:14, 56:2, 62:11, 62:18, 62:20, 75:22, 80:9,

80:13, 81:16, 83:18, 97:7, 101:8, 101:9, 102:10, 106:6, 108:13, 175:2, 181:21, 185:2, 185:8, 185:23, 186:12, 187:9, 188:19, 188:25, 195:14, 195:19, 196:2, 196:4, 196:7, 197:6, 197:17, 197:18, 197:20, 197:25, 198:3, 198:7, 199:10, 201:2, 201:5, 201:7, 201:10, 201:14, 202:23, 203:2, 204:2, 205:17, 207:20, 207:25, 210:13

**high** [5] - 43:14, 137:23, 143:9, 147:9, 172:17

**higher** [3] - 145:22, 147:19, 153:13

**himself** [8] - 20:1, 24:7, 25:11, 26:7, 115:2, 115:8, 124:22, 144:15

**hip** [1] - 49:6

**history** [18] - 12:23, 18:18, 19:5, 22:14, 35:8, 35:11, 39:4, 43:8, 45:2, 99:10, 144:14, 145:2, 145:23, 146:2, 147:6, 148:10, 168:7, 220:10

**hit** [4] - 24:17, 72:1, 206:7, 227:21

**hitting** [1] - 161:16

**hmm** [2] - 80:4, 110:21

**hold** [9] - 17:20, 67:7, 69:24, 74:13, 126:13, 126:14, 131:2, 141:15, 204:19

**holding** [2] - 104:15, 107:11

**home** [19] - 10:5, 20:16, 38:25, 54:8, 68:1, 98:1, 118:12, 119:20, 120:8, 127:17, 132:23, 136:25, 211:21, 218:2, 219:15, 220:7, 222:21, 227:13

**honest** [2] - 120:5,

165:8

**Honor** [110] - 5:25, 6:7, 7:17, 8:7, 8:21, 9:23, 10:16, 11:24, 12:20, 17:25, 21:18, 26:13, 26:15, 27:24, 29:24, 30:1, 30:3, 30:5, 30:14, 30:17, 30:19, 31:7, 41:15, 41:21, 46:2, 54:18, 54:25, 55:2, 58:1, 58:12, 58:16, 59:8, 65:2, 65:5, 65:10, 70:8, 83:23, 84:3, 84:7, 86:20, 89:23, 90:1, 97:18, 97:20, 103:10, 108:6, 108:8, 110:16, 110:18, 110:23, 111:10, 118:4, 118:6, 121:19, 139:17, 139:19, 140:15, 140:17, 140:19, 141:6, 144:9, 144:11, 146:14, 149:13, 149:21, 150:4, 150:6, 154:11, 155:7, 155:19, 156:4, 156:18, 156:21, 157:7, 157:11, 160:10, 162:2, 163:10, 172:3, 174:6, 174:8, 174:11, 174:21, 177:21, 178:4, 180:19, 183:3, 183:5, 183:8, 185:13, 185:16, 185:18, 187:2, 189:4, 189:9, 193:9, 193:14, 210:18, 214:3, 215:9, 216:25, 217:8, 219:25, 225:14, 225:17, 225:18, 226:10, 228:18, 230:2, 230:5

**honor** [1] - 83:23

**Honor's** [1] - 149:20

**HONORABLE** [1] - 1:3

**hope** [2] - 13:2, 216:24

**hopefully** [1] - 5:12

**horse** [1] - 213:19

**hospital** [7] - 13:10, 82:11, 126:13, 154:6, 154:7, 154:14, 155:25

**hospitals** [1] - 125:6

**hotel** [1] - 205:15

**hour** [7] - 63:4, 80:10, 80:11, 106:8, 176:14, 212:20

**hours** [14] - 122:2, 122:3, 130:13, 130:25, 147:24, 148:3, 169:7, 169:10, 169:14, 169:18, 212:16, 218:23, 218:24, 229:23

**house** [16] - 6:13, 10:9, 14:21, 15:23, 15:25, 16:1, 66:14, 131:24, 131:25, 137:3, 137:9, 138:12, 139:22, 216:4, 228:13, 228:21

**housed** [2] - 43:6, 57:15

**housing** [3] - 43:9, 43:16, 44:13

**hundred** [1] - 80:14

**hung** [3] - 200:18, 205:15, 206:18

**hurt** [4] - 25:21, 25:25, 26:4, 174:1

**husband** [19] - 192:9, 192:17, 195:6, 195:11, 195:13, 195:16, 195:19, 196:2, 196:4, 196:12, 196:22, 196:25, 197:20, 198:23, 207:24, 208:19, 208:25, 209:8, 227:15

**husband's** [3] - 190:20, 193:24, 197:6

**hyper** [1] - 153:4

**hypertension** [1] - 18:21

**hypothetical** [4] - 40:21, 145:8, 146:6, 146:7

**hypotheticals** [3] - 144:6, 144:7, 144:8

---

# I

**ice** [1] - 219:23

**ICU** [1] - 171:13

**idea** [9] - 20:11, 108:12, 137:21, 151:14, 223:3, 223:16, 223:24, 224:2, 230:13

**identified** [2] - 103:7, 125:12

**identifies** [1] - 36:21

**identify** [4] - 7:17, 8:22, 9:17, 125:11

**illness** [3] - 37:16, 43:14, 93:13

**immediate** [1] - 153:20

**immediately** [1] - 154:4

**immune** [1] - 165:23

**impact** [2] - 192:19, 192:24

**impeachment** [1] - 30:3

**importance** [2] - 18:17, 87:7

**important** [19] - 48:19, 48:23, 48:24, 49:1, 76:22, 115:10, 115:11, 116:15, 117:15, 133:21, 135:5, 147:22, 148:2, 168:4, 168:7, 173:3, 173:4, 173:14, 198:10

**impression** [1] - 167:2

**improper** [2] - 30:3, 216:22

**IN** [1] - 232:8

**incapable** [1] - 131:4

**incarcerated** [1] - 192:17

**inches** [1] - 99:17

**incident** [5] - 23:21, 40:20, 60:12, 83:8, 112:4

**included** [2] - 36:4, 169:17

**includes** [5] - 33:16, 33:17, 43:4, 43:6, 142:12

**including** [5] - 35:24, 37:15, 38:11, 106:12, 106:16

**inclusive** [1] - 144:1

**income** [4] - 46:14, 46:18, 218:3, 218:15

**incoming** [1] - 200:12

**incorrect** [1] - 19:14

**increased** [1] - 165:21

**increases** [1] - 143:12

**independent** [1] - 215:15

**INDEX** [1] - 3:1

**indicate** [3] - 152:21, 164:15, 193:1

**indicated** [1] - 4:9

**indicates** [6] - 96:7,

151:10, 153:2, 164:12, 164:19, 186:6

**indicating** [2] - 63:18, 147:9

**indication** [1] - 35:21

**individual** [16] - 6:20, 7:4, 11:6, 33:15, 42:14, 42:15, 47:22, 103:23, 104:15, 130:11, 144:18, 147:6, 153:20, 170:16, 171:16, 172:15

**individually** [1] - 89:13

**individuals** [4] - 131:22, 155:3, 171:20, 171:23

**infection** [1] - 165:21

**inflicting** [1] - 70:7

**influence** [19] - 39:5, 91:3, 91:11, 91:15, 91:20, 91:24, 92:18, 93:4, 93:7, 93:17, 110:13, 115:7, 124:24, 125:5, 125:8, 134:14, 193:2, 218:19, 229:20

**information** [103] - 18:12, 19:3, 19:7, 19:14, 19:20, 28:21, 28:22, 28:24, 32:25, 34:22, 36:1, 37:2, 37:10, 37:18, 37:20, 37:24, 39:9, 39:13, 40:8, 40:19, 40:23, 40:25, 42:10, 42:15, 44:4, 44:6, 44:20, 45:5, 45:6, 45:13, 45:14, 48:13, 49:12, 49:15, 51:9, 51:13, 51:14, 53:13, 55:7, 55:13, 55:16, 57:7, 57:21, 63:21, 76:23, 81:21, 83:5, 94:14, 94:16, 95:2, 95:3, 95:24, 96:24, 97:3, 102:15, 103:3, 105:21, 105:23, 105:25, 106:4, 115:19, 115:24, 116:1, 116:11, 116:15, 116:19, 116:25, 117:6, 117:14, 117:18, 119:15, 119:17, 120:19, 123:19, 124:3, 126:25,

129:21, 129:23, 133:13, 147:5, 147:13, 151:9, 152:10, 156:25, 157:1, 164:1, 166:5, 173:15, 173:16, 173:18, 173:24, 176:23, 179:17, 179:25, 180:1, 180:6, 184:9, 184:10, 184:14, 184:20, 184:24, 204:22, 208:17

**initial** [8] - 63:24, 80:24, 81:25, 88:11, 88:18, 89:19, 92:7, 105:22

**injured** [3] - 72:19, 72:21, 162:25

**injuries** [10] - 74:4, 93:11, 93:12, 160:17, 160:21, 160:23, 161:12, 161:23, 161:25, 163:2

**injuring** [2] - 161:17, 164:17

**injury** [8] - 73:20, 73:22, 74:12, 86:3, 92:9, 93:9, 105:20

**inmate** [9] - 48:14, 50:3, 57:13, 102:25, 152:9, 152:10, 179:13, 182:4, 182:5

**inmates** [5] - 181:6, 186:6, 188:5, 188:9, 188:13

**input** [1] - 119:17

**inputs** [1] - 90:21

**inquire** [12] - 31:6, 35:7, 35:10, 59:7, 61:21, 111:9, 141:5, 174:20, 178:3, 183:16, 189:18, 208:4

**inside** [15] - 14:21, 15:4, 15:5, 15:20, 15:24, 16:1, 16:7, 16:12, 16:21, 101:18, 101:19, 114:11, 131:24, 138:22, 158:12

**instance** [2] - 84:22, 131:6

**instead** [2] - 137:6, 177:11

**instruct** [1] - 220:3

**instructed** [1] - 76:6

**instructions** [1] - 100:7

**insure** [2] - 124:3, 132:23

**intake** [9] - 55:13, 84:18, 92:25, 101:19, 101:20, 102:9, 104:8, 104:18, 104:20

**intent** [1] - 117:20

**intention** [1] - 137:25

**interacting** [1] - 188:5

**interaction** [1] - 112:18

**interject** [1] - 176:22

**internal** [10] - 144:19, 158:6, 158:10, 158:14, 158:19, 159:4, 160:4, 160:9, 161:9, 162:11

**interrupt** [1] - 175:15

**intervention** [14] - 6:14, 6:20, 7:4, 7:14, 9:15, 14:3, 124:18, 136:17, 221:20, 221:22, 221:24, 222:2, 222:5, 222:8

**interventions** [1] - 6:17

**interview** [11] - 15:17, 113:5, 114:14, 114:19, 114:21, 117:20, 123:13, 124:15, 124:18, 129:9, 129:18

**interviewed** [1] - 119:21

**interviewing** [4] - 35:17, 116:8, 120:18, 132:7

**interviews** [11] - 39:25, 43:5, 50:3, 77:20, 94:25, 95:7, 95:9, 114:8, 114:10, 122:20

**intoxicated** [29] - 35:20, 88:16, 108:17, 108:20, 108:22, 108:25, 109:4, 109:8, 109:21, 110:7, 115:25, 134:12, 134:16, 134:19, 135:9, 169:20, 169:25, 170:1, 170:7, 170:9, 172:10, 172:15, 172:21, 229:19, 229:22, 229:24, 230:1, 230:19

**intoxication** [11] - 33:22, 33:25, 34:10,

34:22, 34:25, 36:1, 55:8, 116:25, 117:19, 136:2, 172:9

**introduce** [2] - 65:6, 120:25

**introducing** [2] - 65:3, 125:14

**investigate** [3] - 113:15, 113:23, 117:4

**investigating** [3] - 117:7, 117:16, 120:20

**investigation** [11] - 114:6, 117:17, 119:7, 119:9, 119:12, 120:14, 120:15, 129:15, 129:17, 135:1, 135:5

**investigative** [1] - 119:2

**involve** [2] - 47:2, 142:3

**involved** [5] - 63:19, 101:20, 119:11, 153:22, 153:25

**involves** [1] - 171:7

**involving** [1] - 136:19

**iPad** [1] - 213:6

**irrelevant** [2] - 87:4, 156:2

**IS** [1] - 232:14

**isolate** [1] - 64:7

**issue** [5] - 37:15, 40:21, 47:14, 117:15, 143:6

**issues** [3] - 92:24, 95:16, 115:11

**it'll** [2] - 9:1, 84:4

**Item** [1] - 4:3

**itself** [3] - 38:10, 40:11, 68:14

---

## J

**jackets** [1] - 213:7

**JACOB** [1] - 2:15

**Jail** [7] - 32:8, 32:17, 32:18, 32:24, 45:9, 45:10

**jail** [63] - 32:1, 32:13, 32:14, 32:20, 37:21, 37:25, 38:17, 41:24, 42:3, 42:21, 44:10, 45:12, 47:22, 48:14, 55:22, 56:11, 56:13, 56:17, 57:9, 62:20, 75:20, 77:23, 80:21, 82:9, 82:14, 82:15, 83:14, 88:4, 88:5,

94:14, 95:14, 95:17, 95:21, 95:24, 96:18, 96:25, 97:5, 97:13, 100:4, 101:22, 101:25, 102:9, 102:19, 104:4, 104:19, 107:2, 109:24, 148:15, 150:24, 151:2, 156:5, 156:10, 179:13, 179:17, 184:19, 186:25, 187:15, 198:11, 207:10, 208:4, 208:8

**jails** [4] - 43:18, 45:10, 56:22, 181:9

**January** [1] - 26:24

**job** [8] - 12:5, 87:14, 95:12, 134:13, 188:15, 217:15, 217:17, 217:20

**jobs** [4] - 218:5, 218:6, 218:7, 219:2

**JOE** [2] - 2:9, 2:9

**JUDGE** [1] - 1:4

**judicious** [1] - 231:12

**July** [48] - 13:16, 25:15, 25:19, 60:13, 61:23, 63:5, 88:22, 112:7, 124:11, 139:9, 139:13, 145:10, 145:12, 148:14, 175:1, 177:2, 180:25, 181:21, 184:2, 187:11, 191:2, 194:14, 195:21, 196:21, 197:2, 197:8, 197:17, 197:18, 197:19, 198:5, 199:10, 199:11, 200:11, 200:19, 201:15, 202:19, 202:20, 204:11, 205:23, 206:20, 207:14, 207:17, 207:18, 220:19, 220:24, 221:19, 227:8, 230:14

**jump** [1] - 59:22

**jumping** [1] - 130:16

**JUN** [83] - 2:6, 3:6, 3:12, 3:18, 8:7, 30:19, 31:7, 31:9, 41:20, 46:2, 55:2, 55:5, 56:24, 140:21, 141:6, 141:8, 144:2, 144:9, 144:11, 146:9, 146:14,

149:13, 149:16, 149:19, 150:4, 150:6, 150:14, 151:21, 154:11, 155:7, 155:11, 155:15, 155:19, 155:21, 156:4, 156:8, 156:21, 157:7, 157:11, 157:17, 157:19, 158:2, 158:15, 158:21, 159:25, 160:13, 161:22, 162:16, 163:10, 172:3, 172:6, 174:5, 189:9, 189:19, 189:21, 193:9, 193:14, 193:16, 195:22, 199:8, 200:25, 202:14, 203:14, 209:15, 210:5, 210:10, 210:20, 210:25, 212:7, 213:9, 213:23, 214:3, 214:7, 214:10, 215:6, 215:11, 215:23, 216:25, 217:6, 219:4, 225:17, 230:5, 230:7

**June** [3] - 60:4, 214:13, 220:19

**Juror** [6] - 4:8, 4:20, 4:25, 5:1, 5:17, 5:18

**juror** [3] - 4:22, 5:17, 121:13

**jurors** [5] - 5:16, 69:15, 121:21, 175:24, 231:8

**Jury** [1] - 231:7

**jury** [44] - 4:7, 4:17, 5:4, 5:5, 5:9, 5:11, 5:12, 8:1, 9:8, 14:10, 16:12, 18:7, 21:20, 50:13, 61:9, 61:15, 61:18, 66:1, 72:6, 98:3, 103:10, 118:11, 119:1, 120:13, 121:17, 122:13, 122:14, 150:4, 154:5, 155:19, 156:2, 156:24, 157:15, 175:20, 175:23, 177:25, 180:25, 193:14, 214:7, 220:3, 223:15, 230:25

**jury's** [2] - 47:14, 65:20

**Justice** [1] - 33:11
**justice** - 36:7

## K

**keep** [9] - 122:3, 127:20, 132:16, 133:24, 136:21, 176:10, 215:21, 217:2, 231:9
**Kelley** [11] - 6:4, 6:10, 7:3, 25:19, 26:18, 26:22, 27:10, 29:2, 29:10, 113:6, 120:2
**KELLEY** [1] - 3:3
**KELLIE** [1] - 2:16
**kept** [1] - 204:17
**key** [1] - 135:7
**kid** [2] - 22:7, 192:18
**kind** [27] - 23:11, 23:14, 52:21, 59:21, 85:1, 116:17, 120:19, 124:24, 127:8, 130:20, 132:24, 133:20, 134:7, 134:10, 135:12, 137:24, 142:13, 143:19, 147:18, 150:14, 151:15, 151:22, 161:17, 165:4, 170:22, 187:17, 228:17
**kinda** [3] - 137:1, 138:2, 187:15
**kindergarten** [1] - 211:18
**kindling** [1] - 170:25
**kindly** [1] - 158:15
**kitchen** [6] - 15:6, 132:4, 132:5, 132:8, 132:11, 222:25
**kites** [1] - 214:23
**KLAUSNER** [1] - 1:3
**knife** [2] - 67:3, 70:16
**knifes** [1] - 68:6
**knock** [1] - 114:11
**knowing** [1] - 12:23
**knowledge** [8] - 7:13, 45:17, 139:1, 142:24, 162:17, 174:4, 195:13, 195:16
**known** [7] - 18:4, 40:22, 43:10, 128:8, 153:14, 153:22, 153:24
**knows** [2] - 136:1, 136:3

## L

**L-shape** [1] - 85:3
**L.A** [2] - 31:24, 32:12
**ladies** [4] - 61:6, 121:8, 175:17, 230:22
**language** [1] - 24:10
**laptop** [3] - 82:22, 82:24, 85:11
**laptops** [2] - 85:8, 116:18
**large** [1] - 145:25
**last** [21] - 5:12, 9:2, 28:20, 31:2, 34:7, 59:4, 111:7, 115:7, 141:2, 141:3, 148:1, 148:6, 151:7, 173:6, 174:18, 183:14, 189:16, 201:25, 202:3, 214:14
**lasted** [3] - 195:3, 202:25, 206:21
**lasting** [1] - 204:8
**late** [3] - 115:8, 165:24, 171:9
**LAURA** [4] - 1:23, 232:8, 232:20, 232:21
**law** [7] - 33:6, 39:8, 42:6, 51:18, 108:4, 132:20, 142:24
**LAW** [2] - 2:3, 2:9
**laws** [1] - 34:17
**lay** [1] - 156:16
**layouts** [1] - 132:2
**lead** [5] - 36:16, 77:2, 77:14, 134:23, 215:14
**leading** [3] - 104:13, 209:13, 210:3
**leads** [2] - 104:15, 104:18
**learn** [4] - 115:2, 117:17, 117:20, 216:11
**learned** [8] - 94:24, 95:15, 96:4, 97:3, 114:14, 114:23, 208:17, 208:18
**learning** [4] - 34:1, 35:12, 36:2, 115:19
**Learning** [2] - 34:1, 34:12
**least** [5] - 23:1, 218:4, 218:14, 220:25, 222:17
**leave** [1] - 76:2, 79:25, 80:7, 102:17, 107:16, 121:14,
137:9, 175:21, 184:24, 200:17
**left** [30] - 58:20, 68:22, 69:21, 71:5, 71:13, 78:7, 78:8, 85:1, 85:4, 96:1, 97:10, 103:20, 104:5, 116:9, 118:20, 121:21, 122:2, 122:3, 122:25, 123:1, 125:9, 138:23, 140:6, 173:12, 175:24, 176:14, 231:8, 231:10, 231:11
**legal** [1] - 172:18
**less** [3] - 44:24, 100:6, 102:4
**level** [9] - 43:12, 118:19, 134:21, 153:13, 168:9, 170:15, 172:16, 172:18, 172:21
**levels** [5] - 136:2, 143:9, 147:9, 163:17, 163:19
**Lieutenant** [4] - 32:8, 32:9, 32:15, 45:22
**lieutenant** [2] - 33:1, 133:7
**life** [10] - 12:23, 17:7, 17:14, 19:18, 21:1, 22:10, 35:23, 87:15, 115:21, 139:10
**life-threatening** [1] - 139:10
**light** [2] - 123:6, 123:8
**likelihood** [2] - 143:12, 174:1
**likely** [7] - 102:4, 145:5, 145:18, 146:25, 147:13, 147:17, 148:21
**limit** [1] - 172:18
**limited** [1] - 152:10
**limits** [1] - 160:5
**line** [16] - 14:12, 16:11, 27:6, 28:4, 28:7, 55:25, 56:3, 172:22, 172:25, 194:7, 194:12, 194:18, 197:8, 197:10, 197:12, 227:16
**linear** [1] - 168:22
**lines** [5] - 27:10, 29:25, 55:10, 225:15, 230:3
**lining** [1] - 165:6
**linked** [1] - 142:1,
165:22
**liquor** [2] - 114:25, 127:8
**list** [3] - 153:16, 181:17, 216:3
**listed** [1] - 50:2
**listen** [4] - 6:25, 125:19, 154:18, 226:11
**listened** [2] - 48:17, 50:6
**listening** [5] - 69:10, 74:10, 100:15, 127:24, 130:6
**listing** [1] - 162:22
**litigation** [1] - 66:10
**live** [5] - 20:16, 22:23, 62:2, 62:6, 68:1
**lived** [2] - 23:1, 62:4
**liver** [16] - 146:21, 146:22, 146:24, 147:1, 147:2, 147:7, 147:17, 164:4, 164:6, 164:9, 164:11, 164:12, 164:18, 165:11, 166:1
**liver's** [1] - 165:1
**lives** [2] - 136:25, 137:7
**living** [5] - 28:18, 132:1, 132:2, 132:3, 132:11
**lobby** [2] - 187:14, 187:20
**local** [1] - 82:10
**location** [4] - 116:14, 118:22, 159:2, 159:3
**lock** [5] - 69:25, 70:1, 70:4, 71:10, 130:24
**locking** [1] - 130:12
**log** [1] - 57:11
**Logistics** [1] - 32:9
**look** [17] - 27:9, 27:12, 86:7, 90:6, 123:7, 130:14, 149:18, 149:24, 151:8, 155:12, 169:17, 185:16, 186:18, 194:25, 195:24, 222:14, 222:17
**looked** [6] - 118:21, 164:5, 164:7, 188:11, 213:11
**lookin'** [1] - 63:25
**looking** [9] - 10:4, 27:22, 79:23, 135:12, 135:13, 151:15, 195:20, 197:9
**looks** [8] - 122:21, 150:12, 151:12, 159:21, 196:17, 204:8, 206:19, 207:13
**LOS** [4] - 1:16, 1:24, 4:1, 232:4
**Los** [5] - 31:25, 32:17, 32:23, 45:9, 45:10
**lose** [1] - 215:17
**lost** [2] - 126:5, 126:6
**loud** [1] - 27:12
**loved** [6] - 24:3, 213:7, 214:19, 214:24, 214:25, 215:12
**lower** [2] - 161:6, 172:21
**lunch** [2] - 121:9, 121:13
**Lunch** [1] - 122:11

## M

**ma'am** [1] - 189:12
**macro** [2] - 146:24, 147:1
**mail** [1] - 207:10
**mailed** [1] - 216:4
**main** [9] - 32:12, 36:15, 37:6, 37:20, 79:24, 101:14, 162:9, 162:19, 167:17
**maintained** [1] - 112:14
**major** [7] - 40:25, 163:21, 168:8, 168:15, 169:2, 169:9, 170:14
**majority** [2] - 22:23, 47:2
**male** [2] - 104:23, 128:13
**Mammolito** [20] - 10:12, 11:8, 11:11, 12:4, 12:7, 13:12, 14:12, 14:19, 14:24, 17:5, 17:17, 18:3, 18:8, 18:20, 19:17, 24:6, 28:5, 28:22, 113:6, 129:6
**man** [1] - 187:15
**man's** [1] - 68:4
**manifest** [1] - 165:2
**manifestation** [2] - 153:25, 169:11
**manifesting** [2] - 148:24, 172:19
**manner** [1] - 24:4
**Manual** [2] - 185:9,

185:24
**manual** [4] - 185:13, 186:11, 186:14
**Mario** [2] - 140:21, 141:3
**MARIO** [1] - 3:11
**mark** [3] - 11:2, 11:24, 103:12
**marked** [6] - 64:11, 94:6, 94:7, 94:9, 150:7, 193:20
**married** [2] - 190:14, 190:16
**Martinez** [2] - 110:24, 111:16
**massive** [1] - 171:12
**material** [1] - 38:11
**math** [1] - 215:20
**matter** [7] - 8:3, 34:12, 61:8, 121:12, 169:11, 175:19, 230:25
**matters** [1] - 167:23
**max** [1] - 69:15
**MAY** [3] - 1:15, 4:1, 232:18
**McMullen** [95] - 2:9, 2:9, 3:8, 3:10, 3:14, 3:16, 58:16, 58:19, 59:8, 59:10, 61:22, 65:1, 65:5, 65:10, 65:15, 65:21, 65:25, 66:2, 68:19, 69:10, 69:13, 69:18, 70:10, 70:25, 71:2, 71:17, 71:22, 72:7, 73:14, 74:8, 75:15, 78:19, 83:15, 83:20, 84:3, 84:7, 84:12, 86:5, 86:11, 86:13, 86:20, 87:5, 87:18, 87:23, 89:19, 90:1, 90:3, 92:2, 93:1, 93:10, 93:20, 93:25, 94:23, 96:11, 97:17, 108:8, 108:10, 109:12, 110:5, 110:15, 110:23, 111:10, 111:12, 118:3, 139:19, 139:21, 140:15, 150:14, 151:22, 156:18, 157:15, 158:4, 158:15, 174:11, 174:21, 174:23, 176:17, 176:21, 177:4, 177:10, 177:18, 177:21, 178:4, 180:11, 180:13, 180:19,

183:5, 183:8, 183:18, 185:11, 185:20, 187:2, 188:24, 189:3, 195:23
**MDCs** [1] - 116:17
**mean** [15] - 35:11, 87:10, 102:12, 135:2, 141:12, 148:5, 152:16, 158:9, 170:20, 170:22, 170:25, 172:3, 173:15, 205:3
**meaning** [1] - 81:20
**MEANS** [1] - 232:13
**means** [6] - 82:16, 122:1, 153:19, 159:12, 162:14, 168:18
**meant** [1] - 43:22
**measure** [1] - 172:16
**medical** [61] - 12:9, 18:18, 19:5, 35:9, 39:19, 42:13, 43:12, 43:21, 45:6, 45:13, 45:15, 53:17, 53:20, 53:22, 57:8, 57:17, 57:18, 58:6, 58:10, 73:22, 78:6, 82:10, 82:14, 87:1, 87:3, 91:7, 91:21, 92:7, 94:13, 100:14, 105:24, 106:1, 106:3, 106:13, 106:17, 107:6, 107:9, 140:13, 142:22, 143:14, 148:18, 149:3, 149:5, 149:10, 149:15, 149:21, 150:12, 150:24, 152:3, 152:6, 153:20, 153:24, 154:13, 154:25, 157:12, 158:2, 158:3, 173:18, 206:11, 207:7, 230:15
**medically** [2] - 42:19, 102:14
**medication** [4] - 17:23, 18:22, 171:8, 171:14
**medications** [2] - 13:13, 43:13
**medicine** [6] - 141:10, 141:12, 141:16, 141:17, 152:18, 168:23
**meetings** [2] - 198:23,

198:25
**member** [11] - 4:17, 38:19, 39:3, 45:1, 57:13, 58:6, 138:11, 179:12, 179:14, 180:1, 184:12
**members** [15] - 5:11, 39:2, 39:18, 41:10, 56:6, 61:18, 95:15, 122:13, 132:6, 175:7, 177:25, 181:8, 181:10, 181:16, 181:22
**memory** [13] - 27:18, 27:23, 27:25, 60:13, 63:12, 66:23, 76:16, 96:19, 105:16, 113:10, 113:22, 114:2, 179:4
**mental** [6] - 37:16, 43:13, 125:7, 126:9, 126:13, 157:21
**mention** [2] - 176:1, 176:7
**mentioned** [18] - 21:23, 32:16, 33:19, 57:4, 108:12, 145:22, 146:15, 161:24, 163:17, 168:10, 176:9, 176:19, 194:11, 194:23, 208:24, 212:10, 215:12
**mentioning** [1] - 43:1
**message** [2] - 18:20, 200:17
**messages** [1] - 116:16
**met** [3] - 14:24, 15:5, 159:21
**methods** [1] - 35:20
**mic** [2] - 65:18, 65:19
**microphone** [6] - 30:25, 59:1, 111:4, 140:25, 174:16, 189:14
**mics** [1] - 65:22
**middle** [4] - 90:7, 150:18, 190:8, 190:10
**middleman** [1] - 187:18
**MIEDERHOFF** [26] - 2:15, 3:6, 3:12, 41:14, 46:7, 54:17, 54:21, 54:25, 57:3, 57:25, 58:4, 58:12, 149:17, 149:23, 150:1, 155:12, 155:16, 160:10, 160:24, 162:2,

163:14, 167:10, 170:2, 170:6, 172:1, 174:8
**might** [22] - 28:10, 42:4, 65:18, 89:12, 89:15, 89:17, 110:8, 110:11, 115:6, 115:25, 134:20, 135:18, 142:2, 148:16, 153:21, 168:18, 170:16, 171:13, 174:2, 182:5, 213:15, 216:23
**Mik** [1] - 5:2
**mild** [7] - 148:3, 148:8, 149:1, 163:20, 168:8, 168:15
**MILLER** [3] - 1:23, 232:20, 232:21
**mind** [6] - 28:23, 42:8, 108:5, 176:11, 191:3, 211:8
**mine** [4] - 122:23, 122:25, 123:6
**minimal** [1] - 24:3
**minimum** [1] - 38:17
**minor** [4] - 164:25, 169:2, 169:6, 170:14
**minute** [8] - 42:25, 50:2, 83:22, 84:8, 155:13, 195:22, 204:19, 209:2
**minutes** [30] - 16:14, 61:10, 62:8, 63:2, 72:12, 76:1, 79:21, 80:11, 83:21, 96:14, 99:17, 100:5, 106:8, 121:23, 121:24, 121:25, 122:1, 175:17, 175:21, 195:3, 199:14, 200:12, 201:18, 202:25, 204:8, 206:21, 231:10, 231:11, 231:13
**misdemeanor** [2] - 85:15, 85:23
**missed** [1] - 81:11
**misspelled** [2] - 90:18, 90:19
**misstates** [2] - 92:20, 94:19
**mistake** [1] - 94:7
**mixed** [1] - 159:14
**moderate** [1] - 163:20
**modulate** [1] - 70:6
**mom** [2] - 15:20, 148:15
**mom's** [1] - 151:7

**moment** [9] - 30:1, 69:11, 84:13, 86:5, 126:19, 172:19, 225:17, 230:5, 230:11
**money** [3] - 215:19, 217:22
**monitored** [2] - 101:5, 144:18
**monitoring** [1] - 152:6
**month** [1] - 223:10
**months** [4] - 23:1, 216:20, 218:11, 223:18
**morning** [25] - 4:9, 4:14, 5:18, 6:10, 6:11, 26:18, 31:10, 46:8, 59:11, 59:12, 61:4, 111:13, 111:14, 112:10, 118:9, 118:10, 159:21, 197:2, 205:22, 205:23, 206:14, 213:4, 231:3, 231:14
**most** [7] - 4:22, 142:9, 142:15, 166:11, 166:12, 173:4, 212:19
**mother** [32] - 10:2, 15:22, 17:1, 20:24, 23:10, 30:12, 39:23, 41:11, 41:23, 41:24, 42:2, 43:25, 44:9, 44:15, 44:21, 45:1, 114:11, 114:23, 116:8, 117:1, 120:8, 124:19, 126:2, 135:25, 136:8, 136:16, 137:24, 144:15, 147:10, 148:11, 199:21, 220:15
**motion** [1] - 170:3
**mouth** [2] - 215:4, 215:5
**move** [21] - 7:20, 8:24, 9:18, 10:20, 17:24, 20:2, 57:25, 74:19, 83:24, 93:1, 144:3, 149:13, 155:7, 185:14, 192:16, 193:9, 214:3, 215:6, 219:25, 226:9, 228:4
**moved** [1] - 57:22
**movement** [1] - 74:23
**movements** [1] - 25:10
**movies** [1] - 214:25
**moving** [1] - 187:25

**MR** [259] - 3:4, 3:6, 3:8, 3:8, 3:10, 3:10, 3:12, 3:14, 3:14, 3:16, 3:16, 3:18, 6:7, 6:9, 7:2, 7:10, 7:17, 7:20, 7:23, 8:1, 8:6, 8:10, 8:21, 8:24, 9:3, 9:5, 9:8, 9:11, 9:17, 9:23, 9:25, 10:16, 10:20, 10:24, 11:1, 11:5, 11:23, 12:2, 12:24, 17:24, 18:2, 20:2, 20:5, 21:18, 26:2, 26:13, 29:6, 29:9, 29:24, 30:5, 30:7, 30:9, 41:14, 46:7, 54:17, 54:21, 54:25, 57:3, 57:25, 58:4, 58:12, 58:16, 58:19, 59:8, 59:10, 61:22, 65:1, 65:5, 65:10, 65:15, 65:21, 65:25, 66:2, 68:11, 68:14, 68:19, 69:10, 69:13, 69:18, 70:8, 70:10, 70:25, 71:2, 71:15, 71:17, 71:20, 71:22, 72:3, 72:7, 73:12, 73:14, 74:1, 74:8, 75:13, 75:15, 78:14, 78:19, 83:15, 83:20, 84:3, 84:7, 84:12, 86:5, 86:11, 86:13, 86:20, 86:22, 87:5, 87:16, 87:18, 87:21, 87:23, 89:19, 90:1, 90:3, 92:2, 92:20, 93:1, 93:10, 93:20, 93:25, 94:19, 94:23, 96:11, 97:17, 97:20, 97:22, 103:6, 103:9, 103:12, 103:14, 103:17, 104:9, 104:12, 105:1, 105:3, 108:6, 108:8, 108:10, 109:12, 110:5, 110:15, 110:18, 110:23, 111:10, 111:12, 118:3, 118:6, 118:8, 122:18, 125:11, 125:15, 125:18, 125:22, 126:15, 126:17, 126:22, 126:24, 127:20, 127:22, 128:10, 128:12, 128:21, 128:23, 129:12, 129:14, 130:3, 130:5, 131:14,

131:16, 132:13, 132:15, 133:9, 133:11, 135:22, 135:24, 136:11, 136:13, 137:16, 137:18, 138:6, 138:15, 138:17, 139:17, 139:19, 139:21, 140:15, 140:17, 149:17, 149:23, 150:1, 155:12, 155:16, 156:18, 160:10, 160:24, 162:2, 163:14, 167:10, 170:2, 170:6, 172:1, 174:8, 174:11, 174:21, 174:23, 176:17, 176:21, 177:4, 177:10, 177:18, 177:21, 178:4, 180:11, 180:13, 180:19, 180:22, 183:2, 183:5, 183:8, 183:18, 185:11, 185:16, 185:18, 185:20, 187:2, 187:5, 188:21, 188:24, 189:3, 189:6, 199:6, 200:23, 209:13, 210:1, 210:3, 210:8, 210:18, 212:1, 215:9, 217:8, 217:10, 219:9, 219:25, 220:3, 220:5, 221:17, 223:6, 223:8, 225:14, 225:20, 226:3, 226:9, 226:13, 228:4, 228:8, 228:18, 230:2, 230:9

**MS** [93] - 3:4, 3:6, 3:12, 3:18, 4:20, 4:24, 5:25, 8:7, 26:15, 26:17, 26:21, 27:20, 27:24, 29:2, 30:1, 30:3, 30:19, 31:7, 31:9, 41:20, 46:2, 55:2, 55:5, 56:24, 140:21, 141:6, 141:8, 144:2, 144:9, 144:11, 146:9, 146:14, 149:13, 149:16, 149:19, 150:4, 150:6, 150:14, 151:21, 154:11, 155:7, 155:11,

155:15, 155:19, 155:21, 156:4, 156:8, 156:21, 157:7, 157:11, 157:17, 157:19, 158:15, 158:21, 159:25, 160:13, 161:22, 162:16, 163:10, 172:3, 172:6, 174:5, 189:9, 189:19, 189:21, 193:9, 193:14, 193:16, 195:22, 199:8, 200:25, 202:14, 203:14, 209:15, 210:5, 210:10, 210:20, 210:25, 212:7, 213:9, 213:23, 214:3, 214:7, 214:10, 215:6, 215:11, 215:23, 216:25, 217:6, 219:4, 225:17, 230:5, 230:7

**multiple** [6] - 13:15, 36:10, 54:8, 176:2, 182:4, 182:11

**music** [1] - 205:6

**must** [7] - 35:7, 35:14, 37:2, 40:22, 43:15, 174:2

**MY** [1] - 232:15

─────────

# N

**name** [31] - 6:1, 6:3, 31:2, 31:3, 59:3, 59:4, 98:22, 98:23, 100:22, 100:24, 111:6, 111:7, 111:19, 141:1, 141:2, 141:3, 151:7, 167:12, 174:17, 174:18, 177:12, 183:14, 189:16, 190:10, 190:20, 200:7, 205:2, 211:3

**named** [3] - 204:12, 204:13, 204:21

**names** [3] - 200:9, 205:4

**Nancy** [1] - 141:4

**narrative** [5] - 158:25, 213:22, 215:22, 216:19, 216:23

**narratives** [4] - 45:25, 216:20, 216:21, 217:4

**nature** [2] - 128:8,

134:4

**nausea** [3] - 142:16, 172:20, 173:23

**necessarily** [6] - 57:16, 67:20, 90:11, 117:22, 134:18, 159:13

**necessary** [1] - 37:13

**necessity** [1] - 43:5

**need** [18] - 4:18, 8:14, 14:3, 35:9, 37:23, 43:12, 44:20, 51:16, 57:8, 85:13, 130:8, 142:22, 156:2, 168:20, 171:14, 204:18, 208:12, 222:11

**needed** [5] - 14:7, 19:21, 152:5, 222:24, 227:6

**needs** [4] - 17:23, 87:2, 87:3, 153:20

**negative** [4] - 21:15, 142:4, 219:19, 228:17

**neighbor's** [1] - 216:17

**nervous** [1] - 165:15

**neutral** [2] - 47:15, 47:16

**Nevada** [3] - 23:1, 216:9, 221:2

**never** [28] - 24:20, 53:23, 53:25, 54:10, 54:11, 54:12, 54:22, 94:13, 107:21, 132:24, 154:13, 166:22, 167:4, 176:19, 178:8, 207:11, 215:17, 219:10, 219:12, 219:13, 219:16, 223:20, 223:22, 224:15, 225:3, 228:12, 229:2

**new** [6] - 47:4, 131:17, 213:15, 213:16, 216:10

**next** [29] - 30:18, 58:15, 93:19, 104:8, 105:6, 107:10, 107:14, 110:22, 127:23, 140:20, 145:13, 158:16, 174:10, 183:7, 189:8, 190:5, 193:25, 195:2, 201:13, 202:13, 203:13, 205:22, 205:23, 213:4,

213:8, 213:21, 216:19, 220:4, 226:2

**nice** [1] - 46:9

**Nicholas** [4] - 113:7, 190:4, 192:8, 192:9

**Nick** [6] - 10:5, 15:6, 26:4, 30:13, 113:7, 190:25

**Nick's** [1] - 69:7

**niece** [1] - 22:17

**night** [14] - 5:13, 115:7, 125:9, 206:15, 213:2, 221:12, 223:22, 224:6, 224:12, 225:21, 229:20, 229:25, 230:1, 230:16

**nights** [1] - 225:24

**nighttime** [1] - 218:24

**nine** [2] - 23:1, 189:2

**NO** [1] - 1:8

**nobody** [1] - 5:15

**non** [2] - 153:5, 170:3

**non-existent** [1] - 153:5

**non-responsive** [1] - 170:3

**none** [1] - 5:14

**nonemergency** [5] - 191:25, 194:7, 194:12, 194:18, 227:16

**nonresponsive** [6] - 17:25, 20:2, 57:25, 93:2, 226:9, 228:4

**nonsworn** [4] - 42:9, 43:24, 45:12, 179:22

**Norco** [1] - 126:5

**Norcos** [2] - 124:21

**normal** [1] - 118:17

**normally** [2] - 136:23, 142:14

**NORTH** [1] - 2:17

**notation** [2] - 158:7, 162:4

**notations** [2] - 52:18, 58:9

**note** [13] - 152:13, 152:16, 152:17, 152:21, 153:2, 158:23, 158:24, 159:1, 159:7, 159:20, 159:22, 160:17, 162:21

**noted** [2] - 40:10, 57:17

**notepad** [1] - 120:24

**NOTES** [1] - 232:15

**notes** [7] - 40:13,

52:21, 56:1, 56:6, 143:22, 150:11, 150:12
**nothing** [8] - 52:23, 54:2, 66:21, 86:25, 95:15, 97:1, 155:25, 221:25
**notice** [5] - 57:17, 75:2, 99:22, 132:16, 162:20
**noticed** [1] - 14:22
**notified** [1] - 57:18
**noting** [1] - 152:22
**number** [37] - 15:21, 35:12, 40:16, 90:7, 90:8, 90:9, 90:12, 90:13, 103:3, 138:19, 138:22, 138:25, 140:5, 145:13, 162:23, 170:19, 191:25, 192:3, 193:7, 193:21, 193:22, 193:23, 193:24, 194:3, 194:4, 194:6, 194:18, 194:20, 195:1, 195:11, 204:11, 206:16, 206:18, 223:19
**numbers** [2] - 90:11, 197:4
**nurse** [44] - 18:15, 26:10, 81:4, 81:8, 81:14, 81:25, 82:9, 88:18, 88:23, 89:12, 89:14, 90:21, 91:5, 91:10, 91:14, 91:19, 91:22, 92:4, 92:12, 92:19, 92:23, 93:4, 93:6, 93:16, 93:21, 94:21, 94:24, 102:13, 102:14, 108:13, 108:14, 108:19, 109:24, 109:25, 110:1, 110:6, 110:9, 110:12, 142:20, 148:19, 152:21, 152:24, 159:1
**Nurse** [5] - 94:1, 94:2, 94:4, 95:12, 105:7
**nurse's** [4] - 88:24, 89:5, 91:7, 106:20
**nurses** [2] - 142:18, 199:1
**nursing** [6] - 81:2, 95:17, 104:22, 104:24, 105:17, 106:24

## O

**o'clock** [5] - 61:4, 121:14, 191:24, 192:1, 230:21
**oath** [8] - 6:2, 29:15, 61:20, 76:13, 122:15, 166:20, 178:2, 225:10
**object** [5] - 41:14, 68:22, 68:24, 86:22, 210:8
**objection** [31] - 5:4, 68:11, 70:8, 71:15, 71:20, 72:3, 73:12, 75:13, 78:14, 87:16, 87:21, 94:19, 149:25, 150:1, 155:16, 160:10, 160:24, 177:9, 185:18, 199:6, 200:23, 209:13, 209:24, 209:25, 210:1, 210:18, 212:1, 215:9, 219:4, 225:18, 230:7
**objections** [2] - 176:4, 176:6
**objective** [6] - 130:18, 152:13, 152:16, 152:17, 152:19, 152:20
**objects** [1] - 200:8
**obligated** [1] - 4:11
**obligation** [18] - 35:13, 37:1, 37:7, 37:9, 37:19, 39:8, 39:17, 40:7, 40:9, 42:9, 44:3, 45:4, 55:21, 56:14, 97:5, 184:17, 186:11
**obligations** [1] - 40:16
**observations** [6] - 130:22, 149:7, 150:23, 152:22, 159:5, 159:19
**observe** [2] - 152:20, 158:10
**observed** [3] - 94:17, 142:21, 154:25
**observing** [1] - 152:22
**obtained** [1] - 193:5
**occasion** [1] - 62:13
**occasional** [1] - 217:17
**occupation** [1] - 111:25
**occupation-wise** [1] - 111:25
**occur** [1] - 37:4

**occurred** [2] - 38:10, 83:8
**occurring** [1] - 7:15
**odd** [2] - 217:17, 218:6
**OF** [4] - 1:1, 1:2, 1:9, 1:14, 2:1, 2:2, 2:9, 2:13, 232:2, 232:4, 232:6, 232:9, 232:13, 232:15
**offered** [2] - 53:1, 159:2
**office** [6] - 88:24, 89:5, 91:7, 91:22, 92:24, 104:24
**Officer** [5] - 11:8, 15:6, 21:2, 60:24, 113:22
**officer** [60] - 13:12, 33:20, 34:2, 34:13, 34:17, 36:15, 36:16, 36:17, 36:19, 36:21, 36:24, 37:3, 37:12, 37:20, 37:24, 39:9, 39:14, 39:24, 39:25, 40:2, 40:5, 40:7, 40:15, 40:17, 40:22, 40:23, 42:7, 44:2, 44:6, 46:21, 51:3, 51:17, 73:20, 77:2, 77:4, 77:5, 77:14, 77:15, 80:16, 81:3, 81:20, 83:10, 85:16, 85:21, 89:2, 90:17, 91:2, 92:14, 97:4, 102:2, 102:15, 102:21, 107:12, 107:14, 108:4, 112:16, 115:20, 116:3, 118:24
**officer's** [1] - 40:9
**officers** [37] - 33:4, 33:5, 33:6, 33:24, 34:3, 34:20, 34:21, 35:6, 35:10, 35:24, 36:10, 36:11, 36:24, 36:25, 37:1, 37:6, 37:18, 37:23, 37:24, 38:25, 39:1, 39:2, 39:3, 39:8, 39:11, 39:12, 39:16, 39:22, 51:18, 60:23, 87:2, 98:20, 142:24, 157:4
**Officers** [3] - 33:11, 59:25, 112:11
**OFFICES** [1] - 2:9
**official** [2] - 187:19, 210:16
**OFFICIAL** [3] - 1:23, 232:8, 232:22

**often** [7] - 14:2, 39:5, 132:24, 134:12, 134:20, 134:22, 139:5
**oil** [1] - 216:13
**old** [4] - 164:13, 168:12, 211:5, 217:11
**older** [1] - 143:10
**ON** [2] - 2:2, 2:13
**on-scene** [1] - 48:12
**once** [8] - 102:10, 102:16, 102:25, 105:23, 106:1, 106:3, 107:9, 205:25
**one** [75] - 11:10, 13:25, 17:1, 20:24, 24:6, 28:20, 30:1, 30:11, 33:21, 35:8, 35:13, 36:15, 36:21, 39:22, 40:17, 41:17, 42:11, 42:25, 43:7, 43:11, 49:22, 50:12, 65:22, 68:17, 74:18, 84:8, 85:1, 86:6, 89:12, 104:3, 104:4, 106:14, 109:9, 114:5, 114:23, 119:21, 132:2, 143:13, 151:4, 155:13, 161:5, 162:10, 162:14, 162:19, 167:12, 168:18, 170:16, 172:10, 172:17, 175:25, 176:2, 176:3, 176:5, 176:22, 178:21, 179:1, 179:6, 179:10, 184:24, 186:19, 189:24, 195:22, 198:14, 207:24, 209:16, 212:16, 213:18, 213:24, 215:3, 221:11, 226:18, 226:22
**one-on-one** [2] - 17:1, 20:24
**ones** [5] - 50:17, 50:18, 64:14, 133:24, 162:24
**open** [6] - 67:3, 78:20, 78:22, 79:13, 132:4, 151:18
**opened** [1] - 200:1
**opening** [1] - 59:16
**operations** [1] - 186:14
**operative** [1] - 56:19

**operator** [1] - 194:25
**opinion** [6] - 38:14, 58:5, 140:12, 155:5, 159:10, 163:6
**opinions** [19] - 47:9, 47:11, 48:19, 48:23, 49:1, 49:2, 52:13, 52:16, 52:17, 61:8, 121:11, 127:25, 128:6, 133:25, 136:3, 154:17, 161:12, 175:19, 230:24
**opportunity** [12] - 10:12, 19:13, 21:8, 22:16, 66:9, 98:10, 100:9, 101:1, 105:10, 105:12, 124:11, 129:8
**opposed** [2] - 168:15, 170:14
**options** [1] - 137:2
**order** [13] - 33:4, 50:5, 61:16, 70:7, 73:4, 116:15, 136:15, 137:1, 137:4, 137:12, 192:16, 211:23, 212:13
**ordered** [1] - 4:16
**organ** [1] - 165:7
**original** [2] - 19:3, 50:4
**ors** [1] - 108:23
**otherwise** [1] - 51:18
**ourselves** [1] - 130:23
**outlined** [2] - 160:22, 164:3
**outside** [18] - 4:11, 10:14, 14:12, 15:23, 15:25, 16:1, 16:3, 16:6, 16:16, 16:19, 46:18, 53:5, 67:12, 84:17, 101:25, 105:5, 158:13, 219:13
**overhead** [1] - 69:14
**overruled** [9] - 41:16, 74:2, 78:15, 92:22, 94:20, 162:3, 209:14, 210:4, 212:5
**oversight** [2] - 33:10, 94:7
**overuse** [1] - 35:2
**own** [8] - 28:15, 40:12, 68:5, 76:7, 78:18, 95:14, 137:9, 176:25
**owner** [1] - 151:6
**owning** [1] - 151:14

**P**

p.m [27] - 47:23, 48:4, 63:11, 63:14, 194:15, 195:2, 196:21, 197:9, 197:16, 197:18, 198:5, 199:12, 200:11, 202:19, 202:21, 204:5, 204:11, 206:20, 208:16, 208:19, 209:4, 209:20, 224:8, 231:18
packed [1] - 213:4
page [29] - 27:10, 29:25, 150:15, 150:16, 150:18, 151:22, 151:23, 152:8, 158:16, 158:22, 158:23, 186:4, 193:20, 193:21, 193:25, 194:1, 195:9, 195:23, 196:18, 197:9, 197:24, 199:12, 202:19, 202:20, 206:19, 207:12, 208:22, 225:15, 230:3
pain [6] - 70:1, 70:4, 70:6, 99:6, 200:4, 208:10
panic [1] - 155:1
papers [2] - 4:10, 107:13
paperwork [8] - 81:20, 88:6, 102:16, 103:22, 106:21, 107:12, 107:15, 181:7
paralyzed [1] - 171:13
paramedic [3] - 19:4, 34:4, 100:22
paramedics [19] - 14:16, 14:20, 15:2, 16:3, 18:9, 18:21, 19:10, 19:14, 77:25, 78:2, 78:21, 79:7, 79:8, 79:25, 80:7, 99:4, 100:9, 100:17
paranoia [2] - 151:16, 159:3
paranoid [1] - 158:12
pardon [2] - 41:14, 202:5
parent [1] - 216:6
parents [11] - 10:9, 11:21, 14:23, 15:5, 20:16, 24:15, 24:18, 24:21, 24:24, 25:3, 25:5
parents' [1] - 14:21
park [1] - 214:25
part [29] - 14:23, 22:3, 36:2, 38:15, 47:9, 47:11, 50:4, 66:12, 72:5, 96:18, 96:20, 96:21, 128:18, 129:16, 131:25, 139:2, 150:18, 153:17, 154:16, 159:15, 162:6, 162:7, 164:18, 168:4, 168:7, 186:4, 218:16, 220:6
part-time [1] - 218:16
participation [2] - 88:20, 215:24
particular [3] - 38:4, 57:7, 91:1
parties [1] - 154:8
partners [2] - 132:22, 132:25
parts [1] - 90:6
party [3] - 63:19, 130:23, 154:6
pass [1] - 37:2, 76:23, 105:23, 106:1, 171:17, 171:21, 171:24, 179:18, 183:1, 184:15, 184:17, 184:20, 208:13, 209:17
passed [8] - 77:22, 97:2, 105:20, 173:18, 208:15, 208:18, 209:11, 209:21
past [4] - 123:23, 175:9, 220:10, 220:25
pathologist [7] - 143:21, 146:16, 146:19, 146:20, 161:23, 162:21
pathology [2] - 164:3, 164:5
patient [7] - 150:19, 158:5, 158:6, 158:18, 158:19, 159:7, 160:3, 160:7, 163:23
patients [5] - 126:14, 141:14, 141:18, 141:21, 142:5
patrol [2] - 62:21, 62:22, 64:9, 64:10, 72:17, 72:18, 78:18, 85:9, 113:12
pause [1] - 84:12
pay [3] - 44:22, 217:24
paying [1] - 218:3
pays [1] - 61:2
Peace [3] - 33:11, 59:24, 112:10
peace [2] - 51:3, 73:20
peaks [1] - 147:25
pen [1] - 120:24
PENA [3] - 2:4, 3:4, 4:20, 4:24, 5:25, 26:15, 26:17, 26:21, 27:20, 27:24, 29:2, 30:1, 30:3
Penal [2] - 33:8, 85:19
people [20] - 19:7, 36:12, 49:15, 53:4, 53:8, 68:7, 101:13, 102:3, 132:22, 134:12, 135:9, 139:5, 142:15, 143:8, 144:25, 151:15, 166:14, 169:8, 171:12, 181:17
pepper [1] - 72:1
per [9] - 42:14, 45:6, 47:4, 51:17, 128:2, 130:23, 152:9, 176:2, 176:5
percent [6] - 47:6, 114:25, 127:5, 171:16, 171:20, 171:23
period [5] - 71:12, 184:2, 212:21, 223:18, 224:20
peripherally [1] - 161:13
permission [1] - 86:20
person [52] - 33:19, 35:14, 37:21, 42:2, 42:6, 42:7, 42:9, 42:20, 43:24, 44:2, 64:1, 64:17, 76:25, 81:16, 82:1, 82:4, 82:5, 82:10, 90:15, 114:12, 120:21, 131:4, 134:8, 142:18, 144:13, 144:20, 144:22, 144:24, 144:25, 145:2, 145:5, 145:10, 145:11, 145:18, 145:22, 146:25, 147:14, 148:1, 148:10, 157:5, 157:6, 164:15, 168:5, 174:1, 176:3, 179:13, 203:5, 204:13, 206:9
person's [7] - 37:11, 68:1, 68:4, 131:18, 134:21, 169:20, 173:16
personal [9] - 40:13, 54:3, 54:4, 81:21, 83:5, 87:9, 103:3, 184:16, 188:18
personality [1] - 151:18
personalized [1] - 17:1
personally [13] - 7:14, 13:15, 26:1, 26:9, 45:21, 101:18, 105:24, 156:13, 207:20, 219:10, 219:16, 229:6, 230:19
personnel [4] - 45:15, 173:18, 179:22, 210:7
persons [2] - 43:4, 57:4
pertaining [2] - 124:7
pertinent [4] - 117:6, 117:11, 117:14, 123:19
PH [1] - 1:25
phenomenon [1] - 168:17
PHG [1] - 2:3
phone [119] - 7:15, 7:20, 41:3, 41:5, 41:8, 42:3, 42:6, 42:10, 43:25, 44:3, 44:13, 44:15, 48:3, 48:6, 52:3, 52:7, 52:19, 52:25, 53:5, 53:9, 54:12, 54:22, 55:17, 55:22, 56:2, 56:6, 57:5, 57:7, 57:9, 57:11, 81:23, 96:6, 96:7, 96:8, 96:14, 102:24, 136:18, 175:6, 178:8, 178:14, 178:19, 178:23, 178:25, 180:2, 181:5, 181:7, 181:17, 181:18, 184:1, 184:8, 192:6, 192:20, 192:23, 193:5, 193:6, 193:11, 193:17, 193:21, 193:22, 194:3, 194:4, 194:6, 174:1, 176:3, 179:13, 203:5, 204:13, 206:9
phones [2] - 116:16, 205:14
photo [2] - 86:6, 86:16
photographs [2] - 38:22, 74:5
photos [1] - 73:25
phrase [2] - 132:17, 132:19
phrases [1] - 36:5
physical [7] - 25:3, 25:4, 25:5, 25:12, 43:17, 75:17, 116:14
physically [7] - 24:25, 25:9, 25:21, 26:4, 119:18, 166:15, 219:14
physician [4] - 141:10, 141:11, 141:13, 142:23
pick [4] - 212:13, 212:17, 213:13, 213:25
picking [1] - 220:14
pickup [2] - 69:6, 69:7
piece [3] - 34:5, 43:11, 176:23
pieces [1] - 43:15
pier [1] - 214:23
pillow [1] - 159:9
pillows [1] - 213:7
pin [2] - 206:16, 206:18
place [9] - 45:11, 45:20, 73:15, 112:25, 117:11,

119:18, 121:2, 124:17, 129:3, 177:17, 211:13
**PLACE** [1] - 232:11
**placed** [1] - 107:11
**places** [1] - 43:7
**placing** [1] - 113:12
**PLAINTIFF** [2] - 2:2, 3:2
**plaintiff** [5] - 121:23, 121:25, 122:1, 231:10, 231:13
**plaintiff's** [1] - 86:11
**plaintiffs** [10] - 30:19, 46:10, 47:7, 47:12, 58:16, 110:24, 140:21, 174:11, 183:9, 189:9
**PLAINTIFFS** [1] - 1:7
**plan** [4] - 64:5, 132:4, 152:19, 222:8
**planned** [4] - 124:17, 221:22, 221:24, 222:3
**planning** [6] - 64:3, 73:18, 73:24, 86:18, 123:20, 222:6
**plant** [1] - 43:17
**plastic** [1] - 215:4
**plausible** [1] - 173:25
**play** [11] - 11:1, 11:25, 33:17, 64:23, 65:11, 70:25, 83:21, 104:10, 105:1, 213:16, 215:1
**played** [34] - 8:9, 9:10, 9:24, 11:4, 12:1, 65:14, 65:24, 69:12, 69:17, 71:1, 84:11, 103:16, 104:11, 105:2, 113:4, 125:21, 126:16, 126:23, 127:21, 128:11, 128:22, 129:13, 130:4, 131:15, 132:14, 133:10, 135:23, 136:12, 137:17, 138:5, 138:16, 155:22, 214:9, 220:14
**playing** [8] - 65:23, 69:16, 84:8, 103:15, 125:19, 126:15, 127:20, 128:21
**pleasant** [2] - 121:13, 231:2
**pocket** [6] - 67:12, 67:15, 67:17, 67:19, 68:4, 70:16

**pocketknife** [4] - 66:25, 67:19, 68:4, 69:6
**point** [61] - 10:8, 54:21, 62:23, 64:3, 66:16, 66:24, 67:4, 69:19, 70:11, 70:17, 70:20, 71:3, 71:5, 73:15, 73:19, 74:9, 76:25, 77:13, 81:17, 81:24, 86:23, 87:1, 89:22, 91:10, 92:3, 95:3, 95:20, 95:24, 96:16, 101:4, 104:7, 107:5, 115:18, 116:10, 119:21, 122:23, 123:25, 125:7, 129:1, 129:22, 130:24, 133:25, 138:1, 138:13, 142:20, 151:24, 153:12, 153:14, 153:25, 154:3, 168:14, 169:25, 170:7, 172:17, 173:7, 179:6, 179:22, 191:13, 191:18, 193:5, 210:11
**pointing** [2] - 63:18, 152:14
**points** [1] - 151:11
**poisoning** [7] - 34:5, 34:6, 34:7, 34:9, 35:1, 35:2, 35:21
**Police** [4] - 30:19, 31:12, 60:19, 118:13
**police** [28] - 31:13, 31:19, 31:22, 33:4, 33:5, 33:14, 33:20, 33:24, 34:13, 34:17, 34:19, 34:21, 34:23, 35:10, 35:24, 36:10, 36:11, 36:15, 46:21, 51:17, 60:19, 60:23, 61:2, 85:21, 194:7, 210:16, 227:15
**policies** [10] - 45:11, 45:14, 143:23, 185:5, 186:2, 186:5, 186:20, 186:25, 187:8, 188:11
**Policy** [2] - 185:9, 185:24
**policy** [10] - 45:20, 176:7, 180:10, 181:21, 185:13, 186:11, 186:14, 186:17, 186:18, 188:14

**pony** [1] - 85:3
**poor** [1] - 206:10
**portals** [1] - 32:12
**portion** [5] - 11:1, 125:19, 125:24, 127:23, 150:20
**portrayed** [1] - 124:19
**pose** [1] - 146:6
**posed** [2] - 107:17, 172:23
**position** [3] - 72:11, 93:21, 176:13
**positively** [1] - 40:22
**possibilities** [2] - 153:16, 202:11
**possibility** [3] - 26:8, 148:12, 230:18
**possible** [4] - 20:15, 28:19, 76:18, 184:4
**possibly** [1] - 223:18
**POST** [5] - 33:11, 33:24, 59:24, 60:3, 112:10
**post** [6] - 34:18, 50:25, 51:4, 51:10, 51:15, 51:23
**Post** [1] - 33:14
**post-certification** [1] - 34:18
**post-certified** [1] - 51:23
**post-training** [4] - 50:25, 51:4, 51:10, 51:15
**posterior** [1] - 162:22
**postured** [1] - 43:21
**potential** [3] - 25:11, 99:7, 173:25
**potentially** [1] - 87:12
**pounds** [1] - 168:13
**powers** [1] - 33:14
**practice** [8] - 115:18, 116:2, 116:4, 118:17, 123:23, 139:3, 139:6, 176:21
**Practices** [1] - 30:20
**pre** [1] - 82:14
**pre-clearance** [1] - 82:14
**predictable** [1] - 142:2
**predisposes** [1] - 170:24
**preference** [1] - 183:20
**prejudicial** [4] - 155:24, 156:2, 156:24, 157:1
**preoccupied** [1] - 160:4
**prepare** [3] - 87:24,

102:22, 177:11
**prepared** [4] - 83:18, 83:25, 87:25, 177:5
**preparing** [4] - 86:1, 86:4, 88:3, 88:6
**preplanned** [2] - 123:12, 123:18
**presence** [1] - 164:4
**present** [16] - 4:7, 5:9, 61:15, 87:7, 121:17, 128:16, 128:18, 175:23, 196:10, 209:8, 221:9, 225:1, 225:4, 227:18, 227:24, 231:7
**presented** [4] - 52:23, 156:13, 159:7, 160:8
**PRESIDING** [1] - 1:4
**pressure** [3] - 43:14, 70:5, 100:13
**presumably** [1] - 52:4
**pretty** [6] - 65:15, 65:16, 99:16, 143:25, 144:1, 215:5
**previous** [1] - 145:16
**primarily** [1] - 126:12
**primary** [1] - 101:10
**prison** [1] - 87:11
**prisons** [1] - 38:21
**private** [1] - 20:23
**probable** [10] - 83:3, 83:6, 85:12, 85:13, 85:16, 85:25, 86:17, 88:3, 88:7, 102:20
**probative** [1] - 155:24
**problem** [15] - 5:17, 12:12, 22:8, 23:18, 36:19, 64:7, 78:6, 96:17, 97:12, 166:14, 176:19, 177:20, 192:18, 198:23, 207:6
**problems** [4] - 105:18, 165:7, 165:15, 227:4
**procedure** [2] - 43:3, 102:19
**Procedures** [1] - 31:12
**procedures** [8] - 31:13, 31:20, 31:22, 42:17, 131:1, 134:15, 143:24, 187:9
**proceeding** [1] - 5:20
**proceedings** [2] - 122:8, 231:18
**PROCEEDINGS** [2] - 1:14, 232:11
**process** [15] - 7:14, 38:15, 40:11, 80:16,

81:20, 104:25, 106:12, 106:16, 138:8, 138:9, 138:10, 153:6, 159:1, 211:22, 212:23
**processed** [1] - 107:15
**processes** [1] - 102:22
**processing** [1] - 41:1
**produced** [1] - 157:18
**profanity** [1] - 227:13
**professional** [1] - 133:18
**progress** [3] - 36:20, 38:2, 143:22
**progressive** [1] - 164:24
**promoted** [1] - 32:8
**prompted** [2] - 148:21, 221:19
**pronounce** [1] - 146:23
**proof** [1] - 28:18
**proper** [1] - 37:4
**properly** [1] - 129:24
**property** [2] - 21:11, 68:5
**prosecuted** [1] - 86:1
**prospects** [1] - 87:14
**protect** [1] - 156:24
**protection** [1] - 61:2
**prove** [3] - 134:8, 144:8, 146:7
**proven** [1] - 146:13
**provide** [5] - 92:14, 94:17, 102:15, 115:19, 116:2
**provided** [2] - 139:23, 175:9
**provider** [2] - 148:19, 150:12
**providers** [1] - 153:24
**providing** [2] - 47:9, 47:11
**psychiatric** [2] - 145:3, 152:6
**psychologists** [1] - 181:16
**psychotic** [4] - 153:18, 159:17, 161:15, 161:18
**public** [2] - 175:7, 181:8
**publish** [14] - 8:1, 9:8, 10:24, 65:2, 65:9, 86:21, 89:23, 103:9, 103:10, 125:16, 150:4, 155:19,

193:14, 214:7
**published** [3] - 9:21, 84:6, 157:15
**pull** [10] - 67:1, 67:14, 79:17, 83:22, 89:21, 173:22, 195:23, 216:17
**pulled** [1] - 67:2
**pulling** [1] - 66:24
**Puma** [2] - 122:23, 122:24
**purple** - 190:4
**purpose** [3] - 24:10, 98:3, 129:21
**push** [3] - 105:1, 120:22, 123:25
**pushing** [1] - 123:2
**put** [35] - 5:24, 17:20, 36:6, 43:9, 65:18, 65:22, 68:9, 68:10, 68:20, 68:21, 69:19, 69:23, 70:11, 72:14, 72:17, 72:18, 73:11, 76:2, 78:25, 79:1, 83:16, 93:22, 117:6, 117:9, 134:20, 156:2, 171:13, 171:15, 185:12, 192:4, 213:16, 219:22, 219:23, 222:25
**putting** [2] - 70:6, 136:22

## Q

**qualified** [1] - 31:16
**quantities** [2] - 145:25, 147:18
**quantity** [1] - 127:17
**question's** [1] - 92:11
**questioning** [7] - 27:6, 28:4, 28:7, 56:1, 56:3, 172:22, 172:25
**questions** [59] - 5:21, 26:13, 29:3, 29:10, 30:14, 31:11, 33:3, 46:3, 54:25, 55:10, 56:24, 58:12, 65:12, 88:25, 89:1, 89:4, 89:7, 89:13, 90:24, 92:13, 97:18, 99:19, 100:14, 100:15, 106:18, 106:25, 107:3, 107:17, 108:6, 110:16, 118:4, 121:1, 125:20, 130:13, 139:17, 140:15, 144:2, 146:4,

158:18, 163:10, 172:1, 174:6, 176:15, 180:19, 183:2, 183:23, 187:2, 187:8, 188:21, 189:4, 191:10, 191:11, 198:6, 211:7, 212:8, 217:1, 217:5, 217:6
**quick** [2] - 140:9, 149:18
**quiet** [1] - 65:16
**quietly** [2] - 121:15, 175:21
**quite** [3] - 147:22, 148:2, 172:17
**quote** [2] - 159:8, 159:9

## R

**radio** [2] - 113:1, 118:15
**raise** [7] - 30:22, 58:23, 111:1, 140:22, 174:13, 183:11, 189:12
**Ramirez** [3] - 27:7, 28:5, 28:20
**RAMIREZ** [149] - 2:15, 3:4, 3:8, 3:10, 3:14, 3:16, 3:18, 6:7, 6:9, 6:24, 7:2, 7:10, 7:17, 7:20, 7:23, 8:1, 8:6, 8:10, 8:21, 8:24, 9:3, 9:5, 9:8, 9:11, 9:17, 9:23, 9:25, 10:16, 10:20, 10:24, 11:1, 11:5, 11:23, 12:2, 12:24, 17:24, 18:2, 20:2, 20:5, 21:18, 26:2, 26:13, 29:6, 29:9, 29:24, 30:5, 30:7, 30:9, 68:11, 68:14, 70:8, 71:15, 71:20, 72:3, 73:12, 74:1, 75:13, 78:14, 86:22, 87:16, 87:21, 92:20, 94:19, 97:20, 97:22, 103:6, 103:9, 103:12, 103:14, 103:17, 104:9, 104:12, 105:1, 105:3, 108:6, 110:18, 118:6, 118:8, 122:18, 125:11, 125:15, 125:18, 125:22, 126:15, 126:17, 126:22, 126:24,

127:20, 127:22, 128:10, 128:12, 128:21, 128:23, 129:12, 129:14, 130:3, 130:5, 131:14, 131:16, 132:13, 132:15, 133:9, 133:11, 135:22, 135:24, 136:11, 136:13, 137:16, 137:18, 138:6, 138:15, 138:17, 139:17, 140:17, 180:22, 183:2, 185:16, 185:18, 187:5, 188:21, 189:6, 199:6, 200:23, 209:13, 210:1, 210:3, 210:8, 210:18, 212:1, 215:9, 217:8, 217:10, 219:9, 219:25, 220:3, 220:5, 221:17, 223:6, 223:8, 225:14, 225:20, 226:3, 226:9, 226:13, 228:4, 228:8, 228:18, 230:2, 230:9
**ran** [1] - 163:7
**Rancho** [1] - 62:16
**rank** [2] - 51:20, 133:3
**Rank** [1] - 32:7
**rather** [1] - 96:10
**reach** [2] - 67:1, 123:25
**reached** [1] - 67:10
**reaching** [2] - 67:6, 72:1
**reaction** [1] - 157:9
**read** [9] - 27:11, 29:25, 30:8, 177:14, 225:15, 225:19, 230:3, 230:8
**reading** [3] - 27:12, 27:17, 152:11
**ready** [3] - 5:22, 213:4
**real** [1] - 149:18
**reality** [3] - 142:14, 151:13, 158:13
**realize** [1] - 216:24
**realizes** [1] - 222:11
**really** [22] - 14:6, 42:3, 44:16, 74:12, 153:7, 159:12, 173:2, 173:4, 176:11, 187:25, 192:14, 192:17, 192:18,

202:10, 204:14, 206:10, 207:7, 207:8, 213:7, 221:19, 222:2, 227:7
**reask** [1] - 58:3
**reason** [9] - 24:5, 44:22, 130:21, 135:20, 162:10, 163:5, 176:22, 177:4, 220:6
**reasons** [6] - 66:20, 68:6, 82:10, 106:11, 106:15, 162:10
**recap** [1] - 145:24
**receive** [9] - 33:4, 45:12, 53:5, 171:21, 171:24, 180:1, 182:15, 182:18, 182:21
**RECEIVED** [2] - 3:19
**received** [26] - 7:24, 9:1, 9:20, 44:20, 51:25, 52:5, 65:7, 84:4, 89:24, 115:24, 125:16, 150:2, 178:8, 178:21, 179:1, 179:7, 179:12, 182:24, 184:9, 185:2, 185:15, 192:1, 193:12, 195:2, 208:6, 214:5
**receiving** [9] - 43:24, 44:2, 53:9, 80:24, 88:18, 89:19, 182:3, 184:1, 186:10
**recent** [1] - 78:5
**recently** [1] - 143:24
**reception** [2] - 206:8, 206:9
**recess** [8] - 5:5, 5:6, 61:5, 61:11, 61:12, 122:9, 122:11, 177:23
**Recess** [2] - 5:7, 61:13
**recognize** [6] - 11:6, 35:6, 120:4, 120:5, 125:23, 128:14, 131:18, 203:21
**recognized** [1] - 203:17
**recollection** [2] - 27:15, 96:13
**record** [37] - 5:10, 7:18, 8:21, 8:22, 9:18, 10:17, 31:2, 48:9, 53:1, 53:15, 53:18, 54:2, 54:9, 54:10, 55:18, 59:3, 96:7, 103:7, 111:6,

121:20, 122:12, 122:20, 123:3, 124:6, 125:11, 139:8, 158:3, 158:4, 175:24, 177:24, 183:13, 189:15, 194:4, 194:12, 197:5, 199:9, 206:19
**recorded** [3] - 40:10, 139:3, 154:23
**recorder** [13] - 49:6, 49:11, 72:2, 120:22, 122:21, 123:11, 123:12, 123:19, 124:1, 124:4, 139:3, 139:7, 139:23
**recorders** [2] - 64:21, 120:20
**recording** [29] - 40:1, 40:6, 40:18, 49:10, 49:17, 54:12, 54:22, 64:24, 66:5, 66:10, 68:9, 68:12, 68:14, 68:20, 71:3, 71:23, 71:25, 84:9, 122:22, 123:6, 124:2, 125:12, 126:18, 127:23, 128:13, 129:16, 130:6, 131:17
**recordings** [17] - 17:2, 48:16, 48:21, 49:3, 49:23, 49:24, 50:11, 50:15, 50:16, 50:22, 52:7, 154:20, 155:4, 155:15, 156:5, 161:15
**records** [25] - 41:3, 41:5, 41:6, 41:8, 56:9, 149:3, 149:5, 149:10, 149:15, 149:21, 152:3, 154:13, 154:18, 157:13, 178:14, 178:20, 178:23, 178:25, 193:6, 193:11, 193:17, 194:8, 197:23, 208:25
**recount** [1] - 50:5
**recross** [5] - 29:7, 57:1, 110:17, 140:16, 189:5
**RECROSS** [3] - 3:3, 29:8, 57:2
**recross-examination** [1] - 57:1
**RECROSS-EXAMINATION** [2] - 29:8, 57:2

**red** [3] - 123:6, 123:8,
161:5
**redial** [1] - 206:7
**redirect** [11] - 26:14,
29:5, 55:3, 108:7,
110:17, 139:18,
172:2, 174:7, 183:4,
183:5, 188:22
**REDIRECT** [7] - 3:3,
26:16, 55:4, 108:9,
139:20, 172:5,
188:23
**REDUCED** [1] -
232:12
**refer** [3] - 90:11,
132:25, 186:17
**referred** [1] - 60:24
**referring** [6] - 43:2,
69:21, 105:14,
149:18, 150:18,
150:21
**reflect** [6] - 5:10,
61:17, 121:20,
122:12, 177:24,
200:22
**reflux** [1] - 164:25
**refresh** [6] - 27:15,
27:18, 27:23, 27:25,
105:15, 114:2
**refuse** [1] - 153:9
**refused** [2] - 13:25,
21:24
**regarding** [11] - 44:21,
91:2, 94:18, 117:6,
117:16, 120:19,
143:19, 150:24,
207:21, 208:1, 208:8
**regardless** [1] - 44:6
**region** [1] - 101:11
**registered** [1] - 142:18
**regular** [2] - 142:15,
187:21
**regularly** [1] - 131:12
**regulations** [1] -
126:14
**reject** [2] - 82:1, 82:4
**rejects** [1] - 82:9
**relate** [2] - 33:21,
185:5
**related** [7] - 94:14,
95:16, 141:15,
148:12, 171:5,
179:15, 191:15
**relates** [1] - 34:22
**relation** [2] - 132:6,
214:12
**relationship** [4] -
22:21, 211:11,
211:16, 213:10
**relay** [7] - 18:12,

**relayed** [3] - 28:21,
45:15, 109:25
**relaying** [2] - 18:24,
28:23
**released** [1] - 85:15
**relevance** [14] - 70:8,
71:15, 71:20, 72:3,
73:12, 74:1, 75:13,
86:22, 87:16, 87:21,
160:11, 160:24,
210:18, 212:1
**relevant** [4] - 86:24,
156:25, 176:11,
176:12
**relied** [1] - 164:1
**relieve** [1] - 101:25
**relieved** [4] - 81:24,
97:13, 102:16,
107:16
**rely** [5] - 52:12, 52:16,
132:22, 149:10,
155:4
**remember** [65] - 6:2,
7:16, 10:7, 15:11,
17:16, 17:19, 17:21,
22:2, 22:3, 22:6,
22:7, 27:7, 29:13,
29:15, 48:6, 49:20,
61:6, 61:19, 62:14,
74:5, 76:9, 79:18,
99:15, 99:21, 105:9,
107:22, 107:23,
109:1, 109:9,
113:14, 119:25,
120:7, 120:11,
120:12, 121:9,
122:14, 124:14,
132:10, 140:10,
167:9, 172:11,
175:12, 175:17,
178:1, 178:10,
178:16, 179:3,
179:9, 179:11,
181:25, 182:3,
182:7, 200:7, 200:9,
203:15, 203:21,
205:2, 205:5,
212:11, 221:3,
222:16, 225:6,
227:14, 230:22
**remembered** [5] -
182:11, 182:12,
184:5, 184:6, 200:3
**remembering** [2] -
151:4, 205:4
**remembers** [1] - 208:9
**reminding** [1] - 144:9
**rendered** [1] - 161:12

**rent** [1] - 217:24
**repeat** [7] - 14:17,
53:7, 115:23, 124:1,
139:7, 171:18,
226:21
**report** [57] - 15:21,
19:4, 22:13, 36:3,
36:6, 36:8, 36:22,
37:3, 38:10, 38:14,
38:15, 39:18, 40:8,
40:11, 40:24, 47:14,
47:15, 47:17, 48:20,
48:24, 50:3, 50:8,
53:12, 58:10, 72:25,
73:3, 73:6, 79:1,
83:10, 87:25,
109:15, 109:17,
109:20, 116:22,
116:24, 117:4,
117:9, 117:14,
129:25, 138:19,
138:22, 138:25,
140:5, 146:16,
146:19, 146:21,
160:15, 160:20,
160:22, 164:3,
164:5, 169:17,
180:7, 216:3, 216:4
**reported** [5] - 24:6,
117:1, 144:15,
144:16, 147:10
**REPORTED** [1] -
232:10
**REPORTER** [5] - 1:23,
125:2, 232:2, 232:8,
232:22
**reporter** [1] - 8:4
**REPORTER'S** [1] -
1:14
**reporting** [2] - 179:13,
182:4
**reports** [9] - 36:1,
38:9, 38:10, 56:10,
58:5, 111:19,
118:14, 133:21,
143:21
**representation** [1] -
52:9
**represented** [1] -
166:9
**request** [2] - 65:5,
101:21
**requested** [1] - 46:1
**require** [2] - 184:20,
186:24
**required** [13] - 18:22,
33:8, 34:18, 82:14,
179:16, 179:21,
179:23, 180:3,
180:4, 180:5, 180:9,

184:14, 184:15
**requirement** [5] -
42:14, 42:22, 43:3,
92:14, 179:25
**requirements** [3] -
35:16, 38:16, 43:18
**requires** [1] - 35:18
**residence** [4] - 63:6,
68:1, 75:22, 114:11
**resisted** [1] - 137:23
**resisting** [1] - 85:21
**resolved** [1] - 45:7
**resources** [1] - 171:12
**respect** [8] - 87:7,
91:10, 105:24,
126:4, 146:19,
176:24, 184:10,
185:3
**respective** [5] - 5:11,
5:16, 61:18, 122:13,
177:25
**respond** [4] - 113:2,
118:18, 144:19,
156:4
**responded** [1] - 113:2
**responder** [1] - 34:3
**responding** [26] -
36:11, 36:24, 36:25,
37:5, 37:18, 37:23,
38:24, 39:1, 39:2,
39:3, 39:8, 39:11,
39:12, 39:16, 39:22,
39:25, 40:2, 40:5,
40:7, 40:15, 40:17,
67:25, 158:6,
158:10, 158:19,
160:9
**responds** [1] - 66:24
**response** [12] - 17:24,
34:7, 38:1, 92:17,
98:4, 99:19, 129:5,
137:11, 138:8,
158:17, 172:14,
208:6
**responsibilities** [1] -
188:3
**responsibility** [4] -
32:14, 81:18, 82:5,
82:6
**responsible** [5] -
23:14, 36:22, 57:5,
188:4, 188:9
**responsive** [1] - 170:3
**rest** [3] - 5:19, 64:7,
77:14
**restate** [2] - 6:1, 6:3
**restraining** [4] -
136:14, 137:1,
137:4, 137:12
**result** [2] - 42:18,

102:4
**results** [3] - 44:23,
95:8, 147:9
**retained** [1] - 46:24
**retire** [3] - 61:9,
175:20, 230:25
**retired** [1] - 31:24
**retirement** [2] - 46:16,
46:18
**return** [1] - 67:24
**revealed** [1] - 77:20
**review** [13] - 41:3,
41:4, 49:23, 50:1,
56:9, 58:9, 143:19,
152:3, 152:4, 152:9,
154:12, 154:16,
160:20
**reviewed** [23] - 38:4,
38:8, 38:15, 38:16,
38:18, 47:25, 48:8,
49:17, 50:10, 50:14,
50:16, 50:18, 50:20,
50:22, 143:16,
143:21, 143:22,
143:23, 146:15,
146:21, 149:2,
149:5, 160:15
**reviewing** [2] - 41:11,
49:20
**rib** [2] - 162:23, 163:3
**ribs** [1] - 162:23
**ride** [1] - 216:13
**rides** [1] - 213:13
**riding** [1] - 216:16
**right-hand** [1] -
187:15
**rightfully** [1] - 124:16
**rights** [2] - 102:25,
211:23
**rise** [6] - 5:6, 5:8,
61:14, 121:16,
122:10, 231:16
**risk** [28] - 25:16,
53:13, 119:10,
134:1, 134:6, 134:7,
134:17, 134:21,
140:12, 143:1,
143:2, 143:6,
145:23, 147:11,
147:18, 147:24,
165:21, 167:22,
168:3, 168:4,
169:16, 170:17,
182:5, 182:16,
182:19, 182:22,
184:11, 186:7
**risks** [1] - 164:22
**road** [1] - 216:15
**ROGER** [1] - 3:5
**Roger** [4] - 30:20,

31:4, 58:17, 58:19
**role** [12] - 33:16, 38:3, 53:4, 53:8, 60:19, 98:25, 102:10, 117:4, 119:2, 175:4, 175:6, 179:17
**Ronald** [2] - 58:20, 59:5
**RONALD** [1] - 3:7
**ROOM** [1] - 1:24
**room** [20] - 61:9, 106:20, 115:8, 121:13, 132:1, 132:2, 132:3, 132:11, 148:22, 153:13, 154:2, 154:14, 175:20, 221:19, 222:14, 222:17, 223:9, 223:17, 231:1
**rosters** [1] - 187:16
**roughly** [1] - 62:12
**routed** [2] - 42:13, 45:3
**rover** [5] - 187:12, 187:13, 188:4, 188:12, 188:16
**rule** [6] - 180:11, 180:14, 180:16, 184:19, 184:22, 220:7
**rules** [3] - 56:21, 138:12, 180:12
**run** [3] - 4:12, 5:17, 176:10
**running** [2] - 216:23, 217:3
**ruptures** [1] - 162:11

## S

**S-k-a-g-g-s** [1] - 183:15
**S-n-o-w** [1] - 174:19
**safe** [1] - 215:16
**safety** [5] - 66:20, 66:22, 68:6, 136:24, 187:22
**salad** [5] - 144:21, 159:8, 159:12, 159:14, 160:4
**SAME** [1] - 232:12
**SAN** [8] - 1:9, 2:5, 2:8, 2:11, 2:14, 2:18, 3:11, 141:4
**San** [22] - 4:5, 60:6, 60:20, 64:9, 98:18, 112:1, 140:21, 141:3, 141:9, 144:12, 146:10,

150:7, 150:17, 154:12, 156:8, 157:12, 157:20, 160:14, 172:7, 174:5, 186:24, 210:16
**sang** [1] - 213:18
**satisfied** [1] - 204:17
**Saturday** [1] - 201:15
**saw** [21] - 8:14, 15:7, 24:12, 24:20, 63:17, 91:16, 92:5, 119:14, 119:18, 129:24, 133:15, 157:10, 166:22, 167:5, 214:14, 218:24, 219:10, 219:12, 219:13, 219:16, 223:20
**SCA** [1] - 181:13
**Scaggs** [2] - 205:3, 205:6
**scapula** [1] - 78:8
**scar** [1] - 78:7
**scared** [1] - 135:18
**scarring** [1] - 71:13
**SCAs** [1] - 187:17
**scenario** [4] - 33:16, 36:13, 40:15, 123:20
**scene** [34] - 36:11, 37:8, 38:25, 47:18, 48:12, 49:5, 49:9, 49:24, 50:21, 51:22, 73:25, 77:18, 80:5, 86:16, 88:2, 88:4, 88:10, 88:11, 92:9, 94:18, 95:1, 95:13, 98:10, 98:16, 101:21, 112:17, 113:10, 113:11, 116:9, 118:24, 119:5, 146:5, 228:9
**schedule** [2] - 211:13, 212:10
**scheduling** [1] - 187:16
**school** [3] - 211:18, 216:4, 216:8
**schooling** [1] - 215:25
**science** [1] - 168:22
**score** [1] - 5:14
**scrapes** [1] - 161:4
**screen** [5] - 85:4, 89:22, 90:4, 104:6, 185:12, 185:21, 195:24
**screening** [7] - 80:24, 81:4, 81:14, 81:25, 88:18, 89:19, 92:7
**screenshot** [1] -

177:12
**se** [2] - 51:17, 130:23
**seal** [1] - 122:8
**search** [8] - 80:21, 81:12, 82:19, 84:19, 101:17, 102:6, 102:13, 106:21
**searched** [2] - 81:7, 102:7
**searches** [1] - 80:22
**searching** [1] - 102:8
**seat** [6] - 72:18, 78:17, 78:23, 78:24, 79:2, 126:20
**seated** [5] - 30:24, 58:25, 61:16, 111:3, 140:24
**seats** [5] - 5:11, 5:16, 61:18, 122:13, 177:25
**second** [9] - 30:4, 34:4, 69:16, 151:25, 152:2, 152:25, 176:9, 177:8, 206:6
**seconds** [2] - 66:13, 201:25
**secretary** [1] - 181:4
**section** [1] - 43:20
**Section** [1] - 85:19
**secure** [1] - 159:2
**security** [1] - 187:21
**see** [84] - 8:16, 13:18, 13:20, 20:8, 20:19, 24:17, 26:18, 37:7, 37:9, 37:11, 44:5, 46:9, 53:23, 53:25, 61:10, 63:16, 71:13, 76:19, 78:7, 84:16, 85:1, 90:4, 94:1, 103:19, 104:1, 104:16, 105:4, 121:1, 121:13, 128:24, 130:21, 132:4, 134:10, 143:8, 149:7, 150:7, 150:20, 151:18, 152:11, 152:14, 154:24, 158:5, 158:7, 158:17, 159:16, 166:24, 170:22, 175:16, 175:20, 185:21, 186:5, 191:25, 193:17, 194:1, 194:9, 194:12, 194:15, 196:6, 197:8, 197:9, 197:13, 197:19, 199:12, 199:14, 200:11, 200:12,

201:19, 202:20, 209:3, 209:4, 219:20, 219:22, 220:1, 220:6, 221:4, 221:7, 221:8, 223:23, 224:20, 226:7, 231:3, 231:14
**seeing** [6] - 14:1, 14:7, 78:9, 105:15, 130:1, 168:1
**sees** [1] - 102:13
**segment** [1] - 150:20
**seizure** [9] - 39:7, 44:17, 148:17, 184:11, 199:24, 203:7, 204:15, 205:11, 206:12, 229:9, 229:13
**seizures** [7] - 42:4, 96:18, 143:11, 147:12, 148:13, 179:15, 182:22
**selected** [1] - 101:9
**self** [2] - 161:17, 218:5
**self-employment** [1] - 218:5
**self-injuring** [1] - 161:17
**send** [3] - 116:16, 207:9, 216:5
**sense** [1] - 20:1
**sentence** [1] - 186:5
**SEONHAE** [1] - 2:16
**separate** [3] - 33:21, 60:23, 78:18
**sergeant** [2] - 117:5, 133:5
**sergeants** [2] - 187:16, 187:19
**series** [2] - 158:17, 209:3
**serious** [2] - 186:7, 207:7
**seriously** [1] - 45:3
**service** [1] - 36:20
**SET** [1] - 232:11
**set** [7] - 69:6, 69:8, 123:6, 123:8, 131:1, 135:10, 205:13
**sets** [1] - 44:8
**setting** [1] - 32:2
**settle** [1] - 35:7
**seven** [4] - 4:17, 88:25, 201:18, 202:25
**seventh** [2] - 162:22, 162:23
**several** [3] - 54:20, 100:20, 113:17
**severe** [5] - 23:20,

99:6, 142:9, 143:11, 170:23
**shake** [1] - 135:17
**shakes** [2] - 134:11, 172:20
**shall** [1] - 123:12
**shame** [1] - 166:13
**shape** [1] - 85:3
**share** [4] - 117:21, 117:22, 117:24, 180:16
**shelf** [2] - 85:6, 85:8
**Sheriff** [9] - 31:24, 60:6, 60:7, 60:16, 61:1, 61:24, 133:4, 181:2, 181:3
**sheriff's** [1] - 35:24
**Sheriff's** [13] - 32:1, 32:12, 34:16, 60:20, 60:21, 61:2, 64:9, 90:10, 112:1, 175:4, 181:13, 194:19, 210:16
**sheriffs** [1] - 34:19
**Sheriffs** [1] - 32:6
**SHIN** [1] - 2:16
**shins** [1] - 161:3
**shirt** [1] - 190:4
**short** [1] - 200:16
**shortcut** [1] - 207:19
**shorter** [1] - 30:11
**shorts** [1] - 67:12
**shot** [1] - 127:8
**shot-sized** [1] - 127:8
**shots** [2] - 127:6, 127:8
**shoulder** [4] - 92:9, 93:9, 93:11, 105:20
**show** [5] - 86:7, 101:23, 103:6, 133:21, 157:13
**showed** [5] - 13:9, 14:22, 100:17, 115:17, 188:14
**showing** [7] - 66:25, 130:18, 137:6, 146:22, 146:24, 147:1, 216:13
**shown** [3] - 178:19, 178:23, 178:25
**shows** [5] - 113:5, 147:7, 199:9, 201:18, 214:24
**shut** [1] - 79:25
**sick** [1] - 200:1
**side** [13] - 45:6, 64:8, 84:23, 92:7, 92:25, 104:18, 104:20, 104:23, 104:24, 123:1, 132:10, 161:5

**sides** [2] - 8:2, 133:22

**sign** [3] - 4:10, 81:22, 216:5

**signed** [2] - 102:19, 107:16

**significance** [1] - 159:10

**significant** [11] - 35:5, 35:22, 37:12, 42:12, 147:16, 163:5, 164:17, 164:19, 164:23, 166:1, 186:7

**significantly** [1] - 44:24

**signs** [10] - 102:25, 130:18, 134:17, 142:22, 146:22, 146:24, 151:16, 170:22

**silent** [2] - 140:1, 140:7

**silently** [1] - 140:2

**Silva** [3] - 204:12, 204:13, 204:22

**simple** [2] - 25:24, 85:15

**simply** [2] - 51:16, 158:18

**sing** [1] - 213:18

**single** [6] - 13:25, 51:20, 208:11, 224:5, 224:6, 225:21

**sink** [1] - 151:8

**sister** [8] - 39:23, 40:2, 40:8, 119:22, 128:18, 129:2, 132:8, 166:10

**sit** [2] - 49:19, 49:21

**site** [1] - 218:19

**sittin'** [1] - 78:10

**sitting** [3] - 79:4, 160:8, 190:5

**situated** [2] - 122:25

**situation** [5] - 35:22, 48:25, 133:24, 138:3, 173:13

**situations** [3] - 36:10, 136:23, 137:25

**six** [3] - 4:18, 98:17, 196:16

**sized** [1] - 127:8

**Skaggs** [14] - 52:4, 183:9, 183:15, 183:19, 183:21, 183:22, 187:6, 188:25, 205:1, 205:2, 205:5, 205:8, 205:9

**SKAGGS** [1] - 3:15

**skill** [1] - 36:2

**skills** [2] - 33:15, 216:10

**slapped** [2] - 67:2, 70:15

**slapping** [1] - 70:23

**slow** [2] - 125:2, 187:23

**slur** [1] - 99:25

**slurrin'** [1] - 110:9

**slurring** [5] - 75:2, 88:9, 99:22, 109:13, 109:15

**smacked** [1] - 136:18

**smaller** [1] - 127:8

**smell** [6] - 21:24, 75:5, 88:12, 99:14, 99:18, 109:17

**smelled** [10] - 92:10, 93:8, 94:22, 99:13, 105:21, 108:14, 108:21, 109:7, 131:8, 193:3

**smelling** [1] - 109:3

**smells** [1] - 144:16

**snacks** [1] - 213:2

**snippets** [1] - 114:19

**snow** [19] - 174:24, 175:1, 178:5, 180:23, 184:8, 199:19, 199:20, 200:7, 200:8, 201:1, 201:10, 201:14, 201:21, 201:22, 202:16, 203:6, 203:11, 203:16, 208:9

**Snow** [4] - 52:4, 174:12, 174:19, 183:23

**SNOW** [1] - 3:13

**SOAP** [1] - 152:19

**sober** [2] - 28:17, 198:24

**sobering** [3] - 42:16, 42:17, 43:20

**sole** [3] - 46:14, 46:16, 46:18

**someone** [44] - 35:13, 35:19, 37:10, 55:22, 57:12, 57:18, 58:5, 80:12, 82:8, 84:20, 85:15, 87:10, 87:13, 89:8, 104:22, 108:4, 115:25, 119:15, 119:16, 130:12, 130:24, 134:6, 134:19, 134:20, 135:25, 142:25, 164:23, 167:22, 168:10, 168:13,

169:6, 170:9, 170:12, 170:13, 173:17, 184:10, 198:10, 201:8, 203:2, 204:21, 204:23, 206:25, 216:22, 217:4

**somethin'** [1] - 80:23

**sometimes** [10] - 23:9, 60:18, 89:12, 89:14, 89:15, 121:4, 123:4, 142:10, 173:13, 206:15

**somewhat** [1] - 66:5

**somewhere** [3] - 4:13, 82:17, 147:25

**son** [79] - 41:25, 42:4, 44:10, 44:11, 44:17, 53:13, 126:4, 127:1, 136:9, 136:19, 148:16, 182:16, 182:18, 182:21, 184:7, 190:4, 191:5, 192:1, 192:3, 192:8, 192:9, 192:11, 192:20, 193:1, 196:6, 197:3, 198:9, 199:3, 199:22, 200:2, 200:6, 200:19, 201:23, 203:6, 203:18, 204:19, 205:9, 205:13, 205:25, 206:10, 207:11, 207:22, 208:1, 208:4, 208:8, 208:12, 209:16, 209:21, 210:7, 210:21, 211:7, 211:10, 211:21, 211:22, 212:9, 213:25, 215:1, 215:24, 216:10, 217:11, 218:13, 219:2, 219:10, 219:20, 220:14, 221:5, 221:8, 222:5, 223:22, 224:12, 226:14, 226:22, 227:1, 227:21, 228:10, 229:2, 229:7, 229:13, 229:15

**son's** [9] - 124:20, 130:8, 136:3, 192:24, 201:25, 204:14, 207:5, 214:12, 218:20

**song** [1] - 213:19

**songs** [1] - 213:18

**soon** [1] - 173:6

**sore** [3] - 74:12, 74:24, 75:2

**sorry** [26] - 6:18, 6:21, 12:20, 14:17, 16:2, 16:8, 16:9, 24:16, 24:25, 25:7, 25:22, 29:7, 83:23, 115:22, 125:2, 125:4, 149:17, 150:15, 157:16, 158:4, 171:18, 190:18, 192:8, 204:7, 210:24, 223:4

**sort** [10] - 24:20, 25:3, 33:6, 63:10, 69:3, 75:18, 82:24, 142:1, 162:12, 168:16

**sought** [1] - 171:5

**sounds** [4] - 11:17, 63:22, 153:5

**source** [3] - 34:6, 153:21, 218:3

**space** [2] - 43:19, 141:4

**spared** [1] - 165:7

**sparks** [1] - 138:2

**speaker** [1] - 65:17

**speakerphone** [1] - 192:5

**speaking** [19] - 10:2, 11:7, 12:7, 15:7, 30:25, 59:1, 111:5, 123:22, 125:23, 131:22, 132:9, 140:25, 144:20, 174:16, 189:15, 201:10, 203:15, 208:6, 227:18

**speaks** [2] - 147:18, 148:15

**specialist** [1] - 141:14

**specific** [10] - 10:3, 33:14, 57:18, 154:25, 155:3, 162:15, 167:12, 196:18, 223:12, 223:16

**specifically** [8] - 36:4, 90:15, 108:24, 110:2, 120:7, 163:3, 164:10, 224:18

**specifics** [3] - 7:13, 19:20, 63:24

**speculation** [4] - 78:14, 93:23, 200:23, 219:4

**speech** [3] - 100:5, 159:8, 160:3

**speed** [1] - 104:24

**spell** [6] - 59:4, 111:7, 141:1, 174:17, 183:14, 189:16

**spend** [2] - 211:21, 212:9

**spending** [1] - 214:20

**spinning** [1] - 74:13

**spoken** [1] - 129:6

**spontaneous** [1] - 139:5

**sporadically** [1] - 160:9

**spray** [1] - 72:1

**Spring** [1] - 23:8

**squishie** [1] - 213:15

**squishies** [1] - 213:6

**SS** [1] - 232:5

**staff** [23] - 42:7, 42:21, 45:12, 53:20, 53:21, 53:22, 54:6, 55:9, 55:13, 80:21, 81:2, 94:13, 95:17, 101:25, 104:22, 105:17, 106:3, 106:24, 107:2, 143:23, 150:24, 154:25

**stage** [1] - 164:13

**stages** [3] - 164:25, 165:10, 165:24

**stainless** [1] - 85:5

**stamp** [4] - 84:8, 159:22, 177:1, 177:13

**stand** [4] - 5:24, 61:19, 122:14, 178:1

**standard** [3] - 38:17, 45:18, 171:7

**standards** [2] - 56:21, 112:10

**Standards** [3] - 33:12, 59:25, 112:11

**standing** [2] - 101:22, 105:6

**start** [17] - 65:21, 103:15, 120:17, 121:14, 123:21, 125:18, 134:10, 147:23, 155:21, 168:11, 168:18, 169:19, 172:21, 172:24, 196:14, 221:20, 231:4

**started** [7] - 5:22, 118:21, 172:13, 196:22, 211:17, 211:18, 218:25

**starting** [9] - 11:2, 137:7, 144:18, 144:19, 153:8,

**starts** [1] - 196:17
**starts** [2] - 148:6, 169:18
**STATE** [1] - 232:6
**State** [3] - 33:5, 34:13, 35:25
**state** [19] - 6:23, 18:1, 20:4, 31:2, 34:17, 34:19, 34:20, 35:16, 38:16, 55:8, 59:3, 111:6, 117:19, 141:1, 142:25, 170:4, 174:17, 183:13, 189:15
**statement** [14] - 14:18, 15:8, 19:6, 51:12, 56:8, 59:16, 85:25, 88:7, 96:10, 119:23, 169:23, 169:24, 228:23, 229:1
**statements** [5] - 76:5, 76:17, 77:17, 129:7, 139:5
**states** [1] - 159:20
**STATES** [4] - 1:1, 1:1, 1:4, 232:9
**stating** [1] - 151:6
**station** [7] - 32:11, 32:13, 60:21, 83:13, 96:4, 127:9
**Station** [1] - 118:13
**stations** [2] - 32:11, 98:20
**status** [4] - 44:6, 57:16, 111:25
**stay** [7] - 80:5, 81:19, 85:17, 106:6, 106:9, 106:11, 106:15
**stayed** [2] - 80:6, 220:19
**staying** [1] - 218:2
**stays** [1] - 82:6
**steadily** [1] - 218:16
**steady** [6] - 217:14, 217:18, 218:3, 218:10, 218:12, 218:13
**steatosis** [3] - 146:24, 147:1, 164:10
**steel** [2] - 85:6, 85:7
**STENOGRAPHIC** [1] - 232:15
**STENOGRAPHICALLY** [1] - 232:10
**step** [12] - 30:15, 58:13, 80:18, 80:19, 81:6, 110:19, 121:18, 140:18, 174:9, 183:6, 189:7, 231:9

**steps** [5] - 80:15, 99:3, 116:10, 120:14, 122:19
**stick** [2] - 37:17, 123:5
**sticks** [1] - 33:18
**still** [28] - 6:2, 10:14, 11:24, 24:2, 37:6, 39:12, 40:7, 43:24, 44:1, 44:3, 56:18, 56:22, 61:20, 71:10, 78:10, 92:25, 115:6, 169:10, 171:2, 171:24, 172:10, 172:21, 178:2, 201:22, 203:18, 207:13, 229:20, 229:25
**stimuli** [8] - 144:19, 158:6, 158:10, 158:14, 158:19, 159:5, 160:4, 160:9
**stipulated** [18] - 7:21, 8:25, 9:19, 10:21, 65:1, 86:21, 125:13, 149:14, 155:8, 156:18, 156:21, 156:23, 177:3, 177:19, 185:12, 193:10, 214:4, 215:8
**stipulation** [6] - 83:25, 176:24, 177:1, 177:14, 177:15, 177:16
**stood** [1] - 108:5
**stop** [17] - 28:12, 28:16, 42:25, 65:12, 75:8, 101:24, 103:17, 104:12, 105:3, 123:14, 126:17, 155:23, 170:2, 171:12, 173:6, 192:6, 204:21
**stopped** [2] - 5:2, 71:25
**stops** [1] - 71:23
**stories** [1] - 198:25
**story** [2] - 64:8, 121:7
**strangers** [2] - 215:16, 215:18
**STREET** [1] - 1:24
**streets** [1] - 130:16
**stricken** [4] - 20:3, 220:2, 226:11, 228:5
**strict** [1] - 43:12
**strike** [14] - 17:24, 20:2, 48:16, 57:25, 93:1, 120:1, 168:11, 169:19, 170:3, 170:12, 210:14, 220:1, 226:9, 228:4

**stroke** [8] - 44:18, 179:15, 184:11, 199:25, 203:7, 204:15, 205:12, 206:13
**structure** [1] - 152:17
**struggle** [1] - 73:10
**struggling** [1] - 215:20
**stuff** [4] - 49:8, 114:24, 123:5, 134:15
**subarachnoid** [3] - 162:5, 162:13, 162:17
**subject** [9] - 34:12, 37:14, 43:8, 63:17, 63:22, 118:16, 118:18, 125:5, 137:10
**subjective** [1] - 152:19
**subjects** [2] - 51:1, 124:24
**submission** [1] - 86:17
**submitted** [4] - 61:9, 121:12, 175:20, 230:25
**subsequent** [8] - 15:17, 55:17, 55:20, 107:18, 147:7, 151:3, 152:13, 200:10
**substance** [5] - 141:21, 141:24, 141:25, 172:10, 207:3
**Substation** [4] - 60:16, 61:24, 96:2, 112:5
**substation** [3] - 62:7, 62:11, 118:20
**successful** [1] - 33:13
**successfully** [3] - 51:7, 51:10, 51:17
**suffer** [14] - 17:14, 17:18, 18:4, 19:18, 20:25, 22:10, 39:5, 40:3, 139:10, 139:14, 141:21, 147:14, 148:17, 169:21
**suffered** [1] - 147:7
**suffering** [5] - 142:5, 145:5, 147:1, 155:5, 159:11
**suicide** [2] - 130:16, 131:6
**SUITE** [3] - 2:5, 2:7, 2:10

**summer** [6] - 23:7, 220:17, 224:19, 225:25, 226:19, 226:23
**summers** [1] - 211:21
**summoned** [2] - 78:2, 78:6
**supervisor** [1] - 157:22
**supplement** [1] - 117:14
**support** [3] - 36:25, 86:6, 86:17
**supports** [1] - 154:23
**suppose** [1] - 177:12
**supposed** [2] - 64:1, 117:21
**suppression** [1] - 165:24
**surface** [1] - 161:10
**surgery** [1] - 78:5
**suspect** [2] - 37:14, 123:15
**suspicion** [3] - 226:4, 226:19, 226:23
**sustained** [21] - 58:2, 70:9, 71:16, 71:21, 72:5, 73:13, 75:14, 86:24, 87:4, 87:17, 87:22, 160:12, 199:7, 200:24, 210:9, 210:19, 212:2, 212:5, 215:10, 220:2, 228:5
**sweating** [3] - 88:14, 99:20
**sweats** [1] - 142:16
**sweaty** [1] - 75:10
**swim** [1] - 216:12
**sworn** [13] - 30:23, 42:7, 42:20, 44:2, 44:6, 45:12, 53:21, 58:24, 111:2, 140:23, 174:14, 183:12, 189:13
**symptom** [1] - 34:25
**symptoms** [9] - 34:24, 130:18, 134:17, 142:21, 148:24, 153:11, 154:1, 198:17
**system** [5] - 32:13, 35:18, 36:7, 165:15

**T**

**table** [1] - 222:25
**tactical** [1] - 38:2
**tail** [2] - 15:10, 16:14
**talkin'** [1] - 69:5

**talks** [1] - 124:22
**tasked** [1] - 23:12
**tattoos** [1] - 75:12
**taught** [11] - 33:24, 34:21, 34:24, 35:12, 35:16, 70:2, 130:13, 215:19, 216:12, 216:15
**tea** [1] - 219:23
**teach** [1] - 216:10
**teachers** [1] - 216:6
**technical** [1] - 123:5
**technique** [1] - 70:2
**technology** [1] - 123:4
**teenager** [1] - 198:22
**telephone** [3] - 21:6, 41:6, 107:18
**temperature** [1] - 78:16
**ten** [1] - 170:15
**tend** [4] - 44:5, 118:18, 124:8, 132:21
**tended** [2] - 35:9, 37:13
**tends** [1] - 135:17
**term** [2] - 132:20, 133:1
**terms** [13] - 40:10, 98:24, 101:23, 129:15, 130:8, 137:19, 165:25, 166:4, 167:1, 168:9, 173:8, 188:3, 188:11
**terrified** [1] - 202:1
**tertiary** [1] - 171:6
**test** [4] - 21:21, 21:25, 167:20, 192:15
**tested** [1] - 31:21
**testified** [15] - 10:11, 19:12, 21:5, 23:11, 27:15, 27:25, 31:19, 74:16, 76:21, 160:14, 166:1, 166:10, 178:11, 178:24, 181:25
**testify** [15] - 31:13, 31:16, 46:9, 50:17, 68:16, 144:7, 146:3, 146:4, 146:12, 156:7, 156:9, 157:3, 157:6, 157:9, 157:10
**testimony** [31] - 5:23, 15:16, 22:4, 29:11, 29:13, 29:16, 29:19, 47:8, 50:13, 53:15, 57:23, 59:18, 92:21, 94:19, 98:8, 100:8, 107:19, 107:21, 112:9, 120:2,

145:24, 166:20, 175:9, 178:9, 186:15, 217:22, 220:13, 222:4, 225:6, 225:9

**thanked** [1] - 138:23, 140:5, 140:8

**Thanksgiving** [2] - 211:19, 211:20

**THAT** [3] - 232:10, 232:12, 232:14

**THE** [325] - 3:2, 4:3, 4:7, 4:22, 5:1, 5:6, 5:8, 5:10, 6:1, 6:4, 6:5, 6:23, 6:25, 7:6, 7:8, 7:9, 7:19, 7:22, 7:24, 8:2, 8:8, 8:23, 9:1, 9:4, 9:6, 9:9, 9:20, 10:19, 10:22, 10:25, 11:3, 12:18, 12:20, 12:21, 12:22, 18:1, 20:3, 21:15, 21:17, 25:23, 25:25, 26:14, 26:20, 27:17, 27:21, 29:4, 29:7, 30:2, 30:4, 30:6, 30:8, 30:15, 30:17, 30:18, 30:21, 30:22, 30:24, 31:4, 31:5, 41:16, 41:17, 41:19, 45:24, 46:5, 54:15, 54:19, 55:1, 55:3, 56:25, 58:2, 58:13, 58:18, 58:22, 58:23, 58:25, 59:5, 59:6, 61:3, 61:12, 61:14, 61:16, 61:17, 65:3, 65:7, 65:9, 65:13, 65:19, 66:1, 68:13, 68:15, 68:17, 70:9, 71:16, 71:21, 72:4, 73:13, 74:2, 74:5, 74:7, 75:14, 78:15, 78:17, 83:19, 84:2, 84:4, 84:6, 84:10, 86:9, 86:10, 86:12, 86:24, 87:17, 87:22, 89:24, 90:2, 91:14, 91:16, 91:18, 91:21, 91:23, 91:25, 92:1, 92:22, 92:23, 93:3, 93:5, 93:6, 93:8, 93:15, 93:18, 93:19, 93:23, 94:20, 94:21, 96:9, 97:19, 103:8, 103:11, 103:13, 108:7, 109:2, 109:5, 109:6, 109:9, 109:11, 110:1, 110:3, 110:4, 110:17, 110:19,

110:20, 110:21, 110:25, 111:1, 111:3, 111:8, 111:9, 118:5, 121:8, 121:16, 121:18, 121:19, 121:20, 122:7, 122:9, 122:10, 122:12, 125:2, 125:4, 125:14, 125:16, 139:18, 140:16, 140:18, 140:19, 140:20, 140:22, 140:24, 141:3, 141:5, 144:5, 144:10, 146:3, 146:11, 149:15, 149:22, 149:25, 150:2, 150:5, 154:5, 155:10, 155:14, 155:17, 155:20, 155:23, 156:6, 156:9, 156:11, 156:12, 156:15, 156:16, 156:19, 156:23, 157:9, 157:16, 157:18, 157:24, 157:25, 158:1, 159:23, 159:24, 160:12, 160:25, 161:2, 161:11, 161:13, 161:19, 161:20, 161:21, 162:3, 162:4, 163:1, 163:3, 163:5, 163:8, 163:9, 163:12, 167:6, 167:7, 170:4, 172:2, 172:4, 174:7, 174:9, 174:13, 174:15, 174:19, 174:20, 175:15, 175:24, 176:19, 177:3, 177:6, 177:15, 177:19, 177:22, 177:24, 180:10, 180:12, 180:20, 183:4, 183:6, 183:10, 183:11, 183:13, 183:15, 183:16, 185:15, 185:17, 187:3, 188:22, 189:5, 189:7, 189:11, 189:12, 189:14, 189:17, 189:18, 193:12, 193:15, 199:7, 200:24, 202:4, 202:5, 202:6, 202:8, 202:13, 203:11, 203:12,

203:13, 209:14, 209:24, 210:2, 210:4, 210:9, 210:19, 210:24, 212:2, 212:3, 212:4, 213:8, 213:21, 214:5, 214:8, 215:10, 215:21, 216:18, 217:2, 217:7, 219:5, 219:7, 219:8, 220:2, 220:4, 221:14, 221:15, 221:16, 223:4, 223:7, 225:19, 226:2, 226:11, 228:5, 228:7, 228:16, 230:6, 230:8, 230:21, 231:8, 231:16, 232:8, 232:9, 232:10, 232:11, 232:12

**themselves** [7] - 128:7, 130:15, 130:19, 131:5, 158:11, 161:15

**there'd** [1] - 50:13

**THEREAFTER** [1] - 232:12

**thereafter** [1] - 191:24

**therefore** [2] - 95:14, 164:17, 174:2

**thinking** [2] - 77:8, 134:25

**thinks** [1] - 144:25

**third** [3] - 119:15, 130:23, 145:12

**third-hand** [1] - 119:15

**THIS** [1] - 232:14

**thorough** [1] - 36:7

**thoroughly** [3] - 39:17, 43:15, 80:22

**threatening** [7] - 17:7, 17:14, 19:18, 21:1, 22:10, 35:23, 139:10

**three** [11] - 11:9, 114:18, 122:3, 156:19, 163:19, 195:6, 200:12, 212:16, 212:20, 216:20, 218:11

**three-and-a-half** [2] - 122:3, 212:16

**throughout** [4] - 34:19, 34:20, 59:14, 111:22

**thumb** [7] - 72:22, 73:7, 73:9, 73:22, 74:12, 74:24, 75:2

**thumb's** [1] - 74:12

**Thursday** [1] - 4:9

**ticking** [1] - 173:7

**tier** [1] - 150:20

**TIME** [1] - 232:11

**timeline** [4] - 147:20, 147:22, 148:2, 148:5

**timing** [11] - 121:22, 166:16, 171:5, 173:2, 173:3, 173:4, 173:14, 173:15, 173:16, 173:17, 174:3

**title** [3] - 60:25, 180:25, 187:11

**Title** [13] - 38:17, 38:18, 42:14, 42:21, 43:1, 43:3, 43:17, 43:20, 44:3, 44:4, 56:18

**TO** [1] - 232:12

**today** [9] - 4:15, 50:10, 50:14, 121:23, 125:9, 161:12, 189:25, 190:12, 231:2

**together** [9] - 207:23, 213:18, 214:20, 215:2, 215:13, 216:15, 222:3, 222:9

**toilet** [2] - 43:19, 160:8

**tolerance** [4] - 134:21, 168:17, 168:21, 170:15

**tomorrow** [3] - 4:15, 231:3, 231:14

**tonight** [2] - 177:11, 231:2

**took** [19] - 7:15, 8:11, 9:12, 56:8, 57:21, 77:6, 95:14, 99:2, 112:25, 117:11, 119:1, 119:18, 121:2, 133:19, 173:7, 214:11, 218:5, 218:17

**tools** [1] - 116:14

**top** [4] - 152:7, 152:8, 158:23, 193:21

**topic** [1] - 217:5

**total** [5] - 41:25, 121:24, 196:1, 207:20, 208:3

**touch** [1] - 37:5

**touched** [1] - 115:16

**tough** [1] - 212:4

**toward** [1] - 84:25

**towards** [3] - 158:23, 164:14, 231:11

**toxicology** [1] - 147:8

**traffic** [6] - 63:1, 63:3, 118:14, 123:14, 134:13

**train** [3] - 171:10, 172:24, 172:25

**trained** [8] - 35:6, 35:25, 37:23, 39:13, 73:3, 123:10, 130:22, 186:8

**training** [22] - 6:19, 7:4, 7:6, 7:12, 33:3, 33:6, 33:9, 33:10, 33:17, 35:23, 36:18, 38:1, 50:25, 51:4, 51:10, 51:15, 51:25, 98:23, 140:13, 185:2, 186:10, 186:22

**Training** [4] - 32:9, 33:12, 59:25, 112:11

**trainings** [1] - 6:16

**trampoline** [1] - 214:25

**TRANSCRIPT** [1] - 1:14

**transcript** [2] - 41:11, 48:8

**TRANSCRIPTION** [2] - 232:13, 232:14

**transcripts** [2] - 41:18, 48:1

**transfer** [5] - 39:9, 39:13, 148:21, 152:9, 204:20

**transferred** [13] - 32:11, 44:12, 151:25, 152:2, 153:12, 154:2, 154:4, 154:14, 197:3, 204:23, 204:25, 206:1, 206:15

**transport** [2] - 79:3, 101:7

**trash** [1] - 219:13

**trauma** [5] - 161:8, 161:9, 161:24, 162:12, 162:18

**travels** [1] - 213:20

**tray** [1] - 213:5

**treat** [1] - 173:19

**treated** [5] - 35:3, 141:18, 141:21, 142:5, 163:23

**treating** [1] - 141:14

**treatment** [16] - 12:25, 13:1, 13:2, 13:22, 34:7, 167:25, 171:1, 171:6, 171:7,

171:16, 171:21, 171:24, 173:3, 173:4, 173:11

**tremens** [40] - 17:18, 18:4, 27:9, 40:4, 139:15, 142:6, 142:8, 142:9, 143:6, 143:7, 143:8, 143:11, 143:13, 145:6, 145:19, 145:23, 147:15, 147:19, 147:21, 147:23, 148:7, 151:10, 153:3, 155:5, 159:11, 159:16, 163:20, 163:21, 168:9, 168:15, 168:24, 168:25, 169:3, 169:14, 170:10, 170:14, 171:17, 171:20, 171:23, 173:19

**tremor** [1] - 169:12

**tremors** [2] - 134:11, 142:16

**trial** [8] - 5:19, 47:8, 59:14, 89:1, 89:21, 111:23, 114:16, 178:17

**trials** [1] - 31:21

**tricks** [1] - 216:11

**tried** [10] - 13:15, 13:18, 13:20, 13:22, 14:16, 14:19, 67:15, 67:17, 70:15, 227:10

**trigger** [1] - 24:11

**triggered** [2] - 135:8, 135:13

**trips** [1] - 213:17

**Troy** [2] - 183:9, 183:15

**TROY** [1] - 3:15

**truck** [5] - 69:6, 69:7, 71:6, 72:24, 99:24

**TRUE** [1] - 232:14

**true** [40] - 7:3, 21:12, 21:14, 21:16, 21:17, 25:19, 38:24, 39:12, 39:17, 40:6, 40:16, 41:23, 42:9, 44:1, 44:9, 44:19, 47:12, 52:14, 52:15, 128:5, 144:13, 145:4, 145:9, 145:15, 145:16, 145:17, 146:18, 147:4, 148:10, 148:20, 160:1, 218:13, 219:2, 221:7,

224:12, 226:4, 226:18, 228:13, 228:24, 230:13

**trusted** [2] - 23:17, 23:22

**truth** [4] - 29:15, 29:18, 225:10, 225:12

**truthful** [1] - 36:7

**try** [23] - 13:15, 47:15, 47:16, 64:8, 65:19, 67:16, 67:22, 69:13, 119:9, 121:2, 121:5, 133:21, 137:5, 137:21, 137:25, 138:1, 146:23, 206:1, 209:2, 212:23, 228:2, 228:6, 231:4

**tryin'** [2] - 67:10, 74:13

**trying** [18] - 11:20, 16:11, 24:10, 25:1, 33:19, 72:24, 73:10, 74:19, 74:22, 74:23, 99:23, 115:13, 130:16, 133:24, 150:19, 151:8, 202:1, 215:4

**turn** [3] - 104:6, 139:23, 186:4

**turned** [5] - 40:1, 40:5, 40:17, 69:2, 85:11

**turtle** [1] - 214:24

**twisted** [1] - 70:4

**two** [26] - 32:7, 32:10, 33:1, 38:24, 39:1, 39:3, 39:7, 39:11, 39:12, 39:16, 40:16, 43:7, 43:15, 65:22, 84:22, 120:9, 122:2, 122:23, 122:24, 145:13, 162:9, 175:25, 189:24, 199:1, 208:3, 218:8

**type** [16] - 7:12, 32:1, 43:14, 57:22, 70:1, 147:13, 148:23, 151:16, 154:23, 154:24, 166:17, 171:6, 173:13, 179:17, 179:25, 180:1

**types** [1] - 38:21

**TYPEWRITTEN** [1] - 232:12

**typical** [5] - 32:6, 34:24, 40:20, 66:20, 170:11

**typically** [36] - 8:16,

23:7, 33:16, 36:24, 40:12, 57:21, 83:12, 88:21, 104:23, 106:9, 107:24, 119:9, 119:13, 120:18, 121:3, 122:21, 123:2, 123:10, 123:18, 123:23, 124:25, 125:5, 125:6, 134:9, 142:1, 143:8, 147:23, 148:2, 152:18, 153:10, 162:23, 162:24, 164:13, 164:16, 165:3, 165:7

───────────
U
───────────

**U-m-p-h-l-e-t-t** [1] - 111:8

**ultimately** [1] - 227:15

**UMPHLETT** [1] - 3:9

**Umphlett** [37] - 11:16, 11:19, 14:11, 15:6, 15:8, 15:14, 15:18, 15:25, 16:6, 16:13, 16:16, 20:23, 20:25, 21:2, 27:8, 27:16, 28:1, 29:22, 30:10, 49:18, 51:9, 51:19, 110:24, 111:8, 111:13, 111:17, 118:3, 118:9, 120:25, 122:19, 139:22, 191:13, 191:15, 228:23, 229:1, 229:6, 229:12

**un-handcuffed** [1] - 102:6

**un-handcuffs** [1] - 80:22

**unable** [3] - 158:5, 158:18, 160:5

**unavailable** [2] - 192:2, 195:1

**uncooperative** [3] - 118:15, 118:16, 118:18

**uncooperativeness** [1] - 118:19

**uncuff** [6] - 80:21, 84:19, 101:17, 102:6, 102:13, 106:22

**uncuffed** [1] - 81:7

**uncuffing** [1] - 102:8

**under** [40] - 6:2, 17:20, 29:15, 33:8, 34:17, 39:5, 39:8, 42:16,

44:3, 61:20, 65:17, 73:15, 76:13, 78:7, 91:3, 91:11, 91:15, 91:20, 91:24, 92:18, 93:4, 93:7, 93:17, 110:12, 115:6, 122:8, 122:15, 124:24, 125:5, 125:8, 134:14, 145:1, 151:8, 166:20, 167:2, 178:2, 193:2, 218:19, 225:10, 229:20

**underlying** [1] - 143:14

**understood** [9] - 26:10, 114:8, 177:1, 177:13, 179:21, 179:24, 180:8, 184:19, 225:9

**unfortunately** [2] - 19:11, 124:23

**unhappy** [1] - 102:1

**unique** [3] - 90:14, 90:15, 162:8

**unit** [3] - 36:21, 44:13, 118:20, 204:20, 205:14

**UNITED** [4] - 1:1, 1:1, 1:4, 232:8

**units** [2] - 116:18, 118:18

**unknown** [1] - 68:23

**unpredictability** [1] - 136:25

**unredacted** [4] - 197:4, 197:12, 197:15, 197:20

**untreated** [3] - 142:11, 145:18, 148:1

**up** [75] - 4:8, 13:9, 14:22, 15:7, 26:19, 27:12, 27:21, 65:18, 65:22, 66:14, 69:14, 72:24, 73:21, 74:18, 83:16, 83:22, 86:7, 86:8, 87:1, 89:21, 90:4, 99:23, 100:17, 101:8, 101:24, 104:25, 106:18, 113:5, 113:21, 118:21, 120:1, 121:24, 123:8, 123:21, 127:5, 130:7, 130:13, 130:25, 131:2, 133:22, 136:14, 136:22, 137:1, 137:6, 137:12,

138:1, 138:3, 144:8, 146:7, 146:13, 159:14, 168:20, 168:21, 169:18, 177:6, 185:12, 185:21, 186:17, 186:18, 195:1, 195:23, 200:1, 200:18, 205:13, 205:15, 206:18, 212:13, 212:17, 213:5, 213:13, 213:25, 217:5, 220:14, 222:7

**updated** [2] - 122:4, 231:9

**upper** [2] - 104:5, 161:3

**upset** [1] - 137:24

**uses** [2] - 38:20, 44:17

───────────
V
───────────

**Valley** [40] - 60:15, 60:18, 61:24, 62:3, 62:7, 62:10, 62:15, 62:19, 62:20, 62:24, 79:8, 96:1, 100:20, 112:5, 118:13, 118:20, 152:25, 195:17, 196:12, 196:15, 196:23, 196:25, 197:3, 205:20, 206:1, 206:4, 206:24, 206:25, 207:15, 207:18, 207:21, 207:25, 208:20, 209:6, 209:9, 209:18, 209:19, 210:6, 210:12

**variables** [1] - 173:8

**varices** [1] - 165:4

**various** [1] - 51:1

**vary** [1] - 23:6

**vehicle** [9] - 64:10, 64:11, 72:17, 72:18, 78:20, 85:9, 101:24, 113:12

**vehicles** [1] - 78:18

**verbal** [1] - 153:4

**verbalize** [1] - 160:5

**verbally** [1] - 25:9

**verbatim** [1] - 140:11

**Verizon** [1] - 193:6

**versions** [1] - 167:15

**versus** [2] - 4:5, 174:2

**vetting** [1] - 33:17

**Video** [4] - 8:9, 9:10, 9:24, 84:11

**video** [29] - 7:15, 7:16, 7:20, 8:11, 8:15, 9:12, 10:1, 10:6, 50:5, 83:17, 84:14, 91:16, 92:5, 103:16, 103:19, 103:24, 104:1, 104:11, 105:2, 105:10, 105:12, 105:14, 105:15, 143:22, 213:25, 214:9, 214:11, 215:7, 220:13

**videos** [1] - 38:22

**videotaping** [1] - 10:3

**viewed** [1] - 146:21

**viewing** [1] - 54:10

**violence** [3] - 24:20, 25:3, 25:4

**violent** [4] - 24:23, 24:25, 137:7

**visibly** [1] - 134:16

**visit** [3] - 23:7, 54:3, 54:4

**visitation** [2] - 211:23, 212:10

**visitations** [1] - 213:24

**visiting** [9] - 187:20, 221:4, 221:13, 224:7, 224:12, 224:19, 224:24, 225:25, 226:15

**visits** [6] - 181:5, 181:6, 181:12, 181:18, 187:19, 187:21

**visual** [2] - 83:15, 144:24

**voice** [19] - 11:6, 11:8, 11:13, 11:15, 11:17, 11:18, 113:5, 114:21, 126:18, 126:21, 128:13, 128:14, 131:17, 131:18, 201:25, 203:17, 203:20, 207:10

**voicemail** [1] - 206:6

**voices** [1] - 11:10

**volume** [3] - 65:17, 69:15, 122:24

**vomiting** [1] - 172:20

**vote** [1] - 87:14

**VS** [1] - 1:8

### W

**W-2** [1] - 218:15

**waist** [1] - 67:15

**waistband** [2] - 66:25, 67:16

**wait** [2] - 174:3, 194:25

**walk** [3] - 84:20, 140:1, 187:20

**walked** [2] - 79:10, 140:5

**walkin'** [1] - 66:13

**walking** [1] - 84:25

**wall** [5] - 85:3, 85:5, 89:4, 89:5, 160:9

**walls** [1] - 163:7

**Walter** [1] - 214:24

**wanna** [1] - 28:4

**warning** [2] - 135:10

**WAS** [1] - 232:12

**wasted** [1] - 93:15

**wasting** [2] - 86:25, 163:1

**Watch** [2] - 32:9, 45:22

**watch** [5] - 5:13, 32:20, 32:23, 105:10, 105:13

**watched** [1] - 5:14

**water** [1] - 43:19

**waters** [1] - 213:2

**ways** [3] - 13:15, 57:20, 200:8

**weapon** [3] - 67:22, 69:3, 69:4

**weapons** [1] - 66:17

**wearin'** [1] - 64:18

**WEDNESDAY** [2] - 1:15, 4:1

**week** [2] - 211:17, 218:8

**weighing** [1] - 135:4

**weighs** [1] - 168:12

**weird** [1] - 151:9

**welcome** [1] - 178:5

**well-being** [3] - 87:6, 87:8, 135:21

**West** [26] - 62:15, 62:19, 62:24, 152:25, 195:17, 196:12, 196:15, 196:23, 196:25, 197:3, 205:20, 206:1, 206:4, 206:24, 206:25, 207:14, 207:18, 207:21, 207:25, 208:20, 209:6, 209:8, 209:18, 209:19, 210:6, 210:12

**WEST** [4] - 1:24, 2:4, 2:7, 2:10

**west** [1] - 151:4

**WESTERN** [1] - 1:2

**whiled** [1] - 133:22

**whining** [1] - 75:7

**whole** [4] - 86:25, 152:18, 162:14, 167:2

**wide** [1] - 151:18

**Wildfire** [1] - 213:19

**William** [48] - 54:17, 54:23, 55:7, 126:2, 129:2, 131:21, 143:20, 149:5, 163:23, 164:2, 166:9, 171:1, 188:18, 190:11, 190:12, 190:24, 191:5, 191:16, 192:11, 193:2, 199:3, 200:20, 203:19, 205:25, 207:22, 208:1, 208:12, 208:18, 209:11, 209:17, 211:1, 211:7, 211:10, 211:15, 211:22, 212:9, 212:13, 212:17, 212:20, 213:10, 214:19, 215:1, 215:8, 215:13, 215:24, 219:20, 226:22

**William's** [3] - 192:20, 199:21, 200:22

**willin'** [1] - 100:6

**windy** [1] - 66:7

**wine** [1] - 170:19

**wise** [1] - 111:25

**withdraw** [5] - 169:6, 172:10, 229:2, 229:7, 229:15

**withdrawal** [45] - 17:14, 21:1, 22:11, 27:8, 28:25, 33:22, 33:25, 35:5, 35:22, 134:1, 134:7, 134:18, 135:8, 139:11, 140:13, 141:19, 142:10, 142:11, 142:15, 142:17, 142:19, 143:1, 143:2, 143:3, 143:12, 143:15, 148:3, 148:8, 148:17, 149:1, 168:2, 168:3, 168:15, 169:3, 169:9, 169:21, 172:9, 172:19,

173:11, 182:5, 198:15, 198:18, 198:20, 198:21, 199:5

**withdrawals** [14] - 17:8, 19:19, 48:13, 53:13, 135:19, 163:17, 167:23, 168:9, 170:14, 170:23, 170:24, 171:2, 229:5, 229:8

**withdrawing** [2] - 99:8, 134:7

**witness** [44] - 5:24, 30:18, 30:23, 46:12, 46:15, 46:19, 46:25, 58:15, 58:24, 59:18, 61:19, 76:5, 76:17, 77:17, 77:20, 94:25, 95:7, 110:22, 111:2, 114:8, 114:10, 119:18, 120:19, 122:14, 123:15, 140:20, 140:23, 144:6, 174:10, 174:14, 176:2, 176:3, 176:5, 176:6, 177:5, 178:1, 183:7, 189:8, 189:13, 212:4, 230:3

**Witness** [1] - 183:12

**WITNESS** [54] - 6:4, 7:8, 12:20, 12:22, 21:17, 25:25, 30:17, 31:4, 41:17, 59:5, 68:17, 74:5, 78:17, 83:19, 86:9, 86:12, 91:16, 91:21, 92:23, 93:5, 93:8, 93:18, 94:21, 109:5, 109:9, 110:3, 110:20, 111:8, 121:19, 125:4, 140:19, 141:3, 156:11, 156:15, 157:25, 159:24, 161:2, 161:13, 161:20, 162:4, 163:3, 163:8, 167:7, 174:19, 183:15, 189:17, 202:5, 202:8, 203:12, 212:3, 219:7, 221:15, 223:7, 228:7

**witnesses** [6] - 119:12, 119:14, 119:17, 129:23, 146:7, 176:15

**WITNESSES** [1] - 3:2

**wits** [1] - 138:10

**wonder** [1] - 5:2

**word** [7] - 39:7, 112:1, 144:21, 159:8, 159:12, 160:4, 167:7

**wording** [1] - 109:1

**words** [20] - 17:13, 20:25, 21:3, 27:8, 42:7, 53:17, 75:3, 88:9, 99:22, 99:25, 109:13, 109:15, 110:10, 132:16, 135:7, 135:12, 140:10, 159:13, 213:11, 229:17

**works** [2] - 165:1, 186:1

**worn** [1] - 64:17

**worried** [14] - 17:9, 17:12, 40:3, 42:3, 42:4, 44:16, 124:19, 136:8, 176:10, 192:4, 192:14, 199:22, 200:1, 202:10

**worries** [1] - 96:17

**worse** [3] - 42:18, 65:25, 133:24

**worsening** [3] - 153:3, 153:11, 170:24

**worsens** [1] - 145:13

**woulda** [1] - 105:20

**wrist** [5] - 69:25, 70:1, 70:4, 70:6, 71:10

**write** [10] - 35:25, 36:22, 37:7, 38:14, 40:7, 40:12, 73:3, 73:6, 73:9, 180:14

**writing** [1] - 36:3

**written** [3] - 37:9, 38:9, 56:10

**wrote** [7] - 38:13, 72:25, 79:1, 109:15, 109:17, 109:20, 116:22

### Y

**yard** [1] - 84:18

**year** [14] - 23:2, 23:21, 23:22, 23:23, 47:4, 76:11, 130:17, 164:13, 178:12, 217:15, 217:19, 218:4, 218:14, 218:21

**years** [17] - 28:17, 32:7, 32:10, 32:15, 33:1, 46:22, 56:18, 62:5, 100:20, 112:8, 168:12, 189:2,

190:17, 190:18, 190:19, 198:24

**yesterday** [5] - 4:9, 5:13, 14:9, 18:7, 22:16

**youngest** [1] - 190:4

**youngster** [1] - 43:9

**youngsters** [1] - 35:4

**yourself** [8] - 27:11, 66:17, 73:25, 103:19, 105:4, 174:1, 186:20, 186:25

**yourselves** [4] - 61:7, 121:10, 175:18, 230:23